**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

In re:

| | |
|---|---|
| Leestma Management, LLC | Case No. 8:26-bk-02696-CED [Lead Case] |
| Adelaide Pointe QOZB, LLC | Case No. 8:26-bk-02698-CED |
| Adelaide Pointe Boaters Services, LLC | Case No. 8:26-bk-02699-CED |
| Adelaide Pointe Building 1, LLC | Case No. 8:26-bk-02700-CED |
| Waterland Battle Creek, LLC | Case No. 8:26-bk-02701-CED |
| | Chapter 11 |
| Debtors | |
| _____/ | (Jointly Administered Cases) |

## DEBTORS' MOTION FOR TURNOVER PURSUANT TO SECTION 543

The Debtors, Leestma Management, LLC a Florida Limited Liability Company ("LMF"), Adelaide Pointe QOZB, LLC ("AP QOZB"), Adelaide Pointe Boaters Services, LLC ("AP Boaters"), Adelaide Pointe Building 1, LLC ("AP Building"), and Waterland Battle Creek, LLC ("Waterland") (collectively, the "Debtors"),  by counsel and pursuant to Sections 105, 362, 541, and 543 of the Bankruptcy Code, file this Motion seeking entry of an order (1) terminating the current property receivership of John Polderman (the "Receiver"); (2) directing the immediate turnover by the Receiver to the Debtors-in-Possession of all real and personal property of the Debtors; (3) directing the immediate turnover of all revenue, cash, and each cash equivalent derived from the Debtors' real property that may be cash collateral as defined by Section 363(a) of the Bankruptcy Code ("Cash Collateral") including any and all management rights and operational rights of LMF with respect to any affiliated entities that LMF may exercise as a result of its membership interests and control of the Affiliates; (4) directing the immediate turnover of all rights in intangibles and personal property of the Debtors; and (5) directing the Receiver to file a complete accounting of all funds received, disbursed, and held during the receivership period,

and also directing that any such item as may be authorized by the court and that Cash Collateral be returned to the Debtor.

**FACTUAL BACKGROUND**

**I. History of the Debtors of the Adelaide Pointe Project**

1. LMF is a Florida limited liability company that has operated for approximately fourteen years, engaged in the acquisition, rehabilitation, and management of investments, operations, and commercial real estate assets. Ryan M. Leestma serves as the only Member and Manager of the Debtor. Mr. Leestma has over thirty years of experience in technology, renewable energy, commercial real estate development, marina operations, condominium construction, hospitality management, and multi-entity enterprise operations. Mr. Leestma also holds and manages all operational rights, and affiliated Debtors, with respect to any of his affiliated entities' interests in any venture or exercise by virtue of his control over the management of such operations.

2. In 2021, the Debtor purchased approximately 30 acres of brownfield waterfront property in Muskegon, Michigan and initiated the Adelaide Pointe project (the "Project"). The Project involved the rehabilitation of approximately 225,000 square feet of dilapidated warehouses converted into a premium boat storage business, the development of a 169-slip wet marina, a 285-slip dry marina, 55 luxury condominium units, a boater services building, and a four-story commercial building complete with a restaurant and event center. The Project held its grand opening in May 2024 and has become a regional destination, creating over 200 permanent and seasonal jobs and generating a tax base of approximately $3,000,000 annually. The Project's business is nearing seasonal stability and is expected to reach full

stabilization by 2027. The Debtor estimates total assets upon stabilization of approximately $91,400,000 against total secured liabilities of approximately $61,425,691, representing substantial equity of approximately $29,974,309 on a commercial basis alone. When LMF's and Leestma's personal assets are added and included (pledged as additional collateral), the combined equity position of the estate exceeds $43,000,000. The primary lender who holds mortgages on most of the Debtors' and some of Leestma's individual real property is Independent Bank (NASDAQ: IBCR) (the "Independent").

4. The wet marina, dry marina, warehouses, and boater services building are projected to generate revenues growing by 50% annually since inception. Total enterprise EBITDA in 2025 was approximately $4,500,000, projected to reach $5,500,000 in 2026 and $6,500,000 in 2027. Pre-receiver cash flows from the Adelaide Pointe Project campus alone are estimated at $2,500,000 annually. The most profitable summary statistics for the Project show an approximate solvency of approximately $31,000,000, projected to May 1, 2027.

5. LMF also holds commercial real estate investments including an office building at 401 Hall Street SW, Grand Rapids, Michigan, ("Hall Street Property") generating approximately $100,000 per month in EBITDA at approximately 90% occupancy — and additional investments generating approximately $1,000,000 in EBTIDA cash flows annually. Total debt service across all business units is approximately $4,500,000 annually. All creditor payments were being made successfully prior to the events described herein, with the appointment of the Receiver purportedly based on a non-monetary default.

6. While the Debtor contends there is significant and growing equity in the real property, and that as part of the AP Project, free cash flow has grown year over year, Independent Bank took a series of adverse actions against the Debtor and property which constituted the condominium component of the Project and which culminated in the appointment of a receiver as detailed below.

**II. State Court Proceedings**

7. On September 23, 2025, Independent Bank filed its Verified Complaint and Ex Parte Motion for Appointment of Receiver in Muskegon County Circuit Court, Michigan, against the Debtor and related entities, alleging defaults on loans totaling approximately $28,000,000 in principal. The complaint was filed in response to a 3 day old failure to pay property taxes which was subsequently cured.

8. Independent's complaint was filed on the basis of the temporary default in the forbearance agreement. All creditor obligations were current at the time of filing. Upon suspicion and belief Independent Bank had been preparing the receivership motion for months in advance — a fact confirmed by the pre-prepared nature of the motion filed the morning after. Mr. Leestma declined to sign a consent receivership order at an in-person meeting on September 29, 2025. The Debtor submits that the "agreed" nature of the receivership was as to the identity of the Receiver, which may have been suggested by the presiding Michigan state judge.

9. Simultaneously with the filing of the receivership motion, Independent Bank swept the remaining $600,000 of cash from LCMF's operating deposit accounts without notice, and closed a $500,000 line of credit — a facility that had been provided by Independent Bank

after it was provided with significant additional collateral, including a written LOC, as consideration for the Debtor's cooperation in closing two USDA-guaranteed loans — which line of credit funds had never been advanced. These actions were taken the same morning the receivership motion was filed, or information and belief, demonstrating their coordinated and premeditated nature. Independent Bank's Chief Credit Officer Ed Ryan had confirmed this point.

10. Independent Bank's filing caused immediate and documented damages, including approximately $120,000 that was lost Adelaide Events wedding and catering revenues in one week, $30,000 in storage refund requests, and $150,000 in projected storage revenues lost for the 2025 fiscal year. These damages are the subject of the adversary proceeding filed in connection with this bankruptcy case.

11. On October 1, 2025, the Debtor filed its Objection to Motion for Appointment of Receiver.

12. On October 16, 2025, the court entered its Order denying the motion for appointment of a receiver without prejudice.

13. In November 2025, the Debtor notified Independent Bank that the Adelaide Pointe Condominium Homeowners Association ("Condo HOA") was unable to raise capital for its insurance premium and requested a modest loan to bridge the shortfall. Independent Bank refused to allow use of available cash or the credit line previously committed by Ed Ryan to address the Condo HOA shortfall. The day after the insurance policy lapsed — a lapse Independent Bank could have prevented at minimal cost and chose not to — Independent Bank filed a second ex parte receivership motion. Independent Bank then force-placed a $30,000,000 insurance policy on the property that was approximately 50%

larger than the replacement cost value, over Leestma's express objection, at significant unnecessary cost to the Condo HOA. Of the approximately 55 finished and sold and other condominiums occupied or rented, the remaining condos are developed and the Condo HOA remains developer controlled.

14. On December 2, 2025, Independent Bank filed its Renewed Emergency Motion for Appointment of Receiver.

15. In December 2025, Independent Bank simultaneously exercised assignments of rents against the Hall Property (derived herein), Commerce Street, boaters services building and warehouse properties — eliminating all of LMF's and Leestma's corporate and personal income at once. Independent Bank has refused to compensate Mr. Leestma for his ongoing management work during the receivership period and refused to fund the health insurance benefits of Mr. Leestma and the enterprise's LMF employees who receive those benefits through payroll, placing Mr. Leestma's family and LMF's employees in financial jeopardy.

16. Most critically, among the conditions Independent Bank demanded in settlement negotiations during this period was the relinquishment of Leestma's and LMCU's right to seek bankruptcy protection through what the Court would be familiar with as a prospective automatic stay violation.

17. On January 30, 2026, the State Court entered its Receivership Order. The named Defendants in the State proceeding are: Adelaide Pointe Building I, LLC; Adelaide Pointe QOZB, LLC; Adelaide Pointe Boaters Services, LLC; Leestma Management, LLC; and Waterland Battle Creek Properties, LLC, collectively, the ("Receivership Defendants"). The properties of the Receivership Defendants, now subject to the Receivers Control, are

all real and personal property of the Receivership Defendants subject to mortgages and security agreements with both Independent Bank and  Lake Michigan Credit Union ("LMCU").  LMCU  holds the first position mortgage and assignment of rents on the Hall Street Property. Receiver John Polderman of Stevenson & Bullock PLC, who was appointed control over the Receivership Assets, is an attorney with no real estate management, marina, or hospitality experience.

18. The Receivership Order does not contain provisions for the protection of creditors, nor does it include the operational guardrails necessary to ensure smooth operation, court oversight, and preservation of estate value. Moreover and critically, the Receivership Order does not, and cannot, provide the protections applicable to the Debtors under the Bankruptcy Code. These structural deficiencies have led to what the Debtors believe was immediate diminution in Project value, decreased cash flows, and direct harm to other creditors, equity holders, employees, and project stakeholders. The Receiver's management and operational issues have affected half of the project.  Leestma controls the other half, creating a structure that is non-viable for the unified operation of the Project due to the divergence of ownership and debt obligation interests.  The non-Receivership entities, who are not defendants in the Receivership Action, do not lend the Receiver the ability to control the entire project and could not do so under Michigan law.

## III. Post-Receiver Order: Waste and Diminution of Estate

19. Independent Bank has exercised assignments of rents across all properties subject to mortgages or liens, including interests of other creditors, and the Receiver has exercised control over approximately half the Project components but not all.  The Receiver's actions

have significantly hampered the Debtor's ability to move capital between debtor business units to non-debtor business units so as to meet creditor obligations and fund operations during the critical pre-season period.

20. Independent Bank sought and has continued to seek expansion of the receivership against additional non-parties and business units to facilitate a forced liquidation of the Adelaide Pointe Project ("Expansion Motive") as to Receiver's stated intention to stabilize and liquidate the Project without regard to the substantial equity the Debtor holds or the impact on over 200 employees, customers, on public interest, vendors, and other creditors.

21. The Receiver ignores the fact that the Receiver has made numerous accounting and management errors and has refused to utilize the Debtor's experienced management team. The Receiver's proposed inclusion of outside consultants, a new team of outside experts and a new CPA, whose costs have approached or exceeded tens of thousands of dollars per month, create a conflict between the Receiver and Independent Bank, and the Debtors' equity and clearly proven operational abilities, experts and knowledge.

22. This conflict can be illustrated and documented by specific documented acts of the Receiver's waste, mismanagement, and equity destruction. The mismanagement of the Receiver, is supported in detail by sworn declarations of Aubrey Glick, Chief Operating Officer of Adelaide Pointe Development, LLC and Leestma Management, LLC, and Tabitha Krawczyk, the enterprise's bookkeeper, both filed contemporaneously with this filing, as well as audio recordings and Zoom transcripts of meetings between the Receiver, his CPA, and enterprise personnel. The Debtors submit that these declarations and all supporting exhibits are noted elsewhere.  Critical components of the Project are

documented, managed, owned and controlled by entities that are not defendants in the receivership and subject to lien, mortgage, and applicable law.

## A. Physical Absence and Operational Disunity

23. In the approximately eight weeks since his appointment on February 1, 2026, the Receiver has visited the 30-acre Adelaide Pointe campus — a complex, integrated enterprise requiring active on-site management — exactly twice. This total physical absence from the portions of the Project or LMF he nominally controls and does not understand is not a management style choice, it is reckless.

24. The consequences of this absence are documented in transcribed recordings of meetings between the Receiver and LMF personnel. After more than six weeks of purported management, the Receiver did not know that winter boat storage — the enterprise's single largest revenue category, generating approximately $820,000 annually and growing by $200,000 per year — existed as a distinct revenue line. He had not asked or noted where all the relevant storage buildings were physically located. He required LMF's and Project's staff to explain the basic business model to him at a meeting on March 17, 2026.

25. At a recorded meeting on March 30, 2026, Mr. Leestma advised the Receiver and his CPA that the Receiver's submitted court budget was materially wrong. After reviewing a corrected structure, the Receiver agreed on the record to file a corrected budget with the court. He never did so. The prior erroneous budget remains on record before the Michigan court as of the date of concurrent bankruptcy petitions. It will be telling of the Receiver or Independent Bank will still rely on the erroneous reports in opposition to this motion.

**B. Flawed Budget Submitted to the Michigan Court**

26. The Receiver's chosen CPA, Warren Palmer, who billed the estate at $325 per hour, was provided the enterprise's complete financial records and rent records on at least ten separate occasions. He ultimately produced a budget that omitted over $1,000,000 in revenue — including LMF's primary income source (which was boat storage, 2.7 million). That budget was submitted to the Michigan court with a notation that the estate was unable to pay its debts. This was a recklessly incorrect characterization.

27. At the March 30, 2026 recorded meeting, the Receiver and his CPA were advised that the CPA's budget was materially incorrect. The Receiver the requested that the CPA provide a correction to the CPA, requesting "Warren, can you update it based on the budget that Ryan just sent over… and then I will file an updated budget with the court." No updated budget was provided or sent by the Receiver or his CPA, instead the flawed prior budget remains on record in the Michigan court as of the date of concurrent bankruptcy petitions.

28. The submission of a budget with inaccurate financial reports to a court — one that mischaracterized a growing, cash-flowing enterprise as unable to pay its debts — is not an error in business judgment. It is bad faith that materially harms the Debtor in state court proceedings and before this Court and its stakeholders.

**C. Payroll Draws and Federal Tax Non-Remittance**

29. On March 6, 2026, payroll for LMF and Project employees was not remitted properly. Employees were not paid. Federal payroll tax withholdings were not remitted to the Internal Revenue Service. The QuickBooks payroll system previously utilized was frozen,

preventing future payroll processing. The Receiver subsequently attempted to replace the LMF integrated QuickBooks payroll infrastructure with a third-party payroll provider without coordinating or obtaining approval from LMF personnel — a unilateral substitution that compounded the payroll failures and further disrupted LMF's financial systems.

30. Federal payroll tax withholdings are trust funds belonging to the United States government, not the employer. Under 26 U.S.C. § 6672, responsible parties for an enterprise's failure to remit these withholdings are personally liable for a trust fund recovery penalty equal to 100% of the unpaid amount. The Receiver assumed control of the enterprise's payroll function on February 1, 2026. The failure to remit federal payroll tax withholdings occurred during the period of his exclusive control. The Receiver is a "responsible person" within the meaning of § 6672 and is personally exposed to a trust fund recovery penalty equal to 100% of the unremitted withholdings. Mr. Leestma is expressly not liable for these amounts, which accrued entirely during the receivership period under the Receiver's sole authority over payroll.

31. A second payroll failure occurred on March 20, 2026. The Receiver wired $3,752 to Intuit against a total obligation of $5,060, leaving a $1,310 shortfall requiring a third remedial wire. Both the payroll failures and the corrective wire amounts were confirmed through recordings of meetings of March 24 and March 26, 2026.

32. The enterprise's bookkeeper, Tabitha Krawczyk, has or will declare in a declaration filed with this case that during her 1.5 years of service prior to the Receiver, and prior to the LCM Enterprise, payroll was processed accurately and on time without a single instance

of bounced payroll, failed tax remittance, or locked payroll accounts. The contrast with the receiver accomplishing two payroll failures in six weeks is startling.

## D. Unauthorized Conversion of Non-Receivership Funds

33. On or about March 5 and 6, 2026, the Receiver directed Aubrey Glick, the enterprise's Chief Operating Officer, to transfer funds from the Clay Street Huntington Bank account, an account associated with a property entity not included in the receivership order — to fund payroll obligations that should have been funded. This occurred because the accounts had insufficient funds to meet basic payroll obligations at the time. This pattern of financial incompetence continues with numerous other checks bouncing and not clearing, most notably on April 14 when a critical service vendor received a bounced check.

34. When confronted about these issues on a contemporaneously recorded call on March 26, 2026, the Receiver stated: "I don't know, I don't have access over your account. I'm not going to sit here and argue with you, Ryan." The enterprise's bookkeeper, Tabitha Krawczyk, confirmed on the same call that she received the Receiver's direction to make the transfer. Polderman's denial is directly contradicted by his own employee's contemporaneous confirmation and by the transfer records themselves. His response is directly contradicted by the contemporaneous directions he gave to transfer funds.

## E. Control Exercised Over Non-Receivership Assets and Entities

35. On or about March 28, 2026, the Receiver contacted ChoiceOne Bank and directed the bank to freeze LMF and LMF's enterprise checking account — a Florida account in the name of a non-receivership entity not subject to the Michigan receivership order. This

unauthorized action cut off access to operating revenues that were not receivership property and were not subject to any court order permitting the Receiver's interference, without explicitly controlling that entity.

36. On or about March 28, 2026, the Receiver also contacted Mr. Leestma's Condominium insurance carrier and requested to be added as an insured on his policy — a separate policy not within the receivership. This action was taken without authorization.

37. The Receiver engaged in direct communications with the City of Muskegon regarding the operation of the Dry Marina — an asset outside the receivership — without prior notice to or consultation with Mr. Leestma. He then sent alarming emails to multiple attorneys and secured creditors with respect to a perceived emergency. Mr. Leestma resolved the underlying matter in a single email because he had personally negotiated the underlying agreement (Cooperative Use Agreement). No emergency existed. The Receiver unnecessarily created the appearance of an emergency and destabilized other creditor relationships.

## F. Insurance Compliance Failures

38. As of the March 26, 2026 recorded meeting, the Receiver had not obtained access to the enterprise's campus-wide insurance compliance portal as of the day before a compliance deadline that could have resulted in cancellation of the entire policy. He confirmed on the recording: "I don't have, unfortunately, I don't have access to it." He had been appointed receiver for approximately 53 days at that point.

39. The LMF Onsite Operating Officer explained to the Receiver on that same call that force-placed insurance — the consequence of policy cancellation — would cost approximately $250,000 at a time when only two carriers in Michigan underwrite marina operations. The Receiver acknowledged this risk without having the ability to address it. The compliance crisis was resolved only because LMF's staff had been maintaining communications with the insurance broker in parallel with the receivership's nominal oversight.

## G. Regulatory Compliance Failures

40. The receivership caused a letter of credit under the Eastern Great Lake Environmental Administrative Consent Agreement ("EGLE") and the Administrative Consent Agreement ACO-05963 to lapse — a consequence confirmed in EGLE's own March 27, 2026 court filing. As a direct result, the certified construction stormwater operator stopped conducting required site inspections due to non-payment ($500 per day in stipulated assisting compliance with penalties) began accruing against Leestma individually, beginning February 3, 2026. Leestma, individually, as a direct and proximate consequence of the Receiver's failure to maintain regulatory compliance obligations.

## H. Critical Vendor Non-Payment and Work Stoppages

41. Certain critical vendor obligations went unpaid during the receivership, each causing direct operational harm: the Ally truck lease (addressed for the first time at a March 24, 2026 meeting after the account reached delinquency and repossession risk); the golf cart lease; the ice machine lease; the J&H Oil fuel vendor (whose non-payment caused the marina's fuel credit card processing system to be disabled prior to entering the 2026 boating season);

the enterprise's IT vendor (whose non-payment caused the website to go offline and physical access control systems to be disabled); DocuSign (whose suspension prevented execution of condominium purchase agreements); the QuickBooks accounting and payroll software subscriptions (suspended due to non-payment of the American Express credit card on file, causing the enterprise's entire financial management system to become temporarily inaccessible); and phone and internet subscriptions.

42. The LCM and the enterprise's bookkeeper also went unpaid for services rendered during the receivership period, and at project risk on site, threatening the loss of the only individual with comprehensive institutional knowledge of the enterprise's QuickBooks system architecture, payroll structure, vendor payment history, and financial records — knowledge that is irreplaceable and that cannot be transferred to an outside party without months of orientation and significant risk of financial reporting errors.

## I. Proposed Sale of a Condominium at $300,000 Below Market Value

43. The Receiver presented an offer to purchase a condominium unit at the Adelaide Point development at a price approximately $300,000 below what the Debtors contended was the unit's market value and was advised and prepared to accept it. Ryan Leestma personally intervened to prevent the transaction. A below-market sale in the condominium context establishes a comparable for appraisal purposes, and is anticipated to also constitute a low articulation. A $300,000 reduction in comparable value, applied across the 34 remaining unsold condominium units whose completion will generate $27,000,000 to $32,000,000 in gross proceeds, and substantially at estimated cost impair estate equity by more than $10,000,000 from a single transaction, and payment to secured creditors.

**J. The Receiver's Perceived Fiduciary Orientation**

44. The Receiver has stated to Leestma on confirmed recorded calls that his fiduciary duty runs only to the court and to Independent Bank — not to equity holders or to other secured creditors. This statement is categorically wrong as to the normal duties of a Receiver as an estate fiduciary as a matter of law and is itself an independent ground for the Receiver's removal. Under Michigan law, a court-appointed receiver is a fiduciary who owes duties to all parties in interest, including all creditors, equity holders, and the debtor. See *Gamet v. Jenks*, 38 Mich. App. 719 (1972); *In re Receivership of 11910 South Francis Road*, 492 Mich. 208 (2012). A receiver who has publicly stated, on recorded calls, that he owes no duty to equity holders or other creditors while simultaneously meeting privately with the appointing creditor twice per week, reporting the debtor's cooperation level to that creditor, and facilitating undisclosed asset sale discussions on that creditor's behalf, is not a neutral officer of the court. He is an instrument of Independent Bank. The Receiver has been meeting with Independent Bank twice per week presumably to plan the liquidation of the Project at a fire sale price.  He has engaged in undisclosed discussions with potential buyers — including Skyline/Summit and Boline Capital — for the wholesale acquisition of the Project — regarding the purchase of campus assets, including assets outside the receivership, without making such conversations available to or aware of the creditors or anyone else.

45. The Receiver has indicated in emails, audio recordings, transcripts, and various other motions that his goal is to liquidate the Project. A receiver whose stated goal is liquidation of a growing, equity-rich enterprise is not discharging the preservation mandate in the spirit that defines the office. As the Michigan Supreme Court held, "[a] receivership is primarily

to preserve the property and not to dissipate or dispose of it." *Westgate v. Westgate*, 292 N.W. 569 (Mich. 1940).

46. The Receiver also confirmed during a recorded March 30, 2026 meeting that he informed Independent Bank that Mr. Leestma had been fully cooperative and that there were no signs of mismanagement, fraud, conversion, or co-mingling of funds anywhere in the Project or enterprise. The Debtor's assume that the Receiver will disavow this statement in an attempt to harass and damage Mr. Leestma, hopefully not under oath.

## RELIEF REQUESTED

47. 11 U.S.C. § 543 provides for turnover specifically from custodians, such as the state court Receiver in the instant case, and provides in pertinent part:

A custodian shall — (1) deliver to the trustee any property of the debtor held by or transferred to such custodian, or proceeds, product, offspring, rents, or profits of such property, that is in such custodian's possession, custody, or control on the date that such custodian acquires knowledge of the commencement of the case; and (2) file an accounting of any property of the debtor, or proceeds, product, offspring, rents, or profits of such property, that, at any time, came into the possession, custody, or control of such custodian. 11 U.S.C. § 543.

The record compiled in the preceding sections establishes that the Receiver has not been preserving the estate — he has been essentially destroying it by pursuing his liquidation strategy. He visited a 30-acre operational campus exactly twice in eight weeks. He submitted a materially false budget to the Michigan court. He bounced payroll twice, failed to remit federal payroll tax withholdings in violation of 26 U.S.C. § 7501, and locked the enterprise's payroll system. He directed the

unauthorized transfer of funds from accounts outside the receivership order. He froze a Florida LLC account wholly outside the receivership. He allowed EGLE regulatory compliance to lapse, causing $500-per-day penalty accrual against Mr. Leestma personally beginning February 3, 2026. He nearly sold a condominium at $300,000 below market value. He stated on recorded calls that his fiduciary duty runs only to Independent Bank — not to other creditors, equity holders, or the estate. This is not a receiver who has been preserving property "as is necessary." This is a receiver whose management has caused documented, compounding harm to every stakeholder except the one creditor directing his actions. The § 543(d) exception provides no shelter from these facts.

48. The Receiver is a custodian for purposes of 11 U.S.C. §§ 101(11) and 543 and is therefore subject to immediate turnover of all assets of the estate under Section 541 unless otherwise excused pursuant to Section 543(d). The Receivership Properties are plainly property of the estate pursuant to 11 U.S.C. § 541, and the duty of the custodian for turnover is absolute unless excused by this Court. See *In re Prop. Mgmt. & Invest., Inc.*, 17 B.R. 728, 731 (Bankr. M.D. Fla. 1982).

**I. Turnover should not be excused**

49. After notice and hearing, the court may excuse turnover pursuant to § 543(d) if the interests of creditors and equity would be better served by the custodian, in this case the Receiver. In this case, those interests would not be best served. As set forth in the foregoing and in the Declarations filed in support, the Receiver has mismanaged the Project, misappropriate funds, bounced payroll checks and otherwise failed in his tasks and fiduciary duties. The Debtors respectfully submit that absent Chapter 11 reorganization under unified management and possession, the Debtors will suffer substantial losses in Independent

Bank's rush to liquidate the property, or the overall oversight of a court-appointed chief restructuring officer. This is without regard to the enterprise's equity, its growth trajectory, or the interests of the 200-plus employees, customers, vendors, and creditors who depend on its continued successful operation.

50. The Section 543(d) exception does not apply here. The Debtor's assets are appreciating, operations are growing at over 50% annually, and the Receiver's management decisions are actively destroying value. Reorganization under Chapter 11 with the Debtor's and with the assistance of a CRO experienced management in place will maximize recovery for all creditors.

51. A Court considering whether to exercise its discretion under Section 543(d)(1) may consider several factors indicative of whether the interests of creditors would be better served. These factors include: (1) whether there will be sufficient income to fund a successful reorganization; (2) whether the debtor will use the turnover property for the benefit of the creditors; (3) whether there has been mismanagement by the debtor; (4) whether there are avoidance issues raised with respect to property retained by a receiver; and (5) the fact that the bankruptcy automatic stay has deactivated the state court receivership action. See *Dill v. Dime Sav. Bank, FSB* (*In re Dill*), 163 B.R. 221, 225 (E.D.N.Y. 1994).

52. Each of the above factors weighs decisively in favor of turnover.

53. First, there will be sufficient income to fund a successful reorganization. The Debtors' cash flow issues prior to the petition were transient and to some extent created by Independent Bank's coordinated bad faith conduct — the account sweep, the dispute over the LOC, the

loan foreclosure agreement — and reflected a short-term need for working capital, not structural insolvency. The forbearance agreement grievance that triggered the receivership was a failure to pay property taxes by three days. Pre-receiver revenues across the enterprise exceeded $5,000,000 annually. The enterprise is entering its high season in May and cash flows will substantially exceed and provide adequate debt service. To the extent there exists any short-term liquidity issues, the Debtors are seeking DIP financing — an initial $300,000 facility to fund experts (including a CRO) and an additional DIP facility to complete the condominium.

54. Second, the Debtor will use the turnover property for the benefit of the creditors. Revenues and income available for debt service have decreased since the appointment of the Receiver. The Debtor intends to immediately resume payments to vendors, contractors, and other creditors that the Receiver has halted. The Debtor will also immediately direct turnover property toward maximum revenue generation — including the opening of the fuel system for the boating season, the restoration of the IT infrastructure, the re-payment of the insurance compliance vendors, and the engagement of seasonal staff — in which the Receiver has failed to accomplish.

55. Third, there has been no nearly mismanagement by the Debtor. The state court did not find any misconduct by the Debtor in its receivership order. No misconduct was alleged in Independent Bank's complaint. The Receiver himself confirmed on recorded calls that he informed Independent Bank there was no mismanagement, no fraud, no conversion, and no co-mingling of funds — and that Mr. Leestma had been fully cooperative. The result of the ongoing inconsistency indicates that the Receiver and Independent Bank are — including the logistical avoidance issues exist with respect to property retained by the

Receiver. The $600,000 account sweep may be subject to avoidance as a preferential fraudulent transfer under 11 U.S.C. §§ 544 and 548 and avoidance as a preferential transfer under Section 547.

56. Finally, the automatic stay has deactivated the state court receivership. The filing of these petitions on April 1, 2026 has imposed the automatic stay of 11 U.S.C. § 362(a) on all actions against the Debtors and all property of the estates. The suggestion of Bankruptcy stabilization and value maximization of recovery as a return for Debtors and all stakeholders created the inherent and insurmountable conflict between disjointed management and goals that ultimately lead to the need for the current and potentially additional value filings for the Debtors and any AFDE. The Receivership Order should not be enforced while the automatic stay is in effect and continued attempts to continue activities against estate property and nondebtor affiliates devalues the project and makes those actions subject to sanctions and damages.

## CONCLUSION

57. The Debtors' management team has years of experience in construction, development, operations, and management of every aspect of the Adelaide Pointe Project and the LMF commercial portfolio — including direct relationships with every tenant, vendor, lender, customer, and regulatory authority involved in these operations under Section 543(c) unless excused, and the court mandated under Section 543 as well. Mr. Leestma built this enterprise from virtually nothing and as such he is the only individual who can manage it properly.

58. The Receiver — by contrast — has visited the campus twice in eight weeks, does not know its primary revenue source, has bounced payroll twice, failed to remit federal taxes, submitted a false budget to the Michigan court, nearly sold a condominium at $300,000 below market value, taken funds from accounts outside the receivership order, frozen non-receivership accounts, allowed regulatory compliance to lapse, and confirmed on recorded calls that his duty runs only to Independent Bank. This record is not a close call. It is a documented case for immediate termination, all as above, which will be supported by Declaration and all issued over available supporting proof.

59. Absent turnover of the Receivership Properties, there will be continuing and escalating harm to the bankruptcy estate. The spring marina season — the most critical revenue generation period of the year — is weeks away. Every day of continued receivership management is a day of lost preparation that cannot be recovered. The Debtor respectfully requests that this Court act with appropriate urgency to restore management authority to the management that has demonstrated, over five years, the ability to build and operate this enterprise.

**WHEREFORE**, the Debtors respectfully request that this Court enter an Order (a) Terminating the state court receivership of John Polderman of Stevenson & Bullock PLC as Receiver, and compelling turnovers of all Receivership Properties and all other Debtor assets, to assets and also fulfilling all duties; (b) Directing the Receiver to immediately file a complete accounting and fee application with this Court covering all funds received, disbursed, and held during the receivership period, including a full reconciliation of all receivership and non-receivership account transfers directed by the Receiver, and to also negotiate in possession a settlement of such claims; (c) Directing the Receiver to immediately turn over to the Debtors-in-

Possession all funds and property of the estate in his possession, custody, or control, including all financial records, operational systems, vendor contracts, accounts, and management authority; (d) Authorizing the Debtors to immediately retake possession and control of all Debtor properties and business operations, and AFDE assets; (e) Directing the Receiver to immediately pay all outstanding obligations incurred during the receivership period from receivership funds, including payroll, payroll tax obligations, vendor invoices, and bookkeeper compensation; (f) Preserving all causes of action arising from the receivership period including claims for operational damage, vendor relationship damage, payroll tax penalties, unauthorized fund transfers, and all other claims described herein; to the extent adjustable under 11 U.S.C. §§ 543(b)(1) and 543(c)(1) and (c)(2), including direct claims from the Receiver; and (g) granting such other and further relief as this Court deems just and proper.

DATED this 14th day of April, 2026.

/s/ *David Jennis*
David Jennis
Florida Bar No. 775940
**Jennis Morse**
606 East Madison Street
Tampa, FL 33602
Email: djennis@jennislaw.com
Telephone: (813) 229-2800
Proposed Counsel for Debtors

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished, via CM/ECF electronic service to the United States Trustee; and to those parties receiving via CM/ECF in the ordinary course of business and via U.S. Mail to Small Business Administration, 2 North Street, Suite 320, Birmingham, AL 35203; Office of General Counsel, 409 3rd Street SW, Washington DC 20416, and c/o United States Attorney, Attn: Civil Process Clerk, 400 N. Tampa Street, Suite 3200, Tampa, FL 33602 Lake Michigan Credit Union, Attn; Julie Leonard, President, 5540 Glenwood Hills Parkway SE, Grand Rapids, MI 49512 and to those parties identified on the attached L.B.R. 1007-2 Parties in Interest List on this 14th day of April, 2026.

/s/ *David S. Jennis*
David S. Jennis

Label Matrix for local noticing
113A-8
Case 8:26-bk-02696-CED
Middle District of Florida
Tampa
Tue Apr 14 14:19:38 EDT 2026

Independent Bank
c/o Attn: Jeffrey W. Warren, Esq.
Bush Ross, P.A.
Post Office Box 3913
Tampa, FL 33601-3913

Independent Bank
c/o Jeffrey W. Warren, Esq.
Bush Ross, P.A.
P.O. Box 3913
Tampa, FL 33601-3913

Independent Bank
c/o Attn: Kathleen L. DiSanto, Esq.
Bush Ross, P.A.
Post Office Box 3913
Tampa, FL 33601-3913

End of Label Matrix
Mailable recipients    3
Bypassed recipients    0
Total                  3

Label Matrix for local noticing
113A-8
Case 8:26-bk-02698-CED
Middle District of Florida
Tampa
Tue Apr 14 14:13:57 EDT 2026

2025 Winter Property Taxes
173 E. Apple Avenue
Muskegon, MI 49442-3676

Accurate Income Tax
3105 Henry Street
Muskegon, MI 49441-4017

American Express
PO Box 981535
El Paso, TX 79998-1535

Brickley DeLong
316 Morris Avenue
Suite 500
Muskegon, MI 49440-1150

Citizen Financial Services
One Citizens Plaza
Providence, RI 02903-1344

EXXEL Engineering
5252 Clyde Park Ave SW
Grand Rapids, MI 49509-9788

Forklift Exchange
116 W. Hubbard Street
Chicago, IL 60654-8542

Freed & Viereck
1061 N. Robinhood Drive
Muskegon, MI 49445-2083

Independent Bank
c/o Kathleen L. DiSanto, Esq.
Bush Ross, P.A.
P.O. Box 3913
Tampa, FL 33601-3913

Independent Bank
c/o Jeffrey W. Warren, Esq.
Bush Ross, P.A.
P.O. Box 3913
Tampa, FL 33601-3913

Moore & Bruggink
2020 Monroe Ave NW
Grand Rapids, MI 49505-6298

Oscar Larson
Adelaid Pointe QOZB
10100 Dixie Hwy
Clarkston, MI 48348-2414

Pubic Finance Authority
22 E. Mifflin Street
Suit 900
Madison, WI 53703-4247

Red Line Excavating
4277 1/2 Blue Star Highway
Holland, MI 49423

Ryan Leestma
1900 Gulf Drive North
Unit 7
Bradenton Beach, FL 34217-2384

Smith Haughey
900 3rd St.
Suite 204
Muskegon, MI 49440-1152

Soils & Structures
6480 Grand Haven Road
Muskegon, MI 49441-6060

Source One Digital
1137 N. Gateway Blvd.
Muskegon, MI 49441-6099

State of Michigan
PO Box 30458
Lansing, MI 48909-7958

Taft Stettinius & Hollister LLP
27777 Franklin Road
Suite 2500
Southfield, MI 48034-8222

Versatile Fabrication
2708 9th Street
Muskegon, MI 49444-1945

Westmaas
3025 Sangra Ave. SW
Grandville, MI 49418-1153

End of Label Matrix
Mailable recipients    22
Bypassed recipients     0
Total                  22

Label Matrix for local noticing
113A-8
Case 8:26-bk-02699-CED
Middle District of Florida
Tampa
Tue Apr 14 14:14:47 EDT 2026

(p)AF GROUP
ATTN GEOFFREY PAVLIC
200 N GRAND AVE
LANSING MI 48933-1228

Accurate Income Tax
3105 Henry Street
Muskegon, MI 49441-4017

American Express
PO Box 981535
El Paso, TX 79998-1535

Brickley DeLong
316 Morris Avenue
Suite 500
Muskegon, MI 49440-1150

Dockwa
1 Commercial Wharf
Newport, RI 02840-3043

EXXEL Engineering
5252 Clyde Park Ave SW
Grand Rapids, MI 49509-9788

Forklift Exchange
116 W. Hubbard Street
Chicago, IL 60654-8542

Freed & Viereck
1061 N. Robinhood Drive
Muskegon, MI 49445-2083

Greenridge Realty
3115 Orchard Vista Dr.  SE
Grand Rapids, MI 49546-7088

ICW - Workers Comp Ins.
15025 Innovation Drive
San Diego, CA 92128-3455

Independent Bank
c/o Jeffrey W. Warren, Esq.
Bush Ross, P.A.
P.O. Box 3913
Tampa, FL 33601-3913

Independent Bank
c/o Kathleen L. DiSanto, Esq.
Bush Ross, P.A.
P.O. Box 3913
Tampa, FL 33601-3913

Oscar Larson
Adelaid Pointe QOZB
10100 Dixie Hwy
Clarkston, MI 48348-2414

Public Finance Authority
22 E. Mifflin Street
Suit 900
Madison, WI 53703-4247

Ryan Leestma
1900 Gulf Drive North
Unit 7
Bradenton Beach, FL 34217-2384

Sanisweep
3450 River Hill Drive NW
Grand Rapids, MI 49534-9020

Smith Haughey
900 3rd St.
Suite 204
Muskegon, MI 49440-1152

Soils & Structures
6480 Grand Haven Road
Muskegon, MI 49441-6060

State of Michigan
PO Box 30458
Lansing, MI 48909-7958

Taft Stettinius & Hollister LLP
27777 Franklin Road
Suite 2500
Southfield, MI 48034-8222

Versatile Fabrication
2708 9th Street
Muskegon, MI 49444-1945

Waterway Guide
PO Box 419
Midothian, VA 23113-0419

The preferred mailing address (p) above has been substituted for the following entity/entities as so specified
by said entity/entities in a Notice of Address filed pursuant to 11 U.S.C. 342(f) and Fed.R.Bank.P. 2002 (g)(4).

AF Group
200 N. Grand Avenue
Lansing, MI 48933

End of Label Matrix
Mailable recipients    22
Bypassed recipients     0
Total                  22

Label Matrix for local noticing
113A-8
Case 8:26-bk-02700-CED
Middle District of Florida
Tampa
Tue Apr 14 14:15:32 EDT 2026

Accurate Income Tax
3105 Henry Street
Muskegon, MI 49441-4017

American Express
PO Box 981535
El Paso, TX 79998-1535

Brickley DeLong
316 Morris Avenue
Suite 500
Muskegon, MI 49440-1150

Citizen Financial Services
One Citizens Plaza
Providence, RI 02903-1344

EXXEL Engineering
5252 Clyde Park Ave SW
Grand Rapids, MI 49509-9788

Forklift Exchange
116 W. Hubbard Street
Chicago, IL 60654-8542

Freed & Viereck
1061 N. Robinhood Drive
Muskegon, MI 49445-2083

Greenridge Realty
3115 Orchard Vista Dr. SE
Grand Rapids, MI 49546-7088

ICW - Workers Comp Ins.
15025 Innovation Drive
San Diego, CA 92128-3455

Independent Bank
c/o Kathleen L. DiSanto, Esq.
Bush Ross, P.A.
P.O. Box 3913
Tampa, FL 33601-3913

Independent Bank
c/o Jeffrey W. Warren, Esq.
Bush Ross, P.A.
P.O. Box 3913
Tampa, FL 33601-3913

Moore & Bruggink
2020 Monroe Ave NW
Grand Rapids, MI 49505-6298

Oscar Larson
Adelaid Pointe QOZB
10100 Dixie Hwy
Clarkston, MI 48348-2414

Public Finance Authority
22 E. Mifflin Street
Suit 900
Madison, WI 53703-4247

Smith Haughey
900 3rd St.
Suite 204
Muskegon, MI 49440-1152

Soils & Structures
6480 Grand Haven Road
Muskegon, MI 49441-6060

Source One Digital
1137 N. Gateway Blvd
Muskegon, MI 49441-6099

State of Michigan
PO Box 30458
Lansing, MI 48909-7958

Taft Stettinius & Hollister LLP
27777 Franklin Road
Suite 2500
Southfield, MI 48034-8222

Versatile Fabrication
2708 9th Street
Muskegon, MI 49444-1945

Waterway Guide
PO Box 419
Midothian, VA 23113-0419

Westmaas
3025 Sangra Avenue SW
Grandville, MI 49418-1153

End of Label Matrix
Mailable recipients    22
Bypassed recipients     0
Total                  22

Label Matrix for local noticing
113A-8
Case 8:26-bk-02701-CED
Middle District of Florida
Tampa
Tue Apr 14 14:16:16 EDT 2026

Battle Creek City Treasurer
10 N. Division Street
Battle Creek, MI 49014-4061

Bradley Company
220 Lyon Street NW
Suite 400
Grand Rapids, MI 49503-2217

Clean Team Inc.
224 N. 30th St
Battle Creek, MI 49037-7978

Griffin Pest Solutions, Inc.
2700 Stadium Drive
Kalamazoo, MI 49008-1613

Independent Bank
4200 East Beltline Avenue
Grand Rapids, MI 49525-9783

Independent Bank
c/o Jeffrey W. Warren, Esq.
Bush Ross, P.A.
P.O. Box 3913
Tampa, FL 33601-3913

Independent Bank
c/o Kathleen L. DiSanto, Esq.
Bush Ross, P.A.
P.O. Box 3913
Tampa, FL 33601-3913

Indusco Supply Company, Inc.
3645 E. Cork Street
Kalamazoo, MI 49001-4644

US Department of Interior
1849 C Street, N.W.
Washington, DC 20240-0001

The following recipients may be/have been bypassed for notice due to an undeliverable (u) or duplicate (d) address.

(d) Independent Bank Corporation
4200 East Beltline Avenue
Grand Rapids, MI 49525-9783

End of Label Matrix
Mailable recipients     9
Bypassed recipients     1
Total                  10