**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

In re:

| | |
|---|---|
| LEESTMA MANAGEMENT, LLC, | Case No. 8:26-bk-02696-CED [Lead] |
| ADELAIDE POINTE QOZB, LLC, | Case No. 8:26-bk-02698-CED |
| ADELAIDE POINTE BOATERS SERVICES, LLC, | Case No. 8:26-bk-02699-CED |
| ADELAIDE POINTE BUILDING 1, LLC, | Case No. 8:26-bk-02700-CED |
| WATERLAND BATTLE CREEK, LLC, | Case No. 8:26-bk-02701-CED |

Debtors.

Chapter 11

_____/   *(Jointly Administered)*

## DEBTORS' SUPPLEMENTAL OPPOSITION TO RECEIVER'S MOTION TO EXCUSE TURNOVER [Doc. 18]

Debtors, Leestma Management, LLC, Adelaide Pointe QOZB, LLC, Adelaide Pointe Boaters Services, LLC, Adelaide Pointe Building 1, LLC, and Waterland Battle Creek, LLC (collectively, "Debtors"), by and through undersigned counsel, hereby supplement their prior Opposition to State Court Appointed Receiver John Polderman's (the "Receiver") Motion to: (1) Excuse Receiver from Turnover Provisions; and (2) Suspend the Bankruptcy Case (the "Motion to Excuse") [Doc. 18], and in further opposition state as follows:

### I. INTRODUCTION AND SUMMARY

1. The Motion to Excuse asks this Court to permit a state-court custodian to remain in possession of an approximately $85 million marina, condominium, warehouse, and hospitality campus that the custodian has demonstrated he cannot operate. That request must be tested against the only standard that governs it: whether the Receiver has proved, by a preponderance of the evidence, that the interests of *all* creditors — not just Independent Bank Corp. ("IBCP" or the "Bank") — are better served by his continued possession than by turnover to the Debtors-in-Possession. 11 U.S.C. § 543(d)(1); *In re Skymark Props. II, LLC*, 597 B.R. 391, 396 (Bankr. E.D. Mich. 2019); *State Street Bank & Trust Co. v. Park (In re Si Yeon Park, Ltd.)*, 198 B.R. 956, 964

(Bankr. C.D. Cal. 1996) ("The decision requires consideration of the interests of all classes of creditors of the bankruptcy estate, not just the interests of the creditor who initiated the receivership.").

2. The Receiver cannot meet that burden. In the ten weeks since his appointment, the Receiver has:

- bounced payroll twice (March 6 and March 20, 2026);

- failed to remit federal trust-fund payroll withholding taxes;

- failed to withhold or remit City of Muskegon income tax after an unnecessary transition from Intuit/QuickBooks to ADP;

- deducted group health insurance premiums from seven employees' paychecks for approximately three months and failed to remit them, triggering a cancellation notice;

- caused or permitted a cash-flow budget to be filed with the Kent County Circuit Court that omitted over $1,000,000 per month in revenue and has not been corrected;

- caused two electric utility shut-offs and narrowly averted a third;

- ignored EGLE soil erosion compliance issues, receiving a "no progress" notice from the Certified Stormwater Operator

- left essential trade vendors — including a bookkeeper engaged at the Receiver's own direction who has worked for nearly 90 days without pay — unpaid while routing cash to the Bank;

- attempted a condominium unit sale approximately $300,000 below market that would have depressed comparable valuations across 34 remaining units by a cumulative figure in excess of $10,000,000, averted only by Mr. Leestma's personal intervention;

- admitted, through his own retained CPA, that he cannot produce an accurate budget or cash-flow model without the principal's input;

- physically visited the thirty-acre Adelaide Pointe campus only twice between February 1 and April 18, 2026;

2

- admitted on March 17, 2026 — six weeks into his engagement — that neither he nor his CPA knew the enterprise operated a winter boat-storage business producing approximately $820,000 in annual revenue; and

- on day one of the receivership, formed a new Michigan limited liability company with a separate federal EIN (the "Diversion LLC"), opened new books, deposited all operating cash flows into it, and paid all operating expenses and payroll through it — without, so far as Debtors are aware, any consultation with qualified Qualified Opportunity Zone Business ("QOZB") or Qualified Opportunity Fund ("QOF") tax counsel regarding the federal-tax consequences of that structure for Debtor Adelaide Pointe QOZB, LLC ("AP QOZB").

3. That record is not a neutral factual backdrop to a discretionary § 543(d) analysis; it is dispositive of it. The Receiver has stated, that his fiduciary duty runs "*to the court and to whatever the secured creditor is at the moment*" — not to equity, not to the general creditor body, not to other secured creditors. That is not the law. A receiver "owes a fiduciary duty to the owners of the property under his care" and, as a custodian under 11 U.S.C. § 101(11)(C), holds property "for the benefit of the debtor's creditors" — all of them. *Sovereign Bank v. Schwab*, 414 F.3d 450, 454 (3d Cir. 2005).

4, The sections below document the Receiver's operational failures, identify the specific creditors whose interests his custody has injured, and address the unresolved federal-tax questions his structural choices created. Debtors respectfully request that the Motion to Excuse be denied, that immediate turnover be ordered under 11 U.S.C. §§ 542 and 543(b)(1), that the Receiver be directed to produce the accounting required under § 543(b)(2) within ten days, and that the Court reserve jurisdiction to impose a surcharge under § 543(c)(3) for costs caused by the Receiver's and the Bank's conduct.

## II. LEGAL STANDARD

5, Section 543(b)(1) of the Bankruptcy Code imposes a mandatory turnover obligation on any "custodian" — a defined term that unambiguously includes a state-court receiver such as Mr. Polderman. 11 U.S.C. §§ 101(11)(C), 543(b)(1); *Sovereign Bank*, 414 F.3d at 454. Upon learning of the bankruptcy filing, the custodian "may not make any disbursement from … property of the debtor or property of the estate … except such action as is necessary to preserve such property,"

3

and must deliver the property to the debtor-in-possession and file an accounting. 11 U.S.C. § 543(a), (b)(2).

6. Turnover is the rule. The narrow exception in § 543(d)(1) permits a bankruptcy court to excuse compliance only "if the interests of creditors and, if the debtor is not insolvent, of equity security holders would be better served" by continued custodianship. The custodian bears the burden "by a preponderance of the evidence." *Skymark*, 597 B.R. at 396. The factors Michigan bankruptcy courts apply in that analysis, as set out in *Skymark*, are:

1. (1) the likelihood of a reorganization;

2. (2) the probability that funds required for reorganization will be available;

3. (3) whether there are instances of mismanagement by the debtor;

4. (4) whether turnover would be injurious to creditors;

5. (5) whether the debtor will use the turned-over property for the benefit of its creditors;

6. (6) whether there are avoidance issues the receiver cannot pursue; and

7. (7) the fact that the automatic stay has deactivated the state-court receivership.

7. "Regardless of what factors are used to aid the court in its decision, the paramount and sole concern is the interests of all creditors[, and if the debtor is solvent, the interests of equity security holders]." *Skymark*, 597 B.R. at 396 (cleaned up). That means the interests of *all* creditors — not just the Bank that procured the receivership. *Si Yeon Park*, 198 B.R. at 964; *see also In re CCN Realty Corp.*, 19 B.R. 526 (Bankr. S.D.N.Y. 1982) (continued custodianship is appropriate only where it is not injurious or oblivious to other creditors). And "[r]eorganization policy generally favors turnover of business assets to the debtor in a [C]hapter 11 case." *Skymark*, 597 B.R. at 396 (citation omitted).

The Receiver cannot carry his burden on the record this Court is about to review.

## III. THE RECEIVER HAS FAILED IN EVERY ASPECT OF QOZB

8. The paragraphs that follow catalogue the Receiver's documented operational failures during the ten-plus weeks he has held the Adelaide Pointe enterprise. Each subsection addresses a distinct category of failure and identifies the creditor, counterparty, or regulatory authority injured.

The facts are drawn from the Glick and Krawczyk Declarations, contemporaneous bank and vendor records, and communications and correspondences.

## A. Payroll Has Bounced Twice Under the Receiver's Supervision

9. Payroll checks issued at the Receiver's direction were dishonored for insufficient funds on March 6, 2026, and again on March 20, 2026. Payroll is not a discretionary disbursement. Two bounced payrolls, two weeks apart, inside a receivership controlling the debtor's operating bank accounts, is not a liquidity misjudgment. It is a failure of the most fundamental cash-management function any custodian performs.

## B. Federal Trust-Fund Payroll Taxes Have Not Been Remitted

10. The Internal Revenue Code requires every employer to withhold federal income and FICA taxes from employee wages. The amounts withheld "shall be held to be a special fund in trust for the United States." 26 U.S.C. § 7501(a). Willful failure to pay the withheld amounts over to the United States subjects any "responsible person" to 100% personal liability under 26 U.S.C. § 6672. *See Slodov v. United States*, 436 U.S. 238, 243 (1978). The Receiver, having taken custody of the Debtors' payroll function, has failed to remit the trust-fund component of wages paid during his tenure. That failure (i) gives the United States a priority claim against the estate under 11 U.S.C. § 507(a)(8); (ii) exposes the Receiver and his agents to personal § 6672 penalty assessment; and (iii) materially worsens the tax position of the very estate the Receiver was appointed to preserve.

## C. City of Muskegon Income Tax Has Not Been Withheld or Remitted

11. The Receiver unnecessarily transitioned payroll processing from the Debtors' existing Intuit/QuickBooks system to ADP. The transition was executed without verifying that City of Muskegon income tax would be correctly withheld. It was not. Wages have been paid for multiple pay periods with no City of Muskegon tax withheld or transmitted to the City, notwithstanding the Debtors' continuing obligation to do so. The City of Muskegon is now a creditor of the estate by virtue of the Receiver's unnecessary change in the payroll platform.

## D. Employee Health Insurance Premiums Deducted, Not Remitted

12. For approximately three months, the Receiver caused group health insurance premiums to be deducted from seven employees' paychecks but failed to remit the deducted amounts to the insurance carrier. The carrier issued a cancellation notice. The conduct implicates potential state-law conversion claims (funds withheld from wages for a specific purpose were never applied to that purpose) as well as potential ERISA fiduciary-duty exposure under 29 U.S.C. § 1104. The seven employees — whose health coverage depended on the Receiver's remittances — are among the very creditors the Receiver was obligated to protect.

**E. The State-Court Mandatory Budget Is Materially Flawed Incomplete and Remains Uncorrected**

13. The Receiver's CPA, Warren Palmer, filed a cash-flow budget with Judge Benson of the Kent County Circuit Court that omitted more than $1,000,000 per month in revenue, including the enterprise's single largest winter income line — winter boat storage of approximately $825,000. Mr. Leestma walked the Receiver through the omissions in a meeting with Ms. Glick present; the complete winter storage rent roll was sent to the Receiver multiple times. The Receiver acknowledged that the budget was inaccurate. He has not corrected it. He has not filed the monthly reports required by the Receivership Order. He has not filed the accounting required by 11 U.S.C. § 543(b)(2), nor has he moved to be excused from filing one.

**F. Systematic Vendor Non-Payment and Utility Shut-Offs**

14. While operating cash was being routed through the Diversion LLC to the Bank, essential trade vendors were not paid. Unpaid or materially delayed vendors include CheckIt Bookkeeping (engaged at the Receiver's own request, unpaid for nearly 90 days), J&H Oil (marina fuel), Ally Financial (truck lease), DocuSign, the Debtors' IT vendor, and multiple electric utility providers. Two electric utility shut-offs occurred during the Receiver's tenure; a third was narrowly averted. Each of these vendors is a present creditor of the estate whose interest the Receiver's custody has actively harmed. It is noteworthy that all secured and unsecured creditors were fully paid up until the moment IBCP filed their ex parte motion based on a bad-faith, manufactured and pre-meditated desire to liquidate.

**G. Attempted Below-Market Condominium Sale**

15. The Receiver advised that he was prepared to accept an offer approximately $300,000 below market on a single condominium unit. Had the sale closed, the resulting comparable value would have set the new floor for appraisals of the 34 remaining units — a cumulative valuation impairment of more than $10,000,000 against estate equity. The sale did not close only because Mr. Leestma personally intervened. A custodian whose estate-preservation instinct requires owner intervention to avoid an eight-figure self-inflicted valuation loss is not a custodian whose continued possession is serving any creditor other than the one that procured the appointment.

## H. Insurance Compliance Failure

16. Fifty-three days after appointment, the Receiver admitted he did not have access to the enterprise's insurance compliance portal — one day before a compliance deadline that, if missed, would have triggered approximately $250,000 in force-placed insurance premiums. The deadline was met only because enterprise staff had maintained a parallel relationship with the broker. The Receiver's own team was uninvolved in averting the loss.

## I. Operational Naivete and Actual On-Site Lack of Oversight

17. The Receiver admitted on March 17, 2026 — six weeks into his engagement — that neither he nor his CPA knew the Adelaide Pointe enterprise operated a winter boat-storage business producing approximately $820,000 annually. He required the Harbormaster to explain the business model from first principles. Between February 1 and April 18, 2026 — a period of roughly eleven weeks — the Receiver physically visited the thirty-acre campus on exactly two occasions. He has instead run the enterprise remotely, by twice-weekly calls with the Bank.

## J. The Diversion LLC Was Unnecessary, Destabilizing, and Imposed Without Consultation with Qualified Tax Counsel

18. The single most consequential decision the Receiver made on day one was to form a new Michigan limited liability company with a new federal EIN (the "Diversion LLC"), open new books for it, deposit all operating cash flows into it, and pay all operating expenses and payroll from it. The Debtors' existing bank relationships, books, and cash-flow architecture were functional. Nothing in the Receivership Order required replacement of any of them.

7

19. The Receiver has not identified any legitimate receivership business purpose served by the transition. The Receivership Order — attached hereto as **Exhibit A** — specifically provides that the Receiver does not take title to the assets or properties under his control. A second-entity operating structure with a separate EIN was therefore neither required by the Receivership Order nor contemplated by it.

20. Critically, the Receiver made the Diversion LLC decision without, so far as Debtors are aware, consulting with qualified QOZB or QOF tax counsel, and without consulting the Debtors' long-standing QOZB-familiar CPAs at Brickley DeLong. His own retained CPA, Warren Palmer, has admitted that he cannot model the Debtors' cash flow without Mr. Leestma's input on "QOZB treatment." Whether the Diversion LLC structure in fact affects AP QOZB's qualification under 26 U.S.C. § 1400Z-2 is a technical federal-tax question that requires expert analysis the Receiver's team is not qualified to conduct; the point relevant here is narrower and process-based. A prudent custodian of an $85 million Qualified Opportunity Zone investment would have identified the federal-tax attributes of the entities in his custody and analyzed the tax consequences of any operational restructuring *before* imposing it. The Receiver did not.

**K. Failure to Provide the Accounting Required by § 543(b)(2)**

21. Section 543(b)(2) required the Receiver, upon learning of the bankruptcy filing, to file an accounting of all property of the Debtors that has at any time come into his possession. He has not done so. He has also refused to disclose to the Debtors-in-Possession (i) the cash balance in the Diversion LLC; (ii) expense-level detail from the Diversion LLC; (iii) the bank-by-bank disposition of Diversion LLC funds; (iv) the identity of counterparties with whom he has negotiated regarding disposition of Project assets (reportedly including Skyline, Summit, and Bowline Capital); and (v) any adjusting journal entries that would close the Debtors' pre-existing books for the receivership period. None of this information is optional under § 543(b)(2).

22. It must be noted that *never* have *any* of these type of events occurred during Mr. Leestma's 30 year career founding, building and running companies.  Mr. Polderman is over his skis.

23. While the Receiver made a late night filing for the "Accounting" required under the receivership for the first time, the only Accounting actually provided with appropriate generally

accepted accounting principles information was for the Hall Street and Commerce assets. Those assets are managed by Bradley Company as directed by Mr. Leestma many years ago. As for Adelade Pointe, he provided no detailed financial information, including adjusting entries necessary to close Mr. Leestma's books, no balance sheet items, etc. which once again shows the incompetence of the Receiver and a CPA to perform basic accounting functions.

24. Again, as evidenced by the Receiver's "Accounting" reports, he once again admits that he is transferring cash from one operating account directly to another operating account, which is also a violation of generally accepted accounting principles. This has been done many times before and Mr. Leestma has alerted the Receiver and his CPA that this is simply not allowable under GAAP.

## IV. THE CREDITORS AND CONSTITUENCIES WITH INTEREST IN THE PROECT - THE RECEIVER'S CUSTODY HAS HARMED

25. Section 543(d)(1) directs this Court to the interests of *all* creditors — not the interests of the single creditor that procured the receivership. *Si Yeon Park*, 198 B.R. at 964. On this record, the Receiver's custody has injured, and continues to injure, the following classes of creditors, regulatory authorities, and constituencies:

- **4Front Credit Union** – The Receiver is actively receiving and holding wet marina receipts due and owed to 4Front Credit Union. The Receiver knowingly utilized these receipts to pay Receivership expenses.

- **ChoiceOne Bank** – The Receiver is actively receiving and holding dry marina receipts due and owed to ChoiceOne Bank. The Receiver knowingly utilized these receipts to pay Receivership expenses.

- **The United States.** The IRS holds a § 507(a)(8) priority claim for the unremitted federal trust-fund withholding taxes attributable to wages paid during the receivership. The Receiver and his agents, as "responsible persons," have also exposed themselves personally to 100% penalty assessment under 26 U.S.C. § 6672.

- **The City of Muskegon.** Owed unwithheld and unremitted municipal income tax on all wages paid since the Receiver's unnecessary ADP transition.

- **Seven Employees and Their Families.** Whose group health insurance premiums were deducted from their paychecks for approximately three months but never remitted to the carrier, triggering a cancellation notice — and whose continued coverage hung on the Receiver's remittances. The same employees are also owed (or were directly injured by) the wages that went through the two bounced payroll runs of March 6 and March 20, 2026.

- **The Group Health Insurance Carrier.** Which issued a cancellation notice after the non-remittance.

- **CheckIt Bookkeeping.** Engaged at the Receiver's own direction and working without pay for nearly 90 days, while the Receiver continued to disburse funds to the Bank and to his own professionals.

- **J&H Oil.** Marina fuel provider; unpaid as of petition date.

- **Ally Financial.** Enterprise truck payments; unpaid as of petition date.

- **DocuSign.** Operational e-signature subscription critical to enterprise and lease workflows; unpaid.

- **The Debtors' IT Vendor.** Unpaid, placing operational continuity and data access at risk.

- **Multiple Electric Utility Providers.** The Receiver caused two electric service shut-offs and narrowly avoided a third. The utilities are creditors of the estate for arrears; the enterprise, its tenants, its condominium residents, and the boats stored on site bear the operational and safety harm.  The Receiver suggested that the undersigned need not file a motion under section 366.

- **The Debtors' Insurance Broker and Compliance Counterparty.** Exposed, by the Receiver's 53-day failure to access the insurance compliance portal, to a missed deadline that would have triggered approximately $250,000 in force-placed premiums.

- **Unit Purchasers at the 55-Unit Adelaide Pointe Condominium Building.** Whose comparable valuations the Receiver was prepared to impair by approximately $300,000 per unit (more than $10,000,000 cumulatively) via a single below-market unit sale averted only by Mr. Leestma's intervention.

- **The QOF Equity Investors.** Who invested qualifying capital in AP QOZB in reliance on a qualifying federal-tax structure. Whatever qualification consequence or adverse tax consequences ultimately attaches to the Receiver's Diversion LLC structure is a question that turns on technical analysis the Receiver's team is unqualified to perform. The unresolved question itself, a potential tax problem — created unilaterally by the Receiver, without QOZB-counsel consultation — is an injury the investors did not bargain for.

- **Trade Creditors Currently Providing Services.** Who continue to perform work the Bank benefits from, at significant personal and business risk, because the Receiver and the Bank are "picking and choosing what expenses to pay" out of an account into which LMCU's cash collateral has also been swept.

- **The Debtors and the Estate Itself.** Which now bears the cost of undoing the damage done during the receivership — including what may be $200,000 in professional fees that may be necessary to address the QOZB questions the Receiver created, reconcile the books the Receiver has refused to close, and correct any filings affected by the Diversion LLC structure.  As of the last receiver's accountings filed with the court on April 21 no adjusting entries or GAPP compliant financial statements have been prepared for the Project.  Hall and Commerce are prepared by a qualified property manager while the Receiver and his CPA are not.

26. The one creditor whose interests the Receiver has in fact served is the Bank. That creditor is the one that procured the Receiver's appointment on a nominal $10,000 bond, meets with him twice weekly, and has been the receiving end of the cash routed through the Diversion LLC. Section 543(d)(1) does not authorize a custodian's continued possession because *one* creditor is served. It requires a showing that *all* creditors are better served. *Si Yeon Park*, 198 B.R. at 964. The Receiver cannot make that showing on this record.

## V. THE RECEIVER IS NOT A NEUTRAL FIDUCIARY; HE IS THE BANK'S AGENT

27. A custodian under § 543 "owes a fiduciary duty to the owners of the property under his care," and holds the property "for the benefit of the debtor's creditors." *Sovereign Bank*, 414 F.3d at 454. That duty extends "not only [to] the corporation but all its creditors, and, as to the latter, it is his duty to secure all the assets available for their payment." *Id.* n.11 (quotation omitted).

28. By his own statement, the Receiver does not understand his duty in those terms. Asked directly what his fiduciary duty is, the Receiver told Mr. Leestma it runs "to the court and to whatever the secured creditor is at the moment." That is a partisan role, not a fiduciary one.

29. The record beyond his own statement confirms the alignment:

**A. The Obfuscation.**

30. The Receiver has not closed the Debtors' books for the receivership period; has produced no adjusting journal entries; has not disclosed Diversion LLC cash balances; has not identified Diversion LLC expenses; has not filed the § 543(b)(2) accounting or moved to be excused from filing one; has not disclosed the counterparties with whom he has been in negotiation for the purchase of the Project; has not filed the monthly reports required by the Receivership Order; and has instructed his team to operate with "one voice speaking," affirmatively excluding Mr. Leestma from communications with third-party buyers, other creditors, and the Bank.

**B. Action Beyond the Receivership Order.**

31. The Receiver has taken action well outside the scope of the state-court order appointing him. That includes but is not limited to:

- Capturing and utilizing cash collateral from non-Receivership property to pay Receivership expenses, specifically from 4Front Credit Union and ChoiceOne. 4Front Credit Union has specifically objected to the cash collateral motion on these grounds. The Debtor has no objection to the receipt of their revenues and affirms they are due these receipts.

- Shut down multiple Debtors' checking accounts — accounts that were outside his authorized asset and cash collateral pool, had nothing to do with IBCP rents or revenue assignments, and served as the enterprise's backup working capital facility following the Bank's earlier sweeps;

- Directed a CPA to enter Mr. Leestma's personal 2021 ShowHauler recreational vehicle — not receivership property — and instructed the CPA to "take pictures of everything";

- Made withdrawals from a Huntington Bank account on Clay Street that was never receivership property, and from Mr. Leestma's personal accounts;

12

- Requested to be added as an additional insured on Mr. Leestma's personal Florida condominium, which serves as the residence of Mr. Leestma's wife and children and is not within the scope of the Receivership Order; and

- Filed a motion to expand the receivership to sweep in the wet-slip marina, the dry-storage operations, and the multi-use building and related cash flows — assets outside the original Receivership Order — so as to package the entire campus for a preferred-buyer sale (reportedly to Skyline, Summit, or Bowline Capital).

## C. The Nominal Bond.

32. The Bank obtained appointment of the Receiver on a $10,000 bond. On an $85 million asset base — with 169 wet slips, 285 dry slips, a 55-unit condominium building, 225,000 square feet of rehabilitated warehouse space, and related infrastructure at stake — that bond is not a real financial commitment. It is a signal. The Bank's exposure to receiver misconduct is capped at a sum that would not replace a single dry-stored boat. The Bank's assertions about the Receiver's fitness should be evaluated with appropriate skepticism on that record.

## D. Attempts to Takeover the Campus and other Collateral

33. Most alarmingly, the Receiver has attempted to take over the entire campus and assets that Independent Bank has no collateral.  This, frankly, was the driving reason for the Debtors declared Bankruptcy in the first place along with the need to immediately correct any disruption caused by the Receiver; the Debtors were certain that other creditors or those creditors interests in the Debtor's cash management and cash collateral requests would be further damaged by the Receiver's efforts.  In a showing of this, multiple Secured creditors objected to this effort.  The risk of damaging other creditors was too large to ignore and so Mr. Leestma filed to protect them. The Bank's and Receiver's objections to the Debtor's cash management is disingenuous and biased.  The Debtor's cash management system proposed is designed to rectify any potential changes the Receiver and Bank introduced so *all* secured creditors may access their cash collateral.

34. The question is, *why?*  In a text message sent to Mr. Leestma the motive is clear.  Mr. Lightbody, the chief workout executive, wrote Mr. Leestma "**What I wanted to say is…..what you say about a developer may be true but once you seek out (a) banker, a developer is held**

**accountable for results.  Some times results end up with a receiver being the developer"** Clearly, the Bank desires to become the developer and control all assets on campus and they are using the Receiver to do it.

## VI. THE FEDERAL-TAX QUESTIONS THE RECEIVER CREATED — AND IS NOT EQUIPPED TO ANSWER

35. Adelaide Pointe QOF, LLC was organized in April 2021 as a Qualified Opportunity Fund under 26 U.S.C. § 1400Z-2. Its only material investment is equity in AP QOZB, a Qualified Opportunity Zone Business. Approximately $85 million of qualifying capital has been deployed through AP QOZB into 225,000 square feet of rehabilitated warehouse space, 169 wet slips, 285 dry slips, a 55-unit condominium building, and supporting infrastructure in a designated Opportunity Zone.

36. The structure qualifies for three federal tax benefits, each conditioned on continuous compliance during statutorily defined testing windows: (i) deferral of approximately $1,000,000 of original eligible gain (ii) a 10% basis step-up at five years; and (iii) exclusion of post-investment appreciation at ten years. Because the structure depends on the QOZB itself conducting a qualifying trade or business in the zone and deriving at least 50% of its gross income from the active conduct of that business the entity-level identity of the operating business matters as a matter of federal tax law. The Debtors' counsel who originally structured the QOF and QOZB advise that the entity-level tests are real and not formal.

37. On day one of the receivership, the Receiver created the Diversion LLC with a separate federal EIN, deposited operating receipts into the new entity, paid operating expenses and payroll from it, and caused employees and vendors to be engaged through it. He did so without consulting the qualified QOZB counsel who structured the Debtors' Opportunity Zone vehicles or the Debtors' existing QOZB-familiar CPAs. His own CPA has admitted on a call that he cannot produce an accurate cash-flow model without Mr. Leestma's input on "QOZB treatment" — a direct acknowledgment that the Receiver's team did not analyze the federal-tax consequences of the operational restructuring they imposed.

38. Whether the Receiver's Diversion LLC structure ultimately causes AP QOZB to fail a specific statutory or regulatory testing requirement is a technical federal-tax question that the

14

Debtors' proposed Chief Restructuring Officer and its advisors at Cohn Reznick are equipped to analyze and, where necessary, remediate. For purposes of the Motion to Excuse, the relevant points are process-based and narrow:

- ◦ (1) A custodian charged with preserving the value of an Opportunity Zone investment vehicle must, at minimum, identify the federal-tax attributes of the entities in his custody before restructuring their operational architecture.

- ◦ (2) The Receiver did not.

- ◦ (3) The Debtor's are concerned that the questions his structural choice has raised — whether the routing of operating receipts to a non-QOZB affiliate during 2026 testing windows affects the 50% active-conduct test, the working-capital safe harbor, or the "substantially all" holding-period standard — require qualified opinion work to resolve.

- ◦ (4) The qualifying conditions are measured on fixed dates (June 30 and December 31 each year). Each testing window that passes without resolution carries a time-sensitive risk profile.

- ◦ (5) The Debtors are concerned that resolving the questions the Receiver has created by not engaging qualified QOF tax counsel and employing an unfamiliar CPA; reconstructing the operational cash flows the Receiver has refused to disclose; preparing adjusting journal entries; and preparing or correcting tax filings and qualifying-failure disclosures (if any) — will require approximately $200,000 in specialized professional fees the Debtors would not otherwise have incurred. That cost is a direct consequence of the Receiver's decision to impose a structural change on the Debtor's cash management system without first analyzing its federal-tax consequences.

39. Whether Opportunity Fund tax benefits are ultimately preserved, impaired, or forfeited is a question this Court need not decide to resolve the Motion to Excuse. What this Court *does* need to note is that the Receiver created an unresolved, time-sensitive, and unnecessary federal-tax exposure that he (i) admits is not qualified to address, (ii) did not attempt to address, and (iii) has not allowed the Debtors to address through refusal to share the operational books. A prudent custodian would have identified and analyzed the tax attributes of the entities in custody before

imposing a structural change. The fact that the Receiver did not is itself disqualifying under the § 543(d)(1) preponderance standard.

## VII. THE RECEIVER'S MISREPRESENTATIONS TO THE COURT

40. The Motion to Excuse makes a series of statements about Mr. Leestma that the actual record contradicts. The record includes contemporaneous email correspondence, consistent with Mr. Leestma's practice — adopted after being the target of false accusations in prior litigation — of documenting significant business communications.

41. The practice of documentation has a specific history. In 2015, Muskegon County accused Mr. Leestma of having been paid millions of dollars without authorization — accusations the County used as a pretext to terminate its agreement with him. In the ensuing litigation, the Hon. Joyce Draganchuk of the Ingham County Circuit Court (presiding after all Muskegon Circuit Court judges disqualified themselves) ruled that the County had presented "no evidence" of the alleged conduct, and Mr. Leestma was awarded substantial damages of approximately $5,500,000. The smear campaign did not work then and it will not work now. Mr. Leestma conducts his business is the most above-board way possible and employs multiple experts to ensure his records are accurate and properly reported via Brickley Delong, his long-time CPA whom the Receiver ignored.

42. The Receiver and the Bank know there is no truth to any of their smear campaign accusations. On a March 30, 2026 call made days before the bankruptcy filing, and immediately following a report the Receiver had given to the Bank, Mr. Leestma asked the Receiver what had been said. The Receiver stated:

> *"No, I had a call with the bank. They asked me what my ... thoughts were on your cooperation. I said, you know, he's answered every question I've asked. I said, he's not necessarily affirmatively dumping information on me. I said, but, you know, Aubrey's done more than you can, than any payments that have come in. I said I don't think since the receiver has been appointed, anything's been misdirected. I said some of it is just sorting things out. You know what bill goes to where, and that's just a process."*

16

43. Despite that statement — given two days before the Chapter 11 filing — the Receiver subsequently threatened Mr. Leestma with a show-cause motion for contempt in direct response to Mr. Leestma's documented criticism of the Receiver's mis-management. The Receiver acknowledged the retaliatory character of the threat: "I have never filed a show cause and then said the person's cooperating." The Receiver and the Bank have been abusive to Mr. Leestma and his family and now utilize the courts to record that abuse through local media.

44. The specific misstatements in the Motion to Excuse, and the facts that refute each, are as follows:

- *"The Debtors repeatedly defaulted on the loan agreements with Independent Bank."* At the time the Bank filed its state-court motion for a receiver, and at the time the Bank swept Mr. Leestma's cash and terminated his credit, Adelaide Pointe had timely made all scheduled Bank payments.

- *"The Receiver prepared his own budget, which Mr. Leestma criticized as being incomplete and inaccurate."* The Receiver admitted on call — with Ms. Glick present — that the budget filed with the Kent County Circuit Court was inaccurate, after Mr. Leestma had walked through its deficiencies line by line multiple times prior to the submission. The winter storage rent roll of approximately $825,000 had been sent to the Receiver multiple times and was not included. No corrected budget has been filed.

- *"The Receiver further advised Mr. Leestma that if a response was not forthcoming the Receiver would be seeking the initiation of contempt proceedings."* No request for information preceded the contempt threat. When pressed, the Receiver produced a list of items — several of which were inapplicable to Mr. Leestma — that Mr. Leestma returned in under ten minutes, with Ms. Glick present. The Receiver then refused to withdraw his motion and instead threatened Mr. Leestma for the performance of third parties he could not control.

- *"In the month of March, the Receiver discovered that Mr. Leestma simply transferred $12,950 to himself and $6,200 to his brother Isaac Leestma."* The Receiver has acknowledged that the $12,950 was not cash collateral as recently as yesterday with Ms. Glick present. The funds were transferred to Mr. Leestma's previously maintained

17

enterprise cash concentration account so that a payment to ChoiceOne Bank could be made. Mr. Polderman was in the room when it happened. No receivership funds were captured. The $6,200 was the repayment of a short-term loan to Mr. Leestma's brother made from Mr. Leestma's non-receivership businesses — funds the Receiver had no authority over.

- *"Mr. Leestma responded by demanding that the Receiver release the account back to him and by stating that he used the business account to pay personal expenses including his child support."* The account described is Mr. Leestma's cash concentration account, which he uses to manage capital contributions and disbursements across his many entities. Mr. Leestma takes owner draws from that account for his salary and benefits. The implication of personal-and-business commingling is unsupported by any evidence and is contradicted by the Receiver's own statements.

- *[Mr. Leestma] "fraudulently transferred" his personal residences.* No fraudulent such transfer occurred and the Bank's and Receiver's local counsel know it. Mr. Leestma initiated a conventional 30-year refinance of his home through Huntington Bank approximately six weeks before the Bank filed its state-court motion, after the Bank had refused to convert his HELOC mortgages to long-term financing. Huntington Bank's standard refinance process required Mrs. Leestma to be added to the deed. Supporting documentation has been transmitted to, and acknowledged as received by, both the Bank and the Receiver on multiple occasions.

45. Two further accusations also warrant correction. First, the Receiver suggested that Mr. Leestma was somehow responsible for roof damage caused by natural weather events and initially pursued a full roof replacement. Mr. Leestma identified routine application of a GACO-branded roofing product as the correct remedy — cost approximately $20,000 — at a meeting with the Receiver, Ms. Glick and Mr. Leestma's contractor present. Second, the Receiver has recently represented that $100,000 to $150,000 would be required for "life safety improvements" at the campus. The actual cost of those items is approximately $10,000 to $15,000, to be confirmed by Ms. Glick.

46. The Receiver's decision to pursue inaccurate narratives about the Debtors' principal — while his own operational record includes two bounced payrolls, unremitted trust-fund taxes,

converted health insurance premiums, and two utility shut-offs — is itself evidence that his custody is not directed at the interests of creditors.

## VIII. APPLICATION OF THE SKYMARK FACTORS

47. Applying the seven-factor framework of *Skymark* to the record described above, the Receiver cannot carry his preponderance burden:

- **(1) Likelihood of reorganization.** The Debtors have proposed a Chief Restructuring Officer from Cohn Reznick and special counsel with the expertise on QOF matters capable of correcting operations destabilized by the Receiver, addressing the federal-tax questions the Receiver's Diversion LLC structure has raised, and preparing a feasible Chapter 11 plan. Reorganization is not only viable; it is the structure best suited to the nature and scale of the assets.

- **(2) Probability that funds required for reorganization will be available.** The operational enterprise generates revenue sufficient to fund reorganization — as evidenced by the fact that the Receiver has been routing that revenue through the Diversion LLC to pay expenses (when he has paid them at all) and to IBCP. The cash exists; the Receiver's custody has been the impediment to its proper deployment, not the cure.

- **(3) Claim Mismanagement by the debtor.** Absent. The Debtors operated the Adelaide Pointe enterprise across four years, properly serviced creditors, architected and deployed $85 million of qualifying equity and QOF Qualified Opportunity Fund money and built a stabilized campus. The mismanagement on this record is the Receiver's, not the Debtors'.

- **(4) Whether turnover would be injurious to creditors.** Turnover would halt — not cause — continued injury to creditors. The Receiver's seizure of cash collateral from other secured creditors, unremitted trust-fund taxes, unwithheld municipal taxes, unremitted employee insurance premiums, unpaid trade vendors, and utility shut-offs are accumulating harms that compound with each additional day of receiver custody. Turnover relieves the Debtor and the other creditors from that burden.

- **(5) Whether the debtor will use the property for the benefit of creditors.** The Debtors' proposed CRO, special counsel, and existing professionals are prepared to operate the enterprise for the benefit of *all creditors* — not one.

- **(6) Avoidance issues.** A state-court receiver has no avoiding powers. The avoidance powers under 11 U.S.C. §§ 544–550 are available only to the trustee or the debtor-in-possession. Continued custodianship by the Receiver forfeits potentially material avoidance recoveries, including any claims arising out of pre-petition transfers engineered by the Bank and the Receiver. The Receiver's and Bank's claims of fraudulent transfer and red herrings proposed only serve to distract or misdirect the court.

- **(7) Automatic stay.** The automatic stay has deactivated the state-court receivership. Continued administrative action related to the assets by the Receiver is inconsistent with 11 U.S.C. § 362 absent this Court's further order.

48. The "paramount and sole concern" — the interests of all creditors — is served by turnover, not by continued custody. *Skymark*, 597 B.R. at 396.

## IX. THE "BANK NEXT DOOR"

49. As demonstrated, the Receiver has clearly been operating at the behest of the bank whose sole purpose is to control the campus and liquidate, not stabilize. The introduction of the bank and the Receiver as the operational head of only a *subset* of the assets at Adelaide Pointe has created chaos *across the entire campus and directly threatened other creditors*. Once again, a text message from Mr. Lightbody revealed the Bank's and Receiver's state of mind and true motive; **"What I wanted to say is…..what you say about a developer may be true but once you seek out (a) banker, a developer is held accountable for results. Some times results end up with a receiver being the developer"**. Ironically, Mr. Leestma was current on all of his payments with the Bank with another $600,000 on deposit. The Bank manufactured an emergency to seize control and has been disadvantaging equity and creditors ever since.

50. The Bank and the Receiver have been actively attempting to become Mr. Leestma by controlling as many of his personal and corporate assets akin to the therapist in the movie "The Shrink Next Door". This includes trying to take over the Leestma's personal residences via a 28m lien on a 3m homesteaded Florida Condo and a 4m lien on a 2m property in Muskegon. In addition, the bank has recently attempted to repossess the RV used by the Leestma's despite being current on payments. In an attempt to draw attention away from these actions, incompetence and lack of ability they have repeatedly and knowingly made false statements about the facts and Mr. Leestma.

Since the moment they began their efforts to control the development it has been nothing but chaos for everyone involved, *especially* creditors.  Mr. Leestma cares about his creditors as much as himself and has done everything in his power to assist them as part of the team.

## X. REQUESTED RELIEF

51. The Debtors respectfully request that this Court:

(1) Deny the Motion to Excuse in its entirety and order immediate turnover under 11 U.S.C. §§ 542 and 543(b)(1);

(2) Direct the Receiver to produce within ten (10) days the complete accounting required by 11 U.S.C. § 543(b)(2), including (a) all formation documents and bank records for the Diversion LLC; (b) a full inventory of receipts and disbursements from the Diversion LLC; (c) adjusting journal entries necessary to close the Debtors' pre-existing books for the receivership period; (d) the identity and status of all negotiations with prospective purchasers of Project assets (including any of the reported negotiations with Skyline, Summit, and Bowline Capital, prospective buyers that may have been identified by the Debtors and Non-Debtor Affiliated Entities); and (e) identification of all disbursements made from, or property taken from, accounts and property outside the scope of the Receivership Order (including the ChoiceOne Bank accounts, the Huntington Bank Clay Street account, and Mr. Leestma's personal accounts and property);(3) Reserve jurisdiction to surcharge the Receiver and the Bank under 11 U.S.C. § 543(c)(3) for (a) the approximately $200,000 in specialized tax and accounting professional fees that will likely be necessary to resolve the federal-tax questions the Diversion LLC structure has raised; (b) unremitted federal trust-fund payroll taxes and any § 6672 penalty exposure attributable to the receivership period; (c) unremitted City of Muskegon income tax; (d) unremitted employee health insurance premiums; and (e) any other improper disbursements identified upon completion of the § 543(b)(2) accounting; and

(4) Grant such other and further relief as is just and proper.

**WHEREFORE**, the Debtors respectfully request that the Motion to Excuse be denied, that immediate turnover be ordered, that the Receiver be directed to provide a full § 543(b)(2) accounting within ten (10) days, and that this Court reserve jurisdiction to impose a § 543(c)(3) surcharge against the Receiver and the Bank for the damage their conduct has caused.

21

Dated this 22nd day of April, 2026.

/s/ *David S. Jennis*
David S. Jennis
Florida Bar No. 775940
Jennis Morse
606 East Madison Street
Tampa, FL 33602
Email: djennis@jennislaw.com
Telephone: (813) 229-2800
Lead Counsel for Debtors-in-Possession

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served via CM/ECF electronic notification to those all parties that receive service via this Courts CM/ECF electronic service in the ordinary course of business on this 22nd day of April, 2026.

/s/ *David S. Jennis*
David S. Jennis

22

**STATE OF MICHIGAN**
**IN THE CIRCUIT COURT FOR KENT COUNTY**

| | |
|---|---|
| INDEPENDENT BANK, a Michigan banking corporation, | Case No.  25-20760-CBB |
| Plaintiff, | Hon.  Curt A. Benson |
| v. | |
| ADELAIDE POINTE BOATERS SERVICES, LLC, a Michigan limited liability company, ADELAIDE POINTE QOZB LLC, a Michigan limited liability company, ADELAIDE POINTE BUILDING 1, LLC, a Michigan limited liability company, LEESTMA MANAGEMENT, LLC, a Florida limited liability company, WATERLAND BATTLE CREEK PROPERTIES, LLC, a Michigan limited liability company, RYAN LEESTMA, an individual, and the RYAN M. LEESTMA DOMESTIC ASSET PROTECTION TRUST DATED NOVEMBER 30, 2018, EDWIN J VANDERPLOEG, JR., as Trustee of the Ryan M. Leestma Domestic Asset Protection Trust u/a/d November 30, 2018, jointly and severally, | **ORDER APPOINTING RECEIVER** |
| Defendants. | |

| | |
|---|---|
| BODMAN PLC | TAFT STETTINIUS & HOLLISTER LLP |
| Darren J. Burmania (P68240) | R. Christopher Cataldo (P35393) |
| J. Grant Semonin (P86855) | 27777 Frankin Road, Suite 2500 |
| 99 Monroe Ave. NW, Suite 300 | Southfield, MI 48034 |
| Grand Rapids, Michigan 49503 | (248) 351-3000 |
| Phone: (616) 205-4330 | ccataldo@taftlaw.com |
| dburmania@bodmanlaw.com | Counsel for Defendants |
| gsemonin@bodmanlaw.com | |
| Counsel for Plaintiff | |
| | |
| RHOADES MCKEE, P.C. | |
| David E. Bevins (P48955) | |
| 55 Campau N.W., Suite 300 | |
| Grand Rapids, MI 49503 | |
| (616) 235-3500 | |
| debevins@rhoadesmckee.com | |
| Counsel for non-party Lake Michigan Credit Union | |

4938-4357-1339_1

## ORDER APPOINTING RECEIVER

At a session of said Court, held in the
Kent County Circuit Court, State of Michigan

on January __, 2026  1/30/2026 | 4:12 PM EST

PRESENT: Hon. Curt A. Benson
Kent County Circuit Court Judge

Upon motion of Plaintiff Independent Bank ("Independent Bank"), stipulation of the parties, the Court having made the findings set forth below, and the Court being duly advised on the premises and following MCR 2.622, MCL 554.1013, MCL 554.1016, MCL 554.1017, and MCL 554.1057, hereby appoints a receiver and imposes ancillary relief to assist the receiver as follows:

## FINDINGS

1.      The Court has reviewed Independent Bank's Motion for Appointment of Receiver and supporting brief, and Defendants' responses objecting to same, and finds that under MCR 2.622, MCL 554.1013, MCL 554.1016, and (b), MCL 554.1017, MCL 554.1057, and MCL 600.2926 there is good and sufficient cause to appoint a receiver.

2.      The Court further finds that the parties interested in the receivership estate are Adelaide Pointe Building I, LLC, Adelaide Pointe QOZB, LLC, Adelaide Pointe Boaters Services, LLC, Leestma Management, LLC, and Waterland Battle Creek Properties, LLC ("Receivership Defendants") and Lake Michigan Credit Union ("LMCU").

3.      The Court further finds that LMCU has a first-position mortgage and assignment of rents in the real property commonly known as 401 Hall St. S.W. (the "401 Hall St. Property").

2

4938-4357-1339_1

4.      The Court further finds that the proposed receiver, John Polderman ("Mr. Polderman"), has sufficient competence, qualifications, and experience to administer the Receivership Estate (as that term is defined below).

5.      The Court further finds that, under MCR 2.622(B)(6), MCL 554.1017, and MCL 554.1057, it is in the best interest of the Receivership Estate to appoint Mr. Polderman as receiver and, to the extent applicable, there is no actual conflict of interest that would otherwise prevent his appointment.

## APPOINTMENT OF RECEIVER

IT IS HEREBY ORDERED that Mr. Polderman is experienced and qualified to manage and maintain the property at issue in this case, as required by MCR 2.622(B) and MCL 554.1017, and is appointed as receiver ("Receiver") over the Receivership Assets (as that term is defined below) to take possession, custody, and control of them and to aid in their preservation and/or sale.

## RECEIVER CONTROL OVER RECEIVERSHIP ASSETS AND DOCUMENTS

3

IT IS FURTHER ORDERED that the Court hereby takes exclusive jurisdiction and control of (a) all real property of the Receivership Defendants subject to Mortgages with Independent Bank, now owned or hereafter acquired and all present and future revenues, income, issues, profits, and other benefits derived from such real property; (b) all personal property of Receivership Defendants subject to Security Agreements with Independent Bank, now owned or hereafter acquired and all present and future revenues, income, issues, profits, and other benefits derived from such personal property; and (c) all agreements, documents and records related to the foregoing (collectively, "Receivership Assets")[1].

IT IS FURTHER ORDERED that Receivership Defendants and their officers or agents shall turnover, or provide access to, as applicable, the Receivership Assets to the Receiver in accordance with MCL 554.1023.

IT IS FURTHER ORDERED that Receivership Defendants and their past and present officers, directors, members, employees, trustees, agents, representatives, and any entity controlled by Receivership Defendants are directed to cooperate with the Receiver in accordance with MCL 554.1023 and this Order in the transition of the management of the Receivership Assets and shall make immediately available to the Receiver all of their records that comprise part of the Receivership Assets so that the Receiver may adequately account for the Receivership Assets and any associated revenue collected or owing through the date the Receiver is appointed, including, but not limited to, all:

(a)      Communication/correspondence files related to the Receivership Assets;

---

[1] The Receivership Assets specifically exclude condo units purchased by third parties at the Adelaide Pointe development and discharged from Independent Bank's mortgage prior to the entry of this Order.

The Receivership Assets also specifically exclude the personal residence of Ryan M. Leestma, which is property located at 1599 Westwind Ct., Muskegon, Michigan 49445.

4

(b)     Documents identifying and summarizing all pending litigation related to the Receivership Assets;

(c)     All operating licenses, cooperation agreements, consent agreements, and any and all other agreements related to the Receivership Assets;

(d)     All contracts and associated invoices relating to the Receivership Assets;

(e)     All construction drawings, surveys, plans, sale/purchase agreements, permits (both active and expired), and any other documentation or items pertaining to the Receivership Assets as requested by the Receiver;

(f)     All documents, deeds, rent rolls, insurance information, policies, books, records and computer files, software, and records concerning the ownership, operation and management of the Receivership Assets; and

(g)     Such other records pertaining to the ownership, operation, and management of the Receivership Assets as may be reasonably requested by the Receiver.

IT IS FURTHER ORDERED that this Order does not transfer ownership of the Receivership Assets or Receivership Defendants to the Receiver.  The Receiver is not acquiring any ownership of the Receivership Assets or Receivership Defendants.  The Receiver shall not be considered the owner of the Receivership Assets or Receivership Defendants for any purpose, including but not limited to any determination of experience ratings for any insurance purposes, including but not limited to any determinations by the National Committee on Compensation Insurance.  Moreover, Receivership Defendants are not deemed to be under common ownership with Receiver for insurance purposes.  The Receiver and Receivership Defendants are not business entities held by a common majority owner.  None of the employees of Receivership Defendants shall be considered employees of the Receiver for any purpose.

## **RESTRAINT OF ACTIONS BY THIRD PARTIES**

IT IS FURTHER ORDERED that Receivership Defendants and all persons, other than the Receiver, LMCU as to the 401 Hall St. Property, and Independent Bank or those acting in

5

4938-4357-1339_1

furtherance of a direction from the Receiver, LMCU as to the 401 Hall St. Property or Independent Bank, who receive actual notice of this Order by personal service or otherwise are hereby restrained and enjoined in accordance with MCL 554.1024 from:

(a)     Transferring, liquidating, converting, encumbering, pledging, loaning, selling, concealing, dissipating, disbursing, assigning, compromising, spending, withdrawing, drawing on a letter of credit, obtaining or enforcing a lien or security interest or other interest in, or otherwise disposing of any assets or documents of the Receivership Assets;

(b)     Obtaining possession of, exercising control over, or enforcing a judgment against the Receivership Assets;

(c)     Terminating any agreement with Receivership Defendant(s) that may have a direct or indirect impact on the Receivership Assets;

(d)     Destroying, secreting, defacing, transferring, or otherwise altering or disposing of any assets or documents of the Receivership Assets; and

(e)     Doing any act that would interfere with the Receiver taking custody, control, possession, or management of the Receivership Assets or would interfere with the exclusive jurisdiction of the Court over the Receivership Assets.

IT IS FURTHER ORDERED that subject to the other provisions of this Order governing the rights of Independent Bank and LMCU with respect to the 401 Hall St. Property, that any financial institution, business entity, and/or person maintaining or having custody or control of any of the Receivership Assets which is served with a copy of this Order, or otherwise has actual or constructive knowledge of this Order, shall:

(a)     Hold and retain within its control and prohibit, other than by the Receiver, the withdrawal, removal, assignment, transfer, pledge, hypothecation, encumbrance, disbursement, dissipation, conversion, sale, liquidation, or other disposal of any of the assets, funds, documents, or other property held by, or under its control:

1.     on behalf of, or for the benefit of Receivership Defendants; and

2.     that are subject to access or use by, or under the signatory power of Receivership Defendants.

6

4938-4357-1339_1

(b) With regard to the assets, funds, documents or other property identified in subsection (a), provide the Receiver an immediate statement setting forth:

1. The identification number of each account or asset titled in the name, individually or jointly, of Receivership Defendants, or held on behalf thereof, or for the benefit thereof, including all trust accounts managed on behalf of Receivership Defendants or subject to Receivership Defendants' control;

2. The balance of each such account, or a description of the nature and value of such asset;

3. The identification and location of any safe deposit box, commercial mail box, or storage facility that is titled in the name of Receivership Defendants, whether in whole or in part; and

4. If the account, safe deposit box, storage facility or other asset has been closed or removed, the date closed or removed and the balance on said date.

(c) Immediately provide the Receiver with copies of all records or other documentation pertaining to each such account or asset identified in subsection (a), including, but not limited to, originals or copies of account applications, account statements, corporate resolutions, signature cards, checks, drafts, deposit tickets, transfers to and from the accounts, all other debit and credit instruments or slips, currency transaction reports, 1099 forms, and safe deposit box logs; and

(d) Immediately honor any requests by the Receiver with regard to transfers of assets and/or documents of the Receivership Assets.

## DUTIES OF RECEIVERSHIP DEFENDANTS REGARDING ASSETS AND DOCUMENTS

IT IS FURTHER ORDERED that Receivership Defendants shall:

(a) Within three business days following the entry of this Order, take such steps as are necessary to turn over control to the Receiver of all Receivership Assets, subject to the limitations set forth herein with respect to the 401 Hall St. Property;

(b) Within three business days following the entry of this Order, provide Independent Bank, LMCU with respect to the 401 Hall St. Property and the Receiver with a full accounting of all Receivership Assets wherever located, whether such Receivership Assets are held by or for Receivership Defendants or are under Receivership Defendants' direct or indirect control, including the addresses and names of any foreign or domestic financial institution or other entity holding the Receivership Assets, along with the account numbers and balances;

7

(c)     Immediately following the entry of this Order, make the Receivership Assets accessible to the Receiver, including all passwords required to access any computer, electronic account, or digital file or telephonic data containing the Receivership Assets; and

(d)     Provided that the Receiver has initially determined that continuity of present management is in the best interest of the estate, ensure that Receivership Defendants' officers, directors, managers, and professionals are authorized to continue their services to the Defendants subject to the authority afforded to the Receiver under this Order and the Receivership Act.  The Receiver is authorized to compensate such operational and management services within the ordinary course of Receivership Defendants' business operations.

## BOND

IT IS FURTHER ORDERED that under MCR 2.622(G) the Receiver shall immediately present a sworn statement that it will perform its duties faithfully and shall post a cash deposit or nominal bond in the amount of $10,000.

## POWERS AND DUTIES OF RECEIVER

IT IS FURTHER ORDERED that immediately upon entry of this Order and continuing until expiration or termination of the receivership, the Receiver is authorized in accordance with MCL 554.1022 to take any actions the Receiver deems reasonable and appropriate pursuant to the authority granted under this Order to take possession of, to exercise full control over, and to prevent waste and to preserve, manage, maintain, secure and safeguard the Receivership Assets, and take such other actions as may be necessary and appropriate to take possession, to exercise full control, to prevent waste and to preserve, secure and safeguard the Receivership Assets, including taking possession of and copying: all books, records, notes, memoranda, loan documents, deeds, bills of sale, cancelled checks, check ledgers, rent ledgers, calendar notes, diary notes, notes, records, ledgers, electronically stored data, tape recordings, computer discs, or any other financial documents or financial information in whatever form belonging to Receivership Defendants that relates to the Receivership Assets. Without limiting the generality of the foregoing, the Receiver is authorized to:

8

4938-4357-1339_1

(a)     Take all action determined by the Receiver to be necessary or appropriate to safeguard and preserve all tangible and intangible assets of the Receivership Assets and all licenses used in connection with the operation of the Receivership Assets;

(b)     Have immediate access to any business premises of Receivership Defendants where any Receivership Assets are located, including hiring of a locksmith or other court officer to gain access to the leased locations, or the Receivership Assets;

(c)     Monitor the day-to-day business operations of the Receivership Defendants in relation to the Receivership Assets;

(d)     Assume full custody, control and possession of the Receivership Assets;

(e)     Sue for, collect, and manage all Receivership Assets;

(f)     List, market, and, with Court approval, after notice and an opportunity for a hearing is given to all creditors, other known interested parties, the Receivership Defendants, all intervening parties, and all counsel of record, sell or liquidate the Receivership Assets;

(g)     Allow Independent Bank, its counsel, LMCU with respect to the 401 Hall St. Property, and other professionals access to the Receivership Assets at reasonable times to inspect the Receivership Assets and all books and records thereof;

(h)     Collect any unpaid, future, or delinquent revenue, rent, issues and profits regardless of when accrued; provided, however that all rents and profits relating to the 401 Hall St. Property shall be segregated by the Receiver and shall not be used for any purpose other than payment of LMCU debt, Independent Bank debt, and the costs and expenses directly related to the 401 Hall St. Property, including Receiver Fees and Expenses, but only those directly relating to the 401 Hall St. Property;

(i)     Enforce, terminate, or approve any contracts and/or agreements regarding the Receivership Assets (excluding executory contracts);

(j)     Assume or reject any executory contract as provided under MCL 554.1022;

(k)     Borrow from Independent Bank such funds as may be required to pay the costs and expenses of the administration of the receivership, including but not limited to:

1.     the maintenance, completion, preservation, protection, management, marketing, and sale of the Receivership Assets;

2.     the collection or preservation of the Receivership Assets and/or associated revenue arising from it;

3.     city, county, state and federal taxes and assessments pertaining to the Receivership Assets on a current basis;

9

4938-4357-1339_1

4.      maintenance of adequate insurance; and

5.      to issue Receiver's certificates as evidence thereof, which certificates shall constitute a lien upon the Receivership Assets and associated revenue, which lien shall be prior to all other liens, titles or claims with respect to the Receivership Assets except the security interests held by Independent Bank and the liens and rights of LMCU in the 401 Hall St. Property;

(l)      Manage, maintain and operate the Receivership Assets and engage such parties as may be necessary to complete the construction of the Receivership Assets;

(m)      Insure the Receivership Assets as is advisable and/or necessary in cooperation with Independent Bank to the extent the Receivership Assets are not already insured;

(n)      Choose, engage, and employ attorneys, accountants, appraisers, brokers, and other independent contractors and technical specialists (collectively, "Professionals"), that the Receiver deems advisable or necessary in the performance of its duties and responsibilities under the authority granted by this Order consistent with MCL 554.1025;

(o)      Make payments and disbursements generated by and/or collected from the Receivership Assets that are necessary or advisable for carrying out the directions of, and/or exercising the authority granted by, this Order, subject to the limitations set forth herein relating to the 401 Hall St. Property and the Budget (defined below);

(p)      Institute, compromise, adjust, defend, appear in, intervene in, or become party to such actions or proceedings in state, federal or foreign courts or arbitration proceedings that the Receiver deems necessary and advisable to preserve or recover the Receivership Assets or that the Receiver deems necessary and advisable to carry out the Receiver's mandate under this Order;

(q)      Conduct investigations and to issue subpoenas to obtain documents and records pertaining to, or in aid of collection and liquidation of the Receivership Assets;

(r)      Consent to the dissolution of the receivership in the event that Receivership Defendants may compromise or satisfy the claim that gave rise to the appointment of the Receiver, provided, however, that no such dissolution shall occur without a motion by Receivership Defendants, service of the same on those parties who received a copy of this Order and entry of an order of the Court approving such relief; and

(s)      Repay monies to Independent Bank and LMCU as provided below.

4938-4357-1339_1

For clarity, nothing in this Order requires the Receiver to file any tax returns related to the Receivership Assets. The Receiver shall only be authorized to file such tax returns to the extent that (a) applicable law, whether federal or state (or any subdivision thereof), mandates the filing of such tax returns by a receiver for the Receivership Assets or (b) would realize a refund or other benefit from filing such tax returns.

IT IS FURTHER ORDERED that the Receiver shall not have the following powers:

(a)    To exercise any voting rights of the members of Receivership Defendants under its articles, operating agreements, or applicable law, including any action to dissolve or liquidate Receivership Defendants or to place Receivership Defendants in any bankruptcy, insolvency or other creditor adjustment proceeding, under state or federal law, including but not limited to a bankruptcy proceeding under the United States Bankruptcy Code;

(b)    To file any state or federal income tax returns by or on behalf of Receivership Defendants. In this regard, the Receiver shall make available to Receivership Defendants those receivership documents necessary to permit Receivership Defendants to timely file any required federal and state income tax returns.

## REPORTS AND ACCOUNTING

The Receiver shall submit monthly reports to the Court and parties with respect to the Receivership Estate. The Receiver shall submit the Receiver's reports to the Court for the Court's *in camera* inspection. The Receiver's reports are not to be filed with the Clerk of the Court, and shall not be available for public inspection without a specific order of the Court. The Receiver shall provide the Receiver's reports to all counsel of record via email. The Receiver shall submit a final accounting for approval by the Court within 30 days after the termination of the Receivership, or the Receiver's removal or resignation.

## BORROWING FROM INDEPENDENT BANK

IT IS FURTHER ORDERED that the Receiver is authorized to borrow from Independent Bank those amounts which Independent Bank is willing to lend to the Receiver, to permit the

11

4938-4357-1339_1

Receiver to carry out its duties under this Order subject to the provisions set forth in the "Powers and Duties" Section of this Order. Such loans shall be protective advances, shall be evidenced by receivership certificates or notes, under which Independent Bank's right of recourse shall be limited to the Receivership Assets and shall be non-recourse as against the Receiver. The Receiver shall be compensated for its services performed on an hourly basis according to the following schedule:

| Receiver Fee Schedule | Per Hour |
| --- | --- |
| John Polderman | $425.00 |
| Paralegals | $225.00 |

The Receiver, LMCU and Independent Bank will agree on a budget regarding the operation of the receivership estate ("Budget") promptly after entry of this Order and immediately provide a copy of the Budget to the Receivership Defendants and all other parties to this case. The Receiver shall make disbursements only in accordance with the Budget, as the same may be amended from time to time by the Receiver, with the written approval of Independent Bank.

**<u>LIMITATION OF RECEIVER'S AND PROFESSIONALS' LIABILITY</u>**

IT IS FURTHER ORDERED that, except for an act of gross negligence or willful misconduct, the Receiver and the Professionals shall not be liable for any loss or damage incurred by Receivership Defendants, its officers, agents, servants, employees and attorneys or any other person, by reason of any act performed or omitted to be performed by the Receiver and/or the Professionals in connection with the discharge of the Receiver's duties and responsibilities in a commercially reasonable manner consistent with MCL 554.1028. Additionally, in the event of a discharge of the Receiver either by dissolution of the receivership or order of the Court, the Receiver shall have no further duty whatsoever except as otherwise ordered by the Court.

4938-4357-1339_1

LMCU, Independent Bank and the Receiver shall not be liable for any claim, obligation, liability, action, cause of action, cost or expense of Receivership Defendants or the Receivership Assets arising out of or relating to events or circumstances occurring prior to the entry of this Order, including without limitation, any contingent or unliquidated obligations and any liability from the performance of services rendered by third parties on behalf of Receivership Defendants, and any liability to which Receivership Defendants are currently or may ultimately be exposed under any applicable laws pertaining to the ownership, use or operation of the Receivership Assets and operation of Receivership Defendants' businesses (collectively all of the foregoing is referred to as "Pre-Receivership Liabilities").  Independent Bank, LMCU and the Receiver shall not be obligated to advance any funds to pay any Pre-Receivership Liabilities.

## PROFESSIONAL FEES

IT IS FURTHER ORDERED that the Receiver and any Professionals retained by the Receiver with Independent Bank's consent or Court approval are entitled to reasonable compensation for the performance of their duties under this Order and for the cost of actual out-of-pocket expenses incurred by them, subject to the Budget, which compensation shall be derived exclusively from the Receivership Assets. The Receiver shall account separately for time spent on matters relating to the 401 Hall St. Property and may not use the rents and profits of the 401 Hall St. Property for reimbursement of fees and expenses not incurred directly relating to the 401 Hall St. Property. At that time, the Receiver and Professionals shall file with the Court and serve on Receivership Defendants, LMCU and Independent Bank fee applications with regard to any compensation to be paid to the Receiver and the professionals.

The Receiver shall file with the Court and serve on the parties who have filed appearances, a monthly accounting of all receipts and disbursements concerning the performance of its duties under this Order, and a final accounting within 30 days after termination of the receivership.

## DISPOSITION OF PROCEEDS

IT IS FURTHER ORDERED that all proceeds collected by the Receiver from the Receivership Assets shall be distributed as follows:

(a)     Receivership and Professional Fees and expenses incurred by them after the date of entry of this Order that are in accordance with the Budget and with respect to the 401 Hall St. Property rents and profits, the limitations set forth herein;

(b)     The indebtedness due to Independent Bank and LMCU with respect to the 401 Hall St. Property, subject to claims by other secured creditors with respect to proceeds from the sale of collateral upon which such creditors have a higher priority security interest than Independent Bank or LMCU;

(c)     In payment of any other secured creditors of record, in the order of priority and solely with respect to proceeds related to the disposition of the collateral securing their respective claims;

(d)     After payment in full of all amounts due in (a) through (c) above, to the unpaid unsecured creditors of Receivership Defendants on a pro-rata basis in relation to the amount of their claims.

## STAY OF ACTIONS

IT IS FURTHER ORDERED that, in accordance with MCL 554.1024:

(a)     Except by leave of the Court, during the pendency of the receivership ordered herein, all other persons and entities aside from the Receiver, LMCU with respect to the 401 Hall St. Property  and Independent Bank are hereby stayed and enjoined from taking any action to establish or enforce any claim, right, judgment or interest for, against, on behalf of, in, or in the name of Receivership Defendants or against the Receivership Assets, including, but not limited to, the following actions:

14

1. Commencing, prosecuting, continuing, entering, or enforcing any suit, judgment, or proceeding including out of state actions;

2. Accelerating the due date of any obligation or claims against Receivership Defendants; drawing on any letters of credit with Receivership Defendants as applicant; filing or enforcing any lien; taking or attempting to take possession, custody or control of any Receivership Asset and/or attempting to foreclose, forfeit, alter or terminate any interest in any Receivership Asset, whether such acts are part of a judicial proceeding or are acts of self-help or otherwise including any out of state acts, actions, judgments, or proceedings against or relating to Receivership Assets;

3. Executing, issuing, serving or causing the execution, issuance or service of, any legal process against Receivership Defendants, including, but not limited to, attachments, garnishments, subpoenas, writs of replevin, seizure orders, writs of execution, or any other form of process whether specified in this Order or not; and

4. Doing any act or thing whatsoever to interfere with the Receiver taking custody, control, possession, or management of any asset or document pertaining to the Receivership Assets, or to harass or interfere with the Receiver in any way, or to interfere in any manner with the exclusive jurisdiction of the Court over the Receivership Assets.

(b) This Order does not stay the commencement or continuation of a criminal action or proceeding.

(c) Except as otherwise provided in this Order, all persons and entities in need of documentation from the Receiver shall in all instances first attempt to secure such documentation by submitting a formal written request to the Receiver, and, if such request has not been responded to within 30 days of receipt by the Receiver, any such person or entity may thereafter seek relief from the Court with regard to the documentation requested.

## CLAIMS PROCESS

IT IS FURTHER ORDERED that, if the Receiver determines that there will be monies from the Receivership Assets available to distribute to creditors (other than distributions to Independent Bank, other primary secured creditors in certain Receivership Assets, and payment of fees due to the Receiver and any Professionals as described above), the Receiver shall send to all known creditors of Receivership Defendants by first-class mail or other commercially reasonable delivery method a claim form, under which each creditor shall be obligated to specify the amount

15

4938-4357-1339_1

owed to such creditor and to attach thereto all supporting documentation related to such claim. All creditors shall be required to return the claim form by the date specified by the Receiver and in the manner specified by the Receiver; otherwise their right to payment from Receivership Defendants and the receivership estate shall terminate. The Receiver is hereby ordered to publish at least twice during the 60-day period after service of the claim form notice of the bar date for the filing of claims in publications of general circulation in Kent County, Michigan. The Receiver shall specify the date by which claim forms must be submitted to Receiver, which date must be at least 90 days after the later of the mailing of the notice or the last publication date. The Court shall have jurisdiction to adjudicate all claims submitted, upon motion of the Receiver or any creditor, subject to any scheduling or procedures orders which the Court may adopt to address the claims adjudication process.

## TERMINATION OF RECEIVERSHIP

IT IS FURTHER ORDERED that upon the earlier of (i) payment in full of all indebtedness due to Independent Bank and the other creditors of Receivership Defendants, or (ii) the date that all Receivership Assets have been fully administered or abandoned by the Receiver, the Receiver, LMCU and Independent Bank shall stipulate to an order terminating the receivership created by this Order. Upon entry of the order terminating the receivership, all remaining Receivership Assets (if any), and all receivership documents in the possession, custody and/or control of the Receiver shall be turned over to Receivership Defendants. The Receiver shall also turn over all information needed to provide Receivership Defendants with complete and unfettered access to any then remaining Receivership Assets. The Receivership Defendants are also permitted to petition the Court for entry of an order terminating the receivership, after notice to the receiver and all parties, upon such grounds as permitted by law.

16

4938-4357-1339_1

## JURISDICTION

IT IS FURTHER ORDERED that the Court shall retain jurisdiction of this matter for all purposes, and over the Receivership Assets and the parties for the purpose of giving such other relief upon proper showing as is consistent with this Order and substantial justice.

## EFFECTIVE DATE OF ORDER

This order remains in effect until further order of the Court.

SO ORDERED, this ___ day of January, 2026.    1/30/2026 | 4:12 PM EST

P 38891

_____
HON. CIRCUIT COURT JUDGE

THE FOLLOWING PARTIES STIPULATE TO THE ABOVE ORDER:

**PLAINTIFF**                                          **DEFENDANTS**

By: /s/ Darren J. Burmania                      By: /s/ R. Christopher Cataldo w/ permission
    Darren J. Burmania (P68240)                    R. Christopher Cataldo (35393)
    Counsel for Plaintiff                                    Counsel for Defendants

**INTERVENING PLAINTIFF**

By: /s/ David E. Bevins w/ permission
    David E. Bevins (P48955)
    Counsel for Lake Michigan Credit Union

Dated: January 30, 2026

17

4938-4357-1339_1

## Ryan Leestma

| | |
|---|---|
| **From:** | Heidi Sottovia <Heidi.R.Sottovia@huntington.com> |
| **Sent:** | Wednesday, September 3, 2025 4:23 PM |
| **To:** | Ryan Leestma |
| **Subject:** | FW: 00083957191 quit claim deed |
| **Attachments:** | MI-QUIT CLAIM DEEDplatted Leestma.pdf |

**Sensitivity:**          Confidential

Hi Ryan- We would need you to take this quit claim deed to a notary ( any Huntington has one) with your ID, sign the document in front of the notary. Then take it to the county and have it recorded. Send me back a copy of the recorded version and we can start the loans 😊



**Heidi R Sottovia**
Mortgage Loan Officer
The Huntington National Bank
NMLS 1050173

Office: 248.554.6907
Direct: 248.677.1160
Fax: 877.288.0225
**https://www.huntington.com/mortgage/sottovia-heidi**

APPLY NOW

Internal Use

**From:** Adam Belinger <Adam.Belinger@huntington.com>
**Sent:** Wednesday, September 3, 2025 4:16 PM
**To:** Heidi Sottovia <Heidi.R.Sottovia@huntington.com>
**Subject:** RE: 00083957191 quit claim deed
**Sensitivity:** Confidential

Please see attached and let me know if you have questions.

Thank you

**Adam Belinger**
Insurance Operations Manager
Assistant VP
Phone: 614.331.4961
Fax: 877-820-7817
adam.belinger@huntington.com

**HBI Title**
7 Easton Oval, EA4W301
Columbus, OH. 43219

1

huntington.com



Internal Use

**From:** Heidi Sottovia <Heidi.R.Sottovia@huntington.com>
**Sent:** Wednesday, September 3, 2025 3:16 PM
**To:** Adam Belinger <Adam.Belinger@huntington.com>
**Subject:** RE: 00083957191 quit claim deed
**Sensitivity:** Confidential

Just wanted to see if you had an ETA on the quit claim deed?
Ryan M. Leestma
Emily S. Leestma
Yes Joint with rights of survivorship



**Heidi R Sottovia**
Mortgage Loan Officer
The Huntington National Bank
NMLS 1050173

Office: 248.554.6907
Direct: 248.677.1160
Fax: 877.288.0225
**https://www.huntington.com/mortgage/sottovia-heidi**

Internal Use

**From:** Heidi Sottovia <Heidi.R.Sottovia@huntington.com>
**Sent:** Tuesday, September 2, 2025 3:23 PM
**To:** Adam Belinger <Adam.Belinger@huntington.com>
**Subject:** RE: 00083957191 quit claim deed
**Sensitivity:** Confidential

Perfect they will record because it will be quicker that way 😊 thank you again



**Heidi R Sottovia**
Mortgage Loan Officer
The Huntington National Bank
NMLS 1050173

Office: 248.554.6907
Direct: 248.677.1160
Fax: 877.288.0225
**https://www.huntington.com/mortgage/sottovia-heidi**

**APPLY NOW**

---

**From:** Adam Belinger <Adam.Belinger@huntington.com>
**Sent:** Tuesday, September 2, 2025 3:21 PM
**To:** Heidi Sottovia <Heidi.R.Sottovia@huntington.com>
**Subject:** RE: 00083957191 quit claim deed
**Sensitivity:** Confidential

WE can record it if they want or they can we just need Original back if we are recording.

**Adam Belinger**
Insurance Operations Manager
Assistant VP
Phone: 614.331.4961
Fax: 877-820-7817
adam.belinger@huntington.com

**HBI Title**
7 Easton Oval, EA4W301
Columbus, OH. 43219

**huntington.com**



Internal Use

---

**From:** Heidi Sottovia <Heidi.R.Sottovia@huntington.com>
**Sent:** Tuesday, September 2, 2025 3:15 PM
**To:** Adam Belinger <Adam.Belinger@huntington.com>
**Subject:** RE: 00083957191 quit claim deed
**Sensitivity:** Confidential

Would they file it directly with the county since I need it completed before they apply?
Ryan M. Leestma
Emily S. Leestma
Yes Joint with rights of survivorship

3



**Heidi R Sottovia**
Mortgage Loan Officer
The Huntington National Bank
NMLS 1050173

Office: 248.554.6907
Direct: 248.677.1160
Fax: 877.288.0225
**https://www.huntington.com/mortgage/sottovia-heidi**

APPLY NOW

Internal Use

**From:** Adam Belinger <Adam.Belinger@huntington.com>
**Sent:** Tuesday, September 2, 2025 2:33 PM
**To:** Heidi Sottovia <Heidi.R.Sottovia@huntington.com>
**Cc:** Thomas C Zeman <thomas.c.zeman@huntington.com>
**Subject:** RE: 00083957191 quit claim deed
**Sensitivity:** Confidential

Yes we can get that prepared.  Once we have it prepared, we will email it to you and they can take to a Branch and have it notarized.  We will need the original back for recording.  Also just double check how exactly Emily would like to be in title and do the want survivorship rights on the new Deed?

Thanks

**Adam Belinger**
Insurance Operations Manager
Assistant VP
Phone: 614.331.4961
Fax: 877-820-7817
adam.belinger@huntington.com

**HBI Title**
7 Easton Oval, EA4W301
Columbus, OH. 43219

**huntington.com**



Internal Use

**From:** Heidi Sottovia <Heidi.R.Sottovia@huntington.com>
**Sent:** Tuesday, September 2, 2025 12:54 PM

4

**To:** Adam Belinger <Adam.Belinger@huntington.com>
**Cc:** Thomas C Zeman <thomas.c.zeman@huntington.com>
**Subject:** 00083957191 quit claim deed
**Sensitivity:** Confidential

Hi Adam,
I have a refinance that we need to start for 1599 Westwind Ct Muskegon
Currently only Ryan M Leestma is on deed and mortgage  but his wife Emily Leestma is going to be doing the refinance and he will only be on deed. Is it possible for you to draw up a quit claim deed adding Emily to deed with Ryan so we can start our application. ( Because she is not on it currently we have to have her added BEFORE I can apply).
This is part of a 2 pack of loans they are refinancing with us and Ryan is with PCG as well.
HBI will be getting both refinances.



**1599 WESTWIND CT** MUSKEGON, MI 49445    (Property Address)

Parcel Number: 09-310-000-0002-00

**Property Owner:** LEESTMA RYAN M

**Summary Information**

> Residential Building Summary
- Year Built: 2018    - Bedrooms: 5
- Full Baths: 6       - Half Baths: 1
- Sq. Feet: 3,664     - Acres: 1.880

Item **1** of **5**    3 Images / 2 Sketches

### Owner and Taxpayer Information

| Owner | | Taxpayer | |
|---|---|---|---|
| | LEESTMA RYAN M<br>1599 WESTWIND CT<br>MUSKEGON, MI 49445 | | SEE OWNER<br>INFORMATION |



**Heidi R Sottovia**
Mortgage Loan Officer
The Huntington National Bank
NMLS 1050173

Office: 248.554.6907
Direct: 248.677.1160
Fax: 877.288.0225
**https://www.huntington.com/mortgage/sottovia-heidi**


APPLY NOW

5

## Quit Claim Deed

**KNOW ALL PERSONS BY THESE PRESENTS THAT:   Ryan M. Leestma**, **married,** whose address is 1599 Westwind Ct., Muskegon, Michigan 49445,

**CONVEYS and Quitclaims to: Ryan M. Leestma and Emily S. Leestma, married to each other, joint tenants with full rights of survivorship,** whose address is 1599 Westwind Ct., Muskegon, Michigan 49445,

the following described real property located in the Township of Laketon, County of Muskegon, State of Michigan:

LOT 2, PLAT OF FAIRVIEW PARK, ACCORDING TO THE RECORDED PLAT THEREOF. AS RECORDED IN LIBER 4 OF PLATS, PAGE 7. ALSO THAT PART OF LOT 3 OF THE ABOVE DESCRIBED SUBDIVISION DESCRIBED AS FOLLOWS: BEGINNING ON THE DIVIDING LINE BETWEEN LOTS 2 AND 3, 398 FEET SOUTH OF THE NORTH LINE THEREOF; THENCE EASTERLY PARALLEL WITH SAID NORTH LINE 8 FEET; THENCE SOUTHERLY PARALLEL WITH THE ABOVE MENTIONED DIVIDING LINE 100 FEET; THENCE WESTERLY 8 FEET TO SAID DIVIDING LINE; THENCE NORTHERLY TO PLACE AND POINT OF BEGINNING.

EXCEPT:
THAT PART OF LOT 2, OF THE PLAT OF FAIRVIEW PARK, BEING PART OF SECTION 13, TOWN 10 NORTH, RANGE 17 WEST, LAKETON TOWNSHIP, MUSKEGON COUNTY, MICHIGAN, AS RECORDED IN LIBER 4 OF PLATS, PAGE 7, MUSKEGON COUNTY RECORDS, DESCRIBED AS: COMMENCING AT THE NORTHWEST CORNER OF SAID LOT 2 FOR POINT OF BEGINNING OF THE HEREIN DESCRIBED PARCEL; THENCE SOUTHERLY ALONG THE WEST LINE OF SAID LOT 2 A DISTANCE OF 298.47 FEET, MORE OR LESS TO A POINT BEING 40.00 FEET SOUTH OF THE SOUTHEAST CORNER OF LOT 13 OF THE PLAT OF CHADWICK VILLAGE NO. 1, AS RECORDED IN LIBER 20 OF PLATS, PAGES 30-33, MUSKEGON COUNTY RECORDS; THENCE EASTERLY, PARALLEL WITH THE NORTH RIGHT-OF-WAY LINE OF WESTWIND COURT OF SAID CHADWICK VILLAGE NO. 1, A DISTANCE OF 41.1 FEET MORE OR LESS TO THE EAST LINE OF SAID LOT 2; THENCE NORTHERLY ALONG SAID EAST LINE 320 FEET MORE OR LESS TO THE NORTHEAST CORNER OF SAID LOT 2; THENCE SOUTHWESTERLY ALONG THE NORTH LINE OF SAID LOT 2 {ALSO BEING THE SOUTHERLY RIGHT-OF-WAY LINE OF GLENWOOD AVENUE) 40 FEET MORE OR LESS TO POINT OF BEGINNING.

GRANTORS RESERVE TO THEMSELVES AN EXCLUSIVE EASEMENT FOR INGRESS AND EGRESS OVER THE EAST 1/2 OF THE PARCEL CONVEYED IN LIBER 3765 AT PAGE 136. THIS EASEMENT IS PERMANENT AND IS FOR THE BENEFIT OF THE REMAINDER OF LOT 2 OWNED BY GRANTORS SOUTH OF THAT PART CONVEYED BY THIS INSTRUMENT. THIS EASEMENT IS FOR THE EXCLUSIVE USE OF GRANTORS AND OTHER OWNERS OF LOT 2 ONLY.

TOGETHER WITH A PERMANENT EASEMENT FOR INGRESS/EGRESS AND PUBLIC UTILITIES DESCRIBED AS: COMMENCING AT THE ABOVE-DESCRIBED SOUTHEAST CORNER OF SAID LOT 13 OF THE PLAT OF CHADWICK VILLAGE NO. 1; THENCE SOUTH ALONG THE WEST LINE OF SAID LOT 2 OF THE PLAT OF FAIRVIEW PARK (ALSO BEING THE EAST RIGHT-OF-WAY LINE OF SAID WESTWIND COURT) A DISTANCE OF 40.00 FEET FOR POINT OF BEGINNING OF THIS EASEMENT; THENCE CONTINUE SOUTH ALONG THE WEST LINE OF SAID LOT 2 A DISTANCE OF 30.00 FEET; THENCE EAST PARALLEL TO THE NORTH LINE OF SAID WESTWIND COURT, 30.00 FEET; THENCE NORTH, PARALLEL WITH THE WEST LINE OF SAID LOT 2, A DISTANCE OF 30.00 FEET; THENCE WEST 30.00 FEET TO POINT OF BEGINNING.

PROPERTY TAX ID# 61-09-310-000-0002-00
COMMONLY KNOWN AS: 1599 Westwind Ct., Muskegon, Michigan 49445

for the full consideration of $1.00

EXEMPT FROM TRANSFER TAX PURSUANT TO MCL207.526 (a) and MCL207.505 (a)

Subject to easements and building and use restrictions of record and further subject to all prior reservations including all prior oil, gas and other minerals and further subject to all local and state statutes, ordinances and laws.

Dated this _____, 20_____.

**Signed and Sealed:**

_____
Ryan M. Leestma

STATE OF                            ) SS.
COUNTY OF                         )

The foregoing instrument was acknowledged before me this _____ day of _____
by Ryan M. Leestma.

_____
_____, Notary Public
State of Michigan, County of_____
Acting in the County of _____
My commission expires_____

**Drafted By:**   Ryan M. Leestma
1599 Westwind Ct., Muskegon, Michigan 49445

**Return To:**   **Grantee**

**Send Tax Bills To:**   **Grantee**

File No.

**Quit Claim Deed -** *Statutory Form*

Internal Use

This message and any attachments are for the designated recipient only and may contain privileged, proprietary, or otherwise private information. If you have received it in error, please notify the sender immediately and delete the original. Any other use of the email by you is prohibited. This message may contain an advertisement of a product or service constituting a commercial email. You may unsubscribe any time from receiving commercial emails. Huntington Bancshares Incorporated and its affiliated companies, 41 South High Street, Columbus, OH 43287. huntington.com