UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

In re:

| | |
|---|---|
| LEESTMA MANAGEMENT, LLC, | Case No. 8:26-bk-02696-CED [Lead case] |
| ADELAIDE POINTE QOZB, LLC, | Case No. 8:26-bk-02698-CED |
| ADELAIDE POINTE BOATERS SERVICES, LLC | Case No. 8:26-bk-02699-CED |
| ADELAIDE POINTE BUILDING 1, LLC, | Case No. 8:26-bk-02700-CED |
| WATERLAND BATTLE CREEK, LLC, | Case No. 8:26-bk-02701-CED |
| | Chapter 11 |
| | Hon. Caryl E. Delano |
| Debtors. | *Jointly Administered* |

**LIMITED OBJECTION TO DEBTORS' AMENDED
APPLICATION TO EMPLOY CHIEF
RESTRUCTURING OFFICER**

4Front Credit Union ("4Front"), by and through its undersigned counsel, Plunkett Cooney

and Dean Mead, files this Limited Objection to the Debtors' Amended Application to Employ

Chief Restructuring Officer (Dkt. No. 75) (the "CRO Application"). 4Front does not oppose the

employment of a Chief Restructuring Officer ("CRO"), including the CRO's exercise of oversight

and financial management responsibilities with respect to the Wet Marina (as defined below).

However, 4Front objects to the CRO Application to the extent it fails to require that all revenues

derived from the 169-slip Wet Marina be segregated and remitted directly to 4Front, consistent

with 4Front's rights as the recorded and enforcing assignee of rents under Michigan law and its

perfected security interests. 4Front further objects to any surcharge of 4Front's collateral for CRO

compensation, professional fees, or administrative expenses under 11 U.S.C. § 506(c) or

otherwise. In support of this Limited Objection, 4Front states as follows:

1

1.      4Front holds a first-priority mortgage interest and lien against the real property and improvements owned by Adelaide Pointe Wet Marina, LLC ("AP Wet Marina"), which includes a 169-slip wet marina on Muskegon Lake in Muskegon, Michigan (the "Wet Marina"). The Mortgage is dated August 31, 2023. AP Wet Marina has not filed for bankruptcy and is not a debtor in these proceedings. The Mortgage is attached as **Exhibit A**.

2.      4Front perfected its interest in the income derived from the Wet Marina pursuant to an Assignment of Leases and Rents dated August 31, 2023 (the "ALR") (**Exhibit B**). The ALR unconditionally and irrevocably assigns to 4Front all of AP Wet Marina's right, title, and interest in all existing and future leases, use and occupancy agreements, and all rents, income, receipts, revenues, issues, and profits arising from the Wet Marina. On February 26, 2026, 4Front enforced its rights under the ALR by serving a Statutory Notice of Default and Demand to Assignor for Payment of Rents pursuant to MCL 554.1056 and MCL 554.1058 of Michigan's Uniform Assignment of Rents Act, MCL 554.1051 *et seq.* (**Exhibit C**). The Wet Marina received the Notice of Default on March 19, 2026 (Enforcement Date) The Statutory Notice was recorded in the Muskegon County Register of Deeds on March 4, 2026, at Liber 4409, Page 748—well before any Debtor filed for bankruptcy on April 1, 2026. From the Enforcement Date, 4Front is entitled under Michigan law to collect all unpaid accrued rents and all rents accruing thereafter. MCL 554.1056(2).

3.      Pursuant to a Security Agreement dated August 31, 2023, 4Front also holds a security interest and lien against all of AP Wet Marina's personal property, including but not limited to its accounts, general intangibles, inventory, equipment, fixtures, chattel paper, instruments, equipment, deposit accounts, and investment property. The Security Agreement is attached as **Exhibit D**. 4Front perfected its security interest by filing a UCC1 on August 31, 2023

2

with the Michigan Department of State. The UCC1, along with a UCC3 Amendment, is attached as collective **Exhibit E**.

4.     AP Wet Marina has not filed for bankruptcy protection. The Wet Marina is not subject to the receivership proceeding pending in Michigan (Kent County Circuit Court Case No. 25-20760-CBB). The Receivership Order expressly covers Debtor Adelaide Pointe QOZB, LLC ("QOZB") and certain other affiliated entities—not AP Wet Marina or the Wet Marina property.

5.     The Wet Marina is just beginning operations for the 2026 boating season and is expected to generate substantial revenue from permanent slip rentals, transient slip rentals, fuel sales, and other marina related services.

6.     The revenue generated from the Wet Marina (the "Wet Marina Income") has been and continues to be deposited into a bank account maintained by QOZB. The Wet Marina Income is not property of the estate of QOZB or any other Debtor before this Court. While QOZB is named as the counterparty on the slip rental agreements, QOZB does not own the Wet Marina and has no lease, management agreement, operating agreement, or revenue-sharing arrangement with AP Wet Marina that would convey any beneficial ownership of the Wet Marina's rental income stream. QOZB functions solely as a cash management account for AP Wet Marina without any documented authority to retain Wet Marina's revenues. The gross slip revenues are, and always have been, the rents of AP Wet Marina—subject to 4Front's perfected and enforced ALR.

7.     Pursuant to Michigan law MCL §554.1054, an Assignment of Rents is created by an assignment in either an enforceable security instrument that grants a security interest in rents or a document that grants a security interest in rents which is signed in connection with an enforceable security instrument as to any real property described in the document creating the Assignment of

3

#6387629v1

Rents. An assignment of rents creates a presently effective security interest in all accrued and unaccrued rents arising from the real property described in the document creating the Assignment. Pursuant to MCL §554.1055, upon recording the Assignment of Rents in the Register of Deeds, the security interest in rents created by an Assignment of Rents is fully perfected.

8. Pursuant to MCL §554.1056, from the first date of enforcement, the assignee is entitled to collect all the rents that have accrued but remain unpaid on that date, and rents that accrue after that date as those rents accrue. Pursuant to MCL §554.1058, upon the assignor's default, the assignee may give the assignor notice demanding that the assignor pay over the proceeds of any rent that the assignee is entitled to collect.

9. Pursuant to MCL §554.1064, if the assignor fails to turnover proceeds to the assignee, then the assignee may recovery from the assignor or a person liable under the Uniform Voidable Transactions Act in a civil proceeding, both the proceeds that the assignor was obligated to turn over and the reasonable attorney fees and costs incurred by the assignee to the extent provided for by agreement. The assignee may bring an action against the assignor or any person liable under the Uniform Voidable Transactions Act without bringing an action to foreclose any security interest that the assignor has in the real property and the bringing of a Uniform Voidable Transactions Act action does not bar a foreclosure by advertisement of the real property.

10. From the effective Enforcement Date, Adelaide Pointe Wet Marina LLC and Adelaide QOZB, LLC along with the Receiver were required to turnover any remain required to turnover to 4Front all of the rents collected. The failure to turnover rents subjects the persons failing to turnover the rents to an action under the Uniform Voidable Transaction Act.

11. All pre-petition revenue generated by the Wet Marina and currently held by QOZB must be segregated and paid to 4Front immediately.

#6387629v1

12.     All post-petition revenues generated by the Wet Marina must be deposited into an account at 4Front and not commingled with estate funds from the Debtor entities. To the extent there are shared expenses between the Wet Marina and the Debtor entities—such as insurance, shared employees, or campus-wide utilities—4Front recognizes that those shared expenses should be allocated between the entities on a reasonable, documented basis, subject to 4Front's prior written approval of any disbursement from Wet Marina revenues.

13.     On April 22, 2026, the Debtors filed their Amended Application to Employ Chief Restructuring Officer (Dkt. No. 75). The CRO Application seeks to employ the CRO retroactive to April 14, 2026, and proposes that the CRO "make decisions with respects to all aspects of the financial management and operations of the Debtors and the non-Debtor affiliated entities, businesses (including Wet Marina) including without limitation to finance, accounting and treasury and administration and such other areas as he may identify." 4Front does not oppose the CRO's exercise of general oversight, financial management, and reporting responsibilities with respect to the Wet Marina so long as US Marina Group LLC is employed to operate the Wet Marina on a day-to-day basis and not the CRO. Indeed, transparent CRO reporting across both Debtor and non-debtor entities may benefit all stakeholders by providing reliable financial data. However, the CRO's authority over the Wet Marina must be expressly subject to 4Front's rights under Michigan's Uniform Assignment of Rents Act. Specifically, the CRO must not direct, divert, or authorize the use of Wet Marina Income for any purpose other than remittance to 4Front (or to a designated segregated account under 4Front's control), and the CRO's financial management and reporting functions must not be construed as authorizing the estate to exercise dominion or control over revenues that belong to 4Front as a matter of Michigan law.

14.     To the extent Independent Bank asserts that the Wet Marina revenues are QOZB's accounts receivable, its claim has no merit.  Independent Bank does not hold a mortgage on the Wet Marina, does not hold an assignment of rents covering the Wet Marina, and did not file a UCC-1 Financing Statement as to any assets of AP Wet Marina. Its claim is defeated by the UCC's express exclusion of real-property rents from Article 9 (MCL 440.9109(4)(k)) and by Article 9's requirement that a security interest attaches only to collateral in which the debtor has rights. QOZB has no ownership interest in Wet Marina's rent stream and Independent Bank's lien cannot attach to those revenues.

15.     4Front separately objects to any provision in the CRO Application or the proposed CRO engagement order that would authorize a surcharge of 4Front's collateral—including the Wet Marina revenues—for CRO compensation, professional fees, administrative expenses, or other costs under 11 U.S.C. § 506(c) or any other authority. Section 506(c) permits recovery from a secured creditor's collateral only for "the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim." The Wet Marina revenues are not property of the Debtors' estates; they are 4Front's property under Michigan's Uniform Assignment of Rents Act following prepetition enforcement. Even if these revenues were treated as estate property, any surcharge against 4Front's collateral would require a showing that the CRO's services were reasonable, necessary, and provided a direct, quantifiable benefit to 4Front—not merely a general benefit to the estate or to other creditors. *See Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 5 (2000) (only the trustee may seek surcharge under § 506(c)); *In re Flagstaff Foodservice Corp.*, 762 F.2d 10, 12 (2d Cir. 1985) (surcharge requires direct, primarily measurable benefit to the secured creditor). The CRO's restructuring services—budget supervision, professional-fee oversight, plan-related

6

financial analysis, creditor and Court reporting, and compliance with U.S. Trustee requirements—benefit the Debtor entities and their estates. The Debtors have not demonstrated, and cannot demonstrate, that these services provide a direct benefit to 4Front or to the Wet Marina sufficient to satisfy the strict requirements of § 506(c). Accordingly, any order approving the CRO Application must expressly provide that no CRO compensation, professional fees, or administrative expenses may be surcharged against the Wet Marina revenues or any other collateral of 4Front without 4Front's prior written consent or further order of this Court upon noticed motion and an evidentiary showing satisfying the requirements of § 506(c).

WHEREFORE, 4Front Credit Union respectfully requests that this Court enter an order: (a) approving the CRO Application, subject to the express condition that the CRO's authority over the Wet Marina does not include the power to direct, divert, or authorize the use of Wet Marina Income for any purpose other than remittance to 4Front Credit Union (or to a designated segregated account under 4Front's control); (b) directing that all Wet Marina revenues be segregated and remitted to 4Front, consistent with 4Front's rights under Michigan's Uniform Assignment of Rents Act, MCL 554.1051 *et seq.*, and 4Front's perfected security interests; (c) prohibiting any Debtor entity from using, commingling, or encumbering Wet Marina revenues; (d) providing that no CRO compensation, professional fees, or administrative expenses may be surcharged against the Wet

#6387629v1

Marina revenues or any other collateral of 4Front without 4Front's prior written consent or further order of this Court upon noticed motion satisfying the requirements of 11 U.S.C. § 506(c); and (e) granting such other and further relief as is just and proper.

Respectfully submitted,

Dated: May 5, 2026

/s/James A. Timko

James A. Timko, Esq.
Florida Bar No. 0088858
DEAN, MEAD, EGERTON, BLOODWORTH,
CAPOUANO & BOZARTH, P.A.
420 S. Orange Avenue – Suite 700
Orlando, FL 32801
Telephone: 407-841-1200
Facsimile: 407-423-1831
jtimko@deanmead.com
mgodek@deanmead.com

#6387629v1

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 5, 2026, I electronically filed a true and correct copy of the foregoing LIMITED OBJECTION TO DEBTORS' AMENDED APPLICATION TO EMPLOY CHIEF RESTRUCTURING OFFICER with the Clerk of the United States Bankruptcy Court for the Middle District of Florida by using the CM/ECF system, and I furnished a copy of the foregoing document(s) to all parties who receive electronic service via the CM/ECF system.

/s/James A. Timko
James A. Timko, Esq.
Florida Bar No. 0088858

9

#6387629v1

# EXHIBIT A

_____[Space Above This Line is for Recording Information]_____

## MORTGAGE

THIS MORTGAGE ("Mortgage") is made on August 31, 2023, by ADELAIDE POINTE WET MARINA, LLC, a Michigan limited liability company ("Mortgagor"), of 1204 W. Western Ave., Suite A, Muskegon, Michigan 49441, in favor of 4FRONT CREDIT UNION ("Lender"), of 3939 W. Front Street, Traverse City, Michigan 49684.

**THIS MORTGAGE SECURES FUTURE ADVANCES AND IS A FUTURE ADVANCE MORTGAGE UNDER ACT NO. 348 OF THE PUBLIC ACT OF 1990, AS AMENDED (MCLA 565.901 ET SEQ.).**

### GRANTING CLAUSE

To secure the Indebtedness and as security for the purposes stated elsewhere in this Mortgage, the Mortgagor MORTGAGES AND WARRANTS to the Lender, its successors and assigns, the following described properties, rights, interests and privileges (collectively, the "Mortgaged Property"):

A.      The parcel(s) of real estate located in the City of Muskegon, County of Muskegon, State of Michigan, as more particularly described in Schedule A attached to this Mortgage and identified by the tax parcel number(s) as provided therein (collectively, the "Real Estate");

B.      All buildings, structures, fixtures and improvements now located, or subsequently constructed or placed upon the Real Estate, including, without limit, all building materials and building equipment located on the Real Estate;

C.      All machinery, apparatus, equipment, utility systems, appliances, fittings, fixtures, supplies, goods, and articles of personal property of every kind and nature located or subsequently located on the Real Estate and all attachments, accessions and replacements (individually and collectively, "Equipment"), and all of the right, title and interest of the Mortgagor in and to any Equipment which may be subjected to any title retention or security agreement superior in lien to the lien of this Mortgage. All Equipment being part and parcel of the Mortgaged Property and appropriated to the use of the Real Estate and, whether affixed or not, unless the Lender shall otherwise elect, deemed to be real estate and mortgaged under this Mortgage;

D.      All easements, rights-of-way, licenses, privileges and appurtenances relating to the Real Estate;

E.      All rents, issues, profits, revenues, proceeds, accounts and general intangibles arising from the Real Estate or relating to any business conducted by the Mortgagor on the Real Estate, or under present or future leases, reservation and/or purchase agreements, land contracts, licenses or otherwise, all of which are specifically assigned and transferred to the Lender including, without limit, all rights conferred by Act No. 210 of the Michigan Public Acts of 1953, as amended;

F.      All right, title and interest of the Mortgagor in and to the land lying in the bed of any street, road, avenue, alley or walkway, opened or proposed or vacated, adjoining the Real Estate; and

G.      Any and all awards or payments, including, without limit, interest on any awards or payments, and the right to receive them, which may be made with respect to the Mortgaged Property as a result of: the exercise of the right of eminent domain; the alteration of the grade of any street; any loss of or damage to any building or other improvement on the Real Estate; any other injury to or decrease in the value of the Mortgaged Property; any refund due on account of the payment of real estate taxes, assessments or other charges levied against or imposed upon the Mortgaged Property; or any refund of utility deposits or right to any tenant deposit.

### INDEBTEDNESS SECURED BY THIS MORTGAGE

This Mortgage is made to secure all of the following (individually and collectively, the "Indebtedness"):

3568.142/Doc #60

I.  Payment of $6,022,500.00, together with interest, costs and all other sums on that amount, to be paid according to the $6,022,500.00 Promissory Note of even date ("Note") made by Mortgagor (also referred to herein as, the "Borrower"), payable to Lender and all extensions, renewals, modifications, substitutions or replacements, and the Construction Loan Agreement dated of even date ("Agreement"), made by and between Borrower and Lender and all amendments and modifications thereof and any other and any and all extensions, renewals, modifications, substitutions or replacements thereof (all such documents referenced herein are referred to collectively as, the "Loan Documents"). This reference to a particular dollar amount does not in any way limit the dollar amount secured by this Mortgage.

II.  The payment of any and all amounts of any kind now owing or later to become due to the Lender from the Borrower and/or any Guarantors of any portion of the Indebtedness during the term of this Mortgage, however created or arising, whether under the obligations specified above or under any other existing or future instrument or agreement between the Borrower and the Lender, or otherwise, and whether direct, indirect, primary, secondary, fixed, contingent, joint or several, due or to become due, together with interest, costs and all other sums on that amount and including, without limit, all present and future indebtedness or obligations of third parties to the Lender which is guaranteed by the Borrower, and the present or future indebtedness originally owing by the Borrower, to third parties and assigned by third parties to the Lender, and any and all renewals, extensions, modifications, substitutions or replacements of any of them.

III.  The performance of the covenants and obligations due or to become due to the Lender, including, without limit, those due under this Mortgage, and the repayment of all sums expended by the Lender in connection with performance of those covenants and obligations and the enforcement of this Mortgage.

## COVENANTS AND AGREEMENTS

1.  **COVENANTS AND WARRANTIES.** The Mortgagor covenants and warrants to the Lender, as long as the Indebtedness remains outstanding, as follows:

1.1  **Authority; No Conflict.** The Mortgagor has the power and authority to execute, deliver and perform its obligations under this Mortgage. The execution, delivery and performance of this Mortgage by the Mortgagor does not, and will not violate or conflict with any provision of its organizational or charter documents or any agreement, court order or consent decree to which the Mortgagor is a party or by which the Mortgagor may be bound.

1.2  **Title to Mortgaged Property.** The Mortgagor is the owner and is lawfully seized and possessed of the Mortgaged Property. The Mortgagor has good right, full power and authority to mortgage the Mortgaged Property to Lender in accordance with the terms of this Mortgage. The Mortgaged Property is and shall remain free and clear of any liens and encumbrances excepting only the following: real property taxes not yet due and payable and the interests and matters identified on attached Schedule B. The Mortgagor shall pay when due all obligations which, if unpaid, may become a lien on the Mortgaged Property.

1.3  **Payment of Indebtedness.** The Borrower will pay and perform the Indebtedness when due, whether by maturity, acceleration or otherwise.

1.4  **Maintenance of Mortgaged Property; Maintenance Reserve Account; and Waste.**

1.4.1  The Mortgagor shall preserve and maintain the Mortgaged Property in good repair, working order and condition, excepting ordinary wear and tear, shall replace any Equipment which requires replacement, shall procure all necessary utility services, and shall not commit or permit the commission of waste against the Mortgaged Property. The Mortgagor shall promptly protect, repair, replace or rebuild any part of the Mortgaged Property that is damaged or destroyed by fire or other casualty, or that may be effected by any eminent domain or condemnation proceedings.

1.4.2  If the Lender determines that the Mortgagor is not maintaining the Mortgaged Property as required herein, in addition to all of the Lender's other remedies, the Lender may require the Mortgagor to pay into a non-interest bearing reserve account ("Maintenance Reserve Account") an amount estimated by the Lender to be sufficient to enable the Mortgagor to maintain the Mortgaged Property. If required by the Lender, such amount shall be payable in monthly installments (payable in addition to any other sums due under the Indebtedness) subject to adjustment, up or down, annually on the anniversary of the date hereof by the Lender at the Lender's sole discretion. The Maintenance Reserve Account shall be under the Lender's sole control and shall be additional security for the Indebtedness. The Lender shall make disbursements from the Maintenance Reserve Account for maintenance of the Mortgaged Property, or as otherwise provided by this Mortgage, at the Lender's sole discretion.

1.4.3  Failure, refusal or neglect of the Mortgagor to comply with subsection 1.4.1 or to pay any taxes or assessment or any utility rates levied, assessed or imposed upon the Mortgaged Property, and/or nonpayment of any premiums for insurance, shall constitute waste, and shall entitle the Lender to exercise the remedies provided in this Mortgage, as well as those afforded by law, including, without limit, MCLA Section 600.2927, as amended.

3568.142/Doc #60

1.5     **Payment of Taxes; Discharge of Liens.**

1.5.1     The Mortgagor shall pay when due, and before any interest, collection fees or penalties accrue, all taxes, assessments, encumbrances, liens, mortgages, water or sewer charges and other charges and impositions (individually and collectively, "Imposition(s)") levied, assessed or existing with respect to the Mortgaged Property, or any part of it, and the Mortgagor will deliver to the Lender receipts showing payment of the Imposition(s). If the Mortgagor fails to pay any of the Imposition(s), the Lender, at its option, may pay such Imposition(s) and the monies paid shall be a lien upon the Mortgaged Property, added to the amount secured by this Mortgage, and payable immediately by the Mortgagor to the Lender, with interest at the higher of (i) the interest rate, if any, charged by the particular entity levying or assessing the Imposition(s), or (ii) the highest rate charged by the Lender on any of the Indebtedness (but in either case not to exceed the maximum interest rate permitted by law).

1.5.2     At the option of the Lender, the Mortgagor shall pay to the Lender, in advance on the first day of each month, a pro rata portion (as determined by the Lender) of all Imposition(s) levied, assessed or existing on the Mortgaged Property. In the event that sufficient funds have been deposited with the Lender to cover the amount of these Imposition(s) when they become due and payable, the Lender shall pay them. In the event that sufficient funds have not been deposited to cover the amount of these Imposition(s) at least thirty (30) days prior to the time when they become due and payable, the Mortgagor shall immediately pay the amount of the deficiency to the Lender. The Lender shall not be required to keep a separate account or to pay the Mortgagor any interest on the funds held by the Lender for the payment of the Imposition(s) pursuant to this Section 1.5 or for the payment of insurance premiums under Section 1.7 below, or on any other funds deposited with the Lender in connection with this Mortgage. The funds on deposit with the Lender are further security for the Indebtedness and if an Event of Default occurs under this Mortgage, any funds remaining on deposit with the Lender may be applied against the Indebtedness at any time after the Event of Default occurs, and without notice to the Mortgagor.

1.6     **Sale or Transfer of Mortgaged Property.** Without the prior written consent of the Lender, the Mortgagor will not (i) sell, assign, transfer or encumber all or any interest in the Mortgaged Property or (ii) enter into any agreement or grant an option for such purpose, or (iii) permit or suffer any change in the ownership of the Mortgagor. In the event ownership of the Mortgaged Property, or any part, becomes vested in any person(s) other than the Mortgagor, the Lender may deal with and may enter into any contract or agreement with the successor(s) in interest with reference to this Mortgage in the same manner as with the Mortgagor, without discharging or otherwise affecting the lien of this Mortgage or the Mortgagor's obligations under this Mortgage.

1.7     **Insurance.**

1.7.1     The Mortgagor shall keep the buildings and all other improvements on the Mortgaged Property insured for the benefit of the Lender against fire and other hazards and risks, including, without limit, vandalism and malicious mischief, as the Lender may require and shall further provide flood insurance (if the Mortgaged Property is situated in an area which is considered a flood risk area by the United States Department of Housing and Urban Development, and for which flood insurance is available under the National Flood Insurance Act of 1968, as amended), loss of rents insurance, public liability and product liability insurance and any other insurance as the Lender may reasonably require from time to time. All insurance shall be in amounts and in forms and with companies satisfactory to the Lender, and in the case of fire and extended coverage (or builder's risk) insurance shall not be for less than 100% of the full insurable value of the Mortgaged Property. The Mortgagor shall deliver to the Lender the policies evidencing the required insurance with premiums fully paid for one year in advance, and with standard mortgagee clauses (making all losses payable to the Lender). Renewals of the required insurance (together with evidence of premium prepayment for one (1) year in advance) shall be delivered to the Lender at least thirty (30) days before the expiration of any existing policies. All policies and renewals shall provide that they may not be canceled or amended without giving the Lender thirty (30) days prior written notice of cancellation or amendment.

1.7.2     Should the Mortgagor fail to insure or fail to pay the premiums on any required insurance or fail to deliver the policies or renewals as provided above, the Lender may have the insurance issued or renewed (and pay the premiums on it for the account of the Mortgagor) in amounts and with companies and at premiums as the Lender deems appropriate. If the Lender elects to have insurance issued or renewed to insure the Lender's interest, the Lender shall have no duty or obligation of any kind to also insure the Mortgagor's interest or to notify the Mortgagor of the Lender's actions. Any sums paid by the Lender for insurance, as provided above, shall be a lien upon the Mortgaged Property, added to the amount secured by this Mortgage, and payable immediately by the Mortgagor to the Lender, with interest on those sums at the highest rate charged by the Lender on any of the Indebtedness (but not to exceed the maximum interest rate permitted by law).

1.7.3     In the event of loss or damage, the proceeds of all required insurance shall be paid to the Lender. No loss or damage shall itself reduce the Indebtedness. The Lender or any of its employees is each irrevocably appointed attorney-in-fact for the Mortgagor and is authorized to adjust and compromise each loss without the consent of the Mortgagor, to collect, receive and receipt for the insurance proceeds in the name of the Lender and the Mortgagor and to endorse the Mortgagor's name upon any check in payment of the loss. The proceeds shall be applied first toward reimbursement of all costs and expenses of

the Lender in collecting the proceeds (including, without limit, court costs and reasonable attorneys' fees), and then toward payment of the Indebtedness or any portion of it, whether or not then due or payable and in whatever order of maturity as the Lender may elect, or the Lender, at its option, may apply the insurance proceeds, or any part of them, to the repair or rebuilding of the Mortgaged Property. If the Lender elects to restore or repair the Mortgaged Property, the Mortgagor and the Lender shall enter into a written agreement satisfactory to the Lender providing for the terms under which the insurance proceeds shall be released. Application of proceeds by the Lender toward later maturing installments of the Indebtedness shall not excuse the Mortgagor from making the regularly scheduled installment payments nor shall such application extend or reduce the amount of any of these payments.

1.7.4    In the event of a foreclosure of this Mortgage, or the giving of a deed in lieu of foreclosure, the purchaser or grantee of the Mortgaged Property shall succeed to all of the rights of the Mortgagor under the insurance policies including, without limit, any right to unearned premiums and to receive the proceeds.

1.7.5    At the option of the Lender, the Mortgagor shall pay to the Lender, in advance on the first day of each month, a pro rata portion of the annual premiums due (as estimated by the Lender) on the required insurance. In the event that sufficient funds have been deposited with the Lender to cover the amount of the insurance premiums when the premiums become due and payable, the Lender shall pay the premiums. In the event that sufficient funds have not been deposited with the Lender to pay the insurance premiums at least thirty (30) days prior to the time when they become due and payable, the Mortgagor shall immediately pay the amount of the deficiency to the Lender.

1.7.6    Notwithstanding the foregoing provisions, for any loss or damage, the Lender will apply the proceeds of insurance to repair or restoration subject to the following conditions:

1.7.6.1    More than one year remains until maturity of the Note, and the Mortgagor shall continue making all payments under the Indebtedness as and when each becomes due.

1.7.6.2    The loss or damage can be repaired and the buildings and other improvements can be restored so that the Mortgaged Property will be in substantially the same condition it had before the casualty.

1.7.6.3    The Mortgagor submits to the Lender plans, a construction schedule and a budget for restoration, obtains all required permits or licenses, and identifies a contractor(s), all of which are satisfactory to the Lender in all material respects.

1.7.6.4    The insurance proceeds together with other funds delivered to the Lender by the Mortgagor are sufficient to pay the cost of repair and restoration. Funds provided by Mortgagor shall be applied first.

1.7.6.5    All Mortgagor funds and insurance proceeds are advanced in accordance with Lender's standard construction loan terms and conditions.

1.7.6.6    The Mortgagor shall direct the repair or restoration in accordance with the plans, schedule and budget; the work shall be performed in a workmanlike manner, free from defects, and in compliance with applicable law; the Lender may inspect the work at any time and may stop work and order replacement or correction of any non-conforming work; and all repair and restoration shall be completed free of all construction liens.

1.8    **Compliance With Law and Other Matters**. The Mortgagor will comply with all federal, state and local laws, ordinances, rules, regulations and restrictions relating to the ownership, use, occupancy and operation of the Mortgaged Property and will not permit the use of the Mortgaged Property for unlawful purposes. Further, the Mortgagor will comply with, perform the Mortgagor's obligations under, and enforce the obligations of all other parties to all building and use restrictions, ground leases, leases, reservation and/or purchase agreements, condominium documents and/or other instruments affecting or relating to the use and/or occupancy of the Mortgaged Property.

1.9    **No Removal of Improvements**. Without the prior written consent of the Lender, the Mortgagor will not remove, demolish or materially alter or add to any building, structure or other improvement forming part of the Mortgaged Property nor otherwise reduce the value or usefulness of the Mortgaged Property, except for replacement, maintenance and renovation in the ordinary course of business.

1.10    **Recording**. The Mortgagor will cause this Mortgage, any supplemental mortgage and any financing and continuation statements required by the applicable Uniform Commercial Code to be recorded and filed at the Mortgagor's expense in such manner and in such place as may, in the Lender's opinion, be necessary or proper.

1.11    **Additional Assurances**. The Mortgagor will execute and deliver additional instruments and take additional actions as Lender may reasonably request to carry out the terms and conditions of this Mortgage.

1.12    **Books and Records; Inspection Rights**. The Mortgagor will at all times maintain accurate and complete books and records, and copies of all building and use restrictions, ground leases, leases, reservation and/or purchase agreements, condominium documents, contracts and/or other instruments with respect to the Mortgaged Property. The Lender may inspect and

3568.142/Doc #60

Mortgage
- 4 -

make copies of those books and records and any other data relating to the Mortgaged Property. The Lender may inspect and test the Mortgaged Property at such reasonable times as Lender shall determine, and the Mortgagor will permit the Lender and its representatives and inspectors all necessary access to the Mortgaged Property. The Mortgagor will promptly provide to the Lender reports concerning the income, expenses and financial and other conditions of the Mortgaged Property as may be required from time to time by the Lender.

1.13     **Environmental Representation, Warranty and Indemnification**. Notwithstanding anything in this Mortgage to the contrary, the Mortgagor represents, covenants and warrants to the Lender as follows:

1.13.1     For the purpose of this Section the following terms shall have the given meanings:

1.13.1.1 "Relevant Environmental Laws" shall mean all applicable federal, state and local laws, rules, regulations, orders, judicial determinations and decisions or determinations by any judicial, legislative or executive body of any governmental or quasi-governmental entity, whether in the past, the present or the future, with respect to: (i) the installation, existence or removal of, or exposure to, Asbestos on the Mortgaged Property; (ii) the existence on, discharge from, or removal from the Mortgaged Property of Hazardous Materials; and/or (iii) the effects on the environment of the Mortgaged Property or of any activity now, previously, or hereafter conducted on the Mortgaged Property.

1.13.1.2 "Asbestos" shall have the meanings provided under the Relevant Environmental Laws, and shall include, without limited, asbestos fibers and friable asbestos, as such terms are defined under the Relevant Environmental Laws.

1.13.1.3 "Hazardous Materials" shall mean any of the following (as defined by the Relevant Environmental Laws): solid wastes; toxic or hazardous substances, wastes, or contaminants, including, without limit, polychlorinated biphenyls, paint containing lead, and urea formaldehyde foam insulation; and discharges of sewage or effluent.

1.13.2     At all times since Mortgagor has acquired any interest or rights in the Mortgaged Property, whether through lease, land contract, deed or otherwise and, to Mortgagor's knowledge, after due inquiry, at all times prior to Mortgagor's acquisition of such interest or rights in the Mortgaged Property: there are no and have been no violations of the Relevant Environmental Laws at the Mortgaged Property and no consent orders have been entered with respect to the Mortgaged Property; there are no and have been no Hazardous Materials or Asbestos either at, upon, under or within, or released, discharged or emitted at or from, the Mortgaged Property; no Hazardous Materials or Asbestos have released, emitted or otherwise become present at the Mortgaged Property from neighboring land; and no Hazardous Materials or Asbestos have been removed from the Mortgaged Property, except in compliance with the Relevant Environmental Laws.

1.13.3     The Mortgagor, after due inquiry, is not aware of any claims of litigation, and has not received any communication, concerning the presence or possible presence of Hazardous Materials or Asbestos at the Mortgaged Property or concerning any violation or alleged violation of the Relevant Environmental Laws respecting the Mortgaged Property. The Mortgagor shall promptly notify the Lender of any such claims and shall furnish the Lender with a copy of any such communications received after the date of this Mortgage.

1.13.4     The Mortgagor shall ensure that the Mortgaged Property complies in all respects with the Relevant Environmental Laws, shall notify Lender promptly and in reasonable detail in the event that the Mortgagor becomes aware of the presence of Hazardous Materials or Asbestos or a violation of the Relevant Environmental Laws at the Mortgaged Property, and shall conduct all required clean-up, closure or other remediation of any condition necessary to maintain compliance with the Relevant Environmental Laws.

1.13.5     Should the Mortgagor use or permit the Mortgaged Property to be used or maintained so as to subject the Mortgagor, the Lender or the use of the Mortgaged Property to a claim of violation of the Relevant Environmental Laws (unless contested in good faith by appropriate proceedings satisfactory to the Lender), the Mortgagor shall immediately remedy and fully cure, at its own cost and expense, any conditions arising therefrom.

1.13.6     The Mortgagor shall pay immediately when due the cost of compliance with the Relevant Environmental Laws. Further, the Mortgagor shall keep the Mortgaged Property free of any lien imposed pursuant to the Relevant Environmental Laws.

1.13.7     In the event that the Mortgagor fails to comply with any of the requirements of this Section 1.13, after notice to the Mortgagor and the earlier of the expiration of any applicable cure period under this Mortgage or the expiration of the cure period permitted under the Relevant Environmental Laws, if any, the Lender may exercise its right to do one or more of the following:   (i) elect that such failure constitutes a default under this Mortgage; and/or (ii) take any and all actions, at the Mortgagor's expense, that the Lender deems necessary or desirable to cure such failure of compliance. Any costs incurred the Lender pursuant to this Section 1.13, shall become immediately due and payable without notice and with interest thereon at a rate equal to the highest interest rate charged on the Indebtedness (but not to exceed the maximum interest rate permitted by law), and such amount, including interest, shall, if incurred prior to the foreclosure of this Mortgage or the delivery of a deed in lieu of foreclosure, be added to amounts owing under the Indebtedness and shall be secured by this Mortgage.

3568.142/Doc #60

Mortgage
- 5 -

1.13.8    The Lender shall not be liable for and the Mortgagor shall immediately pay to and indemnify, defend and hold the Lender harmless from and against, all loss, cost, liability, damage and expense (including, without limit, attorneys' fees and costs incurred in the investigation, defense and settlement of claims) that the Lender may suffer or incur (as holder of this Mortgage, as mortgagee in possession or as successor in interest to the Mortgagor as owner of the Mortgaged Property by virtue of foreclosure or acceptance of a deed in lieu of foreclosure) as a result of or in connection in any way with the Mortgagor's failure to comply with the terms and provisions of this Section 1.13.

1.13.9    The provisions of this Section 1.13 shall survive the repayment of the Indebtedness and the performance of all duties and obligations related thereto, the foreclosure of this Mortgage, the delivery of a deed in lieu of foreclosure and/or the discharge of this Mortgage.

1.14    **Reporting Requirements**. The Mortgagor shall comply with all of the reporting requirements contained in the Agreement executed simultaneously herewith, if any exist.

1.15    **Foreign Assets Control Representation and Warranty**.

(a)    None of the Mortgagor, or its partners, members, officers, directors, investors or shareholders, nor any of their respective subsidiaries or any Guarantor of the Indebtedness, (i) is a Sanctioned Person (defined below), (ii) has more than 15% of its assets in Sanctioned Countries (defined below), or (iii) derives more than 15% of its operating income from investments in, or transactions with Sanctioned Persons or Sanctioned Countries. The loan proceeds to be advanced by Lender will not be used and have not been used to fund any operations in, finance any investments or activities in or make any payments to, a Sanctioned Person or a Sanctioned Country. For purposes of the foregoing, a "Sanctioned Person" shall mean (i) a person named on the list of "specially designated nationals" or "blocked persons" maintained by the U.S. Office of Foreign Assets Control ("OFAC") at http://www.treasury.gov/resource-center/sanctions/SDN-List/Pages/default.aspx, or as otherwise published from time to time, or (ii)(A) an agency of the government of a Sanctioned Country, (B) an organization controlled by a Sanctioned Country, or (C) a person resident in a Sanctioned Country, to the extent subject to a sanctions program administered by OFAC. A "Sanctioned Country" shall mean a country subject to a sanctions program identified on the list maintained by OFAC and available at http://www.treas.gove/offices/enforcement/ofac/programs/, or as otherwise published from time to time.

(b)    Lender may reject or refuse to accept for credit toward payment of the obligations hereunder or under any of the Loan Documents any account, instrument, chattel paper, lease, or other obligation or property of any kind due from, owed by, or belonging to, a Sanctioned Person.

(c)    Notwithstanding any grant of a security interest by virtue of other provisions of this Mortgage or under any of the Loan Documents, (i) no account, instrument, chattel paper or other obligation or property of any kind due from, owned by, or belonging to, a Sanctioned Person or (ii) any lease in which the lessee is a Sanctioned Person, shall be Collateral.

(d)    Mortgagor shall pay any civil penalty or fine assessed by the U.S. Department of the Treasury's Office of Foreign Assets Control against, and all reasonable costs and expenses (including counsel fees and disbursements) incurred in connection with defense thereof by the Lender as a result of the funding of the loan proceeds by Lender hereunder or the acceptance of payments hereunder or under the Note and other Loan Documents or of Collateral due under any of the Loan Documents.

2.    **APPLICATION OF CONDEMNATION AWARDS**.

2.1    **Condemnation Award**. Any eminent domain or condemnation proceeds shall be paid directly to the Lender and applied toward reimbursement of all the Lender's costs and expenses incurred in connection with collecting the award (including, without limit, court costs and reasonable attorneys' fees), and the balance applied upon the Indebtedness whether or not then due or payable in whatever manner the Lender deems advisable. Application by the Lender of any condemnation award or portion of it toward the last maturing installments of the Indebtedness shall not excuse the Mortgagor from making the regularly scheduled payments nor extend or reduce the amount of these payments.

2.2    **Appointment of Lender**. The Lender or any of its employees is each irrevocably appointed attorney-in-fact for the Mortgagor and is authorized to receive, receipt for, discharge and satisfy any condemnation award or judgment, whether joint or several, on behalf of the Mortgagor, the Mortgagor's legal representatives, successors and assigns; provided, however, that the Lender shall not be liable for failure to collect any condemnation award.

3.    **ADDITIONAL SECURITY**.

3.1    **Security Interest in Personal Property**. The Mortgagor grants the Lender a security interest in any present and future Equipment, fixtures, accounts, general intangibles, instruments, and other personal property included within the definition of Mortgaged Property. The Mortgagor agrees, upon request of the Lender, to promptly furnish a list of personal property owned by the Mortgagor and subject to this Mortgage and, upon request by the Lender, to immediately execute, deliver and/or file any mortgage and any amendments to this Mortgage, any separate security agreement and any financing statements to include

3568.142/Doc #60

Mortgage
- 6 -

specifically this list of personal property. The Lender or any of its employees is each irrevocably appointed attorney-in-fact and is authorized to execute, deliver and/or file any mortgage and any amendments to this Mortgage, any separate security agreement and any financing statements to include specifically the personal property described above.

3.2   **Licenses and Permits.** As additional security for the Indebtedness, the Mortgagor assigns to the Lender all of the Mortgagor's rights and interest in all licenses or permits affecting the Mortgaged Property. This assignment shall not impose upon the Lender any obligations with respect to any license or permit. The Mortgagor shall not cancel or amend any of the licenses or permits assigned (nor permit any of them to terminate if they are necessary or desirable for the operation of the Mortgaged Property) without first obtaining the written approval of the Lender.

3.3   **Contracts.** As additional security for payment of the Indebtedness, the Mortgagor assigns to and grants the Lender a security interest in all existing and future agreements and contracts for the design, development, improvement, construction, maintenance, alteration, repair, testing, operation and management of the Mortgaged Property.

3.4   **Deposits and Accounts.** As additional security for the payment of the Indebtedness and performance of this Mortgage, the Mortgagor grants a security interest to the Lender in all deposits or other accounts with the Lender.

3.5   **Assignment of Rents and Leases.**

3.5.1   As additional security for the payment of the Indebtedness and performance of this Mortgage, the Mortgagor assigns to the Lender all of the Mortgagor's right, title and interest in and to all existing and future written and oral leases and occupancy agreements covering the Mortgaged Property or any part of it (collectively, the "Leases") (but without an assumption by the Lender of liabilities of the Mortgagor under any of these Leases or occupancy agreements by virtue of this assignment), and the Mortgagor assigns to the Lender the leases, rents, issues and profits of the Mortgaged Property and any guaranties of any of the Leases.

3.5.2   At least annually, and more frequently if requested by the Lender, the Mortgagor shall provide the Lender with a certified rent roll and such other information regarding the Leases as the Lender may reasonably require.

3.5.3   If an Event of Default occurs under this Mortgage, the Lender may receive and collect the rents, issues and profits personally, or through a receiver, so long as the Event of Default exists and during the pendency of any foreclosure proceedings and during any redemption period. The Mortgagor consents to the appointment of a receiver.

3.5.4   The Lender shall at no time have any obligation whatever to attempt to collect rents or other amounts from any tenant of the Mortgaged Property. Further, the Lender shall have no obligation to enforce any other obligations owed by any tenant of the Mortgaged Property. No action taken by the Lender under this Mortgage shall make the Lender a "mortgagee in possession."

3.5.5   The Mortgagor shall not collect advance rent under any of the Leases in excess of one month (other than as a security deposit) and the Lender shall not be bound by any prepayment made or received in violation of this prohibition.

3.5.6   At the option of the Lender, this Mortgage shall become subordinate, in whole or in part (but not with respect to priority as to insurance proceeds or any condemnation award) to any or all Leases upon the execution and recording by the Lender of an affidavit to that effect.

3.5.7   The Mortgagor shall timely perform the obligations under the Leases and not permit or suffer any event or condition which gives any tenant a right to cancel, terminate, or assert any defense or offset under any of the Leases.

4.   **EVENTS OF DEFAULT AND REMEDIES.**

4.1   **Events of Default.** Any of the following events shall, for purposes of this Mortgage, constitute an "Event of Default":

4.1.1   Failure by the Mortgagor or any co-obligor to pay any amount owing under the Note, the Agreement, or otherwise on the Indebtedness when due whether by maturity, acceleration or otherwise.

4.1.2   Any failure by the Mortgagor, any co-obligor or any guarantor of all or any part of the Indebtedness to comply with, or breach by the Mortgagor, any co-obligor or any guarantor or subordinator of, any of the terms, provisions, warranties or covenants of this Mortgage, the Agreement or any other any agreement or instrument which is part of the Indebtedness, any guaranty of any of the Indebtedness, or any other agreement or commitment between the Mortgagor, any co-obligor or any guarantor or subordinator and the Lender.

4.1.3   The termination, cancellation or disclaimer of liability or enforceability of any guaranty or subordination agreement given in connection with the Indebtedness.

4.1.4   Institution of foreclosure proceedings or other exercise of rights and remedies under any mortgage or other lien against the Mortgaged Property or any portion thereof.

3568.142/Doc #60

Mortgage
- 7 -

4.1.5   The insolvency of the Mortgagor, any co-obligor or any guarantor or the admission in writing of the Mortgagor's, any co-obligor's or any guarantor's inability to pay debts as they mature.

4.1.6   Any statement, representation or information made or furnished by or on behalf of the Mortgagor, any co-obligor, or any guarantor or subordinator to the Lender in connection with or to induce the Lender to provide any of the Indebtedness shall prove to be false or materially misleading when made or furnished.

4.1.7   Institution of bankruptcy, reorganization, insolvency or other similar proceedings by or against the Mortgagor, any co-obligor, or any guarantor; or the appointment of a receiver, custodian or trustee for the Mortgagor, any co-obligor, any guarantor or any substantial portion of either's assets.

4.1.8   Any loss, theft, substantial damage or destruction to the Mortgaged Property unless insured as required by this Mortgage or other document; or the entry of any judgment against the Mortgagor , any co-obligor, or any guarantor, or the issuance or filing of any attachment, levy, garnishment or the commencement of any related proceeding or other judicial process upon or in respect to the Mortgagor, any co-obligor, or any guarantor or the Mortgaged Property.

4.1.9   Sale or other disposition by the Mortgagor, any co-obligor, or any guarantor of any substantial portion of assets or property, or death, dissolution, merger, consolidation, termination of existence, insolvency, business failure or assignment for the benefit of creditors of or by the Mortgagor, any co-obligor, or any guarantor.

4.1.10   If there is any failure by the Mortgagor, any co-obligor, or any guarantor to pay when due any indebtedness (other than to the Lender) or in the observance or performance of any term, covenant or condition contained in any document evidencing, securing or relating to such indebtedness.

4.1.11   There is a substantial change in the existing or prospective financial condition or worth of the Mortgagor, any co-obligor, any guarantor or the Mortgaged Property, which the Lender in good faith determines to be materially adverse.

4.1.12   Notwithstanding anything to the contrary provided herein, and except as otherwise expressly provided to the contrary, Mortgagor shall have ten (10) days to cure a monetary default from the date of such event, and thirty (30) days to cure a nonmonetary default from the date of such event, failure and/or action, with an additional thirty (30) day cure period solely for nonmonetary defaults in the event that Mortgagor is actively pursuing a cure in good faith with all due diligence.

4.2   **Remedies Upon Event of Default**.  Upon the occurrence of any Event of Default, the Lender shall have the following rights, power and authority:

4.2.1   Declare all or part of the Indebtedness immediately due and payable.

4.2.2   Demand that the Mortgagor immediately surrender the possession of the Mortgaged Property to the Lender and the Mortgagor consents to the Lender taking possession of the Mortgaged Property and the books and records relating to the Mortgaged Property.

4.2.3   Lease the Mortgaged Property and may collect proceeds for the account of the Mortgagor.

4.2.4   Foreclose the interest of the Mortgagor in the Mortgaged Property by action pursuant to applicable law. Commencement of such an action shall be deemed a declaration of acceleration pursuant to clause 4.2.1 above.

4.2.5   The Lender is authorized and empowered to sell or cause to be sold the Mortgaged Property and to convey the same to the purchaser thereof, pursuant the authority and power hereby granted and the provisions of MCLA Section 600.3201 et seq., as amended, pertaining to foreclosure by advertisement, which statute does not require that the Mortgagor be personally notified of such sale or that a judicial hearing be held before the sale is conducted. The Lender may direct the sale of the Mortgaged Property to be in one parcel or several parcels and in any order as the Lender may elect in its sole discretion. The Mortgagor further agrees that the Lender is authorized and empowered to retain out of the sale proceeds such monies as are due under the terms of this Mortgage, including the costs and charges of such sale, including the attorney's fees and expenses, rendering the surplus moneys, if any, to the Mortgagor.

4.2.6   Collect and receive all payments, rents, profits and other amounts that are due or shall subsequently become due under the terms of any leases, land contract, or other agreements by which the Mortgagor is leasing or selling the Mortgaged Property or any interest in the Mortgaged Property. The Lender may also exercise any other rights or remedy of the Mortgagor under any or any lease, land contract or other agreement, and the costs and expenses thereof shall be for the account and expense of the Mortgagor. However, the Lender shall have no obligation to make any demand or inquiry as to the nature of sufficiency of any payment received or to present or file any claim or take any other action to collect or enforce the payment of any amounts to which the Lender may become entitled under this Mortgage. Similarly, the Lender shall not be liable for any of the Mortgagor's obligations under any such lease, land contract or other agreement.

4.2.7    Exercise all rights, remedies and privileges afforded a "secured party" under Article 9 of the Michigan Uniform Commercial Code. Require the Mortgagor to assemble the personal property subject to this Mortgage and make it available to the Lender at a place to be designated by the Lender which is reasonably convenient to both parties. Collect all accounts receivable, take possession of the personal property with or without demand and with or without process of law, and sell and dispose of it and distribute the proceeds according to law. For these purposes, the Mortgagor agrees that any requirement of reasonable notice, if any, shall be met if the Lender sends notice to the Mortgagor at least five (5) days prior to the date of sale, disposition or other event giving rise to the required notice.

4.2.8    Enter upon the Mortgaged Property and take other actions as the Lender deems appropriate to perform the Mortgagor's obligations under this Mortgage, to inspect, repair, protect or preserve the Mortgaged Property, to investigate or test for the presence of any Hazardous Materials, and/or to appraise the Mortgaged Property. All of the Lender's expenditures for these purposes shall be part of the Indebtedness and shall bear interest at the highest rate applicable to any of the Indebtedness.

4.2.9    Pursue any other available remedy at law or equity to enforce the payment of the Indebtedness.

4.3    <u>Remedies Generally</u>.

4.3.1    WARNING: THIS MORTGAGE CONTAINS A POWER OF SALE AND UPON DEFAULT MAY BE FORECLOSED BY ADVERTISEMENT. IN FORECLOSURE BY ADVERTISEMENT AND THE RELATED SALE OF THE MORTGAGED PROPERTY, NO HEARING IS REQUIRED AND THE ONLY NOTICE REQUIRED IS TO PUBLISH NOTICE IN A LOCAL NEWSPAPER AND TO POST A COPY OF THE NOTICE ON THE MORTGAGED PROPERTY.

4.3.2    WAIVER: THE MORTGAGOR WAIVES ALL RIGHTS UNDER THE CONSTITUTION AND LAWS OF THE UNITED STATES AND UNDER THE CONSTITUTION AND LAWS OF THE STATE OF MICHIGAN TO A HEARING PRIOR TO SALE IN CONNECTION WITH ANY FORECLOSURE BY ADVERTISEMENT AND ALL NOTICE REQUIREMENTS EXCEPT AS SET FORTH IN THE STATUTE PROVIDING FOR FORECLOSURE BY ADVERTISEMENT.

4.3.3    All remedies provided for in Section 4.2 shall be available to the extent not prohibited by law. Each remedy shall be cumulative and additional to any other remedy of the Lender at law, in equity or by statute. No delay or omission to exercise any right or power accruing upon any default or Event of Default shall impair any such right or power or shall be construed to be a waiver of, or acquiescence in, any such default or Event of Default.

4.3.4    The Lender may waive any Event of Default and may rescind any declaration of maturity of payments on the Indebtedness. In case of such waiver or recision the Mortgagor and the Lender shall be restored to their respective former positions and rights under this Mortgage. Any waiver by the Lender of any default or Event of Default shall be in writing and shall be limited to the particular default waived and shall not be deemed to waive any other default.

4.3.5    The Lender may release the obligation of any person liable for any of the Indebtedness and may extend time for payment or otherwise modify any terms of any of the Indebtedness without notice to or consent of the Mortgagor or any other person and without impairing the lien or priority of lien of this Mortgage.

4.4    <u>Receivers</u>. Upon an Event of Default and commencement of foreclosure proceedings to enforce the rights of the Lender under this Mortgage, the Lender shall be entitled to the appointment of a receiver or receivers of the Mortgaged Property and of the rents, issues and profits of the Mortgaged Property, pending such proceedings.

4.5    <u>Application of Proceeds</u>. Any proceeds received by the Lender from the exercise of remedies pursuant to Section 4.2 of this Mortgage shall be applied as follows:

4.5.1    First, to pay all costs and expenses incidental to the leasing, foreclosure, sale or other disposition of the Mortgaged Property. These costs and expenses shall include, without limit, reasonable compensation to the Lender, its agents and attorneys and any taxes and assessments or other liens and encumbrances prior to the lien of this Mortgage.

4.5.2    Second, to all sums expended or incurred by the Lender directly or indirectly in carrying out any term, covenant or agreement under this Mortgage or any related document, together with interest as provided in this Mortgage.

4.5.3    Third, to the payment of the Indebtedness. If the proceeds are insufficient to fully pay the Indebtedness, then application shall be made first to late charges and interest accrued and unpaid, then to any applicable prepayment premiums, then to unpaid fees and other charges, and then to the outstanding principal balance.

4.5.4    Fourth, any surplus remaining shall be paid to the Mortgagor or to whomsoever may be lawfully entitled.

4.6    <u>Marshalling</u>. In the event of foreclosure of this Mortgage or the enforcement by the Lender of any other rights and remedies under this Mortgage, the Mortgagor waives any right in respect to marshalling of assets which secure the

3568.142/Doc #60

Mortgage
- 9 -

Indebtedness or to require the Lender to pursue its remedies against any other assets or any other party which may be liable for any of the Indebtedness.

4.7    **Further Actions.** Promptly upon the request of the Lender, the Mortgagor shall execute, acknowledge and deliver any and all further conveyances, documents, mortgages and assurances, and do or cause to be done all further acts as the Lender may require to confirm and protect the lien of this Mortgage or otherwise to accomplish the purposes of this Mortgage.

4.8    **Attorneys Fees.** Any reference in this Mortgage to attorneys' fees shall refer to fees, charges, costs and expenses of in-house and outside attorneys and paralegals, whether or not a suit or proceeding is instituted, and whether incurred at the trial court level, on appeal, in a bankruptcy, administrative or probate proceeding, in consultation with counsel, or otherwise. All costs, expenses and fees of any nature for which the Mortgagor is obligated to reimburse or indemnify the Lender are part of the Indebtedness secured by this Mortgage and are payable upon demand, unless expressly provided otherwise, with interest until repaid at the highest rate charged on any of the Indebtedness (but not to exceed the maximum rate permitted by law).

5.    **MISCELLANEOUS.**

5.1    **Governing Law.** This Mortgage shall be construed in accordance with the laws of the State of Michigan.

5.2    **Successors and Assigns.** This Mortgage shall be binding upon the successors and assigns of the Mortgagor including, without limit, any debtor in possession or trustee in bankruptcy for the Mortgagor, and the rights and privileges of the Lender under this Mortgage shall inure to the benefit of its successors and assigns. This shall not be deemed a consent by the Lender to a conveyance by the Mortgagor of all or any part of the Mortgaged Property or of any ownership interest in the Mortgagor.

5.3    **Notices.** Notice from one party to another relating to this Mortgage shall be deemed effective if made in writing (including telecommunications) and delivered to the recipient's address, telex number or telecopier number set forth in this Mortgage by any of the following means: (a) hand delivery, (b) registered or certified mail, postage prepaid, (c) express mail or other overnight courier service, or (d) telecopy, telex or other wire transmission with request for assurance of receipt in a manner typical with respect to communications of that type. Notice made in accordance with these provisions shall be deemed delivered on receipt if delivered by hand or wire transmission, on the third business day after mailing if mailed by registered or certified mail, or on the next business day after mailing or deposit with the postal service or an overnight courier service if delivered by express mail or overnight courier.

5.4    **Entire Agreement; Amendments.** This Mortgage and any agreement to which it refers state all rights and obligations of the parties and supersede all other agreements (oral or written) with respect to the lien granted by this Mortgage. Any amendment of this Mortgage shall be in writing and shall require the signature of the Mortgagor and the Lender. Any waiver or consent to departure from strict compliance with this Mortgage must be in writing and signed by the Lender.

5.5    **Partial Invalidity.** The invalidity or unenforceability of any provision of this Mortgage shall not affect the validity or enforceability of the remaining provisions of this Mortgage.

5.6    **Inspections.** Any inspection, audit, appraisal or examination by the Lender or its agents of the Mortgaged Property or of information or documents pertaining to the Mortgaged Property is for the sole purpose of protecting the Lender's interests under this Mortgage and is not for the benefit or protection of the Mortgagor or any third party.

5.7    **Joint and Several Liability.** In the event that more than one person or entity executes this Mortgage, the obligations of each person or entity shall be joint and several.

5.8    **Automatic Reinstatement.** Notwithstanding any prior revocation, termination, surrender or discharge of this Mortgage, the effectiveness of this Mortgage shall automatically continue or be reinstated, as the case may be, in the event that:

5.8.1    Any payment received or credit given by the Lender in respect of the Indebtedness is returned, disgorged or rescinded as a preference, impermissible setoff, fraudulent conveyance, diversion of trust funds, or otherwise under any applicable state or federal law, including, without limit, laws pertaining to bankruptcy or insolvency, in which case this Mortgage shall be enforceable as if the returned, disgorged or rescinded payment or credit had not been received or given, whether or not the Lender relied upon this payment or credit or changed its position as a consequence of it.

5.8.2    Any liability is imposed, or sought to be imposed, against the Lender relating to the environmental condition of, or the presence of Hazardous Materials on, in or about the Real Estate, whether this condition is known or unknown, now exists or subsequently arises (excluding only conditions which arise after any acquisition by the Lender of any such property, by foreclosure, in lieu of foreclosure or otherwise, to the extent due to the wrongful acts or omissions of the Lender), in which case this Mortgage shall be enforceable to the extent of all liability, costs and expenses (including without limit reasonable attorneys fees) incurred by the Lender as the direct or indirect result of any environmental condition or Hazardous Materials.

5.8.3    In the event of continuation or reinstatement of this Mortgage, Mortgagor agrees upon demand by the Lender to execute and deliver to the Lender those documents which the Lender determines are appropriate to further evidence (in

3568.142/Doc #60

Mortgage
- 10 -

the public records or otherwise) this continuation or reinstatement, although the failure of the Mortgagor to do so shall not affect in any way the reinstatement or continuation. If Mortgagor does not execute and deliver to the Lender upon demand such documents, the Lender and each officer of the Mortgage is irrevocably appointed (which appointment is coupled with an interest) the true and lawful attorney of the Mortgagor (with full power of substitution) to execute and deliver such documents in the name and on behalf of the Mortgagor.

5.9     WAIVER OF JURY TRIAL. THE MORTGAGOR AND THE LENDER ACKNOWLEDGE THAT THE RIGHT TO TRIAL BY JURY IS A CONSTITUTIONAL ONE, BUT THAT IT MAY BE WAIVED. EACH PARTY, AFTER CONSULTING (OR HAVING HAD THE OPPORTUNITY TO CONSULT) WITH COUNSEL OF THEIR CHOICE, KNOWINGLY AND VOLUNTARILY, AND FOR THEIR MUTUAL BENEFIT, WAIVES ANY RIGHT TO TRIAL BY JURY IN THE EVENT OF LITIGATION REGARDING THE PERFORMANCE OR ENFORCEMENT OF, OR IN ANY WAY RELATED TO, THIS MORTGAGE OR THE INDEBTEDNESS.

5.10    Errors and Omissions; No Default Certificate. Mortgagor shall, on the request of Lender and at the expense of Mortgagor: (a) promptly correct any defect, error or omission which may be discovered in the contents herein or in the contents of any of the other Loan Documents; (b) promptly execute, acknowledge, deliver and record or file such further instruments (including, without limitation, further mortgages, security deeds, security agreements, financing statements, continuation statements and assignments of rents or leases) and promptly do such further acts as may be necessary, desirable or proper to carry out more effectively the purposes set forth herein and/or in the other Loan Documents and to subject to the liens and security interests established herein and/or in the other Loan Documents, of any property intended by the terms hereof and thereof to be covered hereby and thereby, including, but without limitation, any renewals, additions, substitutions, replacements or appurtenances to said property; (c) promptly execute, acknowledge, deliver, procure and record or file any document or instrument (including specifically, without limitation, any financing statement) deemed advisable by Lender to protect, continue or perfect the liens or the security interests granted hereunder to Lender against the rights or interests of third persons; and (d) promptly furnish to Lender, upon Lender's request, a duly acknowledged written statement and estoppel certificate addressed to such party or parties as directed by Lender and in form and substance supplied by Lender, setting forth all amounts due hereunder or under any of the other Loan Documents, stating whether any Default or Event of Default has occurred hereunder or thereunder, stating whether any offsets or defenses exist against the obligations of Mortgagor, hereunder, or against any of the other Loan Documents, and containing such other matters as Lender may reasonably require.

*[Signatures on following page]*

This Mortgage is dated and effective on the date stated above.

MORTGAGOR:

ADELAIDE POINTE WET MARINA, LLC,
a Michigan limited liability company

By: _____
     Ryan M. Leestma
Its:     Manager

NOTARY

The foregoing instrument was acknowledged before me on August 31, 2023, by Ryan M. Leestma, Manager of ADELAIDE POINTE WET MARINA, LLC, a Michigan limited liability company.

_____
Notary Public
My Commission Expires: _____
For the County of _____
Acting in the County of _____

SHARLENE SHINELDECKER
Notary Public - State of Michigan
County of Muskegon
My Commission Expires Nov 9, 2027
Acting in the County of Muskegon

Prepared by and when recorded return to:

Kotz Sangster Wysocki
400 Renaissance Center
Suite 3400
Detroit, Michigan 48243
Attn: Robert B. Goldi

3568.142/Doc #60

Mortgage
- 12 -

SCHEDULE A

LEGAL DESCRIPTION

The land referred to in this Mortgage, situated in the City of Muskegon, County of Muskegon, State of Michigan:

Wet Marina Parcel:

That part of Blocks 578 & 579 of the Revised Plat of 1903 of the City of Muskegon, Section 25, Town 10 North, Range 17 West, City of Muskegon, Muskegon County, Michigan, all lands lying North of the following line including 2 peninsulas, described as: COMMENCING at the Southeast corner of Lot 4 of Block 577; thence North 87°52'58" West 865.74 feet along the North right-of-way line of Western Avenue; thence Westerly 158.32 feet along said North right-of-way line on a 430.58 foot radius curve to the left, the chord of which bears South 81°35'02" West 157.43 feet; thence North 31°10'08" West 998.44 feet to the PLACE OF BEGINNING of said described line; thence North 59 38'02" East 67.38 feet; thence Northeasterly 59.87 feet on a 101.00 foot radius curve to the right, the chord of which bears North 41 °30'57" East 59.00 feet; thence North 58°29'54" East 610.85 feet; thence South 31 °22'33" East 18.36 feet; thence North 58°43'34" East 19.69 feet; thence Northeasterly 37.29 feet on a 64.00 foot radius curve to the left, the chord of which bears North 38°50'20" East 36.77 feet; thence North 04°26'14" East 26.75 feet; thence North 16°45'30" East 180 feet more or less to the shore of Muskegon Lake and the point of ending of said described line. All lands described extend to the waters edge of Muskegon Lake.

Pedestrian Access:

An easement for ingress and egress located in that part of Blocks 578 and 579 of the Revised Plat of 1903 of the City of Muskegon, Section 25, Town 10 North, Range 17 West, City of Muskegon, Muskegon County, Michigan, said easement being described as: COMMENCING at the Southeast corner of Lot 4 of Block 577; thence North 87°52'58" West 260.09 feet along the North right-of-way line of Western Avenue; thence North 01 °56'07" East 659.31 feet along the East line of said Block 578 and its Southerly extension thereof; thence North 32°59'53" West 703.91 feet; thence South 57°00'07" West 256.48 feet to the PLACE OF BEGINNING; thence South 58°37'27" West 17.15 feet; thence North 31°36'08" West 164.18 feet; thence North 58°29'54" East 20.18 feet; thence South 31 °22'32" East 57.90 feet; thence South 73°07'40" East 97.29 feet; thence South 16°52'20" West 16.00 feet; thence Southwesterly 63. 79 feet on a 52.00 foot radius curve to the left, the chord of which bears South 35°56'19" West 59.86 feet to the place of beginning.

Together with and subject to an easement for ingress-egress and public utilities located in that part of Blocks 577, 578 & 579 of the Revised Plat of 1903 of the City of Muskegon, Section 25, Town 10 North, Range 17 West, City of Muskegon, Muskegon County, Michigan, said easement being described as: Beginning on the North right-of-way line of Western Avenue at a point being North 87 degrees 52 minutes 58 seconds West 824.34 feet from the Southeast corner of Lot 4 of said Block 577; thence North 02 degrees 08 minutes 44 seconds East 263.07 feet; thence North 34 degrees 14 minutes 29 seconds East 7 4.27 feet; thence North 23 degrees 44 minutes 59 seconds East 71.13 feet; thence North 02 degrees 08 minutes 44 seconds East 164.98 feet; thence Northerly 75.89 feet on a 358.00 foot radius curve to the left, the chord of which bears North 03 degrees 55 minutes 38 seconds West 75.75 feet; thence Northeasterly 53.16 feet on a 30.00 foot radius curve to the right, the chord of which bears North 40 degrees 45 minutes 35 seconds East 46.47 feet; thence South 88 degrees 28 minutes 50 seconds East 70.66 feet; thence Northeasterly 137.17 feet on a 141.00 foot radius curve to the left, the chord of which bears North 63 degrees 39 minutes 00 seconds East 131.82 feet; thence Easterly 43.20 feet on a 165.00 foot radius non-tangential curve to the left, the chord of which bears South 81 degrees 06 minutes 34 seconds East 43.07 feet; thence South 88 degrees 36 minutes 35 seconds East 77.91 feet; thence Southeasterly 164.07 feet on a 105.00 foot radius curve to the right, the chord of which bears South 43 degrees 50 minutes 39 seconds East 147.88 feet; thence South 00 degrees 55 minutes 16 seconds West 231.33 feet; thence South 88 degrees 08 minutes 38 seconds East 57.67 feet; thence North 01 degrees 56 minutes 07 seconds East 248.95 feet; thence North 88 degrees 06 minutes 24 seconds West 8.34 feet; thence North 32 degrees 59 minutes 53 seconds West 152.26 feet; thence Northwesterly 11.02 feet on a 180.00 foot radius curve to the left, the chord of which bears North 60 degrees 10 minutes 49 seconds West 11.02 feet; thence Northwesterly 23.47 feet on a 44.00 foot radius curve to the right, the chord of which bears North 46 degrees 39 minutes 17 seconds West 23.19 feet; thence North 31 degrees 22 minutes 33 seconds West 32.33 feet; thence South 58 degrees 41 minutes 48 seconds West 30.10 feet; thence Southwesterly 24.54 feet on a 43.00 foot radius curve to the right, the chord of which bears South 75 degrees 02 minutes 37 seconds West 24.20 feet; thence North 88 degrees 36 minutes 35 seconds West 28.07 feet; thence Northwesterly 112.92 feet on a 113.00 foot radius curve to the right, the chord of which bears North 60 degrees 00 minutes 12 seconds West 108.28 feet; thence North 31 degrees 22 minutes 33 seconds West 304.82 feet; thence Northwesterly 25.59 feet on a 100.00 foot radius curve to the left, the chord of which bears North 38 degrees 42 minutes 28 seconds West 25.52 feet; thence North 73 degrees 07 minutes 40 seconds West 86.39 feet; thence Southwesterly 63.79 feet on a 52.00 foot radius curve to the left, the chord of which bears South 35 degrees 56 minutes 19 seconds West 59.86 feet; thence South 58 degrees 37 minutes 27 seconds West 514.47 feet; thence South 10 degrees 46 minutes 30 seconds West 86.44 feet; thence South 31 degrees 22 minutes 33 seconds East 25.92 feet; thence

North 58 degrees 37 minutes 27 seconds East 598.50 feet; thence South 31 degrees 22 minutes 33 seconds East 297.13 feet; thence South 58 degrees 37 minutes 27 seconds West 79.88 feet; thence North 88 degrees 28 minutes 50 seconds West 95.92 feet; thence South 40 degrees 42 minutes 37 seconds West 73.46 feet to Point A, so-called; thence Southerly 123.08 feet on a 292.00 foot radius curve to the right, the chord of which bears South 09 degrees 55 minutes 48 seconds East 122.17 feet; thence South 02 degrees 08 minutes 44 seconds West 161.50 feet; thence Southwesterly 72.07 feet on a 117.00 foot radius curve to the right, the chord of which bears South 19 degrees 47 minutes 30 seconds West 70.93 feet; thence Southerly 143.52 feet on a 233.00 foot radius curve to the left, the chord of which bears South 19 degrees 47 minutes 30 seconds West 141.26 feet; thence South 02 degrees 08 minutes 44 seconds West 194.05 feet to the North right-of-way line of Western Avenue; thence Easterly 23.28 feet along said North right-of-way line on a 430.58 foot radius curve to the right, the chord of which bears South 89 degrees 25 minutes 54 seconds East 23.27 feet; thence South 87 degrees 52 minutes 58 seconds East 41 .40 feet along the North right-of-way line of Western Avenue to the place of beginning.

ALSO Together with and subject to an easement for ingress-egress and public utilities described as: Beginning at above mentioned Point A, so-called; thence South 89 degrees 12 minutes 02 seconds West 32.68 feet; thence South 58 degrees 37 minutes 27 seconds West 287.81 feet; thence Northwesterly 102.90 feet on a 91 .00 foot radius non-tangential curve to the right, the chord of which bears North 63 degrees 46 minutes 09 seconds West 97.50 feet; thence North 31 degrees 22 minutes 33 seconds West 168.67 feet; thence North 58 degrees 37 minutes 27 seconds East 87.08 feet; thence South 31 degrees 22 minutes 33 seconds East 185.00 feet; thence North 58 degrees 37 minutes 27 seconds East 285.00 feet; thence North 31 degrees 22 minutes 33 seconds West 185.00 feet; thence North 58 degrees 37 minutes 27 seconds East 66.00 feet; thence South 31 degrees 22 minutes 33 seconds East 245.03 feet; thence South 40 degrees 42 minutes 37 seconds West 73.46 feet to Point A, so called and the place of ending.

Commonly Known As: 1204 W. Western Ave., Muskegon, Michigan 49441

Tax Parcel No. 61-24-025-100-0001-00

# EXHIBIT B

_____[Space Above This Line is for Recording Information]_____

## ASSIGNMENT OF LEASES AND RENTS

THIS ASSIGNMENT OF LEASES AND RENTS ("Assignment") is made on August 31, 2023, by ADELAIDE POINTE WET MARINA, LLC, a Michigan limited liability company ("Assignor"), of 1204 W. Western Ave., Suite A, Muskegon, Michigan 49441, in favor of 4FRONT CREDIT UNION ("Lender"), of 3939 W. Front Street, Traverse City, Michigan 49684, with respect to Assignor's real property located in the City of Muskegon, County of Muskegon, State of Michigan, as described on attached Exhibit A ("Premises"), on which Assignor has granted Lender a mortgage of even date, in order to secure all of the following (individually and collectively the "Indebtedness"):

A.     Payment in the sum of $6,022,500.00, together with interest, costs and all other sums on that amount, to be paid according to the $6,022,500.00 Promissory Note of even date herewith, made by Assignor (also referred to herein as, the "Borrower"), payable to Lender, the Construction Loan Agreement of even date herewith, made between Borrower and Lender, and any and all extensions, renewals, modifications, substitutions or replacements thereof. This reference to a particular dollar amount does not in any way limit the dollar amount secured by this Assignment.

B.     The payment of any and all amounts of any kind now owing or later to become due to the Lender from the Borrower during the term of this Assignment, however created or arising, whether under the instruments and agreements described above or under any other present or future instrument or agreement between the Borrower and the Lender, or otherwise, and whether direct, indirect, primary, secondary, fixed, contingent, joint or several, due or to become due, together with interest, costs and all other sums on those amounts; and including, without limit, all present and future indebtedness or obligations of third parties to the Lender which is guaranteed by the Borrower, and the present or future indebtedness originally owing by the Borrower to third parties and assigned by third parties to the Lender, and any and all renewals, extensions, modifications, substitutions or replacements of any of them.

C.     The performance of the covenants and obligations due or to become due to the Lender, including, without limit, those due under this Assignment, and the repayment of all sums expended by the Lender in connection with performance of those covenants and obligations.

## COVENANTS AND AGREEMENTS

1.     ASSIGNMENT. For consideration received and to secure payment and performance of the Indebtedness, the Assignor unconditionally and irrevocably grants, transfers, assigns and sets over to the Lender all of the right, title and interest of Assignor in and to:

1.1     Leases. All existing and future leases (or subleases if the Assignor is the owner of the primary leasehold estate) and use and occupancy agreements, whether written or oral, applying to all or any part of the Premises, together with all extensions, renewals or replacements (collectively, "Leases").

1.2     Guarantees. Any and all guarantees of payment or performance under any of the Leases.

1.3     Rent. The immediate and continuing right to collect and receive all of the rents, income, receipts, revenues, issues and profits due or to become due or to which the Assignor is now or in the future (including the period of

3568.142/Doc#68

redemption, if any) entitled to or may demand or claim, arising with respect to the Leases or the Premises; including, without limit, minimum rents, additional rents, percentage rents, parking, maintenance, tax and insurance contributions, proceeds of sale of electricity, gas, chilled and heated water and other utilities and services, deficiency rents and liquidated damages following default, the premium payable by any lessee upon the exercise of cancellation privilege provided in any Lease, and all proceeds payable under any policy of insurance covering loss of rents resulting from untenantability caused by destruction or damage to the Premises or any part thereof, together with any and all rights and claims of any kind which the Assignor may have against any lessee under any Lease or any subtenants or occupants of the Premises (collectively, "Rents").

1.4    Security Deposits. All security deposits, damage deposits and other funds paid to the Assignor by any lessee under any Lease, whether paid in a lump sum or installments.

2.    REPRESENTATIONS AND WARRANTIES. The Assignor represents and warrants that:

2.1    Title. The Assignor is the owner in fee simple of the Premises, or if the Assignor is lessee under a ground lease, that the Assignor is owner of the primary leasehold estate. The Assignor has good title to the Leases and Rents, and good right to assign the same. No other person or entity has any right, title or interest in the Leases or Rents.

2.2    Performance. The Assignor has duly and punctually performed all terms, covenants, conditions and warranties under the Leases on the Assignor's part to be performed.

2.3    Valid Leases. The Leases are valid, unmodified and in full force and effect, except as otherwise reported to Lender.

2.4    No Prior Assignment. The Assignor has not previously sold, assigned, transferred, mortgaged or pledged the Leases or the Rents.

2.5    Collection of Rents. The Rents from the Premises for any period subsequent to the date of this Assignment have not been collected and payment of the Rents has not been waived, released, discounted, set-off or otherwise discharged or compromised, except as otherwise reported to Lender.

2.6    Deposits. The Assignor has not received any deposit from any lessee under any Lease, except as otherwise reported to Lender.

2.7    No Default. The lessees under the Leases are not in default under any of the terms of the Leases, except as otherwise reported to Lender.

3.    AFFIRMATIVE COVENANTS. The Assignor covenants and agrees that it will:

3.1    Performance. Perform all obligations, terms, covenants, conditions and warranties under the Leases on the Assignor's part to be performed, and give prompt written notice to the Lender of any failure on the Assignor's part to perform the same.

3.2    Notice of Assignment. Notify, in writing, and direct each lessee or occupant of the Premises that any security deposit or other deposits delivered to the Assignor have been retained by the Assignor or have been assigned and delivered to the Lender, as the case may be.

3.3    Enforcement. Enforce the performance by each lessee of each and every obligation, term, covenant, condition and agreement in the Leases to be performed.

3.4    Notice of Default. Give the Lender written notice of default by any lessee under any Lease.

3.5    Actions. Appear in and defend any action or proceeding arising under, or in any manner connected with, the Leases or the obligations, duties or liabilities of the Assignor or any lessee under the Leases, and upon request by the Lender, do so in the name and on behalf of the Lender, but at the expense of the Assignor.

3568.142/Doc #68

2

3.6     Costs. Pay all costs and expenses of the Lender, including reasonable attorneys' fees with respect to the Assignment or the enforcement of the Lender's rights under this Assignment.

3.7     Delivery of Leases. Deliver to the Lender an executed copy of each Lease within ten (10) days after its execution, transfer and assign future Leases upon the same terms and conditions as contained in this Assignment, and make, execute and deliver, upon the Lender's demand, any and all assignments and other instruments sufficient for that purpose.

4.      NEGATIVE COVENANTS. The Assignor further covenants and agrees that it will not:

4.1     Collection of Rents in Advance. Receive or collect Rents from any lessee for a period of more than one (1) month in advance, or pledge, transfer, mortgage or otherwise encumber or assign future payments of the Rents.

4.2     Waivers. Waive, excuse, discount, compromise or in any manner release or discharge any lessee from any obligations, covenants, conditions or agreements arising under any Lease.

4.3     Modifications. Cancel, terminate or consent to any surrender of any Lease nor modify or in any way alter the terms of any Lease.

4.4     Settlement. In the event any lessee or guarantor of any Lease should be the subject of any bankruptcy proceeding or any other federal, state or local statute which provides for the possible termination or rejection of any Lease, or any guarantee of any Lease, and in the event such Lease is rejected or guarantee terminated, make any damages settlement without the prior written consent of the Lender.

5.      EVENTS OF DEFAULT. The occurrence of an Event of Default under any document evidencing or securing the Indebtedness, Assignor's failure to comply with or perform this Assignment, or any failure of Assignor's representations and warranties to be true in all respects, shall constitute an Event of Default under this Assignment.

6.      REMEDIES ON DEFAULT. Upon the occurrence of an Event of Default, the Lender, at its option, shall have the rights, power and authority under this Assignment to exercise and enforce any or all of the following rights and remedies:

6.1     Collection of Rents. To demand, collect, receive, sue for, attach and/or levy the Rents, to give proper receipts, releases and acquittances for the Rents, and after deducting all necessary and proper costs and expenses of operation and collection, as determined by the Lender, including reasonable attorneys' fees, to apply the net proceeds, upon the Indebtedness in such manner as the Lender may determine.

6.2     Acceleration of Indebtedness. To declare all or part of the Indebtedness immediately due and payable.

6.3     Actions of Lender. Without regard to the adequacy of the security, with or without legal action or proceeding, through any person or agent, or by a receiver appointed by court, and irrespective of the Assignor's possession of the Premises, to enter upon, take possession of, manage and operate the Premises; make, modify, enforce, cancel or accept surrender of any Lease; remove and evict any lessee; increase or decrease rents; decorate, clean and repair; and otherwise do any act or incur any costs or expense as the Lender shall deem proper to protect the security of this Assignment as fully and to the same extent as the Assignor could do if in possession; and, in such event, to apply the Rents collected to the operation and management of the Premises, but in such order as the Lender shall deem proper (including the payment of reasonable management, brokerage and attorneys' fees) and to the payment of Indebtedness in such manner as the Lender may determine.

6.4     Secured Party. Exercise all rights, remedies and privileges afforded a "secured party" under Article 9 of the Michigan Uniform Commercial Code.

6.5     No Obligation by Lender. Acceptance by the Lender of this Assignment, with all of the rights, powers, privileges and authority so created, shall not, prior to entry upon and taking of possession of the Premises by the Lender, be deemed or construed to constitute the Lender a mortgagee in possession, nor thereafter or at any time or in any event obligate the Lender to appear in or defend any action or proceeding relating to the Leases or to the Premises, or to take any action under this Assignment, or to expend any money or incur any expenses or perform or discharge any obligation, duty or

3568.142/Doc #68

3

liability under the Leases, or to assume any obligation or responsibility for any security deposits or other deposits delivered to the Assignor by any lessee and not assigned and delivered to the Lender; nor shall the Lender be liable in any way for any injury or damage to any person or property sustained in or about the Premises.

6.6     **No Waiver.** The collection of the Rents and application as provided in this Assignment and/or the entry upon and taking possession of the Premises shall not cure or waive any default or waive, modify or affect any notice of default under any document evidencing or securing the Indebtedness or invalidate any act done pursuant to such notice, and the enforcement of any such right or remedy by the Lender, once exercised, shall continue for so long as the Lender shall elect, notwithstanding that the collection and application of the Rents may have cured for the time the original default. If the Lender shall thereafter elect to discontinue the exercise of any such right or remedy, the same or any other right or remedy under this Assignment may be reasserted at any time and from time to time following any subsequent default.

6.7     **Additional Remedies.** The Lender shall have all the rights and remedies provided by law or equity or by agreement of the parties. The remedies of the Lender are cumulative and not exclusive.

7.     **POWER OF ATTORNEY.** For as long as any Indebtedness remains unpaid or unperformed, the Assignor irrevocably constitutes and appoints the Lender the true and lawful attorney of the Assignor, coupled with an interest, and in the name, place and stead of the Assignor:

7.1     **Collection Upon Cancellation.** To demand, sue for, attach, levy, recover and receive any premium or penalty payable upon the exercise, by any lessee under any Lease, of a privilege of cancellation originally provided in any Lease.

7.2     **Collection of Rents.** To give proper receipts, releases and acquittances for the collection of Rents and, after deducting expenses of collection, to apply the net proceeds as a credit upon any portion of the Indebtedness. The Assignor authorizes and directs each lessee to deliver payment to the Lender in accordance with the foregoing.

7.3     **Subordination.** To subject and subordinate any Lease affecting the Premises to the lien of any mortgage on (or any ground lease of) the Premises.

8.     **HOLD HARMLESS.** The Assignor agrees to indemnify and hold the Lender harmless from all liability, loss, damage or expense which the Lender may incur under or by reason of this Assignment, or for any action taken by the Lender under this Assignment, or by reason or in defense of any and all claims and demands asserted against the Lender arising out of the Leases. Should the Lender incur any such liability, loss, damage or expense, the amount thereof (including reasonable attorneys' fees), with interest thereon at the highest default rate provided for under the Indebtedness, shall be payable by the Assignor immediately, without demand.

9.     **CONTINUATION DURING FORECLOSURE.** The rights of the Lender to collect and receive the Rents due under the Leases or to take possession of the Premises, or to exercise any of the other rights or powers granted to the Lender shall, to the extent not prohibited by law, also extend to the period from and after the filing of any suit to foreclose the lien of any mortgage on the Premises, including any period allowed by law for the redemption of the Premises after any foreclosure sale.

10.     **NO MERGER.** So long as any of the Indebtedness shall remain unpaid or unperformed, unless the Lender shall otherwise consent in writing, the fee title and the leasehold estates on the Premises shall not merge, but shall always be kept separate and distinct, notwithstanding the union of such estates in the Assignor or in any lessee or in any third party by purchase or otherwise.

11.     **MISCELLANEOUS.**

11.1     **Governing Law.** This Assignment shall be construed in accordance with the laws of the State of Michigan.

11.2     **Successors and Assigns.** This Assignment shall be binding upon the successors and assigns of the Assignor including, without limit, any debtor in possession or trustee in bankruptcy for the Assignor, and the rights and

3568.142/Doc #68

4

privileges of the Lender under this Assignment shall inure to the benefit of its successors and assigns. This shall not be deemed a consent by the Lender to a conveyance by the Assignor of all or any part of the Premises, any Lease or of any ownership interest in the Assignor.

11.3    **Notices**. Notice from one party to another relating to this Assignment shall be deemed effective if made in writing (including telecommunications) and delivered to the recipient's address, telex number or telecopier number set forth in this Assignment by any of the following means:   hand delivery, registered or certified mail, postage prepaid, express mail or other overnight courier service, or telecopy, telex or other wire transmission with request for assurance of receipt in a manner typical with respect to communications of that type.  Notice made in accordance with these provisions shall be deemed delivered on receipt if delivered by hand or wire transmission, on the third business day after mailing if mailed by registered or certified mail, or on the next business day after mailing or deposit with the postal service or an overnight courier service if delivered by express mail or overnight courier.

11.4    **Amendments**. Any amendment of this Assignment shall be in writing and shall require the signature of the Assignor and the Lender.

11.5    **Partial Invalidity**. The invalidity or unenforceability of any provision of this Assignment shall not affect the validity or enforceability of the remaining provisions of this Assignment.

11.6    **Inspections**. Any inspection, audit, appraisal or examination by the Lender or its agents of the Premises or of information or documents pertaining to the Premises; including, without limit, the Leases, is for the sole purpose of protecting the Lender's interests under this Assignment and is not for the benefit or protection of the Assignor or any third party.

11.7    **Joint and Several Liability**. In the event that more than one person or entity executes this Assignment, the obligations of each person or entity shall be joint and several.

11.8    **Automatic Reinstatement**. Notwithstanding any prior revocation, termination, surrender or discharge of this Assignment, the effectiveness of this Assignment shall automatically continue or be reinstated, as the case may be, in the event that any payment received or credit given by the Lender in respect of the Indebtedness is returned, disgorged or rescinded as a preference, impermissible setoff, fraudulent conveyance, diversion of trust funds, or otherwise under any applicable state or federal law, including, without limit, laws pertaining to bankruptcy or insolvency, in which case this Assignment shall be enforceable as if the returned, disgorged or rescinded payment or credit had not been received or given, whether or not the Lender relied upon this payment or credit or changed its position as a consequence of it.  In the event of continuation or reinstatement of this Assignment, Assignor agrees upon demand by the Lender to execute and deliver to the Lender those documents which the Lender determines are appropriate to further evidence (in the public records or otherwise) this continuation or reinstatement, although the failure of the Assignor to do so shall not affect in any way the reinstatement or continuation. If Assignor does not execute and deliver to the Lender upon demand such documents, the Lender and each officer of the Lender is irrevocably appointed (which appointment is coupled with an interest) the true and lawful attorney of the Assignor (with full power of substitution) to execute and deliver such documents in the name and on behalf of the Assignor.

12.    **WAIVER OF JURY TRIAL.** THE ASSIGNOR AND THE LENDER ACKNOWLEDGE THAT THE RIGHT TO TRIAL BY JURY IS A CONSTITUTIONAL ONE, BUT THAT IT MAY BE WAIVED. EACH PARTY, AFTER CONSULTING (OR HAVING HAD THE OPPORTUNITY TO CONSULT) WITH COUNSEL OF THEIR CHOICE, KNOWINGLY AND VOLUNTARILY, AND FOR THEIR MUTUAL BENEFIT, WAIVES ANY RIGHT TO TRIAL BY JURY IN THE EVENT OF LITIGATION REGARDING THE PERFORMANCE OR ENFORCEMENT OF, OR IN ANY WAY RELATED TO, THIS ASSIGNMENT OR THE INDEBTEDNESS.

*[Remainder of page left intentionally blank; signature page to follow]*

3568.142/Doc #68

This Assignment of Leases and Rents is dated and effective as of the date stated above.

ASSIGNOR:

ADELAIDE POINTE WET MARINA, LLC,
a Michigan limited liability company

By: _____

Ryan M. Leestma

Its:    Manager

NOTARY

The foregoing instrument was acknowledged before me on August 31, 2023, by Ryan M. Leestma, Manager of ADELAIDE POINTE WET MARINA, LLC, a Michigan limited liability company.

_____

Notary Public
My Commission Expires: _____
For the County of _____
Acting in the County of _____

Prepared by and when recorded return to:

Kotz Sangster Wysocki
400 Renaissance Center
Suite 3400
Detroit, Michigan 48243
Attn: Robert B. Goldi

SHARLENE SHINELDECKER
Notary Public - State of Michigan
County of Muskegon
My Commission Expires Nov 9, 2027
Acting in the County of Muskegon

3568.142/Doc #68

6

## EXHIBIT A

### LEGAL DESCRIPTION

The land referred to in this Assignment of Leases and Rents, situated in the City of Muskegon, County of Muskegon, State of Michigan:

Wet Marina Parcel:

That part of Blocks 578 & 579 of the Revised Plat of 1903 of the City of Muskegon, Section 25, Town 10 North, Range 17 West, City of Muskegon, Muskegon County, Michigan, all lands lying North of the following line including 2 peninsulas, described as: COMMENCING at the Southeast corner of Lot 4 of Block 577; thence North 87°52'58" West 865.74 feet along the North right-of-way line of Western Avenue; thence Westerly 158.32 feet along said North right-of-way line on a 430.58 foot radius curve to the left, the chord of which bears South 81°35'02" West 157.43 feet; thence North 31°10'08" West 998.44 feet to the PLACE OF BEGINNING of said described line; thence North 59 38'02" East 67.38 feet; thence Northeasterly 59.87 feet on a 101.00 foot radius curve to the right, the chord of which bears North 41 °30'57" East 59.00 feet; thence North 58°29'54" East 610.85 feet; thence South 31 °22'33" East 18.36 feet; thence North 58°43'34" East 19.69 feet; thence Northeasterly 37.29 feet on a 64.00 foot radius curve to the left, the chord of which bears North 38°50'20" East 36.77 feet; thence North 04°26'14" East 26.75 feet; thence North 16°45'30" East 180 feet more or less to the shore of Muskegon Lake and the point of ending of said described line. All lands described extend to the waters edge of Muskegon Lake.

Pedestrian Access:

An easement for ingress and egress located in that part of Blocks 578 and 579 of the Revised Plat of 1903 of the City of Muskegon, Section 25, Town 10 North, Range 17 West, City of Muskegon, Muskegon County, Michigan, said easement being described as: COMMENCING at the Southeast corner of Lot 4 of Block 577; thence North 87°52'58" West 260.09 feet along the North right-of-way line of Western Avenue; thence North 01 °56'07" East 659.31 feet along the East line of said Block 578 and its Southerly extension thereof; thence North 32°59'53" West 703.91 feet; thence South 57°00'07" West 256.48 feet to the PLACE OF BEGINNING; thence South 58°37'27" West 17.15 feet; thence North 31°36'08" West 164.18 feet; thence North 58°29'54" East 20.18 feet; thence South 31 °22'32" East 57.90 feet; thence South 73°07'40" East 97.29 feet; thence South 16°52'20" West 16.00 feet; thence Southwesterly 63. 79 feet on a 52.00 foot radius curve to the left, the chord of which bears South 35°56'19" West 59.86 feet to the place of beginning.

Together with and subject to an easement for ingress-egress and public utilities located in that part of Blocks 577, 578 & 579 of the Revised Plat of 1903 of the City of Muskegon, Section 25, Town 10 North, Range 17 West, City of Muskegon, Muskegon County, Michigan, said easement being described as: Beginning on the North right-of-way line of Western Avenue at a point being North 87 degrees 52 minutes 58 seconds West 824.34 feet from the Southeast corner of Lot 4 of said Block 577; thence North 02 degrees 08 minutes 44 seconds East 263.07 feet; thence North 34 degrees 14 minutes 29 seconds East 7 4.27 feet; thence North 23 degrees 44 minutes 59 seconds East 71.13 feet; thence North 02 degrees 08 minutes 44 seconds East 164.98 feet; thence Northerly 75,89 feet on a 358.00 foot radius curve to the left, the chord of which bears North 03 degrees 55 minutes 38 seconds West 75.75 feet; thence Northeasterly 53.16 feet on a 30.00 foot radius curve to the right, the chord of which bears North 40 degrees 45 minutes 35 seconds East 46.47 feet; thence South 88 degrees 28 minutes 50 seconds East 70.66 feet; thence Northeasterly 137.17 feet on a 141.00 foot radius curve to the left, the chord of which bears North 63 degrees 39 minutes 00 seconds East 131.82 feet; thence Easterly 43.20 feet on a 165.00 foot radius non-tangential curve to the left, the chord of which bears South 81 degrees 06 minutes 34 seconds East 43.07 feet; thence South 88 degrees 36 minutes 35 seconds East 77.91 feet; thence Southeasterly 164.07 feet on a 105.00 foot radius curve to the right, the chord of which bears South 43 degrees 50 minutes 39 seconds East 147.88 feet; thence South 00 degrees 55 minutes 16 seconds West 231.33 feet; thence South 88 degrees 08 minutes 38 seconds East 57.67 feet; thence North 01 degrees 56 minutes 07 seconds East 248.95 feet; thence North 88 degrees 06 minutes 24 seconds West 8.34 feet; thence North 32 degrees 59 minutes 53 seconds West 152.26 feet; thence Northwesterly 11.02 feet on a 180.00 foot radius curve to the left, the chord of which bears North 60 degrees 10 minutes 49 seconds West 11.02 feet; thence Northwesterly 23.47 feet on a 44.00 foot radius curve to the right, the chord of which bears North 46 degrees 39 minutes 17 seconds West 23.19 feet; thence North 31 degrees 22 minutes 33 seconds West 32.33 feet; thence South 58 degrees 41 minutes 48 seconds West 30.10 feet; thence Southwesterly 24.54 feet on a 43.00 foot radius curve to the right, the chord of which bears South 75 degrees 02

3568.142/Doc#68

ASSIGNMENT OF LEASES AND RENTS
EXHIBIT A

minutes 37 seconds West 24.20 feet; thence North 88 degrees 36 minutes 35 seconds West 28.07 feet; thence Northwesterly 112.92 feet on a 113.00 foot radius curve to the right, the chord of which bears North 60 degrees 00 minutes 12 seconds West 108.28 feet; thence North 31 degrees 22 minutes 33 seconds West 304.82 feet; thence Northwesterly 25.59 feet on a 100.00 foot radius curve to the left, the chord of which bears North 38 degrees 42 minutes 28 seconds West 25.52 feet; thence North 73 degrees 07 minutes 40 seconds West 86.39 feet; thence Southwesterly 63.79 feet on a 52.00 foot radius curve to the left, the chord of which bears South 35 degrees 56 minutes 19 seconds West 59.86 feet; thence South 58 degrees 37 minutes 27 seconds West 514.47 feet; thence South 10 degrees 46 minutes 30 seconds West 86.44 feet; thence South 31 degrees 22 minutes 33 seconds East 25.92 feet; thence North 58 degrees 37 minutes 27 seconds East 598.50 feet; thence South 31 degrees 22 minutes 33 seconds East 297.13 feet; thence South 58 degrees 37 minutes 27 seconds West 79.88 feet; thence North 88 degrees 28 minutes 50 seconds West 95.92 feet; thence South 40 degrees 42 minutes 37 seconds West 73.46 feet to Point A, so-called; thence Southerly 123.08 feet on a 292.00 foot radius curve to the right, the chord of which bears South 09 degrees 55 minutes 48 seconds East 122.17 feet; thence South 02 degrees 08 minutes 44 seconds West 161.50 feet; thence Southwesterly 72.07 feet on a 117.00 foot radius curve to the right, the chord of which bears South 19 degrees 47 minutes 30 seconds West 70.93 feet; thence Southerly 143.52 feet on a 233.00 foot radius curve to the left, the chord of which bears South 19 degrees 47 minutes 30 seconds West 141.26 feet; thence South 02 degrees 08 minutes 44 seconds West 194.05 feet to the North right-of-way line of Western Avenue; thence Easterly 23.28 feet along said North right-of-way line on a 430.58 foot radius curve to the right, the chord of which bears South 89 degrees 25 minutes 54 seconds East 23.27 feet; thence South 87 degrees 52 minutes 58 seconds East 41.40 feet along the North right-of-way line of Western Avenue to the place of beginning.

ALSO Together with and subject to an easement for ingress-egress and public utilities described as: Beginning at above mentioned Point A, so-called; thence South 89 degrees 12 minutes 02 seconds West 32.68 feet; thence South 58 degrees 37 minutes 27 seconds West 287.81 feet; thence Northwesterly 102.90 feet on a 91.00 foot radius non-tangential curve to the right, the chord of which bears North 63 degrees 46 minutes 09 seconds West 97.50 feet; thence North 31 degrees 22 minutes 33 seconds West 168.67 feet; thence North 58 degrees 37 minutes 27 seconds East 87.08 feet; thence South 31 degrees 22 minutes 33 seconds East 185.00 feet; thence North 58 degrees 37 minutes 27 seconds East 285.00 feet; thence North 31 degrees 22 minutes 33 seconds West 185.00 feet; thence North 58 degrees 37 minutes 27 seconds East 66.00 feet; thence South 31 degrees 22 minutes 33 seconds East 245.03 feet; thence South 40 degrees 42 minutes 37 seconds West 73.46 feet to Point A, so called and the place of ending.

Commonly Known As: 1204 W. Western Ave., Muskegon, Michigan 49441

Tax Parcel No. 61-24-025-100-0001-00

ASSIGNMENT OF LEASES AND RENTS
EXHIBIT A

# EXHIBIT C

Received & Sealed for Record
William A. Moulatsiotis Register of Deeds
Muskegon County Michigan
03/04/2026 10:56 AM Liber: 4409 Page: 748

William A. Moulatsiotis Liber: 4409 Page: 748
Register of Deeds        PAGE: 1 of 4
Muskegon County Michigan  03/04/2026 10:56 AM
022      5875270

_(Above for recording data)_

## STATUTORY NOTICE OF DEFAULT AND DEMAND TO ASSIGNOR
## FOR PAYMENT OF RENTS

In accordance with the provisions of Michigan Public Acts of 115 of 2022, as amended, notice and demand is given as follows:

**Adelaide Pointe Wet Marina, LLC**, a Michigan limited liability company, ("Assignor") executed a certain Assignment of Leases and Rents in favor of **4Front Credit Union** ("Lender"), dated August 31, 2023, and recorded on September 1, 2023, at Liber 4337, Page 795, in the Muskegon County Register of Deeds (the "Assignment of Rents").

The Assignment of Rents pertains to certain real estate located in the City of Muskegon, Muskegon County, Michigan as more particularly described in **Exhibit A** (the "Property"). Pursuant to the Assignment of Rents, Assignor assigned all leases and rents to Lender to secure repayment of its indebtedness to Lender. Lender has the right to collect rents from the Property upon the default of Borrower under the Assignment of Rents and the underlying loan documents.

Default has occurred by Assignor under the terms of the Assignment of Rents and the associated loan documents.

In accordance with MCL 554.1058, Lender hereby notifies Assignor that Lender is demanding that Assignor pay over the proceeds to Lender of any rents it is entitled to collect under MCL 554.1056, including but not limited to rent payments, occupancy agreements, and/or slip fees.

[Signature on next page.]

1

61838312.1

Dated: February 26, 2026

**4Front Credit Union**

By its attorneys:

Plunkett Cooney,
a Michigan professional corporation

By: _____
Peter D. Cronk, Authorized Agent

STATE OF MICHIGAN          )
                           ) ss
COUNTY OF INGHAM           )

    The foregoing document was acknowledged before me this February 26 2026, by Peter D. Cronk, Esq., Authorized Agent for Plunkett Cooney, a Michigan professional corporation, the attorneys for 4Front Credit Union, on its behalf.

Laura L. Robbins, Notary Public
Ingham County, Michigan
My commission expires: 2.15.2029
Acting in Ingham County

Drafted by / When recorded return to:

Peter D. Cronk, Esq.
PLUNKETT COONEY, P.C.
101 S. Washington Square, Suite 1200
Lansing, Michigan 48933
517.324.5611

William A. Moulatsiotis Liber: 4409 Page: 748
Register of Deeds          PAGE: 2 of 4
Muskegon County Michigan  03/04/2026 10:56 AM
022     5875270

2

61838312.1

## EXHIBIT A

The land located in the City of Muskegon, Muskegon County, State of Michigan, and is described as follows:

Wet Marina Parcel:

That part of Blocks 578 & 579 of the Revised Plat of 1903 of the City of Muskegon, Section 25, Town 10 North, Range 17 West, City of Muskegon, Muskegon County, Michigan, all lands lying North of the following line including 2 peninsulas, described as: COMMENCING at the Southeast corner of Lot 4 of Block 577; thence North 87°52'58" West 865.74 feet along the North right-of-way line of Western Avenue; thence Westerly 158.32 feet along said North right-of-way line on a 430.58 foot radius curve to the left, the chord of which bears South 81°35'02" West 157.43 feet; thence North 31°10'08" West 998.44 feet to the PLACE OF BEGINNING of said described line; thence North 59 38'02" East 67.38 feet; thence Northeasterly 59.87 feet on a 101.00 foot radius curve to the right, the chord of which bears North 41 °30'57" East 59.00 feet; thence North 58°29'54" East 610.85 feet; thence South 31 °22'33" East 18.36 feet; thence North 58°43'34" East 19.69 feet; thence Northeasterly 37.29 feet on a 64.00 foot radius curve to the left, the chord of which bears North 38°50'20" East 36.77 feet; thence North 04°26'14" East 26.75 feet; thence North 16°45'30" East 180 feet more or less to the shore of Muskegon Lake and the point of ending of said described line. All lands described extend to the waters edge of Muskegon Lake.

Pedestrian Access:

An easement for ingress and egress located in that part of Blocks 578 and 579 of the Revised Plat of 1903 of the City of Muskegon, Section 25, Town 10 North, Range 17 West, City of Muskegon, Muskegon County, Michigan, said easement being described as: COMMENCING at the Southeast corner of Lot 4 of Block 577; thence North 87°52'58" West 260.09 feet along the North right-of-way line of Western Avenue; thence North 01 °56'07" East 659.31 feet along the East line of said Block 578 and its Southerly extension thereof; thence North 32°59'53" West 703.91 feet; thence South 57°00'07" West 256.48 feet to the PLACE OF BEGINNING; thence South 58°37'27" West 17.15 feet; thence North 31°36'08" West 164.18 feet; thence North 58°29'54" East 20.18 feet; thence South 31 °22'32" East 57.90 feet; thence South 73°07'40" East 97.29 feet; thence South 16°52'20" West 16.00 feet; thence Southwesterly 63. 79 feet on a 52.00 foot radius curve to the left, the chord of which bears South 35°56'19" West 59.86 feet to the place of beginning.

Together with and subject to an easement for ingress-egress and public utilities located in that part of Blocks 577, 578 & 579 of the Revised Plat of 1903 of the City of Muskegon, Section 25, Town 10 North, Range 17 West, City of Muskegon, Muskegon County, Michigan, said easement being described as: Beginning on the North right-of-way line of Western Avenue at a point being North 87 degrees 52 minutes 58 seconds West 824.34 feet from the Southeast corner of Lot 4 of said Block 577; thence North 02 degrees 08 minutes 44 seconds East 263.07 feet; thence North 34 degrees 14 minutes 29 seconds East 7 4.27 feet; thence North 23 degrees 44 minutes 59 seconds East 71.13 feet; thence North 02 degrees 08 minutes 44 seconds East 164.98 feet; thence Northerly 75.89 feet on a 358.00 foot radius curve to the left, the chord of which bears North 03 degrees 55 minutes 38 seconds West 75.75 feet; thence Northeasterly 53.16 feet on a 30.00 foot radius curve to the right, the chord of which bears North 40 degrees 45 minutes 35 seconds East 46.47 feet; thence South 88 degrees 28 minutes 50 seconds East 70.66 feet; thence Northeasterly 137.17 feet on a 141.00 foot radius curve to the left, the chord of which bears North 63 degrees 39 minutes 00 seconds East 131.82 feet; thence Easterly 43.20 feet on a 165.00 foot radius non-tangential curve to the left, the chord of which bears South 81 degrees 06 minutes 34 seconds East 43.07 feet; thence South 88 degrees 36 minutes 35 seconds East 77.91 feet; thence Southeasterly 164.07 feet on a 105.00 foot radius curve to the right, the chord of which bears South 43 degrees 50 minutes 39 seconds East 147.88 feet; thence South 00 degrees 55 minutes 16 seconds West 231.33 feet; thence South 88 degrees 08 minutes 38 seconds East 57.67 feet; thence North 01 degrees 56 minutes 07 seconds East 248.95 feet; thence North 88 degrees 06 minutes 24 seconds West 8.34 feet; thence North 32 degrees 59 minutes 53 seconds West 152.26 feet; thence Northwesterly 11.02 feet on a 180.00 foot radius curve to the left, the chord of which bears North 60 degrees 10 minutes 49 seconds West 11.02 feet; thence Northwesterly 23.47 feet on a 44.00 foot radius curve to the right, the chord of which bears North 46 degrees 39 minutes 17 seconds West 23.19 feet; thence North 31 degrees 22 minutes 33 seconds West 32.33 feet; thence South 58 degrees 41 minutes 48 seconds West 30.10 feet; thence Southwesterly 24.54 feet on a 43.00 foot radius curve to the right, the chord of which bears South 75 degrees 02

3

William A. Moulatsiotis Liber: 4409 Page: 748
Register of Deeds          PAGE: 3 of 4
Muskegon County Michigan  03/04/2026 10:56 AM
022   5875270

minutes 37 seconds West 24.20 feet; thence North 88 degrees 36 minutes 35 seconds West 28.07 feet; thence Northwesterly 112.92 feet on a 113.00 foot radius curve to the right, the chord of which bears North 60 degrees 00 minutes 12 seconds West 108.28 feet; thence North 31 degrees 22 minutes 33 seconds West 304.82 feet; thence Northwesterly 25.59 feet on a 100.00 foot radius curve to the left, the chord of which bears North 38 degrees 42 minutes 28 seconds West 25.52 feet; thence North 73 degrees 07 minutes 40 seconds West 86.39 feet; thence Southwesterly 63.79 feet on a 52.00 foot radius curve to the left, the chord of which bears South 35 degrees 56 minutes 19 seconds West 59.86 feet; thence South 58 degrees 37 minutes 27 seconds West 514.47 feet; thence South 10 degrees 46 minutes 30 seconds West 86.44 feet; thence South 31 degrees 22 minutes 33 seconds East 25.92 feet; thence North 58 degrees 37 minutes 27 seconds East 598.50 feet; thence South 31 degrees 22 minutes 33 seconds East 297.13 feet; thence South 58 degrees 37 minutes 27 seconds West 79.88 feet; thence North 88 degrees 28 minutes 50 seconds West 95.92 feet; thence South 40 degrees 42 minutes 37 seconds West 73.46 feet to Point A, so-called; thence Southerly 123.08 feet on a 292.00 foot radius curve to the right, the chord of which bears South 09 degrees 55 minutes 48 seconds East 122.17 feet; thence South 02 degrees 08 minutes 44 seconds West 161.50 feet; thence Southwesterly 72.07 feet on a 117.00 foot radius curve to the right, the chord of which bears South 19 degrees 47 minutes 30 seconds West 70.93 feet; thence Southerly 143.52 feet on a 233.00 foot radius curve to the left, the chord of which bears South 19 degrees 47 minutes 30 seconds West 141.26 feet; thence South 02 degrees 08 minutes 44 seconds West 194.05 feet to the North right-of-way line of Western Avenue; thence Easterly 23.28 feet along said North right-of-way line on a 430.58 foot radius curve to the right, the chord of which bears South 89 degrees 25 minutes 54 seconds East 23.27 feet; thence South 87 degrees 52 minutes 58 seconds East 41 .40 feet along the North right-of-way line of Western Avenue to the place of beginning.

ALSO Together with and subject to an easement for ingress-egress and public utilities described as: Beginning at above mentioned Point A, so-called; thence South 89 degrees 12 minutes 02 seconds West 32.68 feet; thence South 58 degrees 37 minutes 27 seconds West 287.81 feet; thence Northwesterly 102.90 feet on a 91 .00 foot radius non-tangential curve to the right, the chord of which bears North 63 degrees 46 minutes 09 seconds West 97.50 feet; thence North 31 degrees 22 minutes 33 seconds West 168.67 feet; thence North 58 degrees 37 minutes 27 seconds East 87.08 feet; thence South 31 degrees 22 minutes 33 seconds East 185.00 feet; thence North 58 degrees 37 minutes 27 seconds East 285.00 feet; thence North 31 degrees 22 minutes 33 seconds West 185.00 feet; thence North 58 degrees 37 minutes 27 seconds East 66.00 feet; thence South 31 degrees 22 minutes 33 seconds East 245.03 feet; thence South 40 degrees 42 minutes 37 seconds West 73.46 feet to Point A, so called and the place of ending.

Commonly known as: 1204 W. Western Ave., Muskegon, MI 49441

Tax ID#: 61-24-025-100-0001-00

4

William A. Moulatsiotis   Liber: 4409 Page: 748
Register of Deeds             PAGE:  4 of 4
Muskegon County Michigan   03/04/2026 10:56 AM
022        5875270

# EXHIBIT D

Loan Number: 221910

## SECURITY AGREEMENT

1.    **THE SECURED INDEBTEDNESS.** For valuable consideration, effective as of August 31, 2023, ADELAIDE POINTE WET MARINA, LLC, a Michigan limited liability company ("Debtor") makes this Security Agreement ("Agreement") in favor of 4FRONT CREDIT UNION ("Lender"), to secure the payment of all present and future indebtedness, liabilities and obligations of Debtor to Lender, however created or arising, whether under the following and all extensions, renewals, modifications, substitutions or replacements:

*Note:* the $6,022,500.00 Promissory Note dated of even date herewith made by Debtor payable to Lender (the "Note");

*Agreement:* the Construction Loan Agreement dated of even date herewith made between Debtor and Lender;

*Other:* any other note(s), guaranty(ies), loan and/or letter of credit agreement(s), indemnity agreement(s) or other evidence(s) of indebtedness to Lender made as of the date of this Agreement by Debtor;

or under any other present or future instrument or agreement between Debtor and Lender, or otherwise, and whether direct, indirect, primary, secondary, fixed, contingent, joint or several, due or to become due, and including, without limit, all present and future indebtedness or obligations of third parties to Lender which is guaranteed by Debtor, and the present or future indebtedness originally owing by Debtor to third parties and assigned by third parties to Lender, and any and all renewals, extensions, modifications, substitutions or replacements of any of them, and the performance of the covenants and obligations due or to become due to Lender, including, without limit, those due under this Agreement, and the repayment of all sums expended by Lender in connection with performance of those covenants and obligations (individually and collectively, the "Indebtedness")

2.    **GRANT OF SECURITY INTEREST IN COLLATERAL.** To secure payment of the Indebtedness, Debtor grants Lender a continuing security interest in all of the following assets and property of Debtor, wherever located and whether now owned or existing or hereafter arising or acquired:

*All Assets:* All of Debtor's personal property, including without limit accounts (including health-care-insurance receivables), chattel paper (whether tangible or electronic), general intangibles (including payment intangibles and software), instruments (including promissory notes), documents, deposit accounts, money, investment property, letters of credit, letter of credit rights, supporting obligations (including guaranties), goods (including inventory, equipment, and fixtures) and all imbedded software, licenses to use the property or rights of any other person, copyrights, patents, trademarks, trade names, refunds and claims for refunds of taxes, and commercial tort claims now or later specifically identified by Debtor;

together with all of their replacements, substitutions, accessions, and additions, all of their proceeds and products, including, without limit, all collections and distributions on account of any of them, insurance proceeds and proceeds of any indemnity, warranty, or guaranty payable to Debtor, or arising out of any condemnation or other governmental actions, and all cash, deposit accounts, accounts, chattel paper and general intangibles arising from any sale, rent, lease, casualty loss or other disposition, all documents of title covering any of them, and all books, records, reports, and correspondence concerning them and devices and software programs for maintaining the same (collectively, "Collateral").

3.    **WARRANTIES AND REPRESENTATIONS.** Debtor represents and warrants to Lender as follows:

3.1    **Payment of Indebtedness.** Debtor will pay the Indebtedness and perform all obligations related to the Indebtedness when due, whether by maturity, acceleration or otherwise.

3.2    **Authority.** This Agreement is the valid and binding obligation of Debtor, enforceable in accordance with its terms. Debtor is duly organized and validly existing and in good standing under the laws of the state of its organization stated above, and the execution, delivery and performance of this Agreement has been duly authorized by all necessary action of Debtor's governing body and will not violate Debtor's governing instruments or other agreements.

3.3    **Name; Address; Location of Collateral.** Debtor's name and mailing address, chief executive office address, and the location of the Collateral and all records concerning the Collateral are accurately set forth above or on the signature page of this Agreement. Debtor has not conducted business in any other name, except as set forth on the signature page to this Agreement.

3.4    **Title to Collateral.** Debtor has good and marketable title to the Collateral, free and clear of any liens, encumbrances or security interests whatsoever, other than the security interest granted by this Agreement and existing liens, encumbrances or security interests disclosed to and accepted by Lender in writing. Lender's security interest in the Collateral has first priority, and Debtor will keep the Collateral free of all other liens, encumbrances and security interests. Debtor will defend the Collateral against all claims and demands of all persons at any time claiming any interest in the Collateral. Debtor will mark its records and the Collateral to clearly indicate the security interest of Lender, and will deliver to Lender all promissory notes and tangible chattel paper included in the Collateral, properly endorsed or assigned for transfer.

3568.142/Doc #62

3.5    Nature of Collateral. All of the Collateral is held by Debtor solely for business purposes, and none of the Collateral constitutes consumer goods. No part of the Collateral consists of equipment used in farming operations or farm products or accounts or general intangibles arising from or relating to the sale of farm products by a farmer. The Collateral was acquired in the ordinary course of business of Debtor. There are no setoffs, counterclaims or defenses against the Collateral. Each account, instrument, investment property, chattel paper, letter of credit right, general intangible, and document included in the Collateral is, or when arising or acquired will be, the valid, binding and enforceable obligation of the account debtor or other obligor.

3.6    Perfection. Except as disclosed to and accepted by Lender in writing, no financing statement covering all or any part of the Collateral is on file in any public office. Debtor authorizes Lender to file any initial financing statement and all amendments, without Debtor's signature or other authentication (a) describing the Collateral and (b) containing any other information required by the Michigan Uniform Commercial Code, as the case may be ("UCC") or other applicable law for sufficiency or filing office acceptance. This Agreement shall be terminated only by the filing of a termination statement in accordance with the applicable provisions of the UCC. Debtor will do all other things, execute all documents, and pay all related costs necessary or requested by Lender to establish, verify or continue the validity and priority of Lender's security interest, including without limitation notation of Lender's name as secured party on certificates of title, compliance with any United States statute, regulation or treaty, obtaining third party consents, and effecting any agreement with any third party for control of any Collateral.

3.7    Commercial Tort Claims. Except as set forth on an exhibit to this Agreement, Debtor has no commercial tort claims. If Debtor acquires a commercial tort claim, Debtor shall immediately notify Lender, furnish a brief description and, in a signed writing, grant Lender a security interest in the claim and its proceeds on the terms and conditions of this Agreement.

4.    COVENANTS. Debtor covenants and agrees as follows:

4.1    Control of Collateral. Debtor will cooperate with Lender in obtaining control with respect to Collateral that consists of deposit accounts, investment property, letter of credit rights and electronic chattel paper. Debtor will cause any letter of credit issuer to consent to the assignment of the letter of credit's proceeds to Lender and will cause any depositary bank, securities intermediary, or commodities intermediary to agree to comply at any time with Lender's instructions for the disposition of deposited funds or entitlement orders or other instructions as to securities or other investment property. If any Collateral is in the possession of a third party, Debtor will join Lender in any notice to such third party of Lender's security interest and in obtaining such third party's acknowledgement that it will hold the Collateral for Lender's benefit.

4.2    Payment of Taxes. Debtor shall pay when due and before any interest, collection fees or penalties accrue, all taxes, expenses, assessments, liens or other charges which may now or hereafter be levied or assessed against the Collateral. Debtor shall furnish proof of payment upon request of Lender.

4.3    Insurance. Debtor shall keep the tangible Collateral insured at all times against fire and other hazards and risks, including, without limit, vandalism and malicious mischief, as Lender may require and shall provide public liability and product liability insurance and any other insurance as Lender may reasonably require from time to time. All insurance shall be in amounts and in forms and with companies satisfactory to Lender. Debtor shall deliver to Lender proof of the required insurance with premiums fully paid for one year in advance, and with loss payee clauses making all losses payable to Lender. Renewals of the required insurance (together with evidence of premium prepayment for one (1) year in advance) shall be delivered to Lender at least thirty (30) days before the expiration of any existing policies. All policies and renewals shall provide that they may not be canceled or amended without giving Lender thirty (30) days prior written notice of cancellation or amendment. In the event of loss or damage, the proceeds of all required insurance shall be paid to Lender. No loss or damage shall itself reduce the Indebtedness. Lender or any of its employees is each irrevocably appointed attorney-in-fact for Debtor and is authorized to adjust and compromise each loss without the consent of Debtor, to collect, receive and receipt for the insurance proceeds in the name of Lender and Debtor and to endorse Debtor's name upon any check in payment of the loss. The proceeds shall be applied first to reimburse Lender's costs and expenses in collecting the proceeds (including, without limit, court costs and reasonable attorneys' fees), and then to payment of the Indebtedness or any portion of it, whether or not then due or payable and in whatever order of maturity as Lender may elect. Lender, at its option, may apply the insurance proceeds, or any part of them, to the replacement, repair or restoration of the Collateral, subject to a written agreement with Debtor satisfactory to Lender providing for the terms under which the insurance proceeds shall be released.

4.4    Maintenance of Collateral. Debtor will maintain the Collateral in good condition and repair, and will replace any damaged or obsolete Collateral. Debtor shall not use, or suffer or permit the use of, the Collateral for any unlawful purpose, and shall use, operate and control the Collateral in compliance with all applicable law and regulation, including without limitation those governing protection of the environment and the use and disposal of hazardous substances, and shall not cause, permit or suffer the presence, use, storage, disposal, or release on or in any place where the Collateral is located any toxic or hazardous substance as defined in any federal or state law, regulation or rule relating to health, safety or environmental protection. Debtor will promptly inform Lender of any loss or diminution in value of the Collateral. Debtor shall make or permit no modification, compromise or

3568.142/Doc #62

Security Agreement
- 2 -

substitution for the Collateral without the prior written consent of Lender, provided that in the ordinary course of business Debtor may (1) grant any person obligated on any of the Collateral any credits, refunds and adjustments to which they may be lawfully entitled, and (2) repair and replace equipment.

4.5     **Leased Facilities.** If the Collateral is located at a facility leased by Debtor, Debtor will obtain from the lessor a consent to the granting of a security interest in the Collateral and a disclaimer of any interest of the lessor in the Collateral. The consent and disclaimer shall be in form acceptable to Lender. Debtor will pay all rents and perform other obligations for any leased facilities.

4.6     **Redelivered Collateral.** If Lender redelivers any of the Collateral in Lender's possession to Debtor or Debtor's designee for the purpose of (1) the ultimate sale or exchange thereof, (2) presentation, collection, enforcement, renewal, or registration of transfer thereof, or (3) loading, unloading, storing, shipping, transshipping, manufacturing, processing or otherwise dealing therewith preliminary to sale or exchange, such redelivery shall be in trust for the benefit of Lender and shall not constitute a release of Lender's security interest therein or in the proceeds or products thereof unless Lender specifically so agrees in writing. If Debtor requests any such redelivery, Debtor will deliver with such request a duly executed financing statement in form and substance satisfactory to Lender. Any proceeds of Collateral coming into Debtor's possession as a result of any such redelivery shall be held in trust for Lender and forthwith delivered to Lender for application on the Indebtedness. Lender may (if, in its sole discretion, it elects to do so) deliver the Collateral or any part of the Collateral to Debtor, and such delivery by Lender shall discharge Lender from any and all liability or responsibility for such Collateral.

4.7     **Prohibition on Transfer or Modification.** Debtor shall not transfer, sell, assign, lease or modify the Collateral or any interest therein, any part thereof, or any substantial portion of Debtor's other assets or property without the prior written consent of Lender, except for sales of inventory and replacements of equipment and supplies in the ordinary course of Debtor's business.

4.8     **Prohibition on Change of Name, Organization or Location.** Debtor shall not conduct Debtor's business under any name other than as appears in this Agreement nor change or reorganize the type of Debtor's business entity, nor change the location of any of the Collateral without the prior written consent of Lender.

4.9     **Right of Setoff.** Debtor grants Lender the right, exercisable at any time, whether or not Debtor is then in default, to set off or apply against the Indebtedness any account or deposit with Lender in which Debtor has an interest or against any other amounts which may be in the possession of Lender and to the credit of Debtor.

4.10    **Examination of Records and Collateral.** Debtor shall keep full and accurate records of Debtor's business, including, without limit, records related to the Collateral, and such records shall be open to audit, inspection and duplication by Lender at all times. Lender may enter upon any property owned by or in the possession of Debtor to examine and inspect the Collateral. Debtor shall promptly provide Lender with any information concerning the Collateral as Lender may request at any time.

4.11    **Further Actions.** Promptly upon the request of Lender, Debtor shall execute, acknowledge and deliver any and all further documents, security agreements, financing statements and assurances, and do or cause to be done all further acts as Lender may require to confirm and protect the lien of this Agreement or otherwise to accomplish the purposes of this Agreement.

5.     **RECEIVABLES.** Debtor covenants and agrees as follows:

5.1     **Collection.** Debtor shall continue to collect and enforce all present and future payments due to Debtor pursuant to any of the Collateral (collectively, the "Receivables") until Lender notifies Debtor and the account debtors, issuers, and other obligors under the Receivables of Lender's interest under this Agreement, after which time Debtor shall hold any proceeds collected with respect to the Receivables in trust for Lender and shall cooperate and assist in collection and enforcement of the Receivables. Debtor shall not commingle the proceeds and shall turn the proceeds over to Lender immediately upon receipt.

5.2     **Updates.** Debtor shall, immediately upon request from Lender, provide Lender with an updated list of the Receivables, stating the current name and address of each obligor, the balance due, the amount of any setoffs, defenses, contras or counterclaims, whether Debtor's performance is complete, and any other comments required by Lender. Each update list shall be Debtor's warranty that (i) the Receivables are valid and enforceable and owing, subject only to reported offsets, (ii) if evidenced by a note, chattel paper, or other instrument or document, it has been endorsed and delivered to Lender, or (iii) Debtor does not know of any death, dissolution, liquidation, insolvency, bankruptcy, appointment of receiver, or similar action by or against any obligor of the Receivables.

5.3     **Notice to Obligors.** Lender may notify obligors under the Receivables of the existence of this Agreement, and Lender may instruct the obligors under the Receivables to make future payments to Lender (whether before or after default by Debtor).

3568.142/Doc #62

5.4 **Actions of Lender.** Debtor agrees that Lender shall be entitled, in its own name (or in the name of Debtor or otherwise) but at the sole expense of Debtor, to collect, demand, receive, sue for or compromise any and all of the Receivables, to give good and sufficient releases, to endorse any checks, drafts or other orders for the payment of money payable to Debtor in payment of the Receivables and, in Lender's discretion, to file any claims or take any other action or proceeding which Lender deems advisable. Upon the occurrence of an Event of Default, to establish a United States Post Office Box in the name of Debtor but under the exclusive custody and control of Lender, to direct all obligors on any Receivable(s) or other intangible to make all payments due and to become due thereon to the United States Post Office Box established by Lender in the name of Debtor or to make said payments directly to Lender, to direct the Postmaster of the United States Post Office to forward to Lender all mail addressed to Debtor or to hold all mail addressed to Debtor at the Post Office until an officer or employee of Lender shall request possession of same, to open and dispose of all mail, howsoever received by Lender, addressed to Debtor, and to endorse any item howsoever received by Lender, representing any payment on or other proceeds or products of the Collateral.

5.5 **No Duty.** Debtor acknowledges and agrees that Lender shall not be required or obligated to make any, demand or to make any inquiry as to the nature or sufficiency of any payment received by Lender with respect to the Receivables or to present to file any claim or take any other action to collect or enforce the payment of any amounts with respect to the Receivables.

6. **REIMBURSEMENT OF EXPENSES.** Debtor shall reimburse Lender for all costs and expenses, including attorneys' fees, incurred by Lender in enforcing the rights of Lender under this Agreement. Such costs and expenses shall include, without limitation, costs or expenses incurred by Lender in any bankruptcy, reorganization, insolvency or other similar proceeding. Any reference in this Agreement to attorneys' fees shall mean fees, charges, costs and expenses of both in-house and outside counsel and paralegals, whether or not a suit or proceeding is instituted, and whether incurred at the trial court level, on appeal, in a bankruptcy, administrative or probate proceeding, in a workout, in consultation with counsel, or otherwise. All costs, expenses and fees of any nature for which Debtor is obligated to reimburse or indemnify Lender are part of the Indebtedness secured by this Agreement and are payable upon demand, unless expressly provided otherwise, with interest at the highest rate charged by Lender on any of the Indebtedness (but not to exceed the maximum rate permitted by law).

7. **POWER OF ATTORNEY.** Debtor (a) irrevocably appoints Lender or any agent of Lender (which appointment is coupled with an interest) the true and lawful attorney of Debtor (with full power of substitution) in the name, place and stead of, and at the expense of, Debtor and (b) authorizes Lender or any agent of Lender, in its own name, at Debtor's expense, to do any of the following, as Lender, in its sole discretion, deems appropriate: to demand, receive, sue for, and give receipts or acquittances for any moneys due or to become due on any Collateral (including without limit to draft against Collateral); to endorse any item representing any payment on or proceeds of the Collateral; to execute and file in the name of and on behalf of Debtor all financing statements or other filings deemed necessary or desirable by Lender to evidence, perfect, or continue the security interests granted in this Agreement; and to do and perform any act on behalf of Debtor permitted or required under this Agreement.

8. **RIGHTS AND OBLIGATIONS OF LENDER.** In the event that Debtor fails to pay taxes, maintain insurance or perform any other obligation arising under this Agreement, Lender may pay or perform such obligation(s) for the account of Debtor and the same shall be added to the Indebtedness and shall be immediately due and payable together with interest at the highest rate charged by Lender on any of the Indebtedness (but not to exceed the maximum rate permitted by law). Lender shall not be liable for any loss to the Collateral nor shall such loss reduce the amount of the Indebtedness. Lender will use reasonable care in the custody and preservation of any Collateral in Lender's possession, but Lender has no duty to preserve rights against prior parties, and Lender may use or operate any such Collateral to preserve it or its value.

9. **INDEMNIFICATION.** Debtor shall indemnify, defend and save Lender harmless from all claims, liabilities, obligations, damages, fines, costs, and expenses, including attorneys' fees, incurred by Lender and causes of action or other rights asserted against Lender and relating to this Agreement or Debtor's obligations hereunder and/or the Collateral, its ownership, use, collection, disposition or compliance with applicable law.

10. **EVENTS OF DEFAULT AND REMEDIES.**

10.1 **Events of Default.** Any of the following events shall, for purposes of this Agreement, constitute an "Event of Default":

10.1.1 Failure by Debtor or any co-obligor to pay any amount owing on the Indebtedness when due, whether by maturity, acceleration or otherwise.

10.1.2 Any failure by Debtor, any co-obligor or any guarantor of all or any part of the Indebtedness to comply with, or breach by Debtor, any co-obligor, any guarantor or any subordinator of any of the terms, provisions, warranties or covenants of this Agreement or any other agreement or commitment between Debtor, any co-obligor, any guarantor or any subordinator and Lender.

Security Agreement
- 4 -

10.1.3 Termination, cancellation, or disclaimer of liability or enforceability of any guaranty or subordination agreement given in connection with any of the Indebtedness.

10.1.4 Institution of remedial proceedings or other exercise of rights and remedies by the holder of any security interest or other lien against any of the Collateral.

10.1.5 The insolvency of Debtor, any co-obligor or any guarantor or the admission in writing of Debtor's, any co-obligor's or any guarantor's inability to pay debts as they mature.

10.1.6 Any statement, representation or information made or furnished by or on behalf of Debtor, any co-obligor, any guarantor or subordinator to Lender in connection with or to induce Lender to provide any of the Indebtedness shall prove to be false or materially misleading when made or furnished.

10.1.7 Institution of bankruptcy, reorganization, insolvency or other similar proceedings by or against Debtor, any co-obligor or any guarantor or the appointment of a receiver, custodian or trustee for the Debtor, any co-obligor or any guarantor or any substantial portion of its assets.

10.1.8 Any loss, theft, substantial damage or destruction to the Collateral, unless insured as required by this Agreement or other document; or the entry of any judgment against Debtor, any co-obligor, or any guarantor, or the issuance or filing of any judgment, attachment, levy, garnishment or the commencement of any related proceeding or judicial process upon or in respect to Debtor, any co-obligor or any guarantor or the Collateral.

10.1.9 Sale or other disposition by Debtor, any co-obligor or any guarantor of any substantial portion of assets or property, or death, dissolution, merger, consolidation, termination of existence, insolvency, business failure or assignment for the benefit of creditors of or by Debtor, any co-obligor or any guarantor.

10.1.10 If there is any failure by Debtor, any co-obligor or any guarantor to pay when due any indebtedness (other than to Lender) or in the observance or performance of any term, covenant or condition in any document evidencing, securing or relating to such indebtedness.

10.1.11 There is a substantial change in the existing or prospective financial condition of Debtor, any co-obligor, any guarantor or the Collateral, which Lender in good faith determines to be materially adverse.

10.1.12 Lender in good faith deems itself insecure.

10.1.13 Notwithstanding anything to the contrary provided herein, and except as otherwise expressly provided to the contrary, Debtor shall have ten (10) days to cure a monetary default from the date of such event, and thirty (30) days to cure a nonmonetary default from the date of such event, failure and/or action, with an additional thirty (30) day cure period solely for nonmonetary defaults in the event that Debtor is actively pursuing a cure in good faith with all due diligence.

10.2 **Remedies.** Upon the occurrence of any Event of Default, Lender shall have the right to do the following:

10.2.1 Declare all or part of the Indebtedness immediately due and payable.

10.2.2 Institute legal proceedings to foreclose the lien and security interest granted by this Agreement, to recover judgment for all of the Indebtedness then due and owing, and to collect it out of any of the Collateral or the proceeds of its sale.

10.2.3 Institute legal proceedings for the sale, under the judgment or decree of any court of competent jurisdiction, of any or all of the Collateral.

10.2.4 Take possession of the Collateral (and any other property then in or on the Collateral) wherever located and all related records, and/or render any of it unusable with or without demand, and with or without process of law; sell, lease, license and dispose of the Collateral, with or without preparation or processing, in any amount or order, at one or more public or private sales or other dispositions, at places and times and on terms and conditions as Lender may deem fit, and distribute the proceeds according to this Agreement and applicable law. Any statutory requirement for notice shall be met if Lender shall send notice to Debtor at least ten (10) days prior to the date of sale, disposition or other applicable event.

10.2.5 Notify all account debtors and other persons obligated under any of the Collateral to make all payments and otherwise render all performance to or for the benefit of Lender and demand, collect, sue for, receive, receipt for, settle and compromise, extend or postpone the time for payment of, forbear from enforcing, and otherwise do all things Debtor could do in connection therewith.

10.2.6 Apply to the Indebtedness the balance of any deposit account maintained with Lender and instruct the depositary bank maintaining any other deposit account subject to Lender's control to pay its balance to Lender for application to the Indebtedness.

3568.142/Doc #62

Security Agreement

- 5 -

10.2.7   Exercise any one or more of the rights and remedies under the UCC or at law or equity to enforce the payment of the Indebtedness.

### 10.3   Remedies Generally.

10.3.1   Lender may disclaim or modify any warranties on any disposition of any Collateral. At any sale pursuant to this Agreement, physical or constructive possession of the Collateral is not required and any purchaser may conclusively rely on the recitals in any evidence of conveyance and shall have not obligation to see to the application of the purchase money. Any sale of any of the Collateral under this Agreement shall be a perpetual bar against Debtor with respect to that Collateral.

10.3.2   Debtor agrees, upon request of Lender, to assemble the Collateral and all related records and make it available to Lender at any place which is reasonably convenient for Lender. Debtor grants Lender permission to enter upon any premises owned or occupied by Debtor for the purpose of taking possession of the Collateral. Debtor agrees to notify all persons obligated under any of the Collateral to make all payments to Lender and Debtor waives any right to recover from any other party liable for the Indebtedness (by subrogation, indemnity, or otherwise) any amount Debtor pays or Lender recovers under this Agreement.

10.3.3   All remedies provided for under this Agreement shall be available to the extent not prohibited by law. Each remedy shall be cumulative and additional to any other remedy of Lender at law, in equity or by statute. No delay or omission to exercise any right or power accruing upon any default or Event of Default shall impair any such right or power or shall be construed to be a waiver of, or acquiescence in, any such default or Event of Default.

10.3.4   Lender has no obligation to marshal any collateral security or other assurances of payment in favor of Debtor or to resort to any collateral security or assurances of payment in any order.

10.3.5   To the extent that Lender must exercise remedies in a commercially reasonable manner, Debtor agrees that it is not commercially unreasonable if Lender does not (a) incur expense Lender deems significant or unreasonable to prepare or process Collateral before disposition, (b) exercise collection remedies against or compromise or settle claims with account debtors or other persons obligated on any Collateral, (c) advertise Collateral dispositions in any particular media, (d) use professional auctioneers or internet auction sites for Collateral disposition, (e) dispose of Collateral in wholesale rather than retail markets, or (f) disclaim warranties on disposition.

10.4   **Application of Proceeds; Liability for Deficiency.** Subject to applicable law, any cash proceeds received by Lender from the exercise of its remedies shall be applied as follows: first, to pay all costs and expenses incidental to retaking and disposition of the Collateral, including, without limit, reasonable attorneys fees, and any taxes, assessments, liens and encumbrances prior to the lien of this Agreement; second, to the payment of the Indebtedness in the following order: (i) Lender's expenses made to perform Debtor's obligations, (ii) late charges and interest accrued and unpaid, (iii) any prepayment premiums, (iv) unpaid fees and other charges, and (v) the outstanding principal balance; and third, any surplus remaining shall be paid to whomsoever may be lawfully entitled, and then to Debtor. Debtor and any other person obligated on the Indebtedness shall remain liable for any deficiency after application of proceeds.

10.5   **Suretyship Waivers.** Debtor waives demand, notice, protest, notice of acceptance of this Agreement, notice of loans made, credit extended, Collateral received or delivered or other action taken in reliance hereon and all other demands and notices of any description. With respect to both the Indebtedness and the Collateral, Debtor assents to any extension or postponement of the time of payment or any other indulgence, any substitution, exchange or release of or failure to perfect any security interest in any Collateral, the addition or release of any party or person primarily or secondarily liable, the acceptance of partial payment and the settlement, compromising or adjusting of any thereof, all in such manner and at such time or times as Lender may deem advisable. Lender shall have no duty to collect or protect the Collateral or any income thereon, or to preserve rights against prior parties or any other pertinent rights beyond the safe custody thereof. Debtor further waives any and all other suretyship defenses.

## 11.   MISCELLANEOUS.

11.1   **Governing Law.** This Agreement shall be construed according to the laws of the State of Michigan. All terms defined in the UCC that are used in this Agreement without separate definition shall have the meanings given them in the UCC.

11.2   **Successors and Assigns.** Lender shall have the right to assign any of the Indebtedness and deliver all or any part of the Collateral without Debtor's consent. This Agreement shall be binding upon the successors and assigns of Debtor including, without limit, any debtor in possession or trustee in bankruptcy for Debtor, and the rights and privileges of Lender under this Agreement shall inure to the benefit of its successors and assigns. This shall not be deemed a consent by Lender to a conveyance by Debtor of all or any part of the Collateral or of any ownership interest in Debtor.

11.3   **Notices.** Notice from one party to another relating to this Agreement, if required, shall be deemed effective if made in writing (including telecommunications) and delivered to the recipient's address, telex number or telecopier number set forth by any

3568.142/Doc #62

Security Agreement

- 6 -

of the following means:  hand delivery, registered or certified mail, postage prepaid, express mail or other overnight courier service or telecopy, telex or other wire transmission with request for assurance of receipt in a manner typical with respect to communications of that type.  Notice made in accordance with these provisions shall be deemed delivered on receipt if delivered by hand or wire transmission, on the third business day after mailing if mailed by registered or certified mail, or on the next business day after mailing or deposit with the postal service or an overnight courier service if delivered by express mail or overnight courier.

11.4    **Entire Agreement; Waivers; Amendments.**  This Agreement and any agreement to which it refers state all rights and obligations of the parties and supersede all other agreements (oral or written) with respect to the security interests granted by this Agreement.  Any waiver by Lender of any default or Event of Default shall be in writing and shall be limited to the particular default waived and shall not be deemed to waive any other default.  Any amendment of this Agreement shall be in writing and shall require the signature of Debtor and Lender.

11.5    **Partial Invalidity.**  The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of the remaining provisions of this Agreement.

11.6    **Inspections.**  Any inspection, audit, appraisal or examination by Lender or its agents of the Collateral or of information or documents pertaining to the Collateral is for the sole purpose of protecting Lender's interests under this Agreement and is not for the benefit or protection of Debtor or any third party.

11.7    **Joint and Several Liability.**  In the event that more than one person or entity executes this Agreement, the obligations of each person or entity shall be joint and several and may be enforced against any one or more of them in any order without releasing any of the others.

11.8    **Automatic Reinstatement.**  Notwithstanding any prior revocation, termination, surrender or discharge of this Agreement, the effectiveness of this Agreement shall automatically continue or be reinstated, as the case may be, in the event that any payment received or credit given by Lender in respect of the Indebtedness is returned, disgorged or rescinded as a preference, impermissible setoff, fraudulent conveyance, diversion of trust funds, or otherwise under any applicable state or federal law, including, without limit, laws pertaining to bankruptcy or insolvency, in which case this Agreement shall be enforceable as if the returned, disgorged or rescinded payment or credit had not been received or given, whether or not Lender relied upon this payment or credit or changed its position as a consequence of it.  In the event of continuation or reinstatement of this Agreement, Debtor agrees upon demand by Lender to execute and deliver to Lender those documents which Lender determines are appropriate to further evidence (in the public records or otherwise) this continuation or reinstatement, although the failure of Debtor to do so shall not affect in any way the reinstatement or continuation. If Debtor does not execute and deliver to Lender such documents upon demand, Lender and each officer of Lender is irrevocably appointed (which appointment is coupled with an interest) the true and lawful attorney of Debtor (with full power of substitution) to execute and deliver such documents in the name and on behalf of Debtor.

11.9    **WAIVER OF JURY TRIAL.**  DEBTOR AND LENDER ACKNOWLEDGE THAT THE RIGHT TO TRIAL BY JURY IS A CONSTITUTIONAL ONE, BUT THAT IT MAY BE WAIVED. EACH PARTY, AFTER CONSULTING (OR HAVING HAD THE OPPORTUNITY TO CONSULT) WITH COUNSEL OF THEIR CHOICE, KNOWINGLY AND VOLUNTARILY, AND FOR THEIR MUTUAL BENEFIT, WAIVES ANY RIGHT TO TRIAL BY JURY IN THE EVENT OF LITIGATION REGARDING THE PERFORMANCE OR ENFORCEMENT OF, OR IN ANY WAY RELATED TO, THIS AGREEMENT OR THE INDEBTEDNESS.

11.10    **CROSS-COLLATERALIZATION/CROSS-DEFAULT.**  Debtor agrees the Collateral is security for the Loan(s) under the Note and for all other indebtedness of Debtor to Lender, whether or not such indebtedness is related by class or kind and whether or not contemplated by the parties at the time of creating such indebtedness or at the time of executing any documents evidencing or relating to such indebtedness. Any default under the terms of any such indebtedness to Lender, or any other breach of the terms of such indebtedness shall also constitute an Event of Default under the Note and any Event of Default under the Note shall be a default under any indebtedness of Debtor to Lender.

*[Remainder of page left intentionally blank; signature page to follow]*

This Security Agreement is dated and effective on the date first above written.

| | |
|---|---|
| **Debtor's Mailing Address:**<br><br>1204 W. Western Ave., Suite A, Muskegon, MI 49441 | **DEBTOR:**<br><br>ADELAIDE POINTE WET MARINA, LLC,<br>a Michigan limited liability company, |
| **Debtor's Organization Form and Identification Number:**<br><br>Limited Liability Company; 803018619 | By:_____<br>    Ryan M. Leestma<br>Its:   Manager |
| **Debtor's State of Organization:**<br><br>Michigan | |
| **Debtor's previous legal names:**<br><br>Not Applicable | |
| **Debtor's current assumed names:**<br><br>None | |
| **Location of Collateral:**<br><br>1204 W. Western Ave., Suite A, Muskegon, MI 49441 | |
| **Location of all records relating to the Collateral:**<br><br>1204 W. Western Ave., Suite A, Muskegon, MI 49441 | |
| **Third parties in possession of any Collateral and addresses:**<br><br>Not applicable | |
| **Lessors/Owners of Leased Facilities:**<br><br>Not applicable | |

# EXHIBIT E



## UCC FINANCING STATEMENT AMENDMENT

Michigan Department of State - Uniform Commercial Code

FOLLOW INSTRUCTIONS

**Filing Number: 20230915000361-6**

Filing Date and Time: 09/15/2023 12:34 PM

Total Number of Pages: 1

*(This document was filed electronically)*

A. NAME & PHONE OF CONTACT AT FILER (optional)
**Nancy Minhinnick**

B. E-MAIL CONTACT AT FILER (optional)
**nancym@mbcloans.biz**

C. SEND ACKNOWLEDGEMENT TO: (Name and Address)
**Nancy Minhinnick**
**2200 Commonwealth Blvd**
**Ste 200**
**Ann Arbor, MI 48105 USA**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1a. INITIAL FINANCING STATEMENT FILE NUMBER
**20230831000586-2**

1b. ⓐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS
Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13

2. ⓐ TERMINATION: Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

3. ⓐ ASSIGNMENT (full or partial): Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

4. ⓐ CONTINUATION: Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

5. ⓐ PARTY INFORMATION CHANGE:

Check one of these two boxes:

This Change affects ⓐ Debtor or ⓐ Secured Party of record

AND Check one of these three boxes to:
ⓐ CHANGE name and/or address: Complete Item 6a or 6b; and Item 7a or 7b and Item 7c
ⓐ ADD name: Complete Item 7a or 7b, and item 7c
ⓐ DELETE name: Give record name to be deleted in Item 6a or 6b

6. CURRENT RECORD INFORMATION: Complete for Party Information Change - provide only one name (6a or 6b)

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

7. CHANGED OR ADDED INFORMATION: Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 7b. INDIVIDUAL'S SURNAME | | | |
| INDIVIDUAL'S FIRST PERSONAL NAME | | | |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

8. ☑ COLLATERAL CHANGE: Also check one of these four boxes: ⓐ ADD collateral   ⓐ DELETE collateral   ☑ RESTATE covered collateral   ⓐ ASSIGN collateral

Indicate collateral:

All Assets: All of Debtor's personal property, including without limit accounts (including health-care-insurance receivables), chattel paper (whether tangible or electronic), general intangibles (including payment intangibles and software), instruments (including promissory notes), documents, deposit accounts, money, investment property, letters of credit, letter of credit rights, supporting obligations (including guaranties), goods (including inventory, equipment, and fixtures) and all imbedded software, licenses to use the property or rights of any other person, copyrights, patents, trademarks, trade names, refunds and claims for refunds of taxes, and commercial tort claims now or later specifically identified by Debtor;

together with all of their replacements, substitutions, accessions, and additions, all of their proceeds and products, including, without limit, all collections and distributions on account of any of them, insurance proceeds and proceeds of any indemnity, warranty, or guaranty payable to Debtor, or arising out of any condemnation or other governmental actions, and all cash, deposit accounts, accounts, chattel paper and general intangibles arising from any sale, rent, lease, casualty loss or other disposition, all documents of title covering any of them, and all books, records, reports, and correspondence concerning them and devices and software programs for maintaining the same (collectively, "Collateral")

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT: Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here ⓐ and provide name of authorizing Debtor

| 9a. ORGANIZATION'S NAME **4Front Credit Union** | | | |
|---|---|---|---|
| OR 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

10. OPTIONAL FILER REFERENCE DATA:

FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT (Form UCC3) (Rev. 04/20/11)



# UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

Michigan Department of State - Uniform Commercial Code

Filing Number: 20230912000645-8

Filing Date and Time: 09/12/2023 04:06 PM

Total Number of Pages: 1

*(This document was filed electronically)*

| A. NAME & PHONE OF CONTACT AT FILER (optional) |
|---|
| **Louise Evans** |
| B. E-MAIL CONTACT AT FILER (optional) |
| **levans@kotzsangster.com** |
| C. SEND ACKNOWLEDGEMENT TO: (Name and Address) |
| **Louise Evans** |
| **400 Renaissance Ctr** |
| **Suite 3400** |
| **Detroit, MI 48243 USA** |

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

1. DEBTOR'S NAME: Provide only <u>one</u> Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in Item 10 of the Financing Statement Addendum (Form UCC1Ad)

| | 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|---|
| | **ADELAIDE POINTE WET MARINA, LLC** | | | | |
| OR | 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | | | |
| | 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| | **1204 W. Western Ave. Suite A** | **Muskegon** | **MI** | **49441** | **USA** |

2. DEBTOR'S NAME: Provide only <u>one</u> Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| | 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|---|
| | | | | | |
| OR | 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | | | |
| | 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| | | | | | |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only <u>one</u> Secured Party name (3a or 3b)

| | 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|---|
| | **4FRONT CREDIT UNION** | | | | |
| OR | 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | | | |
| | 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| | **3939 W. Front Street** | **Traverse City** | **MI** | **49684** | **USA** |

4. COLLATERAL: This financing statement covers the following collateral:

All Assets: All of Debtor's personal property, including without limit accounts (including health-care-insurance receivables), chattel paper (whether tangible or electronic), general intangibles (including payment intangibles and software), instruments (including promissory notes), documents, deposit accounts, money, investment property, letters of credit, letter of credit rights, supporting obligations (including guaranties), goods (including inventory, equipment, and fixtures) and all imbedded software, licenses to use the property or rights of any other person, copyrights, patents, trademarks, trade names, refunds and claims for refunds of taxes, and commercial tort claims now or later specifically identified by Debtor;

together with all of their replacements, substitutions, accessions, and additions, all of their proceeds and products, including, without limit, all collections and distributions on account of any of them, insurance proceeds and proceeds of any indemnity, warranty, or guaranty payable to Debtor, or arising out of any condemnation or other governmental actions, and all cash, deposit accounts, accounts, chattel paper and general intangibles arising from any sale, rent, lease, casualty loss or other disposition, all documents of title covering any of them, and all books, records, reports, and correspondence concerning them and devices and software programs for maintaining the same (collectively, "Collateral").

5. Check <u>only</u> if applicable and check <u>only</u> one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

| 6a. Check <u>only</u> if applicable and check <u>only</u> one box: <br> ☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility | 6b. Check <u>only</u> if applicable and check <u>only</u> one box: <br> ☐ Agricultural Lien ☐ Non-UCC Filing |
|---|---|

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
   **3568.142**

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)