UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

In re:

| | |
|---|---|
| Leestma Management, LLC, | Case No 8:26-bk-02696-CED [Lead Case] |
| Adelaide Pointe QOZB, LLC | Case No. 8:26-bk-02698-CED |
| Adelaide Pointe Boaters Services, LLC | Case No. 8:26-bk-02699-CED |
| Adelaide Pointe Building 1, LLC | Case No. 8:26-bk-02700-CED |
| Waterland Battle Creek, LLC | Case No. 8:26-bk-02701-CED |
| | Chapter 11 |
| Debtors. | |
| _____/ | *Jointly Administered Cases* |

**DEBTORS' STATEMENT OF DISPUTED BUDGET
ISSUES AND MOTION TO STRIKE**

Leestma Management, LLC, Adelaide Pointe QOZB, LLC, Adelaide Pointe Boaters

Services, LLC, Adelaide Pointe Building 1, LLC and Waterland Battle Creek, LLC (collectively

the "Debtors"), by undersigned counsel, hereby submits this Notice of Compliance and of Disputed

Budget Issues, and move to strike the cash collateral budget originally filed with this Court at Doc.

No. 37-1 (the "Receiver's Budget") [1] and identifies the budget items in dispute as set forth below

"Disputed Budget Items" and respectfully state:

**I. Preliminary Statement**

1.      The Receiver's Budget is materially flawed and the Receiver has effectively

conceded as much in open court. The Receiver's flaws are not interpretive judgment calls. They

are specific, identifiable, line-item errors that understate revenue, overstate expense, attribute the

---

[1] As this Court has been repeatedly advised, the Receiver was authorized by the Michigan Court (the "Receivership Order") and specifically directed to file his reports with the Michigan Court for in camera review only and not to file his reports in the public record. The Debtors submit that the Receiver himself willfully violated the Receivership Order by filing the Receiver's Report in this Court's public record, presumably to preserve his own position and income stream from the receivership estate. The Debtors have asked their Michigan counsel to bring the Receiver's transgressions before the Michigan Court when it seeks relief from Michigan's version of the Barton Doctrine.

obligations of affiliated non-Debtor entities ("ANDE") to the estate, and omit the Receiver's own substantial professional fees from disclosure. Two independently-prepared budgets — the Debtors' own initial Budget ("Initial Budget") prepared by Mr. Leestma using Adelaide Pointe's QuickBooks accounting data, and the comprehensive draft 26-week Cash Collateral Budget subsequently prepared by CohnReznick Advisory, LLC ("CRO Budget") with access to the entire Adelaide Pointe Project ("Project") — produce materially-aligned figures that show the Project is operationally cash-flow positive. The Receiver's Budget stands alone in projecting a manufactured deficit narrative inconsistent with both of the independently-prepared budgets and inconsistent with the Receiver's own oral revisions and representations made in open court when prepared to the CRO's Budget or the Initial Debtor Budget.[2]

### Disputed Budget Issues

2.      This Notice and Motion to Stike and referenced budgets is limited to the Project (including the warehouses at 1204 W. Western Avenue, the boater services facility at 400 Adelaide Circle, and the related winter-storage and marina-services operations in the Project). The Debtors do not dispute the Receiver's Budget portrayal of the cash positions of the property owned by Debtor LMF "Hall Street" or "Waterland Commerce." Both of those properties are managed by professional property managers Bradley Property Management at LMF is Hall Street, and operate under predictable, stable rent-roll cash flow. Predictable, professionally-managed operations are exactly what the Debtors are separately seeking to bring to the entire Adelaide Pointe Project through the Debtors' separately-pending Motion to Employ US Marine Group ("USMG") as professional marina manager — using the same model that has been in place at "Hall Street" and

---

[2] The only feedback the Debtors have received from the Bank as to the Debtors' Budget was a text message from the Bank's local counsel advising that the Bank was "confused" as to the operative budget. On May 5, 2026 at approximately 11:17 a.m., the Receiver's counsel sent an email to multiple parties and the United States Trustee attaching the Receiver's budget, and thereby again publicizing the Budget to Debtor's creditors.

"Waterland Commerce," as applied to the project, a 30-acre integrated waterfront enterprise. Engaging USMG would also free Mr. Leestma to focus full-time on reorganization rather than day-to-day operations and assist the proposed CRO in their duties by providing professional information and assistance to the CRO =. The cash management dispute concerning the Adelaide Pointe Project reflects the gap between the operational complexity of the Project and the absence of professional management today. The Project is currently operated by the Receiver who has attempted to take complete control.

## II. Procedural Background

3.      On April 15, 2026, the Receiver filed his cash collateral budget at Doc. No. 37-1. That filing was provided to the Debtors only when it appeared on the docket; it had not been served on the Debtors prior to the hearing on April 15, 2026, and the parties acknowledged to this Court that the version provided of the Receiver's Budget was concealed.

4.      On April 22, 2026, at the hearing on the Receiver's Budget, the Debtors raised material disagreements with multiple line items — identifying revenue lines that had been understated, expense lines that had been overstated or improperly attributed to Debtor entities, and the omission of the Receiver's own fees from disclosure. The Court directed the parties to work on the agreed budget overnight and to consider an agreed budget the next morning. Mr. Leestma personally compiled a competing budget that night for the Debtors' review, drawing the underlying figures from the Projects historical QuickBooks accounting system — the same accounting system the Receiver's on-site financial professional, Warren Palmer (the "Receiver CPA"), can be quoted as stating he has been using throughout the process: The Receiver CPA can be quoted as stating "I went through QuickBooks as it's been set up by Adelaide Point to get that piece of information." The Debtors' initial prepared budget (the "Initial Debtors Draft"). The CRO Budget has been

circulated by the proposed CRO to secured creditors, Independent Bank (the "Bank"), the United States Trustee and has been provided for in camera review.

5. On April 23, 2026, between approximately 10:00 a.m. and 12:00 p.m., counsel for the Receiver and counsel for Independent Bank ("IBCP" or the "Bank") caucused privately together while the Debtors and their counsel waited in the courtroom. After the lunch recess, the Receiver and the Bank returned to the courtroom at approximately 1:30 p.m. The Receiver's cash need that they had previously represented to the Court at approximately $300,000 was, at the resumed hearing at approximately 1:30 p.m., orally revised to between $15,000 and $50,000 — a reduction of approximately 85% to 95%. That oral revision is preserved in the hearing transcript and constitutes the Receiver's own concession that the filed Receiver's Budget is materially flawed.

6. In the period that followed the April 22,-23, 2026 hearing, the Debtors' proposed CRO, prepared a comprehensive 26-week Cash Collateral Budget (the "CRO Budget,") covering the period May 9, 2026 through October 31, 2026, the CRO Budget was prepared in consultation with both the Receiver and Mr. Leestma. The Debtors' Initial Debtors Budget and the CRO Budget independently converge on materially the same figures for the disputed line items. By contrast, although this Court directed the parties to work together to produce a workable Agreed Budget, the Receiver chose not to revise his own improperly filed Receiver's Budget despite his open-court concession of prior mistakes. He has now submitted the same flawed Budget as Doc. No. 37-1 filed and/or circulated parallel court proceedings: in this Court at Doc. No. 37-1; as an attachment to his Second Receiver's Report submitted for in camera review in Independent Bank v. Adelaide Pointe Boaters Services, LLC et al., Case No. 25-20760-CBB, Kent County Circuit Court (Hon. Curt A. Benson (the "Michigan Case")); and again in those on May 5, 2026 at approximately 11:17

a.m., when his counsel re-circulated the identical Receiver's Budget to Debtors' counsel and to

credit or body and UST without modification and without reference to the CRO Budget.

7.      The cumulative cash flow comparison across all three budgets, for the May–July

2026 overlap period in which all three budgets project figures, is set forth below. (April 2026 is

omitted because the Draft of Debtors' Budget prepared by the CRO Budget begins May 9, 2026.)

All figures are stated for the Adelaide Pointe Project as the draft prepared by the CRO; the Hall

Street and Waterland Commerce — as discussed above — are not in dispute and are not included.[3]

**Table 1 — Monthly and Cumulative Operating Cash Flow Comparison, May–July 2026 (Project Drafts)**

| Period | Receiver's Budget (Doc. 37-1) | Initial Debtors Draft (Ex. A) | Draft CRO Budget (Ex. B) |
|---|---|---|---|
| May 2026 | +$20,932 | +$37,061 | +$18,396 |
| June 2026 | +$51,679 | +$115,758 | +$118,396 |
| July 2026 | +$96,847 | +$194,196 | +$201,238 |
| **TOTAL May–July** | **+$169,458** | **+$347,015** | **+$338,030** |

*Receiver figures derived from Doc. 37-1 cumulative monthly cash flow. Draft CRO figures stated for the Project only (excluding LMF Hall Street and Waterland Commerce) and excluding the one-time $450,000 USMG escrow / working , which is included in to the Draft CRO Budget. The sources are: proposed Budget and the CRO Budget submitted for in camera review.*

8.      Two observations follow. First, the Initial Debtors Draft (Exhibit A) and the Draft

CRO Budget (Exhibit B) independently converge on materially the same total operating cash flow

for the May–July overlap period — $347,015 and $338,030, and respectively, reflect a divergence

or variance of less than 3%. That convergence is independently confirmatory: two independent

processes (Mr. Leestma's overnight reconstruction from QuickBooks data and in the Initial

Debtors Budget the CRO's subsequent professional analysis) reached effectively the same answer.

Second, the Receiver's figure for the same period reflecting a gap of — $169,458 — is

approximately half of the figures the Debtors and the CRO independently reached. The gap

---

[3] The Hall Street Budget prepared by Bradley is not integrated at the request of secured creditors Lake Michigan Credit Union ("LMCU")

between the Receiver's Budget and the two independently-aligned budgets is not a rounding difference. It reflects specific, identifiable line-item flaws set forth in below.

9.      Due to the consistent email submissions and filings by the Receiver and the Bank, the Debtors had not had a chance to vet these comparative differences with the CRO, as the Bank's and Receiver's coordinated attacks on both Mr. Leestma and these cases have been virtually constant since April 1, 2026, when the Bank sought judgment against Mr. Leestma in Michigan, while the Debtors were attempting to comply with the process directed by this Court. Further, and at the request of secured creditors LMCU, the Hall Street Budget was broken out from any revisions to the draft CRO Budget initially circulated, again in the Debtors' and proposed CRO's efforts to collaborate. The record will reflect multiple vitriolic filings by additional counsel brought to the table by the Bank on May 7, 2026

**<u>Argument</u>**

*I. The Standard.*

10.     A cash budget submitted by the Receiver as state-court-appointed fiduciary must rest on accurate, verifiable, good-faith assumptions. The Court should be able to rely on it. Other parties in interest should be able to rely on it. Allocations of professional fees, adequate-protection payments, and operational priorities are made against it. The proposed CRO Budget does that. When the underlying assumptions are demonstrably flawed as in the Receiver Budget and where the fiduciary who submitted them has effectively conceded those flaws in open court but where that fiduciary has nonetheless refused to amend the document and has instead re-circulated the same flawed analysis without modification, the simple recirculation of the Receiver's flawed Budget should not stand as the operative cash collateral budget in these cases. The Debtors submit to two courts.

*II. Material Line-Item Differences — Three-Way Comparison.*

11.     The principal disputed line items are summarized in the following table. Data contained in the Receiver's Budget figures are identified as "[Doc. 37-1, Line__]"; the comparative direction attempted by the Receiver identified with respect to the disputed line item (understated/overstated/omitted). The Disputed Budget Issues are established by the comparison of matching line items in the CRO Budget and Initial Debtor Budget. The Court should make findings of these Disputed Budget Issues with respect to these.

**Table 2 — Material Line-Item Differences, May–July 2026 Totals (Project Drafts)**

| Disputed Line Item | Receiver's Budget (Doc. 37-1) | Initial Debtors Draft (Ex. A) | Draft CRO Budget (Ex. B) |
|---|---|---|---|
| Winter Storage Revenue (rent roll) | Materially understated [Doc. 37-1, Line _] | $255,790 | $306,948 (rent roll plus growth, combined) |
| Winter Storage Revenue Anticipated Growth | $0 (omitted) [Doc. 37-1] | $51,158 | Included above (note [3]: 20%+ annual growth assumption applied conservatively) |
| **Total Winter Storage** | **[exact figure to be supplied] — Revenue Anticipation** | **$306,948** | **$306,948** |
| Marina Summer Payroll | Booked against warehouse entity beginning May (improperly attributed) [Doc. 37-1, Line _] | $39,800 (May $29,800 + Jun-Jul $5,000 ea.) properly allocated | Aggregated within AP Operating Disbursements ($259,464 over 13 weeks; allocated by allocation methodology in Note [7]) |
| Gas (DTE Energy) — Summer Months | Significant ongoing summer-month gas expense (lacks seasonal operation) [Doc. 37-1, Line _] | $3,000 total (May $2,000; Jun $500; Jul $500) | Aggregated within AP Operating Disbursements (utility detail not separately broken out) |
| Electric (Consumers Energy) — Summer Months (adjusted for heater-fan seasonal load) | Approximately constant year-round (ignoring heater-fan seasonal load) [Doc. 37-1, Line _] | $34,800 total (May $9,000; Jun $12,900; Jul $12,900) | Aggregated within AP Operating Disbursements (utility detail not separately broken out) |
| Dry Marina Lease Payment | Booked as Debtor obligation [Doc. 37-1, Line _] (reflakeu) | $0 (excluded — obligation of non-Debtor Harbor West QOZB, LLC, per Receiver's Motion to Expand) | $0 (excluded — wet/dry marinas are non-Debtor entities, per Note [C]) |
| Receiver's Own Fees | OMITTED from filed Budget. Per Independent Bank's pleadings, Receiver works ~50 hrs/wk; Receiver has confirmed $425/hr rate. Math: 50 hrs × $425 × 4 weeks ≈ $85,000/month, or ~$255,000 May–July | Not budgeted as Debtor expense (purportedly Receiver's) | $335,000 across 26 weeks (Restructuring Disbursement Line [23], including catch-up of unpaid prepetition fees) |
| **Net Operating Cash Flow May–July** | **+$169,458** | **+$347,015** | **+$338,030** |

*Sources: Doc. 37-1; Initial Debtor Budget; Draft CRO Budget (Exhibit B).*

### III. BUDGET DISPUTES

**12.** Winter storage revenue. The Receiver's Budget materially understates winter storage revenue and omits the storage growth line entirely. The Project's winter storage revenue has grown by 20% or more annually since 2021 — a fact in the Debtors' historical operating data, in the Initial Debtors Draft (Exhibit A), and in the Draft CRO Budget (Note [3]). The Receiver's purported justification — that he reviewed winter-storage contracts in DocuSign — is a distinction without a difference: winter storage contracts in DocuSign do not contain dollar amounts. The Receiver had access to the actual winter-storage revenue data in Adelaide Pointe's QuickBooks accounting system and elected to short the line. Exhibit A and Exhibit B independently converge on $306,948 of winter storage revenue for the May–July period.

**13.** Marina summer payroll. The Receiver's Budget allocates marina summer payroll to the warehouse entity beginning in May. By that point in the season, the staff in question (boat-service technicians and storage-launch hands) have transitioned out of warehouse-related work and are servicing the wet and dry marina operations — which are non-Debtor entities. The proper allocation drops warehouse-entity payroll from $29,800 in May to $5,000 in June and July (Exhibit A). The Receiver's allocation overstates Debtor-entity expense and produces a misleading deficit at the warehouse entity.[4]

**14.** Gas (DTE Energy) and Electric (Consumers Energy). The Receiver's Budget projects significant ongoing gas heating expense across the summer months and treats electric expense as approximately constant year-round. Both projections are inconsistent with the operational reality of the Project: buildings on the Project are not heated during May–October; and the dominant component of Project electric load during heating season is the fans on the gas

---

[4] The Debtors acknowledge that CRO fees and any compensation awarded to Mr. Leestma will not be substituted for the Receiver's fees.

heaters, which do not operate when the heaters are not running. The Debtors' utility billing history in Adelaide Pointe's accounting system reflects the actual seasonal pattern May DTE $2,000, Jun-Jul $500 each; May Consumers $9,000, Jun-Jul $12,900 each. The Receiver's figures do not.

15.    Dry marina lease payment. The Receiver's Budget books the dry marina lease payment as an expense of the receivership / Debtor estate. The dry marina is owned by Harbor West QOZB, LLC, a non-Debtor entity — a fact established in the Receiver's own February 23, 2026 Motion to Expand Receivership Estate filed in the underlying state-court receivership. The dry marina lease is an obligation of that non-Debtor entity, not of any Debtor entity in this case.

16.    Receiver's own fees. The Receiver's Budget does not disclose, on a properly-budgeted line item, the Receiver's own professional fees charged to the receivership estate. Independent Bank to increase its secured claim itself has represented in its filings in this Court that the Receiver is working and presumably funded by approximately 50 hours per week, and the Receiver has confirmed that his billing rate is $425 per hour. The arithmetic is straightforward: 50 hours per week at $425 per hour produces approximately $21,250 per week, or approximately $85,000 per month — approximately $255,000 across the May–July comparison window. The Draft CRO Budget reflects approximately $335,000 of Receiver fees across 26 weeks, including catch-up of unpaid prepetition Receiver professional fees (Note [23]). Yet the Receiver and the Bank protest the estimated cost of the CRO. The Receiver's 50 hour-per-week billing volume against an enterprise the Receiver himself has acknowledged on the recorded record requires approximately $12,500 per month of net cash to operate is itself questionable, particularly in light of the documented operational disruption under his administration (bounced or stop-paid checks, threatened fuel-vendor service cutoffs, an employee walkout, the cash-only fuel operation, and the

attempted corruption of the Debtors' accounting records). Mr. Leestma operated the same Project and for years without producing any operating short falls of those disruptions.

### IV. The Status Of The Receiver's Budget Reflects His Posture As An Instrument Of Independent Bank.

17.     The problems set forth in Section II — understated revenue, overstated expense, omitted Receiver's Fees, ANDE obligations attributed across the operations without allocation — is consistent with the Receiver's own characterization of his role and his perception and fiduciary duty. In his February 23, 2026 Motion to Expand Receivership Estate, the Receiver represented to the state court: "absent the additional control, the Receiver is unable to address the concerns raised by the State of Michigan or City of Muskegon or conversely, will be forced to provide benefits for other secured creditors at the expense of Independent Bank." (Receiver's Motion to Expand Receivership Estate, Case No. 25-20760-CBB (the "Michigan Case"), Kent County Circuit Court, filed Feb. 23, 2026, ¶ 57.) That sentence frames the Receiver's view as the Project as one in which the Receiver's concern is whether benefits will accrue only to Independent Bank or to other secured creditors. It is the operative lens through which the Receiver's Budget should be read — a budget the Receiver uses to expand his control over the Bank's collateral by overstating the gap between the Project's operational complexity the need for unified operation by the proposed CRO and the absence of professional management today.

18.     Two additional facts follow that skewed lens and vision. First, the Receiver's first budget submitted in the Michigan Case—— contained no winter storage revenue at all. The Receiver subsequently agreed with the Debtors' management that winter storage revenue should be included as part of the Receiver's first budget, and the Receiver's Budget improperly filed with this Court as Doc. 37-1 Budget filed in this Court accordingly contains a winter storage revenue

line, but at a materially understated level .The pattern is not random. Each successive iteration of the Receiver's Budget moves the dial only as far as the Debtors and ANDE forced him to move it, and no further. The Debtors' believe that the Receiver did not submit any of the corresponding updated reports with the Michigan Court that the Receivership Order required. Second, in a Zoom meeting with Debtors' and ANDE management in late March, the Receiver acknowledged the budget required updating to reflect accurate winter storage revenue and other line items the Debtors and ANDE had identified, and represented that he would update the Budget. He never did. Instead, he filed a new budget that arrived at the same result by adding the same amount of winter storage revenue as he added in expenses to reflect a bleak financial condition. On May 5, 2026 the Receiver exacerbated his errors through his counsel's re-circulation by email to interested parties). Mr. Polderman is attempting to deliver the same false outcome through repetition of the flawed Receiver's Budget. The Debtors need not repeat the cliché about not creating the truth by repeating the same falsehood.

19.     In summary of these disputed issues, the Debtors simply rely on this Court's common sense. The flawed Receiver's Budget who has characterized his administrative concern as avoiding benefits to the Debtors and other secured creditors at the Banks monetary expense, should not be presumed to be a neutral, good-faith projection of operational cash needs. It is a tool of advocacy for the Bank. The pattern in the Receiver's Budget — every adjustment running in the same direction — is consistent with the Receiver's purposeful framing. So is the pattern of refusing to amend the Budget after agreeing to do so, and instead resubmitting it three times without input provided by the CRO. The Court should not credit the Receiver's Budget on its merits, and should strike Doc. No. 37-1 to support and restrict access to the public record. The Debtors are uncertain whether any updated reports were even filed with the Michigan Court, as

Receiver's counsel has candidly admitted that the reports filed with this Court were not created until April 14, 2026.

**Relief Requested**

**20.**    For the foregoing reasons, the Debtors respectfully request that this Court enter an Order: (i) striking Doc. No. 37-1 (the Receiver's Cash Collateral Budget) from the record and restricting access to that document filed to the public record; (ii) declining to credit any representations of operational cash needs premised upon the flawed Receiver's Budget filed at Doc. No. 37-1 that contains figures as the operative cash collateral budgets for purposes of the these proceedings, subject to such modifications as this Court directs; (iv) directing that any future cash budget submitted to this Court by the Receiver be supported by a sworn declaration identifying the underlying source data, the historical periods used, and that purports to establish historical operating data already in the Receiver's possession through the Project accounting system, and the specific reasons for any departure from the Debtors' historical operating data; and (v) granting such other and further relief as this Court deems just and proper, that would require this information in consideration to opinion of any expert opposed to the Receiver's purposes.[5]

WHEREFORE, the Debtors respectfully request that this Court enter the relief requested above and grant such further relief as appropriate

Dated: May 7, 2026

JENNIS MORSE, P.A.

/s/ *David S. Jennis*
David S. Jennis
Florida Bar No. 775940

---

[5] The Debtors submit that since the Receiver and his and the Bank's counsel positioned the Receiver as an expert, his opinion should meet the standard of Daubert and Federal Rules of Evidence 702

606 East Madison Street
Tampa, Florida 33602
Telephone: (813) 229-2800
Email: djennis@jennislaw.com
Counsel for Debtors and Debtors-in-Possession

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing was served via CM/ECF on all parties registered to receive electronic notice in this case on this 7th day of May, 2026.

/s/ *David S. Jennis*
David S. Jennis