**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**
www.flmb.uscourts.gov

In re:

| | |
|---|---|
| LEESTMA MANAGEMENT, LLC, | Case No.: 8:26-bk-02696-CED [LEAD] |
| ADELAIDE POINTE QOZB, LLC, | Case No.: 8:26-bk-02698-CED |
| ADELAIDE POINTE BOATERS SERVICES, LLC, | Case No.: 8:26-bk-02699-CED |
| ADELAIDE POINTE BUILDING 1, LLC, | Case No.: 8:26-bk-02700-CED |
| WATERLAND BATTLE CREEK, LLC, | Case No.: 8:26-bk-02701-CED |

      Debtors.                                      *Jointly Administered*

_____/

### STANCORP MORTGAGE INVESTORS, LLC, AS AUTHORIZED AGENT AND SERVICER'S VERIFIED MOTION FOR RELIEF FROM THE AUTOMATIC STAY OR, ALTERNATIVELY, FOR ADEQUATE PROTECTION

StanCorp Mortgage Investors, LLC, as authorized agent and servicer for lenders Standard Insurance Company, Banner Life Insurance Company, The Lincoln National Life Insurance Company, and PL Mortgage Fund, LLC ("**StanCorp**"), by and through its undersigned counsel, moves this Court pursuant to 11 U.S.C. § 362(d)(1) and (2), 11 U.S.C. § 363(e), and Federal Rule of Bankruptcy Procedure 4001(a) for the entry of an order modifying the automatic stay to allow StanCorp to exercise its rights under applicable non-bankruptcy law with respect to the Debtor's interest in real property commonly known as 6102 and 6120 Clay Avenue Southwest, Wyoming, Michigan 49548 with tax parcel identification numbers of 41-21-01-600-003 and 41-21-01-600-006 (the "**Property**"),[1] or alternatively, for adequate protection, and in support thereof states as follows:

---

[1] The Property consists of a 20,160 square foot single story, office building built in 1994 with approximately 107 parking spaces, located eight miles south of the Grand Rapids central business district and situated on 4.83 acres with 3.64 acres of development land with billboard. Upon information and belief, the Property is currently unoccupied and not generating any revenue as the sole tenant vacated the Property by the end of 2025. Additionally, the Property is not part of or connected to the Adelaide Pointe project on Muskegon Lake and is not a Receivership Asset subject to the Order Appointing Receiver (Doc. No. 18, Ex. B) entered by the Circuit Court for Kent County, Michigan (the "**Receiver Order**"), as the Property is not subject to a mortgage or security agreement in favor of Independent Bank.

**JURISDICTION AND VENUE**

1.      The Court has jurisdiction to consider the Motion under 28 U.S.C. §§ 1334 and 157.  This matter is a core proceeding under 28 U.S.C. § 157(b).  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory predicates for the relief requested herein are Sections 362(d) and 363(e) of Title 11 of the United States Code, Sections 101, *et seq.* (the "**Bankruptcy Code**").

**BACKGROUND**

**A.      Loan History**

3.      On or about January 12, 2024, Leestma Management LLC (the "**Debtor**") and Ryan Leestma ("**R. Leestma**") jointly executed and delivered to Standard Insurance Company, a promissory note in the original amount of $2,800,000.00 (the "**Note**").  A copy of the Note is attached as **Exhibit A**.

4.      To secure payment of the Note, on or about January 12, 2024, the Debtor executed and delivered to Standard Insurance Company a Mortgage for the Property, which was recorded on January 25, 2024, in the Official Records for Kent County, Michigan as Instrument No. 202401250004269 (the "**Mortgage**").  A copy of the Mortgage is attached as **Exhibit B**.

5.      To further secure payment of the Note, on or about January 12, 2024, the Debtor executed and delivered to Standard Insurance Company an Assignment of Lessor's Interest in Leases which was recorded on January 25, 2024, in the Official Records for Kent County, Michigan as Instrument No. 202401250004270, a copy of which is attached as **Exhibit C**.

6.      On or about February 13, 2024, Standard Insurance Company executed allonges transferring certain interests in the Note to the below investors:

> a.   An undivided 14.65% interest to Banner Life Insurance Company

b.   An undivided 14.9% interest to PL Mortgage Fund, LLC; and

c.   An undivided 12.7% interest to The Lincoln National Life Insurance Company

A copy of the three allonges to the Note are attached hereto as **Composite Exhibit D**.

7.      On or about January 24, 2025 (but with an effective date of February 13, 2024), Standard Insurance Company executed and delivered to Banner Life Insurance Company, PL Mortgage Fund, LLC, and The Lincoln National Life Insurance Company, an Assignment of Lender's Interest in Mortgage and Related Loan Documents,  which was recorded on January 24, 2025, in the Official Records for Kent County, Michigan as Instrument No. 202501240004185, a copy of which is attached as **Exhibit E.**

8.      Also on or about January 24, 2025 (but with an effective date of February 13, 2024), Standard Insurance Company executed and delivered to Banner Life Insurance Company, PL Mortgage Fund, LLC, and The Lincoln National Life Insurance Company, an Assignment of Assignment of Lessor's Interest in Leases and Related Loan Documents,  which was recorded on January 24, 2025, in the Official Records for Kent County, Michigan as Instrument No. 202501240004186, a copy of which is attached as **Exhibit F.**

9.      Exhibits A – F are sometimes collectively called the "**Loan Documents**."

**B.      Defaults and Notice Under the Loan**

10.     The Debtor and R. Leestma defaulted under the Loan Documents by, among other potential defaults, failing to pay the full monthly amount due November 1, 2025, and thereafter (the "**Default**").

11.     On November 11, 2025, StanCorp provided a Demand Letter and Notice of Intent to Accelerate Debt and Commence Foreclosure Proceedings to the Debtor and R. Leestma (the "**Notice**") relative to the Default.  A true and correct copy of the Notice is attached as **Exhibit G**.

12.    Subsequently, StanCorp, the Debtor and R. Leestma entered into a forbearance agreement dated December 30, 2025 (the "**Forbearance Agreement**"), with an expiration date of March 1, 2026, a copy of which is attached as **Exhibit H**.

13.    On February 25, 2026, the Forbearance Agreement was extended to March 31, 2026, a copy of which extension is attached as **Exhibit I**.

14.    Since the Default and receipt of the Notice, the Debtor has failed to pay 2025 Winter property taxes for the Property as they came due and those taxes (currently totaling at least $22,015.13) are now in delinquent status and accruing interest.

**C.    The Debtor's Bankruptcy Case**

15.    On April 1, 2026 (the "**Petition Date**"), the Debtor filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code along with four related entities whose cases are being jointly administered with the Debtor's case.

16.    Per the Debtor's Case Management Summary, the Debtor filed bankruptcy primarily due to issues surrounding a project being developed by the Debtor known as Adelaide Pointe on the shores of Muskegon Lake in Muskegon, Michigan. *See* Doc. No. 12, ¶ 1. Notably, the Case Management Summary makes no mention of the Property. The Property is not part of the Adelaide Pointe project and is not subject to the Receiver Order. Rather, the Property is a separate property in the Debtor's larger commercial real estate portfolio but one that is currently vacant and not generating any revenue.

17.    As of the Petition Date, StanCorp is owed $2,982,756.13. *See* Proof of Claim No. 3.

**ARGUMENT**

**I.     Cause Exists to Grant Stay Relief Pursuant to 11 U.S.C. § 362(d)(1).**

18.     Cause exists to terminate the automatic stay pursuant to § 362(d)(1) of the Bankruptcy Code due to the lack of adequate protection of StanCorp's interest in the Property. Relief from the automatic stay is governed by Section 362(d)(1), which states, "the court shall grant relief from the stay . . . for cause, including lack of adequate protection in an interest in property of such party in interest." 11 U.S.C. § 362(d)(1).

19.     "Cause" is not defined in the Bankruptcy Code, but rather is determined on a case-by-case basis. There are several factors that the Court may consider when determining whether "cause" exists, including: (1) "whether the debtor has acted in bad faith," (2) "the hardships imposed on the parties with an eye towards the overall goals of the Bankruptcy Code," and (3) "pending state court proceedings[.]" *Baker v. Bank of Am., N.A.*, No. 20-10780, 2020 WL 7706473, at *8 (11th Cir. Dec. 29, 2020) (citing *In re Feingold*, 730 F.3d 1268, 1277 (11th Cir. 2013) (citation and quotation marks omitted)); *see also In re Ellingsworth Residential Community Ass'n, Inc.*, No. 6:20-BK-01346-KSJ, 2020 WL 6803154, at *2 (Bankr. M.D. Fla. Oct. 16, 2020).

20.     Additionally, the failure to make mortgage payments is one such situation that constitutes "cause" for relief from the automatic stay. *In re Schuessler*, 386 B.R. 458, 480 (Bankr. S.D.N.Y. 2008); *see also In re Three Tuns, Inc.*, 35 B.R. 110 (Bankr. E.D. Pa. 1983) (secured creditor was granted relief from stay to foreclose its mortgage on debtor's real property because no post-petition mortgage payments had been made). This is especially true when "a debtor lacks the willingness; the current means; or a realistic, near-present ability to make contractual payments to the secured creditor." *Id.*

5

21.     In this case, cause exists for granting StanCorp relief from the stay.  Significantly, not only has the Debtor defaulted under the terms of the Loan Documents, but the Property also remains unoccupied and is not generating any revenue, the latest property taxes remain unpaid, and the amount owed under the Loan Documents continues to accrue interest and other fees and expenses as this case continues without StanCorp receiving any payments. Simply put, cause exists to lift the stay because the Debtor continues to possess the Property while paying nothing toward what is owed to StanCorp under the Loan Documents. As such, cause exists for this Court to lift the automatic stay.

**II.     Cause Exists to Grant Stay Relief Pursuant to 11 U.S.C. § 362(d)(2).**

22.     Cause also exists to grant stay relief under § 362(d)(2) of the Bankruptcy Code.

23.     Section 362(d)(2) provides that "the court shall grant relief from the stay . . . with respect to a stay of an act against property under subsection (a) of this section, if—(A) the debtor does not have an equity in such property; and (B) such property is not necessary to an effective reorganization." 11 U.S.C. § 362(d)(2). Both elements of section 362(d)(2) must be satisfied before relief can be granted. *In re 412 Boardwalk, Inc.*, 520 B.R. 126, 134 (Bankr. M.D. Fla. 2014) (Funk, J.). "The Movant has the burden of demonstrating that a debtor has no equity, and the debtor has the burden of demonstrating that the property is necessary to an effective reorganization." *Id.*; *see also* 11 U.S.C. § 362(g).

24.     Upon information and belief, there is minimal to no equity in the Property (which remains vacant and is not generating any revenue) while the total amount due under the Loan Documents continues to increase every day.[2]

---

[2] As of the date of this Motion, the Debtor has yet to file its bankruptcy schedules and statement of financial affairs. While StanCorp is in the process of obtaining an appraisal of the Property, its efforts to coordinate with the Debtor access for the appraiser to inspect the Property have not been successful to date.

25. The second element of section 362(d)(2) requires the debtor to prove that the property is necessary for an "effective" reorganization. *In re Royal Palm Square Assocs.*, 124 B.R. 129, 132 (Bankr. M.D. Fla. 1991). A reasonable possibility of a successful reorganization must exist. *In re Pegasus Agency, Inc.,* 101 F.3d 882 (2d Cir. 1996). This requirement is satisfied where none of the following is true: (1) "the property has sufficient equity which could be refinanced and the plan could be funded from a new loan"; (2) "the property will be sold and the sale will produce sufficient monies to fund the plan of reorganization"; or (3) "the property is unique in character and it is essential to the survival of the reorganized entity." *Royal Palm*, 124 B.R. at 132. None of these are true in this case. Accordingly, the Court should terminate the automatic stay under section 362(d)(2) with respect to the Property.

**III.    StanCorp Is Entitled to Adequate Protection Pursuant to 11 U.S.C. § 363(e).**

26. Alternatively, StanCorp should be granted adequate protection. Section 363(e) of the Bankruptcy Code provides:

> Notwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest. This subsection also applies to property that is subject to any unexpired lease of personal property (to the exclusion of such property being subject to an order to grant relief from the stay under section 362).

11 U.S.C. § 363(e).

27. Further, Section 361 states:

> When adequate protection is required under section 362, 363, or 364 of this title of an interest of an entity in property, such adequate protection may be provided by—
>
> (1) requiring the trustee to make a cash payment or periodic cash payments to such entity, to the extent that the stay under section 362

7

of this title, use, sale, or lease under section 363 of this title, or any grant of a lien under section 364 of this title results in a decrease in the value of such entity's interest in such property;

(2) providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property; or

(3) granting such other relief, other than entitling such entity to compensation allowable under section 503 (b)(1) of this title as an administrative expense, as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

28.     Accordingly, the use by Debtor of the Property mandates adequate protection be given.  The requirement of adequate protection in Section 363(e) is mandatory.  If adequate protection cannot be offered, the use, sale or lease of the collateral must be prohibited.

29.     What constitutes adequate protection is decided on a case-by-case basis.  *See, e.g., In re George Ruggiere Chrysler-Plymouth, Inc.*, 727 F.2d 1017, 1019 (11th Cir. 1984) (requiring individual determination of value of secured interest and whether use of cash collateral threatens that value); *Matter of Karl A. Neise, Inc.*, 16 B.R. 600, 601 (Bankr. S.D. Fla. 1981) ("What constitutes adequate protection varies with the facts and circumstances of each particular case…"). The critical purpose of adequate protection is to guard against the diminution in the value of a secured creditor's collateral during the period when such collateral is being used by the debtor in possession. *Id.*; *In re 495 Central Park Avenue Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992).

30.     Accordingly, StanCorp respectfully request it be provided with adequate protection as follows:

i.    Debtor pays adequate protection payments to StanCorp on a monthly basis in at least the amount of $21,380.00, which represents the monthly principal and interest payment;

ii.   Debtor pays the 2025 Winter Property taxes in full as soon as reasonably appropriate;

iii. Debtor to provide StanCorp access to the Property to conduct an inspection;

iv. Debtor timely performs all obligations of a debtor-in-possession required by the Bankruptcy Code, Federal Rules of Bankruptcy Procedure, and this Court; and

v. Debtors shall maintain insurance coverage for the Property in accordance with the obligations under the Loan Documents listing StanCorp as loss payee.

This list of adequate protection items is non-exhaustive and StanCorp may seek to supplement it prior to a hearing on this Motion.

  **WHEREFORE**, StanCorp respectfully requests that this Court enter an order (a) granting StanCorp relief from the automatic stay to exercise its *in rem* rights against the Property through completion of foreclosure and issuance of a certificate of title; or, (b) in the alternative, granting StanCorp adequate protection; and (c) granting such other and further relief as this Court deems appropriate.

Dated:  May 11, 2026.

/s/ Rhys P. Leonard
Stephanie C. Lieb, Esq.
Florida Bar No. 0031806
Email: slieb@trenam.com
Rhys P. Leonard, Esq.
Florida Bar No. 0059176
Email: rleonard@trenam.com
TRENAM, KEMKER, SCHARF, BARKIN, FRYE,
  O'NEILL & MULLIS, P.A.
101 E. Kennedy Blvd., Suite 2700
Tampa, FL 33602
Telephone:  (813) 227-7469
*Counsel to StanCorp Mortgage Investors, LLC, as agent and servicer for lenders Standard Insurance Company, Banner Life Insurance Company, The Lincoln National Life Insurance Company and PL Mortgage Fund, LLC*

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on May 11, 2026, a true and correct copy of the foregoing was furnished by CM/ECF to all registered CM/ECF recipients and the Local Rule 1007-2 parties-in-interest, and by first class U.S. Mail, postage prepaid to: Leestma Management, LLC, 1900 Gulf Drive North, Unit 7, Bradenton Beach, FL 34217 and those LR 1007-2 Parties In Interest.

*/s/ Rhys P. Leonard*
Rhys P. Leonard

Label Matrix for local noticing
113A-8
Case 8:26-bk-02696-CED
Middle District of Florida
Tampa
Mon May 11 12:25:34 EDT 2026

4Front Credit Union
c/o David A. Lerner, Esq.
Plunkett Cooney
38505 Woodward Ave - Suite 100
Bloomfield Hills, MI 48304-5096

City of Muskegon
c/o Marc N. Swanson
Miller, Canfield, Paddock and Stone
150 West Jefferson, Suite 2500
Detroit, MI 48226-4432

Independent Bank
c/o Attn: Jeffrey W. Warren, Esq.
Bush Ross, P.A.
Post Office Box 3913
Tampa, FL 33601-3913

Independent Bank
c/o Attn: Kathleen L. DiSanto, Esq.
Bush Ross, P.A.
Post Office Box 3913
Tampa, FL 33601-3913

Independent Bank
c/o Jeffrey W. Warren, Esq.
Bush Ross, P.A.
P.O. Box 3913
Tampa, FL 33601-3913

Michigan Credit Union
c/o Hill Ward Henderson, P.A.
101 East Kennedy Boulevard
Suite 3700
Tampa, FL 33602-5195

Team Financial Group Inc
c/o Angela N Grewal
Adams and Reese LLP
501 Riverside Avenue Ste 601
Jacksonville, FL 32202-4937

End of Label Matrix
Mailable recipients    7
Bypassed recipients    0
Total                  7

**VERIFICATION**

Under the penalties of perjury, I, Amy Frazey, state as follows:

1. I am the Managing Director and Senior Vice President of StanCorp Mortgage Investors, LLC and am authorized to execute this Verification on behalf thereof.

2. I have read the foregoing Verified Motion for Relief from the Automatic Stay , or in the Alternative, for Adequate Protection ("**Verified Motion**"), and I have personal knowledge of the facts set forth therein, or of these facts as they appear in the business records, reports, memoranda and data compilations of StanCorp Mortgage Investors, LLC made at or near the time of the events described by, or from information transmitted by, a person or persons with knowledge of the events described whose regular practice it was to make and keep such records in the ordinary course of the regularly conducted business activities of StanCorp Mortgage Investors, LLC; that I am one of the persons with custody of such records; that I am familiar with the methods and preparation and identity of such records; that I routinely rely on such records in the usually course of my business and the business of StanCorp Mortgage Investors, LLC.

3. The facts as set forth in the Verified Motion are true and correct.

4. The default by the Debtor as set forth in the Verified Motion continues to exist as of the date of this Verification.

Dated: May 8, 2026

STANCORP MORTGAGE INVESTORS, LLC

By: _____

Name: Amy Frazey

Title: Managing Director and Senior Vice President

# EXHIBIT A

Digitally
signed by
Michelle.You
ngclaus
Date:
2024.01.22
12:22:40
-08'00'

SIC Loan No. **C3110110**

## NOTE

**$2,800,000.00**                                                    January _12_, 2024

FOR VALUE RECEIVED, the undersigned ("Borrower"), jointly and severally, promises to pay in lawful money of the United States, to the order of **Standard Insurance Company, an Oregon corporation** ("Lender"), at its office in Hillsboro, Oregon, or such other place as Lender may designate, the principal amount of a loan ("Loan") of **Two Million Eight Hundred Thousand and No/100ths Dollars ($2,800,000.00)**, together with interest, on the following agreements, terms and conditions.

1.    Payments.    Borrower will make monthly payments of principal and interest to Lender, in amounts sufficient to fully amortize the Principal Balance over a **Twenty Five (25)** year amortization period in substantially equal monthly payments. Such monthly payments of principal and interest will be in the initial amount of **Twenty One Thousand Three Hundred Eighty and No/100ths** Dollars **($21,380.00)** payable on the first day of each month, commencing with the **first** day of **March, 2024** ("First Payment Date"), together with such other sums as may become due hereunder or under any instrument securing this Note, until the entire indebtedness is fully paid, except that any remaining indebtedness if not sooner paid will be finally due and payable on the **first** day of **February, 2049**, which is the maturity date of this Note ("Maturity Date"). The monthly payment amount will change after each Rate Adjustment Date (as defined in Paragraph 2) to an amount sufficient to repay the then unpaid Principal Balance in full at the then current interest rate, in substantially equal monthly payments over the balance of the amortization period specified above. If applicable, until the payment is again changed, Borrower will pay the new monthly payment each month beginning on the first day of the first calendar month after the applicable Rate Adjustment Date. Lender will mail or deliver to Borrower a notice of any changes in the interest rate, and any resulting changes in the monthly payments required under this Note, before the date the first payment is due after the applicable Rate Adjustment Date. Every payment received will be applied, in any order that may be determined by Lender in its sole discretion, to sums under this Note, including, without limitation: (a) Automated Clearing House ("ACH") termination/late charges; (b) expenses paid or funds advanced by Lender with interest at the Default Rate when applicable (as hereinafter defined); (c) any prepayment fees due with respect to any payment and any other fees which may remain unpaid; (d) accrued interest on the Principal Balance from time to time remaining unpaid; and (e) subject to the prepayment provisions herein, the Principal Balance. "Principal Balance" means the then outstanding Loan amount together with all sums, if any, that Lender has advanced, including for expenses paid, or added to the Loan.

2.    Interest.    The interest rate will change on the applicable Rate Adjustment Date(s). Interest will be calculated on the basis of a 360-day year consisting of twelve 30-day months, except that interest due and payable for a period for less than a full month and/or any prepayment will be calculated on an actual accrual method. The initial interest rate included in the monthly payments, unless adjusted as otherwise provided in this Note, will be calculated at the rate of **Seven and Seven-Eighths** percent **(7.875%)** per annum ("Note Rate") on the unpaid Principal Balance. Borrower also promises to pay interest at the Note Rate from the date of disbursement of the Loan proceeds ("Disbursement Date") to the date from which interest is included in the First Payment Date. As used herein, "Rate Adjustment Date(s)" will be as follows:

- 35 months from the First Payment Date;
- 71 months from the First Payment Date;

Note (MI 07/21)

- 107 months from the First Payment Date;
- 143 months from the First Payment Date;
- 179 months from the First Payment Date;
- 215 months from the First Payment Date;
- 251 months from the First Payment Date.

**(a)**    One hundred and twenty (120) days before each Rate Adjustment Date, Lender will notify Borrower in writing of the Adjusted Interest Rate that will become effective in accordance with this Note. The "Adjusted Interest Rate" will be Lender's then prevailing annual interest rate for similar loans then being originated by Lender with a similar term (equal to the period between the Rate Adjustment Date and the earlier of the next Rate Adjustment Date or the Maturity Date) then being originated by Lender on properties comparable to the Property (as herein defined) as determined solely by Lender.

**(b)**    Borrower will have thirty (30) days from the date of receipt of such notification from Lender to accept or reject the Adjusted Interest Rate. Failure by Borrower to notify Lender of the acceptance or rejection of the Adjusted Interest Rate within such thirty (30) day period will be deemed to be a rejection of the Adjusted Interest Rate. If the Adjusted Interest Rate is rejected by Borrower (or deemed rejected), the entire unpaid Principal Balance, all accrued unpaid interest, and any other amounts payable under the other Loan Documents (defined below) shall be due and payable in full, without a Prepayment Fee, no later than the pending Rate Adjustment Date for which Lender has provided written notice.

**(c)**    If Borrower accepts the Adjusted Interest Rate for the offered period, the Adjusted Interest Rate will become effective on the pending Rate Adjustment Date for which Lender has provided written notice and monthly installments of principal and interest will then be due and payable in an amount to be determined that will amortize the remaining unpaid Principal Balance at the Adjusted Interest Rate over the remaining amortization period. In such case, Borrower will also have the option to prepay a portion of the remaining unpaid Principal Balance as described in Subparagraph 3(e) below. Except as described in Subparagraph 3(e) below, prepayment of all or a portion of the unpaid Principal Balance after an Adjusted Interest Rate is accepted and before the pending Rate Adjustment Date for which Lender has provided written notice will require payment to Lender of a Prepayment Fee as described in Subparagraphs 3(a) – 3(d) below, calculated from the Prepayment Date to the earlier or (i) the next Rate Adjustment Date for which an Adjusted Interest Rate has not been accepted; or (ii) the Maturity Date.

**(d)**    Thereafter, monthly installments of principal and interest on the unpaid Principal Balance, at the Adjusted Interest Rate, in the amount thus calculated, will be due and payable in consecutive monthly installments commencing on the first day of the calendar month after the Rate Adjustment Date and continuing on the first day of each calendar month thereafter, to and including the monthly installment of principal and interest due and payable on the earlier of the next Rate Adjustment Date or the Maturity Date.

Note (MI 07/21)

3.      Prepayment Restrictions; Fees.  Borrower has the privilege to prepay, in full but not in part, the obligation evidenced by this Note upon giving Lender (i) not less than thirty (30) days' prior written notice of (a) Borrower's intention to so prepay this Note, and (b) the date upon which such prepayment will be received by Lender ("Prepayment Date"), and (ii) payment to Lender of the Prepayment Fee (as hereinafter defined), if any, then due to Lender as hereinafter provided.

(a)    As used herein, the term "Prepayment Fee" means an amount which is the greater of:

(i)     one percent (1%) of the outstanding Principal Balance at the time of prepayment; or

(ii)    the sum of:

(A)    the Present Value (as hereinafter defined) of the scheduled monthly payments due under this Note from the Prepayment Date to the earlier of the next Rate Adjustment Date for which an Adjusted Interest Rate has not been accepted or the Maturity Date, and

(B)    the Present Value of the amount of principal and interest due under this Note on the earlier of the next Rate Adjustment Date for which an Adjusted Interest Rate has not been accepted or the Maturity Date (assuming all scheduled monthly payments due before such dates were made when due), minus

(C)    the outstanding Principal Balance as of the Prepayment Date.

The "Present Values" described in (A) and (B) will be calculated by Lender on a monthly basis as of the Prepayment Date, discounted at a rate equal to the yield-to-maturity of the U.S. Treasury Note or Bond closest in maturity to the earlier of the next Rate Adjustment Date for which an Adjusted Interest Rate has not been accepted or the Maturity Date as reported in The Wall Street Journal (or, if The Wall Street Journal is no longer published, as reported in such other daily financial publication of national circulation which will be designated by Lender) on the fifth business day preceding the Prepayment Date. Borrower will be obligated to prepay this Note on the Prepayment Date.

(b)    Notwithstanding the foregoing or any other provision herein, if Lender elects to apply any portion of insurance proceeds, condemnation awards, or any escrowed amounts to the reduction of the outstanding Principal Balance in its sole discretion as described in the Mortgage of even date ("Mortgage"), no Prepayment Fee will be due or payable as a result of such application and the monthly installments due and payable will be reduced accordingly.

(c)    In the event the Maturity Date is accelerated by Lender at any time due to an Event of Default (defined below), then a tender of payment in an amount necessary to satisfy the entire outstanding Principal Balance together with all accrued unpaid interest made by Borrower, or by anyone on behalf of Borrower, at any time before, at, or as a result of, a foreclosure sale or sale pursuant to power of sale, will constitute a voluntary prepayment before the Maturity Date thus requiring the

Note (MI 07/21)

payment to Lender of a Prepayment Fee as described in Subparagraph (a) above; provided, however, that in the event such Prepayment Fee is construed to be interest under the laws of the State of Michigan in any circumstance, such payment will not be required to the extent that the amount, together with other interest payable, exceeds the maximum rate of interest that may be lawfully charged under applicable law.

**(d)**    During the ninety (90) day period immediately preceding the Maturity Date, the entire outstanding Principal Balance and all accrued unpaid interest may be prepaid in whole, but not in part, at par, without incurring a Prepayment Fee.

**(e)**    Notwithstanding anything contained herein to the contrary, if Borrower accepts the Adjusted Interest Rate as provided in paragraph 2 above, Borrower shall have the right to prepay a portion of the unpaid principal balance of this Note prior to the Rate Adjustment Date, without a Prepayment Fee, provided the remaining principal balance of this Note after the prepayment may not be less than $150,000.00. Any partial prepayment must be received by Lender no less than thirty (30) days prior to the Rate Adjustment Date. Any partial prepayment will be applied to pay down the principal balance of this Note upon Lender's receipt of such prepayment. The then remaining principal balance of this Note will then be used to calculate the new monthly payment amount as described in paragraph 2(d) above.

4.    Waiver.    To the extent permitted by law, each and every Borrower, surety, guarantor, endorser or signator to this Note, in whatever capacity, hereby waives presentment, demand, protest, notice of dishonor and all other notices, and agrees that Lender may exercise its rights hereunder in any order and at any time, and may do so, without notice to or consent of any such person, and without in any way diminishing the obligations of any such person: (a) deal with any such person with reference to this Note by way of forbearance, extension, modification, compromise or otherwise; (b) extend, release, surrender, exchange, compromise, discharge or modify any right or obligation evidenced by this Note, secured by or provided by the Mortgage and/or any other Loan documents that evidence or secure the Loan ("Loan Documents"); and (c) take any other action which Lender may deem reasonably appropriate to protect its security interest in the property securing this Note ("Property") and the Property. Any such action(s) taken under the preceding sentence may be taken against one, all, or some of such persons, and Lender may take any such action against one differently than another of such persons, in Lender's sole discretion.

5.    Default; Default Rate.    Time is material and of the essence hereof with respect to the payment of any sums of any nature by and the performance of all duties or obligations of the Borrower. Each of the following will be an Event of Default under this Note and/or any Loan Documents: (a) failure to make any payment of principal and/or interest or any other payment required by the provisions of any Loan Documents on the date such payment or payments are due; (b) failure to perform any other provision of any Loan Documents; (c) falsity in any material respect of (i) the warranties in any Loan Documents, and/or (ii) any representation, warranty or information furnished by Borrower or its agents to Lender in connection with the Loan; (d) failure to timely provide all financial information, reports or statements described in the Loan Documents, including information required under Paragraph B.15 of the Mortgage; (e) failure to continue Loan payments via ACH; (f) a proceeding under any bankruptcy, receivership or insolvency law is instituted by or against Borrower or any guarantor; (g) the making of an assignment for the benefit of creditors by Borrower or any guarantor; (h) the imposition upon Lender, under any laws, of

Note (MI 07/21)

what Lender may deem to be a substantial tax upon Lender by reason of its interest in the Mortgage (unless Borrower may lawfully and does pay such tax); and/or (i) if any of the following appear on the list of Specially Designated Nationals and Blocked Persons that is maintained by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC") or on any other similar list maintained by any governmental entity or agency (collectively, the "SDN List"): (1) any Borrower; (2) any principal, manager or majority shareholder of any Borrower ("Principal"); (3) any guarantor or indemnitor, if any; and/or (4) any person or entity related to any Borrower, Principal, guarantor, indemnitor, the Loan or the Property. Any Event of Default under this Note constitutes an Event of Default under the Mortgage and all of the Loan Documents. Any Event of Default under any Loan Document constitutes an Event of Default under this Note. Upon the occurrence of any Event of Default, any sum not paid as provided in any Loan Documents, will, at the option of Lender, without notice, bear interest from such due date at a rate of interest ("Default Rate") equal to: (i) four (4) percentage points per annum greater than the Note Rate, or the maximum rate of interest permitted by law, whichever is the lesser; or (ii) two (2) percentage points per annum greater than the Note Rate, or the maximum rate of interest permitted by law, whichever is the lesser if the only Event of Default is (A) failure to timely provide financial information as described in Subparagraph (d) above, or (B) failure to continue Loan payments via ACH as described in Subparagraph (e) above. In addition, at the option of Lender, upon the occurrence of an Event of Default, the unpaid Principal Balance, accrued interest, plus any other sums due under any Loan Documents will at once become due and payable, without notice except as described in Paragraph 12, and will bear interest at the Default Rate. If an Event of Default occurs during a period of time in which prepayment is permitted only on payment of a Prepayment Fee, such fee will be computed as if the sum declared due on default were a prepayment and will be added to the sums due and payable.

6.    ACH Termination and Late Charges. If any payment is not received by Lender (or by the correspondent if a correspondent has been designated by Lender to receive payments) either (a) via ACH, and/or (b) within five (5) calendar days after its due date, Lender, at its option, may assess a charge equal to five cents for each $1.00 of each non-ACH or overdue payment or the maximum charge permitted by the laws of the state in which the Property is located, whichever is less. Such charge will be due and payable on demand, and Lender, at its option, may (a) refuse any non-ACH and/or late payment or any subsequent payment unless paid via ACH and/or accompanied by such charge, as the case may be, (b) add such charge to the Principal Balance or (c) treat the failure to pay such charge as demanded as an Event of Default. If such charge is added to the Principal Balance, it will bear interest at the Default Rate.

7.    Acknowledgments Regarding Default Rate, ACH/Late Charges and Prepayment Fees.

(a)    Borrower acknowledges and agrees that (i) a default in making the payments agreed to be paid when due will result in the Lender incurring additional expense in servicing the loan, loss to Lender of the use of the money due, and in frustration to Lender in meeting its other commitments, (ii) if for any reason it fails to pay any amounts when due, Lender will be entitled to damages for the detriment caused thereby, but that it is extremely difficult and impractical to ascertain the extent of such damages, and (iii) the Default Rate and the ACH/late charge are a reasonable estimate of such damages.

(b)    Borrower acknowledges and agrees that (i) prepayment before the Maturity Date may result in loss to Lender, (ii) the amount of the loss will depend on the interest rates at the time of prepayment, the amount of principal prepaid and the length of

Note (MI 07/21)

time remaining between the prepayment date and the scheduled maturity date, (iii) prepayment is most likely to occur when interest rates have dropped below the Note Rate, and (iv) because it is extremely difficult and impractical to ascertain now the amount of loss Lender may suffer in the event of prepayment, (A) Lender will be entitled to damages for the loss caused by prepayment and (B) the Prepayment Fee is a reasonable measure of such damages. Borrower agrees that the Prepayment Fee will be imposed, to the extent permitted by law, whether the prepayment is voluntary, involuntary or by operation of law, in connection with an Event of Default, or required by Lender in connection with a transfer or contract to transfer the Property, **provided** that no Prepayment Fee will be added to sums prepaid to the Principal Balance, at Lender's election, with casualty insurance proceeds or condemnation awards.

**(c)**    Borrower (i) waives any right to prepay the loan evidenced hereby without payment of the Prepayment Fee in connection with a transfer or contract to transfer the Property by the undersigned, or a successor in interest of the undersigned, and (ii) agrees to pay such Prepayment Fee as provided above in connection with such a transfer or contract to transfer.

**(d)**    Borrower represents that it is a knowledgeable real estate investor and fully understands the effect of the fees, charges, waiver and agreement contained above. Borrower acknowledges and agrees that the making of the Loan by Lender at the interest rate and with the other terms described is sufficient consideration for such fees, charges, waiver and agreement, and that Lender would not make this Loan on these terms without such fees, charges, waiver and agreement.

**8.**    Expenses and Attorney Fees.    The following are "Attorney Fees": (a) if Lender refers this Note to an attorney for collection or seeks legal advice following a threat or an Event of Default alleged in good faith; (b) if Lender is the prevailing party in any litigation instituted in connection with the Loan; (c) if Lender or any other person initiates any judicial or nonjudicial action, suit or proceeding in connection with the Loan, including a foreclosure sale and any action to recover possession of the Property after foreclosure, (d) if an attorney is employed by Lender to (i) appear in any such action, suit or proceeding; or (ii) reclaim, seek relief from a judicial or statutory stay, sequester, protect, preserve or enforce Lender's interest in any Loan Documents; or (iii) assist Lender in any foreclosure sale. Attorney Fees will be reasonable and will also include proceedings at pre-trial, discovery, trial and appellate levels, discretionary review, post-judgment collection, under federal bankruptcy law, in eminent domain, under probate proceedings, and/or in connection with any state or federal tax lien together with fees, including court fees, costs incurred in searching records, the cost of title reports, the cost of appraisals, and the cost of surveyors' reports and expenses including reasonable fees for paralegals and other hired professionals. Borrower will pay Attorney's Fees incurred by Lender and/or its attorneys. If not paid within ten (10) days after such Attorney Fees become due and written demand for payment is made upon Borrower, such amount may, at Lender's option and to the extent permitted by law, be added to the Principal Balance and will bear interest at the Default Rate. Borrower acknowledges and agrees that the Attorney Fees will be deemed to be advances to protect Lender's interest in the Property, and may be charged and collected from Borrower in connection with a reinstatement following an Event of Default.

**9.**    No Usury.    All Agreements between the Borrower and the Lender, whether now existing or whether hereafter arising and whether written or oral, are hereby expressly limited so that in no contingency or event whatsoever, whether by reason of acceleration of the maturity, or

Note (MI 07/21)

otherwise, will the amount paid or agreed to be paid to the Lender for the use, forbearance or detention of the money to be loaned hereunder, or advanced for the performance or payment of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to the indebtedness evidenced hereby, exceed the maximum amount permissible under applicable law. If from any circumstances whatsoever fulfillment of any provision hereof or of any such other document, at the time performance of such provision will be due, will involve transcending the limit of validity prescribed by law, then ipso facto the obligation to be fulfilled will be reduced to the limit of such validity, and if from such circumstances the Lender hereof will ever receive anything of value deemed by applicable law to be interest in any amount that would exceed the highest lawful rate payable hereunder, an amount equal to any excessive interest will be applied to the reduction of the principal amount owing hereunder and not to the payment of interest, and if the amount that would be excessive interest exceeds the principal balance then owing, such excess will be refunded to the party paying the same. It is further agreed, without limitation of the foregoing, that all calculations of the rate of interest contracted for, charged, or received under this Note, or under any instrument evidencing or securing the loan evidenced hereby, that are made for the purpose of determining whether such rate exceeds the maximum lawful contract rate, will be made, to the extent permitted by applicable law, by amortizing, prorating, allocating, and spreading throughout the full stated term of the loan evidenced hereby, all such interest at any time contracted for, charged, or received from the Borrower or otherwise by the Lender or Lenders hereof in connection with such loan so that the rate of interest on account of such indebtedness, as so calculated, is uniform throughout the term. The terms and provisions of this paragraph will control and supersede every other provision of all agreements between the parties hereto.

10.    Security.  The indebtedness evidenced by this Note is secured by the Mortgage and may be secured by other security instruments.

11.    Due on Sale or Encumbrance.  As provided in the Mortgage, and subject to any exceptions provided, transfers or encumbrances of the Property, or of ownership interests in Borrower, will cause all sums evidenced by the Loan Documents to become immediately due and payable. By signing this Note, Borrower acknowledges that Borrower has received and reviewed a copy of the Mortgage and is familiar with the provisions restricting the transfer of the Property and the ownership interests therein.

12.    Notice and Opportunity to Cure.  Lender will not accelerate the sums evidenced hereby because of a nonmonetary Event of Default (defined below) by Borrower unless Borrower fails to cure the nonmonetary Event of Default within thirty (30) days of the date on which Lender mails or delivers written notice of the nonmonetary Event of Default to Borrower. The term "nonmonetary Event of Default" means a failure by Borrower or any other person or entity to perform any obligation contained in any Loan Documents, other than the obligation to make payments provided for in this Note or any other Loan Document. If a nonmonetary Event of Default is capable of being cured and the cure cannot reasonably be completed within the thirty (30) day cure period, the cure period will be extended up to sixty (60) days so long as Borrower has commenced action to cure within the thirty (30) day cure period, and in Lender's opinion, Borrower is proceeding to cure the default with due diligence. None of the foregoing will be construed to obligate Lender to forebear in any other manner from exercising its remedies and Lender may pursue any other rights or remedies which Lender may have because of a default.

13.    Notice.  Except as otherwise provided in this Note, all notices required or permitted under this Note will be in writing and may be telecopied, delivered by hand or a nationally

Note (MI 07/21)

recognized overnight courier service, or mailed by first class registered or certified mail, return receipt requested, postage prepaid, and addressed as follows:

**If to Lender:**

Standard Insurance Company
Attn: Mortgage Loan Servicing T3A
10265 NE Tanasbourne Drive
Hillsboro, OR 97124

**If to Borrower:**

Leestma Management, LLC
1900 Gulf Drive N Unit 7
Bradenton Beach, Florida 34217

Ryan Leestma
1599 Westwind Ct.
Muskegon, MI 49445

Changes in the respective addresses to which such notices will be directed may be made from time to time by either party by notice to the other party at least ten (10) days before such change of address it to become effective. Notices given by mail in accordance with this provision will be deemed to have been given three (3) days after the date of dispatch; notices given by any other means will be deemed to have been given when received.

    **14.**    Commercial Purpose. The obligation evidenced by this Note is exclusively for commercial or business purposes.

    **15.**    Governing Law. The law of the state of Michigan will govern the validity, interpretation, construction and performance of this Note. Borrower irrevocably submits to the jurisdiction of any state or federal court in the State where the Property is located in any action or proceeding brought to enforce or arising out of or relating to this Note, and waives any claim that such forum is an inconvenient forum.

    **16.**    Successors and Assigns. Whenever used herein, the words "undersigned", "Borrower" and/or "Lender" are deemed to include their respective heirs, executors, administrators, personal representatives, officers, directors, employees, agents, successors, and/or assigns.

//

//

//

//

//

[Signatures on the Following Page]

Note (MI 07/21)

## NOTICE TO THE BORROWER

DO NOT SIGN THIS NOTE BEFORE YOU READ IT. THIS NOTE PROVIDES FOR THE PAYMENT OF A FEE IF THE NOTE IS REPAID BEFORE THE DATE PROVIDED FOR REPAYMENT IN THIS NOTE AND OTHER CHARGES IF PAYMENTS ARE NOT PAID THROUGH ACH AND/OR LATE. IF YOU HAVE ANY QUESTIONS ABOUT THIS NOTE, YOU SHOULD CONSULT YOUR ATTORNEY.

### SIGNATURE OF BORROWER

Leestma Management, LLC,
a Florida limited liability company

By: _____
Ryan M. Leestma, Member

By: _____
Emily S. Leestma, Member

_____
Ryan Leestma, Individually

Document Drafted By: Michelle Youngclaus

Note (MI 07/21)

# **EXHIBIT B**

RECEIVED
REGISTER OF DEEDS
KENT COUNTY, MI

2024 JAN 25 2:38 PM

202401250004269   Total Pages: 19
01/25/2024 02:52 PM   Fees: $30.00
Lisa Posthumus Lyons, County Clerk/Register
Kent County, MI       SEAL

## MORTGAGE

SIC Loan No. **C3110110**
Parcel Identification Number **41-21-01-600-003, and 41-21-01-600-006**

THIS MORTGAGE made this **January _17_, 2024**, by **Leestma Management, LLC, a Florida limited liability company** ("Mortgagor") whose address is 1900 Gulf Drive N Unit 7, Bradenton Beach, Florida 34217, in favor of **Standard Insurance Company, an Oregon corporation** ("Mortgagee") whose address is 10265 NE Tanasbourne Drive, Hillsboro, Oregon 97124.

Mortgagor irrevocably mortgages, warrants, and assigns to Mortgagee that property in the County of **Kent**, State of Michigan, described on Exhibit "A" attached and incorporated by this reference ("Real Property") and Real Property means any and/or all of the Real Property as the context requires.

Commonly known as:   **6102 and 6120 Clay Avenue Southwest
Wyoming, Michigan, 49548**

Tax Parcel Identification No.:   **41-21-01-600-003, and 41-21-01-600-006**

Mortgagor's organizational number:   **B7417X**

Together with (a) any existing and all future recorded and/or unrecorded leases entered into on all or any part of the subject property referenced below, together with all rents, income, contract rights, issues, security deposits and profits arising from the leases and renewals thereof; (b) all rents, income, contract rights, issues, security deposits and profits for the use and occupation of the premises described in the leases or in this Mortgage and from all leases upon any or all of the real property described below, which are now executed or which may hereafter during the term of the Assignment be executed; (c) the guaranties of tenants' performance under the leases, if any; (d) all buildings and improvements now or hereafter thereon, and all appurtenances, easements, right in party walls, water and water rights, pumps and pumping plants and all shares of stock evidencing the same; (e) all fixtures and property now or later attached to or used with the Property, including but not limited to machinery, equipment, appliances and fixtures for generating or distributing air, water, heat, electricity, light, fuel or refrigeration, or for ventilating or sanitary purposes, or for the exclusion of vermin or insects, or for the removal of dust, refuse or garbage, all wallbeds, wallsafes, built-in furniture and installations, shelving, lockers, partitions, door stops, vaults, elevators, dumbwaiters, awnings, window shades, venetian blinds, light fixtures, fire hoses and brackets and boxes for same, fire sprinklers, alarm systems, drapery rods and brackets, screens, linoleum, carpets, plumbing, laundry tubs and trays, ice boxes, refrigerators, heating units, stoves, water heaters, incinerators, communication systems and all installations for which any such building is specifically designed; (f) all awards, compensation and settlements made as a result of the taking by power of eminent

Mortgage (MI 09/23)

Page 1

domain of the Real Property; (g) all trade names by which the Real Property is known, any books and records relating to the use and operation of the Real Property, all present and future plans and specifications and contracts relevant to the design, construction, management or inspection of any construction on any improvements on the Real Property and all present and future licenses, permits, approvals and agreements with or from any municipal corporation, county, state or other governmental or quasi-governmental entity relevant to the development, improvement or use of any or all of the Real Property; and (h) all rights of Mortgagor in and to any escrow or withhold agreements, surety bonds, warranties, management contracts, leasing or sales agreements with any real estate agents or brokers, and service contracts with any entity, relevant to the development, improvement, leasing, sale or use of the Real Property or any personal property located thereon; and all of said items whether now or hereafter installed being declared to be, for all purposes of this Mortgage, a part of the realty; and all the estate, interest or other claim or demand, including insurance, in law or equity, which Mortgagor now has or may hereafter acquire, in and to the aforesaid property; the specific enumerations herein not excluding the general.  The Real Property and all of the foregoing constitute the "Property" and the Property means any and/or all of the Property as the context requires.

This Mortgage is made for the purpose of securing, in such order of priority as Mortgagee may elect: (a) payment of the indebtedness in the sum of **$2,800,000.00** evidenced by that certain Note of even date the signers of which are hereinafter collectively referred to as "Borrower", delivered to Mortgagee and payable to its order, with final payment due on the **first** day of **February, 2049**, which is the maturity date of this Mortgage, and any and all modifications, extensions or renewals thereof, whether hereafter evidenced by the Note or otherwise ("Note"); (b) payment of interest on said indebtedness according to the terms of the Note; (c) payment of all other sums, with interest as herein provided, becoming due and payable under the provisions hereof to Mortgagee; (d) performance of each and every condition, obligation, covenant, promise and agreement of Mortgagor contained herein, or in the Note, or in any loan agreement relative to any indebtedness evidenced by the Note, including any guaranties, ("Loan"), or in any security agreement or mortgage at any time given to secure any indebtedness hereby secured or any part thereof; and (e) payment of such additional sums with interest thereon as may be hereafter advanced by or borrowed from the Mortgagee, its successors or assigns, by the then record owner(s) of the Property when evidenced by another promissory note or notes which are by the terms thereof secured by this Mortgage.  This Mortgage constitutes a Future Advance Mortgage under Michigan law.  All sums are collectively referred to as the "Indebtedness".  THE NOTE MAY CONTAIN PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE.

Mortgagor's Covenants and Warranties.  Mortgagor warrants that: (a) Mortgagor is the owner in fee simple absolute of the Property; (b) the Property is free, and will be kept free, from all liens and encumbrances, except those accepted by Mortgagee in writing, and Mortgagor will defend the title granted to and in favor of Mortgagee against all and every person claiming or to claim the same; (c) the Loan proceeds are not for use primarily for personal, family or household purposes; (d) to Mortgagor's knowledge after due inquiry into previous ownership and use of the Property, there are no Hazardous Substances (defined below) located on the Property and Mortgagor will not place or permit to be placed on the Property any Hazardous Substances (defined below), except in minor quantities as necessary for the operation and maintenance of the Property, used and stored in accordance with law, or in the form of consumer products held for retail sale in sealed containers; (e) the Property is zoned for the existing or contemplated use of the Property; (f) the Property is in compliance with all applicable zoning, subdivision, and environmental laws, regulations, and ordinances applicable thereto; all deed restrictions, subdivision and building ordinances and other applicable governmental laws (including the Fair Housing Act and the Americans With Disabilities Act, as each is amended from time to time) have

Mortgage (MI 09/23)

been fully complied with; and Mortgagor has all licenses and permits required by governmental authorities with respect to the Property, its operation, improvement and use; (g) the Property has indefeasible access to public rights of way as now improved and open to public passage, and is not encroached upon by improvements or rights of others, nor do the improvements on the Property encroach upon the property of others; (h) there are no actions, lawsuits, or other proceedings pending or, to the Mortgagor's knowledge, threatened against or affecting the Property or Borrower or any guarantor which might adversely affect the ability of Borrower or any guarantor to perform its obligations under the Note or other Loan Documents which evidence or secure the Loan ("Loan Documents"), or which might adversely affect the priority of Mortgagee's first lien on the Property; (i) consummation of the Loan and performance under the Loan Documents will not conflict with or result in a breach of any law, regulation or court order applicable to Borrower or the Property; (j) no condemnation proceeding is pending or, to the Mortgagor's knowledge, threatened with respect to the Property; (k) there has been no material adverse change in the financial condition of Mortgagor or Borrower or any guarantor which might adversely affect the ability of Mortgagor or Borrower or any guarantor to perform its obligations under the Loan Documents, or which might adversely affect the priority of Mortgagee's first lien on the Property; (l) all services and utilities, such as water, electricity and sewer, are available to the Property; and (m) with respect to each Mortgagor who is an individual, no part of the Property constitutes any part of Mortgagor's business homestead or residential homestead. As used in this Mortgage, Hazardous Substances means: (a) any "hazardous waste" as defined in the Resource Conservation and Recovery Act of 1976 (42 U.S.C. § 6901 et seq.), as amended from time to time, and regulations promulgated thereunder, (b) any "hazardous substance" as defined by the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (42 U.S.C. § 9601 et seq.), as amended from time to time, and regulations promulgated thereunder; (c) radon, asbestos, polychlorinated biphenyls (PCB's), explosives, radioactive substances, and material quantities of petroleum products; (d) any substance the presence of which on the Property is regulated by any federal, state or local law relating to the protection of the environment or public health; and (e) any other substance which by law requires special handling in its collection, storage, treatment or disposal.

## A.   Mortgagor agrees as follows:

1.   _Payment of Indebtedness; Performance of Covenants._  Mortgagor will pay each and every installment of principal and interest on the Note and Indebtedness, as and when the same becomes due, and perform and observe all of the covenants, agreements and provisions contained in all the Loan Documents.

2.   _Maintenance; Compliance; Inspection._  Mortgagor will: keep the Property in good condition and repair; not permit or suffer any extraordinary repairs or removal or demolition of, or a structural change in any building, fixture, equipment, or other improvement on the Property; comply with all laws, ordinances, regulations, covenants, conditions and restrictions affecting the Property or requiring any alteration or improvements to be made thereon (including the Fair Housing Act and the Americans With Disabilities Act, as each is amended from time to time); not commit, suffer or permit waste or any act upon the Property in violation of law; cultivate, irrigate, fertilize, prune and do all other acts reasonably necessary to maintain the character or use of the Property, the specific enumeration herein not excluding the general; and keep the Property free from all encumbrances, except those accepted by Mortgagee in writing. Mortgagor will permit Mortgagee, or its agents, upon reasonable prior notice, to inspect the Property, including the interior of any structure.

Mortgage (MI 09/23)

3.     <u>Hazardous Waste and Substances; Environmental Requirements.</u>

(a)     Mortgagor will comply with all laws, governmental standards and regulations applicable to Mortgagor or to the Property regarding occupational health and safety, hazardous waste and substances, and environmental matters. Mortgagor will promptly notify Mortgagee of its receipt of any notice of (i) a violation of any such law, standard or regulation; (ii) all claims made or threatened by any third party against Mortgagor or the Property relating to any loss or injury resulting from any Hazardous Substances; and/or (iii) Mortgagor's discovery of any occurrence or condition on any real property adjoining or in the vicinity of the Property that could cause the Property to be subject to any restrictions on the ownership, occupancy, transferability or use of the Property under any environmental law. The use, generation, storage, release, threatened release, discharge, disposal or presence on, under or about the Property of Hazardous Substances by Mortgagor, Mortgagor's agents, or any tenant or sublessee occupying the Property, except in minor quantities as necessary for the operation and maintenance of the Property, used and stored in accordance with applicable law, or in the form of consumer products held for retail sale in sealed containers, all of which have and will be used, stored and disposed of in accordance with commercially reasonable practices and all laws, will be an Event of Default (defined below), and Mortgagor will not engage in or permit such activities or events to occur upon the Property.

(b)     Mortgagor will indemnify and hold Mortgagee, its directors, officers, employees, agents, successors and assigns harmless from all loss, cost, damage, claim and expense (including all reasonable attorney fees, costs and/or expenses, whether at trial, on appeal, discretionary review, bankruptcy or otherwise [collectively and as defined in the Note, "Attorney Fees"]) incurred by Mortgagee in connection with the falsity in any material respect of the covenants contained herein or of Mortgagor's failure to perform the obligations of this Paragraph.

(c)     Mortgagor agrees that a receiver may be appointed to enable Mortgagee to enter upon and inspect the Property for the purpose of determining the existence, location, nature and magnitude of any past or present release or threatened release of any Hazardous Substance into, onto, beneath or from the Property. Any costs incurred by Mortgagee in obtaining the appointment of a receiver and performing the inspections, including Attorney Fees, will be paid by Mortgagor. If not paid within ten (10) days after such fees, costs and expenses become due and written demand for payment is made upon Mortgagor, such amount may, at Mortgagee's option, be added to the Principal Balance of the Note ("Principal Balance") and will bear interest at the Default Rate, as defined in the Note.

4.     <u>Casualty Loss/Restoration Construction.</u> Unless Mortgagee determines, in its sole discretion, pursuant to the provisions in Paragraph B.1., to apply the insurance proceeds to the reduction of the Indebtedness, Mortgagor will promptly commence and diligently pursue to completion the repair, restoration and rebuilding of the Property that has been partially damaged or destroyed in full compliance with all legal requirements and to the same condition, character and at least equal value and general utility as nearly as possible to that existing prior to such damage or destruction. Mortgagor further agrees: to complete same in accordance with plans and specifications satisfactory to Mortgagee, to allow Mortgagee to inspect the Property at all times during construction and to replace any work or materials unsatisfactory to Mortgagee within fifteen (15) days after notice from Mortgagee of such fact. If said work upon the construction or

Mortgage (MI 09/23)

restoration of the building or buildings is discontinued for a period of fifteen (15) days, Mortgagee may, at its option, also enter into and upon the Property and complete the construction or restoration of said building or buildings. Mortgagor gives Mortgagee full authority and power to make such entry and to enter into such contracts or arrangements as may be necessary to complete or restore said building or buildings and all monies expended by Mortgagee in connection with such completion or restoration will be added to the Principal Balance and secured by these presents and will be payable by Mortgagor on demand with interest as provided in the Note.

5.   Insurance.

(a)   Property and Other Insurance. Mortgagor will obtain and maintain in full force and effect during the term of this Mortgage such insurance as Mortgagee may reasonably require from time to time by notice to Mortgagor, including, without limitation, insurance providing (i) protection against fire, extended coverage and other all risk perils, including flood (where required) and other coverage as deemed appropriate by Mortgagee from time to time, with endorsements for waiver of subrogation, replacement cost coverage, inflation adjustment, and vandalism and malicious mischief coverage, all in amounts not less than the full replacement cost of all improvements including the cost of debris removal, (ii) comprehensive general public liability coverage with a broad form coverage endorsement with limits of $2,000,000 for aggregate liability and a single limit of $1,000,000, and (iii) business interruption and/or rent loss insurance (equal to twelve (12) months annualized income).

(b)   Insurance Companies and Policies. All insurance will be written by a company or companies acceptable to Mortgagee with an A- or better rating by A.M. Best Company, Inc. The policies described in Paragraphs 5a(i) and (iii) above will contain (i) a standard mortgagee clause naming Mortgagee as the first mortgagee with loss proceeds under the policies payable to Mortgagee, and (ii) a waiver of subrogation endorsement as to Mortgagee. The policy described in Paragraph 5a(ii) above must name Mortgagee as an additional named insured, and the policy described in Paragraph 5a(iii) above must provide that all proceeds be payable to Mortgagee. Each policy described above will provide for a thirty (30) day notice of cancellation or modification, will be satisfactory to Mortgagee as to form and substance, and shall contain endorsements that no act or negligence of Mortgagor or any occupant, and no occupancy or use of the Property for purposes more hazardous than permitted by the terms of the policy will affect the validity or enforceability of such insurance as against Mortgagee. Each policy must be in full force and effect as of the date of recording this Mortgage, must contain such additional provisions as Mortgagee deems necessary or desirable to protect its interest, and must be accompanied by proof of premiums paid for the current policy year. All such insurance must be written in amounts sufficient to prevent Mortgagor from becoming a co-insurer under the applicable policies. Mortgagor will provide acceptable ACORD Form certificates evidencing insurance coverage to Mortgagee thirty (30) days prior to any policy expiration date or in the event any policy is modified or canceled.

(c)   Blanket Policy. If a blanket policy is issued, Mortgagor will furnish Mortgagee with a certified copy of said policy, together with a certificate indicating that Mortgagee is the insured under said policy in the proper designated amount.

Mortgage (MI 09/23)

**(d)**     <u>Notice of Loss.</u> In the event of loss, Mortgagor will immediately notify Mortgagee. Mortgagee may make proof of loss if it is not made promptly by Mortgagor.

**(e)**     <u>Insurance Obtained by Third Party.</u> If insurance is provided to Mortgagee by a tenant or any party other than Mortgagor, there is a lapse in coverage, coverage is not with a company acceptable to Mortgagee with an A Category or better rating, coverage is not in an amount equal to the full replacement value of the improvements, or coverage does not in any other way meet conditions required by Mortgagee, Mortgagor will provide coverage within thirty (30) days of being notified by Mortgagee of any inadequacy in coverage. If Mortgagee does not receive proof of such coverage within thirty (30) days, Mortgagee may force place insurance until proof of coverage which meets the conditions of the Loan is received. Premiums for this force place coverage are at rates higher than Mortgagor could obtain, and payment will be the responsibility of Mortgagor, provided that at Mortgagee's sole option, Mortgagee may add the cost of such premiums to the Principal Balance.

**6.**     <u>Defense.</u> Mortgagor will appear in and defend any action or proceeding purporting to affect the security hereof or the rights or powers of Mortgagee and will pay all costs and expenses, including cost of evidence of title and Attorney Fees.

**7.**     <u>Taxes and Assessments.</u>

**(a)**     <u>Payment.</u> Mortgagor will pay, at least ten (10) days before the same shall become delinquent, all taxes and assessments affecting the Property or upon this Mortgage or the debt secured thereby, or against Mortgagee by reason of the ownership of this Mortgage and the Note, or either of them, including assessments on appurtenant water stock. Mortgagor will also pay, when due, all encumbrances, charges and liens, with interest, on the Property, which appear to be prior or superior hereto and shall deliver to Mortgagee upon request the official receipt(s) showing payment thereof, and will pay all costs, fees and expenses of this Mortgage.

**(b)**     <u>Waste.</u> The failure of the Mortgagor to pay any taxes or assessments assessed against the Property, any installment thereof or any premium payable with respect to any insurance policy covering the Property shall constitute waste and shall entitle the Mortgagee to the benefits of Section 600.2927 of the Michigan Revised Judicature Act of 1961, as amended, being MCL 600.2927. The Mortgagor hereby consents to the appointment of a receiver pursuant to any necessary court order under the Act if the Mortgagee elects to seek relief under the Act.

**8.**     <u>Monthly Deposits.</u> Unless this covenant is prohibited by law or waived in writing by Mortgagee, Mortgagor will pay each year to Mortgagee, together with and in addition to the monthly payments of principal and interest payable under the terms of the Note, until the Note is fully paid, in equal monthly installments, the estimated amount of the annual property taxes, assessments, insurance premiums and similar charges next payable, as estimated by Mortgagee. If at any time Mortgagee determines that such payments will not be sufficient to account for each such charge on its due date, Mortgagor will pay to Mortgagee, upon demand, additional sums as necessary to account for such deficiency. Mortgagee may retain the sums received under this Paragraph and apply them to such charges when they become due. Sums received will not earn interest and may be commingled with other funds of Mortgagee. If Mortgagee is required by law

Mortgage (MI 09/23)

to pay interest on these sums, Mortgagee may, to the extent permitted by law, impose a charge for holding and disbursing such funds.  In the Event of a Default under any Loan Document, Mortgagee may apply the sums required under this Paragraph (without prepayment fee and without limiting the privilege, if any, to prepay any amounts secured hereby) first to accrued interest and then to the Principal Balance secured hereby.  As an additional covenant hereof, and in any event if the foregoing provision for prepayment is at any time prohibited by law, or waived in writing by Mortgagee, or Mortgagor fails to make payments in the full amount required under this Paragraph, Mortgagor will pay such charges when they are due and, upon demand, provide Mortgagee with satisfactory evidence of payment and coverage.

9.      Leases.  Mortgagor will fully perform all the terms and conditions on Mortgagor's part to be performed in any existing or future lease with respect to which Mortgagor is lessor covering the Property.  Mortgagor will not, without the prior consent of Mortgagee, terminate, cancel or accept the surrender of, or suffer or permit the termination, cancellation or surrender of such lease, except upon the expiration of the term thereof, or materially modify or alter, or suffer or permit the material modification or alteration of such lease.  Mortgagor further covenants and agrees not to enter into any lease for a term in excess of three (3) years for fifteen percent (15%) or more of the net rentable area of the Property without the prior written consent of Mortgagee. Mortgagee reserves the right to declare any subordinate lease superior to the lien of this Mortgage, at its sole option.

10.     Fees for Information.  Mortgagor will pay Mortgagee, to the extent permitted by law, a reasonable fee, as determined by Mortgagee, for providing to Mortgagor or a third party a statement concerning the obligations secured by this Mortgage or any other information requested by Mortgagor or the third party.

11.     Security Agreement.

(a)     Grant of Security Interest.  With respect to any of the Property which constitutes personal property or fixtures governed by the Uniform Commercial Code of the State of Michigan or where Mortgagor is organized ("Code"), this Mortgage constitutes a security agreement between Mortgagor as Debtor and Mortgagee as Secured Party, and Mortgagor hereby grants to Mortgagee a security interest in such Property.  Cumulative of all other rights of Mortgagee hereunder, Mortgagee has all of the rights conferred upon secured parties by the Code. Mortgagor will execute and deliver to Mortgagee all financing statements that may from time to time be required by Mortgagee to establish and maintain the validity and priority of the security interest of Mortgagee, or any modification thereof, and will bear all costs and expenses of any searches reasonably required by Mortgagee.

(b)     Rights of Mortgagee.  Mortgagee may exercise any or all secured party remedies under the Code, and it is agreed that if, upon an Event of Default, Mortgagee proceeds to dispose of such property in accordance with the provisions of the Code, ten (10) days' written notice by Mortgagee to Mortgagor will be deemed to be reasonable notice under any provision of the Code requiring such notice; provided, however, that Mortgagee may, at its option, dispose of such property in accordance with Mortgagee's rights and remedies with respect to the real property pursuant to the provisions of this Mortgage, in lieu of proceeding under the Code. Upon default, Mortgagor covenants and agrees upon demand by Mortgagee to assemble and deliver to Mortgagee all of the personal property in which Mortgagee has been granted a security interest by Mortgagor.

Mortgage (MI 09/23)

(c)   Change in Mortgagor's Name.   Mortgagor will give advance notice in writing to Mortgagee of any proposed change in Mortgagor's name, identity, or corporate structure and will execute and deliver to Mortgagee, prior to or concurrently with the occurrence of any such change, all additional financing statements that Mortgagee may require to establish and maintain the validity and priority of Mortgagee's security interest with respect to any applicable Property.

(d)   Fixture Filing.   With respect to those items of the Property that are or will become fixtures upon the Property, this Mortgage is effective as a financing statement files as a fixture filing from the date of its filing for record in the real estate records of the county in which the Property is situated.  Information concerning the security interest created by this instrument may be obtained from Mortgagee, as Secured Party, at the address of Mortgagee below.  The mailing address of Mortgagor, as Debtor, is below.

12.   Restrictive Uses.   Mortgagor will not, without Mortgagee's prior written consent, change the general nature of the occupancy of the Property, initiate, acquire or permit any change in any public or private restrictions (including without limitation a zoning reclassification) limiting the uses which may be made of the Property, or take or permit any action which would impair the Property or Mortgagee's lien or security interest in the Property.

13.   Changes In Use.   If Mortgagor, Borrower or a related entity or person occupies or leases the Property, Mortgagor will make no change in the use or occupancy of the Property or otherwise limit the uses which may be made of the Property without Mortgagee's prior written consent.

## B.   It is mutually agreed that:

1.   Application of Insurance or Condemnation Proceeds.   All sums paid under any insurance policy or condemnation award will be paid to the Mortgagee, at its option.  Mortgagee agrees to allow the use of sums paid for repair and reconstruction of the Property provided:

(a)   there exists no Event of Default or no other event which with the passing of time or the giving of notice or both would constitute an Event of Default under any Loan Document;

(b)   all proceeds and additional funds deposited by the Mortgagor with Mortgagee prior to the commencement of any repair or reconstruction are adequate, as determined by Mortgagee, to complete repair and reconstruction of the Property pursuant to plans and specifications approved by Mortgagee;

(c)   if, in Mortgagee's determination, the Loan to value ratio, upon completion of repair or restoration, will exceed seventy-five percent (75%), the Principal Balance will be reduced to an amount which, reduces the loan to value ratio, as calculated by Mortgagee, to no more than seventy-five percent (75%).  In such a case, the remaining monthly payments of principal and interest may be adjusted to amortize the reduced Principal Balance over the remaining term of the Loan, at Mortgagee's discretion.  Any amount prepaid under this provision may be paid without a

Mortgage (MI 09/23)

prepayment fee, provided however, any additional amount Mortgagor desires to prepay, if any, will be subject to applicable prepayment fees;

**(d)**    disbursement procedures acceptable to Mortgagee are in place;

**(e)**    Mortgagee must have received acceptable estoppels, consents and assurances from municipal authorities, tenants in the Property, and others, as Mortgagee may request; and

**(f)**    Mortgagee has received evidence satisfactory to it, that reconstruction and/or repair can be completed at least three (3) months prior to the date the Note secured by this Mortgage is due and payable.

If the above conditions are not satisfied as to the application of the proceeds or any awards, Mortgagee will apply the same (after first deducting therefrom Mortgagee's reasonable expenses incurred in collecting the same, including but not limited to Attorney Fees) to the reduction of the Principal Balance without a prepayment fee or to payment of the restoration, repair, replacement or rebuilding of the property that is damaged, destroyed or taken in such manner as Mortgagee may determine.

If any proceeds are applied to the reduction of the Principal Balance, the remaining monthly payments of principal and interest will be reduced to amortize the reduced Principal Balance over the remaining amortization period of the Loan.

**2.**    <u>Non-Waiver.</u>  No waiver of any Event of Default will be considered a waiver of any other or subsequent Event of Default or breach, and no delay or omission in exercising or enforcing the rights and powers herein granted will be construed as a waiver of such rights and powers, and likewise no exercise or enforcement of any rights or powers hereunder will be held to exhaust such rights and powers, and every such right and power may be exercised from time to time.

**3.**    <u>Assignment of Rents.</u>  As more fully described in the Assignment of Lessor's Interest in Leases of even date ("Assignment of Leases"), and to further secure the amounts described herein and in the Note, Mortgagor assigns the rents, income, issues and profits of the Property and hereby gives to and confers upon Mortgagee the right, power and authority, during the continuance of this Mortgage, to collect the rents, income, issues and profits of the Property. Mortgagee shall be entitled to all of the rights and benefits conferred by Act No. 115 of the Michigan Public Acts of 2022, as amended (MCL § 554.1051 et. seq.).  To the extent the provisions of this paragraph are inconsistent with the terms of a separate Assignment of Leases, if any, the terms of the Assignment of Leases controls.

**4.**    <u>Mortgagee's Right to Cure and Defend.</u>  Should Mortgagor fail to make any payment or to do any act as provided in any Loan Documents, Mortgagee, but without obligation so to do and without notice to or demand upon Mortgagor and without releasing Mortgagor from any obligation hereof, may make or do the same in such manner and to such extent as either may deem necessary to protect the security hereof, and Mortgagor authorizes Mortgagee to enter upon the Property for such purpose. Mortgagee may, before full payment of all sums secured by this Mortgage:  appear in and defend any action or proceeding purporting to affect the security hereof or the rights or powers of Mortgagee; pay, purchase, contest or compromise any encumbrance, charge or lien which, in the judgment of either, appears to be prior or superior hereto; and, in exercising any power conferred by this Mortgage, pay necessary expenses,

Mortgage (MI 09/23)

employ counsel and pay reasonable fees therefor (including fees on appeal). Mortgagor agrees to repay immediately and without demand all sums so expended by Mortgagee with interest from date of expenditure at the Default Rate.

5.  Default; Acceleration; Default Rate.  Time is material and of the essence hereof with respect to the payment of any sums of any nature by and the performance of all duties or obligations of the Mortgagor.  The occurrence of an "Event of Default" as that term is defined in the Note constitutes an "Event of Default" under the Loan Documents including this Mortgage. Upon an Event of Default, Mortgagee may declare all sums secured hereby immediately due and payable.  Any sum not paid as provided herein or in the Loan Documents will bear interest from such due date at the Default Rate.  If an Event of Default occurs during a period of time in which prepayment is permitted only on payment of prepayment fee, such fee will be computed as if the sum declared due on an Event of Default were a prepayment and will be added to the Indebtedness.  Mortgagor consent to a personal deficiency judgment for any part of the debt hereby secured which will not be paid by the sale of the Property, unless such judgment is prohibited by law.  Upon the occurrence of an Event of Default, at the option of the Mortgagee, Mortgagee may commence foreclosure proceedings against the Property through judicial proceedings or by advertisement pursuant to the statutes in such case made and provided and sell the Property or cause the same to be sold in accordance with such statutes in, at the option of the Mortgagee, a single parcel or several parcels. By execution of this Mortgage, the Mortgagor hereby grants to the Mortgagee the power to sell and convey the Property at public sale in accordance with the statutes providing therefor.

In the case of the occurrence of an Event of Default under subsection B.5(g) above, Mortgagee has the right to take any and all action or to make any report or notification required by OFAC or any other applicable governmental entity or agency or by the Laws relating to the SDN List.

6.  Expenses and Attorney Fees.  As more fully described and defined in the Note, Mortgagor agrees to promptly pay to Mortgagee all Attorney Fees.

7.  Waiver of Defenses; Interpretation.  The right to plead any Statute of Limitations in any suit brought upon any Loan Document or the Indebtedness or to foreclose or enforce this Mortgage or arising by reason of any Event of Default, is waived to the full extent permissible by law.  The term Mortgagee will mean the owner and holder, including pledgees, of the Note, whether named as Mortgagee herein.  In this Mortgage, whenever the context so requires, the masculine gender includes the feminine and/or neuter, and the singular number includes the plural.

8.  Due on Sale or Encumbrance.

(a)  Generally.  The Loan is personal to Mortgagor and not assignable.  In making it, Mortgagee has relied on Mortgagor's credit, Mortgagor's interest in the Property, and the financial market conditions at the time the Loan is made.  Except as described in Subparagraphs B.8 (c) and (d) below, in the event of a sale, conveyance, transfer or encumbrance, directly or indirectly, either voluntarily, involuntarily or by operation of law, of the title to or possession of the Property (a "Transfer"), Mortgagee may declare the entire balance of this Loan immediately due and payable. In such event, and to the extent permitted by law, a prepayment charge calculated in accordance with the prepayment provisions of the Note will be added to the sum due and payable. Alternatively, the provisions in the Loan

Mortgage (MI 09/23)

Documents may be modified, at Mortgagee's sole option, to conform to provisions being offered by Mortgagee in similar loans at the time Mortgagee's waiver is sought, or in the event Mortgagee is not offering similar loans at such time, on such reasonable terms as Mortgagee may determine.

(b)     Transfer Examples. For the purpose of, and without limiting the generality of the foregoing, the occurrence at any time of any of the following events, will constitute a Transfer:

(i)      Any sale, conveyance, assignment or other transfer of, or the grant of a security interest in, all or any part of the legal and/or equitable title to the Real Property;

(ii)     Any sale, conveyance, assignment or other transfer of, or the grant of a security interest in, any share of stock of Mortgagor if Mortgagor is a corporation;

(iii)    Any sale, conveyance, assignment or other transfer of, or the grant of a security interest in, any general partnership interest in Mortgagor if Mortgagor is a partnership; or

(iv)     Any sale, conveyance, assignment or other transfer of, or the grant of a security interest in, any member's interest in Mortgagor if Mortgagor is a limited liability company.

Transfers between or among existing shareholders, partners, or members of Mortgagor will not constitute Transfers so long as the Loan is not in an Event of Default at the time of such transfers and Mortgagee receives prompt written notice of such transfers.

(c)     Permitted Borrower Release and Third-Party Transfer. If Mortgagor makes a written request to Mortgagee ("Transfer Request") for a third-party transfer, Mortgagee will waive its acceleration and prepayment call rights under Paragraph B.8(a), and release Borrower from liability for the Loan, if the Loan is not then in an Event of Default and all of the following conditions are met:

(i)      The following items, all of which must be satisfactory to Mortgagee, in its sole and absolute discretion, will be submitted to Mortgagee with the Transfer Request:

(A)     The identity and organizational documents for the purchaser of the Property;

(B)     The financial statements, financial strength, tax returns and credit history of the purchaser;

(C)     The current rent roll for the Property;

(D)     The operating statements for the Property:

(i)      A current year-to-date; and

        **(ii)**    The two most recent years/historical;

   **(E)**    The current leases for the Property;

   **(F)**    A current environmental inspection report for the Property;

   **(G)**    The sale agreement and related documents; and

   **(H)**    A detailed description of the source of the purchaser's equity in the Property.

**(ii)**    The purchaser evidences a history of property management satisfactory to Mortgagee or contracts for management of the Property with a property management firm satisfactory to Mortgagee.

**(iii)**    If the amount then due on the Note exceeds seventy percent (70%) of the sale price of the Property, Mortgagor must pay down the balance due on the Note to an amount which does not exceed seventy percent (70%) of the sales price and the remaining monthly payments of principal and interest may be adjusted to amortize the reduced Principal Balance over the remaining term of the Loan, at Mortgagee's discretion. Any amount prepaid under this provision may be paid without a prepayment fee, provided however, any additional amount Mortgagor or the purchaser desires to prepay, if any, will be subject to applicable prepayment fees.

**(iv)**    The purchaser and Borrower promptly sign and deliver to Mortgagee, Mortgagee's assumption and release documents.

**(v)**    Mortgagor furnishes to Mortgagee, at Mortgagor's expense, an endorsement to Mortgagee's title insurance policy insuring the continued validity, enforceability, and priority of the Mortgage following the assumption and release. The form and content of the endorsement must be satisfactory to Mortgagee. If required by the Mortgagee or the title insurer, the Mortgagor will furnish estoppels and subordination agreements from tenants of the Property and other necessary parties in form and substance acceptable to the Mortgagee and the title insurer.

**(vi)**    In the event the Loan was made with a requirement imposed upon the Mortgagor to complete any specified repairs of the Property, the Mortgagor will not be entitled to a consent by Mortgagee pursuant to the terms of this provision until such repairs have been completed to Mortgagee's satisfaction.

**(vii)**    The Mortgagee may, at its option, require tax reserves as referred to in Paragraph A.8 of this Mortgage, whether previously waived conditionally or otherwise as a condition to its consent.

**(viii)**    Mortgagee is paid a lump sum fee of one percent (1%) of the Principal Balance.

Mortgage (MI 09/23)

**(ix)**   The payment of a transfer fee to Mortgagee's designated servicing agent in an amount equal to one percent (1%) of the Principal Balance.

**(x)**   Without limiting the generality or effect of the foregoing, waiver by Mortgagee of its right to accelerate the Loan upon any transfer or contract to transfer, or to require satisfaction of the conditions set forth in this subparagraph, will not be deemed a waiver by Mortgagee of its right to accelerate the Loan upon any other transfer or contract to transfer or of its right upon such transfer or contract to transfer to require satisfaction of the conditions set forth above in this subparagraph.

**(d)**   Permitted Related-Party Transfer.  If Mortgagor, any Borrower or any Guarantor, if applicable (including existing shareholders, members or partners) (each a "Loan Party") makes a Transfer Request for a related-party transfer, Mortgagee will waive its acceleration and prepayment call rights under Subparagraph (a), if the Loan is not then in an Event of Default and the following conditions are met:

**(i)**   Mortgagee is paid a lump sum fee of $2,500.00 or $5,000.00 for title transfer, plus payment of recording, title and/or Attorney Fees, if any;

**(ii)**   The Loan Party and the transferee promptly sign and deliver to Mortgagee, Mortgagee's assumption documents whereby the transferee assumes liability for payment and performance of the Loan Documents, all to the same extent of the Loan Party's liability, as applicable, which will remain primary and will not be released; and

**(iii)**   The transferee is:

**(A)**   The spouse and/or issue of Mortgagor or Borrower, as applicable;

**(B)**   The trustee(s) of a testamentary trust for the benefit of the spouse and/or issue of Mortgagor or Borrower, that succeeded to Mortgagor's or Borrower's interest upon Mortgagor's or Borrower's death, divorce or legal separation;

**(C)**   The trustee(s) of an inter vivos trust established by Mortgagor or Borrower for estate planning purposes, provided that Mortgagor or Borrower, as applicable, is a trustee of such trust at the time of transfer; or

**(D)**   A new entity established for estate planning purposes, composed of Mortgagor, Mortgagor's principals, and/or Mortgagor's spouse and/or issue or Borrower, Borrower's principals, and/or Borrower's spouse and/or issue, as applicable.

9.   Deficiency.  Except as limited in the Note, if applicable, Mortgagor consents to a personal deficiency judgment for any part of the Indebtedness which will not be paid by the sale of the Property, unless such judgment is prohibited by law. Any Mortgagor who is a married person hereby agrees that recourse may be had against his or her other property, however owned, but without creating any lien or charge thereon, for any deficiency due after sale of the Property;

Mortgage (MI 09/23)

except that this provision will not apply in the case of a Mortgagor who executes this Mortgage but not the Note secured hereby.

    **10.**    Waiver of Rights Regarding Property. To the extent permitted by law, Mortgagor hereby releases and waives (a) all rights to any homestead exemption in the Property; (b) all rights of dower and curtsy in the Property; and (c) all rights to possession of the Property during any period allowed by law for redemption.

    **11.**    Waiver of Right to Marshal. Mortgagor, for Mortgagor and for all persons hereafter claiming through or under Mortgagor or who may at any time become holders of liens junior to the lien of this Mortgage, waives and releases all rights to direct the order in which any of the Property will be sold in the event of any sale or sales and to have the Property and/or any other property now or hereafter constituting security for any of the Indebtedness marshaled upon any foreclosure of this Mortgage or of any other security for any of the Indebtedness.

    **12.**    Severability. In the event any provision contained in this Mortgage will for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability will not affect any other provision of this Mortgage, but this Mortgage will be construed as if such invalid, illegal or unenforceable provision had never been contained herein.

    **13.**    Signature on Mortgage Only. Notwithstanding any other provision of this Mortgage, any person who executes this Mortgage, but not the Note secured hereby, will have no personal liability on the Note or for any deficiency judgment which may be obtained upon foreclosure of this Mortgage. Such persons jointly and severally waive presentment, demand, protest and all notices and agree that Mortgagee, without notice to them or their consent, and upon such terms as Mortgagee may deem advisable, and without affecting in any way Mortgagee's rights hereunder as against the Property, may:

    **(a)**    Extend, release, surrender, exchange, compromise, discharge or modify any right or obligation secured by or provided by this Mortgage or any other instrument securing this loan, or

    **(b)**    Take any other action which Mortgagee may deem reasonably appropriate to protect its security interest in the Property.

    **14.**    Governing Law. The law of the State of Michigan governs the validity, interpretation, construction and performance of this Mortgage. Mortgagor irrevocably submits to the jurisdiction of any state or federal court in the State where the Property is located in any action or proceeding brought to enforce or arising out of or relating to this Mortgage, and waives any claim that such forum is an inconvenient forum.

    **15.**    Financial Statements. Within sixty (60) days of the close of each calendar year, Mortgagor will furnish Mortgagee, at Mortgagor's expense, all in a form satisfactory to Mortgagee and certified by Borrower or guarantors, as the case may be, with (a) annual statement of operations of the Property, stating that such annual statement presents fairly the financial condition of the Property being reported upon and has been prepared in accordance with sound accounting principles consistently applied, (b) the financial statement for any tenants in whom Mortgagor and/or Borrower has a controlling interest, and (c) Borrower's financial statement, if Borrower is not an individual. The annual operating statement will include an annual rent schedule, and a schedule of gross receipts of each tenant who is obligated to pay additional rent based on a percentage of gross receipts.

Mortgage (MI 09/23)

**16.    Notice and Opportunity to Cure.**  Notwithstanding any other provision of this Mortgage, Mortgagee will not accelerate the sums secured because of a nonmonetary default (defined below) unless Mortgagor fails to cure the Event of Default within thirty (30) days of the earlier of the date on which Mortgagee mails or delivers written notice of the Event of Default to Mortgagor.  For purposes of this Mortgage, the term "nonmonetary default" means a failure by Mortgagor or any other person or entity to perform any obligation contained in any Loan Documents, other than the obligation to make payments provided for in the Note or any other Loan Document.  If a nonmonetary default is capable of being cured and the cure cannot reasonably be completed within the thirty (30) day cure period, the cure period will be extended up to sixty (60) days so long as Mortgagor has commenced action to cure within the thirty (30) day cure period, and in Mortgagee's opinion, Mortgagor is proceeding to cure the Event of Default with due diligence.  No notice of an Event of Default and no opportunity to cure will be required if during any 12-month period Mortgagee has already sent a notice to Mortgagor concerning the Event of Default in the performance of the same obligation.  None of the foregoing will be construed to obligate Mortgagee to forebear in any other manner from exercising its remedies and Mortgagee may pursue any other rights or remedies which Mortgagee may have because of an Event of Default.

**17.    Notices.**  Except as otherwise provided in this Mortgage, all notices required or permitted under this Mortgage must be in writing and may be telecopied, delivered by hand or a nationally recognized overnight courier service, or mailed by first class registered or certified mail, return receipt requested, postage prepaid, and addressed as listed in the first Paragraph of this Mortgage.  Changes in the respective addresses to which such notices may be directed may be made from time to time by any party by notice to the other parties given at least ten (10) days before such change of address is to become effective.  Notices and consents given by mail in accordance with this paragraph will be deemed to have been given three (3) days after the date of dispatch; notices and consents given by any other means shall be deemed to have been given when received.

**18.    Dissemination of Information.**  If Mortgagee determines at any time to sell, transfer or assign the Note or this Mortgage and the other security documents, and any or all servicing rights, or to grant participations, Mortgagee may provide to any prospective purchaser, transferee, assignee, participant or rating agency and their agents and successors, all documents and information Mortgagee has or may acquire relating to this Loan, Mortgagor, Borrower, any guarantors and/or indemnitors, if applicable, and the Property.

**19.    ERISA.**  Borrower will not engage in any transaction which could cause this Loan or any action taken hereunder to be a non-exempt prohibited transaction under the Employee Retirement Income Security Act of 1974, as amended ("ERISA").  Borrower is not an employee benefit plan or a governmental plan under ERISA.  Borrower's assets do not constitute plan assets under ERISA.  Borrower will indemnify and hold Mortgagee harmless for any and all ERISA or state-related liability or losses.

**20.    Non-Foreign Person.**  Mortgagor is not a "foreign person" as defined by the IRS.

**21.    Entire Agreement.**  This Mortgage, the Note and any other loan documents securing the Note constitute the entire and complete agreement of the parties with respect to the subject matter hereof, and supersede all prior or contemporaneous understandings, arrangements and commitments, all of which, whether oral or written, are merged herein.  This

Mortgage (MI 09/23)

Mortgage will bind and inure to the benefit of the parties to this Mortgage and any successor or assignee acquiring an interest hereunder consistent with Paragraph B.8 above.

### SIGNATURE OF MORTGAGOR

Leestma Management, LLC,
a Florida limited liability company

By: _____
Ryan M. Leestma, Member

By: _____
Emily S. Leestma, Member

### ACKNOWLEDGMENTS FOR EACH MORTGAGOR MUST BE ATTACHED IN SIZE AND FORM AS REQUIRED BY STATE LAW.

**MORTGAGOR'S ADDRESS:**

Leestma Management, LLC
1900 Gulf Drive N Unit 7
Bradenton Beach, Florida 34217

**MORTGAGEE'S ADDRESS:**

Standard Insurance Company
Attn: Mortgage Loan Servicing T3A
10265 NE Tanasbourne Drive
Hillsboro, OR 97124

Document Drafted By: Michelle Youngclaus
and When Recorded Return To:
STANCORP MORTGAGE INVESTORS, LLC
10265 NE Tanasbourne Drive
HILLSBORO, OR 97124
ATTN: LOAN CLOSING, T3A

Mortgage (MI 09/23)

# MORTGAGE NOTARY ACKNOWLEDGEMENT

STATE OF FLORIDA

COUNTY OF Manatee

January, 12, 2024

The foregoing instrument was acknowledged before me on ~~January 25, 2024~~
By Ryan M. Leestma and Emily S. Leestma, Members of Leestma management, LLC,
a Florida limited liability company

Notary Signature: Binalben Patel
Notary Name Printed:

Notary Public Manatee County, Florida State

Acting In          County

My commission expires: 06-29-2027

(NOTARY SEAL)

Notary Public State of Florida
Binalben Patel
My Commission HH 416616
Expires 6/29/2027

## EXHIBIT "A"
## LOAN NO. C3110110

**Parcel 1:**

All that part of the South 22 rods of the North fractional 1/2 of the Northwest fractional 1/4 of Section 1, Town 5 North, Range 12 West, Byron Township (now City of Wyoming), Kent County, Michigan, lying West of the Penn Central Trans. Co. Railroad right of way and Easterly of a limited access right of way line which is 700 feet Easterly of (measured at right angles) and parallel to the survey line of Highway US-131.

**Parcel 2:**

That part of the Northwest fractional 1/4 of Section 1, Town 5 North, Range 12 West, Byron Township (now City of Wyoming), Kent County, Michigan, described as: Commencing at the North 1/4 corner of said Section 1; thence North 88°14'10" West, 99.28 feet along the North line of said Northwest fractional 1/4; thence South 00°01'45" West, 1192.66 feet along the West line of the railroad right of way to the South line of the North fractional 1/2 of said Northwest fractional 1/4 and the point of beginning; thence South 00°01'45" West, 557.74 feet along the West line of the railroad right of way; thence North 44°25'40" West, 812.90 feet to a point which is 700 feet Easterly of, measured at right angles, from the centerline of existing Highway US-131; thence South 87°42'30" East, 569.78 feet along the South line of the North fractional 1/2 of said Northwest fractional 1/4 to the point of beginning.

Parcels 1 and 2 being more particularly described as:
A parcel of land being part of the East 1/2 of the Northwest fractional 1/4 of Section 1, Town 5 North, Range 12 West, Byron Township, Kent County, Michigan, described as: Commencing at the North 1/4 corner of Section 1; thence South 88°32'58" West (recorded as North 88°14'10" West) 99.28 feet along the North line of said Northwest fractional 1/4; thence South 03°12'00" East (recorded as South 00°01'45" West) 829.18 feet to the point of beginning on the North line of the South 22 rods of the North fractional 1/2 of the Northwest fractional 1/4 of Section 1; thence continuing South 03°12'00" East (recorded as South 00°01'45" West) 920.90 feet along the West line of the Railroad Right of Way; thence North 47°40'00" West 812.59 feet (recorded as North 44°25'40" West 812.90 feet) to a point which is 700 feet Easterly of, measured at right angles, from the centerline of existing Highway US-131; thence North 04°24'50" West parallel to the survey line of US-131, 363.77 feet to the North line of the South 22 rods of the North fractional 1/2 of the Northwest fractional 1/4; thence North 89°03'10" East along the North line of the South 22 rods of the North fractional 1/2 of the Northwest fractional 1/4, 577.37 feet to the point of beginning.

Together with an easement for ingress and egress as disclosed in Access Easement recorded in Instrument No. 20070109-0003393, more particularly described as: A parcel of land being part of Section 1, Town 5 North, Range 12 West, Byron Township, Kent County, Michigan, described as: Commencing at the North 1/4 corner of Section 1; thence South 88°32'58" West (recorded as North 88°14'10" West) along the North Section line 627.87 feet to the point of beginning, which is 766 feet East of, and measured perpendicular to, the survey centerline of Highway US-131; thence South 04°24"50" East, parallel to and 766 feet East of the centerline of Highway US-131, 825.50 feet; thence South 89°01'10" West 66.12 feet; thence North

Exhibit "A" Legal Description

04°24'50" West parallel to and 700 feet East of the Centerline of Highway US-131, 824.92 feet to the North line of Section 1; thence North 10°00'25" West 97.15 feet; thence North 76°05'50" East 17.00 feet to a point on a curve to the right, said curve has a radius of 533.00 feet and a long chord bearing and distance of North 08°59'45" West 101.69 feet; thence Northwesterly along the arc of said curve 101.84 feet; thence North 03°31'18" West 2.62 feet to the Southeast corner Lot 6 of the Plat of Argo Industrial Park; thence North 88°45'02" East along the South line of Argo Industrial Park 66.00 feet to the Southwest corner of Lot 7 of the Plat of Argo Industrial Park and a point on a curve to the left, said curve has a radius of 467.00 feet and a long chord bearing and distance of South 16°31'30" East 210.16 feet; thence Southeasterly along the arc of said curve 211.97 feet to the North line of Section 1; thence South 88°32'58" West along the North line of Section 1, 43.27 feet to the point of beginning.

Exhibit "A" Legal Description

Page 2

# **EXHIBIT C**

RECEIVED
REGISTER OF DEEDS
KENT COUNTY, MI

2024 JAN 25 2:38 PM

202401250004270    Total Pages: 9
01/25/2024 02:52 PM    Fees: $30.00
Lisa Posthumus Lyons, County Clerk/Register
Kent County, MI          SEAL

## ASSIGNMENT OF LESSOR'S INTEREST IN LEASES

SIC Loan No. **C3110110**

THIS ABSOLUTE ASSIGNMENT made **January** _12_, **2024**, is by **Leestma Management, LLC, a Florida limited liability company** ("Assignor") whose address is listed on the signature page of this Assignment in favor of **Standard Insurance Company, an Oregon corporation** ("Assignee") whose address is listed on the signature page of this Assignment.

Assignor, for good and valuable consideration, receipt of which is acknowledged, grants, transfers and absolutely and unconditionally assigns to Assignee all of Assignor's right, title and interest in and to **any existing and all future recorded and/or unrecorded leases entered into on all or any part of the subject property referenced below during the term of this Assignment,** together with (a) all rents, income, contract rights, issues, security deposits and profits whether now or later due ("Rents") arising from the leases and renewals; (b) all Rents for the use and occupation of the premises described in the leases or in the deed of trust (which term is construed to include a mortgage, as the case may be) described below and from all leases upon any part of the real property described below, which are now or later executed; and (c) the guaranties of tenants' performance under the leases, if any. The leases and guaranties described above, any extensions or renewals and any lease subsequently executed covering the real property described below are referred to as the "Lease".

This Assignment is made and proceeds may be applied in such order of priority as Assignee may elect:

(a)     Payment of the indebtedness evidenced by a certain Note, including any extensions, replacements, substitutions or renewals (the "Note"), in the original principal sum of **Two Million Eight Hundred Thousand and No/100ths** Dollars **($2,800,000.00)** made by the **Assignor first referenced above** to Assignee, secured by a Mortgage (the "Mortgage") on real property situated in the County of **Kent**, State of Michigan, described on Exhibit "A" attached hereto (the "Real Property").

The Note may be secured by a security agreement or agreements covering personal property located on or related to the Real Property and by any security instruments. The Mortgage, Security Agreement(s) and any security instruments are collectively referred to as the "Security Instruments";

(b)     Payment of all other sums with interest becoming due and payable to Assignee under the provisions of this Assignment, the Note or the Security Instruments; and

Assignment of Lessor's Interest in Leases (MI 09/23)

(c)    Performance and discharge of each and every condition, obligation, covenant, promise and agreement of Assignor in this Assignment, the Note or the Security Instruments.

**Assignor agrees as follows:**

1.    Assignor's Warranties.  Assignor warrants that: (a) Assignor has good title to the Lease assigned and good right to assign the same, and no one else has any right, title or interest in the Lease; (b) Assignor has timely kept, observed and/or performed all of its terms, covenants, conditions and warranties of the Lease; (c) Assignor has not previously sold, assigned, transferred, mortgaged or pledged the Rents; (d) the Lease is valid and enforceable and has not been altered, modified or amended; (e) the Lessee is not in default under any of the terms, covenants, or conditions; and (f) no Rents reserved in the Lease have been assigned or anticipated and no Rents for any period subsequent to the date of this Assignment have been collected in advance of the time when the same became due under the terms of the Lease.

2.    Assignor's Covenants of Performance.  Assignor covenants with Assignee: (a) to observe and perform all the obligations imposed upon the Lessor under the Lease and not to do or permit to be done anything to impair the security thereof; (b) not to collect any of the Rents arising or accruing under the Lease or from the Real Property in advance of the time when the same will become due; (c) not to execute any other assignment of lessor's interest in the Lease or assignment of Rents; (d) not to materially alter, modify or change, or suffer or permit the material modification or alteration of the terms of the Lease or cancel, terminate or accept a surrender of the Lease without the prior written consent of Assignee; (e) at Assignee's request, to assign and transfer to Assignee any and all subsequent leases and to execute and deliver at the request of Assignee all such further assurances and assignments in the premises as Assignee may from time to time require; (f) to enforce or secure the full performance of the Lease by any tenant to be performed, and to notify Assignee of the occurrence of any default under the Lease; (g) to appear in and defend any action or proceeding arising under, occurring out of, or in any manner connected with the Lease or the obligations, duties or liabilities of Assignor, but in all cases at the expense of Assignor; (h) to pay all costs and expenses of Assignee, including reasonable attorney's fees, in any action or proceeding in which Assignee may appear including any appeal; (i) not to enter into any lease for a term in excess of three (3) years for fifteen percent (15%) or more of the net rentable area of the Real Property without the prior written consent of Assignee; and (j) neither to create nor permit any lien, charge or encumbrance upon its interest as lessor of the Lease except the lien of the Security Instruments or as permitted in the Security Instruments.

3.    Application of Rents.  All rents received by Assignor prior to the occurrence of an Event of Default (as defined in the Note) and the payment of any indebtedness described in the Note, Mortgage and/or the Security Instruments (collectively, the "Indebtedness") or in the performance of any obligation, term, covenant, condition or warranty herein, in the Note, Mortgage, or Lease shall be held by Assignor as a trust fund to be applied, **firstly** to the payment of taxes and assessments on the Real Property before penalty or interest is due; **secondly** to the cost of insurance, maintenance and repairs required by the terms of the Mortgage; **thirdly** to the satisfaction of all obligations specifically set forth in the Lease; and **fourthly** to the payment of interest and principal becoming due on the Note and Mortgage, before using any part of the same for any other purposes.

4.    Rights of Assignee.  Upon or at any time after an Event of Default, Assignee, at its option and without notice, has the complete right, power and authority hereunder to exercise and enforce any or all of the following rights and remedies at any time:

(a)    to collect the rents without taking possession, and to demand, collect, receive, sue for, attach and levy against the Rents in Assignee's own name; to give proper receipts, and releases; and after deducting all costs and expenses of operation and collection as determined by Assignee, including attorney's fees, to apply the net proceeds, together with any funds of Assignor deposited with Assignee, upon any Indebtedness and in such order as Assignee may determine;

(b)    to declare all sums of the Indebtedness immediately due and payable and, at its option, exercise all or any of the rights and remedies contained in the Note and Mortgage;

(c)    without regard to the adequacy of any security or the solvency of Assignor, without any action or proceeding through any person or by agent, or by a receiver to be appointed by a court, and without regard to Assignor's possession, to enter upon, take possession of, manage and operate any part of the Real Property, make, modify, enforce, cancel, or accept surrender of any lease now or hereafter in effect on any part of the Real Property; remove and evict any lessee or tenant; increase or decrease rents; decorate, clean and repair; and otherwise do any act or incur any reasonable costs or expenses as Assignee deems proper to protect the Lease and/or Rents, as fully and to the same extent as Assignor could do if in possession; and in such event, to apply the Rents so collected in such order as Assignee deems proper to the operation and management of the Real Property, including the payment of reasonable management, brokerage and attorneys fees, payment of the Indebtedness, and payment to a reserve fund for replacements, which fund will not bear interest;

(d)    require Assignor to transfer all security deposits to Assignee, together with all records evidencing such deposits; and

(e)    Assignee may collect the rents, income, issues and profits of the Real Property and Leases so long as a default shall exist and during the pendency of any foreclosure proceedings and during the redemption period, and Assignor agrees to consent to a receiver if this is believed necessary or desirable by Assignee to enforce its rights under this section.  Assignee is entitled to all of the rights and benefits conferred by Act No. 115 of the Michigan Public Acts of 2022, as amended (MCL  554.1051 et. seq.).

5.    Present Assignment.  This Assignment constitutes a perfected, absolute and present assignment, subject to the revocable license granted above.  Any security deposits received by Assignor prior to an Event of Default are assigned to and will be promptly paid to Assignee immediately upon the occurrence of an Event of Default. Any Rents which accrue prior to an Event of Default but are paid thereafter will be promptly paid to the Assignee. Except as permitted in Paragraph 2 above, Assignor hereby releases and surrenders to Assignee all rights to amend, modify or in any way alter the Leases without the prior written consent of the Assignee.

6.    Event of Default Not Cured By Collection.  The collection and/or application of Rents and/or the entry upon and taking possession of the Real Property will not cure or waive any

Event of Default; or waive, modify or affect any notice of an Event of Default required under the Note and Mortgage; or invalidate any act done pursuant to such notice. The enforcement of any right or remedy by Assignee, once exercised, will continue until Assignee has collected and applied such Rents as may have cured (for the time) such Event of Default. Although the original Event of Default be cured and the exercise of any such right or remedy be discontinued, the same or any other right or remedy hereunder will not be exhausted and may be reasserted at any time and from time to time following any subsequent Event of Default. The rights and powers conferred on Assignee hereunder are cumulative and not in lieu of any other rights and powers otherwise granted Assignee.

      7.     Effect of Assignment. The acceptance by Assignee of this Assignment, with all of the rights, powers, privileges and authority so created, is not, prior to entry upon and taking possession of the Real Property by Assignee, deemed or construed to constitute Assignee a "Mortgagee in Possession".

      Assignee is not liable for any loss sustained by Assignor resulting from Assignee's failure to let the Real Property after an Event of Default or from any act or omission of Assignee in managing the Real Property after an Event of Default unless such loss is caused by the willful misconduct and bad faith of Assignee. Assignee is not obligated to perform or discharge, nor does Assignee undertake to perform or discharge, any obligation, duty, or liability under the Lease or under or by reason of this Assignment, or to assume any obligation or responsibility for any security deposits or other deposits delivered to Assignor by any lessee and not assigned and delivered to Assignee. This Assignment does not operate to place responsibility for the control, care, management or repair of the Real Property upon Assignee, nor for the carrying out of any of the terms and conditions of the Lease; nor does it operate to make Assignee responsible or liable for any waste committed on the Real Property by the tenants or any parties or for any dangerous or defective condition of the Real Property, or for any negligence in the management, upkeep, repair or control of the Real Property, resulting in loss or injury or death to any tenant, licensee, employee or stranger.

      8.     Indemnification. Assignor indemnifies and holds Assignee harmless from any and all liability, loss, damage or expense which Assignee may incur under or by reason or in defense of any and all claims and demands that may be asserted against Assignee by third parties arising out of the Lease, including, but not limited to, any claims by any tenants of credit for rental for any period under any Lease more than one (1) month in advance of the due date paid to and received by Assignor, but not delivered to Assignee. Should Assignee incur any such liability, loss, damage or expense, such amount (including attorneys fees, whether incurred at trial, on appeal or otherwise) with interest at the Default Rate (as defined in the Note) will be payable to Assignee immediately without demand, and are secured by the Mortgage.

      9.     Termination of Assignment, Payment of Rent. Upon payment in full of the Indebtedness, this Assignment will become and be void and of no effect, but the affidavit, certificate, letter or statement of any officer, agent or attorney of Assignee showing any part of said principal, interest or indebtedness to remain unpaid will be and constitute conclusive evidence of the validity, effectiveness and continuing force of this Assignment and any person may, and is hereby authorized to, rely thereon. Assignor authorizes and directs the lessee named in the Lease or any other or future lessee or occupant of the premises described therein or in the Mortgage, upon receipt from Assignee of written notice to the effect that Assignee is then the holder of the Note and Security Instruments and that an Event of Default exists, to pay over to Assignee all rents, income, contract rights, issues, security deposits and profits arising or accruing

Assignment of Lessor's Interest in Leases (MI 09/23)

under the Lease or from the premises described therein or in the Mortgage and to continue to do so until otherwise notified by Assignee.

10.   **Assignee's Right to Deal With Security.** Assignee may take or release security for the payment of the Indebtedness, may release any party primarily or secondarily liable and may apply any security held by it to the satisfaction of the Indebtedness without prejudice to any of its rights under this Assignment.

11.   **Cross Default.** Breach of any term, covenant, and condition herein contained by Assignor constitutes an Event of Default under the Note and each of the Security Instruments, and an Event of Default under any of said documents constitutes an Event of Default hereunder.

12.   **No Waiver.** Nothing contained in this Assignment and no act done or omitted by Assignee pursuant to the powers and rights granted it hereunder will be deemed to be a waiver by Assignee of its rights and remedies under the Note and Security Instruments; this Assignment is made and accepted without prejudice to any of the rights and remedies possessed by Assignee under the terms of the Note and Security Instruments. The right of Assignee to collect the principal sum, interest, and any Indebtedness and to enforce any security held by it may be exercised by Assignee either prior to, simultaneously with, or subsequent to any action taken by it hereunder.

13.   **Conflict With Mortgage.** In the case of any conflict between the terms of this instrument and the terms of the Mortgage, the terms of this Assignment prevail.

14.   **Construction.** Whenever the context so requires, the singular number includes the plural, the plural the singular, and the use of any gender includes all genders. All obligations of each Assignor hereunder are joint and several.

15.   **Notices.** All notices required or permitted under this Agreement must be in writing and may be telecopied, delivered by hand or a nationally recognized overnight courier service, or mailed by first class registered or certified mail, return receipt requested, postage prepaid, and addressed as follows:

**If to Assignor:**

Leestma Management, LLC
1900 Gulf Drive N Unit 7
Bradenton Beach, Florida 34217

**If to Assignee:**

Standard Insurance Company
Attn: Mortgage Loan Servicing T3A
10265 NE Tanasbourne Drive
Hillsboro, OR 97124

Changes in the respective addresses to which such notices must be directed may be made from time to time by either party by notice to the other party given at least ten (10) days before such change of address is to become effective. Notices given by mail in accordance with this provision will be deemed to have been given three (3) days after the date of dispatch; notices given by any other means will be deemed to have been given when received.

16.   **Severability.** If any provision of this Assignment or the application thereof to any entity, person or circumstance is held to be invalid, illegal or unenforceable in any respect, the remainder of this Assignment and the application of such provisions to other entities, persons or circumstances will not be affected thereby and will be enforced to the greatest extent permitted by law.

Assignment of Lessor's Interest in Leases (MI 09/23)

**17.** <u>Governing Law.</u> The law of the state in which the Real Property is located governs the validity, interpretation, construction and performance of this Assignment. Assignor irrevocably submits to the jurisdiction of any state or federal court in the State where the Property is located in any action or proceeding brought to enforce or otherwise arising out of or relating to this Assignment, and waives any claim that such forum is an inconvenient forum.

**18.** <u>Entire Agreement.</u> This Assignment constitutes the entire and complete agreement concerning the assignment of Rents and Leases between the parties hereto. No variations, modifications or changes herein or hereof are binding upon any party hereto unless set forth in a document duly executed by or on behalf of such party.

**19.** <u>Assignment Binds Successors.</u> This Assignment, together with the covenants and warranties herein contained, inures to the benefit of Assignee and any subsequent holders of the Note and Mortgage and is binding upon Assignor, Assignor's heirs, personal representatives, successors and assigns, all tenants and their subtenants and assigns, and any subsequent owner of premises described in the Mortgage.

<u>SIGNATURE OF ASSIGNOR</u>

Leestma Management, LLC,
a Florida limited liability company

By: _____
 Ryan M. Leestma, Member

By: _____
 Emily S. Leestma, Member

**ASSIGNOR'S ADDRESS:**

Leestma Management, LLC
1900 Gulf Drive N Unit 7
Bradenton Beach, Florida 34217

**ASSIGNEE'S ADDRESS:**

Standard Insurance Company
Attn: Mortgage Loan Servicing T3A
10265 NE Tanasbourne Drive
Hillsboro, OR 97124

Document Drafted By: Michelle Youngclaus
When Recorded Return To:
**STANCORP MORTGAGE INVESTORS, LLC**
10265 NE Tanasbourne Drive
HILLSBORO, OR 97124
ATTN: **CLOSING DEPT., T3A**

**ACKNOWLEDGMENTS FOR EACH ASSIGNOR MUST BE ATTACHED IN
SIZE AND FORM AS REQUIRED BY STATE LAW.**

Assignment of Lessor's Interest in Leases (MI 09/23)

20240125000

**ASSIGNMENT OF LESSORS' INTEREST NOTARY ACKNOWLEDGEMENT**

STATE OF FLORIDA

COUNTY OF Manatee

The foregoing instrument was acknowledged before me on January ~~25,~~ 2024 *January 12, 2024*
By Ryan M. Leestma and Emily S. Leestma, Members of Leestma management, LLC,
a Florida limited liability company

Notary Signature: Binalben Patel
Notary Name Printed:

Notary Public Manatee County, Florida State

Acting in          County

My commission expires: 06-29-2027

(NOTARY SEAL)

Notary Public State of Florida
Binalben Patel
My Commission HH 416615
Expires 6/29/2027

**EXHIBIT "A"**
LOAN NO. **C3110110**

**Parcel 1:**

All that part of the South 22 rods of the North fractional 1/2 of the Northwest fractional 1/4 of Section 1, Town 5 North, Range 12 West, Byron Township (now City of Wyoming), Kent County, Michigan, lying West of the Penn Central Trans. Co. Railroad right of way and Easterly of a limited access right of way line which is 700 feet Easterly of (measured at right angles) and parallel to the survey line of Highway US-131.

**Parcel 2:**

That part of the Northwest fractional 1/4 of Section 1, Town 5 North, Range 12 West, Byron Township (now City of Wyoming), Kent County, Michigan, described as: Commencing at the North 1/4 corner of said Section 1; thence North 88°14'10" West, 99.28 feet along the North line of said Northwest fractional 1/4; thence South 00°01'45" West, 1192.66 feet along the West line of the railroad right of way to the South line of the North fractional 1/2 of said Northwest fractional 1/4 and the point of beginning; thence South 00°01'45" West, 557.74 feet along the West line of the railroad right of way; thence North 44°25'40" West, 812.90 feet to a point which is 700 feet Easterly of, measured at right angles, from the centerline of existing Highway US-131; thence South 87°42'30" East, 569.78 feet along the South line of the North fractional 1/2 of said Northwest fractional 1/4 to the point of beginning.

Parcels 1 and 2 being more particularly described as:
A parcel of land being part of the East 1/2 of the Northwest fractional 1/4 of Section 1, Town 5 North, Range 12 West, Byron Township, Kent County, Michigan, described as: Commencing at the North 1/4 corner of Section 1; thence South 88°32'58" West (recorded as North 88°14'10" West) 99.28 feet along the North line of said Northwest fractional 1/4; thence South 03°12'00" East (recorded as South 00°01'45" West) 829.18 feet to the point of beginning on the North line of the South 22 rods of the North fractional 1/2 of the Northwest fractional 1/4 of Section 1; thence continuing South 03°12'00" East (recorded as South 00°01'45" West) 920.90 feet along the West line of the Railroad Right of Way; thence North 47°40'00" West 812.59 feet (recorded as North 44°25'40" West 812.90 feet) to a point which is 700 feet Easterly of, measured at right angles, from the centerline of existing Highway US-131; thence North 04°24'50" West parallel to the survey line of US-131, 363.77 feet to the North line of the South 22 rods of the North fractional 1/2 of the Northwest fractional 1/4; thence North 89°03'10" East along the North line of the South 22 rods of the North fractional 1/2 of the Northwest fractional 1/4, 577.37 feet to the point of beginning.

Together with an easement for ingress and egress as disclosed in Access Easement recorded in Instrument No. 20070109-0003393, more particularly described as: A parcel of land being part of Section 1, Town 5 North, Range 12 West, Byron Township, Kent County, Michigan, described as: Commencing at the North 1/4 corner of Section 1; thence South 88°32'58" West (recorded as North 88°14'10" West) along the North Section line 627.87 feet to the point of beginning, which is 766 feet East of, and measured perpendicular to, the survey centerline of Highway US-131; thence South 04°24"50" East, parallel to and 766 feet East of the centerline of Highway US-131, 825.50 feet; thence South 89°01'10" West 66.12 feet; thence North

Exhibit "A" Legal Description

04°24'50" West parallel to and 700 feet East of the Centerline of Highway US-131, 824.92 feet to the North line of Section 1; thence North 10°00'25" West 97.15 feet; thence North 76°05'50" East 17.00 feet to a point on a curve to the right, said curve has a radius of 533.00 feet and a long chord bearing and distance of North 08°59'45" West 101.69 feet; thence Northwesterly along the arc of said curve 101.84 feet; thence North 03°31'18" West 2.62 feet to the Southeast corner Lot 6 of the Plat of Argo Industrial Park; thence North 88°45'02" East along the South line of Argo Industrial Park 66.00 feet to the Southwest corner of Lot 7 of the Plat of Argo Industrial Park and a point on a curve to the left, said curve has a radius of 467.00 feet and a long chord bearing and distance of South 16°31'30" East 210.16 feet; thence Southeasterly along the arc of said curve 211.97 feet to the North line of Section 1; thence South 88°32'58" West along the North line of Section 1, 43.27 feet to the point of beginning.

Exhibit "A" Legal Description

# **EXHIBIT D**

**ALLONGE**

**SIC LOAN #:** C3110110

**NOTE ENDORSEMENT**

Endorsed, without recourse, to **Banner Life Insurance Company, a Maryland insurance company, as to an undivided 14.65% interest.**

Dated effective: February 13, 2024

**SELLER:**

**STANDARD INSURANCE COMPANY**
an Oregon corporation

By: _____
      Assistant Vice President

Attest: _____

**ALLONGE**

**SIC LOAN #:** C3110110

**NOTE ENDORSEMENT**

Endorsed, without recourse, to **PL Mortgage Fund, LLC, a Delaware limited liability company, as to an undivided 14.9% interest.**

Dated effective: February 13, 2024

**SELLER:**

**STANDARD INSURANCE COMPANY**
an Oregon corporation

By: _____
      Assistant Vice President

Attest: _____

**ALLONGE**

**SIC LOAN #:** C3110110

**NOTE ENDORSEMENT**

Endorsed, without recourse, to **The Lincoln National Life Insurance Company, an Indiana corporation, as to an undivided 12.7% interest.**

Dated effective: February 13, 2024

<u>**SELLER:**</u>

**STANDARD INSURANCE COMPANY**
an Oregon corporation

By: _____
Assistant Vice President

Attest: _____

# EXHIBIT E

RECEIVED
REGISTER OF DEEDS
KENT COUNTY, MI

2025 JAN 24 8:02 AM

Prepared By: Kim Ireland
**STANCORP MORTGAGE INVESTORS, LLC**
10265 NE Tanasbourne Drive
Hillsboro, OR 97124

Recording Requested and When
Recorded, return to:
Rae Bodonyi
Lenders Recording Services (2024)
5061 N Abbe Rd, Suite 1
Sheffield Village, Ohio 44035

**202501240004185   Total Pages: 4**
**01/24/2025 08:58 AM   Fees: $30.00**
**Lisa Posthumus Lyons, County Clerk/Register**
**Kent County, MI        SEAL**

3406807

## ASSIGNMENT OF LENDERS INTEREST IN MORTGAGE
## AND RELATED LOAN DOCUMENTS

FOR VALUE RECEIVED, the undersigned ("Assignor") hereby grants, assigns and transfers to Banner Life Insurance Company, a Maryland insurance company (14.65%), The Lincoln National Life Insurance Company, an Indiana corporation (12.7%), PL Mortgage Fund, LLC, a Delaware limited liability company (14.9%), (hereinafter collectively, "Assignee"), each to an undivided interest under the following loan documents:

| Mortgagor | Loan Number | Date of Recording | Recording No. |
|---|---|---|---|
| **LEESTMA MANAGEMENT LLC** | C3110110 | Mortgage: 1/25/2024 | Mortgage: 202401250004269 |

Tax Account Number: 41-21-01-600-003; 41-21-01-600-006.

Commonly known as: 6102 CLAY AVENUE SOUTHWEST, WYOMING, MI, 49548; 6120 CLAY AVENUE SOUTHWEST, WYOMING, MI, 49548.

See Exhibit "A" attached hereto and by this reference made a part hereof for legal description.

All as described in the Official Records in the Office of the County Recorder of Kent County, Michigan together with the note(s) described therein, the money due and to become due therein with interest, all rights accrued to or to accrue under the Mortgage and all rights under the separate Assignment of Lessor's Interest in Leases of even date with the Mortgage.

See following page(s) for Assignor and Assignee (hereinafter collectively "Lender"), Addresses.

C3110110

Dated effective February 13, 2024

"ASSIGNOR"

**Standard Insurance Company,**
an Oregon corporation

KL

By: _____
Name: Amy Frazey
Title: Assistant Vice President

KI

Attest: _____
Name: Paul Freese
Title: Senior Director
StanCorp Mortgage Investors, LLC



## LENDER ADDRESSES

Standard Insurance Company
10265 NE Tanasbourne Drive
Hillsboro, OR 97124

Banner Life Insurance Company
3275 Bennett Creek Avenue
Frederick, MD 21704

Lincoln National Life Insurance Company
100 North Greene Street
Greensboro, NC 27401

PL Mortgage Fund LLC
700 Newport Center Drive
Newport Beach, CA 92660

C3110110

STATE OF OREGON       )

                              ) ss:

COUNTY OF WASHINGTON   )

      On this 15TH day of January, 2025, before me, Kimberly Ann Ireland, appeared AMY FRAZEY and PAUL FREESE, both to me personally known, who being duly sworn did say that she, the said AMY FRAZEY is the Assistant Vice President of STANDARD INSURANCE COMPANY, an Oregon corporation, the within named corporation, and that the seal affixed to said document is the corporate seal of said corporation, and that the said document was signed and sealed in behalf of said corporation by authority of its Board of Directors, and he, the said PAUL FREESE is the Senior Director of STANCORP MORTGAGE INVESTORS, LLC, an Oregon limited liability company, as Servicer for STANDARD INSURANCE COMPANY and AMY FRAZEY and PAUL FREESE acknowledged said document to be the free act and deed of said corporation.

      IN TESTIMONY WHEREOF, I have hereunto set my hand and seal the day and year last above written.



OFFICIAL STAMP
KIMBERLY ANN IRELAND
NOTARY PUBLIC - OREGON
COMMISSION NO. 1042107
MY COMMISSION EXPIRES NOVEMBER 07, 2027

                                    Kimberly Ann Ireland
                                    Notary Public for Oregon
My Commission Expires: November 07, 2027

**Exhibit "A" Legal Description**

Parcel 1:

All that part of the South 22 rods of the North fractional 1/2 of the Northwest fractional 1/4 of Section 1, Town 5 North, Range 12 West, Byron Township (now City of Wyoming), Kent County, Michigan, lying West of the Penn Central Trans. Co. Railroad right of way and Easterly of a limited access right of way line which is 700 feet Easterly of (measured at right angles) and parallel to the survey line of Highway US-131.

Parcel 2:

That part of the Northwest fractional 1/4 of Section 1, Town 5 North, Range 12 West, Byron Township (now City of Wyoming), Kent County, Michigan, described as: Commencing at the North 1/4 corner of said Section 1; thence North 88°14'10" West, 99.28 feet along the North line of said Northwest fractional 1/4; thence South 00°01'45" West, 1192.66 feet along the West line of the railroad right of way to the South line of the North fractional 1/2 of said Northwest fractional 1/4 and the point of beginning; thence South 00°01'45" West, 557.74 feet along the West line of the railroad right of way; thence North 44°25'40" West, 812.90 feet to a point which is 700 feet Easterly of, measured at right angles, from the centerline of existing Highway US-131; thence South 87°42'30" East, 569.78 feet along the South line of the North fractional 1/2 of said Northwest fractional 1/4 to the point of beginning.

Parcels 1 and 2 being more particularly described as:
A parcel of land being part of the East 1/2 of the Northwest fractional 1/4 of Section 1, Town 5 North, Range 12 West, Byron Township, Kent County, Michigan, described as: Commencing at the North 1/4 corner of Section 1; thence South 88°32'58" West (recorded as North 88°14'10" West) 99.28 feet along the North line of said Northwest fractional 1/4; thence South 03°12'00" East (recorded as South 00°01'45" West) 829.18 feet to the point of beginning on the North line of the South 22 rods of the North fractional 1/2 of the Northwest fractional 1/4 of Section 1; thence continuing South 03°12'00" East (recorded as South 00°01'45" West) 920.90 feet along the West line of the Railroad Right of Way; thence North 47°40'00" West 812.59 feet (recorded as North 44°25'40" West 812.90 feet) to a point which is 700 feet Easterly of, measured at right angles, from the centerline of existing Highway US-131; thence North 04°24'50" West parallel to the survey line of US-131, 363.77 feet to the North line of the South 22 rods of the North fractional 1/2 of the Northwest fractional 1/4; thence North 89°03'10" East along the North line of the South 22 rods of the North fractional 1/2 of the Northwest fractional 1/4, 577.37 feet to the point of beginning.

Together with an easement for ingress and egress as disclosed in Access Easement recorded in Instrument No. 20070109-0003393, more particularly described as: A parcel of land being part of Section 1, Town 5 North, Range 12 West, Byron Township, Kent County, Michigan, described as: Commencing at the North 1/4 corner of Section 1; thence South 88°32'58" West (recorded as North 88°14'10" West) along the North Section line 627.87 feet to the point of beginning, which is 766 feet East of, and measured perpendicular to, the survey centerline of Highway US-131; thence South 04°24'50" East, parallel to and 766 feet East of the centerline of Highway US-131, 825.50 feet; thence South 89°01'10" West 66.12 feet; thence North

04°24'50" West parallel to and 700 feet East of the Centerline of Highway US-131, 824.92 feet to the North line of Section 1; thence North 10°00'25" West 97.15 feet; thence North 76°05'50" East 17.00 feet to a point on a curve to the right, said curve has a radius of 533.00 feet and a long chord bearing and distance of North 08°59'45" West 101.69 feet; thence Northwesterly along the arc of said curve 101.84 feet; thence North 03°31'18" West 2.62 feet to the Southeast corner Lot 6 of the Plat of Argo Industrial Park; thence North 88°45'02" East along the South line of Argo Industrial Park 66.00 feet to the Southwest corner of Lot 7 of the Plat of Argo Industrial Park and a point on a curve to the left, said curve has a radius of 467.00 feet and a long chord bearing and distance of South 16°31'30" East 210.16 feet; thence Southeasterly along the arc of said curve 211.97 feet to the North line of Section 1; thence South 88°32'58" West along the North line of Section 1, 43.27 feet to the point of beginning.

C3110110

# EXHIBIT F

RECEIVED
REGISTER OF DEEDS
KENT COUNTY, MI

2025 JAN 24 8:02 AM

Prepared By: Kim Ireland
**STANCORP MORTGAGE INVESTORS, LLC**
10265 NE Tanasbourne Drive
Hillsboro, OR 97124

**202501240004186   Total Pages: 4**
**01/24/2025 08:58 AM   Fees: $30.00**
Lisa Posthumus Lyons, County Clerk/Register
Kent County, MI        SEAL

Recording Requested and When
Recorded, return to:
Rae Bodonyi
Lenders Recording Services (2024)
5061 N Abbe Rd, Suite 1
Sheffield Village, Ohio 44035
3406600

## ASSIGNMENT OF ASSIGNMENT OF LESSOR'S INTEREST IN LEASES
## AND RELATED LOAN DOCUMENTS

FOR VALUE RECEIVED, the undersigned ("Assignor") hereby grants, assigns and transfers to Banner Life Insurance Company, a Maryland insurance company (14.65%), The Lincoln National Life Insurance Company, an Indiana corporation (12.7%), PL Mortgage Fund, LLC, a Delaware limited liability company (14.9%), (hereinafter collectively, "Assignee"), each to an undivided interest under the following loan documents:

| Mortgagor | Loan Number | Date of Recording | Recording No. |
|---|---|---|---|
| **LEESTMA MANAGEMENT LLC** | C3110110 - A | Assignment of Lessor's Interest in Leases: 1/25/2024 | Assignment of Lessor's Interest in Leases: 202401250004270 |

Tax Account Number:  41-21-01-600-003; 41-21-01-600-006.

Commonly known as: 6102 CLAY AVENUE SOUTHWEST, WYOMING, MI, 49548; 6120 CLAY AVENUE SOUTHWEST, WYOMING, MI, 49548.

See Exhibit "A" attached hereto and by this reference made a part hereof for legal description.

All as described in the Official Records in the Office of the County Recorder of Kent County, Michigan together with the note(s) described therein, the money due and to become due therein with interest, all rights accrued to or to accrue under the Mortgage and all rights under the separate Assignment of Lessor's Interest in Leases of even date with the Mortgage.

See following page(s) for Assignor and Assignee (hereinafter collectively "Lender"), Addresses.

C3110110

Dated effective February 13, 2024

"ASSIGNOR"

**Standard Insurance Company,**
an Oregon corporation

KL
By: _____
Name: Amy Frazey
Title:   Assistant Vice President

KI
Attest: _____
Name: Paul Freese
Title:   Senior Director
         StanCorp Mortgage Investors, LLC



## LENDER ADDRESSES

Standard Insurance Company
10265 NE Tanasbourne Drive
Hillsboro, OR 97124

Banner Life Insurance Company
3275 Bennett Creek Avenue
Frederick, MD 21704

Lincoln National Life Insurance Company
100 North Greene Street
Greensboro, NC 27401

PL Mortgage Fund LLC
700 Newport Center Drive
Newport Beach, CA 92660

C3110110

STATE OF OREGON         )

                              ) ss:

COUNTY OF WASHINGTON   )

       On this 15TH day of January, 2025, before me, Kimberly Ann Ireland, appeared AMY FRAZEY and PAUL FREESE, both to me personally known, who being duly sworn did say that she, the said AMY FRAZEY is the Assistant Vice President of STANDARD INSURANCE COMPANY, an Oregon corporation, the within named corporation, and that the seal affixed to said document is the corporate seal of said corporation, and that the said document was signed and sealed in behalf of said corporation by authority of its Board of Directors, and he, the said PAUL FREESE is the Senior Director of STANCORP MORTGAGE INVESTORS, LLC, an Oregon limited liability company, as Servicer for STANDARD INSURANCE COMPANY and AMY FRAZEY and PAUL FREESE acknowledged said document to be the free act and deed of said corporation.

       IN TESTIMONY WHEREOF, I have hereunto set my hand and seal the day and year last above written.



OFFICIAL STAMP
KIMBERLY ANN IRELAND
NOTARY PUBLIC - OREGON
COMMISSION NO. 1042107
MY COMMISSION EXPIRES NOVEMBER 07, 2027

                                  Kimberly Ann Ireland
                                  Notary Public for Oregon
My Commission Expires: November 07, 2027

## Exhibit "A" Legal Description

**Parcel 1:**

All that part of the South 22 rods of the North fractional 1/2 of the Northwest fractional 1/4 of Section 1, Town 5 North, Range 12 West, Byron Township (now City of Wyoming), Kent County, Michigan, lying West of the Penn Central Trans. Co. Railroad right of way and Easterly of a limited access right of way line which is 700 feet Easterly of (measured at right angles) and parallel to the survey line of Highway US-131.

**Parcel 2:**

That part of the Northwest fractional 1/4 of Section 1, Town 5 North, Range 12 West, Byron Township (now City of Wyoming), Kent County, Michigan, described as: Commencing at the North 1/4 corner of said Section 1; thence North 88°14'10" West, 99.28 feet along the North line of said Northwest fractional 1/4; thence South 00°01'45" West, 1192.66 feet along the West line of the railroad right of way to the South line of the North fractional 1/2 of said Northwest fractional 1/4 and the point of beginning; thence South 00°01'45" West, 557.74 feet along the West line of the railroad right of way; thence North 44°25'40" West, 812.90 feet to a point which is 700 feet Easterly of, measured at right angles, from the centerline of existing Highway US-131; thence South 87°42'30" East, 569.78 feet along the South line of the North fractional 1/2 of said Northwest fractional 1/4 to the point of beginning.

Parcels 1 and 2 being more particularly described as:
A parcel of land being part of the East 1/2 of the Northwest fractional 1/4 of Section 1, Town 5 North, Range 12 West, Byron Township, Kent County, Michigan, described as: Commencing at the North 1/4 corner of Section 1; thence South 88°32'58" West (recorded as North 88°14'10" West) 99.28 feet along the North line of said Northwest fractional 1/4; thence South 03°12'00" East (recorded as South 00°01'45" West) 829.18 feet to the point of beginning on the North line of the South 22 rods of the North fractional 1/2 of the Northwest fractional 1/4 of Section 1; thence continuing South 03°12'00" East (recorded as South 00°01'45" West) 920.90 feet along the West line of the Railroad Right of Way; thence North 47°40'00" West 812.59 feet (recorded as North 44°25'40" West 812.90 feet) to a point which is 700 feet Easterly of, measured at right angles, from the centerline of existing Highway US-131; thence North 04°24'50" West parallel to the survey line of US-131, 363.77 feet to the North line of the South 22 rods of the North fractional 1/2 of the Northwest fractional 1/4; thence North 89°03'10" East along the North line of the South 22 rods of the North fractional 1/2 of the Northwest fractional 1/4, 577.37 feet to the point of beginning.

Together with an easement for ingress and egress as disclosed in Access Easement recorded in Instrument No. 20070109-0003393, more particularly described as: A parcel of land being part of Section 1, Town 5 North, Range 12 West, Byron Township, Kent County, Michigan, described as: Commencing at the North 1/4 corner of Section 1; thence South 88°32'58" West (recorded as North 88°14'10" West) along the North Section line 627.87 feet to the point of beginning, which is 766 feet East of, and measured perpendicular to, the survey centerline of Highway US-131; thence South 04°24'50" East, parallel to and 766 feet East of the centerline of Highway US-131, 825.50 feet; thence South 89°01'10" West 66.12 feet; thence North

04°24'50" West parallel to and 700 feet East of the Centerline of Highway US-131, 824.92 feet to the North line of Section 1; thence North 10°00'25" West 97.15 feet; thence North 76°05'50" East 17.00 feet to a point on a curve to the right, said curve has a radius of 533.00 feet and a long chord bearing and distance of North 08°59'45" West 101.69 feet; thence Northwesterly along the arc of said curve 101.84 feet; thence North 03°31'18" West 2.62 feet to the Southeast corner Lot 6 of the Plat of Argo Industrial Park; thence North 88°45'02" East along the South line of Argo Industrial Park 66.00 feet to the Southwest corner of Lot 7 of the Plat of Argo Industrial Park and a point on a curve to the left, said curve has a radius of 467.00 feet and a long chord bearing and distance of South 16°31'30" East 210.16 feet; thence Southeasterly along the arc of said curve 211.97 feet to the North line of Section 1; thence South 88°32'58" West along the North line of Section 1, 43.27 feet to the point of beginning.

C3110110

# EXHIBIT G

Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com. FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery, misdelivery, or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim. Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental, consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss. Maximum for items of extraordinary value is $1,000, e.g. jewelry, precious metals, negotiable instruments and other items listed in our Service Guide. Written claims must be filed within strict time limits, see current FedEx Service Guide.

After printing this label:
1. Fold the printed page along the horizontal line.
2. Place label in shipping pouch and affix it to your shipment.

CONSIGNEE COPY - PLEASE PLACE IN FRONT OF POUCH





**ELECTRONIC MAIL / READ RECEIPT REQUESTED:**
**(RML@LEESTMAMANAGEMENT.COM)**
**OVERNIGHT AND REGULAR MAIL**

November 11, 2025

Leestma Management LLC     Ryan M Leestma
1900 Gulf Drive N Unit 7       1599 Westwind Ct
Bradenton Beach, FL 34217   Muskegon, MI 49445

**RE:   SMI Loan No:      C3110110**
**Property Address:   6102 Clay Avenue Southwest, Wyoming, MI  49548**
**6120 Clay Avenue Southwest, Wyoming, MI  49548**

**DEMAND LETTER**
**NOTICE OF INTENT TO ACCELERATE DEBT**
**AND COMMENCE FORECLOSURE PROCEEDINGS**

**<u>FINAL PERFORMANCE DATE: NOVEMBER 21, 2025</u>**

StanCorp Mortgage Investors, LLC is the agent representing the lender on a promissory note secured by a first Mortgage on the property generally known as 6102 & 6120 Clay Avenue Southwest, Wyoming, MI  49548 (Property). The Note dated January 12, 2024 (Note) matures February 01, 2049. The Note, Mortgage and other documents securing the loan (Loan) are hereinafter collectively referred to as the "Loan Documents".

The Loan is in default in the following particulars:

- MONTHLY PAYMENT DEFAULT: The monthly loan payment due 11/01/25 has not been paid as agreed. The amounts due are:

| | | | | |
|---|---|---|---|---|
| 11/01/25 P&I Payment | | | $ | 21,380.00 |
| Default interest from 11/01/25 to 11/11/25 | at | 10.000000% | | 52.95 |
| **TOTAL MONTHLY PAYMENT DEFAULT** | | | **$** | **21,432.95** |

StanCorp Mortgage Investors, LLC
10265 NE Tanasbourne Drive 3rd Floor
Hillsboro, OR 97124
Tel 971.321.6100

Page 2 – Demand Letter
Loan No: C3110110, Borrower: Leestma Management LLC; Ryan M Leestma.
November 11, 2025

- <u>OTHER CHARGES DEFAULT:</u> Other charges have not been paid as agreed. The amounts due are:

| | | |
|---|---|---|
| Late fees due as of 11/11/25 | $ | 1,069.00 |
| Returned check fees due as of 11/11/25 | | 20.00 |
| **TOTAL OTHER CHARGES DEFAULT** | **$** | **1,089.00** |

**STANCORP MORTGAGE INVESTORS, LLC (STANCORP) HEREBY DEMANDS THAT:**

- The Loan be brought current, curing the monthly payment default and the other charges default in the following amounts:

| | | |
|---|---|---|
| Monthly Payment Default | $ | 21,432.95 |
| Other Charges Default | | 1,089.00 |
| **AMOUNT DUE as of 11/11/25** | **$** | **22,521.95** |
| PER DIEM DEFAULT INTEREST * | $ | 5.29 |

*\* Add to Amount Due for each day from 11/11/25 to the date payment arrives at StanCorp.*

*The amount required to cure the monetary default is equal to the AMOUNT DUE as set forth above, <u>PLUS</u> the above indicated PER DIEM INTEREST amount added for each day from November 11, 2025 to the date payment is received in our office.*

**Reinstatement must be paid by cashier's check, certified check, money order, or wire made payable to StanCorp Mortgage Investors, LLC and received on or before 4:00 p.m. (Pacific Standard Time) November 21, 2025 (the "<u>Final Performance Date</u>"). Send payment and other above required items to:**

| **To WIRE funds:** | **To MAIL funds:** |
|---|---|
| U. S. National Bank, Head Office | StanCorp Mortgage Investors, LLC |
| 321 SW 6th Avenue, Portland OR 97204 | 10265 NE Tanasbourne Drive – 3rd Floor |
| ABA No.: 123 000 220 | Hillsboro, OR 97124 |
| Acct Name:  StanCorp Mortgage Investors LLC | Attn: Loan Servicing Manager |
| Acct No.: 153607102982 | |
| **Ref: Loan # C3110110** | |

*PLEASE NOTE: Cybercrimes are on the rise. If you receive an e-mail or any other communication that appears to be generated from a StanCorp Mortgage Investor, LLC employee that contains new, revised or altered bank wire instructions, consider it suspect and call our office at a number you trust. Our bank wire instructions rarely change.*

**Monthly debits to your bank account for loan payments are suspended.**  StanCorp will neither reinstate your loan by ACH draft nor resume automatic monthly debits until the demands of this letter have been met.

If the demands set forth above are not met by the Final Performance Date, the entire unpaid balance of the Loan and all other sums due thereunder are hereby automatically accelerated

without further notice to you. In that event, StanCorp Mortgage Investors, LLC will refer this loan to its attorney with instructions to commence foreclosure proceedings.

**TIME IS OF THE ESSENCE.  IF THE DEMANDS SET FORTH ABOVE ARE NOT MET ON OR BEFORE THE FINAL PAYMENT DATE, THE ENTIRE PRINCIPAL BALANCE OF THE LOAN, PLUS ACCRUED INTEREST AND ANY OTHER SUM SECURED BY THE LOAN DOCUMENTS SHALL BE DUE AND PAYABLE.  THIS IS NOTICE TO YOU OF STRICT ENFORCEMENT OF ALL TIME DEADLINES.**

Gwen Schaeffer
Manager, SMI Operations

cc:     Amy Frazey
        Jan Gravdal, McEwen Gisvold LLP
        Alexandra Henthorne
        District Capital

Leestma Management LLC
1900 Gulf Drive N Unit 7
Bradenton Beach, FL 34217

Ryan M Leestma
1599 Westwind Ct
Muskegon, MI 49445

# EXHIBIT H



**ELECTRONIC MAIL ONLY/READ RECEIPT REQUESTED: RML@leestmamanagement.com**

December 30, 2025

Leestma Management, LLC  and  Ryan M Leestma, Individually

Re:    Forbearance Agreement (this "<u>Agreement</u>")
       Loan No.:  C3110110  (the "<u>Loan</u>")
       Borrower: Leestma Management LLC and Ryan M Leestma, individually
                 (collectively the "<u>Borrower</u>")
       Subject Property:  6102 & 6120 Clay Avenue Southwest, Wyoming, MI  49548
                 (the "<u>Property</u>")

Dear Borrower:

You have requested that StanCorp Mortgage Investors, LLC, as administrative representative for the current lenders of the above referenced Loan (collectively, "<u>Lender</u>") conditionally and temporarily forbear from collection of certain principal and interest payments and other past due payments under the Loan (collectively, the "<u>Delayed Payments</u>"), and from initiating or continuing to exercise its rights and remedies related to Lender's non-receipt of certain Delayed Payments including, but not limited to, foreclosing on the Property.

You have requested this because the Delayed Payments required under the documents which evidence, guaranty, and/or secure the Loan (collectively, the "<u>Loan Documents</u>") were not made when due, and your Loan is in default (the "<u>Default</u>"). The Property, leases, "<u>Rents</u>" (as hereinafter defined) and all other collateral and security granted to the Lender pursuant to the Loan Documents are collectively referred to herein as the "<u>Security</u>".  This Agreement is a Loan Document. Capitalized terms not otherwise defined have the meanings given them in the other Loan Documents.

Further, you acknowledge that as a result of such Default, which has not been timely cured Events of Default under the Loan Documents, the entire principal balance of the Loan, plus accrued interest and any other sum secured by the Loan Documents is now due and owing, all as more fully set forth in (a) that certain Demand Letter Notice of Intent to Accelerate Debt and Commence Foreclosure Proceedings Letter dated November 11, 2025 (the "<u>Demand Letter</u>"), in which Lender notified you of the Default and its intent to accelerate the Loan if payment was not made by November 21, 2025 and immediately entitled to accelerate the Loan, with all indebtedness due and owing under the Loan and the Loan Documents being immediately due and payable and exercise its rights and remedies under the Loan Documents and applicable law ("<u>Enforcement Action</u>".)

Loan No. C3110110
December 30, 2025
Page 2 of 9

Although Lender is under no obligation to permit any accommodations or concessions, Lender has agreed to forbear from initiating or continuing foreclosure rights and remedies relating to the Default under the following terms and conditions:

1.   The Lender agrees, subject to the terms and conditions set forth herein, to forbear from pursuing further Enforcement Action, from the period (the "Forbearance Period") commencing on the Effective Date (hereinafter defined) and continuing until the earliest of the occurrence of (a) a new Event of Default, or (b) Borrower's failure to keep StanCorp promptly apprised of the progress or lack thereof, including due diligence benchmarks under the Buy and Sell Agreement for the Property between the LLC Borrower and Green Shield Properties, LLC dated December 17, 2025 ("PSA"), including delivery of the earnest money, or (c) the amendment to, termination of and/or expiration of the PSA), or  (d) March 1, 2026 (such earliest date being hereinafter referred to as, the "Forbearance Period Expiration Date"). Upon the Forbearance Period Expiration Date, the Lender's agreement to forbear as set forth herein automatically terminates, without notice or demand, at which point the Lender may immediately thereafter proceed with Enforcement Action.

2.   Borrower's obligation to pay to Lender the Delayed Payments of principal and interest, along with late charges, other interest, third party report fees and any other charges arising due to the delay (including, without limitation, Lender's attorneys' fees and costs incurred in connection therewith), shall be deferred during the Forbearance Period and shall immediately be due and payable on the Forbearance Period Expiration Date.   To avoid any confusion or misunderstanding, all interest, late charges, and any other charges arising due to the Delayed Payments (including, without limitation, Lender's attorney's fees and costs incurred in connection therewith) will continue to accrue during the Forbearance Period.

3.   On or before the Forbearance Period Expiration Date, the Borrower shall remit a payment in immediately available funds by cashier's check, certified check, money order, or wire made payable to StanCorp Mortgage Investors, LLC in accordance with the wire instructions attached hereto as "**Exhibit A**", in an amount sufficient to satisfy all of the then-outstanding indebtedness due and owing under the Loan Documents, including, without limitation, all principal, accrued and unpaid interest, late charges, late check fees, report fees, escrow charges, and all costs and expenses incurred by Lender in enforcing its rights and remedies under the Loan (including its attorneys' fees and costs), the "Indebtedness".

4.  Impound payments in amounts acceptable to the Lender will be required during the Forbearance Period and any tax shortages will be the responsibility of Borrower.  Borrower remain obligated to maintain insurance coverage as required in the Loan Documents during the Forbearance Period.

5.   The Borrower covenants and agrees to use best faith efforts to refinance the Loan or otherwise satisfy the Loan in full as soon as possible, but in any event not later than the Forbearance Period Expiration Date.

6.   On or before January 15, 2026 and continuing on the first (1ˢᵗ) day of each month thereafter through and including the Forbearance Period Expiration Date, the Borrower shall provide (or cause to be provided) to the Lender certified written updates detailing the status of the Borrower's efforts to satisfy the Indebtedness whether by refinancing or otherwise, together with copies of the correspondence, documentation and information relating to or evidencing the same including,

Loan No. C3110110
December 30, 2025
Page 3 of 9

copies of (i) any loan applications, and any terms sheets, commitment letters and other material documents received by any of the Borrower relating to refinancing or satisfaction of the Loan (to the extent not previously furnished to the Lender). The immediately preceding sentence notwithstanding, the Borrower shall provide to the Lender within ten (10) days of the Lender's written request, such other documentation and information that the Lender may request in its reasonable discretion relating to the Borrower's performance under this Agreement and the Loan Documents, as may be requested from time to time.

7. [Intentionally omitted.].

8. The Borrower acknowledges that pursuant to the Demand Letter any interest that the Borrower had in and to the Rents was terminated and revoked effective on or before November 25, 2025, and that any Rents collected by the Borrower were to be held in trust for the benefit of the Lender and turned over to the Lender. During the Forbearance Period, the Borrower shall be entitled to collect and use the Rents for legitimate expenses related to operating and maintaining the Property and shall account to the Lender for the use thereof.

9. All Loan Documents shall automatically be amended and modified pursuant to the terms of this Agreement (including but not limited to amendment to the Mortgage, Assignment of Rents and Security Agreement and Fixture Filing recorded on July 10, 2023, securing the Loan (the "Deed of Trust")). The Borrower agrees to execute such other and further documents as the Lender may deem in its absolute discretion to be reasonably necessary, proper or convenient, including without limitation, modification agreements, promissory notes, loan and security agreements, deeds of trust, agreements, financing statements, continuation statements, contracts, assignments and similar instruments as may from time to time be necessary, proper or convenient to perfect, confirm, establish, re-establish, continue or complete any security interest in and to the Property and to further effectuate the agreements of the Borrower contained herein. The Borrower hereby irrevocably and automatically appoints the Lender as the Borrower' attorney-in-fact to execute such document in the Borrower' name, place and stead and on the Borrower's behalf, and such power of attorney shall constitute a power of attorney with an interest and shall be irrevocable.

10. The Lender's agreement hereunder shall not take effect unless and until this Agreement shall be duly executed by Borrower. While electronic signatures and delivery will constitute an original, Borrower will deliver a wet ink executed original copy of the same to the Lender.

11. If the Lender seeks to foreclose on the Property following the occurrence of an Event of Default (including, the Borrower's failure to satisfy the Indebtedness on or before the Forbearance Period Expiration Date), the Borrower agrees not to oppose any such foreclosure sale of the Property (including, without limitation, the ratification of any such sale) and to accept all notices and cooperate with the Lender in connection with the foreclosure sale of the Property.

12. The Borrower agrees that no further encumbrances, including, but not limited to, any mortgage, security agreement, financing statement, deed of trust, or other lien (including mechanics' liens), shall be placed against any of the Security (other than in favor of the Lender). The Borrower further agree not to sell, transfer, or convey any asset or property, whether tangible or intangible, without the prior written consent of the Lender.

Loan No. C3110110
December 30, 2025
Page 4 of 9

13. The Borrower acknowledges and agrees that exclusive of interest accrued as described under the Note and other charges arising due to the Delayed Payments (including, without limitation, Lender's attorneys' fees and costs) as of December 26, 2025, the principal balance of the Loan is $2,736,001.41.

Lender preserves its rights under the Loan Documents including as to any Enforcement Action, and Borrower acknowledge that if Borrower fail to timely make impound payments and/or fail to pay off the Indebtedness in full by the Forbearance Period Expiration Date or fail to perform or comply with any other obligation required by this Agreement or the Loan Documents during the Forbearance Period, then Lender shall have no obligation to continue to forbear and all of the then-outstanding Indebtedness shall become immediately due and payable, and any previously pursued Enforcement Action shall immediately resume.

Without liability for failing to do so, Borrower and Lender may commence discussion of various courses of action which might be in their mutual interests. Either of Borrower or Lender, in their sole and absolute discretion, may terminate these discussions at any time and for any reason; and, upon such termination of discussions, the parties' respective obligations to one another shall be only as set forth in executed written agreements, if any.

Except as set forth in this Agreement, neither Lender nor Borrower shall be bound by any agreement, verbal or written, on individual issues, and no rights or liabilities, either express or implied, shall arise on the part of the parties hereto, or any third party, until and unless (a) agreement is reached on all issues, and (b) the agreement on all issues has been reduced to a written agreement, signed by each party, and approved by Lender's appropriate authorities.  No verbal agreement shall be considered binding on either party.  Furthermore, to avoid any confusion or misunderstanding, each also agrees that this Agreement may only be amended in writing.

Notwithstanding any other provisions of this Agreement, or any claims of the parties to the contrary, the Borrower covenant and agree that the Loan Documents (as amended hereby) are in full force and effect and shall remain in full force and effect and **except for the payment deferral, Borrower is obligated to strictly comply with the terms of the Loan Documents (as amended hereby)**, unless and until otherwise modified by a signed, written document.  No negotiations or other actions undertaken shall constitute a waiver of any party's rights under the Loan Documents, except to the extent specifically stated in a written agreement.  Without limiting in any manner Borrower' continuing obligations under the Loan Documents, Borrower acknowledge and agree that Borrower' obligation to keep the property taxes on the Property current requires Borrower to either (a) pay the estimated property taxes to Lender on a monthly basis, together with any shortage when taxes are due, or (b) pay property taxes when due, in the event that Lender has waived the requirement of a monthly tax impound.  The obligation to keep the property taxes on the Property current remains an obligation of Borrower during the Forbearance Period.

For and in consideration of the Lender's agreement herein, the Borrower hereby irrevocably waives and releases any and all claims, actions, causes of action, suits, and defenses debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, liabilities, variances, trespasses, damages, judgments, extents, executions, claims and demands, whatsoever in law or equity, whether known or unknown,

Loan No. C3110110
December 30, 2025
Page 5 of 9

which the Borrower, or their successors and assigns, ever had, now have, or hereafter can, shall or may have against the Lender, and its officers, directors, shareholders, employees, agents and attorneys. This release shall survive the termination of this Agreement and shall retain its full force and effect as to all matters which any Obligor might hereafter have against Lender for or by reason of any matter, cause or thing whatsoever which relates to the negotiations contemplated hereunder or the Loan Documents; provided, however, that the waiver and release set forth above shall not release either party from any of its obligations under this Agreement, the Loan Documents, and any written agreement. Borrower specifically acknowledges and ratifies the terms of the Loan Documents permitting Lender or its agents to inspect the Property. Borrower understands and agrees that to evaluate or consider any requests Lender has needed and may need, as part of its due diligence, to engage consultants to promptly inspect the Property and title thereto. Borrower agrees to cooperate with and assist Lender's consultants in connection with any Property inspections. Borrower further agrees to instruct any applicable property managers and/or tenants to cooperate with such inspections.

The laws of the State of Michigan (excluding, however, conflict of law principles) shall govern and be applied to determine all issues relating to this Agreement and the rights and obligations of the Lender and Borrower, including the validity, construction, interpretation, and enforceability of this Agreement and its various provisions and the consequences and legal effect of all transactions and events which resulted in the issuance of this Agreement or which occurred or were to occur as a direct or indirect result of this Agreement having been executed.

In the event that a bankruptcy case is hereafter filed by or against either Borrower, the Borrower specifically agree that the automatic stay provisions of Section 362 of the United States Bankruptcy Code applicable to any such bankruptcy case shall be immediately terminated as to the Lender and all of that Property and other collateral which constitutes property of the bankruptcy estate created thereby, so that the Lender may immediately assert all of its rights and remedies under this Agreement, the Loan Documents and applicable law with respect to the Property. The Borrower further agree not to contest any motion to terminate or modify the automatic stay filed by the Lender in any such bankruptcy case and to immediately execute and deliver to the Lender and to file with the bankruptcy court such documents, pleadings, and papers as are necessary for the Lender to obtain such an immediate termination of the automatic stay.

Each right, power and remedy of the Lender as provided for in this Agreement and the other Loan Documents, or now or hereafter existing at law or in equity or by statute or otherwise shall be cumulative and concurrent and shall be in addition to every other such right, power or remedy, and the exercise or beginning of the exercise by the Lender of any one or more of such rights, powers or remedies shall not preclude the simultaneous or later exercise by the Lender of any or all other such rights, powers or remedies.

Should this Agreement or any Loan Documents be referred to an attorney for any reason, whether any suit is filed and/or a judgment is entered, by confession or otherwise, the Borrower shall pay all of the Lender's costs, expenses and fees resulting from such referral, including, without limitation, attorneys' fees. If enforcement of this Agreement results in the Lender obtaining a money judgment against the Borrower, Lender's right to payment and reimbursement of attorneys' fees and costs arising after the entry of such judgment shall not be extinguished or merged into the judgment but shall survive the judgment as a continuing claim against the Borrower and the Property.

Loan No. C3110110
December 30, 2025
Page 6 of 9

The Borrower's obligations to the Lender under and with respect to this Agreement and the other Loan Documents are absolute, unconditional, and independent of any defense or rights of set-off, recoupment or counterclaim which the Borrower might have against the Lender, and the Borrower agree that all payments required hereunder shall be made absolutely, free of any deductions and without abatement, diminution or set-off.

The Borrower acknowledges that the Loan Documents are the valid and binding obligations of the Borrower to which the Borrower have no defenses, counterclaims or setoffs; and the Borrower has no causes of action, claims, demands or liabilities of any kind, whatsoever in law or equity, against the Lender, including, but not limited to, those arising from or related to the Loan, the Loan Documents and/or any servicing or enforcement actions taken in connection therewith.

Without limiting any of the terms and conditions of this Agreement, the Borrower represents, warrants, and confirms that the Lender holds first priority valid, properly perfected and indefeasible security interests and liens in, to and against the Security.

Neither any failure nor any delay on the part of the Lender in exercising any right, power, or remedy under and with respect to this Agreement, the other Loan Documents or applicable law shall operate as a waiver thereof, nor shall a single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power, or remedy. No waiver or forbearance by the Lender as to the Borrower shall waive or release any rights or claims which the Lender may now have or hereafter have against any other person, firm or individual or which the Lender may have against the Borrower with respect to any other obligations of the Borrower to the Lender. The Lender reserves all rights.

This Agreement shall not cause a novation of any of the Borrower's obligations under or with respect to any of the other Loan Documents, nor shall it extinguish, terminate, or impair the Borrower' obligations under or with respect to any of the other Loan Documents.

The Borrower acknowledges their respective obligations under the Loan Documents and agree that their respective obligations shall extend to the terms and conditions set forth in this Agreement. The Borrower's obligations under this Agreement shall be in addition to any obligations of the Borrower under the Loan Documents and, where conflicting or inconsistent provisions or obligations exist, the Loan Documents and this Agreement shall be read together, where possible, to provide the broadest and most encompassing obligations on the Borrower, and shall be construed, interpreted and resolved to benefit the Lender.

Except as expressly modified by this Agreement, the Borrower shall fully and faithfully satisfy and perform the terms, conditions, representations, covenants, and warranties of the Loan Documents, each of which are incorporated by reference herein. All cure periods or grace periods provided for in the Loan Documents, and all provisions in the Loan Documents which required the Lender to provide notice to the Borrower upon the occurrence of a default thereunder, are hereby deleted and shall no longer have any force or effect. Except as expressly modified by this Agreement, the Borrower acknowledges and agrees that all other terms and conditions of the Loan Documents shall remain unchanged, in full force and effect and are hereby ratified and confirmed by the Borrower in all respects and shall be strictly complied with by the Borrower going

Loan No. C3110110
December 30, 2025
Page 7 of 9

forward. Capitalized terms used but not defined herein have the meanings given in the Loan Documents.

Borrower acknowledges that they each have thoroughly read and reviewed the terms and provisions of this Agreement and each is familiar with same, that the terms and provisions contained herein are clearly understood by each of them and have been fully and unconditionally consented to by each of them, and that they have had full benefit and advice of counsel, or the opportunity to seek the full benefit and advice of counsel, of their own selection in regard to understanding the terms, meaning and effect of this Agreement.  Borrower's execution of this Agreement is done freely, voluntarily, with full knowledge, and without duress, and that in executing this Agreement, Borrower is not relying on any other representations either written or oral, express or implied, made to Borrower by any other party hereto, and that the consideration received by Borrower hereunder has been actual and adequate.

TIME IS STRICTLY OF THE ESSENCE AS TO EACH OF THE BORROWER'S OBLIGATIONS HEREUNDER.

**Unless exempt under the Corporate Transparency Act (the "Act"), the entity in the below signature block is and will remain in compliance with the Act, including making timely submissions to The Financial Crimes Enforcement Network (FinCEN), a bureau of the U.S. Treasury.**

**Under Oregon law, most agreements, promises and commitments made by Lender concerning loans and other credit extensions which are not for personal, family or household purposes or secured solely by the Borrower's residence must be in writing, express consideration and be signed by an authorized representative of Lender to be enforceable.**

To accept, please execute this Agreement below and return to Lender by December 31, 2025.

Sincerely,

cc:
   Tyler Bellis, Esq. of McEwen Gisvold LLP

**[BORROWER'S SIGNATURE PAGE FOLLOWS]**

Loan No. C3110110
December 30, 2025
Page 8 of 9

**The undersigned Borrower, and each of them, acknowledge and agree that they have read this Agreement and all exhibits attached thereto, understand its contents, and sought the advice of their own independent legal counsel, or had the opportunity to seek the advice of their own independent legal counsel, prior to executing and delivering this Agreement; further, the undersigned Members of the LLC Borrower hereby represent and warrant that they have full authority to execute this Agreement on behalf of the LLC Borrower.**

Consented and agreed to on this ___ date of December 2025 (the "Effective Date").

                                              **Borrower:**

**LEESTMA MANAGEMENT, LLC,
a Florida limited liability company**


By: _____          _____
    Ryan M. Leestma, Member           **RYAN M. LEESTMA aka RYAN LEESTMA,
                                       Individually**


By: _____
    Emily S. Leestma, Member

Loan No. C3110110
December 30, 2025
Page 9 of 9

## Exhibit A

## Payment Instructions

| **To WIRE funds**: | **To MAIL funds**: |
|---|---|
| U.S. National Bank, Head Office | StanCorp Mortgage Investors, LLC |
| 321 SW 6th Avenue, Portland OR 97204 | 10265 NE Tanasbourne Drive – 3rd Floor |
| ABA No. 123 000 220 | Hillsboro, OR 97214 |
| Acct Name: StanCorp Mortgage Investors LLC | Attn: Loan Servicing Supervisor |
| Acct No.: 153607102982 | |
| **Ref: Loan #: C3110110** | |

*PLEASE NOTE: Cybercrimes are on the rise. If you receive an e-mail or any other communication that appears to be generated from a StanCorp Mortgage Investors, LLC employee that contains new, revised or altered bank wire instructions consider it suspect and call our office at a number you trust. Our bank wire instructions rarely change.*

# EXHIBIT I



**VIA ELECTRONIC MAIL ONLY:**
**RML@leestmamanagement.com**


February 25, 2026


Re:     Forbearance Agreement dated December 30, 2025 (the "Agreement")
        Loan No.:        C3110110 (the "Loan")
        Borrower:       **LEESTMA MANAGEMENT LLC** and **RYAN M. LEESTMA**, individually
                        (collectively, the "Borrower")
        Subject Property: **6102 & 6120 Clay Avenue Southwest, Wyoming, MI 49548** (the
                        "Property")
                        One (1) Month Extension of Forbearance Period Expiration Date

Dear Borrower:

Subject to the following, StanCorp Mortgage Investors, LLC, as administrative representative for the current lenders holding the interests under the above referenced Loan ("Lender") on a one-time basis agrees to extend the Forbearance Period Expiration Date as defined in Section 1 of the Agreement to the earlier of the occurrence of: (a) a new Event of Default, or (b) Borrower's failure to keep Lender promptly apprised of the progress or lack thereof, including due diligence benchmarks under the Buy and Sell Agreement for the Property between the Borrower and Green Shield Properties, LLC dated December 17, 2025 ("PSA"), or (c) the amendment to, termination of and/or expiration of the PSA, or (d) March 31, 2026 (the "Extension").  This Extension does not constitute Lender's agreement to extend again and/or beyond the dates listed above.

1.  **Remaining Terms:** Except as described above, all remaining terms and conditions of the Agreement and the Loan Documents (as defined in the Agreement) remain unchanged and in full force and effect.

2.  **Borrower's Acceptance:** By Borrower's continued use of the Loan proceeds, it is conclusively deemed that Borrower (a) affirms all of Borrower's obligations under the Agreement and the Loan Documents, (b) agrees that this Extension does not operate to reduce or discharge the Borrower's obligations under the Agreement or the Loan Documents, and (c) accepts and agrees that all other terms and conditions of the Agreement and the Loan Documents remain unchanged and in full force and effect.

3.  **Future Transactions:** Please note that Lender's willingness to grant this Extension in no way limits Lender's right to disapprove of future extensions and/or transactions concerning the Loan.

StanCorp Mortgage Investors, LLC
10265 NE Tanasbourne Drive 3rd Floor
Hillsboro, OR 97124
Tel 971.321.6100

Loan No.: C3110110
February 25, 2026
Page 2 of 2

**Under Oregon law, most agreements, promises and commitments made by Lender concerning loans and other credit extensions which are not for personal, family or household purposes or secured solely by the Borrower's residence must be in writing, express consideration and be signed by an authorized representative of Lender to be enforceable.**

Sincerely,

Amy Frazey
Senior Vice President and Managing Director

cc:   Tyler Bellis, Esq. of McEwen Gisvold LLP