UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

In re:

| | |
|---|---|
| Leestma Management, LLC | Case No. 8:26-bk-02696-CED [Lead Case] |
| Adelaide Pointe QOZB, LLC | Case No. 8:26-bk-02698-CED |
| Adelaide Pointe Boaters Services, LLC | Case No. 8:26-bk-02699-CED |
| Adelaide Pointe Building 1, LLC | Case No. 8:26-bk-02700-CED |
| Waterland Battle Creek, LLC | Case No. 8:26-bk-02701-CED |
| | Chapter 11, |

Debtors.

_____/ (Jointly Administered Cases)

**VARIANCE MEMORANDUM OF DEBTORS-IN-POSSESSION
IN OPPOSITION TO RECEIVER'S OPERATING BUDGET (DOC. 126)
AND IN SUPPORT OF SUBSTITUTE CASH COLLATERAL BUDGET**
*(Hearing: May 27, 2026)*

Debtors, Leestma Management, LLC, Adelaide Pointe QOZB, LLC, Adelaide Pointe

Boaters Services, LLC, Adelaide Pointe Building 1, LLC, and Waterland Battle Creek, LLC

(collectively, the "Debtors"), by and through undersigned counsel, respectfully submit this

Variance Memorandum in support of the contemporaneously-filed *Renewed Motion to Strike*

*Receiver's Cash Collateral Budget (Doc. 126) and to Approve Debtors' Substitute Cash Collateral*

*Budget* (the "Motion to Strike"). This Memorandum addresses the underlying numerical record;

the Motion to Strike addresses the procedural relief and the cumulative pattern of conduct.

I.      **INTRODUCTION**

1.      This Memorandum addresses the substantive numerical differences between the Receiver's

        Operating Budget (Doc. 126) and the Debtors' Substitute Cash Collateral Budget (Version

        6.1, the "Substitute Budget") and demonstrates—through independent professional

        verification—why the Substitute Budget is the operative budget on which the Court should

        rely.

1

2.     For the first time in this proceeding, the Debtors' figures are supported by an independent third-party professional reconstruction performed by CohnReznick LLP ("CRO"), the Debtors' proposed Chief Restructuring Officer. Working from the same operational data the Receiver has had since March 2026, and preparing its analysis independently of the Debtors' preparation of the Substitute Budget, CRO's Draft Cash Flow Forecast (the "CRO Forecast") converges with the Substitute Budget within 1.17% on cumulative net operating cash flow over the apples-to-apples June through September 2026 comparison window. The Receiver's Doc. 126 stands alone: 73.2% below the convergent professional view on Net Adelaide Pointe Operating Position, and omitting Hall Street and Waterland Commerce in their entirety.

3.     The Court is therefore presented not with a credibility contest between competing professional accounts, but with a single outlier (Doc. 126) against a noise-floor convergence of two independent professional reconstructions (CRO and the Substitute Budget).

## II.   METHODOLOGY

4.     The operative comparison window is June through September 2026 (four months). This is the only period in which all three budgets fully overlap: Doc. 126 covers April through September 2026 (no October data); the CRO Forecast covers weeks ending May 9 through October 31, 2026; the Substitute Budget covers May through October 2026. Excluding May resolves two timing artifacts in the CRO Forecast (a Week 1 catch-up loading in CRO's May Adelaide Pointe Operating Disbursements line, and CRO's 26-week window beginning after the May 1, 2026 Hall Street rent receipt). The cash collateral hearing is

scheduled for May 27, 2026, which makes May operationally moot for forward-looking budget purposes regardless.

5.   Three CRO-specific normalizations are applied to enable apples-to-apples comparison: (i) removal of the $7,800/month Forklift Loan embedded in CRO's bundled Adelaide Pointe Operating Disbursements line, because the forklift belongs to a non-debtor affiliated entity and is excluded from the AP-scope budgets of both the Debtors' and the Receiver; (ii) exclusion of CRO's $120,000 AP Property Tax escrow entry in September 2026, because AP property taxes are not due until March 2027 (a CRO error that neither the Debtors' nor the Receiver shares in the comparison window); and (iii) exclusion of CRO's $8,000/month US Marina Group Monthly Operating Cost line, because USMG has not been retained as marina operator. Each normalization is documented cell-by-cell in the supporting workbook.

## III.   THE CONVERGENCE

6.   On the apples-to-apples June–September 2026 window, the three budgets compare as follows:

| Metric (Jun–Sep 2026) | Polderman (Doc 126) | CRO (Normalized) | Substitute Budget | CRO vs Subst. | Polderman Gap |
|---|---|---|---|---|---|
| Adelaide Pointe Revenue | $779,137 | $1,189,777 | $1,199,132 | −0.78% | −35.0% |
| AP Operating Disbursements | $525,159 | $256,478 | $251,197 | +2.10% | +109.1% |
| Net AP Operating Position | $253,978 | $933,299 | $947,935 | −1.54% | −73.2% |
| Hall + Commerce (Net) | OMITTED | $299,933 | $299,899 | $34 (exact) | — |

| Cumulative Net Operating Cash Flow | (deficit) | $1,233,232 | $1,247,834 | −1.17% | — |
|---|---|---|---|---|---|

7. The pattern is unmistakable. On Adelaide Pointe Revenue, CRO and the Substitute Budget converge within 0.78% on approximately $1.19 million; the Receiver is 35.0% below both. On AP Operating Disbursements (after the documented normalizations), CRO and the Substitute Budget converge within 2.10% on approximately $254,000; the Receiver is 109.1% above both. On Net AP Operating Position, CRO and the Substitute Budget converge within 1.54% on approximately $940,000 of positive operating cash flow; the Receiver shows $253,978—73.2% below the convergent professional view.

8. On Hall Street and Waterland Commerce—both debtor entities with material rent receipts and operating activity, and both within the cash collateral period—the Receiver's Doc. 126 is silent. CRO and the Substitute Budget converge within $34 on $300,000 of net position on those two entities—essentially dollar-for-dollar. When aggregated to cumulative net operating cash flow over the four-month window, the CRO Forecast is $1,233,232 and the Substitute Budget is $1,247,834—a $14,602 difference, or 1.17%. This is the noise floor of professional forecasting; for practical purposes, the two budgets are the same number.

## IV. THE FOUR DOCUMENTED ERRORS IN DOC. 126

9. The Receiver's 73.2% deviation from the convergent CRO/Substitute Budget view on Net AP Operating Position is not a matter of reasonable professional disagreement. It is the cumulative effect of specific, identifiable, documented errors. Four are summarized below; the supporting workbook documents each cell-by-cell.

10. **DTE Energy Seasonal Error — $71,000 overstated.** Doc. 126 budgets $15,000 per month for DTE Energy (natural gas) every month, including the summer months June through September. DTE natural gas in West Michigan is consumed for winter heating; consumption from June through September is at minimum. The $15,000 figure is the winter heating rate. Applying that rate to the summer months overstates the line by approximately $71,000 over the comparison window. The Receiver has access to the DTE account history; the error is operational, not forecasting.

11. **Capital Expenditures — $214,895 budgeted, only approximately $55,000 actually spent.** Doc. 126 includes $214,895 in capital expenditures (Roof $40,000, Fire Panel $50,000, Erosion Control $25,000, Sidewalk Completion $65,000, plus Annual Fire Inspections of $6,429 and Sprinkler Monitoring installations across three buildings totaling $28,466). Of that $214,895, the Debtors' information is that approximately $55,000 has actually been spent. The remaining approximately $160,000 is neither under executed contract nor scheduled for the comparison window. Neither the CRO Forecast nor the Substitute Budget includes the unspent items.

12. **Forklift Loan — Non-debtor affiliated entity ($7,800/month).** Doc. 126 charges the receivership estate $7,800 per month for a forklift loan that belongs to a non-debtor affiliated entity. While Adelaide Pointe operations make use of the forklift, the loan obligation is not Adelaide Pointe's. The Substitute Budget correctly excludes the forklift from AP operating disbursements; CRO's bundled line includes it, hence the normalization in Section II above ($31,200 across four months).

13. **Hall Street and Waterland Commerce — Omitted entirely.** Both Hall Street and Waterland Commerce are debtor entities with material operating activity, and both are

within the cash collateral period. As shown in Section III above, CRO and the Substitute Budget converge on these entities within $34 on $300,000 of net position. The Receiver's silence is not an oversight; it is a scope choice. A cash collateral budget that is silent as to two of the three operating entities is, on its face, an insufficient basis for a cash collateral order.

## V.    THREE TIMING DIFFERENCES DISCLOSED

14.    The Debtors' disclose three timing differences that exist among the budgets, in order to forestall any suggestion that the comparison has been curated. Each is documented in the supporting workbook and each is addressed by the operative June–September window.

15.    **CRO Hall Street May rent window timing.** CRO's 26-week budget begins with the week ending May 9, 2026—after the May 1, 2026 Hall Street rent receipt. CRO therefore shifts that receipt into its June column; the Substitute Budget books the receipt in May. When equalized to the same June–September window, CRO and the Substitute Budget match within $34 on $575,904 of Hall Street rent. The difference is a window-start timing artifact, not a substantive disagreement.

16.    **Substitute Budget Commerce May property tax correction.** Earlier iterations of the Substitute Budget (Version 6) included a $50,000 Commerce property tax payment in May 2026. The Debtors' concedes that this entry was mid-timed; CRO's treatment of $0 in May for Commerce property tax was correct. Version 6.1 reflects this correction. The correction is operationally moot for the June–September comparison window because May is excluded.

17.    **CRO AP Property Tax Escrow (excluded as CRO error).** CRO's draft includes a $120,000 escrow entry for Adelaide Pointe property taxes in September 2026. AP property

taxes are not due until March 2027. Doc. 126 separately escrows $50,000 per month for property tax ($300,000 over the six-month period)—similarly not supported by the actual due date. Both CRO's entry and the Receiver's escrow are excluded from the operative comparison in Section III. Only the Substitute Budget correctly reflects $0 of AP property tax within the cash collateral period.

**VI.     CONCLUSION**

18.     For the foregoing reasons, the Debtors' respectfully submit that the Court should (i) decline to authorize use of cash collateral on the basis of the Receiver's Doc. 126; (ii) authorize use of cash collateral on the basis of the Substitute Budget (Version 6.1); and (iii) recognize the 1.17% convergence between the CohnReznick Forecast and the Substitute Budget as the operative numerical baseline for any cash collateral order entered in this proceeding. The procedural relief is sought in the companion Renewed Motion to Strike, filed contemporaneously herewith.

Dated this 26th day of May, 2026.

Respectfully submitted,

**JENNIS MORSE, P.A.**

/s/ *David S. Jennis*
David S. Jennis
Florida Bar No. 775940
606 East Madison Street
Tampa, Florida 33602
Telephone: (813) 229-2800
Email: djennis@jennislaw.com
*Counsel for the Debtors and
Debtors-in-Possession*