UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

| | |
|---|---|
| In re: | Chapter 11 |
| Leestma Management, LLC | Case No. 8:26-bk-02696-CED [Lead Case] |
| Adelaide Pointe QOZB, LLC | Case No. 8:26-bk-02698-CED |
| Adelaide Pointe Boaters Services, LLC | Case No. 8:26-bk-02699-CED |
| Adelaide Pointe Building 1, LLC | Case No. 8:26-bk-02700-CED |
| Waterland Battle Creek, LLC | Case No. 8:26-bk-02701-CED |
| Debtors. | (Jointly Administered) |
| _________________________________/ | |

**NON-PARTY WEST SHORE BANK'S RESPONSE IN OPPOSITION TO DEBTORS' EMERGENCY MOTION TO ENFORCE OR EXTEND THE AUTOMATIC STAY AND FOR CIVIL CONTEMPT SANCTIONS**

Non-party, West Shore Bank ("West Shore"), by its undersigned attorneys, submits this Response in Opposition to *Debtors' Emergency Motion to Enforce or Extend the Automatic Stay, Including the Extension of the Stay to Mult-Use and its Property if Necessary, and for Civil Contempt Sanctions Pursuant to Sections 105 and 362 of the Bankruptcy Code* (the "Sanctions Motion") (Doc. No. 261) pursuant to Fed. R. Bankr. P. 9014(a) and 11 U.S.C. § 1109(b), and in support of this Response states as follows:[1]

## INTRODUCTION

Debtors seek to sanction West Shore for foreclosing on property that no Debtor in bankruptcy owns. The property at issue is owned by Adelaide Pointe Multi-Use, LLC, a non-debtor, and Debtors concede that fact. Yet Debtors ask this Court to disregard the separate legal

[1] As of the date of this filing, West Shore has not been served with the Motion nor has Debtors' counsel provided . West Shore only learned of the filing when another creditor's attorney provided a copy of the Motion to West Shore's counsel.

existence of Multi-Use, treat its property as property of the estate, and sanction West Shore for exercising its rights against that non-debtor property. The automatic stay does not reach that far.

A debtor's ownership interest in a separate subsidiary entity does not give the debtor ownership of that entity's assets, and Debtors cannot invoke the protections of bankruptcy for Multi-Use without Multi-Use itself seeking bankruptcy protection. Debtors' alternative request to "extend" the stay fares no better. Section 362 does not authorize the Court to simply expand the automatic stay to encompass a non-debtor and its property. The relief Debtors seek is injunctive relief under § 105, and Debtors must satisfy the applicable procedural and substantive requirements for that extraordinary relief. They have done neither. They have not established unusual circumstances, an identity of interests sufficient to treat Multi-Use and the Debtors as one, or the requirements necessary for preliminary injunctive relief. West Shore did not violate the automatic stay because the foreclosure concerns property owned by a non-debtor, not property of the estate. And Debtors cannot convert an alleged stay violation into a backdoor request for extraordinary injunctive relief against West Shore while disregarding the separate corporate form on which their own organizational structure depends. The Motion should be denied.

## BACKGROUND

### A. West Shore Bank's Loan to Non-Debtor Entity and Non-Estate Property

1. Non-Debtor, Adelaide Pointe Multi-Use, LLC ("Multi-Use"), owns the Multi-Use Property located at 500 Adelaide Circle, parcel no. 61-24-025-100-0001-40 (the "Multi-Use Property "), in the Adelaide Point development.

2. On February 28, 2024, Multi-Use executed and delivered to West Shore a promissory note in the original principal amount of $6,575,000.00 (the "2024 Note"), which was secured by a Construction Mortgage also dated February 28, 2024 and recorded February 29, 2024

at Liber 4349, Page 447 in the Muskegon County Register of Deeds (the "2024 Mortgage"), granting West Shore a priority mortgage in the Multi-Use Property (then known as 1204 W Western Avenue, Muskegon, Michigan 49441). To further secure the 2024 Note, Multi-Use executed and delivered to West Shore an Assignment of Rents dated February 28, 2024, and recorded on February 29, 2024, at Liber 4349, Page 448 in the Muskegon County Register of Deeds (the "2024 AOR"). Although the Note is guaranteed by QOZB, as well as Harbor West QOZB, LLC, West Shore did not lend any funds to QOZB. The relevant 2024 loan documents are attached as **Composite Exhibit 1.**

3. To further secure the indebtedness due to West Shore under the Notes, Multi-Use executed a Commercial Security Agreement dated February 28, 2024, granting West Shore a security interest in the following property:

> All inventory, chattel paper, accounts, equipment, general intangibles, and all titled vehicles and property on which [West Shore] has placed a lien on title, whether any of the foregoing is now owned or acquired later; all accessions, addition, replacements, and substitutions relating to any of the foregoing; all records of any kind relation to the foregoing; all proceeds relating to any of the foregoing (including insurance, general intangibles and other account proceeds).

(the "Collateral"). (*See* Ex. 1.)

4. On April 17, 2025, Multi-Use executed and delivered to West Shore a promissory note (the "2025 Note," and collectively with the 2024 Note, the "Notes") in the original principal amount of $500,000.00, which was secured by a Construction Mortgage (the "2025 Mortgage," and collectively with the 2024 Mortgage, the "Mortgages") also dated April 17, 2025, granting West Shore a mortgage in the Multi-Use Property. Multi-Use also executed another Assignment of Rents and another Commercial Security Agreement. The 2025 loan documents are attached as **Composite Exhibit 2.**

5. Multi-Use constructed a four-story building on the Multi-Use Property that now houses a restaurant, event center, and other retail space.

**B. West Shore's Foreclosure of Non-Debtor Property and Sanctions Motion**

6. On March 3, 2026, pursuant to the terms of the AOR and in accordance with Michigan law, West Shore recorded a Statutory Notice of Default with the Muskegon County Register of Deeds at Liber 4409, Page 582, directing Multi-Use to pay over its rents to West Shore. The Notice of Default was served on tenants of the Multi-Use Property on March 4, 2026.

7. To be clear, none of the tenants in the Multi-Use Property are Debtors. To date, Muskegon Brewing Company Operations, LLC and Adelaide Pointe Events LLC have failed to adhere to the default notice and have paid no rents to West Shore Bank. Not surprisingly, these entities are managed by Emily Leestma, Ryan Leestma's wife.

8. Since that date, West Shore is has exercised its rights under its mortgages to foreclose by advertisement on the Multi-Use Property under Michigan state law (see MCL 600.3201, *et. seq.*). The foreclosure does not implicate any of the Debtors nor the Debtors' property. The foreclosure sale is scheduled for September 18, 2026.

9. On August 20, 2026, the Debtors, Leestma Management, LLC, Adelaide Pointe QOZB, LLC, Adelaide Pointe Boaters Services, LLC, Adelaide Pointe Building 1, LLC, and Waterland Battle Creek, LLC (collectively, the Debtors), filed the instant Sanctions Motion. In the Sanctions Motion, the Debtors concede on its face that the Multi-Use Property is owned by Adelaide Pointe Multi-Use, LLC. (Doc. No. 261, p. 1.) According to Debtors' Motion, Multi-

Use is a subsidiary of Debtors Adelaide Pointe QOZB, LLC (99%) and Leestma Management, LLC (1%).[2]

10. Despite Debtors' knowledge that the Multi-Use Property is not owned by any debtor, they nevertheless request this Court impose sanctions against West Shore for invoking its state court rights as to non-debtor property. Debtors even go so far to say that the Multi-Use Property is property of the Debtors' estate fully knowing it is not titled in any Debtors' name. Presumably, their entire argument hinges upon the parent-subsidiary relationship.

11. Worse still, Debtors' position here also conflicts with the position taken by at least two Debtors in the Michigan Case. More specifically, at least two of the Debtors (Adelaide Pointe QOZB LLC and Leestma Management LLC) are defendants in the Kent County, Michigan Circuit Court Case No. 25-20760-BB (the "Michigan Case"), which is a receivership action. When the receiver in the Michigan Case attempted to expand the receivership to cover the Multi-Use Property, Debtors objected on the grounds that Multi-Use is a distinct legal entity and the Multi-Use Property is not property of the receivership debtors. A true and correct copy of the Objection is attached as **Exhibit 3.**

12. The Multi-Use Property was vested in Multi-Use by that certain Quit Claim Deed dated July 12, 2023, and recorded on July 13, 2023, at Liber 43334, Page 25 in the Muskegon County Register of Deeds (the "Deed"). A true copy of the Deed is attached as **Exhibit 4.**

---

[2] This may or may not be accurate. According to the Certification of Beneficial Owners that Multi-Use signed on April 17, 2025, Ryan Leestma individually owned 78% of Multi-Use. Further, according to the Limited Liability Company Resolution to Borrower/Grant Collateral dated February 28, 2024, Adelaide Pointe QOZB LLC is the sole member of Adelaide Pointe Multi-Use LLC.

## ARGUMENT

### I. WEST SHORE DID NOT VIOLATE THE AUTOMATIC STAY BECAUSE THE MULTI-USE PROPERTY IS NOT PROPERTY OF THE ESTATE

The Multi-Use Property is not property of the estate and West Shore did not violate the automatic stay. Section 362(a)(3) operates as a stay against "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3). In turn, Section 541 defines "property of the estate" to include "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541. Courts have repeatedly held that assets owned by a debtor's subsidiary are not "property of the estate" within the meaning of 11 U.S.C. § 362. *See, e.g., Kreisler v. Goldberg*, 478 F.3d 209, 214 (4th Cir. 2007) ("The fact that a parent corporation has an ownership interest in a subsidiary, however, does not give the parent any direct interest in the assets of the subsidiary."); *Nat'l Elec. Benefit Fund v. 3W Elec. LLC*, No. CV PWG-16-1580, 2017 WL 1079954, at *3 (D. Md. Mar. 20, 2017) ("Although [debtor]'s ownership interest in the LLC may be part of the bankruptcy estate, the property interests of the LLC remain its own and are not protected by [debtor]'s automatic stay."); *In re Penn,* 2010 WL 9445533, *2 (Bankr. N.D. Ga. Apr. 2, 2010) (automatic stay does not apply to the foreclosure sale where the company owned the real property and the individual debtor's ownership interest did not give him any direct ownership interest in the real property); *In re Commercial Mortg. and Finance Co.*, 414 B.R. 389 (Bankr.N.D.Ill.2009) ("[P]roperty of the estate includes the debtor's stock in a subsidiary, but not the assets of the subsidiary."); *In re Murray,* 147 B.R. 688 (Bankr. E.D.Va.1992) ("the debtor has no present interest in property owned by the various corporate entities."). To the extent Multi-Use desires bankruptcy protection, it is required to file its own bankruptcy petition. *See Kreisler,* 478 F.3d at 213-14 (an

entity that is established to hold property is a separate legal entity is required to file its own bankruptcy petition).

For instance, in *Kreisler v. Goldberg*, 478 F.3d 209 (4th Cir. 2007), the debtor's wholly owned subsidiary was a party to a ground lease (its only asset). *Id.* at 211–12. When the subsidiary's lessor filed an ejectment action, the debtor asked the bankruptcy court to find a violation of the automatic stay. *Id.* at 212. Both the bankruptcy court and the district court found that the ejectment action did not violate the automatic stay because the subsidiary's assets are not estate property. *Id.* The Fourth Circuit affirmed, rejecting arguments strikingly similar to those made here by Debtors.

Like the debtor in *Kreisler*, Adelaide Pointe QOZB could have elected to hold the real property directly, but it did not. "Having assumed whatever benefits flow from that decision, it cannot ignore the existence of the LLC in order to escape its disadvantages." *Id.* at 214. Accordingly, West Shore did not violate the automatic stay because the Multi-Use Property is not property of the estate. Finally, even if the Court were to find that the Multi-Use Property is part of the estate, the mountain of case law cited above and weighing in the other direction creates a "fair ground of doubt" that must be absent to impose civil contempt sanctions. *See generally Taggart v. Lorenzen*, 587 U.S. 554 (2019). The Sanctions Motion must be denied.

## II. THE DEBTORS CANNOT OBTAIN AN EXTENSION OF THE AUTOMATIC STAY TO MULTI-USE UNDER § 362

The plain language of Bankruptcy Code § 362(a) does not provide authority to extend the automatic stay to non-debtors. Courts that have addressed the specific issue of what provision of the Bankruptcy Code provides a Bankruptcy Court with any requisite authority to enjoin a third-party action have rejected the proposition that a bankruptcy court can just "extend" the automatic stay under §362(a).

As was succinctly articulated in *In re Hillsborough Holdings Corp.*:

> This Court is not unmindful of a view of some that under appropriate circumstances it is proper to "extend the automatic stay" to protect the non-debtors against discovery proceedings in actions brought against officers, directors and former employees of the debtor. However, this Court is constrained to reject the proposition stated and the notion that the protection afforded by § 362 could be extended to non-debtors. There is nothing in the language of this Section or in the legislative history of this Section which warrants such a conclusion.

*In re Hillsborough Holdings Corp.*, 130 B.R. 603, 606 (Bankr. M.D. Fla. 1991) (internal citation omitted). Thus, the only authority upon which a bankruptcy court could provide a debtor any type of relief like that sought by the Debtors here is through the Court's powers under 11 U.S.C. § 105 and the imposition of a preliminary injunction. *Id.*; *see also Patton v. Bearden,* 8 F.3d 343, 349 (6th Cir. 1993) (noting that although referred to as "extensions of the automatic stay" in *A.H. Robins* and *Kanawha*, the so-called extensions based on "unusual circumstances" were in fact injunctions that would need to be imposed by the bankruptcy court under §105); *Fratelli Cosulich Unipessoal, S.A. v. Specialty Fuels Bunkering, LLC*, 2014 WL 2611547, *7 (S.D. Ala. June 11, 2014 ) (holding that only basis for relief sought by debtor was through proving entitlement to injunctive relief under § 105); *Pride Family Brands, Inc. v. Carls Patio, Inc.*, 2013 WL 4647216, * n. 10 (S.D. Fla. Aug. 29, 2013) (noting that the defendant had only requested relief under §362 of the Bankruptcy Code and "courts have opined that a § 105 extension order must be obtained" through affirmative relief in the bankruptcy court."). To be sure, pursuant to Bankruptcy Code §105(a), a bankruptcy court "may issue any order . . . that is necessary or appropriate to carry out the provisions of this title." It is axiomatic that § 105 is not a basis for a court to enter Orders that are inconsistent with the Bankruptcy Code, and "it is clear it is not an independent source of power but merely a power granted to enforce other provisions of the Code." *In re Regency Realty Associates,* 179 B.R. 717, 719 (Bankr. M.D. Fla. 1995). Because § 362 does not itself extend to

Multi-Use or its property, Debtors' request must stand or fall as a request for injunctive relief under § 105. It fails under either the unusual-circumstances doctrine or the traditional requirements for preliminary injunctive relief.

## III. DEBTORS HAVE NOT ESTABLISHED ENTITLEMENT TO INJUNCTIVE RELIEF UNDER § 105

### A. The Debtors Did Not Properly Seek Injunctive Relief

Even though § 105(a) gives the bankruptcy courts broad power to issue any order that is "necessary or appropriate" to the reorganization effort, "this broad authority does not allow the bankruptcy court to apply a less stringent standard for granting injunctive relief for the benefit of non-debtor defendants than is traditionally required for the issuance of any injunction." *In re Bora Bora, Inc.* (Bankr. D.P.R. 2010) (citing *Matter of Supermercado Gamboa, Inc.* (Bankr. D.P.R. 1986)). Thus, a request for injunctive relief is ordinarily brought by adversary proceeding. Fed. R. Bankr. P. 7001(7); *see e.g.*, *In re Nat. Century Fin. Enterprises, Inc.*, 423 F.3d 567, 579 (6th Cir. 2005) (stating that a debtor initiates an adversary proceeding in order to request a § 105(a) preliminary injunction); *In re Swallen's Inc.,* 205 B.R. 879, 880 (Bankr. S.D. Ohio 1997) (injunctive relief was denied for failure to request it through adversary proceeding); *In re Nasco P.R., Inc.,* 117 B.R. 35, 38 (Bankr. D.P.R. 1990) ("A party wishing to invoke the Court's injunctive power under Section 105(a) must file an adversary proceeding ... and must follow the traditional standards for the issuance of an injunction."). Here, the Sanctions Motion seeks to enjoin West Shore from taking any action to enforce its state law rights, which should properly be initiated by an adversary proceeding. For this reason alone, the request should be denied.

### B. Debtors Have Not Established "Unusual Circumstances" Warranting Injunctive Relief for Multi-Use

Even if the Court were to overlook Debtors' failure to seek this relief through the proper procedural vehicle, Debtors still cannot establish entitlement to an injunction. They have not demonstrated the unusual circumstances necessary to justify extending bankruptcy protection to a non-debtor, nor have they satisfied the traditional requirements for preliminary injunctive relief. Thus, Debtors' request to enjoin West Shore from exercising its rights should be denied.

Debtors argue that "unusual circumstances" warrant a stay extension. Indeed, courts have extended the automatic stay to non-debtor third parties in rare unusual circumstances. "Unusual circumstances" include those cases where (i) the nondebtor and debtor enjoy such an identity of interest that the suit against the nondebtor is essentially a suit against the debtor, and (ii) when the third-party action will have an adverse impact on the debtor's ability to accomplish reorganization. *In re Melbourne Beach, LLC*, No. 6:17-BK-07975-KSJ, 2019 WL 10734362, at *2 (Bankr. M.D. Fla. Oct. 9, 2019) (citing *Lanard Toys Ltd. v. Toys "R" US-Delaware, Inc.*, Case No. 3:15-cv-849-J-34PDB, 2017 WL 5256870, *4 (M.D. Fla. Nov. 13, 2017)). In contrast, where a non-debtor co-defendant is allegedly liable upon its own breach of duty, then the automatic stay protection afforded to a debtor is not extended to a non-debtor co-defendant. *Brent v. Source Interlink Distribution, LLC*, No. 2:14-CV-52-FTM-38DNF, 2014 WL 4162770, at *1 (M.D. Fla. Aug. 21, 2014) (citing *In re Metal Ctr., Inc.*, 31 B.R. 458, 462 (Bankr. D. Conn. 1983)). But "where the proposed action involves only third parties and no estate property, and where an 'unusual-circumstances' 'exception' would be needed to justify extension of the automatic stay, § 105 is the more appropriate source of authority for assessing the propriety of a stay." *In re Panther Mountain*

*Land Dev., LLC*, 686 F.3d 916, 926 (8th Cir. 2012). Thus, the typical rules governing injunctions should apply to such a request. *Id.* at 927; *Patton v. Bearden*, 8 F.3d 343, 349 (6th Cir. 1993).

The unusual circumstances exception, the *Kreisler* Court explained, is applicable only where "there is such identity between the debtor and the third-party defendant that the debtor may be said to be the real party defendant and that a judgment against the third-party defendant will in effect be a judgment or finding against the debtor." *Kreisler*, 478 F.3d at 213 (quoting *A.H. Robins Co., Inc. v. Piccinin*, 788 F.2d 994, 999 (4th Cir.1986)). An example offered by *Kreisler* is where a third-party is entitled to absolute indemnity by a debtor. *Id.*

The *Kreisler* debtors argued for the unusual circumstances exception too. The Fourth Circuit flatly rejected the exception's applicability, explaining that "[i]t is a fundamental precept of corporate law that each corporation is a separate legal entity with its own debts and assets, even when such corporation is wholly owned by another corporate entity." *Id.* And as a result, no judgment against the subsidiary posed an obligation or liability on the parent. *Id.* The Court also found significant that the subsidiary was formed for a distinct purpose—to hold title to real estate—rather than existing to do the parent company's "act and bidding." *Id.*

Here too, Multi-Use is a distinct legal entity formed under state law to serve a particular purpose, namely to hold title to the Multi-Use Property. The foreclosure does not impose a liability or obligation on any of the Debtors. Accordingly, these are not unusual circumstances, and there is no basis to extend bankruptcy protection to Multi-Use. Debtors fail to make a robust argument in support of the "unusual circumstances" exception but cite to *In re Neuman*, 128 B.R. 333 (S.D.N.Y. 1991) for support. *Neuman* is unavailing. In *Neuman*, the state court action named the debtor individually. *Id.* at 337. Furthermore, the relief sought in the state court action would have

"necessarily affect[ed] [a] settlement agreement approved by the Bankruptcy Court." *Id.* Here, neither is true and the Sanctions Motion should be denied.

**C. Foreclosure Does Not Deprive Debtors of an Interest in Property**

Like Debtors here, the debtors in *Kreisler* argued that the automatic stay applied because the subsidiary's loss of property would cause the parent's interest in the subsidiary to lose value. *Kreisler*, 478 F.3d. at 214. *Kreisler* rejected that argument too. It distinguished between an asset losing value (allowed) versus a debtor being deprived of an interest in property (disallowed). *Id.* at 214-15. A diminution in value without a change in the nature and extent of the interest does not amount to a violation of the stay. *Id.* Both before and after the foreclosure, the nature and extent of any membership interest held by a Debtor in Multi-Use remains unchanged.

Moreover, Debtors cite to *In re Bialac*, 712 F.2d 426 (9th Cir. 1983) to argue that foreclosing on a non-debtor's property can deprive a debtor of an interest in property. But *Bialac* is inapposite. There, the debtor had a pre-foreclosure right to redemption in the property at issue—a distinct property right that the debtor was otherwise deprived of. *See id.* at 427-28. In this case, Debtors have no similar pre-petition right in or to the Multi-Use Property. Further, to the extent a parent company retains the right of redemption (which it does not)—that right will remain both before and after the foreclosure.

**D. Debtors Have Not Satisfied the Requirements for a Preliminary Injunction**

Likewise, Debtors have failed to carry their burden to establish entitlement to injunctive relief. To do that, Debtors must show: "(1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Four Seasons Hotels And*

*Resorts, B.V. v. Consorcio Barr, S.A.*, 320 F.3d 1205, 1210 (11th Cir. 2003). Debtors made no arguments relating to any of the required elements. Accordingly, they fail to establish entitlement to a preliminary injunction under Section 105.

First, Debtors cannot establish a likelihood of success because the Multi-Use Property is not property of the estate, the automatic stay does not apply to West Shore's foreclosure, and the record does not establish unusual circumstances warranting injunctive relief.

Second, Debtors cannot establish irreparable injury because the foreclosure concerns property owned by Multi-Use. Any argument that the foreclosure may diminish the value of a Debtor's ownership interest does not establish that a Debtor is being deprived of property, particularly in light of the existing *Kreisler* analysis.

Third, the balance of harms does not favor an injunction. West Shore is seeking to enforce its bargained-for rights against property securing the debt of Multi-Use. Enjoining that foreclosure would restrain West Shore from exercising those rights while Debtors have not established that the property is estate property or that the foreclosure is otherwise subject to the automatic stay.

Fourth, Debtors have made no showing that an injunction would not be adverse to the public interest. Their request instead asks the Court to disregard the separate legal existence of a non-debtor and expand bankruptcy protection beyond its statutory reach.

As a result, the Debtors have failed to establish any of the factors to warrant an injunction and this relief should be denied.

## **CONCLUSION**

The automatic stay protects Debtors and property of the estate. Debtors' Motion asks this Court to disregard that settled statutory limit and extend bankruptcy protection to property owned by a separate, non-debtor entity. Section 362 does not reach that property, and West Shore therefore

did not violate the automatic stay by exercising its rights against it. Nor have Debtors established any procedural or substantive basis for the extraordinary injunctive relief they seek under § 105. If Multi-Use seeks the protections afforded by the Bankruptcy Code, it must seek those protections through its own bankruptcy case. Accordingly, the Court should deny the Sanctions Motion in its entirety.

**WHEREFORE,** West Shore respectfully requests that the Court (i) deny the Sanctions Motion in its entirety, (ii) deny Debtors' request for civil contempt sanctions and any extension or injunctive relief as to Adelaide Pointe Multi-Use, LLC or the Multi-Use Property, and (iii) grant West Shore such other and further relief as the Court deems just and proper.

*/s/ Dana L. Robbins-Boehner*
Dana L. Robbins-Boehner, Esq.
Florida Bar No. 106626
Email: drobbins@burr.com
BURR & FORMAN LLP
201 N. Franklin St., Suite 3200
Tampa, Florida 33602
Phone: (813) 221-2626
Fax: (813) 221-7335

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on August 26, 2026, I electronically filed the foregoing with the Clerk of Court by using the Case Management/Electronic Case Filing ("CM/ECF") system which will send notice of electronic filing to all parties indicated on the electronic filing receipt.

*/s/ Dana L. Robbins-Boehner*
Dana L. Robbins-Boehner

# Composite Exhibit 1

# PROMISSORY NOTE

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $6,575,000.00 | 02-28-2024 | 07-20-2049 | [redacted]4490 | 1A2 / 84 | [redacted] | RMF | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item. Any item above containing "***" has been omitted due to text length limitations.

**Borrower:** ADELAIDE POINTE MULTI-USE, LLC
1204 W WESTERN AVE
MUSKEGON, MI 49441-1674

**Lender:** West Shore Bank
Main Office
201 W Loomis St
PO Box 627
Ludington, MI 49431
(231) 845-3500

**Principal Amount: $6,575,000.00** **Date of Note: February 28, 2024**

**PROMISE TO PAY. ADELAIDE POINTE MULTI-USE, LLC ("Borrower") promises to pay to West Shore Bank ("Lender"), or order, in lawful money of the United States of America, the principal amount of Six Million Five Hundred Seventy-five Thousand & 00/100 Dollars ($6,575,000.00), together with interest on the unpaid principal balance from February 28, 2024, until paid in full.**

**PAYMENT. Subject to any payment changes resulting from changes in the Index, Borrower will pay this loan in accordance with the following payment schedule:**

**5 MONTHS OF INTEREST PAYMENTS- INTEREST RATE BASED ON NATIONAL PRIME:**
Borrower will pay 5 regular monthly payments of all accrued unpaid interest due as of each payment date, beginning March 20, 2024, with all subsequent interest payments to be due on the same day of each month after that.
**VARIABLE INTEREST RATE.** The interest rate on this Note is subject to change from time to time based on changes in an independent index which is the National Prime as published in the Wall Street Journal (the "Index"). The Index is not necessarily the lowest rate charged by Lender on its loans. Lender will tell Borrower the current Index rate upon Borrower's request. The interest rate change will not occur more often than each day. Borrower understands that Lender may make loans based on other rates as well. **The Index currently is 8.500% per annum.** Interest on the unpaid principal balance of this Note will be calculated as described in the "INTEREST CALCULATION METHOD" paragraph using a rate of equal to the Index, adjusted if necessary for any minimum and maximum rate limitations described below, resulting in an initial rate of 8.500% per annum based on a year of 360 days. If Lender determines, in its sole discretion, that the Index has become unavailable or unreliable, either temporarily, indefinitely, or permanently, during the term of this Note, Lender may amend this Note by designating a substantially similar substitute index. Lender may also amend and adjust the Margin to accompany the substitute index. The change to the Margin may be a positive or negative value, or zero. In making these amendments, Lender may take into consideration any then-prevailing market condition for selecting a substitute index and margin for specific Index that is unavailable or unreliable. Such an amendment to the terms of this Note will become effective and bind Borrower 10 business days after Lender gives written notice to Borrower without any action or consent of the Borrower.

Borrower acknowledges that the interest rate will be adjusted quarterly; such repricing will be based on the National Prime Rate (the Index); the first rate change shall be effective as of 7/20/2024 and will be adjusted quarterly thereafter.

**Lender will review and adjust the payment amount at least annually as needed to amortize Principal over the remaining term of the Note.**

**Beginning with the the quarterly payment due 10/20/2025- INTEREST RATE BASED ON 3-MONTH SOFR effective as of 07/20/2024:**
Principal installments, together with payment of all accrued but unpaid interest, shall be made by Borrower, without notice, on the dates and in the amounts set forth in Exhibit A hereto. The entire principal balance, together with all accrued and unpaid interest thereon, shall be due and payable in full on 07/20/2049 (the "Maturity Date"). All payments of principal and interest shall be made in lawful currency of the United States of America which shall be legal tender in payment of all debts, public and private, at the time of payment.

Unless otherwise agreed or required by applicable law, payments will be applied first to any accrued unpaid interest; then to principal; and then to any late charges. **Borrower will pay Lender at Lender's address shown above or at such other place as Lender may designate in writing.**

**LINE OF CREDIT.** This Note evidences a straight line of credit. Advances under this Note, as well as directions for payment from Borrower's accounts, may be requested orally or in writing by Borrower or by an authorized person. Lender may, but need not, require that all oral requests be confirmed in writing. Borrower agrees to be liable for all sums either: (A) advanced in accordance with the instructions of an authorized person or (B) credited to any of Borrower's accounts with Lender. The unpaid principal balance owing on this Note at any time may be evidenced by endorsements on this Note or by Lender's internal records, including daily computer print-outs.

**VARIABLE INTEREST RATE.** The interest rate on this Note is subject to change from time to time based on changes in an independent index which is the Three (3) Month Secured Overnight Financing Rate (SOFR) as published by the CME Group Benchmark Administration. The Index is a broad measure of the three month cost of borrowing cash collateralized by Treasury securities. The Index is currently published by the CME Group Benchmark Administration (the "3M SOFR Administrator") on its website each business day. (the "Index"). The Index is not necessarily the lowest rate charged by Lender on its loans. Lender will tell Borrower the current Index rate upon Borrower's request. The interest rate change will not occur more often than each three months. Borrower understands that Lender may make loans based on other rates as well. **The Index currently is 5.338% per annum.** Interest on the unpaid principal balance of this Note will be calculated as described in the "INTEREST CALCULATION METHOD" paragraph using a rate of 2.500 percentage points over the Index (the "Margin"), resulting in an initial rate of 7.838% per annum based on a year of 360 days. If Lender determines, in its sole discretion, that the Index has become unavailable or unreliable, either temporarily, indefinitely, or permanently, during the term of this Note, Lender may amend this Note by designating a substantially similar substitute index. Lender may also amend and adjust the Margin to accompany the substitute index. The change to the Margin may be a positive or negative value, or zero. In making these amendments, Lender may take into consideration any then-prevailing market convention for selecting a substitute index and margin for the specific Index that is unavailable or unreliable. Such an amendment to the terms of this Note will become effective and bind Borrower 10 business days after Lender gives written notice to Borrower without any action or consent of the Borrower. NOTICE: Under no circumstances will the interest rate on this Note be more than the maximum rate allowed by applicable law. Whenever increases occur in the interest rate, Lender, at its option, may do one or more of the following: (A) increase Borrower's payments to ensure Borrower's loan will pay off by its original final maturity date, (B) increase Borrower's payments to cover accruing interest, (C) increase the number of Borrower's payments, and (D) continue Borrower's payments at the same amount and increase Borrower's final payment.

**INTEREST CALCULATION METHOD. Interest on this Note is computed on a 365/360 basis; that is, by applying the ratio of the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding (but not including February 29 in leap years). All interest payable under this Note is computed using this method.**

**PREPAYMENT FEE.** Borrower agrees that all loan fees and other prepaid finance charges are earned fully as of the date of the loan and will not be subject to refund upon early payment (whether voluntary or as a result of default), except as otherwise required by law. **Upon prepayment of this Note, Lender is entitled to the following prepayment fee:**

**10% Prepayment Penalty will be assessed if prepaid after 18 months interest period (08/20/2025), but within 08/20/2026;**

**5% Prepayment Penalty will be assessed if prepaid after 08/20/2026, but within 08/20/2027;**

**3% Prepayment Penalty will be assessed if prepaid after 08/20/2027, but within 08/20/2028;**

**1% Prepayment Penalty will be assessed if prepaid after 08/20/2027, but within 08/20/2029; . Except for the foregoing, Borrower may pay all or a portion of the amount owed earlier than it is due.** Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments under the payment schedule. Rather, early payments will reduce the principal balance due and may result in Borrower's making fewer payments. Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Note, and Borrower will remain obligated to pay any further amount owed to Lender. **All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: West Shore Bank, 201 W. Loomis Street, PO Box 627 Ludington, MI 49431-0627.**

**HEDGE.** All swap agreements or hedge transactions, if any, between Borrower and Lender or its affiliates are independent agreements and governed by the written provision of said swap agreements, which will remain in full force and effect, unaffected by any repayments, prepayments, acceleration, reduction, increase or change in the terms of the note, except as otherwise expressly provided in said written swap agreements or hedge agreements, and any payoff statement from Lender relating to the note shall not apply to said swap or hedge agreements, except as otherwise expressly provided in such payoff statement. Any penalty fees, or expenditures resulting from said swap or hedge agreement even if incurred by or paid by the Lender on behalf of the Borrower shall be the responsibility of the Borrower and included in the indebtedness of this note and related documentation. **Except for the foregoing, Borrower may pay all or a portion of the amount owed earlier than it is due.** Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments under the payment schedule. Rather, early payments will reduce the principal balance due and may result in Borrower's making fewer payments. Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language. If Borrower sends such a payments, Lender may accept it without losing any of Lender's rights under the Note, and Borrower will remain obligated to pay any further amount owed to Lender. **All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: West Shore Bank, 201 W. Loomis Street, PO Box 627 Ludington, MI 49431-0627.**

**LATE CHARGE.** If a payment is 7 days or more late, Borrower will be charged **5.000% of the unpaid portion of the regularly scheduled payment.**

**INTEREST AFTER DEFAULT.** Upon default, including failure to pay upon final maturity, the interest rate on this Note shall be increased by adding an additional 3.000 percentage point margin ("Default Rate Margin"). The Default Rate Margin shall also apply to each succeeding interest rate change that would have applied had there been no default. However, in no event will the interest rate exceed the maximum interest rate limitations under applicable law.

**DEFAULT.** Each of the following shall constitute an event of default ("Event of Default") under this Note:

**Payment Default.** Borrower fails to make any payment when due under this Note.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note or in any of the related documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Default in Favor of Third Parties.** Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's property or Borrower's ability to repay this Note or perform Borrower's obligations under this Note or any of the related documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Note or the related documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Death or Insolvency.** The dissolution of Borrower (regardless of whether election to continue is made), any member withdraws from Borrower, or any other termination of Borrower's existence as a going business or the death of any member, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any guaranty of the indebtedness evidenced by this Note.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of this Note is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**LENDER'S RIGHTS.** Upon default, Lender may declare the entire unpaid principal balance under this Note and all accrued unpaid interest immediately due, and then Borrower will pay that amount.

**ATTORNEYS' FEES; EXPENSES.** Lender may hire or pay someone else to help collect this Note if Borrower does not pay. Borrower will pay Lender that amount. This includes, subject to any limits under applicable law, Lender's reasonable attorneys' fees and Lender's legal expenses whether or not there is a lawsuit, including reasonable attorneys' fees and expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. If not prohibited by applicable law, Borrower also will pay any court costs, in addition to all other sums provided by law.

**JURY WAIVER. Lender and Borrower hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by either Lender or Borrower against the other.**

**GOVERNING LAW. This Note will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Michigan without regard to its conflicts of law provisions. This Note has been accepted by Lender in the State of Michigan.**

**CHOICE OF VENUE.** If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of Mason County, State of Michigan.

**DISHONORED ITEM FEE.** Borrower will pay a fee to Lender of $25.00 if Borrower makes a payment on Borrower's loan and the check or preauthorized charge with which Borrower pays is later dishonored.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the indebtedness against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

**COLLATERAL.** Borrower acknowledges this Note is secured by

REAL ESTATE MORTGAGE AND ASSIGNMENT OF RENTS DATED 02/28/2024 on Property Located at 1204 W Western Avenue (Multi-use Parcel), Muskegon, MI 49441

SECURITY AGREEMENT DATED 02/28/2024 Covering All Inventory, Chattel Paper, Accounts, Machinery, Equipment, General Intangibles, Furnishings, Fixtures, and all titled vehicles and property on which the Lender has placed a lien on title; whether any of the foregoing is owned now or acquired later; all accessions, additions, replacements, and substitutions relating to any of the foregoing; all records of any kind relating to any of the foregoing; all proceeds relating to any of the foregoing (including insurance, general intangibles and other accounts proceeds)

GUARANTY OF ADELAIDE POINTE QOZB LLC DATED 02/28/2024

GUARANTY OF ADELAIDE POINTE QOF LLC DATED 02/28/2024

GUARANTY OF HARBOR WEST QOZB MULTI-USE, LLC DATED 02/28/2024

GUARANTY OF HARBOR WEST QOZB LLC DATED 02/28/2024

GUARANTY OF HARBOR WEST QOF LLC DATED 02/28/2024

GUARANTY OF IBEX HOSPITALITY GROUP, LLC DATED 02/28/2024 SECURED BY SECURITY AGREEMENT DATED 02/28/2024 Covering All Inventory, Chattel Paper, Accounts, Equipment, General Intangibles, and all titled vehicles and property on which the Lender has placed a lien on title; whether any of the foregoing is owned now or acquired later; all accessions, additions, replacements, and substitutions relating to any of the foregoing; all records of any kind relating to any of the foregoing; all proceeds relating to any of the foregoing (including insurance, general intangibles and other accounts proceeds)

GUARANTY OF MUSKEGON BREWING COMPANY OPERATIONS, LLC DATED 02/28/2024 SECURED BY SECURITY AGREEMENT DATED 02/28/2024 Covering All Inventory, Chattel Paper, Accounts, Equipment, Liquor License (excluding All Alcoholic Inventory), General Intangibles, and all titled vehicles and property on which the Lender has placed a lien on title; whether any of the foregoing is owned now or acquired later; all accessions, additions, replacements, and substitutions relating to any of the foregoing; all records of any kind relating to any of the foregoing; all proceeds relating to any of the foregoing (including insurance, general intangibles and other accounts proceeds)
AND
Liquor License
Borrower is granting Lender a security interest in the following type (or items) or property; All general intangibles now owned or later acquired by Borrower, including, without limitation, all liquor licenses that are now issued, subsequently acquired, or renewed at a later date, and specifically Liquor License Number L-000435941 & L-000435942 and all renewals, replacements, extensions and modifications thereof, and permits associated therewith.
Upon default and foreclosure of any security interest granted Lender in any liquor license that is now issued, subsequently acquired, or renewed at a later dated and specifically Liquor License Number L-000435941 & L-000435942 and all renewals, replacements, extensions and modifications thereof, and permits associated therewith. Borrower agrees that it will not interfere or otherwise impede the transfer of any liquor license to the Lender, and further, Borrower agrees that it will fully cooperate with the Lender, the Michigan Liquor Control Commission or its successor or agency, and any other regulatory authority to facilitate the transfer of the liquor license to Lender. Borrower's failure to cooperate shall entitle Lender to damages and actual attorney fees; whether any of the foregoing it owned now or acquired later; all accessions, additions, replacements, and substitutions relating to any of the foregoing; all records of any kind relating to any of the foregoing all proceeds relating to any of the foregoing (including insurance, general intangibles and accounts proceeds); whether any of the foregoing is owned now or acquired later; all accessions, additions, replacements, and substitutions relating to any of the foregoing; all records of any kind relating to any of the foregoing; all proceeds relating to any of the foregoing (including insurance general intangibles and accounts proceeds).

GUARANTY OF ADELAIDE EVENTS LLC DATED 02/28/2024 SECURED BY SECURITY AGREEMENT DATED 02/28/2024 Covering All Inventory, Chattel Paper, Accounts, Equipment, General Intangibles, and all titled vehicles and property on which the Lender has placed a lien on title; whether any of the foregoing is owned now or acquired later; all accessions, additions, replacements, and substitutions relating to any of the foregoing; all records of any kind relating to any of the foregoing; all proceeds relating to any of the foregoing (including insurance, general intangibles and other accounts proceeds)

GUARANTY OF LEESTMA MANAGEMENT, LLC DATED 02/28/2024 SECURED BY SECURITY AGREEMENT DATED 02/28/2024 Covering All Inventory, Chattel Paper, Accounts, Equipment, General Intangibles, and all titled vehicles and property on which the Lender has placed a lien on title; whether any of the foregoing is owned now or acquired later; all accessions, additions, replacements, and substitutions relating to any of the foregoing; all records of any kind relating to any of the foregoing; all proceeds relating to any of the foregoing (including insurance, general intangibles and other accounts proceeds)

GUARANTY OF RYAN M LEESTMA DATED 02/28/2024

GUARANTY OF EMILY S LEESTMA DATED 02/28/2024

**CONDITIONS FOR FUTURE ADVANCES.** The conditions for future advances are officer approval for each advance. Advances will be deposited into account number specified or issuance of a Cashier's Check.

**AGREEMENT TO PROVIDE FINANCIAL STATEMENTS.** In the event of default for which Lender does not accelerate the loan, including the failure of Borrower to provide the financial statements as required hereunder of under the loan agreement, the applicable interest rate on the loan, for a period beginning three (3) days after written notice of such default and ending upon the curing of said noticed default, shall increase one quarter of one percent (.25%) for the first thirty (30) days of said default and increase an additional one quarter of one percent (.25%) during each thirty days (30) day period thereafter during which notice default continues. However, in no event will the interest rate exceed the maximum interest rate limitations under applicable law.

Such default interest rates shall apply to the outstanding principal balance as of the loan. Upon the curing of the noticed default, the interest rate on the loan shall revert to the initially agreed-upon interest rate effective on the date on which the default is cured.

This default provision will become effective if Lender is not in receipt of year-end financial statements within one-hundred-twenty (120) days after fiscal year end.

**SUCCESSOR INTERESTS.** The terms of this Note shall be binding upon Borrower, and upon Borrower's heirs, personal representatives, successors and assigns, and shall inure to the benefit of Lender and its successors and assigns.

**NOTIFY US OF INACCURATE INFORMATION WE REPORT TO CONSUMER REPORTING AGENCIES.** Borrower may notify Lender if Lender reports any inaccurate information about Borrower's account(s) to a consumer reporting agency. Borrower's written notice describing the specific inaccuracy(ies) should be sent to Lender at the following address: West Shore Bank 201 W. Loomis Street, PO Box 627 Ludington, MI 49431-0627.

**GENERAL PROVISIONS.** If any part of this Note cannot be enforced, this fact will not affect the rest of the Note. Lender may delay or forgo enforcing any of its rights or remedies under this Note without losing them. Borrower and any other person who signs, guarantees or endorses this Note, to the extent allowed by law, waive presentment, demand for payment, and notice of dishonor. Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability. All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral; and take any other action deemed necessary by Lender without the consent of or notice to anyone. All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made. The obligations under this Note are joint and several.

**PRIOR TO SIGNING THIS NOTE, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE, INCLUDING THE VARIABLE INTEREST RATE PROVISIONS. BORROWER AGREES TO THE TERMS OF THE NOTE.**

**BORROWER ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS PROMISSORY NOTE.**

**BORROWER:**

**ADELAIDE POINTE MULTI-USE, LLC**

By: ______________________________
**RYAN M LEESTMA, Manager of ADELAIDE POINTE MULTI-USE, LLC**

**LENDER:**

**WEST SHORE BANK**

X ______________________________
**Robert M Fisher II, Vice President**

LaserPro, Ver. 20.1.0.034 Copr. Finastra USA Corporation 1997, 2024. All Rights Reserved. - MI F:\HARLAND\CFI\LPL\D20.FC TR-31600 PR-53

INPUT BY: Ajw 02.29.24

VERIFIED BY: CG 3.7.24

# Exhibit A to PROMISSORY NOTE
# RATE CONVERSION AGREEMENT

Qualified Financial Contract

| Principal | Loan Date | Maturity | Loan No. | Call/Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $6,575,000.00 | 02/28/2024 | 07/20/2049 | [redacted]4490 | 1A2/ 84 | [redacted] | RMF | |
| References in the boxes above do not limit the applicability of this document to any particular loan, hedge or lien. Any item above containing "***" has been omitted due to text length limitations. | | | | | | | |

Borrower: ADELAIDE POINTE MULTI-USE, LLC
1204 W WESTERN AVE
MUSKEGON, MI 49441-1674

Hedge Provider: ARC Fixed Rate Provider
600 Luckie Drive, Suite 405
Birmingham, AL 35223
ARC@southstatebank.com

This Rate Conversion Agreement (this "***Agreement***") date as of 02/28/2024, between ARC Fixed Rate Provider ("***Fixed Rate Provider***") and ADELAIDE POINTE MULTI-USE, LLC ("***Borrower***").

PRELIMINARY STATEMENTS

Borrower has signed a promissory note dated as of 02/28/2024, in the principal amount of **$6,575,000.00** (the "***Note***") in connection with a loan agreement (the "***Loan Agreement***") dated as of the same date between Borrower and West Shore Bank ("***Bank***").

Interest under the Note is calculated at a rate per annum (the "***Note Rate***") equal to a variable rate identified in the Note plus a spread of 2.50% (the "***Spread***").

**The transaction under this Agreement (the "*Transaction*"), taken together with the Note, is intended to allow Borrower to make a payment equivalent to interest calculated at a fixed rate of 6.800% per annum (the "*Fixed Rate*") on the outstanding principal amount specified in the Note for each Payment Period (defined below) from 7/20/2024 until** 7/20/2029, **(the "*Rate Conversion Maturity Date*"), despite the variable nature of the Note Rate. However, any language in the Note that refers to a floor or minimum rate for the variable index is not part of the Transaction, and the economic effect of such language is not hedged by this Agreement.**

This Agreement is considered a Qualified Financial Contract ("QFC") by the Federal Deposit Insurance Corporation ("FDIC") and by the Courts. The Agreement terms are typical terms for an interest rate swap, placing the agreement within the statutory definition of a QFC. The statutory definition of QFC includes five categories of contracts and allows for the FDIC to include additional contracts. A QFC is "any securities contract, commodity contract, forward contract, repurchase agreement, **swap agreement**, and any similar agreement that the FDIC determines by regulation, resolution, or order to be a qualified financial contract. 12 U.S.C. § 1821(e)(8)(D)(i).

NOW THEREFORE, in consideration of the mutual agreements herein set forth, the parties hereto agree as follows:

**Section 1. The Transaction.** For each payment period specified in Schedule I attached hereto ("***Payment Period***") through the Rate Conversion Maturity Date, the following payment shall be made on the payment date shown in Schedule I ("***Payment Date***") corresponding to that Payment Period. The payment amounts will be determined by Fixed Rate Provider.

(i) If the Note Rate is greater than the Fixed Rate, Fixed Rate Provider will pay Borrower the excess of interest calculated at the Note Rate on the notional principal amount shown in Schedule I for the Payment Period over interest calculated at the Fixed Rate for the same amount and period; or

(ii) If the Fixed Rate is greater than the Note Rate, Borrower will pay Fixed Rate Provider the excess of interest calculated at the Fixed Rate on the notional principal amount shown in Schedule I for the Payment Period over interest calculated at the Note Rate for the same amount and period.

**Section 2. Payments.** Unless Fixed Rate Provider notifies otherwise, cash flows between the parties and related communications will be handled by Bank, acting as servicing agent for Fixed Rate Provider. Payments made to Bank and identified as payments in respect of the Transaction will be considered as payments hereunder. This will result in the Bank generating a single payment notice to

Borrower based on the Fixed Rate and Borrower making a single payment based on the Fixed Rate to the Bank, as shown in Schedule I.

**Section 3. Collateral.** Borrower's obligations under this Agreement will be secured by the collateral securing Borrower's obligations under the Loan Agreement and the Note.

**Section 4. Prepayment; Termination.**

(a) **Prepayment**. Upon (i) Borrower's full or partial prepayment of principal under the Note (and Borrower agrees that any single partial prepayment must be no less than $100,000.00, or the entire principal amount of the Note if the principal then outstanding on the Note is less than $100,000.00 ), or (ii) Borrower's borrowing of less than the full amount of principal stated in the Note (each such event, a "***Prepayment Event***"), the notional principal amount for each Payment Period in Schedule I will automatically be reduced by the same amount as the reduction in the corresponding principal amount under the Note.

(b) **Termination.** If any of the following events (each, a "***Termination Event***") has occurred and is then continuing with respect to a party ("***Non-Performing Party***"), then the other party ("***Performing Party***") may, by not less than three Business Days' notice to Non-Performing Party, terminate the Transaction in full. "Business Day" has the meaning set forth in Schedule I.

(i) Borrower Termination Events:

a. Failure to Pay. Borrower fails to make, when due, any payment under this Agreement, if not remedied on or before the shortest cure period (however defined or described, including absence of a cure period or a cure period of zero days) for payment default under the Note.

b. Default under Note. A default, event of default or other similar condition or event (however described) in respect of Borrower occurs under the Loan Agreement or the Note.

c. Misrepresentation. Any material misrepresentation by Borrower in this Agreement.

(ii) Fixed Rate Provider Termination Events:

a. Failure to Pay. Fixed Rate Provider fails to make, when due, any payment under this Agreement before the third Business Day after notice of failure is provided.

b. Bankruptcy. Fixed Rate Provider (1) has a resolution passed for its winding-up, dissolution or liquidation (except under a consolidation, merger or similar event); (2) becomes insolvent or is unable to pay its debts; or (3) seeks or becomes subject to appointment of a provisional liquidator, conservator, receiver, trustee, custodian or similar official for it or all or substantially all its assets.

**Section 5. Early Unwind Amount.**

(a) Early Unwind Amount. The Early Unwind Amount will be calculated by Fixed Rate Provider for any Prepayment Event or by Performing Party or its agent for any Termination Event (in each case acting in good faith and in a commercially reasonable manner) as of the date of the Prepayment Event or Termination Event (the "***Early Unwind Date***"). The Early Unwind Amount represents the loss of bargain and the loss of protection against future risks for the parties and is not a penalty.

(b) Definitions. For purposes of this Section 5, the terms specified below are defined as follows:

"***Early Unwind Amount***" means (i) the Future Amount (whether positive or negative), *plus* (ii) the Unpaid Amounts owed by Borrower to Fixed Rate Provider, *minus* (iii) the Unpaid Amounts owed by Fixed Rate Provider to Borrower, *plus* (iv) $800 administrative fee paid by Borrower to Fixed Rate Provider if the amount of notional principal prepaid is less than the full amount of the notional principal amount then outstanding.

"***Unpaid Amounts***" owed by a party means amounts that became payable by the party under Section 1 on or prior to the Early Unwind Date of the Transaction and remain unpaid on the Early Unwind Date, together with any interest accrued on that obligation.

"***Future Amount***" means the amount calculated by Fixed Rate Provider for any Prepayment Event or by Performing Party for any Termination Event, as follows:

(i) For each Payment Period from the Early Unwind Date through the Rate Conversion Maturity Date, the amount of interest that would have accrued for that Payment Period at the Initial Swap Rate on: (x) the amount by which the notional principal is automatically reduced for a Prepayment Event or (y) the entire notional principal for a Termination Event.

(ii) For each Payment Period from the Early Unwind Date through the Rate Conversion Maturity Date, the amount of interest that would have accrued for that Payment Period at the Final Swap Rate on: (x) the amount by which the notional principal is automatically reduced for a Prepayment Event or (y) the entire notional principal for a Termination Event.

(iii) Subtract, for each Payment Period, the amount calculated in paragraph (ii) above from the amount calculated in paragraph (i) above, which will result in periodic amounts from the Early Unwind Date to the Rate Conversion Maturity Date.

(iv) Calculate the net present value of the periodic amounts determined in paragraph (iii) above using the Final Swap Rate as the discount factor.

***"Initial Swap Rate"*** means the rate of interest established at the time of execution of this Agreement and stated on Schedule I.

***"Final Swap Rate"*** means a single rate of interest reasonably established by Fixed Rate Provider (or, if Fixed Rate Provider is in default, by Borrower or its agent), at the Early Unwind Date, to result in a reasonable breakage fee consistent with the economics of the Transaction. The Final Swap Rate will be based on interest rates applicable in the market for the period from the Early Unwind Date to the Rate Conversion Maturity Date.

(c) Payment. If the Early Unwind Amount is a positive number, Borrower will pay such amount to Fixed Rate Provider; if it is a negative number, Fixed Rate Provider will pay the absolute value of such amount to Borrower (*provided that* if a Borrower default, event of default or other similar condition or event (howsoever described) has occurred under the Note and Borrower has assigned to Bank payment of the Early Unwind Amount owed to Borrower, then Fixed Rate Provider will pay such amount to Bank). In each case, payment of the Early Unwind Amount must be made in U.S. dollars no later than two Business Days after Performing Party's notice of such amount.

**Section 6. Default Interest.** A party that defaults in the performance of any payment obligation will, as permitted by law, be required to pay interest (before as well as after termination of the Transaction or judgment) on the overdue amount, on demand, for the period from (and including) the due date for payment to (but excluding) the date of payment, at the Note Rate plus 5%.

**Section 7. Representations and Warranties.** Each party represents to the other party on the date of this Agreement and at all times until the termination of the Transaction and full payment of all amounts due under this Agreement, that: (a) it is properly organized, validly existing and in good standing under the laws of its jurisdiction, it has authority to perform its obligations under this Agreement, and all required governmental and other consents with respect to the Transaction and this Agreement are effective and complied with; (b) performance of this Agreement does not violate or conflict with its constitutional documents or any legal or governmental order, judgment or restriction, and its obligations under this Agreement are legal, valid and binding; (c) no Termination Event has occurred and is continuing, and no existing, pending or threatened legal proceeding against it or any affiliate would affect the enforceability or its performance under this Agreement; (d) all information furnished by it is materially true, accurate and complete; (e) based on its or its advisors' evaluation (and not that of the other party or the other party's affiliates or representatives), it has made its own independent determination to enter into, and as to the appropriateness of, the Transaction and this Agreement; (f) it is capable of understanding and assessing the merits of (and understands and accepts) their terms, conditions and risks; (g) it is acting for its own account; (h) the other party (and each affiliate and representative of the other party) is not acting as a fiduciary for or an advisor to it in connection with the Transaction or this Agreement; and (i) it is not a federal, state, county or local government or government agency, an employee benefit plan (whether private or governmental), or an endowment.

**Section 8. Covenants.** Borrower covenants to maintain all governmental and other consents required to be obtained by it with respect to the Transaction and this Agreement, and comply with all applicable laws and orders if failure to comply would impair its ability to perform its obligations under the Transaction or this Agreement.

**Section 9. Illegality.** If, due to any change in law (including a court or government agency interpretation) after the date of this Agreement, it becomes unlawful to maintain or perform any obligations under this Agreement or the Transaction, either party may terminate the Transaction. Fixed Rate Provider will determine a payment amount, and such amount shall be paid, as if the Transaction were terminated under Section 5.

**Section 10. Disclaimers.** Unless otherwise provided in this Agreement, obligations under this Agreement and the Transaction are separate from and independent of the Note and Loan Agreement. Terms of the Note shall not be deemed to apply to this Agreement or the Transaction unless expressly provided. Except as provided in Sections 4 and 5, the Transaction may only be terminated before the Rate Conversion Maturity Date upon mutual agreement of the parties. Nothing in this Section 10 will affect any set-off rights or limit the right to terminate the Transaction or calculate an Early Unwind Amount under Sections 4 and 5.

**Section 11. Borrower Eligibility and Compliance.**

(a) Borrower is not a "financial entity," as defined under the Commodity Exchange Act, as amended, and is entering into this arrangement with Fixed Rate Provider to hedge risk associated with variability of the interest rate under the Note and not to speculate in interest rates or invest or trade in financial instruments.

(b) Borrower will generally meet its financial obligations under this Agreement with cash flow from operations or other readily available financial resources. On the date of this Agreement, Borrower is an "eligible contract participant" within the meaning of the Commodity Exchange Act, as amended. Borrower represents and warrants to Fixed Rate Provider that Borrower is not an issuer of securities registered or required to be registered under the Securities and Exchange Act of 1934, as amended, and is not required to file reports under such Act. Borrower understands that it is entitled to have the Transaction cleared on a derivative clearinghouse approved by the U.S. Commodity Futures Trading Commission (***"CFTC"***) and elects not to have this Transaction cleared through such a clearinghouse. Borrower understands that some aspects of non-centrally cleared hedges (including the Transaction) are riskier than cleared hedges.

(c) Reporting.

(i) Fixed Rate Provider will act as the reporting counterparty for the Transaction in compliance with the CFTC's regulations. Fixed Rate Provider must report both parties' Legal Entity Identifier (LEI) (the LEI is an alphanumeric identifier unique to each party that will identify the party for its lifetime), as well as other data about the Transaction, to a swap data repository monitored by the CFTC. Borrower understands that pricing information and other terms of the Transaction (but not the identity of the parties) may be made public.

(ii) Borrower must obtain an LEI and provide such LEI to Fixed Rate Provider. Borrower and Fixed Rate Provider agree as follows:

1. Borrower requests that Fixed Rate Provider obtain a LEI on its behalf.
2. In connection with this request, Borrower acknowledges and agrees that (1) Borrower authorizes Fixed Rate Provider (and all authorized personnel of Fixed Rate Provider) to apply for an LEI on its behalf and to perform all duties required in connection therewith, including but not limited to completing or issuing any and all authorizations, declarations of intent, or documentation required by Local Operational Units ("LOUs") in connection with such application and responding to any additional inquiries or requests for evidence of Borrower's authorization, (2) to the extent any such authorizations, declarations of intent, or documentation require signature of Borrower, Borrower authorizes Fixed Rate Provider to execute such authorizations, declarations of intent or documentation on its behalf, and (3) Borrower certifies that the person (or persons) executing this Agreement is authorized to grant to the Fixed Rate Provider permission to apply for Borrower's LEI as described in (1).
3. Fixed Rate Provider will be responsible for the cost of obtaining the LEI.
4. Borrower, and not Fixed Rate Provider, will maintain its LEI, as required by applicable CFTC rules, including annual renewals and any other continuing obligations related to maintaining its LEI not explicitly identified in this Agreement.

(d) Borrower will notify Fixed Rate Provider promptly if any of the information under or provided in connection with this Section 11 is no longer accurate. Borrower will notify Fixed Rate Provider of any corporate or similar event no later than the day after the event.

**Section 12. Expenses.** Unless otherwise provided in this Agreement, Non-Performing Party will hold harmless and indemnify, on demand, Performing Party for and against all reasonable out-of-pocket expenses (including legal fees) incurred by Performing Party by reason of the enforcement and protection of its rights under this Agreement or by reason of termination of the Transaction under Section 5, including, but not limited to, costs of collection.

**Section 13. Transfer; Assignment.** Neither this Agreement nor any interest or obligation in or under this Agreement may be transferred or assigned (whether by way of security or otherwise) by either party without the prior written consent of the other party, except that (i) either party may make such a transfer or assignment of this Agreement to the surviving entity of a consolidation, merger or similar

event, or to the transferee of all or substantially all its assets (but without prejudice to any other right or remedy under this Agreement), and (ii) either party may assign all or any part of any Early Unwind Amount (and interest accrued thereon) payable to it. Any purported transfer that is not in compliance with this Section 13 will be void and may be treated by the non-transferring party as if the Transaction were terminated because of a Termination Event with respect to the transferring party.

Notwithstanding anything contained in this Section 13, if Borrower's obligations under the Loan Agreement or the Note or its interest in any collateral securing such obligations are sold, assigned or otherwise transferred to any lawful purchaser, assignee or transferee, Borrower may, with Fixed Rate Provider's written consent, assign, sell, or transfer, without recourse, its rights and obligations in or under this Agreement (and any collateral securing such obligations) to such purchaser, assignee or transferee. Furthermore, if the Borrower's obligation under the Loan Agreement or the Note is repaid in full, Borrower may, with Fixed Rate Providers written consent apply the benefit of this Agreement to another note between the Borrower and the Bank ("New Note") to allow the Borrower to make a payment equivalent to interest calculated at the Fixed Rate despite the variable nature of any New Note.

**Section 14. Notices.** All notices and other communications to a party in connection with this Agreement will be given in writing (including by facsimile or email) at the address supplied in writing by such party to the other party. Notices and other communications will be effective upon delivery.

**Section 15. Legal Proceedings.**

(a) Governing Law and Jurisdiction. This Agreement will be governed by and construed in accordance with the state law governing the Loan Agreement. Each party irrevocably submits to the non-exclusive jurisdiction of the courts of such state and any federal courts identified therein and waives any objections thereto.

(b) Waiver of Jury Trial. Each party waives, to the fullest extent permitted by law, any right it may have to trial by jury relating to the Transaction or this Agreement.

(c) Waiver of Immunities. To the fullest extent permitted by law, each party irrevocably (i) waives immunity to which it or its assets may be entitled, on the grounds of sovereignty or similar grounds, from (A) suit, (B) jurisdiction of any court, (C) injunctive relief, specific performance or recovery of property, (D) attachment of assets and (E) execution or enforcement of judgment and (ii) agrees that it will not claim such immunity in any proceedings.

**Section 16. Miscellaneous.**

(a) Amendments. No amendment, modification or waiver in respect of this Agreement will be effective unless in writing and executed by each of the parties.

(b) Remedies Cumulative; No Waiver. Except as provided in this Agreement, the rights, powers, remedies and privileges provided in this Agreement are cumulative and not exclusive of any rights, powers, remedies and privileges provided by law. A failure or delay in their exercise will not be presumed to operate as a waiver, and a single or partial exercise will not be presumed to preclude any subsequent or further exercise.

(c) Sharing of Information. Borrower authorizes the Bank to share with ARC Fixed Rate Provider reports, financial statements or other information that Bank receives from Borrower and reasonably requested by ARC Fixed Rate Provider, or as required for ARC Fixed Rate Provider to perform its obligations under this Agreement.

[*Signature page follows*]

SOUTHSTATE BANK, N.A.
d/b/a ARC Fixed Rate Provider

By: Ed Menjivar
Name: Ed Menjivar
Title: VP - Middle Office Manager

ADELAIDE POINTE MULTI-USE, LLC

By: ______________________
RYAN M LEESTMA, Manager of ADELAIDE POINTE MULTI-USE, LLC

West Shore Bank agrees to and acknowledges its role as servicing agent, in accordance with Section 2.

West Shore Bank

By: ______________________
Name: Robert M. Fisher II
Title: Vice-President

Schedule I

Initial Swap Rate: 4.300% (Act/360 day count, against CME 3-month term SOFR)

However, in the event that CME 3-month term SOFR is discontinued, or is no longer published, or any government authority having jurisdiction over Fixed Rate Provider states that CME 3-month term SOFR may no longer be used, then Fixed Rate Provider may substitute another benchmark index as endorsed from time to time by International Swaps and Derivatives Association Board Benchmark Committee.

Payment Dates: The 20th day of each third month, commencing on 10/20/2024.

Business Day Convention: Any payment due on a day other than a Business Day will be payable on the next Business Day. "Business Day" means any day on which the Federal Reserve Bank of New York is settling payments.

| | |
|---|---|
| Initial Swap Rate | **4.300%** |
| Spread | **2.500%** |
| Fixed Rate | **6.800%** |
| Fixed Payment | **$138,448.46** |
| Starting Notional | **$6,575,000.00** |
| Day convention | **360** |
| Amortization term (mo) | **300** |

| | Payment Period | | Payment Date | Principal Outstanding | End of Period Reduction | Interest Payment | Total Payment |
|---|---|---|---|---|---|---|---|
| | From | To | | | | | |
| 1 | 7/20/24 | 10/20/24 | 10/20/24 | $6,575,000.00 | $24,189.58 | $114,258.88 | $138,448.46 |
| 2 | 10/20/24 | 1/20/25 | 1/20/25 | $6,550,810.42 | $24,609.94 | $113,838.52 | $138,448.46 |
| 3 | 1/20/25 | 4/20/25 | 4/20/25 | $6,526,200.48 | $27,503.06 | $110,945.40 | $138,448.46 |
| 4 | 4/20/25 | 7/20/25 | 7/20/25 | $6,498,697.42 | $26,743.08 | $111,705.38 | $138,448.46 |
| 5 | 7/20/25 | 10/20/25 | 10/20/25 | $6,471,954.34 | $25,980.28 | $112,468.18 | $138,448.46 |
| 6 | 10/20/25 | 1/20/26 | 1/20/26 | $6,445,974.06 | $26,431.76 | $112,016.70 | $138,448.46 |
| 7 | 1/20/26 | 4/20/26 | 4/20/26 | $6,419,542.30 | $29,316.25 | $109,132.21 | $138,448.46 |
| 8 | 4/20/26 | 7/20/26 | 7/20/26 | $6,390,226.05 | $28,607.58 | $109,840.88 | $138,448.46 |
| 9 | 7/20/26 | 10/20/26 | 10/20/26 | $6,361,618.47 | $27,897.67 | $110,550.79 | $138,448.46 |
| 10 | 10/20/26 | 1/20/27 | 1/20/27 | $6,333,720.80 | $28,382.47 | $110,065.99 | $138,448.46 |
| 11 | 1/20/27 | 4/20/27 | 4/20/27 | $6,305,338.33 | $31,257.71 | $107,190.75 | $138,448.46 |
| 12 | 4/20/27 | 7/20/27 | 7/20/27 | $6,274,080.62 | $30,603.99 | $107,844.47 | $138,448.46 |
| 13 | 7/20/27 | 10/20/27 | 10/20/27 | $6,243,476.63 | $29,950.72 | $108,497.74 | $138,448.46 |
| 14 | 10/20/27 | 1/20/28 | 1/20/28 | $6,213,525.91 | $30,471.19 | $107,977.27 | $138,448.46 |
| 15 | 1/20/28 | 4/20/28 | 4/20/28 | $6,183,054.72 | $32,168.62 | $106,279.84 | $138,448.46 |
| 16 | 4/20/28 | 7/20/28 | 7/20/28 | $6,150,886.10 | $32,721.57 | $105,726.89 | $138,448.46 |
| 17 | 7/20/28 | 10/20/28 | 10/20/28 | $6,118,164.53 | $32,128.36 | $106,320.10 | $138,448.46 |
| 18 | 10/20/28 | 1/20/29 | 1/20/29 | $6,086,036.17 | $32,686.68 | $105,761.78 | $138,448.46 |
| 19 | 1/20/29 | 4/20/29 | 4/20/29 | $6,053,349.49 | $35,541.52 | $102,906.94 | $138,448.46 |
| 20 | 4/20/29 | 7/20/29 | 7/20/29 | $6,017,807.97 | $35,009.03 | $103,439.43 | $138,448.46 |

## Exhibit 1 - Prepayment Event Example Scenario

| | |
|---|---|
| Initial balance: | $ 6,575,000 |
| Amortization Term (yrs): | 25.00 |
| Commitment Term: | 5.00 |
| Initial Hedge Rate: | 4.30% |
| Fixed Rate to Borrower: | 6.80% |
| Starting Date: | 7/20/24 |

**Prepayment Hedge Rate vs. Initial Hedge Rate**

| Remaining Term | 3.550% | 3.800% | 4.05% | 4.30% | 4.55% | 4.8000% | 5.050% | Prepayment Hedge Rate |
|---|---|---|---|---|---|---|---|---|
| 5yrs | ($219,582) | ($145,506) | ($72,315) | $0 | $71,451 | $142,049 | $211,803 | |
| 4yrs | ($177,013) | ($117,431) | ($58,429) | $0 | $57,862 | $115,162 | $171,907 | |
| 3yrs | ($133,735) | ($88,824) | ($44,247) | $0 | $43,918 | $87,511 | $130,781 | |
| 2yrs | ($89,780) | ($59,701) | ($29,775) | $0 | $29,624 | $59,097 | $88,421 | |
| 1yrs | ($45,188) | ($30,085) | ($15,022) | $0 | $14,982 | $29,924 | $44,827 | |
| | | Borrower pays upon termination | | | Borrower is paid upon termination | | | |

SOUTH STATE BANK

**Schedule I**

**Transaction Supplement**
**Under Master Servicing Agreement**
**Between West Shore Bank and South State Bank, N.A.**

**For Transaction 2024_0228_3**

This Transaction Supplement is part of and is subject to and governed by the Master Servicing Agreement, between West Shore Bank and South State Bank, N.A.

**Date**: February 28, 2024

**Borrower**: Adelaide Pointe Multi-Use, LLC

**Loan Agreement and documents for related Collateral**:

PROMISSORY NOTE,

CONSTRUCTION MORTGAGE,

All other original documents included in Borrower's closing package.

The **Loan** is the loan evidenced by such Loan Agreement.

**Rate Conversion Agreement**: ARC Agreement between South State Bank, N.A. and the borrower, dated as of February 28, 2024. The **Hedge** is the interest rate hedge evidenced by such Rate Conversion Agreement.

**Collateral** is any and all collateral securing obligations of the Borrower under the Loan or the Hedge, as specified in any one or more of the Loan Agreement, the Rate Conversion Agreement, and any other agreement related to Collateral for the Loan or the Hedge.

**Other terms**:

SOUTH STATE BANK, N.A.

Ed Menjivar

Name: Ed Menjivar
Title: VP – Middle Office Manager

WEST SHORE BANK

[signature]

Name: Robert M. Fisher II
Title: Vice-President Commercial Loan

Received & Sealed for Record
MARK F. FAIRCHILD REGISTER OF DEEDS
Muskegon County Michigan
02/29/2024 09:02:00 AM Liber: 4349 Page: 447

MARK F. FAIRCHILD
REGISTER OF DEEDS
Muskegon County Michigan
5815023 M01

Liber: 4349 Page: 447
Page: 1 of 17
02/29/2024 09:02:00 AM

# CONSTRUCTION MORTGAGE

RECORDATION REQUESTED BY:
West Shore Bank
201 W. Loomis Street, PO Box 627
Ludington, MI 49431-0627

WHEN RECORDED MAIL TO:
West Shore Bank
201 W. Loomis Street, PO Box 627
Ludington, MI 49431-0627

FOR RECORDER'S USE ONLY

---

**THIS MORTGAGE dated February 28, 2024, is made and executed between ADELAIDE POINTE MULTI-USE, LLC, A Michigan Limited Liability Company, whose address is 1204 W WESTERN AVE, MUSKEGON, MI 49441-1674 (AS TO MULTI-USE PARCEL) (referred to below as "Grantor") and West Shore Bank, whose address is 201 W Loomis St, PO Box 627, Ludington, MI 49431 (referred to below as "Lender").**

**GRANT OF MORTGAGE. For valuable consideration, Grantor** mortgages and warrants to Lender all of Grantor's right, title, and interest in and to the following described real property, together with all existing or subsequently erected or affixed buildings, improvements and fixtures; all easements, rights of way, and appurtenances; all rights to make divisions of the land that are exempt from the platting requirements of the Michigan Land Division Act, as it shall be amended; all water, water rights, watercourses and ditch rights (including stock in utilities with ditch or irrigation rights); and all other rights, royalties, and profits relating to the real property, including without limitation all minerals, oil, gas, geothermal and similar matters, **(the "Real Property") located in MUSKEGON County, State of Michigan:**

**See EXHIBIT A , which is attached to this Mortgage and made a part of this Mortgage as if fully set forth herein.**

**The Real Property or its address is commonly known as 1204 W WESTERN AVENUE, MUSKEGON, MI 49441. The Real Property tax identification number is [redacted].**

**CROSS-COLLATERALIZATION.** In addition to the Note, this Mortgage secures all obligations, debts and liabilities, plus interest thereon, of Grantor to Lender, or any one or more of them, as well as all claims by Lender against Grantor or any one or more of them, whether now existing or hereafter arising, whether related or unrelated to the purpose of the Note, whether voluntary or otherwise, whether due or not due, direct or indirect, determined or undetermined, absolute or contingent, liquidated or unliquidated, whether Grantor may be liable individually or jointly with others, whether obligated as guarantor, surety, accommodation party or

otherwise, and whether recovery upon such amounts may be or hereafter may become barred by any statute of limitations, and whether the obligation to repay such amounts may be or hereafter may become otherwise unenforceable.

Grantor presently assigns to Lender all of Grantor's right, title, and interest in and to all present and future leases of the Property and all Rents from the Property. In addition, Grantor grants to Lender a Uniform Commercial Code security interest in the Personal Property and Rents.

**FUTURE ADVANCES.** In addition to the Note, this Mortgage secures all future advances made by Lender to Grantor whether or not the advances are made pursuant to a commitment. Specifically, without limitation, this Mortgage secures, in addition to the amounts specified in the Note, all future amounts Lender in its discretion may loan to Grantor, together with all interest thereon.

**ADDITIONAL SECURED PARTY.** SouthState Bank, N.A. d/b/a ARC Fixed Rate Provider (including its successors and assigns) ("Fixed Rate Provider"), is an additional secured party under this Mortgage. Any of the terms Mortgagee, Beneficiary, Secured Party or other term intended to reference the entity benefiting from the security interest or lien created hereunder to secure Borrower's/Grantor's obligations is deemed to include Fixed Rate Provider. Any of the terms Obligations, Secured Obligations, Debt, Secured Debt or other terms intended to reference Borrower's/Grantor's obligations secured hereunder is deemed to include obligations owed by Borrower/Grantor to Fixed Rate Provider under the Rate Conversion Agreement between Fixed Rate Provider and Borrower/Grantor, dated on or about the date hereof (such agreement, as the same may be amended or modified, the "Rate Conversion Agreement").

Lender and Fixed Rate Provider have previously entered into a Master Servicing Agreement specifying, among other things, circumstances under which Fixed Rate Provider may take over Lender's rights under the Loan, Loan Agreement or Note and with respect to collateral for Borrower's/Grantor's obligations thereunder and under the Rate Conversion Agreement. Until Borrower's/Grantor's receipt of written notice from Fixed Rate Provider, Lender will be entitled to exercise all rights of Bank and Fixed Rate Provider hereunder and all rights of Lender under the Loan, Loan Agreement or Note. Upon and after written notice from Fixed Rate Provider to Borrower/Grantor that Fixed Rate Provider is entitled to act with respect to the Loan, Loan Agreement or Note and the property pledged hereunder, (i) Fixed Rate Provider will be entitled to exercise all rights of Lender and Fixed Rate Provider hereunder and all rights of Lender under the Loan, Loan Agreement or Note and (ii) Borrower/Grantor will comply with instructions, notices and other communications solely from Fixed Rate Provider with respect to rights of Bank and Fixed Rate Provider hereunder and rights of Lender under the Loan, Loan Agreement or Note. The relative rights and priorities as between Fixed Rate Provider and Lender with respect to the rights referred to in this paragraph will be governed by the Master Servicing Agreement.

As additional security for Borrower's/Grantor's obligations to Lender secured hereunder, Borrower/Grantor pledges to Lender and grants Lender a first priority lien and security interest in any Early Unwind Amount (as defined in the Rate Conversion Agreement) owed to Borrower/Grantor under the Rate Conversion Agreement. In the event of a default by Borrower/Grantor under the Loan, Loan Agreement or Note, Borrower/Grantor assigns to Lender payment of any such Early Unwind Amount. Upon written notice from Lender to Fixed Rate Provider that a default has occurred under the Loan, Loan Agreement or Note, Fixed Rate Provider will be authorized to pay such Early Unwind Amount to Lender without liability to Borrower/Grantor. Any dispute on Borrower's/Grantor's part regarding the appropriateness of Lender's notice of default or Fixed Rate Provider's payment of the Early Unwind Amount to Lender will be addressed by Borrower/Grantor to Lender, and Borrower/Grantor will not seek legal or other recourse or remedy from or with respect to Fixed Rate Provider.

**THIS MORTGAGE, INCLUDING THE ASSIGNMENT OF RENTS AND THE SECURITY INTEREST IN THE RENTS AND PERSONAL PROPERTY, IS GIVEN TO SECURE (A) PAYMENT OF THE INDEBTEDNESS AND (B) PERFORMANCE OF ANY AND ALL COVENANTS AND OBLIGATIONS UNDER THE NOTE, THE RELATED DOCUMENTS, AND THIS MORTGAGE. THIS MORTGAGE IS GIVEN AND ACCEPTED ON THE FOLLOWING TERMS AND COVENANTS:**

**PAYMENT AND PERFORMANCE.** Except as otherwise provided in this Mortgage, Grantor shall pay to Lender all amounts secured by this Mortgage as they become due and shall strictly perform all of Grantor's obligations

under this Mortgage.

**CONSTRUCTION MORTGAGE.** This Mortgage is a "construction mortgage" for the purposes of Sections 9-334 and 2A-309 of the Uniform Commercial Code, as those sections have been adopted by the State of Michigan.

**POSSESSION AND MAINTENANCE OF THE PROPERTY.** Grantor and Lender agree that Grantor's possession and use of the Property shall be governed by the following provisions:

**Possession and Use.** Until the occurrence of an Event of Default, Grantor may (1) remain in possession and control of the Property; (2) use, operate or manage the Property; and (3) collect the Rents from the Property.

**Duty to Maintain.** Grantor shall maintain the Property in tenantable condition and promptly perform all repairs, replacements, and maintenance necessary to preserve its value.

**Compliance With Environmental Laws.** Grantor represents and warrants to Lender that: (1) During the period of Grantor's ownership of the Property, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance by any person on, under, about or from the Property; (2) Grantor has no knowledge of, or reason to believe that there has been, except as previously disclosed to and acknowledged by Lender in writing, (a) any breach or violation of any Environmental Laws, (b) any use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance on, under, about or from the Property by any prior owners or occupants of the Property, or (c) any actual or threatened litigation or claims of any kind by any person relating to such matters; and (3) Except as previously disclosed to and acknowledged by Lender in writing, (a) neither Grantor nor any tenant, contractor, agent or other authorized user of the Property shall use, generate, manufacture, store, treat, dispose of or release any Hazardous Substance on, under, about or from the Property; and (b) any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations and ordinances, including without limitation all Environmental Laws. Grantor authorizes Lender and its agents to enter upon the Property to make such inspections and tests, at Grantor's expense, as Lender may deem appropriate to determine compliance of the Property with this section of the Mortgage. Any inspections or tests made by Lender shall be for Lender's purposes only and shall not be construed to create any responsibility or liability on the part of Lender to Grantor or to any other person. The representations and warranties contained herein are based on Grantor's due diligence in investigating the Property for Hazardous Substances. Grantor hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Grantor becomes liable for cleanup or other costs under any such laws; and (2) agrees to indemnify, defend, and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Mortgage or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release occurring prior to Grantor's ownership or interest in the Property, whether or not the same was or should have been known to Grantor. The provisions of this section of the Mortgage, including the obligation to indemnify and defend, shall survive the payment of the Indebtedness and the satisfaction and reconveyance of the lien of this Mortgage and shall not be affected by Lender's acquisition of any interest in the Property, whether by foreclosure or otherwise.

**Nuisance, Waste.** Grantor shall not cause, conduct or permit any nuisance nor commit, permit, or suffer any stripping of or waste on or to the Property or any portion of the Property. Without limiting the generality of the foregoing, Grantor will not remove, or grant to any other party the right to remove, any timber, minerals (including oil and gas), coal, clay, scoria, soil, gravel or rock products without Lender's prior written consent.

**Removal of Improvements.** Grantor shall not demolish or remove any Improvements from the Real Property without Lender's prior written consent. As a condition to the removal of any Improvements, Lender may require Grantor to make arrangements satisfactory to Lender to replace such Improvements with Improvements of at least equal value.

**Lender's Right to Enter.** Lender and Lender's agents and representatives may enter upon the Real Property at all reasonable times to (a) attend to Lender's interests, (b) inspect the Property for purposes of Grantor's compliance with the terms and conditions of this Mortgage, (c) appraise the property, (d) investigate whether the property is a site or source of environmental contamination, or (e) remove to remediate any environmental contamination. Without limiting the foregoing, Lender shall have the right to conduct and submit to appropriate governmental agencies a "baseline environmental assessment" of the property within the meaning of section 20101 of the Michigan Natural Resources and Environmental Protection Act, MCL section 324.20101, as it shall be amended from time to time. If, at the time of the appraisal, investigation, assessment, removal, or remediation, there shall have occurred and be continuing an Event of Default, then all costs and expenses of the appraisal, investigation, assessment, removal or remediation, shall be subject to the "Lender's Expenditures" section of this Mortgage. Grantor shall execute any consultant contract, waste manifest, notice, and other documents that Lender requests to enable Lender to take or conduct any action or activity contemplated by this paragraph, if Grantor is given a reasonable opportunity to negotiate the terms of the contract, manifest, notice, or other document.

**Compliance with Governmental Requirements.** Grantor shall promptly comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the use or occupancy of the Property, including without limitation, the Americans With Disabilities Act. Grantor may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Grantor has notified Lender in writing prior to doing so and so long as, in Lender's sole opinion, Lender's interests in the Property are not jeopardized. Lender may require Grantor to post adequate security or a surety bond, reasonably satisfactory to Lender, to protect Lender's interest.

**Duty to Protect.** Grantor agrees neither to abandon or leave unattended the Property. Grantor shall do all other acts, in addition to those acts set forth above in this section, which from the character and use of the Property are reasonably necessary to protect and preserve the Property.

**CONSTRUCTION LOAN.** If some or all of the proceeds of the loan creating the Indebtedness are to be used to construct or complete construction of any Improvements on the Property, the Improvements shall be completed no later than the maturity date of the Note (or such earlier date as Lender may reasonably establish) and Grantor shall pay in full all costs and expenses in connection with the work. Lender will disburse loan proceeds under such terms and conditions as Lender may deem reasonably necessary to insure that the interest created by this Mortgage shall have priority over all possible liens, including those of material suppliers and workmen. Lender may require, among other things, that disbursement requests be supported by receipted bills, expense affidavits, waivers of liens, construction progress reports, and such other documentation as Lender may reasonably request.

**DUE ON SALE - CONSENT BY LENDER.** Lender may, at Lender's option, declare immediately due and payable all sums secured by this Mortgage upon the sale or transfer, without Lender's prior written consent, of all or any part of the Real Property, or any interest in the Real Property. Grantor's "interest" in the Real Property shall be considered to include, without limitation, any right to make a division of the Real Property that is exempt from the requirement of the Michigan Land Division Act, as it shall be amended. A "sale or transfer" means the conveyance of Real Property or any right, title or interest in the Real Property; whether legal, beneficial or equitable; whether voluntary or involuntary; whether by outright sale, deed, installment sale contract, land contract, contract for deed, leasehold interest with a term greater than three (3) years, lease-option contract, or by sale, assignment, or transfer of any beneficial interest in or to any land trust holding title to the Real Property, or by any other method of conveyance of an interest in the Real Property. If any Grantor is a corporation, partnership or limited liability company, transfer also includes any restructuring of the legal entity (whether by merger, division or otherwise) or any change in ownership of more than twenty-five percent (25%) of the voting stock, partnership interests or limited liability company interests, as the case may be, of such Grantor. However, this option shall not be exercised by Lender if such exercise is prohibited by federal law or by Michigan law.

**TAXES AND LIENS.** The following provisions relating to the taxes and liens on the Property are part of this

Mortgage:

**Payment.** Grantor shall pay when due (and in all events prior to delinquency) all taxes, payroll taxes, special taxes, assessments, water charges and sewer service charges levied against or on account of the Property, and shall pay when due all claims for work done on or for services rendered or material furnished to the Property. Grantor shall maintain the Property free of any liens having priority over or equal to the interest of Lender under this Mortgage, except for those liens specifically agreed to in writing by Lender, and except for the lien of taxes and assessments not due as further specified in the Right to Contest paragraph.

**Right to Contest.** Grantor may withhold payment of any tax, assessment, or claim in connection with a good faith dispute over the obligation to pay, so long as Lender's interest in the Property is not jeopardized. If a lien arises or is filed as a result of nonpayment, Grantor shall within fifteen (15) days after the lien arises or, if a lien is filed, within fifteen (15) days after Grantor has notice of the filing, secure the discharge of the lien, or if requested by Lender, deposit with Lender cash or a sufficient corporate surety bond or other security satisfactory to Lender in an amount sufficient to discharge the lien plus any costs and reasonable attorneys' fees, or other charges that could accrue as a result of a foreclosure or sale under the lien. In any contest, Grantor shall defend itself and Lender and shall satisfy any adverse judgment before enforcement against the Property. Grantor shall name Lender as an additional obligee under any surety bond furnished in the contest proceedings.

**Evidence of Payment.** Grantor shall upon demand furnish to Lender satisfactory evidence of payment of the taxes or assessments and shall authorize the appropriate governmental official to deliver to Lender at any time a written statement of the taxes and assessments against the Property.

**Notice of Construction.** Grantor shall notify Lender at least fifteen (15) days before any work is commenced, any services are furnished, or any materials are supplied to the Property, if any mechanic's lien, materialmen's lien, or other lien could be asserted on account of the work, services, or materials. Grantor will upon request of Lender furnish to Lender advance assurances satisfactory to Lender that Grantor can and will pay the cost of such improvements.

**PROPERTY DAMAGE INSURANCE.** The following provisions relating to insuring the Property are a part of this Mortgage:

**Maintenance of Insurance.** Grantor shall procure and maintain policies of fire insurance with standard extended coverage endorsements on a replacement basis for the full insurable value covering all Improvements on the Real Property in an amount sufficient to avoid application of any coinsurance clause, and with a standard mortgagee clause in favor of Lender. Grantor shall also procure and maintain comprehensive general liability insurance in such coverage amounts as Lender may request with Lender being named as additional insureds in such liability insurance policies. Additionally, Grantor shall maintain such other insurance, including but not limited to hazard, business interruption and boiler insurance as Lender may require. Policies shall be written by such insurance companies and in such form as may be reasonably acceptable to Lender. Grantor shall deliver to Lender certificates of coverage from each insurer containing a stipulation that coverage will not be cancelled or diminished without a minimum of thirty (30) days' prior written notice to Lender and not containing any disclaimer of the insurer's liability for failure to give such notice. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Grantor or any other person. Should the Real Property be located in an area designated by the Administrator of the Federal Emergency Management Agency as a special flood hazard area, Grantor agrees to obtain and maintain flood insurance, if available, for the full unpaid principal balance of the loan and any prior liens on the property securing the loan, up to the maximum policy limits set under the National Flood Insurance Program, or as otherwise required by Lender, and to maintain such insurance for the term of the loan. Flood insurance may be purchased under the National Flood Insurance Program, from private insurers providing "private flood insurance" as defined by applicable federal flood insurance statutes and regulations, or from another flood insurance provider that is both acceptable to Lender in its sole discretion and permitted by applicable federal flood insurance statutes and regulations.

**Application of Proceeds.** Grantor shall promptly notify Lender of any loss or damage to the Property. Lender may make proof of loss if Grantor fails to do so within fifteen (15) days of the casualty. Whether or not Lender's security is impaired, Lender may, at Lender's election, receive and retain the proceeds of any insurance and apply the proceeds to the reduction of the Indebtedness, payment of any lien affecting the Property, or the restoration and repair of the Property. If Lender elects to apply the proceeds to restoration and repair, Grantor shall repair or replace the damaged or destroyed Improvements in a manner satisfactory to Lender. Lender shall, upon satisfactory proof of such expenditure, pay or reimburse Grantor from the proceeds for the reasonable cost of repair or restoration if Grantor is not in default under this Mortgage. Any proceeds which have not been disbursed within 180 days after their receipt and which Lender has not committed to the repair or restoration of the Property shall be used first to pay any amount owing to Lender under this Mortgage, then to pay accrued interest, and the remainder, if any, shall be applied to the principal balance of the Indebtedness. If Lender holds any proceeds after payment in full of the Indebtedness, such proceeds shall be paid to Grantor as Grantor's interests may appear.

**Grantor's Report on Insurance.** Upon request of Lender, however not more than once a year, Grantor shall furnish to Lender a report on each existing policy of insurance showing: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the property insured, the then current replacement value of such property, and the manner of determining that value; and (5) the expiration date of the policy. Grantor shall, upon request of Lender, have an independent appraiser satisfactory to Lender determine the cash value replacement cost of the Property.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Property or if Grantor fails to comply with any provision of this Mortgage or any Related Documents, including but not limited to Grantor's failure to discharge or pay when due any amounts Grantor is required to discharge or pay under this Mortgage or any Related Documents, Lender on Grantor's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Property and paying all costs for insuring, maintaining and preserving the Property. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Grantor. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity. The Mortgage also will secure payment of these amounts. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon the occurrence of any Event of Default.

**WARRANTY; DEFENSE OF TITLE.** The following provisions relating to ownership of the Property are a part of this Mortgage:

**Title.** Grantor warrants that: (a) Grantor holds good and marketable title of record to the Property in fee simple, free and clear of all liens and encumbrances other than those set forth in the Real Property description or in any title insurance policy, title report, or final title opinion issued in favor of, and accepted by, Lender in connection with this Mortgage, and (b) Grantor has the full right, power, and authority to execute and deliver this Mortgage to Lender.

**Defense of Title.** Subject to the exception in the paragraph above, Grantor warrants and will forever defend the title to the Property against the lawful claims of all persons. In the event any action or proceeding is commenced that questions Grantor's title or the interest of Lender under this Mortgage, Grantor shall defend the action at Grantor's expense. Grantor may be the nominal party in such proceeding, but Lender shall be entitled to participate in the proceeding and to be represented in the proceeding by counsel of Lender's own choice, and Grantor will deliver, or cause to be delivered, to Lender such instruments as Lender may request from time to time to permit such participation.

**Compliance With Laws.** Grantor warrants that the Property and Grantor's use of the Property complies with all existing applicable laws, ordinances, and regulations of governmental authorities.

**Survival of Representations and Warranties.** All representations, warranties, and agreements made by Grantor in this Mortgage shall survive the execution and delivery of this Mortgage, shall be continuing in nature, and shall remain in full force and effect until such time as Grantor's Indebtedness shall be paid in full.

**CONDEMNATION.** The following provisions relating to condemnation proceedings are a part of this Mortgage:

**Proceedings.** If any proceeding in condemnation is filed, Grantor shall promptly notify Lender in writing, and Grantor shall promptly take such steps as may be necessary to defend the action and obtain the award. Grantor may be the nominal party in such proceeding, but Lender shall be entitled to participate in the proceeding and to be represented in the proceeding by counsel of its own choice, and Grantor will deliver or cause to be delivered to Lender such instruments and documentation as may be requested by Lender from time to time to permit such participation.

**Application of Net Proceeds.** If all or any part of the Property is condemned by eminent domain proceedings or by any proceeding or purchase in lieu of condemnation, Lender may at its election require that all or any portion of the net proceeds of the award be applied to the Indebtedness or the repair or restoration of the Property. The net proceeds of the award shall mean the award after payment of all reasonable costs, expenses, and attorneys' fees incurred by Lender in connection with the condemnation.

**IMPOSITION OF TAXES, FEES AND CHARGES BY GOVERNMENTAL AUTHORITIES.** The following provisions relating to governmental taxes, fees and charges are a part of this Mortgage:

**Current Taxes, Fees and Charges.** Upon request by Lender, Grantor shall execute such documents in addition to this Mortgage and take whatever other action is requested by Lender to perfect and continue Lender's lien on the Real Property. Grantor shall reimburse Lender for all taxes, as described below, together with all expenses incurred in recording, perfecting or continuing this Mortgage, including without limitation all taxes, fees, documentary stamps, and other charges for recording or registering this Mortgage.

**Taxes.** The following shall constitute taxes to which this section applies: (1) a specific tax upon this type of Mortgage or upon all or any part of the Indebtedness secured by this Mortgage; (2) a specific tax on Grantor which Grantor is authorized or required to deduct from payments on the Indebtedness secured by this type of Mortgage; (3) a tax on this type of Mortgage chargeable against the Lender or the holder of the Note; and (4) a specific tax on all or any portion of the Indebtedness or on payments of principal and interest made by Grantor.

**Subsequent Taxes.** If any tax to which this section applies is enacted subsequent to the date of this Mortgage, this event shall have the same effect as an Event of Default, and Lender may exercise any or all of its available remedies for an Event of Default as provided below unless Grantor either (1) pays the tax before it becomes delinquent, or (2) contests the tax as provided above in the Taxes and Liens section and deposits with Lender cash or a sufficient corporate surety bond or other security satisfactory to Lender.

**SECURITY AGREEMENT; FINANCING STATEMENTS.** The following provisions relating to this Mortgage as a security agreement are a part of this Mortgage:

**Security Agreement.** This instrument shall constitute a Security Agreement to the extent any of the Property constitutes fixtures, and Lender shall have all of the rights of a secured party under the Uniform Commercial Code as amended from time to time.

**Security Interest.** Upon request by Lender, Grantor shall take whatever action is requested by Lender to perfect and continue Lender's security interest in the Personal Property. In addition to recording this Mortgage in the real property records, Lender may, at any time and without further authorization from Grantor, file executed counterparts, copies or reproductions of this Mortgage as a financing statement. Grantor shall reimburse Lender for all expenses incurred in perfecting or continuing this security interest. Upon default, Grantor shall not remove, sever or detach the Personal Property from the Property. Upon default, Grantor shall assemble any Personal Property not affixed to the Property in a manner and at a place reasonably convenient to Grantor and Lender and make it available to Lender within three (3) days after

receipt of written demand from Lender to the extent permitted by applicable law.

**Addresses.** The mailing addresses of Grantor (debtor) and Lender (secured party) from which information concerning the security interest granted by this Mortgage may be obtained (each as required by the Uniform Commercial Code) are as stated on the first page of this Mortgage.

**FURTHER ASSURANCES; ATTORNEY-IN-FACT.** The following provisions relating to further assurances and attorney-in-fact are a part of this Mortgage:

**Further Assurances.** At any time, and from time to time, upon request of Lender, Grantor will make, execute and deliver, or will cause to be made, executed or delivered, to Lender or to Lender's designee, and when requested by Lender, cause to be filed, recorded, refiled, or rerecorded, as the case may be, at such times and in such offices and places as Lender may deem appropriate, any and all such mortgages, deeds of trust, security deeds, security agreements, financing statements, continuation statements, instruments of further assurance, certificates, and other documents as may, in the sole opinion of Lender, be necessary or desirable in order to effectuate, complete, perfect, continue, or preserve (1) Grantor's obligations under the Note, this Mortgage, and the Related Documents, and (2) the liens and security interests created by this Mortgage as first and prior liens on the Property, whether now owned or hereafter acquired by Grantor. Unless prohibited by law or Lender agrees to the contrary in writing, Grantor shall reimburse Lender for all costs and expenses incurred in connection with the matters referred to in this paragraph.

**Attorney-in-Fact.** If Grantor fails to do any of the things referred to in the preceding paragraph, Lender may do so for and in the name of Grantor and at Grantor's expense. For such purposes, Grantor hereby irrevocably appoints Lender as Grantor's attorney-in-fact for the purpose of making, executing, delivering, filing, recording, and doing all other things as may be necessary or desirable, in Lender's sole opinion, to accomplish the matters referred to in the preceding paragraph.

**FULL PERFORMANCE.** If Grantor pays all the Indebtedness, including without limitation all future advances, when due, and otherwise performs all the obligations imposed upon Grantor under this Mortgage, Lender shall execute and deliver to Grantor a suitable satisfaction of this Mortgage and suitable statements of termination of any financing statement on file evidencing Lender's security interest in the Rents and the Personal Property. Grantor will pay, if permitted by applicable law, any reasonable termination fee as determined by Lender from time to time.

**EVENTS OF DEFAULT.** Each of the following, at Lender's option, shall constitute an Event of Default under this Mortgage:

**Payment Default.** Grantor fails to make any payment when due under the Indebtedness.

**Default on Other Payments.** Failure of Grantor within the time required by this Mortgage to make any payment for taxes or insurance, or any other payment necessary to prevent filing of or to effect discharge of any lien. Such failure to make payment for taxes or insurance shall constitute waste at the time such items are due and payable.

**Other Defaults.** Grantor fails to comply with or to perform any other term, obligation, covenant or condition contained in this Mortgage or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Grantor.

**Default in Favor of Third Parties.** Should Grantor default under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Grantor's property or Grantor's ability to repay the Indebtedness or Grantor's ability to perform Grantor's obligations under this Mortgage or any of the Related Documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Grantor or on Grantor's behalf under this Mortgage or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Defective Collateralization.** This Mortgage or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien)

at any time and for any reason.

**Death or Insolvency.** The dissolution of Grantor's (regardless of whether election to continue is made), any member withdraws from the limited liability company, or any other termination of Grantor's existence as a going business or the death of any member, the insolvency of Grantor, the appointment of a receiver for any part of Grantor's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Grantor.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Grantor or by any governmental agency against any property securing the Indebtedness. This includes a garnishment of any of Grantor's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Grantor as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Grantor gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Breach of Other Agreement.** Any breach by Grantor under the terms of any other agreement between Grantor and Lender that is not remedied within any grace period provided therein, including without limitation any agreement concerning any indebtedness or other obligation of Grantor to Lender, whether existing now or later.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Adverse Change.** A material adverse change occurs in Grantor's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**RIGHTS AND REMEDIES ON DEFAULT.** Upon the occurrence of an Event of Default and at any time thereafter, Lender, at Lender's option, may exercise any one or more of the following rights and remedies, in addition to any other rights or remedies provided by law:

**Accelerate Indebtedness.** Lender shall have the right at its option without notice to Grantor to declare the entire Indebtedness immediately due and payable, including any prepayment fee that Grantor would be required to pay.

**UCC Remedies.** With respect to all or any part of the Personal Property, Lender shall have all the rights and remedies of a secured party under the Uniform Commercial Code. Without limiting those rights and remedies, Lender may, at its option, either (a) enforce its security interest in the Personal Property under the Uniform Commercial Code or other applicable law or (b) include the Personal Property in any judicial or non-judicial foreclosure of this Mortgage.

**Collect Rents.** Lender shall have the right, without notice to Grantor, to take possession of the Property and collect the Rents, including amounts past due and unpaid, and apply the net proceeds, over and above Lender's costs, against the Indebtedness. In furtherance of this right, Lender may require any tenant or other user of the Property to make payments of rent or use fees directly to Lender. If the Rents are collected by Lender, then Grantor irrevocably designates Lender as Grantor's attorney-in-fact to endorse instruments received in payment thereof in the name of Grantor and to negotiate the same and collect the proceeds. Payments by tenants or other users to Lender in response to Lender's demand shall satisfy the obligations for which the payments are made, whether or not any proper grounds for the demand existed. Lender may exercise its rights under this subparagraph either in person, by agent, or through a receiver.

**Appoint Receiver.** Any failure of Grantor to pay any taxes assessed against the Property or to pay any installment of those taxes or to pay any insurance premium upon any policy covering any property located

upon the Property shall constitute waste and shall entitle Lender to the appointment by a court of competent jurisdiction of a receiver of the Property for the purpose of preventing the waste, except that no receiver may be appointed for any dwelling house or farm occupied by any owner of it as the owner's home or farm or for any store or other business property having an assessed valuation of $7,500 or less. Subject to the order of the court, the receiver may collect the rents and income from the Property and shall exercise control over the Property to the extent ordered by the court. A court may also appoint a receiver for the Property in any other circumstances permitted by law. Lender shall have the right to have a receiver appointed to take possession of all or any part of the Property, with the power to protect and preserve the Property, to operate the Property preceding foreclosure or sale, and to collect the Rents from the Property and apply the proceeds, over and above the cost of the receivership, against the Indebtedness. The receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Property exceeds the Indebtedness by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver.

**Judicial Foreclosure.** Lender may obtain a judicial decree foreclosing Grantor's interest in all or any part of the Property.

**Nonjudicial Sale.** Lender may sell, release and convey the Real Property at public sale and sign and deliver to the purchasers at the sale good and sufficient deeds of conveyance, paying any surplus funds, after payment in full of the sums then due under this Mortgage and the expenses of the sale, including attorney fees as provided by law, to Grantor, all in accordance with applicable law.

**Warning. This Mortgage contains a power of sale, and, upon default, may be foreclosed by advertisement. In foreclosure by advertisement, no hearing is involved and the only notice required is to publish notice in a local newspaper and to post a copy of the notice on the Property.**

**Waiver.** If this Mortgage is foreclosed by advertisement, Grantor hereby voluntarily and knowingly waives all rights under the Constitution and laws of the State of Michigan and Constitution and laws of the United States to all notice and a hearing in connection with the above-mentioned foreclosure by advertisement, except as set forth in the Michigan statute providing for foreclosure by advertisement.

**Deficiency Judgment.** If permitted by applicable law, Lender may obtain a judgment for any deficiency remaining in the Indebtedness due to Lender after application of all amounts received from the exercise of the rights provided in this section.

**Tenancy at Will.** If Grantor remains in possession of the Property after Lender or the purchaser at a foreclosure sale of the Property become lawfully entitled to possession of the Property, the Grantor shall become a tenant at will of Lender or the purchaser of the Property and shall, at the option of the person lawfully entitled to possession, either (1) pay a reasonable rental for the use of the Property or (2) vacate the Property immediately upon the demand of the person lawfully entitled to possession.

**Other Remedies.** Lender shall have all other rights and remedies provided in this Mortgage or the Note or available at law or in equity.

**Sale of the Property.** To the extent permitted by applicable law, Grantor hereby waives any and all right to have the Property marshalled. In exercising its rights and remedies, Lender shall be free to sell all or any part of the Property together or separately, in one sale or by separate sales and Grantor waives Grantor's rights under MCLA Section 600.3224 to have separate parcels sold separately and to have no more parcels than necessary sold. Lender shall be entitled to bid at any public sale on all or any portion of the Property.

**Notice of Sale.** Lender shall give Grantor reasonable notice of the time and place of any public sale of the Personal Property or of the time after which any private sale or other intended disposition of the Personal Property is to be made. Reasonable notice shall mean notice given at least ten (10) days before the time of the sale or disposition. Any sale of the Personal Property may be made in conjunction with any sale of the Real Property.

**Election of Remedies.** Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Grantor under

this Mortgage, after Grantor's failure to perform, shall not affect Lender's right to declare a default and exercise its remedies. Nothing under this Mortgage or otherwise shall be construed so as to limit or restrict the rights and remedies available to Lender following an Event of Default, or in any way to limit or restrict the rights and ability of Lender to proceed directly against Grantor and/or against any other co-maker, guarantor, surety or endorser and/or to proceed against any other collateral directly or indirectly securing the Indebtedness. After the date that payment of the Indebtedness secured by this Mortgage has been accelerated by Lender, acceptance by Lender of any amount(s) paid by or on behalf of Grantor which is less than the full unpaid balance of the Indebtedness, including without limitation all accrued interest, late charges and other amounts due Lender under this Mortgage, shall not be deemed a waiver of default or acceleration, but shall be credited toward the unpaid balance of the Indebtedness, unless Lender shall specifically agree in writing to waive any such default or acceleration or both.

**Attorneys' Fees; Expenses.** If Lender institutes any suit or action to enforce any of the terms of this Mortgage, Lender shall be entitled to recover its reasonable attorneys' fees. Whether or not any court action is involved, and to the extent not prohibited by law, all reasonable expenses Lender incurs that in Lender's opinion are necessary at any time for the protection of its interest or the enforcement of its rights shall become a part of the Indebtedness payable on demand and shall bear interest at the Note rate from the date of the expenditure until repaid. Expenses covered by this paragraph include, without limitation, however subject to any limits under applicable law, Lender's reasonable attorneys' fees and Lender's legal expenses whether or not there is a lawsuit, including reasonable attorneys' fees and expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services, the cost of searching records, obtaining title reports (including foreclosure reports), surveyors' reports, and appraisal fees and title insurance, to the extent permitted by applicable law. Grantor also will pay any court costs, in addition to all other sums provided by law.

**NOTICES.** Any notice required to be given under this Mortgage, including without limitation any notice of default and any notice of sale shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Mortgage. All copies of notices of foreclosure from the holder of any lien which has priority over this Mortgage shall be sent to Lender's address, as shown near the beginning of this Mortgage. Any party may change its address for notices under this Mortgage by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Grantor agrees to keep Lender informed at all times of Grantor's current address. Unless otherwise provided or required by law, if there is more than one Grantor, any notice given by Lender to any Grantor is deemed to be notice given to all Grantors.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Mortgage:

**Amendments.** This Mortgage, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Mortgage. No alteration of or amendment to this Mortgage shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Annual Reports.** If the Property is used for purposes other than Grantor's residence, Grantor shall furnish to Lender, upon request, a certified statement of net operating income received from the Property during Grantor's previous fiscal year in such form and detail as Lender shall require. "Net operating income" shall mean all cash receipts from the Property less all cash expenditures made in connection with the operation of the Property.

**Caption Headings.** Caption headings in this Mortgage are for convenience purposes only and are not to be used to interpret or define the provisions of this Mortgage.

**Governing Law. This Mortgage will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Michigan without regard to its conflicts of law**

**provisions. This Mortgage has been accepted by Lender in the State of Michigan.**

**Choice of Venue.** If there is a lawsuit, Grantor agrees upon Lender's request to submit to the jurisdiction of the courts of Mason County, State of Michigan.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Mortgage unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Mortgage shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Mortgage. No prior waiver by Lender, nor any course of dealing between Lender and Grantor, shall constitute a waiver of any of Lender's rights or of any of Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Mortgage, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Severability.** If a court of competent jurisdiction finds any provision of this Mortgage to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Mortgage. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Mortgage shall not affect the legality, validity or enforceability of any other provision of this Mortgage.

**Merger.** There shall be no merger of the interest or estate created by this Mortgage with any other interest or estate in the Property at any time held by or for the benefit of Lender in any capacity, without the written consent of Lender.

**Successors and Assigns.** Subject to any limitations stated in this Mortgage on transfer of Grantor's interest, this Mortgage shall be binding upon and inure to the benefit of the parties, their successors and assigns. If ownership of the Property becomes vested in a person other than Grantor, Lender, without notice to Grantor, may deal with Grantor's successors with reference to this Mortgage and the Indebtedness by way of forbearance or extension without releasing Grantor from the obligations of this Mortgage or liability under the Indebtedness.

**Time is of the Essence.** Time is of the essence in the performance of this Mortgage.

**Use of Pronouns.** Any term used to designate any of the parties in this Mortgage shall be deemed to include the respective heirs, estate representatives, successors, and assigns of the parties, and all pronouns and relative words used in this Mortgage are intended to apply in the singular, plural, feminine or neuter forms as the context may require, to appropriately refer to the parties designated.

**Waive Jury. All parties to this Mortgage hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by any party against any other party.**

**Waiver of Homestead Exemption.** Grantor hereby releases and waives all rights and benefits of the homestead exemption laws of the State of Michigan as to all Indebtedness secured by this Mortgage.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Mortgage. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Mortgage shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Borrower.** The word "Borrower" means ADELAIDE POINTE MULTI-USE, LLC and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without

limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Mortgage in the events of default section of this Mortgage.

**Grantor.** The word "Grantor" means ADELAIDE POINTE MULTI-USE, LLC.

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Indebtedness.

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Improvements.** The word "Improvements" means all existing and future improvements, buildings, structures, mobile homes affixed on the Real Property, facilities, additions, replacements and other construction on the Real Property.

**Indebtedness.** The word "Indebtedness" means all principal, interest, and other amounts, costs and expenses payable under the Note or Related Documents, together with all renewals of, extensions of, modifications of, consolidations of and substitutions for the Note or Related Documents and any amounts expended or advanced by Lender to discharge Grantor's obligations or expenses incurred by Lender to enforce Grantor's obligations under this Mortgage, together with interest on such amounts as provided in this Mortgage. Specifically, without limitation, Indebtedness includes the future advances set forth in the Future Advances provision, together with all interest thereon and all amounts that may be indirectly secured by the Cross-Collateralization provision of this Mortgage.

**Lender.** The word "Lender" means West Shore Bank, its successors and assigns.

**Mortgage.** The word "Mortgage" means this Mortgage between Grantor and Lender.

**Note.** The word "Note" means AND INCLUDES WITHOUT LIMITATION ALL OF BORROWER'S PROMISSORY NOTES AND/OR CREDIT AGREEMENTS EVIDENCING BORROWER'S LOAN OBLIGATIONS IN FAVOR OF LENDER, TOGETHER WITH ALL RENEWALS OF, EXTENSIONS OF, MODIFICATIONS OF, REFINANCINGS OF, CONSOLIDATIONS OF AND SUBSTITUTIONS FOR PROMISSORY NOTES OR CREDIT AGREEMENTS. **NOTICE TO GRANTOR: THE NOTE CONTAINS A VARIABLE INTEREST RATE.**

**Personal Property.** The words "Personal Property" mean all equipment, fixtures, and other articles of personal property now or hereafter owned by Grantor, and now or hereafter attached or affixed to the Real Property; together with all accessions, parts, and additions to, all replacements of, and all substitutions for, any of such property; and together with all proceeds (including without limitation all insurance proceeds and refunds of premiums) from any sale or other disposition of the Property.

**Property.** The word "Property" means collectively the Real Property and the Personal Property.

**Real Property.** The words "Real Property" mean the real property, interests and rights, as further described in this Mortgage.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

**Rents.** The word "Rents" means all present and future rents, revenues, income, issues, royalties, profits, and other benefits derived from the Property.

**GRANTOR COVENANTS AND AGREES TO THE PROVISIONS OF THIS MORTGAGE.**

**GRANTOR:**

**ADELAIDE POINTE MULTI-USE, LLC**

By: ______________________________
RYAN M LEESTMA, Manager of ADELAIDE POINTE MULTI-USE, LLC

This Mortgage was prepared by: ROBERT M FISHER II, VP COMMERCIAL LOANS
West Shore Bank
201 W Loomis St
Ludington, MI 49431

MARK F. FAIRCHILD
REGISTER OF DEEDS
Muskegon County Michigan
5815023 M01

Liber: 4349 Page: 447
Page: 14 of 17
02/29/2024 09:02:00 AM

## LIMITED LIABILITY COMPANY ACKNOWLEDGMENT

STATE OF Michigan )
) SS
COUNTY OF Muskegon )

On this 28th day of February, 20 24, before me, the undersigned Notary Public, personally appeared **RYAN M LEESTMA, Manager of ADELAIDE POINTE MULTI-USE, LLC,** and known to me to be a member or designated agent of the limited liability company that executed the Mortgage and acknowledged the Mortgage to be the free and voluntary act and deed of the limited liability company, by authority of statute, its articles of organization or its operating agreement, for the uses and purposes therein mentioned, and on oath stated that he or she is authorized to execute this Mortgage and in fact executed the Mortgage on behalf of the limited liability company.

**By**_______________ **My commission expires**_______________

**Notary Public, State of**_______________, **County of**_______________

**Acting in the County of**_______________

SHARLENE SHINELDECKER
Notary Public - State of Michigan
County of Muskegon
My Commission Expires Nov 9, 2027
Acting in the County of Muskegon

LaserPro, Ver. 20.1.0.034 Copr. Finastra USA Corporation 1997, 2024. All Rights Reserved. - MI
F:\HARLAND\CFI\LPL\G03.FC TR-31600 PR-53

EXHIBIT 'A'

(Multi-Purpose Parcel):
All that part of Block 578 of the Revised Plat of 1903 of the City of Muskegon, Section 25, Town 10 North, Range 17 West, City of Muskegon, Muskegon County, Michigan, described as: COMMENCING at the Southeast corner of Block 577; thence North 87°52'58" West, 260.09 feet along the North right-of-way line of Western Avenue; thence North 01°56'07" East, 659.31 feet along the East line of said Block 578 and its Southerly extension thereof; thence North 32°59'53" West, 729.95 feet; thence North 43°59'53" West, 34.86 feet; thence South 46°00'07" West, 63.51 feet to the PLACE OF BEGINNING; thence South 16°52'20" West, 101.79 feet; thence North 73°07'40" West, 161.76 feet; thence North 31°22'33" West, 39.54 feet; thence North 58°43'34" East, 19.69 feet; thence Northeasterly 37.29 feet on a 64.00 foot radius curve to the left, the chord of which bears North 38°50'20" East, 36.77 feet; thence North 04°26'14" East, 26.75 feet; thence South 73°19'17" East, 170.13 feet to the place of beginning.

Together with and subject to an easement for ingress-egress and public utilities located in that part of Blocks 577, 578 & 579 of the Revised Plat of 1903 of the City of Muskegon, Section 25, Town 10 North, Range 17 West, City of Muskegon, Muskegon County, Michigan, said easement being described as: Beginning on the North right-of-way line of Western Avenue at a point being North 87 degrees 52 minutes 58 seconds West, 824.34 feet from the Southeast corner of Lot 4 of said Block 577; thence North 02 degrees 08 minutes 44 seconds East, 263.07 feet; thence North 34 degrees 14 minutes 29 seconds East, 74.27 feet; thence North 23 degrees 44 minutes 59 seconds East, 71.13 feet; thence North 02 degrees 08 minutes 44 seconds East, 164.98 feet; thence Northerly 75.89 feet on a 358.00 foot radius curve to the left, the chord of which bears North 03 degrees 55 minutes 38 seconds West, 75.75 feet; thence Northeasterly 53.16 feet on a 30.00 foot radius curve to the right, the chord of which bears North 40 degrees 45 minutes 35 seconds East, 46.47 feet; thence South 88 degrees 28 minutes 50 seconds East, 70.66 feet; thence Northeasterly 137.17 feet on a 141.00 foot radius curve to the left, the chord of which bears North 63 degrees 39 minutes 00 seconds East, 131.82 feet; thence Easterly 43.20 feet on a 165.00 foot radius non-tangential curve to the left, the chord of which bears South 81 degrees 06 minutes 34 seconds East, 43.07 feet; thence South 88 degrees 36 minutes 35 seconds East, 77.91 feet; thence Southeasterly 164.07 feet on a 105.00 foot radius curve to the right, the chord of which bears South 43 degrees 50 minutes 39 seconds East, 147.88 feet; thence South 00 degrees 55 minutes 16 seconds West, 231.33 feet; thence South 88 degrees 08 minutes 38 seconds East, 57.67 feet; thence North 01 degrees 56 minutes 07 seconds East, 248.95 feet; thence North 88 degrees 06 minutes 24 seconds West, 8.34 feet; thence North 32 degrees 59 minutes 53 seconds West, 152.26 feet; thence Northwesterly 11.02 feet on a 180.00 foot radius curve to the left, the chord of which bears North 60 degrees 10 minutes 49 seconds West, 11.02 feet; thence Northwesterly 23.47 feet on a 44.00 foot radius curve to the right, the chord of which bears North 46 degrees 39 minutes 17 seconds West, 23.19 feet; thence North 31 degrees 22 minutes 33 seconds West, 32.33 feet; thence South 58 degrees 41 minutes 48 seconds West, 30.10 feet; thence Southwesterly 24.54 feet on a 43.00 foot radius curve to the right, the chord of which bears South 75 degrees 02 minutes 37 seconds West, 24.20 feet; thence North 88 degrees 36 minutes 35 seconds West, 28.07 feet; thence Northwesterly 112.92 feet on a 113.00 foot radius curve to the right, the chord of which bears North 60 degrees 00 minutes 12 seconds West, 108.28 feet; thence North 31 degrees 22 minutes 33 seconds West, 304.82 feet; thence Northwesterly 25.59 feet on a 100.00 foot radius curve to the left, the chord of which bears North 38 degrees 42 minutes 28 seconds West, 25.52 feet; thence North 73 degrees 07 minutes 40 seconds West, 86.39 feet; thence Southwesterly 63.79 feet on a 52.00 foot radius curve to the left, the chord of which bears South 35 degrees 56 minutes 19 seconds West, 59.86 feet; thence South 58 degrees 37 minutes 27 seconds West, 514.47 feet; thence South 10 degrees 46 minutes 30 seconds West, 86.44 feet; thence South 31 degrees 22 minutes 33 seconds East, 25.92 feet; thence North 58 degrees 37 minutes 27 seconds East, 598.50 feet; thence South 31 degrees 22 minutes 33 seconds East, 297.13 feet; thence South 58 degrees 37 minutes 27 seconds West, 79.88 feet; thence North 88 degrees 28 minutes 50 seconds West, 95.92 feet; thence South 40 degrees 42 minutes 37 seconds West, 73.46 feet to Point A, so-called; thence Southerly 123.08 feet on a 292.00 foot radius curve to the right, the chord of which bears South 09 degrees 55 minutes 48 seconds East, 122.17 feet; thence South 02 degrees 08 minutes 44 seconds West, 161.50 feet; thence Southwesterly 72.07 feet on a 117.00 foot radius curve to the right, the chord of which bears South 19 degrees 47 minutes 30 seconds West, 70.93 feet; thence Southerly 143.52 feet on a 233.00 foot radius curve to the left, the chord of which bears South 19 degrees 47 minutes 30 seconds

West, 141.26 feet; thence South 02 degrees 08 minutes 44 seconds West, 194.05 feet to the North right-of-way line of Western Avenue; thence Easterly 23.28 feet along said North right-of-way line on a 430.58 foot radius curve to the right, the chord of which bears South 89 degrees 25 minutes 54 seconds East, 23.27 feet; thence South 87 degrees 52 minutes 58 seconds East, 41.40 feet along the North right-of-way line of Western Avenue to the place of beginning.

ALSO Together with and subject to an easement for ingress-egress and public utilities described as: Beginning at above mentioned Point A, so-called; thence South 89 degrees 12 minutes 02 seconds West, 32.68 feet; thence South 58 degrees 37 minutes 27 seconds West, 287.81 feet; thence Northwesterly 102.90 feet on a 91.00 foot radius non-tangential curve to the right, the chord of which bears North 63 degrees 46 minutes 09 seconds West, 97.50 feet; thence North 31 degrees 22 minutes 33 seconds West, 168.67 feet; thence North 58 degrees 37 minutes 27 seconds East, 87.08 feet; thence South 31 degrees 22 minutes 33 seconds East, 185.00 feet; thence North 58 degrees 37 minutes 27 seconds East, 285.00 feet; thence North 31 degrees 22 minutes 33 seconds West, 185.00 feet; thence North 58 degrees 37 minutes 27 seconds East, 66.00 feet; thence South 31 degrees 22 minutes 33 seconds East, 245.03 feet; thence South 40 degrees 42 minutes 37 seconds West, 73.46 feet to Point A, so called and the place of ending.

ALSO, A Pedestrian access easement for ingress and egress located in that part of Blocks 578 and 579 of the Revised Plat of 1903 of the City of Muskegon, Section 25, Town 10 North, Range 17 West, City of Muskegon, Muskegon County, Michigan, said easement being described as: COMMENCING at the Southeast corner of Lot 4 of Block 577; thence North 87°52'58" West 260.09 feet along the North right-of-way line of Western Avenue; thence North 01°56'07" East 659.31 feet along the East line of said Block 578 and its Southerly extension thereof; thence North 32°59'53" West 703.91 feet; thence South 57°00'07" West 256.48 feet to the PLACE OF BEGINNING; thence South 58°37'27" West 17.15 feet; thence North 31°36'08" West 164.18 feet; thence North 58°29'54" East 20.18 feet; thence South 31°22'32" East 57.90 feet; thence South 73°07'40" East 97.29 feet; thence South 16°52'20" West 16.00 feet; thence Southwesterly 63.79 feet on a 52.00 foot radius curve to the left, the chord of which bears South 35°56'19" West 59.86 feet to the place of beginning.

Received & Sealed for Record
MARK F. FAIRCHILD REGISTER OF DEEDS
Muskegon County Michigan
02/29/2024 09:02:00 AM Liber: 4349 Page: 448

MARK F. FAIRCHILD
REGISTER OF DEEDS
Muskegon County Michigan
5815024 M14

Liber: 4349 Page: 448
Page: 1 of 11
02/29/2024 09:02:00 AM

# ASSIGNMENT OF RENTS

RECORDATION REQUESTED BY:
West Shore Bank
201 W. Loomis Street, PO Box 627
Ludington, MI 49431-0627

WHEN RECORDED MAIL TO:
West Shore Bank
201 W. Loomis Street, PO Box 627
Ludington, MI 49431-0627

FOR RECORDER'S USE ONLY

---

# ASSIGNMENT OF RENTS

**THIS ASSIGNMENT OF RENTS dated February 28, 2024, is made and executed between ADELAIDE POINTE MULTI-USE, LLC, A Michigan Limited Liability Company, whose address is 1204 W WESTERN AVE, MUSKEGON, MI 49441-1674 (AS TO MULTI-USE PARCEL) (referred to below as "Grantor") and West Shore Bank, whose address is 201 W Loomis St, PO Box 627, Ludington, MI 49431 (referred to below as "Lender").**

**ASSIGNMENT. For valuable consideration, Grantor hereby assigns, grants a continuing security interest in, and conveys to Lender all of Grantor's right, title, and interest in and to the Rents from the following described Property located in MUSKEGON County, State of Michigan:**

**See EXHIBIT A , which is attached to this Assignment and made a part of this Assignment as if fully set forth herein.**

**The Property or its address is commonly known as 1204 W WESTERN AVENUE, MUSKEGON, MI 49441. The Property tax identification number is** [redacted]

**CROSS-COLLATERALIZATION.** In addition to the Note, this Assignment secures all obligations, debts and liabilities, plus interest thereon, of Grantor to Lender, or any one or more of them, as well as all claims by Lender against Grantor or any one or more of them, whether now existing or hereafter arising, whether related or unrelated to the purpose of the Note, whether voluntary or otherwise, whether due or not due, direct or indirect, determined or undetermined, absolute or contingent, liquidated or unliquidated, whether Grantor may be liable individually or jointly with others, whether obligated as guarantor, surety, accommodation party or otherwise, and whether recovery upon such amounts may be or hereafter may become barred by any statute of limitations, and whether the obligation to repay such amounts may be or hereafter may become otherwise unenforceable.

**FUTURE ADVANCES.** In addition to the Note, this Assignment secures all future advances made by Lender to Grantor whether or not the advances are made pursuant to a commitment. Specifically, without limitation, this Assignment secures, in addition to the amounts specified in the Note, all future amounts Lender in its discretion may loan to Grantor, together with all interest thereon.

**THIS ASSIGNMENT IS GIVEN TO SECURE (1) PAYMENT OF THE INDEBTEDNESS AND (2) PERFORMANCE OF ANY AND ALL OBLIGATIONS OF GRANTOR UNDER THE NOTE, THIS ASSIGNMENT, AND THE RELATED DOCUMENTS. THIS ASSIGNMENT IS GIVEN AND ACCEPTED ON THE FOLLOWING TERMS:**

**PAYMENT AND PERFORMANCE.** Except as otherwise provided in this Assignment or any Related Documents, Grantor shall pay to Lender all amounts secured by this Assignment as they become due, and shall strictly perform all of Grantor's obligations under this Assignment. Unless and until Lender exercises its right to collect the Rents as provided below and so long as there is no default under this Assignment, Grantor may remain in possession and control of and operate and manage the Property and collect the Rents, provided that the granting of the right to collect the Rents shall not constitute Lender's consent to the use of cash collateral in a bankruptcy proceeding.

**GRANTOR'S REPRESENTATIONS AND WARRANTIES.** Grantor warrants that:

**Ownership.** Grantor is entitled to receive the Rents free and clear of all rights, loans, liens, encumbrances, and claims except as disclosed to and accepted by Lender in writing.

**Right to Assign.** Grantor has the full right, power and authority to enter into this Assignment and to assign and convey the Rents to Lender.

**No Prior Assignment.** Grantor has not previously assigned or conveyed the Rents to any other person by any instrument now in force.

**No Further Transfer.** Grantor will not sell, assign, encumber, or otherwise dispose of any of Grantor's rights in the Rents except as provided in this Assignment.

**LENDER'S RIGHT TO RECEIVE AND COLLECT RENTS.** Lender shall have the right at any time, and even though no default shall have occurred under this Assignment, to collect and receive the Rents. For this purpose, Lender is hereby given and granted the following rights, powers and authority:

**Notice to Tenants.** Lender may send notices to any and all tenants of the Property advising them of this Assignment and directing all Rents to be paid directly to Lender or Lender's agent.

**Enter the Property.** Lender may enter upon and take possession of the Property; demand, collect and receive from the tenants or from any other persons liable therefor, all of the Rents; institute and carry on all legal proceedings necessary for the protection of the Property, including such proceedings as may be necessary to recover possession of the Property; collect the Rents and remove any tenant or tenants or other persons from the Property.

**Maintain the Property.** Lender may enter upon the Property to maintain the Property and keep the same in repair; to pay the costs thereof and of all services of all employees, including their equipment, and of all continuing costs and expenses of maintaining the Property in proper repair and condition, and also to pay all taxes, assessments and water utilities, and the premiums on fire and other insurance effected by Lender on the Property.

**Compliance with Laws.** Lender may do any and all things to execute and comply with the laws of the State of Michigan and also all other laws, rules, orders, ordinances and requirements of all other governmental agencies affecting the Property.

**Lease the Property.** Lender may rent or lease the whole or any part of the Property for such term or terms and on such conditions as Lender may deem appropriate.

**Employ Agents.** Lender may engage such agent or agents as Lender may deem appropriate, either in Lender's name or in Grantor's name, to rent and manage the Property, including the collection and application of Rents.

**Other Acts.** Lender may do all such other things and acts with respect to the Property as Lender may deem appropriate and may act exclusively and solely in the place and stead of Grantor and to have all of the powers of Grantor for the purposes stated above.

**No Requirement to Act.** Lender shall not be required to do any of the foregoing acts or things, and the fact that Lender shall have performed one or more of the foregoing acts or things shall not require Lender to do any other specific act or thing.

**APPLICATION OF RENTS.** All costs and expenses incurred by Lender in connection with the Property shall be for Grantor's account and Lender may pay such costs and expenses from the Rents. Lender, in its sole discretion, shall determine the application of any and all Rents received by it; however, any such Rents received by Lender which are not applied to such costs and expenses shall be applied to the Indebtedness. All expenditures made by Lender under this Assignment and not reimbursed from the Rents shall become a part of the Indebtedness secured by this Assignment, and shall be payable on demand, with interest at the Note rate from date of expenditure until paid.

**FULL PERFORMANCE.** If Grantor pays all of the Indebtedness when due and otherwise performs all the obligations imposed upon Grantor under this Assignment, the Note, and the Related Documents, Lender shall execute and deliver to Grantor a suitable satisfaction of this Assignment and suitable statements of termination of any financing statement on file evidencing Lender's security interest in the Rents and the Property. Any termination fee required by law shall be paid by Grantor, if permitted by applicable law.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Property or if Grantor fails to comply with any provision of this Assignment or any Related Documents, including but not limited to Grantor's failure to discharge or pay when due any amounts Grantor is required to discharge or pay under this Assignment or any Related Documents, Lender on Grantor's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Rents or the Property and paying all costs for insuring, maintaining and preserving the Property. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Grantor. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity. The Assignment also will secure payment of these amounts. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon the occurrence of any Event of Default.

**DEFAULT.** Each of the following, at Lender's option, shall constitute an Event of Default under this Assignment:

**Payment Default.** Grantor fails to make any payment when due under the Indebtedness.

**Other Defaults.** Grantor fails to comply with or to perform any other term, obligation, covenant or condition contained in this Assignment or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Grantor.

**Default on Other Payments.** Failure of Grantor within the time required by this Assignment to make any payment for taxes or insurance, or any other payment necessary to prevent filing of or to effect discharge of any lien. Such failure to make payment for taxes or insurance shall constitute waste at the time such items are due and payable.

**Default in Favor of Third Parties.** Any guarantor or Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of any guarantor's or Grantor's property or ability to perform their respective obligations under this Assignment or any of the Related Documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Grantor or

on Grantor's behalf under this Assignment or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Defective Collateralization.** This Assignment or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Death or Insolvency.** The dissolution of Grantor's (regardless of whether election to continue is made), any member withdraws from the limited liability company, or any other termination of Grantor's existence as a going business or the death of any member, the insolvency of Grantor, the appointment of a receiver for any part of Grantor's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Grantor.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Grantor or by any governmental agency against the Rents or any property securing the Indebtedness. This includes a garnishment of any of Grantor's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Grantor as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Grantor gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Property Damage or Loss.** The Property is lost, stolen, substantially damaged, sold, or borrowed against.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Adverse Change.** A material adverse change occurs in Grantor's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**RIGHTS AND REMEDIES ON DEFAULT.** Upon the occurrence of any Event of Default and at any time thereafter, Lender may exercise any one or more of the following rights and remedies, in addition to any other rights or remedies provided by law:

**Accelerate Indebtedness.** Lender shall have the right at its option without notice to Grantor to declare the entire Indebtedness immediately due and payable, including any prepayment fee that Grantor would be required to pay.

**Collect Rents.** Lender shall have the right, without notice to Grantor, to take possession of the Property and collect the Rents, including amounts past due and unpaid, and apply the net proceeds, over and above Lender's costs, against the Indebtedness. In furtherance of this right, Lender shall have all the rights provided for in the Lender's Right to Receive and Collect Rents Section, above. If the Rents are collected by Lender, then Grantor irrevocably designates Lender as Grantor's attorney-in-fact to endorse instruments received in payment thereof in the name of Grantor and to negotiate the same and collect the proceeds. Payments by tenants or other users to Lender in response to Lender's demand shall satisfy the obligations for which the payments are made, whether or not any proper grounds for the demand existed. Lender may exercise its rights under this subparagraph either in person, by agent, or through a receiver.

**Appoint Receiver.** Any failure of Grantor to pay any taxes assessed against the Property or to pay any installment of those taxes or to pay any insurance premium upon any policy covering any property located upon the Property shall constitute waste and shall entitle Lender to the appointment by a court of competent jurisdiction of a receiver of the Property for the purpose of preventing the waste, except that no receiver may be appointed for any dwelling house or farm occupied by any owner of it as the owner's home or farm or for any store or other business property having an assessed valuation of $7,500 or less.

Subject to the order of the court, the receiver may collect the rents and income from the Property and shall exercise control over the Property to the extent ordered by the court. A court may also appoint a receiver for the Property in any other circumstances permitted by law. Lender shall have the right to have a receiver appointed to take possession of all or any part of the Property, with the power to protect and preserve the Property, to operate the Property preceding foreclosure or sale, and to collect the Rents from the Property and apply the proceeds, over and above the cost of the receivership, against the Indebtedness. The receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Property exceeds the Indebtedness by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver.

**Other Remedies.** Lender shall have all other rights and remedies provided in this Assignment or the Note or by law.

**Election of Remedies.** Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Grantor under this Assignment, after Grantor's failure to perform, shall not affect Lender's right to declare a default and exercise its remedies.

**Attorneys' Fees; Expenses.** If Lender institutes any suit or action to enforce any of the terms of this Assignment, Lender shall be entitled to recover its reasonable attorneys' fees. Whether or not any court action is involved, and to the extent not prohibited by law, all reasonable expenses Lender incurs that in Lender's opinion are necessary at any time for the protection of its interest or the enforcement of its rights shall become a part of the Indebtedness payable on demand and shall bear interest at the Note rate from the date of the expenditure until repaid. Expenses covered by this paragraph include, without limitation, however subject to any limits under applicable law, Lender's reasonable attorneys' fees and Lender's legal expenses whether or not there is a lawsuit, including reasonable attorneys' fees and expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services, the cost of searching records, obtaining title reports (including foreclosure reports), surveyors' reports, and appraisal fees, title insurance, and fees for the Trustee, to the extent permitted by applicable law. Grantor also will pay any court costs, in addition to all other sums provided by law.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Assignment:

**Amendments.** This Assignment, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Assignment. No alteration of or amendment to this Assignment shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Caption Headings.** Caption headings in this Assignment are for convenience purposes only and are not to be used to interpret or define the provisions of this Assignment.

**Governing Law. This Assignment will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Michigan without regard to its conflicts of law provisions. This Assignment has been accepted by Lender in the State of Michigan.**

**Choice of Venue.** If there is a lawsuit, Grantor agrees upon Lender's request to submit to the jurisdiction of the courts of Mason County, State of Michigan.

**Merger.** There shall be no merger of the interest or estate created by this Assignment with any other interest or estate in the Property at any time held by or for the benefit of Lender in any capacity, without the written consent of Lender.

**Interpretation.** (1) In all cases where there is more than one Borrower or Grantor, then all words used in this Assignment in the singular shall be deemed to have been used in the plural where the context and construction so require. (2) If more than one person signs this Assignment as "Grantor," the obligations of each Grantor are joint and several. This means that if Lender brings a lawsuit, Lender may sue any one or more of the Grantors. If Borrower and Grantor are not the same person, Lender need not sue Borrower

first, and that Borrower need not be joined in any lawsuit. (3) The names given to paragraphs or sections in this Assignment are for convenience purposes only. They are not to be used to interpret or define the provisions of this Assignment.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Assignment unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Assignment shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Assignment. No prior waiver by Lender, nor any course of dealing between Lender and Grantor, shall constitute a waiver of any of Lender's rights or of any of Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Assignment, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Notices.** Any notice required to be given under this Assignment shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Assignment. Any party may change its address for notices under this Assignment by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Grantor agrees to keep Lender informed at all times of Grantor's current address. Unless otherwise provided or required by law, if there is more than one Grantor, any notice given by Lender to any Grantor is deemed to be notice given to all Grantors.

**Powers of Attorney.** The various agencies and powers of attorney conveyed on Lender under this Assignment are granted for purposes of security and may not be revoked by Grantor until such time as the same are renounced by Lender.

**Severability.** If a court of competent jurisdiction finds any provision of this Assignment to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Assignment. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Assignment shall not affect the legality, validity or enforceability of any other provision of this Assignment.

**Successors and Assigns.** Subject to any limitations stated in this Assignment on transfer of Grantor's interest, this Assignment shall be binding upon and inure to the benefit of the parties, their successors and assigns. If ownership of the Property becomes vested in a person other than Grantor, Lender, without notice to Grantor, may deal with Grantor's successors with reference to this Assignment and the Indebtedness by way of forbearance or extension without releasing Grantor from the obligations of this Assignment or liability under the Indebtedness.

**Time is of the Essence.** Time is of the essence in the performance of this Assignment.

**Waive Jury. All parties to this Assignment hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by any party against any other party.**

**Waiver of Homestead Exemption.** Grantor hereby releases and waives all rights and benefits of the homestead exemption laws of the State of Michigan as to all Indebtedness secured by this Assignment.

**Waiver of Right of Redemption.** NOTWITHSTANDING ANY OF THE PROVISIONS TO THE CONTRARY CONTAINED IN THIS ASSIGNMENT, GRANTOR HEREBY WAIVES ANY AND ALL RIGHTS OF REDEMPTION FROM SALE UNDER ANY ORDER OR JUDGMENT OF FORECLOSURE ON GRANTOR'S BEHALF AND ON BEHALF OF EACH AND EVERY PERSON, EXCEPT JUDGMENT CREDITORS OF GRANTOR, ACQUIRING ANY INTEREST IN OR TITLE TO THE PROPERTY SUBSEQUENT TO THE DATE OF

THIS ASSIGNMENT.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Assignment. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Assignment shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Assignment.** The word "Assignment" means this ASSIGNMENT OF RENTS, as this ASSIGNMENT OF RENTS may be amended or modified from time to time, together with all exhibits and schedules attached to this ASSIGNMENT OF RENTS from time to time.

**Borrower.** The word "Borrower" means ADELAIDE POINTE MULTI-USE, LLC.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Assignment in the default section of this Assignment.

**Grantor.** The word "Grantor" means ADELAIDE POINTE MULTI-USE, LLC.

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Indebtedness.

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

**Indebtedness.** The word "Indebtedness" means all principal, interest, and other amounts, costs and expenses payable under the Note or Related Documents, together with all renewals of, extensions of, modifications of, consolidations of and substitutions for the Note or Related Documents and any amounts expended or advanced by Lender to discharge Grantor's obligations or expenses incurred by Lender to enforce Grantor's obligations under this Assignment, together with interest on such amounts as provided in this Assignment. Specifically, without limitation, Indebtedness includes the future advances set forth in the Future Advances provision, together with all interest thereon and all amounts that may be indirectly secured by the Cross-Collateralization provision of this Assignment.

**Lender.** The word "Lender" means West Shore Bank, its successors and assigns.

**Note.** The word "Note" means AND INCLUDES WITHOUT LIMITATION ALL OF BORROWER'S PROMISSORY NOTES AND/OR CREDIT AGREEMENTS EVIDENCING BORROWER'S LOAN OBLIGATIONS IN FAVOR OF LENDER, TOGETHER WITH ALL RENEWALS OF, EXTENSIONS OF, MODIFICATIONS OF, REFINANCINGS OF, CONSOLIDATIONS OF AND SUBSTITUTIONS FOR PROMISSORY NOTES OR CREDIT AGREEMENTS.

**Property.** The word "Property" means all of Grantor's right, title and interest in and to all the Property as described in the "Assignment" section of this Assignment.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

**Rents.** The word "Rents" means all of Grantor's present and future rights, title and interest in, to and under any and all present and future leases, including, without limitation, all rents, revenue, income, issues, royalties, bonuses, accounts receivable, cash or security deposits, advance rentals, profits and proceeds from the Property, and other payments and benefits derived or to be derived from such leases of every kind and nature, whether due now or later, including without limitation Grantor's right to enforce such leases and to receive and collect payment and proceeds thereunder.

THE UNDERSIGNED ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS ASSIGNMENT, AND NOT PERSONALLY BUT AS AN AUTHORIZED SIGNER, HAS CAUSED THIS ASSIGNMENT TO BE SIGNED AND EXECUTED ON BEHALF OF GRANTOR ON FEBRUARY 28, 2024.

GRANTOR:

ADELAIDE POINTE MULTI-USE, LLC

By:________________________________
RYAN M LEESTMA, Manager of ADELAIDE POINTE MULTI-USE, LLC

---

This ASSIGNMENT OF RENTS was prepared by: ROBERT M FISHER II, VP COMMERCIAL LOANS
West Shore Bank
201 W Loomis St
Ludington, MI 49431

---

## LIMITED LIABILITY COMPANY ACKNOWLEDGMENT

**STATE OF** Michigan )
) **SS**
**COUNTY OF** Muskegon )

On this 28th day of February, 20 24, before me, the undersigned Notary Public, personally appeared **RYAN M LEESTMA, Manager of ADELAIDE POINTE MULTI-USE, LLC,** and known to me to be a member or designated agent of the limited liability company that executed the ASSIGNMENT OF RENTS and acknowledged the Assignment to be the free and voluntary act and deed of the limited liability company, by authority of statute, its articles of organization or its operating agreement, for the uses and purposes therein mentioned, and on oath stated that he or she is authorized to execute this Assignment and in fact executed the Assignment on behalf of the limited liability company.

**By** [signature] **My commission expires** ______________

**Notary Public, State of** ______________, **County of** ______________

**Acting in the County of** ______________

SHARLENE SHINELDECKER
Notary Public - State of Michigan
County of Muskegon
My Commission Expires Nov 9, 2027
Acting in the County of Muskegon

LaserPro, Ver. 20.1.0.034 Copr. Finastra USA Corporation 1997, 2024. All Rights Reserved. - MI
F:\HARLAND\CFI\LPL\G14.FC TR-31600 PR-53

EXHIBIT 'A'

(Multi-Purpose Parcel):
All that part of Block 578 of the Revised Plat of 1903 of the City of Muskegon, Section 25, Town 10 North, Range 17 West, City of Muskegon, Muskegon County, Michigan, described as: COMMENCING at the Southeast corner of Block 577; thence North 87°52'58" West, 260.09 feet along the North right-of-way line of Western Avenue; thence North 01°56'07" East, 659.31 feet along the East line of said Block 578 and its Southerly extension thereof; thence North 32°59'53" West, 729.95 feet; thence North 43°59'53" West, 34.86 feet; thence South 46°00'07" West, 63.51 feet to the PLACE OF BEGINNING; thence South 16°52'20" West, 101.79 feet; thence North 73°07'40" West, 161.76 feet; thence North 31°22'33" West, 39.54 feet; thence North 58°43'34" East, 19.69 feet; thence Northeasterly 37.29 feet on a 64.00 foot radius curve to the left, the chord of which bears North 38°50'20" East, 36.77 feet; thence North 04°26'14" East, 26.75 feet; thence South 73°19'17" East, 170.13 feet to the place of beginning.

Together with and subject to an easement for ingress-egress and public utilities located in that part of Blocks 577, 578 & 579 of the Revised Plat of 1903 of the City of Muskegon, Section 25, Town 10 North, Range 17 West, City of Muskegon, Muskegon County, Michigan, said easement being described as: Beginning on the North right-of-way line of Western Avenue at a point being North 87 degrees 52 minutes 58 seconds West, 824.34 feet from the Southeast corner of Lot 4 of said Block 577; thence North 02 degrees 08 minutes 44 seconds East, 263.07 feet; thence North 34 degrees 14 minutes 29 seconds East, 74.27 feet; thence North 23 degrees 44 minutes 59 seconds East, 71.13 feet; thence North 02 degrees 08 minutes 44 seconds East, 164.98 feet; thence Northerly 75.89 feet on a 358.00 foot radius curve to the left, the chord of which bears North 03 degrees 55 minutes 38 seconds West, 75.75 feet; thence Northeasterly 53.16 feet on a 30.00 foot radius curve to the right, the chord of which bears North 40 degrees 45 minutes 35 seconds East, 46.47 feet; thence South 88 degrees 28 minutes 50 seconds East, 70.66 feet; thence Northeasterly 137.17 feet on a 141.00 foot radius curve to the left, the chord of which bears North 63 degrees 39 minutes 00 seconds East, 131.82 feet; thence Easterly 43.20 feet on a 165.00 foot radius non-tangential curve to the left, the chord of which bears South 81 degrees 06 minutes 34 seconds East, 43.07 feet; thence South 88 degrees 36 minutes 35 seconds East, 77.91 feet; thence Southeasterly 164.07 feet on a 105.00 foot radius curve to the right, the chord of which bears South 43 degrees 50 minutes 39 seconds East, 147.88 feet; thence South 00 degrees 55 minutes 16 seconds West, 231.33 feet; thence South 88 degrees 08 minutes 38 seconds East, 57.67 feet; thence North 01 degrees 56 minutes 07 seconds East, 248.95 feet; thence North 88 degrees 06 minutes 24 seconds West, 8.34 feet; thence North 32 degrees 59 minutes 53 seconds West, 152.26 feet; thence Northwesterly 11.02 feet on a 180.00 foot radius curve to the left, the chord of which bears North 60 degrees 10 minutes 49 seconds West, 11.02 feet; thence Northwesterly 23.47 feet on a 44.00 foot radius curve to the right, the chord of which bears North 46 degrees 39 minutes 17 seconds West, 23.19 feet; thence North 31 degrees 22 minutes 33 seconds West, 32.33 feet; thence South 58 degrees 41 minutes 48 seconds West, 30.10 feet; thence Southwesterly 24.54 feet on a 43.00 foot radius curve to the right, the chord of which bears South 75 degrees 02 minutes 37 seconds West, 24.20 feet; thence North 88 degrees 36 minutes 35 seconds West, 28.07 feet; thence Northwesterly 112.92 feet on a 113.00 foot radius curve to the right, the chord of which bears North 60 degrees 00 minutes 12 seconds West, 108.28 feet; thence North 31 degrees 22 minutes 33 seconds West, 304.82 feet; thence Northwesterly 25.59 feet on a 100.00 foot radius curve to the left, the chord of which bears North 38 degrees 42 minutes 28 seconds West, 25.52 feet; thence North 73 degrees 07 minutes 40 seconds West, 86.39 feet; thence Southwesterly 63.79 feet on a 52.00 foot radius curve to the left, the chord of which bears South 35 degrees 56 minutes 19 seconds West, 59.86 feet; thence South 58 degrees 37 minutes 27 seconds West, 514.47 feet; thence South 10 degrees 46 minutes 30 seconds West, 86.44 feet; thence South 31 degrees 22 minutes 33 seconds East, 25.92 feet; thence North 58 degrees 37 minutes 27 seconds East, 598.50 feet; thence South 31 degrees 22 minutes 33 seconds East, 297.13 feet; thence South 58 degrees 37 minutes 27 seconds West, 79.88 feet; thence North 88 degrees 28 minutes 50 seconds West, 95.92 feet; thence South 40 degrees 42 minutes 37 seconds West, 73.46 feet to Point A, so-called; thence Southerly 123.08 feet on a 292.00 foot radius curve to the right, the chord of which bears South 09 degrees 55 minutes 48 seconds East, 122.17 feet; thence South 02 degrees 08 minutes 44 seconds West, 161.50 feet; thence Southwesterly 72.07 feet on a 117.00 foot radius curve to the right, the chord of which bears South 19 degrees 47 minutes 30 seconds West, 70.93 feet; thence Southerly 143.52 feet on a 233.00 foot radius curve to the left, the chord of which bears South 19 degrees 47 minutes 30 seconds

West, 141.26 feet; thence South 02 degrees 08 minutes 44 seconds West, 194.05 feet to the North right-of-way line of Western Avenue; thence Easterly 23.28 feet along said North right-of-way line on a 430.58 foot radius curve to the right, the chord of which bears South 89 degrees 25 minutes 54 seconds East, 23.27 feet; thence South 87 degrees 52 minutes 58 seconds East, 41.40 feet along the North right-of-way line of Western Avenue to the place of beginning.

ALSO Together with and subject to an easement for ingress-egress and public utilities described as: Beginning at above mentioned Point A, so-called; thence South 89 degrees 12 minutes 02 seconds West, 32.68 feet; thence South 58 degrees 37 minutes 27 seconds West, 287.81 feet; thence Northwesterly 102.90 feet on a 91.00 foot radius non-tangential curve to the right, the chord of which bears North 63 degrees 46 minutes 09 seconds West, 97.50 feet; thence North 31 degrees 22 minutes 33 seconds West, 168.67 feet; thence North 58 degrees 37 minutes 27 seconds East, 87.08 feet; thence South 31 degrees 22 minutes 33 seconds East, 185.00 feet; thence North 58 degrees 37 minutes 27 seconds East, 285.00 feet; thence North 31 degrees 22 minutes 33 seconds West, 185.00 feet; thence North 58 degrees 37 minutes 27 seconds East, 66.00 feet; thence South 31 degrees 22 minutes 33 seconds East, 245.03 feet; thence South 40 degrees 42 minutes 37 seconds West, 73.46 feet to Point A, so called and the place of ending.

ALSO, A Pedestrian access easement for ingress and egress located in that part of Blocks 578 and 579 of the Revised Plat of 1903 of the City of Muskegon, Section 25, Town 10 North, Range 17 West, City of Muskegon, Muskegon County, Michigan, said easement being described as: COMMENCING at the Southeast corner of Lot 4 of Block 577; thence North 87°52'58" West 260.09 feet along the North right-of-way line of Western Avenue; thence North 01°56'07" East 659.31 feet along the East line of said Block 578 and its Southerly extension thereof; thence North 32°59'53" West 703.91 feet; thence South 57°00'07" West 256.48 feet to the PLACE OF BEGINNING; thence South 58°37'27" West 17.15 feet; thence North 31°36'08" West 164.18 feet; thence North 58°29'54" East 20.18 feet; thence South 31°22'32" East 57.90 feet; thence South 73°07'40" East 97.29 feet; thence South 16°52'20" West 16.00 feet; thence Southwesterly 63.79 feet on a 52.00 foot radius curve to the left, the chord of which bears South 35°56'19" West 59.86 feet to the place of beginning.

# Composite Exhibit 2

# PROMISSORY NOTE

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $500,000.00 | 04-17-2025 | 04-17-2050 | [redacted]4771 | 1A2 / 84 | [redacted] | RMF | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item. Any item above containing "***" has been omitted due to text length limitations.

**Borrower:** ADELAIDE POINTE MULTI-USE, LLC
1204 W WESTERN AVE
MUSKEGON, MI 49441-1674

**Lender:** West Shore Bank
Main Office
201 W Loomis St
PO Box 627
Ludington, MI 49431
(231) 845-3500

**Principal Amount: $500,000.00** **Date of Note: April 17, 2025**

**PROMISE TO PAY. ADELAIDE POINTE MULTI-USE, LLC ("Borrower") promises to pay to West Shore Bank ("Lender"), or order, in lawful money of the United States of America, the principal amount of Five Hundred Thousand & 00/100 Dollars ($500,000.00), together with interest on the unpaid principal balance from April 17, 2025, until paid in full.**

**PAYMENT. Subject to any payment changes resulting from changes in the Index, Borrower will pay this loan in accordance with the following payment schedule, which calculates interest on the unpaid principal balances as described in the "INTEREST CALCULATION METHOD" paragraph using the interest rates described in this paragraph: 6 monthly consecutive interest payments, beginning May 17, 2025, with interest calculated on the unpaid principal balances using an interest rate based on the Three (3) Month Secured Overnight Financing Rate (SOFR) as published by the CME Group Benchmark Administration. The Index is a broad measure of the three month cost of borrowing cash collateralized by Treasury securities. The Index is currently published by the CME Group Benchmark Administration (the "3M SOFR Administrator") on its website each business day. (currently 4.361%), plus a margin of 3.000 percentage points, adjusted if necessary for the minimum and maximum rate limitations for this loan, resulting in an initial interest rate of 7.500% per annum based on a year of 360 days; 293 monthly consecutive principal and interest payments in the initial amount of $3,754.52 each, beginning November 17, 2025, with interest calculated on the unpaid principal balances using an interest rate based on the Three (3) Month Secured Overnight Financing Rate (SOFR) as published by the CME Group Benchmark Administration. The Index is a broad measure of the three month cost of borrowing cash collateralized by Treasury securities. The Index is currently published by the CME Group Benchmark Administration (the "3M SOFR Administrator") on its website each business day. (currently 4.361%), plus a margin of 3.000 percentage points, adjusted if necessary for the minimum and maximum rate limitations for this loan, resulting in an initial interest rate of 7.500% per annum based on a year of 360 days; and one principal and interest payment of $3,757.48 on April 17, 2050, with interest calculated on the unpaid principal balances using an interest rate based on the Three (3) Month Secured Overnight Financing Rate (SOFR) as published by the CME Group Benchmark Administration. The Index is a broad measure of the three month cost of borrowing cash collateralized by Treasury securities. The Index is currently published by the CME Group Benchmark Administration (the "3M SOFR Administrator") on its website each business day. (currently 4.361%), plus a margin of 3.000 percentage points, adjusted if necessary for the minimum and maximum rate limitations for this loan, resulting in an initial interest rate of 7.500% per annum based on a year of 360 days. This estimated final payment is based on the assumption that all payments will be made exactly as scheduled and that the Index does not change; the actual final payment will be for all principal and accrued interest not yet paid, together with any other unpaid amounts under this Note. Unless otherwise agreed or required by applicable law, payments will be applied first to any accrued unpaid interest; then to principal; and then to any late charges. Borrower will pay Lender at Lender's address shown above or at such other place as Lender may designate in writing.**

**LINE OF CREDIT.** This Note evidences a straight (non-revolving) line of credit with draw down period to expire on October 17, 2025. Advances under this Note, as well as directions for payment from Borrower's accounts, may be requested orally or in writing by Borrower or by an authorized person. Lender may, but need not, require that all oral requests be confirmed in writing. Borrower agrees to be liable for all sums either: (A) advanced in accordance with the instructions of an authorized person or (B) credited to any of Borrower's accounts with Lender. The unpaid principal balance owing on this Note at any time may be evidenced by endorsements on this Note or by Lender's internal records, including daily computer print-outs.

**VARIABLE INTEREST RATE.** The interest rate on this Note is subject to change from time to time based on changes in an independent index which is the Three (3) Month Secured Overnight Financing Rate (SOFR) as published by the CME Group Benchmark Administration. The Index is a broad measure of the three month cost of borrowing cash collateralized by Treasury securities. The Index is currently published by the CME Group Benchmark Administration (the "3M SOFR Administrator") on its website each business day. (the "Index"). The Index is not necessarily the lowest rate charged by Lender on its loans. If Lender determines, in its sole discretion, that the Index for this Note has become unavailable or unreliable, either temporarily, indefinitely, or permanently, during the term of this Note, Lender may amend this Note by designating a substantially similar substitute index. Lender may also amend and adjust any margin corresponding to the Index being substituted to accompany the substitute index. Margins corresponding to the Index are described in the "Payments" section. The change to the margin may be a positive or negative value, or zero. In making these amendments, Lender may take into consideration any then-prevailing market convention for selecting a substitute index and margin for the specific Index that is unavailable or unreliable. Such an amendment to the terms of this Note will become effective and bind Borrower 10 business days after Lender gives written notice to Borrower without any action or consent of the Borrower. Lender will tell Borrower the current Index rate upon Borrower's request. The interest rate change will not occur more often than each three months. Borrower understands that Lender may make loans based on other rates as well. **The Index currently is 4.361% per annum.** The interest rate or rates to be applied to the unpaid principal balance during this Note will be the rate or rates set forth herein in the "Payment" section. Notwithstanding any other provision of this Note, after the first payment stream, the interest rate for each subsequent payment stream will be effective as of the due date of the last payment in the just-ending payment stream. NOTICE: Under no circumstances will the interest rate on this Note be less than 7.500% per annum or more than the maximum rate allowed by applicable law. Whenever increases occur in the interest rate, Lender, at its option, may do one or more of the following: (A) increase Borrower's payments to ensure Borrower's loan will pay off by its original final maturity date, (B) increase Borrower's payments to cover accruing interest, (C) increase the number of Borrower's payments, and (D) continue Borrower's payments at the same amount and increase Borrower's final payment.

**INTEREST CALCULATION METHOD. Interest on this Note is computed on a 365/360 basis; that is, by applying the ratio of the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding (but not including February 29 in leap years). All interest payable under this Note is computed using this method.**

**PREPAYMENT.** Borrower may pay without penalty all or a portion of the amount owed earlier than it is due. Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments under the payment schedule. Rather, early payments will reduce the principal balance due and may result in Borrower's making fewer payments. Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Note, and Borrower will remain obligated to pay any further amount owed to Lender. **All written**

**communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: West Shore Bank, 201 W. Loomis Street, PO Box 627 Ludington, MI 49431-0627.**

**LATE CHARGE.** If a payment is 7 days or more late, Borrower will be charged **5.000% of the unpaid portion of the regularly scheduled payment.**

**INTEREST AFTER DEFAULT.** Upon default, including failure to pay upon final maturity, the interest rate on this Note shall be increased by adding an additional 3.000 percentage point margin ("Default Rate Margin"). The Default Rate Margin shall also apply to each succeeding interest rate change that would have applied had there been no default. After maturity, or after this Note would have matured had there been no default, the Default Rate Margin will continue to apply to the final interest rate described in this Note. However, in no event will the interest rate exceed the maximum interest rate limitations under applicable law.

**DEFAULT.** Each of the following shall constitute an event of default ("Event of Default") under this Note:

**Payment Default.** Borrower fails to make any payment when due under this Note.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note or in any of the related documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Default in Favor of Third Parties.** Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's property or Borrower's ability to repay this Note or perform Borrower's obligations under this Note or any of the related documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Note or the related documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Death or Insolvency.** The dissolution of Borrower (regardless of whether election to continue is made), any member withdraws from Borrower, or any other termination of Borrower's existence as a going business or the death of any member, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any guaranty of the indebtedness evidenced by this Note.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of this Note is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**LENDER'S RIGHTS.** Upon default, Lender may declare the entire unpaid principal balance under this Note and all accrued unpaid interest immediately due, and then Borrower will pay that amount.

**ATTORNEYS' FEES; EXPENSES.** Lender may hire or pay someone else to help collect this Note if Borrower does not pay. Borrower will pay Lender that amount. This includes, subject to any limits under applicable law, Lender's reasonable attorneys' fees and Lender's legal expenses whether or not there is a lawsuit, including reasonable attorneys' fees and expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. If not prohibited by applicable law, Borrower also will pay any court costs, in addition to all other sums provided by law.

**JURY WAIVER. Lender and Borrower hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by either Lender or Borrower against the other.**

**GOVERNING LAW. This Note will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Michigan without regard to its conflicts of law provisions. This Note has been accepted by Lender in the State of Michigan.**

**CHOICE OF VENUE.** If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of Mason County, State of Michigan.

**DISHONORED ITEM FEE.** Borrower will pay a fee to Lender of $25.00 if Borrower makes a payment on Borrower's loan and the check or preauthorized charge with which Borrower pays is later dishonored.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the indebtedness against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

**COLLATERAL.** Borrower acknowledges this Note is secured by

REAL ESTATE MORTGAGE AND ASSIGNMENT OF RENTS DATED 04/17/2025 on Real Property Located at 500 Adelaide Circle (Multi-Use Parcel), Muskegon, MI 49441

SECURITY AGREEMENT DATED 02/28/2024 Covering All Inventory, Chattel Paper, Accounts, Machinery, Equipment, General Intangibles, Furnishings, Fixtures, and all titled vehicles and property on which the Lender has placed a lien on title; whether any of the foregoing is owned now or acquired later; all accessions, additions, replacements, and substitutions relating to any of the foregoing; all records of any kind relating to any of the foregoing; all proceeds relating to any of the foregoing (including insurance, general intangibles and other accounts proceeds)

GUARANTY OF ADELAIDE POINTE QOZB LLC DATED 02/28/2024

GUARANTY OF ADELAIDE POINTE QOF LLC DATED 02/28/2024

GUARANTY OF HARBOR WEST QOZB MULTI-USE, LLC DATED 02/28/2024

GUARANTY OF HARBOR WEST QOZB LLC DATED 02/28/2024

GUARANTY OF HARBOR WEST QOF LLC DATED 02/28/2024

GUARANTY OF IBEX HOSPITALITY GROUP, LLC DATED 02/28/2024 SECURED BY SECURITY AGREEMENT DATED 02/28/2024 Covering All Inventory, Chattel Paper, Accounts, Equipment, General Intangibles, and all titled vehicles and property on which the Lender has placed a lien on title; whether any of the foregoing is owned now or acquired later; all accessions, additions, replacements, and substitutions relating to any of the foregoing; all records of any kind relating to any of the foregoing; all proceeds relating to any of the foregoing (including insurance, general intangibles and other accounts proceeds)

GUARANTY OF MUSKEGON BREWING COMPANY OPERATIONS, LLC DATED 04/17/2025 SECURED BY SECURITY AGREEMENT DATED 04/17/2025 Covering All Inventory, Chattel Paper, Accounts, Equipment, Liquor License (excluding All Alcoholic Inventory), General Intangibles, and all titled vehicles and property on which the Lender has placed a lien on title; whether any of the foregoing is owned now or acquired later; all accessions, additions, replacements, and substitutions relating to any of the foregoing; all records of any kind relating to any of the foregoing; all proceeds relating to any of the foregoing (including insurance, general intangibles and other accounts proceeds)

AND

Liquor License

Borrower is granting Lender a security interest in the following type (or items) or property; All general intangibles now owned or later acquired by Borrower, including, without limitation, all liquor licenses that are now issued, subsequently acquired, or renewed at a later date, and specifically Liquor License Number L-000473663 & L-000473664 renewals, replacements, extensions and modifications thereof, and permits associated therewith.
Upon default and foreclosure of any security interest granted Lender in any liquor license that is now issued, subsequently acquired, or renewed at a later dated and specifically Liquor License Number L-000473663 & L-000473664 and all renewals, replacements, extensions and modifications thereof, and permits associated therewith. Borrower agrees that it will not interfere or otherwise impede the transfer of any liquor license to the Lender, and further, Borrower agrees that it will fully cooperate with the Lender, the Michigan Liquor Control Commission or its successor or agency, and any other regulatory authority to facilitate the transfer of the liquor license to Lender. Borrower's failure to cooperate shall entitle Lender to damages and actual attorney fees; whether any of the foregoing it owned now or acquired later; all accessions, additions, replacements, and substitutions relating to any of the foregoing; all records of any kind relating to any of the foregoing all proceeds relating to any of the foregoing (including insurance, general intangibles and accounts proceeds); whether any of the foregoing is owned now or acquired later; all accessions, additions, replacements, and substitutions relating to any of the foregoing; all records of any kind relating to any of the foregoing; all proceeds relating to any of the foregoing (including insurance general intangibles and accounts proceeds).

GUARANTY OF ADELAIDE EVENTS LLC DATED 02/28/2024 SECURED BY SECURITY AGREEMENT DATED 02/28/2024 Covering All Inventory, Chattel Paper, Accounts, Equipment, General Intangibles, and all titled vehicles and property on which the Lender has placed a lien on title; whether any of the foregoing is owned now or acquired later; all accessions, additions, replacements, and substitutions relating to any of the foregoing; all records of any kind relating to any of the foregoing; all proceeds relating to any of the foregoing (including insurance, general intangibles and other accounts proceeds)

GUARANTY OF LEESTMA MANAGEMENT, LLC DATED 02/28/2024 SECURED BY SECURITY AGREEMENT DATED 02/28/2024 Covering All Inventory, Chattel Paper, Accounts, Equipment, General Intangibles, and all titled vehicles and property on which the Lender has placed a lien on title; whether any of the foregoing is owned now or acquired later; all accessions, additions, replacements, and substitutions relating to any of the foregoing; all records of any kind relating to any of the foregoing; all proceeds relating to any of the foregoing (including insurance, general intangibles and other accounts proceeds)

GUARANTY OF RYAN M LEESTMA DATED 02/28/2024

GUARANTY OF EMILY S LEESTMA DATED 02/28/2024

**CONDITIONS FOR FUTURE ADVANCES.** The conditions for future advances are officer approval for each advance. Advances will be deposited into account number specified or issuance of a Cashier's Check.

**AGREEMENT TO PROVIDE FINANCIAL STATEMENTS.** In the event of default for which Lender does not accelerate the loan, including the failure of Borrower to provide the financial statements as required hereunder of under the loan agreement, the applicable interest rate on the loan, for a period beginning three (3) days after written notice of such default and ending upon the curing of said noticed default, shall increase one quarter of one percent (.25%) for the first thirty (30) days of said default and increase an additional one quarter of one percent (.25%) during each thirty days (30) day period thereafter during which notice default continues. However, in no event will the interest rate exceed the maximum interest rate limitations under applicable law.

Such default interest rates shall apply to the outstanding principal balance as of the loan. Upon the curing of the noticed default, the interest rate on the loan shall revert to the initially agreed-upon interest rate effective on the date on which the default is cured.

This default provision will become effective if Lender is not in receipt of year-end financial statements within one-hundred-twenty (120) days after fiscal year end.

**SUCCESSOR INTERESTS.** The terms of this Note shall be binding upon Borrower, and upon Borrower's heirs, personal representatives, successors and assigns, and shall inure to the benefit of Lender and its successors and assigns.

**NOTIFY US OF INACCURATE INFORMATION WE REPORT TO CONSUMER REPORTING AGENCIES.** Borrower may notify Lender if Lender reports any inaccurate information about Borrower's account(s) to a consumer reporting agency. Borrower's written notice describing the specific inaccuracy(ies) should be sent to Lender at the following address: West Shore Bank 201 W. Loomis Street, PO Box 627 Ludington, MI 49431-0627.

**GENERAL PROVISIONS.** If any part of this Note cannot be enforced, this fact will not affect the rest of the Note. Lender may delay or forgo enforcing any of its rights or remedies under this Note without losing them. Borrower and any other person who signs, guarantees or endorses this Note, to the extent allowed by law, waive presentment, demand for payment, and notice of dishonor. Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability. All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral; and take any other action deemed necessary by Lender without the consent of or notice to anyone. All such parties also agree that Lender may modify

this loan without the consent of or notice to anyone other than the party with whom the modification is made. The obligations under this Note are joint and several.

**PRIOR TO SIGNING THIS NOTE, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE, INCLUDING THE VARIABLE INTEREST RATE PROVISIONS. BORROWER AGREES TO THE TERMS OF THE NOTE.**

**BORROWER ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS PROMISSORY NOTE.**

**BORROWER:**

**ADELAIDE POINTE MULTI-USE, LLC**

**By:**______________________________
**RYAN M LEESTMA, Manager of ADELAIDE POINTE MULTI-USE, LLC**

**LENDER:**

**WEST SHORE BANK**

**X**______________________________
**Robert M Fisher II, Vice President**

LaserPro, Ver. 20.1.0.034 Copr. Finastra USA Corporation 1997, 2025. All Rights Reserved. - MI F:\HARLAND\CFI\LPL\D20.FC TR-32802 PR-53

INPUT BY: SL 4.18.25

VERIFIED BY: TM 4-23-25

Received & Sealed for Record
William A. Moulatsiotis Register of Deeds
Muskegon County Michigan
04/18/2025 09:00:36 AM Liber: 4384 Page: 654

William A. Moulatsiotis
Register of Deeds
Muskegon County Michigan
5850201 M01

Liber: 4384 Page: 654
Page: 1 of 16
04/18/2025 09:00:36 AM

# CONSTRUCTION MORTGAGE

**RECORDATION REQUESTED BY:**
**West Shore Bank**
**201 W. Loomis Street, PO Box 627**
**Ludington, MI 49431-0627**

**WHEN RECORDED MAIL TO:**
**West Shore Bank**
**201 W. Loomis Street, PO Box 627**
**Ludington, MI 49431-0627**

FOR RECORDER'S USE ONLY

---

**THIS MORTGAGE dated April 17, 2025, is made and executed between ADELAIDE POINTE MULTI-USE, LLC, A Michigan Limited Liability Company, whose address is 1204 W WESTERN AVE, MUSKEGON, MI 49441-1674 (AS TO MULTI-USE PARCEL) (referred to below as "Grantor") and West Shore Bank, whose address is 201 W Loomis St, PO Box 627, Ludington, MI 49431 (referred to below as "Lender").**

**GRANT OF MORTGAGE. For valuable consideration, Grantor** mortgages and warrants to Lender all of Grantor's right, title, and interest in and to the following described real property, together with all existing or subsequently erected or affixed buildings, improvements and fixtures; all easements, rights of way, and appurtenances; all rights to make divisions of the land that are exempt from the platting requirements of the Michigan Land Division Act, as it shall be amended; all water, water rights, watercourses and ditch rights (including stock in utilities with ditch or irrigation rights); and all other rights, royalties, and profits relating to the real property, including without limitation all minerals, oil, gas, geothermal and similar matters, **(the "Real Property") located in Muskegon County, State of Michigan:**

**See Exhibit "A", which is attached to this Mortgage and made a part of this Mortgage as if fully set forth herein.**

**The Real Property or its address is commonly known as 500 Adelaide Circle (Multi-Use Parcel), Muskegon, MI 49441. The Real Property tax identification number is [redacted].**

**CROSS-COLLATERALIZATION.** In addition to the Note, this Mortgage secures all obligations, debts and liabilities, plus interest thereon, of Grantor to Lender, or any one or more of them, as well as all claims by Lender against Grantor or any one or more of them, whether now existing or hereafter arising, whether related or unrelated to the purpose of the Note, whether voluntary or otherwise, whether due or not due, direct or indirect, determined or undetermined, absolute or contingent, liquidated or unliquidated, whether Grantor may be liable individually or jointly with others, whether obligated as guarantor, surety, accommodation party or

otherwise, and whether recovery upon such amounts may be or hereafter may become barred by any statute of limitations, and whether the obligation to repay such amounts may be or hereafter may become otherwise unenforceable.

Grantor presently assigns to Lender all of Grantor's right, title, and interest in and to all present and future leases of the Property and all Rents from the Property. In addition, Grantor grants to Lender a Uniform Commercial Code security interest in the Personal Property and Rents.

**FUTURE ADVANCES.** In addition to the Note, this Mortgage secures all future advances made by Lender to Grantor whether or not the advances are made pursuant to a commitment. Specifically, without limitation, this Mortgage secures, in addition to the amounts specified in the Note, all future amounts Lender in its discretion may loan to Grantor, together with all interest thereon.

**THIS MORTGAGE, INCLUDING THE ASSIGNMENT OF RENTS AND THE SECURITY INTEREST IN THE RENTS AND PERSONAL PROPERTY, IS GIVEN TO SECURE (A) PAYMENT OF THE INDEBTEDNESS AND (B) PERFORMANCE OF ANY AND ALL COVENANTS AND OBLIGATIONS UNDER THE NOTE, THE RELATED DOCUMENTS, AND THIS MORTGAGE. THIS MORTGAGE IS GIVEN AND ACCEPTED ON THE FOLLOWING TERMS AND COVENANTS:**

**PAYMENT AND PERFORMANCE.** Except as otherwise provided in this Mortgage, Grantor shall pay to Lender all amounts secured by this Mortgage as they become due and shall strictly perform all of Grantor's obligations under this Mortgage.

**CONSTRUCTION MORTGAGE.** This Mortgage is a "construction mortgage" for the purposes of Sections 9-334 and 2A-309 of the Uniform Commercial Code, as those sections have been adopted by the State of Michigan.

**POSSESSION AND MAINTENANCE OF THE PROPERTY.** Grantor and Lender agree that Grantor's possession and use of the Property shall be governed by the following provisions:

**Possession and Use.** Until the occurrence of an Event of Default, Grantor may (1) remain in possession and control of the Property; (2) use, operate or manage the Property; and (3) collect the Rents from the Property.

**Duty to Maintain.** Grantor shall maintain the Property in tenantable condition and promptly perform all repairs, replacements, and maintenance necessary to preserve its value.

**Compliance With Environmental Laws.** Grantor represents and warrants to Lender that: (1) During the period of Grantor's ownership of the Property, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance by any person on, under, about or from the Property; (2) Grantor has no knowledge of, or reason to believe that there has been, except as previously disclosed to and acknowledged by Lender in writing, (a) any breach or violation of any Environmental Laws, (b) any use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance on, under, about or from the Property by any prior owners or occupants of the Property, or (c) any actual or threatened litigation or claims of any kind by any person relating to such matters; and (3) Except as previously disclosed to and acknowledged by Lender in writing, (a) neither Grantor nor any tenant, contractor, agent or other authorized user of the Property shall use, generate, manufacture, store, treat, dispose of or release any Hazardous Substance on, under, about or from the Property; and (b) any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations and ordinances, including without limitation all Environmental Laws. Grantor authorizes Lender and its agents to enter upon the Property to make such inspections and tests, at Grantor's expense, as Lender may deem appropriate to determine compliance of the Property with this section of the Mortgage. Any inspections or tests made by Lender shall be for Lender's purposes only and shall not be construed to create any responsibility or liability on the part of Lender to Grantor or to any other person. The representations and warranties contained herein are based on Grantor's due diligence in investigating the Property for Hazardous Substances. Grantor hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Grantor becomes liable for cleanup or other

costs under any such laws; and (2) agrees to indemnify, defend, and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Mortgage or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release occurring prior to Grantor's ownership or interest in the Property, whether or not the same was or should have been known to Grantor. The provisions of this section of the Mortgage, including the obligation to indemnify and defend, shall survive the payment of the Indebtedness and the satisfaction and reconveyance of the lien of this Mortgage and shall not be affected by Lender's acquisition of any interest in the Property, whether by foreclosure or otherwise.

**Nuisance, Waste.** Grantor shall not cause, conduct or permit any nuisance nor commit, permit, or suffer any stripping of or waste on or to the Property or any portion of the Property. Without limiting the generality of the foregoing, Grantor will not remove, or grant to any other party the right to remove, any timber, minerals (including oil and gas), coal, clay, scoria, soil, gravel or rock products without Lender's prior written consent.

**Removal of Improvements.** Grantor shall not demolish or remove any Improvements from the Real Property without Lender's prior written consent. As a condition to the removal of any Improvements, Lender may require Grantor to make arrangements satisfactory to Lender to replace such Improvements with Improvements of at least equal value.

**Lender's Right to Enter.** Lender and Lender's agents and representatives may enter upon the Real Property at all reasonable times to (a) attend to Lender's interests, (b) inspect the Property for purposes of Grantor's compliance with the terms and conditions of this Mortgage, (c) appraise the property, (d) investigate whether the property is a site or source of environmental contamination, or (e) remove to remediate any environmental contamination. Without limiting the foregoing, Lender shall have the right to conduct and submit to appropriate governmental agencies a "baseline environmental assessment" of the property within the meaning of section 20101 of the Michigan Natural Resources and Environmental Protection Act, MCL section 324.20101, as it shall be amended from time to time. If, at the time of the appraisal, investigation, assessment, removal, or remediation, there shall have occurred and be continuing an Event of Default, then all costs and expenses of the appraisal, investigation, assessment, removal or remediation, shall be subject to the "Lender's Expenditures" section of this Mortgage. Grantor shall execute any consultant contract, waste manifest, notice, and other documents that Lender requests to enable Lender to take or conduct any action or activity contemplated by this paragraph, if Grantor is given a reasonable opportunity to negotiate the terms of the contract, manifest, notice, or other document.

**Compliance with Governmental Requirements.** Grantor shall promptly comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the use or occupancy of the Property, including without limitation, the Americans With Disabilities Act. Grantor may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Grantor has notified Lender in writing prior to doing so and so long as, in Lender's sole opinion, Lender's interests in the Property are not jeopardized. Lender may require Grantor to post adequate security or a surety bond, reasonably satisfactory to Lender, to protect Lender's interest.

**Duty to Protect.** Grantor agrees neither to abandon or leave unattended the Property. Grantor shall do all other acts, in addition to those acts set forth above in this section, which from the character and use of the Property are reasonably necessary to protect and preserve the Property.

**CONSTRUCTION LOAN.** If some or all of the proceeds of the loan creating the Indebtedness are to be used to construct or complete construction of any Improvements on the Property, the Improvements shall be completed no later than the maturity date of the Note (or such earlier date as Lender may reasonably establish) and Grantor shall pay in full all costs and expenses in connection with the work. Lender will disburse loan proceeds under such terms and conditions as Lender may deem reasonably necessary to insure that the interest created by this Mortgage shall have priority over all possible liens, including those of material suppliers and workmen. Lender may require, among other things, that disbursement requests be supported by receipted bills, expense

affidavits, waivers of liens, construction progress reports, and such other documentation as Lender may reasonably request.

**DUE ON SALE - CONSENT BY LENDER.** Lender may, at Lender's option, declare immediately due and payable all sums secured by this Mortgage upon the sale or transfer, without Lender's prior written consent, of all or any part of the Real Property, or any interest in the Real Property. Grantor's "interest" in the Real Property shall be considered to include, without limitation, any right to make a division of the Real Property that is exempt from the requirement of the Michigan Land Division Act, as it shall be amended. A "sale or transfer" means the conveyance of Real Property or any right, title or interest in the Real Property; whether legal, beneficial or equitable; whether voluntary or involuntary; whether by outright sale, deed, installment sale contract, land contract, contract for deed, leasehold interest with a term greater than three (3) years, lease-option contract, or by sale, assignment, or transfer of any beneficial interest in or to any land trust holding title to the Real Property, or by any other method of conveyance of an interest in the Real Property. If any Grantor is a corporation, partnership or limited liability company, transfer also includes any restructuring of the legal entity (whether by merger, division or otherwise) or any change in ownership of more than twenty-five percent (25%) of the voting stock, partnership interests or limited liability company interests, as the case may be, of such Grantor. However, this option shall not be exercised by Lender if such exercise is prohibited by federal law or by Michigan law.

**TAXES AND LIENS.** The following provisions relating to the taxes and liens on the Property are part of this Mortgage:

**Payment.** Grantor shall pay when due (and in all events prior to delinquency) all taxes, payroll taxes, special taxes, assessments, water charges and sewer service charges levied against or on account of the Property, and shall pay when due all claims for work done on or for services rendered or material furnished to the Property. Grantor shall maintain the Property free of any liens having priority over or equal to the interest of Lender under this Mortgage, except for those liens specifically agreed to in writing by Lender, and except for the lien of taxes and assessments not due as further specified in the Right to Contest paragraph.

**Right to Contest.** Grantor may withhold payment of any tax, assessment, or claim in connection with a good faith dispute over the obligation to pay, so long as Lender's interest in the Property is not jeopardized. If a lien arises or is filed as a result of nonpayment, Grantor shall within fifteen (15) days after the lien arises or, if a lien is filed, within fifteen (15) days after Grantor has notice of the filing, secure the discharge of the lien, or if requested by Lender, deposit with Lender cash or a sufficient corporate surety bond or other security satisfactory to Lender in an amount sufficient to discharge the lien plus any costs and reasonable attorneys' fees, or other charges that could accrue as a result of a foreclosure or sale under the lien. In any contest, Grantor shall defend itself and Lender and shall satisfy any adverse judgment before enforcement against the Property. Grantor shall name Lender as an additional obligee under any surety bond furnished in the contest proceedings.

**Evidence of Payment.** Grantor shall upon demand furnish to Lender satisfactory evidence of payment of the taxes or assessments and shall authorize the appropriate governmental official to deliver to Lender at any time a written statement of the taxes and assessments against the Property.

**Notice of Construction.** Grantor shall notify Lender at least fifteen (15) days before any work is commenced, any services are furnished, or any materials are supplied to the Property, if any mechanic's lien, materialmen's lien, or other lien could be asserted on account of the work, services, or materials. Grantor will upon request of Lender furnish to Lender advance assurances satisfactory to Lender that Grantor can and will pay the cost of such improvements.

**PROPERTY DAMAGE INSURANCE.** The following provisions relating to insuring the Property are a part of this Mortgage:

**Maintenance of Insurance.** Grantor shall procure and maintain policies of fire insurance with standard extended coverage endorsements on a replacement basis for the full insurable value covering all Improvements on the Real Property in an amount sufficient to avoid application of any coinsurance clause,

and with a standard mortgagee clause in favor of Lender. Grantor shall also procure and maintain comprehensive general liability insurance in such coverage amounts as Lender may request with Lender being named as additional insureds in such liability insurance policies. Additionally, Grantor shall maintain such other insurance, including but not limited to hazard, business interruption and boiler insurance as Lender may require. Policies shall be written by such insurance companies and in such form as may be reasonably acceptable to Lender. Grantor shall deliver to Lender certificates of coverage from each insurer containing a stipulation that coverage will not be cancelled or diminished without a minimum of thirty (30) days' prior written notice to Lender and not containing any disclaimer of the insurer's liability for failure to give such notice. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Grantor or any other person. Should the Real Property be located in an area designated by the Administrator of the Federal Emergency Management Agency as a special flood hazard area, Grantor agrees to obtain and maintain flood insurance, if available, for the full unpaid principal balance of the loan and any prior liens on the property securing the loan, up to the maximum policy limits set under the National Flood Insurance Program, or as otherwise required by Lender, and to maintain such insurance for the term of the loan. Flood insurance may be purchased under the National Flood Insurance Program, from private insurers providing "private flood insurance" as defined by applicable federal flood insurance statutes and regulations, or from another flood insurance provider that is both acceptable to Lender in its sole discretion and permitted by applicable federal flood insurance statutes and regulations.

**Application of Proceeds.** Grantor shall promptly notify Lender of any loss or damage to the Property. Lender may make proof of loss if Grantor fails to do so within fifteen (15) days of the casualty. Whether or not Lender's security is impaired, Lender may, at Lender's election, receive and retain the proceeds of any insurance and apply the proceeds to the reduction of the Indebtedness, payment of any lien affecting the Property, or the restoration and repair of the Property. If Lender elects to apply the proceeds to restoration and repair, Grantor shall repair or replace the damaged or destroyed Improvements in a manner satisfactory to Lender. Lender shall, upon satisfactory proof of such expenditure, pay or reimburse Grantor from the proceeds for the reasonable cost of repair or restoration if Grantor is not in default under this Mortgage. Any proceeds which have not been disbursed within 180 days after their receipt and which Lender has not committed to the repair or restoration of the Property shall be used first to pay any amount owing to Lender under this Mortgage, then to pay accrued interest, and the remainder, if any, shall be applied to the principal balance of the Indebtedness. If Lender holds any proceeds after payment in full of the Indebtedness, such proceeds shall be paid to Grantor as Grantor's interests may appear.

**Grantor's Report on Insurance.** Upon request of Lender, however not more than once a year, Grantor shall furnish to Lender a report on each existing policy of insurance showing: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the property insured, the then current replacement value of such property, and the manner of determining that value; and (5) the expiration date of the policy. Grantor shall, upon request of Lender, have an independent appraiser satisfactory to Lender determine the cash value replacement cost of the Property.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Property or if Grantor fails to comply with any provision of this Mortgage or any Related Documents, including but not limited to Grantor's failure to discharge or pay when due any amounts Grantor is required to discharge or pay under this Mortgage or any Related Documents, Lender on Grantor's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Property and paying all costs for insuring, maintaining and preserving the Property. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Grantor. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity. The Mortgage also

will secure payment of these amounts. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon the occurrence of any Event of Default.

**WARRANTY; DEFENSE OF TITLE.** The following provisions relating to ownership of the Property are a part of this Mortgage:

**Title.** Grantor warrants that: (a) Grantor holds good and marketable title of record to the Property in fee simple, free and clear of all liens and encumbrances other than those set forth in the Real Property description or in any title insurance policy, title report, or final title opinion issued in favor of, and accepted by, Lender in connection with this Mortgage, and (b) Grantor has the full right, power, and authority to execute and deliver this Mortgage to Lender.

**Defense of Title.** Subject to the exception in the paragraph above, Grantor warrants and will forever defend the title to the Property against the lawful claims of all persons. In the event any action or proceeding is commenced that questions Grantor's title or the interest of Lender under this Mortgage, Grantor shall defend the action at Grantor's expense. Grantor may be the nominal party in such proceeding, but Lender shall be entitled to participate in the proceeding and to be represented in the proceeding by counsel of Lender's own choice, and Grantor will deliver, or cause to be delivered, to Lender such instruments as Lender may request from time to time to permit such participation.

**Compliance With Laws.** Grantor warrants that the Property and Grantor's use of the Property complies with all existing applicable laws, ordinances, and regulations of governmental authorities.

**Survival of Representations and Warranties.** All representations, warranties, and agreements made by Grantor in this Mortgage shall survive the execution and delivery of this Mortgage, shall be continuing in nature, and shall remain in full force and effect until such time as Grantor's Indebtedness shall be paid in full.

**CONDEMNATION.** The following provisions relating to condemnation proceedings are a part of this Mortgage:

**Proceedings.** If any proceeding in condemnation is filed, Grantor shall promptly notify Lender in writing, and Grantor shall promptly take such steps as may be necessary to defend the action and obtain the award. Grantor may be the nominal party in such proceeding, but Lender shall be entitled to participate in the proceeding and to be represented in the proceeding by counsel of its own choice, and Grantor will deliver or cause to be delivered to Lender such instruments and documentation as may be requested by Lender from time to time to permit such participation.

**Application of Net Proceeds.** If all or any part of the Property is condemned by eminent domain proceedings or by any proceeding or purchase in lieu of condemnation, Lender may at its election require that all or any portion of the net proceeds of the award be applied to the Indebtedness or the repair or restoration of the Property. The net proceeds of the award shall mean the award after payment of all reasonable costs, expenses, and attorneys' fees incurred by Lender in connection with the condemnation.

**IMPOSITION OF TAXES, FEES AND CHARGES BY GOVERNMENTAL AUTHORITIES.** The following provisions relating to governmental taxes, fees and charges are a part of this Mortgage:

**Current Taxes, Fees and Charges.** Upon request by Lender, Grantor shall execute such documents in addition to this Mortgage and take whatever other action is requested by Lender to perfect and continue Lender's lien on the Real Property. Grantor shall reimburse Lender for all taxes, as described below, together with all expenses incurred in recording, perfecting or continuing this Mortgage, including without limitation all taxes, fees, documentary stamps, and other charges for recording or registering this Mortgage.

**Taxes.** The following shall constitute taxes to which this section applies: (1) a specific tax upon this type of Mortgage or upon all or any part of the Indebtedness secured by this Mortgage; (2) a specific tax on Grantor which Grantor is authorized or required to deduct from payments on the Indebtedness secured by this type of Mortgage; (3) a tax on this type of Mortgage chargeable against the Lender or the holder of the Note; and (4) a specific tax on all or any portion of the Indebtedness or on payments of principal and interest made by Grantor.

**Subsequent Taxes.** If any tax to which this section applies is enacted subsequent to the date of this Mortgage, this event shall have the same effect as an Event of Default, and Lender may exercise any or all of its available remedies for an Event of Default as provided below unless Grantor either (1) pays the tax before it becomes delinquent, or (2) contests the tax as provided above in the Taxes and Liens section and deposits with Lender cash or a sufficient corporate surety bond or other security satisfactory to Lender.

**SECURITY AGREEMENT; FINANCING STATEMENTS.** The following provisions relating to this Mortgage as a security agreement are a part of this Mortgage:

**Security Agreement.** This instrument shall constitute a Security Agreement to the extent any of the Property constitutes fixtures, and Lender shall have all of the rights of a secured party under the Uniform Commercial Code as amended from time to time.

**Security Interest.** Upon request by Lender, Grantor shall take whatever action is requested by Lender to perfect and continue Lender's security interest in the Personal Property. In addition to recording this Mortgage in the real property records, Lender may, at any time and without further authorization from Grantor, file executed counterparts, copies or reproductions of this Mortgage as a financing statement. Grantor shall reimburse Lender for all expenses incurred in perfecting or continuing this security interest. Upon default, Grantor shall not remove, sever or detach the Personal Property from the Property. Upon default, Grantor shall assemble any Personal Property not affixed to the Property in a manner and at a place reasonably convenient to Grantor and Lender and make it available to Lender within three (3) days after receipt of written demand from Lender to the extent permitted by applicable law.

**Addresses.** The mailing addresses of Grantor (debtor) and Lender (secured party) from which information concerning the security interest granted by this Mortgage may be obtained (each as required by the Uniform Commercial Code) are as stated on the first page of this Mortgage.

**FURTHER ASSURANCES; ATTORNEY-IN-FACT.** The following provisions relating to further assurances and attorney-in-fact are a part of this Mortgage:

**Further Assurances.** At any time, and from time to time, upon request of Lender, Grantor will make, execute and deliver, or will cause to be made, executed or delivered, to Lender or to Lender's designee, and when requested by Lender, cause to be filed, recorded, refiled, or rerecorded, as the case may be, at such times and in such offices and places as Lender may deem appropriate, any and all such mortgages, deeds of trust, security deeds, security agreements, financing statements, continuation statements, instruments of further assurance, certificates, and other documents as may, in the sole opinion of Lender, be necessary or desirable in order to effectuate, complete, perfect, continue, or preserve (1) Grantor's obligations under the Note, this Mortgage, and the Related Documents, and (2) the liens and security interests created by this Mortgage on the Property, whether now owned or hereafter acquired by Grantor. Unless prohibited by law or Lender agrees to the contrary in writing, Grantor shall reimburse Lender for all costs and expenses incurred in connection with the matters referred to in this paragraph.

**Attorney-in-Fact.** If Grantor fails to do any of the things referred to in the preceding paragraph, Lender may do so for and in the name of Grantor and at Grantor's expense. For such purposes, Grantor hereby irrevocably appoints Lender as Grantor's attorney-in-fact for the purpose of making, executing, delivering, filing, recording, and doing all other things as may be necessary or desirable, in Lender's sole opinion, to accomplish the matters referred to in the preceding paragraph.

**FULL PERFORMANCE.** If Grantor pays all the Indebtedness, including without limitation all future advances, when due, and otherwise performs all the obligations imposed upon Grantor under this Mortgage, Lender shall execute and deliver to Grantor a suitable satisfaction of this Mortgage and suitable statements of termination of any financing statement on file evidencing Lender's security interest in the Rents and the Personal Property. Grantor will pay, if permitted by applicable law, any reasonable termination fee as determined by Lender from time to time.

**EVENTS OF DEFAULT.** Each of the following, at Lender's option, shall constitute an Event of Default under

this Mortgage:

**Payment Default.** Grantor fails to make any payment when due under the Indebtedness.

**Default on Other Payments.** Failure of Grantor within the time required by this Mortgage to make any payment for taxes or insurance, or any other payment necessary to prevent filing of or to effect discharge of any lien. Such failure to make payment for taxes or insurance shall constitute waste at the time such items are due and payable.

**Other Defaults.** Grantor fails to comply with or to perform any other term, obligation, covenant or condition contained in this Mortgage or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Grantor.

**Default in Favor of Third Parties.** Should Grantor default under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Grantor's property or Grantor's ability to repay the Indebtedness or Grantor's ability to perform Grantor's obligations under this Mortgage or any of the Related Documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Grantor or on Grantor's behalf under this Mortgage or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Defective Collateralization.** This Mortgage or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Death or Insolvency.** The dissolution of Grantor's (regardless of whether election to continue is made), any member withdraws from the limited liability company, or any other termination of Grantor's existence as a going business or the death of any member, the insolvency of Grantor, the appointment of a receiver for any part of Grantor's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Grantor.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Grantor or by any governmental agency against any property securing the Indebtedness. This includes a garnishment of any of Grantor's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Grantor as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Grantor gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Breach of Other Agreement.** Any breach by Grantor under the terms of any other agreement between Grantor and Lender that is not remedied within any grace period provided therein, including without limitation any agreement concerning any indebtedness or other obligation of Grantor to Lender, whether existing now or later.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Adverse Change.** A material adverse change occurs in Grantor's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**RIGHTS AND REMEDIES ON DEFAULT.** Upon the occurrence of an Event of Default and at any time thereafter, Lender, at Lender's option, may exercise any one or more of the following rights and remedies, in addition to any other rights or remedies provided by law:

**Accelerate Indebtedness.** Lender shall have the right at its option without notice to Grantor to declare the entire Indebtedness immediately due and payable, including any prepayment fee that Grantor would be required to pay.

**UCC Remedies.** With respect to all or any part of the Personal Property, Lender shall have all the rights and remedies of a secured party under the Uniform Commercial Code. Without limiting those rights and remedies, Lender may, at its option, either (a) enforce its security interest in the Personal Property under the Uniform Commercial Code or other applicable law or (b) include the Personal Property in any judicial or non-judicial foreclosure of this Mortgage.

**Collect Rents.** Lender shall have the right, without notice to Grantor, to take possession of the Property and collect the Rents, including amounts past due and unpaid, and apply the net proceeds, over and above Lender's costs, against the Indebtedness. In furtherance of this right, Lender may require any tenant or other user of the Property to make payments of rent or use fees directly to Lender. If the Rents are collected by Lender, then Grantor irrevocably designates Lender as Grantor's attorney-in-fact to endorse instruments received in payment thereof in the name of Grantor and to negotiate the same and collect the proceeds. Payments by tenants or other users to Lender in response to Lender's demand shall satisfy the obligations for which the payments are made, whether or not any proper grounds for the demand existed. Lender may exercise its rights under this subparagraph either in person, by agent, or through a receiver.

**Appoint Receiver.** Any failure of Grantor to pay any taxes assessed against the Property or to pay any installment of those taxes or to pay any insurance premium upon any policy covering any property located upon the Property shall constitute waste and shall entitle Lender to the appointment by a court of competent jurisdiction of a receiver of the Property for the purpose of preventing the waste, except that no receiver may be appointed for any dwelling house or farm occupied by any owner of it as the owner's home or farm or for any store or other business property having an assessed valuation of $7,500 or less. Subject to the order of the court, the receiver may collect the rents and income from the Property and shall exercise control over the Property to the extent ordered by the court. A court may also appoint a receiver for the Property in any other circumstances permitted by law. Lender shall have the right to have a receiver appointed to take possession of all or any part of the Property, with the power to protect and preserve the Property, to operate the Property preceding foreclosure or sale, and to collect the Rents from the Property and apply the proceeds, over and above the cost of the receivership, against the Indebtedness. The receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Property exceeds the Indebtedness by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver.

**Judicial Foreclosure.** Lender may obtain a judicial decree foreclosing Grantor's interest in all or any part of the Property.

**Nonjudicial Sale.** Lender may sell, release and convey the Real Property at public sale and sign and deliver to the purchasers at the sale good and sufficient deeds of conveyance, paying any surplus funds, after payment in full of the sums then due under this Mortgage and the expenses of the sale, including attorney fees as provided by law, to Grantor, all in accordance with applicable law.

**Warning. This Mortgage contains a power of sale, and, upon default, may be foreclosed by advertisement. In foreclosure by advertisement, no hearing is involved and the only notice required is to publish notice in a local newspaper and to post a copy of the notice on the Property.**

**Waiver.** If this Mortgage is foreclosed by advertisement, Grantor hereby voluntarily and knowingly waives all rights under the Constitution and laws of the State of Michigan and Constitution and laws of the United States to all notice and a hearing in connection with the above-mentioned foreclosure by advertisement, except as set forth in the Michigan statute providing for foreclosure by advertisement.

**Deficiency Judgment.** If permitted by applicable law, Lender may obtain a judgment for any deficiency remaining in the Indebtedness due to Lender after application of all amounts received from the exercise of the rights provided in this section.

**Tenancy at Will.** If Grantor remains in possession of the Property after Lender or the purchaser at a foreclosure sale of the Property become lawfully entitled to possession of the Property, the Grantor shall become a tenant at will of Lender or the purchaser of the Property and shall, at the option of the person lawfully entitled to possession, either (1) pay a reasonable rental for the use of the Property or (2) vacate the Property immediately upon the demand of the person lawfully entitled to possession.

**Other Remedies.** Lender shall have all other rights and remedies provided in this Mortgage or the Note or available at law or in equity.

**Sale of the Property.** To the extent permitted by applicable law, Grantor hereby waives any and all right to have the Property marshalled. In exercising its rights and remedies, Lender shall be free to sell all or any part of the Property together or separately, in one sale or by separate sales and Grantor waives Grantor's rights under MCLA Section 600.3224 to have separate parcels sold separately and to have no more parcels than necessary sold. Lender shall be entitled to bid at any public sale on all or any portion of the Property.

**Notice of Sale.** Lender shall give Grantor reasonable notice of the time and place of any public sale of the Personal Property or of the time after which any private sale or other intended disposition of the Personal Property is to be made. Reasonable notice shall mean notice given at least ten (10) days before the time of the sale or disposition. Any sale of the Personal Property may be made in conjunction with any sale of the Real Property.

**Election of Remedies.** Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Grantor under this Mortgage, after Grantor's failure to perform, shall not affect Lender's right to declare a default and exercise its remedies. Nothing under this Mortgage or otherwise shall be construed so as to limit or restrict the rights and remedies available to Lender following an Event of Default, or in any way to limit or restrict the rights and ability of Lender to proceed directly against Grantor and/or against any other co-maker, guarantor, surety or endorser and/or to proceed against any other collateral directly or indirectly securing the Indebtedness. After the date that payment of the Indebtedness secured by this Mortgage has been accelerated by Lender, acceptance by Lender of any amount(s) paid by or on behalf of Grantor which is less than the full unpaid balance of the Indebtedness, including without limitation all accrued interest, late charges and other amounts due Lender under this Mortgage, shall not be deemed a waiver of default or acceleration, but shall be credited toward the unpaid balance of the Indebtedness, unless Lender shall specifically agree in writing to waive any such default or acceleration or both.

**Attorneys' Fees; Expenses.** If Lender institutes any suit or action to enforce any of the terms of this Mortgage, Lender shall be entitled to recover its reasonable attorneys' fees. Whether or not any court action is involved, and to the extent not prohibited by law, all reasonable expenses Lender incurs that in Lender's opinion are necessary at any time for the protection of its interest or the enforcement of its rights shall become a part of the Indebtedness payable on demand and shall bear interest at the Note rate from the date of the expenditure until repaid. Expenses covered by this paragraph include, without limitation, however subject to any limits under applicable law, Lender's reasonable attorneys' fees and Lender's legal expenses whether or not there is a lawsuit, including reasonable attorneys' fees and expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services, the cost of searching records, obtaining title reports (including foreclosure reports), surveyors' reports, and appraisal fees and title insurance, to the extent permitted by applicable law. Grantor also will pay any court costs, in addition to all other sums provided by law.

**NOTICES.** Any notice required to be given under this Mortgage, including without limitation any notice of default and any notice of sale shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Mortgage. All copies of notices of foreclosure from the holder of any lien which has priority over this Mortgage shall be sent to Lender's address, as shown near the beginning of this Mortgage. Any party may change its address for

notices under this Mortgage by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Grantor agrees to keep Lender informed at all times of Grantor's current address. Unless otherwise provided or required by law, if there is more than one Grantor, any notice given by Lender to any Grantor is deemed to be notice given to all Grantors.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Mortgage:

**Amendments.** This Mortgage, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Mortgage. No alteration of or amendment to this Mortgage shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Annual Reports.** If the Property is used for purposes other than Grantor's residence, Grantor shall furnish to Lender, upon request, a certified statement of net operating income received from the Property during Grantor's previous fiscal year in such form and detail as Lender shall require. "Net operating income" shall mean all cash receipts from the Property less all cash expenditures made in connection with the operation of the Property.

**Caption Headings.** Caption headings in this Mortgage are for convenience purposes only and are not to be used to interpret or define the provisions of this Mortgage.

**Governing Law. This Mortgage will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Michigan without regard to its conflicts of law provisions. This Mortgage has been accepted by Lender in the State of Michigan.**

**Choice of Venue.** If there is a lawsuit, Grantor agrees upon Lender's request to submit to the jurisdiction of the courts of Mason County, State of Michigan.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Mortgage unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Mortgage shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Mortgage. No prior waiver by Lender, nor any course of dealing between Lender and Grantor, shall constitute a waiver of any of Lender's rights or of any of Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Mortgage, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Severability.** If a court of competent jurisdiction finds any provision of this Mortgage to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Mortgage. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Mortgage shall not affect the legality, validity or enforceability of any other provision of this Mortgage.

**Merger.** There shall be no merger of the interest or estate created by this Mortgage with any other interest or estate in the Property at any time held by or for the benefit of Lender in any capacity, without the written consent of Lender.

**Successors and Assigns.** Subject to any limitations stated in this Mortgage on transfer of Grantor's interest, this Mortgage shall be binding upon and inure to the benefit of the parties, their successors and assigns. If ownership of the Property becomes vested in a person other than Grantor, Lender, without notice to Grantor, may deal with Grantor's successors with reference to this Mortgage and the Indebtedness by way of forbearance or extension without releasing Grantor from the obligations of this Mortgage or liability under the Indebtedness.

**Time is of the Essence.** Time is of the essence in the performance of this Mortgage.

**Use of Pronouns.** Any term used to designate any of the parties in this Mortgage shall be deemed to include the respective heirs, estate representatives, successors, and assigns of the parties, and all pronouns and relative words used in this Mortgage are intended to apply in the singular, plural, feminine or neuter forms as the context may require, to appropriately refer to the parties designated.

**Waive Jury. All parties to this Mortgage hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by any party against any other party.**

**Waiver of Homestead Exemption.** Grantor hereby releases and waives all rights and benefits of the homestead exemption laws of the State of Michigan as to all Indebtedness secured by this Mortgage.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Mortgage. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Mortgage shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Borrower.** The word "Borrower" means ADELAIDE POINTE MULTI-USE, LLC and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Mortgage in the events of default section of this Mortgage.

**Grantor.** The word "Grantor" means ADELAIDE POINTE MULTI-USE, LLC.

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Indebtedness.

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Improvements.** The word "Improvements" means all existing and future improvements, buildings, structures, mobile homes affixed on the Real Property, facilities, additions, replacements and other construction on the Real Property.

**Indebtedness.** The word "Indebtedness" means all principal, interest, and other amounts, costs and expenses payable under the Note or Related Documents, together with all renewals of, extensions of, modifications of, consolidations of and substitutions for the Note or Related Documents and any amounts expended or advanced by Lender to discharge Grantor's obligations or expenses incurred by Lender to enforce Grantor's obligations under this Mortgage, together with interest on such amounts as provided in

this Mortgage. Specifically, without limitation, Indebtedness includes the future advances set forth in the Future Advances provision, together with all interest thereon and all amounts that may be indirectly secured by the Cross-Collateralization provision of this Mortgage.

**Lender.** The word "Lender" means West Shore Bank, its successors and assigns.

**Mortgage.** The word "Mortgage" means this Mortgage between Grantor and Lender.

**Note.** The word "Note" means AND INCLUDES WITHOUT LIMITATION ALL OF BORROWER'S PROMISSORY NOTES AND/OR CREDIT AGREEMENTS EVIDENCING BORROWER'S LOAN OBLIGATIONS IN FAVOR OF LENDER, TOGETHER WITH ALL RENEWALS OF, EXTENSIONS OF, MODIFICATIONS OF, REFINANCINGS OF, CONSOLIDATIONS OF AND SUBSTITUTIONS FOR PROMISSORY NOTES OR CREDIT AGREEMENTS. **NOTICE TO GRANTOR: THE NOTE CONTAINS A VARIABLE INTEREST RATE.**

**Personal Property.** The words "Personal Property" mean all equipment, fixtures, and other articles of personal property now or hereafter owned by Grantor, and now or hereafter attached or affixed to the Real Property; together with all accessions, parts, and additions to, all replacements of, and all substitutions for, any of such property; and together with all proceeds (including without limitation all insurance proceeds and refunds of premiums) from any sale or other disposition of the Property.

**Property.** The word "Property" means collectively the Real Property and the Personal Property.

**Real Property.** The words "Real Property" mean the real property, interests and rights, as further described in this Mortgage.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

**Rents.** The word "Rents" means all present and future rents, revenues, income, issues, royalties, profits, and other benefits derived from the Property.

**GRANTOR COVENANTS AND AGREES TO THE PROVISIONS OF THIS MORTGAGE.**

**GRANTOR:**

**ADELAIDE POINTE MULTI-USE, LLC**

**By:** ______________________________
**RYAN M LEESTMA, Manager of ADELAIDE POINTE MULTI-USE, LLC**

---

**This Mortgage was prepared by:** **ROBERT M FISHER II, VP COMMERCIAL LOANS**
**West Shore Bank**
**201 W Loomis St**
**Ludington, MI 49431**

---

## LIMITED LIABILITY COMPANY ACKNOWLEDGMENT

STATE OF Michigan )
) SS
COUNTY OF Muskegon )

On this 17th day of April, 20 25, before me, the undersigned Notary Public, personally appeared **RYAN M LEESTMA, Manager of ADELAIDE POINTE MULTI-USE, LLC,** and known to me to be a member or designated agent of the limited liability company that executed the Mortgage and acknowledged the Mortgage to be the free and voluntary act and deed of the limited liability company, by authority of statute, its articles of organization or its operating agreement, for the uses and purposes therein mentioned, and on oath stated that he or she is authorized to execute this Mortgage and in fact executed the Mortgage on behalf of the limited liability company.

**By** [signature] **My commission expires** ________

**Notary Public, State of** ________, **County of** ________

**Acting in the County of** ________

TERESA LaVIGNE
Notary Public, State of Michigan
County of Muskegon
My Commission Expires June 22, 2030
Acting in the County of Muskegon

LaserPro, Ver. 20.1.0.034 Copr. Finastra USA Corporation 1997, 2025. All Rights Reserved. - MI
F:\HARLAND\CFI\LPL\G03.FC TR-32802 PR-53

EXHIBIT "A"

(Multi-Purpose Parcel):
All that part of Block 578 of the Revised Plat of 1903 of the City of Muskegon, Section 25, Town 10 North, Range 17 West, City of Muskegon, Muskegon County, Michigan, described as: COMMENCING at the Southeast corner of Block 577; thence North 87°52'58" West, 260.09 feet along the North right-of-way line of Western Avenue; thence North 01°56'07" East, 659.31 feet along the East line of said Block 578 and its Southerly extension thereof; thence North 32°59'53" West, 729.95 feet; thence North 43°59'53" West, 34.86 feet; thence South 46°00'07" West, 63.51 feet to the PLACE OF BEGINNING; thence South 16°52'20" West, 101.79 feet; thence North 73°07'40" West, 161.76 feet; thence North 31°22'33" West, 39.54 feet; thence North 58°43'34" East, 19.69 feet; thence Northeasterly 37.29 feet on a 64.00 foot radius curve to the left, the chord of which bears North 38°50'20" East, 36.77 feet; thence North 04°26'14" East, 26.75 feet; thence South 73°19'17" East, 170.13 feet to the place of beginning.

Together with and subject to an easement for ingress-egress and public utilities located in that part of Blocks 577, 578 & 579 of the Revised Plat of 1903 of the City of Muskegon, Section 25, Town 10 North, Range 17 West, City of Muskegon, Muskegon County, Michigan, said easement being described as: Beginning on the North right-of-way line of Western Avenue at a point being North 87 degrees 52 minutes 58 seconds West, 824.34 feet from the Southeast corner of Lot 4 of said Block 577; thence North 02 degrees 08 minutes 44 seconds East, 263.07 feet; thence North 34 degrees 14 minutes 29 seconds East, 74.27 feet; thence North 23 degrees 44 minutes 59 seconds East, 71.13 feet; thence North 02 degrees 08 minutes 44 seconds East, 164.98 feet; thence Northerly 75.89 feet on a 358.00 foot radius curve to the left, the chord of which bears North 03 degrees 55 minutes 38 seconds West, 75.75 feet; thence Northeasterly 53.16 feet on a 30.00 foot radius curve to the right, the chord of which bears North 40 degrees 45 minutes 35 seconds East, 46.47 feet; thence South 88 degrees 28 minutes 50 seconds East, 70.66 feet; thence Northeasterly 137.17 feet on a 141.00 foot radius curve to the left, the chord of which bears North 63 degrees 39 minutes 00 seconds East, 131.82 feet; thence Easterly 43.20 feet on a 165.00 foot radius non-tangential curve to the left, the chord of which bears South 81 degrees 06 minutes 34 seconds East, 43.07 feet; thence South 88 degrees 36 minutes 35 seconds East, 77.91 feet; thence Southeasterly 164.07 feet on a 105.00 foot radius curve to the right, the chord of which bears South 43 degrees 50 minutes 39 seconds East, 147.88 feet; thence South 00 degrees 55 minutes 16 seconds West, 231.33 feet; thence South 88 degrees 08 minutes 38 seconds East, 57.67 feet; thence North 01 degrees 56 minutes 07 seconds East, 248.95 feet; thence North 88 degrees 06 minutes 24 seconds West, 8.34 feet; thence North 32 degrees 59 minutes 53 seconds West, 152.26 feet; thence Northwesterly 11.02 feet on a 180.00 foot radius curve to the left, the chord of which bears North 60 degrees 10 minutes 49 seconds West, 11.02 feet; thence Northwesterly 23.47 feet on a 44.00 foot radius curve to the right, the chord of which bears North 46 degrees 39 minutes 17 seconds West, 23.19 feet; thence North 31 degrees 22 minutes 33 seconds West, 32.33 feet; thence South 58 degrees 41 minutes 48 seconds West, 30.10 feet; thence Southwesterly 24.54 feet on a 43.00 foot radius curve to the right, the chord of which bears South 75 degrees 02 minutes 37 seconds West, 24.20 feet; thence North 88 degrees 36 minutes 35 seconds West, 28.07 feet; thence Northwesterly 112.92 feet on a 113.00 foot radius curve to the right, the chord of which bears North 60 degrees 00 minutes 12 seconds West, 108.28 feet; thence North 31 degrees 22 minutes 33 seconds West, 304.82 feet; thence Northwesterly 25.59 feet on a 100.00 foot radius curve to the left, the chord of which bears North 38 degrees 42 minutes 28 seconds West, 25.52 feet; thence North 73 degrees 07 minutes 40 seconds West, 86.39 feet; thence Southwesterly 63.79 feet on a 52.00 foot radius curve to the left, the chord of which bears South 35 degrees 56 minutes 19 seconds West, 59.86 feet; thence South 58 degrees 37 minutes 27 seconds West, 514.47 feet; thence South 10 degrees 46 minutes 30 seconds West, 86.44 feet; thence South 31 degrees 22 minutes 33 seconds East, 25.92 feet; thence North 58 degrees 37 minutes 27 seconds East,

598.50 feet; thence South 31 degrees 22 minutes 33 seconds East, 297.13 feet; thence South 58 degrees 37 minutes 27 seconds West, 79.88 feet; thence North 88 degrees 28 minutes 50 seconds West, 95.92 feet; thence South 40 degrees 42 minutes 37 seconds West, 73.46 feet to Point A, so-called; thence Southerly 123.08 feet on a 292.00 foot radius curve to the right, the chord of which bears South 09 degrees 55 minutes 48 seconds East, 122.17 feet; thence South 02 degrees 08 minutes 44 seconds West, 161.50 feet; thence Southwesterly 72.07 feet on a 117.00 foot radius curve to the right, the chord of which bears South 19 degrees 47 minutes 30 seconds West, 70.93 feet; thence Southerly 143.52 feet on a 233.00 foot radius curve to the left, the chord of which bears South 19 degrees 47 minutes 30 seconds West, 141.26 feet; thence South 02 degrees 08 minutes 44 seconds West, 194.05 feet to the North right-of-way line of Western Avenue; thence Easterly 23.28 feet along said North right-of-way line on a 430.58 foot radius curve to the right, the chord of which bears South 89 degrees 25 minutes 54 seconds East, 23.27 feet; thence South 87 degrees 52 minutes 58 seconds East, 41.40 feet along the North right-of-way line of Western Avenue to the place of beginning.

ALSO Together with and subject to an easement for ingress-egress and public utilities described as: Beginning at above mentioned Point A, so-called; thence South 89 degrees 12 minutes 02 seconds West, 32.68 feet; thence South 58 degrees 37 minutes 27 seconds West, 287.81 feet; thence Northwesterly 102.90 feet on a 91.00 foot radius non-tangential curve to the right, the chord of which bears North 63 degrees 46 minutes 09 seconds West, 97.50 feet; thence North 31 degrees 22 minutes 33 seconds West, 168.67 feet; thence North 58 degrees 37 minutes 27 seconds East, 87.08 feet; thence South 31 degrees 22 minutes 33 seconds East, 185.00 feet; thence North 58 degrees 37 minutes 27 seconds East, 285.00 feet; thence North 31 degrees 22 minutes 33 seconds West, 185.00 feet; thence North 58 degrees 37 minutes 27 seconds East, 66.00 feet; thence South 31 degrees 22 minutes 33 seconds East, 245.03 feet; thence South 40 degrees 42 minutes 37 seconds West, 73.46 feet to Point A, so called and the place of ending.

ALSO, A Pedestrian access easement for ingress and egress located in that part of Blocks 578 and 579 of the Revised Plat of 1903 of the City of Muskegon, Section 25, Town 10 North, Range 17 West, City of Muskegon, Muskegon County, Michigan, said easement being described as: COMMENCING at the Southeast corner of Lot 4 of Block 577; thence North 87°52'58" West 260.09 feet along the North right-of-way line of Western Avenue; thence North 01°56'07" East 659.31 feet along the East line of said Block 578 and its Southerly extension thereof; thence North 32°59'53" West 703.91 feet; thence South 57°00'07" West 256.48 feet to the PLACE OF BEGINNING; thence South 58°37'27" West 17.15 feet; thence North 31°36'08" West 164.18 feet; thence North 58°29'54" East 20.18 feet; thence South 31°22'32" East 57.90 feet; thence South 73°07'40" East 97.29 feet; thence South 16°52'20" West 16.00 feet; thence Southwesterly 63.79 feet on a 52.00 foot radius curve to the left, the chord of which bears South 35°56'19" West 59.86 feet to the place of beginning.

Received & Sealed for Record
William A. Moulatsiotis Register of Deeds
Muskegon County Michigan
04/18/2025 09:00:36 AM Liber: 4384 Page: 655

William A. Moulatsiotis
Register of Deeds
Muskegon County Michigan
5850202 M14

Liber: 4384 Page: 655
Page: 1 of 12
04/18/2025 09:00:36 AM

## ASSIGNMENT OF RENTS

RECORDATION REQUESTED BY:
West Shore Bank
201 W. Loomis Street, PO Box 627
Ludington, MI 49431-0627

WHEN RECORDED MAIL TO:
West Shore Bank
201 W. Loomis Street, PO Box 627
Ludington, MI 49431-0627

FOR RECORDER'S USE ONLY

---

## ASSIGNMENT OF RENTS

THIS ASSIGNMENT OF RENTS dated April 17, 2025, is made and executed between ADELAIDE POINTE MULTI-USE, LLC, A Michigan Limited Liability Company, whose address is 1204 W WESTERN AVE, MUSKEGON, MI 49441-1674 (AS TO MULTI-USE PARCEL) (referred to below as "Grantor") and West Shore Bank, whose address is 201 W Loomis St, PO Box 627, Ludington, MI 49431 (referred to below as "Lender").

**ASSIGNMENT.** For valuable consideration, Grantor hereby assigns, grants a continuing security interest in, and conveys to Lender all of Grantor's right, title, and interest in and to the Rents from the following described Property located in Muskegon County, State of Michigan:

See Exhibit "A", which is attached to this Assignment and made a part of this Assignment as if fully set forth herein.

The Property or its address is commonly known as 500 Adelaide Circle (Multi-Use Parcel), Muskegon, MI 49441. The Property tax identification number is [redacted].

**CROSS-COLLATERALIZATION.** In addition to the Note, this Assignment secures all obligations, debts and liabilities, plus interest thereon, of Grantor to Lender, or any one or more of them, as well as all claims by Lender against Grantor or any one or more of them, whether now existing or hereafter arising, whether related or unrelated to the purpose of the Note, whether voluntary or otherwise, whether due or not due, direct or indirect, determined or undetermined, absolute or contingent, liquidated or unliquidated, whether Grantor may be liable individually or jointly with others, whether obligated as guarantor, surety, accommodation party or otherwise, and whether recovery upon such amounts may be or hereafter may become barred by any statute of limitations, and whether the obligation to repay such amounts may be or hereafter may become otherwise unenforceable.

**FUTURE ADVANCES.** In addition to the Note, this Assignment secures all future advances made by Lender to Grantor whether or not the advances are made pursuant to a commitment. Specifically, without limitation, this Assignment secures, in addition to the amounts specified in the Note, all future amounts Lender in its discretion may loan to Grantor, together with all interest thereon.

**THIS ASSIGNMENT IS GIVEN TO SECURE (1) PAYMENT OF THE INDEBTEDNESS AND (2) PERFORMANCE OF ANY AND ALL OBLIGATIONS OF GRANTOR UNDER THE NOTE, THIS ASSIGNMENT, AND THE RELATED DOCUMENTS. THIS ASSIGNMENT IS GIVEN AND ACCEPTED ON THE FOLLOWING TERMS:**

**PAYMENT AND PERFORMANCE.** Except as otherwise provided in this Assignment or any Related Documents, Grantor shall pay to Lender all amounts secured by this Assignment as they become due, and shall strictly perform all of Grantor's obligations under this Assignment. Unless and until Lender exercises its right to collect the Rents as provided below and so long as there is no default under this Assignment, Grantor may remain in possession and control of and operate and manage the Property and collect the Rents, provided that the granting of the right to collect the Rents shall not constitute Lender's consent to the use of cash collateral in a bankruptcy proceeding.

**GRANTOR'S REPRESENTATIONS AND WARRANTIES.** Grantor warrants that:

**Ownership.** Grantor is entitled to receive the Rents free and clear of all rights, loans, liens, encumbrances, and claims except as disclosed to and accepted by Lender in writing.

**Right to Assign.** Grantor has the full right, power and authority to enter into this Assignment and to assign and convey the Rents to Lender.

**No Prior Assignment.** Grantor has not previously assigned or conveyed the Rents to any other person by any instrument now in force.

**No Further Transfer.** Grantor will not sell, assign, encumber, or otherwise dispose of any of Grantor's rights in the Rents except as provided in this Assignment.

**LENDER'S RIGHT TO RECEIVE AND COLLECT RENTS.** Lender shall have the right at any time, and even though no default shall have occurred under this Assignment, to collect and receive the Rents. For this purpose, Lender is hereby given and granted the following rights, powers and authority:

**Notice to Tenants.** Lender may send notices to any and all tenants of the Property advising them of this Assignment and directing all Rents to be paid directly to Lender or Lender's agent.

**Enter the Property.** Lender may enter upon and take possession of the Property; demand, collect and receive from the tenants or from any other persons liable therefor, all of the Rents; institute and carry on all legal proceedings necessary for the protection of the Property, including such proceedings as may be necessary to recover possession of the Property; collect the Rents and remove any tenant or tenants or other persons from the Property.

**Maintain the Property.** Lender may enter upon the Property to maintain the Property and keep the same in repair; to pay the costs thereof and of all services of all employees, including their equipment, and of all continuing costs and expenses of maintaining the Property in proper repair and condition, and also to pay all taxes, assessments and water utilities, and the premiums on fire and other insurance effected by Lender on the Property.

**Compliance with Laws.** Lender may do any and all things to execute and comply with the laws of the State of Michigan and also all other laws, rules, orders, ordinances and requirements of all other governmental agencies affecting the Property.

**Lease the Property.** Lender may rent or lease the whole or any part of the Property for such term or terms and on such conditions as Lender may deem appropriate.

**Employ Agents.** Lender may engage such agent or agents as Lender may deem appropriate, either in Lender's name or in Grantor's name, to rent and manage the Property, including the collection and application of Rents.

**Other Acts.** Lender may do all such other things and acts with respect to the Property as Lender may deem appropriate and may act exclusively and solely in the place and stead of Grantor and to have all of the powers of Grantor for the purposes stated above.

**No Requirement to Act.** Lender shall not be required to do any of the foregoing acts or things, and the fact that Lender shall have performed one or more of the foregoing acts or things shall not require Lender to do any other specific act or thing.

**APPLICATION OF RENTS.** All costs and expenses incurred by Lender in connection with the Property shall be for Grantor's account and Lender may pay such costs and expenses from the Rents. Lender, in its sole discretion, shall determine the application of any and all Rents received by it; however, any such Rents received by Lender which are not applied to such costs and expenses shall be applied to the Indebtedness. All expenditures made by Lender under this Assignment and not reimbursed from the Rents shall become a part of the Indebtedness secured by this Assignment, and shall be payable on demand, with interest at the Note rate from date of expenditure until paid.

**FULL PERFORMANCE.** If Grantor pays all of the Indebtedness when due and otherwise performs all the obligations imposed upon Grantor under this Assignment, the Note, and the Related Documents, Lender shall execute and deliver to Grantor a suitable satisfaction of this Assignment and suitable statements of termination of any financing statement on file evidencing Lender's security interest in the Rents and the Property. Any termination fee required by law shall be paid by Grantor, if permitted by applicable law.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Property or if Grantor fails to comply with any provision of this Assignment or any Related Documents, including but not limited to Grantor's failure to discharge or pay when due any amounts Grantor is required to discharge or pay under this Assignment or any Related Documents, Lender on Grantor's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Rents or the Property and paying all costs for insuring, maintaining and preserving the Property. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Grantor. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity. The Assignment also will secure payment of these amounts. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon the occurrence of any Event of Default.

**DEFAULT.** Each of the following, at Lender's option, shall constitute an Event of Default under this Assignment:

**Payment Default.** Grantor fails to make any payment when due under the Indebtedness.

**Other Defaults.** Grantor fails to comply with or to perform any other term, obligation, covenant or condition contained in this Assignment or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Grantor.

**Default on Other Payments.** Failure of Grantor within the time required by this Assignment to make any payment for taxes or insurance, or any other payment necessary to prevent filing of or to effect discharge of any lien. Such failure to make payment for taxes or insurance shall constitute waste at the time such items are due and payable.

**Default in Favor of Third Parties.** Any guarantor or Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of any guarantor's or Grantor's property or ability to perform their respective obligations under this Assignment or any of the Related Documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Grantor or

on Grantor's behalf under this Assignment or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Defective Collateralization.** This Assignment or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Death or Insolvency.** The dissolution of Grantor's (regardless of whether election to continue is made), any member withdraws from the limited liability company, or any other termination of Grantor's existence as a going business or the death of any member, the insolvency of Grantor, the appointment of a receiver for any part of Grantor's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Grantor.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Grantor or by any governmental agency against the Rents or any property securing the Indebtedness. This includes a garnishment of any of Grantor's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Grantor as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Grantor gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Property Damage or Loss.** The Property is lost, stolen, substantially damaged, sold, or borrowed against.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Adverse Change.** A material adverse change occurs in Grantor's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**RIGHTS AND REMEDIES ON DEFAULT.** Upon the occurrence of any Event of Default and at any time thereafter, Lender may exercise any one or more of the following rights and remedies, in addition to any other rights or remedies provided by law:

**Accelerate Indebtedness.** Lender shall have the right at its option without notice to Grantor to declare the entire Indebtedness immediately due and payable, including any prepayment fee that Grantor would be required to pay.

**Collect Rents.** Lender shall have the right, without notice to Grantor, to take possession of the Property and collect the Rents, including amounts past due and unpaid, and apply the net proceeds, over and above Lender's costs, against the Indebtedness. In furtherance of this right, Lender shall have all the rights provided for in the Lender's Right to Receive and Collect Rents Section, above. If the Rents are collected by Lender, then Grantor irrevocably designates Lender as Grantor's attorney-in-fact to endorse instruments received in payment thereof in the name of Grantor and to negotiate the same and collect the proceeds. Payments by tenants or other users to Lender in response to Lender's demand shall satisfy the obligations for which the payments are made, whether or not any proper grounds for the demand existed. Lender may exercise its rights under this subparagraph either in person, by agent, or through a receiver.

**Appoint Receiver.** Any failure of Grantor to pay any taxes assessed against the Property or to pay any installment of those taxes or to pay any insurance premium upon any policy covering any property located upon the Property shall constitute waste and shall entitle Lender to the appointment by a court of competent jurisdiction of a receiver of the Property for the purpose of preventing the waste, except that no receiver may be appointed for any dwelling house or farm occupied by any owner of it as the owner's home or farm or for any store or other business property having an assessed valuation of $7,500 or less.

Subject to the order of the court, the receiver may collect the rents and income from the Property and shall exercise control over the Property to the extent ordered by the court. A court may also appoint a receiver for the Property in any other circumstances permitted by law. Lender shall have the right to have a receiver appointed to take possession of all or any part of the Property, with the power to protect and preserve the Property, to operate the Property preceding foreclosure or sale, and to collect the Rents from the Property and apply the proceeds, over and above the cost of the receivership, against the Indebtedness. The receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Property exceeds the Indebtedness by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver.

**Other Remedies.** Lender shall have all other rights and remedies provided in this Assignment or the Note or by law.

**Election of Remedies.** Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Grantor under this Assignment, after Grantor's failure to perform, shall not affect Lender's right to declare a default and exercise its remedies.

**Attorneys' Fees; Expenses.** If Lender institutes any suit or action to enforce any of the terms of this Assignment, Lender shall be entitled to recover its reasonable attorneys' fees. Whether or not any court action is involved, and to the extent not prohibited by law, all reasonable expenses Lender incurs that in Lender's opinion are necessary at any time for the protection of its interest or the enforcement of its rights shall become a part of the Indebtedness payable on demand and shall bear interest at the Note rate from the date of the expenditure until repaid. Expenses covered by this paragraph include, without limitation, however subject to any limits under applicable law, Lender's reasonable attorneys' fees and Lender's legal expenses whether or not there is a lawsuit, including reasonable attorneys' fees and expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services, the cost of searching records, obtaining title reports (including foreclosure reports), surveyors' reports, and appraisal fees, title insurance, and fees for the Trustee, to the extent permitted by applicable law. Grantor also will pay any court costs, in addition to all other sums provided by law.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Assignment:

**Amendments.** This Assignment, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Assignment. No alteration of or amendment to this Assignment shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Caption Headings.** Caption headings in this Assignment are for convenience purposes only and are not to be used to interpret or define the provisions of this Assignment.

**Governing Law. This Assignment will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Michigan without regard to its conflicts of law provisions. This Assignment has been accepted by Lender in the State of Michigan.**

**Choice of Venue.** If there is a lawsuit, Grantor agrees upon Lender's request to submit to the jurisdiction of the courts of Mason County, State of Michigan.

**Merger.** There shall be no merger of the interest or estate created by this Assignment with any other interest or estate in the Property at any time held by or for the benefit of Lender in any capacity, without the written consent of Lender.

**Interpretation.** (1) In all cases where there is more than one Borrower or Grantor, then all words used in this Assignment in the singular shall be deemed to have been used in the plural where the context and construction so require. (2) If more than one person signs this Assignment as "Grantor," the obligations of each Grantor are joint and several. This means that if Lender brings a lawsuit, Lender may sue any one or more of the Grantors. If Borrower and Grantor are not the same person, Lender need not sue Borrower

first, and that Borrower need not be joined in any lawsuit. (3) The names given to paragraphs or sections in this Assignment are for convenience purposes only. They are not to be used to interpret or define the provisions of this Assignment.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Assignment unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Assignment shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Assignment. No prior waiver by Lender, nor any course of dealing between Lender and Grantor, shall constitute a waiver of any of Lender's rights or of any of Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Assignment, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Notices.** Any notice required to be given under this Assignment shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Assignment. Any party may change its address for notices under this Assignment by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Grantor agrees to keep Lender informed at all times of Grantor's current address. Unless otherwise provided or required by law, if there is more than one Grantor, any notice given by Lender to any Grantor is deemed to be notice given to all Grantors.

**Powers of Attorney.** The various agencies and powers of attorney conveyed on Lender under this Assignment are granted for purposes of security and may not be revoked by Grantor until such time as the same are renounced by Lender.

**Severability.** If a court of competent jurisdiction finds any provision of this Assignment to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Assignment. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Assignment shall not affect the legality, validity or enforceability of any other provision of this Assignment.

**Successors and Assigns.** Subject to any limitations stated in this Assignment on transfer of Grantor's interest, this Assignment shall be binding upon and inure to the benefit of the parties, their successors and assigns. If ownership of the Property becomes vested in a person other than Grantor, Lender, without notice to Grantor, may deal with Grantor's successors with reference to this Assignment and the Indebtedness by way of forbearance or extension without releasing Grantor from the obligations of this Assignment or liability under the Indebtedness.

**Time is of the Essence.** Time is of the essence in the performance of this Assignment.

**Waive Jury. All parties to this Assignment hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by any party against any other party.**

**Waiver of Homestead Exemption.** Grantor hereby releases and waives all rights and benefits of the homestead exemption laws of the State of Michigan as to all Indebtedness secured by this Assignment.

**Waiver of Right of Redemption.** NOTWITHSTANDING ANY OF THE PROVISIONS TO THE CONTRARY CONTAINED IN THIS ASSIGNMENT, GRANTOR HEREBY WAIVES ANY AND ALL RIGHTS OF REDEMPTION FROM SALE UNDER ANY ORDER OR JUDGMENT OF FORECLOSURE ON GRANTOR'S BEHALF AND ON BEHALF OF EACH AND EVERY PERSON, EXCEPT JUDGMENT CREDITORS OF GRANTOR, ACQUIRING ANY INTEREST IN OR TITLE TO THE PROPERTY SUBSEQUENT TO THE DATE OF

THIS ASSIGNMENT.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Assignment. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Assignment shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Assignment.** The word "Assignment" means this ASSIGNMENT OF RENTS, as this ASSIGNMENT OF RENTS may be amended or modified from time to time, together with all exhibits and schedules attached to this ASSIGNMENT OF RENTS from time to time.

**Borrower.** The word "Borrower" means ADELAIDE POINTE MULTI-USE, LLC.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Assignment in the default section of this Assignment.

**Grantor.** The word "Grantor" means ADELAIDE POINTE MULTI-USE, LLC.

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Indebtedness.

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

**Indebtedness.** The word "Indebtedness" means all principal, interest, and other amounts, costs and expenses payable under the Note or Related Documents, together with all renewals of, extensions of, modifications of, consolidations of and substitutions for the Note or Related Documents and any amounts expended or advanced by Lender to discharge Grantor's obligations or expenses incurred by Lender to enforce Grantor's obligations under this Assignment, together with interest on such amounts as provided in this Assignment. Specifically, without limitation, Indebtedness includes the future advances set forth in the Future Advances provision, together with all interest thereon and all amounts that may be indirectly secured by the Cross-Collateralization provision of this Assignment.

**Lender.** The word "Lender" means West Shore Bank, its successors and assigns.

**Note.** The word "Note" means AND INCLUDES WITHOUT LIMITATION ALL OF BORROWER'S PROMISSORY NOTES AND/OR CREDIT AGREEMENTS EVIDENCING BORROWER'S LOAN OBLIGATIONS IN FAVOR OF LENDER, TOGETHER WITH ALL RENEWALS OF, EXTENSIONS OF, MODIFICATIONS OF, REFINANCINGS OF, CONSOLIDATIONS OF AND SUBSTITUTIONS FOR PROMISSORY NOTES OR CREDIT AGREEMENTS.

**Property.** The word "Property" means all of Grantor's right, title and interest in and to all the Property as described in the "Assignment" section of this Assignment.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

**Rents.** The word "Rents" means all of Grantor's present and future rights, title and interest in, to and under any and all present and future leases, including, without limitation, all rents, revenue, income, issues, royalties, bonuses, accounts receivable, cash or security deposits, advance rentals, profits and proceeds from the Property, and other payments and benefits derived or to be derived from such leases of every kind and nature, whether due now or later, including without limitation Grantor's right to enforce such leases and to receive and collect payment and proceeds thereunder.

THE UNDERSIGNED ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS ASSIGNMENT, AND NOT PERSONALLY BUT AS AN AUTHORIZED SIGNER, HAS CAUSED THIS ASSIGNMENT TO BE SIGNED AND EXECUTED ON BEHALF OF GRANTOR ON APRIL 17, 2025.

GRANTOR:

ADELAIDE POINTE MULTI-USE, LLC

By: ______________________________
RYAN M LEESTMA, Manager of ADELAIDE POINTE MULTI-USE, LLC

This ASSIGNMENT OF RENTS was prepared by: ROBERT M FISHER II, VP COMMERCIAL LOANS
West Shore Bank
201 W Loomis St
Ludington, MI 49431

## LIMITED LIABILITY COMPANY ACKNOWLEDGMENT

**STATE OF** Michigan )

) **SS**

**COUNTY OF** Muskegon )

On this 17th day of April, 20 25, before me, the undersigned Notary Public, personally appeared **RYAN M LEESTMA, Manager of ADELAIDE POINTE MULTI-USE, LLC,** and known to me to be a member or designated agent of the limited liability company that executed the ASSIGNMENT OF RENTS and acknowledged the Assignment to be the free and voluntary act and deed of the limited liability company, by authority of statute, its articles of organization or its operating agreement, for the uses and purposes therein mentioned, and on oath stated that he or she is authorized to execute this Assignment and in fact executed the Assignment on behalf of the limited liability company.

**By** [signature] **My commission expires** ____________

**Notary Public, State of** ____________, **County of** ____________

**Acting in the County of** ____________

TERESA LaVIGNE
Notary Public, State of Michigan
County of Muskegon
My Commission Expires June 22, 2030
Acting in the County of Muskegon

LaserPro, Ver. 20.1.0.034 Copr. Finastra USA Corporation 1997, 2025. All Rights Reserved. - MI
F:\HARLAND\CFI\LPL\G14.FC TR-32802 PR-53

EXHIBIT "A"

(Multi-Purpose Parcel):
All that part of Block 578 of the Revised Plat of 1903 of the City of Muskegon, Section 25, Town 10 North, Range 17 West, City of Muskegon, Muskegon County, Michigan, described as: COMMENCING at the Southeast corner of Block 577; thence North 87°52'58" West, 260.09 feet along the North right-of-way line of Western Avenue; thence North 01°56'07" East, 659.31 feet along the East line of said Block 578 and its Southerly extension thereof; thence North 32°59'53" West, 729.95 feet; thence North 43°59'53" West, 34.86 feet; thence South 46°00'07" West, 63.51 feet to the PLACE OF BEGINNING; thence South 16°52'20" West, 101.79 feet; thence North 73°07'40" West, 161.76 feet; thence North 31°22'33" West, 39.54 feet; thence North 58°43'34" East, 19.69 feet; thence Northeasterly 37.29 feet on a 64.00 foot radius curve to the left, the chord of which bears North 38°50'20" East, 36.77 feet; thence North 04°26'14" East, 26.75 feet; thence South 73°19'17" East, 170.13 feet to the place of beginning.

Together with and subject to an easement for ingress-egress and public utilities located in that part of Blocks 577, 578 & 579 of the Revised Plat of 1903 of the City of Muskegon, Section 25, Town 10 North, Range 17 West, City of Muskegon, Muskegon County, Michigan, said easement being described as: Beginning on the North right-of-way line of Western Avenue at a point being North 87 degrees 52 minutes 58 seconds West, 824.34 feet from the Southeast corner of Lot 4 of said Block 577; thence North 02 degrees 08 minutes 44 seconds East, 263.07 feet; thence North 34 degrees 14 minutes 29 seconds East, 74.27 feet; thence North 23 degrees 44 minutes 59 seconds East, 71.13 feet; thence North 02 degrees 08 minutes 44 seconds East, 164.98 feet; thence Northerly 75.89 feet on a 358.00 foot radius curve to the left, the chord of which bears North 03 degrees 55 minutes 38 seconds West, 75.75 feet; thence Northeasterly 53.16 feet on a 30.00 foot radius curve to the right, the chord of which bears North 40 degrees 45 minutes 35 seconds East, 46.47 feet; thence South 88 degrees 28 minutes 50 seconds East, 70.66 feet; thence Northeasterly 137.17 feet on a 141.00 foot radius curve to the left, the chord of which bears North 63 degrees 39 minutes 00 seconds East, 131.82 feet; thence Easterly 43.20 feet on a 165.00 foot radius non-tangential curve to the left, the chord of which bears South 81 degrees 06 minutes 34 seconds East, 43.07 feet; thence South 88 degrees 36 minutes 35 seconds East, 77.91 feet; thence Southeasterly 164.07 feet on a 105.00 foot radius curve to the right, the chord of which bears South 43 degrees 50 minutes 39 seconds East, 147.88 feet; thence South 00 degrees 55 minutes 16 seconds West, 231.33 feet; thence South 88 degrees 08 minutes 38 seconds East, 57.67 feet; thence North 01 degrees 56 minutes 07 seconds East, 248.95 feet; thence North 88 degrees 06 minutes 24 seconds West, 8.34 feet; thence North 32 degrees 59 minutes 53 seconds West, 152.26 feet; thence Northwesterly 11.02 feet on a 180.00 foot radius curve to the left, the chord of which bears North 60 degrees 10 minutes 49 seconds West, 11.02 feet; thence Northwesterly 23.47 feet on a 44.00 foot radius curve to the right, the chord of which bears North 46 degrees 39 minutes 17 seconds West, 23.19 feet; thence North 31 degrees 22 minutes 33 seconds West, 32.33 feet; thence South 58 degrees 41 minutes 48 seconds West, 30.10 feet; thence Southwesterly 24.54 feet on a 43.00 foot radius curve to the right, the chord of which bears South 75 degrees 02 minutes 37 seconds West, 24.20 feet; thence North 88 degrees 36 minutes 35 seconds West, 28.07 feet; thence Northwesterly 112.92 feet on a 113.00 foot radius curve to the right, the chord of which bears North 60 degrees 00 minutes 12 seconds West, 108.28 feet; thence North 31 degrees 22 minutes 33 seconds West, 304.82 feet; thence Northwesterly 25.59 feet on a 100.00 foot radius curve to the left, the chord of which bears North 38 degrees 42 minutes 28 seconds West, 25.52 feet; thence North 73 degrees 07 minutes 40 seconds West, 86.39 feet; thence Southwesterly 63.79 feet on a 52.00 foot radius curve to the left, the chord of which bears South 35 degrees 56 minutes 19 seconds West, 59.86 feet; thence South 58 degrees 37 minutes 27 seconds West, 514.47 feet; thence South 10 degrees 46 minutes 30 seconds West, 86.44 feet; thence South 31 degrees 22 minutes 33 seconds East, 25.92 feet; thence North 58 degrees 37 minutes 27 seconds East,

598.50 feet; thence South 31 degrees 22 minutes 33 seconds East, 297.13 feet; thence South 58 degrees 37 minutes 27 seconds West, 79.88 feet; thence North 88 degrees 28 minutes 50 seconds West, 95.92 feet; thence South 40 degrees 42 minutes 37 seconds West, 73.46 feet to Point A, so-called; thence Southerly 123.08 feet on a 292.00 foot radius curve to the right, the chord of which bears South 09 degrees 55 minutes 48 seconds East, 122.17 feet; thence South 02 degrees 08 minutes 44 seconds West, 161.50 feet; thence Southwesterly 72.07 feet on a 117.00 foot radius curve to the right, the chord of which bears South 19 degrees 47 minutes 30 seconds West, 70.93 feet; thence Southerly 143.52 feet on a 233.00 foot radius curve to the left, the chord of which bears South 19 degrees 47 minutes 30 seconds West, 141.26 feet; thence South 02 degrees 08 minutes 44 seconds West, 194.05 feet to the North right-of-way line of Western Avenue; thence Easterly 23.28 feet along said North right-of-way line on a 430.58 foot radius curve to the right, the chord of which bears South 89 degrees 25 minutes 54 seconds East, 23.27 feet; thence South 87 degrees 52 minutes 58 seconds East, 41.40 feet along the North right-of-way line of Western Avenue to the place of beginning.

ALSO Together with and subject to an easement for ingress-egress and public utilities described as: Beginning at above mentioned Point A, so-called; thence South 89 degrees 12 minutes 02 seconds West, 32.68 feet; thence South 58 degrees 37 minutes 27 seconds West, 287.81 feet; thence Northwesterly 102.90 feet on a 91.00 foot radius non-tangential curve to the right, the chord of which bears North 63 degrees 46 minutes 09 seconds West, 97.50 feet; thence North 31 degrees 22 minutes 33 seconds West, 168.67 feet; thence North 58 degrees 37 minutes 27 seconds East, 87.08 feet; thence South 31 degrees 22 minutes 33 seconds East, 185.00 feet; thence North 58 degrees 37 minutes 27 seconds East, 285.00 feet; thence North 31 degrees 22 minutes 33 seconds West, 185.00 feet; thence North 58 degrees 37 minutes 27 seconds East, 66.00 feet; thence South 31 degrees 22 minutes 33 seconds East, 245.03 feet; thence South 40 degrees 42 minutes 37 seconds West, 73.46 feet to Point A, so called and the place of ending.

ALSO, A Pedestrian access easement for ingress and egress located in that part of Blocks 578 and 579 of the Revised Plat of 1903 of the City of Muskegon, Section 25, Town 10 North, Range 17 West, City of Muskegon, Muskegon County, Michigan, said easement being described as: COMMENCING at the Southeast corner of Lot 4 of Block 577; thence North 87°52'58" West 260.09 feet along the North right-of-way line of Western Avenue; thence North 01°56'07" East 659.31 feet along the East line of said Block 578 and its Southerly extension thereof; thence North 32°59'53" West 703.91 feet; thence South 57°00'07" West 256.48 feet to the PLACE OF BEGINNING; thence South 58°37'27" West 17.15 feet; thence North 31°36'08" West 164.18 feet; thence North 58°29'54" East 20.18 feet; thence South 31°22'32" East 57.90 feet; thence South 73°07'40" East 97.29 feet; thence South 16°52'20" West 16.00 feet; thence Southwesterly 63.79 feet on a 52.00 foot radius curve to the left, the chord of which bears South 35°56'19" West 59.86 feet to the place of beginning.

# BUSINESS LOAN AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $500,000.00 | 04-17-2025 | 04-17-2050 | [redacted]4771 | 1A2 / 84 | [redacted] | RMF | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item. Any item above containing "***" has been omitted due to text length limitations.

**Borrower:** ADELAIDE POINTE MULTI-USE, LLC
1204 W WESTERN AVE
MUSKEGON, MI 49441-1674

**Lender:** West Shore Bank
Main Office
201 W Loomis St
PO Box 627
Ludington, MI 49431
(231) 845-3500

---

**THIS BUSINESS LOAN AGREEMENT dated April 17, 2025, is made and executed between ADELAIDE POINTE MULTI-USE, LLC ("Borrower") and West Shore Bank ("Lender") on the following terms and conditions. Borrower has received prior commercial loans from Lender or has applied to Lender for a commercial loan or loans or other financial accommodations, including those which may be described on any exhibit or schedule attached to this Agreement. Borrower understands and agrees that: (A) in granting, renewing, or extending any Loan, Lender is relying upon Borrower's representations, warranties, and agreements as set forth in this Agreement; (B) the granting, renewing, or extending of any Loan by Lender at all times shall be subject to Lender's sole judgment and discretion; and (C) all such Loans shall be and remain subject to the terms and conditions of this Agreement.**

**TERM.** This Agreement shall be effective as of April 17, 2025, and shall continue in full force and effect until such time as all of Borrower's Loans in favor of Lender have been paid in full, including principal, interest, costs, expenses, attorneys' fees, and other fees and charges, or until such time as the parties may agree in writing to terminate this Agreement.

**CONDITIONS PRECEDENT TO EACH ADVANCE.** Lender's obligation to make the initial Advance and each subsequent Advance under this Agreement shall be subject to the fulfillment to Lender's satisfaction of all of the conditions set forth in this Agreement and in the Related Documents.

**Loan Documents.** Borrower shall provide to Lender the following documents for the Loan: (1) the Note; (2) Security Agreements granting to Lender security interests in the Collateral; (3) financing statements and all other documents perfecting Lender's Security Interests; (4) evidence of insurance as required below; (5) guaranties; (6) together with all such Related Documents as Lender may require for the Loan; all in form and substance satisfactory to Lender and Lender's counsel.

**Borrower's Authorization.** Borrower shall have provided in form and substance satisfactory to Lender properly certified resolutions, duly authorizing the execution and delivery of this Agreement, the Note and the Related Documents. In addition, Borrower shall have provided such other resolutions, authorizations, documents and instruments as Lender or its counsel, may require.

**Payment of Fees and Expenses.** Borrower shall have paid to Lender all fees, charges, and other expenses which are then due and payable as specified in this Agreement or any Related Document.

**Representations and Warranties.** The representations and warranties set forth in this Agreement, in the Related Documents, and in any document or certificate delivered to Lender under this Agreement are true and correct.

**No Event of Default.** There shall not exist at the time of any Advance a condition which would constitute an Event of Default under this Agreement or under any Related Document.

**REPRESENTATIONS AND WARRANTIES.** Borrower represents and warrants to Lender, as of the date of this Agreement, as of the date of each disbursement of loan proceeds, as of the date of any renewal, extension or modification of any Loan, and at all times any Indebtedness exists:

**Organization.** Borrower is a limited liability company which is, and at all times shall be, duly organized, validly existing, and in good standing under and by virtue of the laws of the State of Michigan. Borrower is duly authorized to transact business in all other states in which Borrower is doing business, having obtained all necessary filings, governmental licenses and approvals for each state in which Borrower is doing business. Specifically, Borrower is, and at all times shall be, duly qualified as a foreign limited liability company in all states in which the failure to so qualify would have a material adverse effect on its business or financial condition. Borrower has the full power and authority to own its properties and to transact the business in which it is presently engaged or presently proposes to engage. Borrower maintains an office at 1204 W WESTERN AVE, MUSKEGON, MI 49441-1674. Unless Borrower has designated otherwise in writing, the principal office is the office at which Borrower keeps its books and records including its records concerning the Collateral. Borrower will notify Lender prior to any change in the location of Borrower's state of organization or any change in Borrower's name. Borrower shall do all things necessary to preserve and to keep in full force and effect its existence, rights and privileges, and shall comply with all regulations, rules, ordinances, statutes, orders and decrees of any governmental or quasi-governmental authority or court applicable to Borrower and Borrower's business activities.

**Assumed Business Names.** Borrower has filed or recorded all documents or filings required by law relating to all assumed business names used by Borrower. Excluding the name of Borrower, the following is a complete list of all assumed business names under which Borrower does business: **None.**

**Authorization.** Borrower's execution, delivery, and performance of this Agreement and all the Related Documents have been duly authorized by all necessary action by Borrower and do not conflict with, result in a violation of, or constitute a default under (1) any provision of (a) Borrower's articles of organization or membership agreements, or (b) any agreement or other instrument binding upon Borrower or (2) any law, governmental regulation, court decree, or order applicable to Borrower or to Borrower's properties.

**Financial Information.** Each of Borrower's financial statements supplied to Lender truly and completely disclosed Borrower's financial condition as of the date of the statement, and there has been no material adverse change in Borrower's financial condition subsequent to the date of the most recent financial statement supplied to Lender. Borrower has no material contingent obligations except as disclosed in such financial statements.

**Legal Effect.** This Agreement constitutes, and any instrument or agreement Borrower is required to give under this Agreement when delivered will constitute legal, valid, and binding obligations of Borrower enforceable against Borrower in accordance with their respective terms.

**Properties.** Except as contemplated by this Agreement or as previously disclosed in Borrower's financial statements or in writing to Lender and as accepted by Lender, and except for property tax liens for taxes not presently due and payable, Borrower owns and has good title to all of Borrower's properties free and clear of all Security Interests, and has not executed any security documents or financing statements relating to such properties. All of Borrower's properties are titled in Borrower's legal name, and Borrower has not used or filed a financing

statement under any other name for at least the last five (5) years.

**Hazardous Substances.** Except as disclosed to and acknowledged by Lender in writing, Borrower represents and warrants that: (1) During the period of Borrower's ownership of the Collateral, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance by any person on, under, about or from any of the Collateral. (2) Borrower has no knowledge of, or reason to believe that there has been (a) any breach or violation of any Environmental Laws; (b) any use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance on, under, about or from the Collateral by any prior owners or occupants of any of the Collateral; or (c) any actual or threatened litigation or claims of any kind by any person relating to such matters. (3) Neither Borrower nor any tenant, contractor, agent or other authorized user of any of the Collateral shall use, generate, manufacture, store, treat, dispose of or release any Hazardous Substance on, under, about or from any of the Collateral; and any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations, and ordinances, including without limitation all Environmental Laws. Borrower authorizes Lender and its agents to enter upon the Collateral to make such inspections and tests as Lender may deem appropriate to determine compliance of the Collateral with this section of the Agreement. Any inspections or tests made by Lender shall be at Borrower's expense and for Lender's purposes only and shall not be construed to create any responsibility or liability on the part of Lender to Borrower or to any other person. The representations and warranties contained herein are based on Borrower's due diligence in investigating the Collateral for hazardous waste and Hazardous Substances. Borrower hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Borrower becomes liable for cleanup or other costs under any such laws, and (2) agrees to indemnify, defend, and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Agreement or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release of a hazardous waste or substance on the Collateral. The provisions of this section of the Agreement, including the obligation to indemnify and defend, shall survive the payment of the Indebtedness and the termination, expiration or satisfaction of this Agreement and shall not be affected by Lender's acquisition of any interest in any of the Collateral, whether by foreclosure or otherwise.

**Litigation and Claims.** No litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Borrower is pending or threatened, and no other event has occurred which may materially adversely affect Borrower's financial condition or properties, other than litigation, claims, or other events, if any, that have been disclosed to and acknowledged by Lender in writing.

**Taxes.** To the best of Borrower's knowledge, all of Borrower's tax returns and reports that are or were required to be filed, have been filed, and all taxes, assessments and other governmental charges have been paid in full, except those presently being or to be contested by Borrower in good faith in the ordinary course of business and for which adequate reserves have been provided.

**Lien Priority.** Unless otherwise previously disclosed to Lender in writing, Borrower has not entered into or granted any Security Agreements, or permitted the filing or attachment of any Security Interests on or affecting any of the Collateral directly or indirectly securing repayment of Borrower's Loan and Note, that would be prior or that may in any way be superior to Lender's Security Interests and rights in and to such Collateral.

**Binding Effect.** This Agreement, the Note, all Security Agreements (if any), and all Related Documents are binding upon the signers thereof, as well as upon their successors, representatives and assigns, and are legally enforceable in accordance with their respective terms.

**AFFIRMATIVE COVENANTS.** Borrower covenants and agrees with Lender that, so long as this Agreement remains in effect, Borrower will:

**Notices of Claims and Litigation.** Promptly inform Lender in writing of (1) all material adverse changes in Borrower's financial condition, and (2) all existing and all threatened litigation, claims, investigations, administrative proceedings or similar actions affecting Borrower or any Guarantor which could materially affect the financial condition of Borrower or the financial condition of any Guarantor.

**Financial Records.** Maintain its books and records in accordance with GAAP, applied on a consistent basis, and permit Lender to examine and audit Borrower's books and records at all reasonable times.

**Financial Statements.** Furnish Lender with the following:

**Additional Requirements.**

**ADELAIDE POINTE MULTI-USE, LLC:**
Annual Federal Income Tax Return, including all Statements, Schedules and K-1's; to be provided to Lender within 15 days after the Return filing deadline.
Annual Rent Roll; to be provided to Lender within 15 days of Lender request.
Annual Debt Schedule; to be provided to Lender within 15 days of Lender request.
Annual company prepared Financial Statements; to be provided to Lender within 45 days following annual end date.
Borrower to provide to Lender any new leases, amendments, or extension within 30 days of execution.
Borrower to provide notice to Lender of any vacancy within 30 days of tenant vacating the premises.
Borrower to provide notice to Lender of any delinquent rent payment in excess of 30 days.
Any change in ownership of the Borrower after the closing date shall require the prior written consent of the Lender, which consent shall be subject to terms and conditions acceptable to the Lender in its sole discretion. Borrower will be responsible to inform the Lender of any changes of ownership at least 60 days before they are to occur.
Borrower to maintain Primary Deposit Operating Account and Cash Management Services with Lender.

**ADELAIDE POINTE QOZB LLC:**
Annual Federal Income Tax Return, including all Statements, Schedules and K-1's; to be provided to Lender within 15 days after the Return filing deadline.
Any change in ownership after the closing date shall require the prior written consent of the Lender, which consent shall be subject to terms and conditions acceptable to the Lender in its sole discretion. Borrower will be responsible to inform the Lender of any changes of ownership at least 60 days before they are to occur.
Annual Debt Schedule; to be provided to Lender within 15 days of Lender request.

**ADELAIDE POINTE QOF LLC:**
Annual Federal Income Tax Return, including all Statements, Schedules and K-1's; to be provided to Lender within 15 days after the Return filing deadline.
Annual Debt Schedule; to be provided to Lender within 15 days of Lender request.

**HARBOR WEST QOZB MULTI-USE, LLC:**
Annual Federal Income Tax Return, including all Statements, Schedules and K-1's; to be provided to Lender within 15 days after the

Return filing deadline.
Annual Debt Schedule; to be provided to Lender within 15 days of Lender request.

**HARBOR WEST QOZB LLC:**
Annual Federal Income Tax Return, including all Statements, Schedules and K-1's; to be provided to Lender within 15 days after the Return filing deadline.
Annual Debt Schedule; to be provided to Lender within 15 days of Lender request.

**HARBOR WEST QOF LLC:**
Annual Federal Income Tax Return, including all Statements, Schedules and K-1's; to be provided to Lender within 15 days after the Return filing deadline.
Annual Debt Schedule; to be provided to Lender within 15 days of Lender request.

**IBEX HOSPITALITY GROUP, LLC:**
Annual Federal Income Tax Return, including all Statements, Schedules and K-1's; to be provided to Lender within 15 days after the Return filing deadline.
Annual Debt Schedule; to be provided to Lender within 15 days of Lender request.
Quarterly Company Prepared Financial Statements; to be provided to Lender within 45 days following the quarter-end.

**MUSKEGON BREWING COMPANY OPERATIONS, LLC:**
Annual Federal Income Tax Return, including all Statements, Schedules and K-1's; to be provided to Lender within 15 days after the Return filing deadline.
Quarterly Company Prepared Financial Statements; to be provided to Lender within 45 days following the quarter-end.
Annual Debt Schedule; to be provided to Lender within 15 days of Lender request.

**ADELAIDE EVENTS LLC:**
Annual Federal Income Tax Return, including all Statements, Schedules and K-1's; to be provided to Lender within 15 days after the Return filing deadline.
Quarterly Company Prepared Financial Statements; to be provided to Lender within 45 days following the quarter-end.
Annual Debt Schedule; to be provided to Lender within 15 days of Lender request.

**LEESTMA MANAGEMENT, LLC:**
Annual Federal Income Tax Return, including all Statements, Schedules and K-1's; to be provided to Lender within 15 days after the Return filing deadline.
Quarterly Company Prepared Financial Statements; to be provided to Lender within 45 days following the quarter-end.
Annual Debt Schedule; to be provided to Lender within 15 days of Lender request.

**RYAN M LEESTMA AND EMILY S LEESTMA:**
Annual Signed West Shore Bank Personal Financial Statement; to be provided to Lender within 15 days of Lender request.
Annual Federal Income Tax Return, including all Statements, Schedules and K-1's; to be provided to Lender within 15 days after the Return filing deadline.
Annual Debt Schedule; to be provided to Lender within 15 days of Lender request.

**BORROWER AND GUARANTORS MAY BE REQUIRED TO SUBMIT ADDITIONAL FINANCIAL INFORMATION PERIODICALLY UPON REQUEST OF LENDER.**

**EACH DRAW SHALL REQUIRE THE BORROWER TO PROVIDE A SWORN STATEMENT, LIEN WAIVER, TITLE COMPANY ENDORSEMENT, AND INSPECTION BY APPRAISER..**

All financial reports required to be provided under this Agreement shall be prepared in accordance with GAAP, applied on a consistent basis, and certified by Borrower as being true and correct.

**Additional Information.** Furnish such additional information and statements, as Lender may request from time to time.

**Additional Requirements.**

**Prohibition against Borrower assuming liabilities or obligations of others.** Outside investment and loans/advances to stockholders, owners, officers, or affiliates require the prior written consent of Lender. Loans from stockholders, owners, officers or affiliates must be subordinated to the guaranteed loan or converted to stock. No payments are to be made on these debts unless the loan is current and in good standing.

**Limitations on Borrower dividend payments and compensation of officers, owners and members of Borrower.** Dividend payments and compensation of officers, owners, and members will be limited to an amount that, when taken, will not adversely affect the repayment ability of Borrower. This amount may not be increased year-to-year unless (1) an after-tax profit was made in the preceding fiscal year, (2) Borrower is and will remain in compliance with covenants of this Business Loan Agreement and the USDA Conditional Commitment, and (3) all Borrower debts are paid to a current status. This is not intended to apply to dividend payments to cover personal tax liability resulting from profitability of the business.

**Limitations on the purchase and sale of equipment and other fixed assets.** Borrower must not acquire additional fixed assets (including assignments, transfers and leases) that would result in Borrower not being in compliance with required ratios without Lender's written consent. Borrower will not lease, sell, transfer, or otherwise encumber fixed assets without the concurrence of Lender. Disposition of fixed assets serving as collateral for this loan must also have the concurrence of the Agency (USDA Rural Development).

**GLOBAL DEBT SERVICE COVERAGE RATIO:**
Maintain a Global Debt Service Coverage ("DSC") ratio of no less than 1.10x, measured annually. The Global DSC will be calculated as follows based on Borrower's annual tax returns: Sum of EBITDA for each Entity (defined as: net profit after tax + depreciation + amortization expense + interest expense - distributions to stockholders) divided by Sum of Total Annual payments of Debt for each entity (defined as: total interest expense + total required annual principal payments on all debt).

**Insurance.** Maintain fire and other risk insurance, public liability insurance, and such other insurance as Lender may require with respect to Borrower's properties and operations, in form, amounts, coverages and with insurance companies acceptable to Lender. Borrower, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least thirty (30) days prior written notice to Lender. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Borrower or any other person. In connection with all policies covering assets in which Lender holds or is offered a

security interest for the Loans, Borrower will provide Lender with such lender's loss payable or other endorsements as Lender may require.

**Insurance Reports.** Furnish to Lender, upon request of Lender, reports on each existing insurance policy showing such information as Lender may reasonably request, including without limitation the following: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the properties insured; (5) the then current property values on the basis of which insurance has been obtained, and the manner of determining those values; and (6) the expiration date of the policy. In addition, upon request of Lender (however not more often than annually), Borrower will have an independent appraiser satisfactory to Lender determine, as applicable, the actual cash value or replacement cost of any Collateral. The cost of such appraisal shall be paid by Borrower.

**Guaranties.** Prior to disbursement of any Loan proceeds, furnish executed guaranties of the Loans in favor of Lender, executed by the guarantors named below, on Lender's forms, and in the amounts and under the conditions set forth in those guaranties.

| Names of Guarantors | Amounts |
|---|---|
| ADELAIDE POINTE QOZB LLC | Unlimited |
| ADELAIDE POINTE QOF LLC | Unlimited |
| HARBOR WEST QOZB MULTI-USE, LLC | Unlimited |
| HARBOR WEST QOZB LLC | Unlimited |
| HARBOR WEST QOF LLC | Unlimited |
| IBEX HOSPITALITY GROUP, LLC | Unlimited |
| MUSKEGON BREWING COMPANY OPERATIONS, LLC | Unlimited |
| ADELAIDE EVENTS LLC | Unlimited |
| LEESTMA MANAGEMENT, LLC | Unlimited |
| RYAN M LEESTMA | Unlimited |
| EMILY S LEESTMA | Unlimited |

**Other Agreements.** Comply with all terms and conditions of all other agreements, whether now or hereafter existing, between Borrower and any other party and notify Lender immediately in writing of any default in connection with any other such agreements.

**Loan Proceeds.** Use all Loan proceeds solely for Borrower's business operations, unless specifically consented to the contrary by Lender in writing.

**Taxes, Charges and Liens.** Pay and discharge when due all of its indebtedness and obligations, including without limitation all assessments, taxes, governmental charges, levies and liens, of every kind and nature, imposed upon Borrower or its properties, income, or profits, prior to the date on which penalties would attach, and all lawful claims that, if unpaid, might become a lien or charge upon any of Borrower's properties, income, or profits. Provided however, Borrower will not be required to pay and discharge any such assessment, tax, charge, levy, lien or claim so long as (1) the legality of the same shall be contested in good faith by appropriate proceedings, and (2) Borrower shall have established on Borrower's books adequate reserves with respect to such contested assessment, tax, charge, levy, lien, or claim in accordance with GAAP.

**Performance.** Perform and comply, in a timely manner, with all terms, conditions, and provisions set forth in this Agreement, in the Related Documents, and in all other instruments and agreements between Borrower and Lender. Borrower shall notify Lender immediately in writing of any default in connection with any agreement.

**Operations.** Maintain executive and management personnel with substantially the same qualifications and experience as the present executive and management personnel; provide written notice to Lender of any change in executive and management personnel; conduct its business affairs in a reasonable and prudent manner.

**Environmental Studies.** Promptly conduct and complete, at Borrower's expense, all such investigations, studies, samplings and testings as may be requested by Lender or any governmental authority relative to any substance, or any waste or by-product of any substance defined as toxic or a hazardous substance under applicable federal, state, or local law, rule, regulation, order or directive, at or affecting any property or any facility owned, leased or used by Borrower.

**Compliance with Governmental Requirements.** Comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the conduct of Borrower's properties, businesses and operations, and to the use or occupancy of the Collateral, including without limitation, the Americans With Disabilities Act. Borrower may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Borrower has notified Lender in writing prior to doing so and so long as, in Lender's sole opinion, Lender's interests in the Collateral are not jeopardized. Lender may require Borrower to post adequate security or a surety bond, reasonably satisfactory to Lender, to protect Lender's interest.

**Inspection.** Permit employees or agents of Lender at any reasonable time to inspect any and all Collateral for the Loan or Loans and Borrower's other properties and to examine or audit Borrower's books, accounts, and records and to make copies and memoranda of Borrower's books, accounts, and records. If Borrower now or at any time hereafter maintains any records (including without limitation computer generated records and computer software programs for the generation of such records) in the possession of a third party, Borrower, upon request of Lender, shall notify such party to permit Lender free access to such records at all reasonable times and to provide Lender with copies of any records it may request, all at Borrower's expense.

**Compliance Certificates.** Unless waived in writing by Lender, provide Lender at least annually, with a certificate executed by Borrower's chief financial officer, or other officer or person acceptable to Lender, certifying that the representations and warranties set forth in this Agreement are true and correct as of the date of the certificate and further certifying that, as of the date of the certificate, no Event of Default exists under this Agreement.

**Environmental Compliance and Reports.** Borrower shall comply in all respects with any and all Environmental Laws; not cause or permit to exist, as a result of an intentional or unintentional action or omission on Borrower's part or on the part of any third party, on property owned and/or occupied by Borrower, any environmental activity where damage may result to the environment, unless such environmental activity is pursuant to and in compliance with the conditions of a permit issued by the appropriate federal, state or local governmental authorities; shall furnish to Lender promptly and in any event within thirty (30) days after receipt thereof a copy of any notice, summons, lien, citation, directive, letter or other communication from any governmental agency or instrumentality concerning any intentional or unintentional action or omission on Borrower's part in connection with any environmental activity whether or not there is damage to the environment and/or other natural resources.

**Additional Assurances.** Make, execute and deliver to Lender such promissory notes, mortgages, deeds of trust, security agreements, assignments, financing statements, instruments, documents and other agreements as Lender or its attorneys may reasonably request to evidence and secure the Loans and to perfect all Security Interests.

**Domestic Asset Protection Trust Transfers.** Provide Lender prior written notice of Borrower's intent to transfer any asset to a domestic asset protection trust, including, without limitation, any trust created under or governed by the Qualified Dispositions in Trust Act (MCL § 700.1041 et seq.), as amended from time to time. Further, Borrower may not make any such transfer without the prior written approval of Lender, which Lender may give or withhold in its sole discretion. Borrower acknowledges and agrees that any such transfer made without such prior written notification and such prior written approval will violate this Agreement, and such a transfer will not affect the rights of Lender.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Borrower fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Borrower's failure to discharge or pay when due any amounts Borrower is required to discharge or pay under this Agreement or any Related Documents, Lender on Borrower's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on any Collateral and paying all costs for insuring, maintaining and preserving any Collateral. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Borrower. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity.

**CESSATION OF ADVANCES.** If Lender has made any commitment to make any Loan to Borrower, whether under this Agreement or under any other agreement, Lender shall have no obligation to make Loan Advances or to disburse Loan proceeds if: (A) Borrower or any Guarantor is in default under the terms of this Agreement or any of the Related Documents or any other agreement that Borrower or any Guarantor has with Lender; (B) Borrower or any Guarantor dies, becomes incompetent or becomes insolvent, files a petition in bankruptcy or similar proceedings, or is adjudged a bankrupt; (C) there occurs a material adverse change in Borrower's financial condition, in the financial condition of any Guarantor, or in the value of any Collateral securing any Loan; or (D) any Guarantor seeks, claims or otherwise attempts to limit, modify or revoke such Guarantor's guaranty of the Loan or any other loan with Lender; or (E) Lender in good faith deems itself insecure, even though no Event of Default shall have occurred.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the Indebtedness against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

**DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

**Payment Default.** Borrower fails to make any payment when due under the Loan.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Default in Favor of Third Parties.** Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's or any Grantor's property or Borrower's or any Grantor's ability to repay the Loans or perform their respective obligations under this Agreement or any of the Related Documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Death or Insolvency.** The dissolution of Borrower (regardless of whether election to continue is made), any member withdraws from Borrower, or any other termination of Borrower's existence as a going business or the death of any member, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Defective Collateralization.** This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the Loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of the Loan is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**EFFECT OF AN EVENT OF DEFAULT.** If any Event of Default shall occur, except where otherwise provided in this Agreement or the Related Documents, all commitments and obligations of Lender under this Agreement or the Related Documents or any other agreement immediately will terminate (including any obligation to make further Loan Advances or disbursements), and, at Lender's option, all Indebtedness immediately will become due and payable, all without notice of any kind to Borrower, except that in the case of an Event of Default of the type described in the "Insolvency" subsection above, such acceleration shall be automatic and not optional. In addition, Lender shall have all the rights and remedies provided in the Related Documents or available at law, in equity, or otherwise. Except as may be prohibited by applicable law, all of Lender's rights and remedies shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Borrower or of any Grantor shall not affect Lender's right to declare a default and to exercise its rights and remedies.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

**Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Borrower agrees to pay upon demand all of Lender's costs and expenses, including Lender's reasonable attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement. Lender may hire or pay someone else to help enforce this Agreement, and Borrower shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's reasonable attorneys' fees and legal expenses whether or not there is a lawsuit, including reasonable attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Borrower also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Consent to Loan Participation.** Borrower agrees and consents to Lender's sale or transfer, whether now or later, of one or more participation interests in the Loan to one or more purchasers, whether related or unrelated to Lender. Lender may provide, without any limitation whatsoever, to any one or more purchasers, or potential purchasers, any information or knowledge Lender may have about Borrower or about any other matter relating to the Loan, and Borrower hereby waives any rights to privacy Borrower may have with respect to such matters. Borrower additionally waives any and all notices of sale of participation interests, as well as all notices of any repurchase of such participation interests. Borrower also agrees that the purchasers of any such participation interests will be considered as the absolute owners of such interests in the Loan and will have all the rights granted under the participation agreement or agreements governing the sale of such participation interests. Borrower further waives all rights of offset or counterclaim that it may have now or later against Lender or against any purchaser of such a participation interest and unconditionally agrees that either Lender or such purchaser may enforce Borrower's obligation under the Loan irrespective of the failure or insolvency of any holder of any interest in the Loan. Borrower further agrees that the purchaser of any such participation interests may enforce its interests irrespective of any personal claims or defenses that Borrower may have against Lender.

**Governing Law. This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Michigan without regard to its conflicts of law provisions. This Agreement has been accepted by Lender in the State of Michigan.**

**Choice of Venue.** If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of Mason County, State of Michigan.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Borrower, or between Lender and any Grantor, shall constitute a waiver of any of Lender's rights or of any of Borrower's or any Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Notices.** Any notice required to be given under this Agreement shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Agreement. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Borrower agrees to keep Lender informed at all times of Borrower's current address. Unless otherwise provided or required by law, if there is more than one Borrower, any notice given by Lender to any Borrower is deemed to be notice given to all Borrowers.

**Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

**Subsidiaries and Affiliates of Borrower.** To the extent the context of any provisions of this Agreement makes it appropriate, including without limitation any representation, warranty or covenant, the word "Borrower" as used in this Agreement shall include all of Borrower's subsidiaries and affiliates. Notwithstanding the foregoing however, under no circumstances shall this Agreement be construed to require Lender to make any Loan or other financial accommodation to any of Borrower's subsidiaries or affiliates.

**Successors and Assigns.** All covenants and agreements by or on behalf of Borrower contained in this Agreement or any Related Documents shall bind Borrower's successors and assigns and shall inure to the benefit of Lender and its successors and assigns. Borrower shall not, however, have the right to assign Borrower's rights under this Agreement or any interest therein, without the prior written consent of Lender.

**Survival of Representations and Warranties.** Borrower understands and agrees that in making the Loan, Lender is relying on all representations, warranties, and covenants made by Borrower in this Agreement or in any certificate or other instrument delivered by Borrower to Lender under this Agreement or the Related Documents. Borrower further agrees that regardless of any investigation made by Lender, all such representations, warranties and covenants will survive the making of the Loan and delivery to Lender of the Related Documents, shall be continuing in nature, and shall remain in full force and effect until such time as Borrower's Indebtedness shall be paid in full, or until this Agreement shall be terminated in the manner provided above, whichever is the last to occur.

**Time is of the Essence.** Time is of the essence in the performance of this Agreement.

**Waive Jury. All parties to this Agreement hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by any party against any other party.**

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code. Accounting words and terms not otherwise defined in this Agreement shall have the meanings assigned to them in accordance with generally accepted accounting principles as in

effect on the date of this Agreement:

**Advance.** The word "Advance" means a disbursement of Loan funds made, or to be made, to Borrower or on Borrower's behalf on a line of credit or multiple advance basis under the terms and conditions of this Agreement.

**Agreement.** The word "Agreement" means this Business Loan Agreement, as this Business Loan Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to this Business Loan Agreement from time to time.

**Borrower.** The word "Borrower" means ADELAIDE POINTE MULTI-USE, LLC and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Collateral.** The word "Collateral" means all property and assets granted as collateral security for a Loan, whether real or personal property, whether granted directly or indirectly, whether granted now or in the future, and whether granted in the form of a security interest, mortgage, collateral mortgage, deed of trust, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien, charge, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever, whether created by law, contract, or otherwise.

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Agreement in the default section of this Agreement.

**GAAP.** The word "GAAP" means generally accepted accounting principles.

**Grantor.** The word "Grantor" means each and all of the persons or entities granting a Security Interest in any Collateral for the Loan, including without limitation all Borrowers granting such a Security Interest.

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Loan.

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Indebtedness.** The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Borrower is responsible under this Agreement or under any of the Related Documents.

**Lender.** The word "Lender" means West Shore Bank, its successors and assigns.

**Loan.** The word "Loan" means any and all loans and financial accommodations from Lender to Borrower whether now or hereafter existing, and however evidenced, including without limitation those loans and financial accommodations described herein or described on any exhibit or schedule attached to this Agreement from time to time.

**Note.** The word "Note" means AND INCLUDES WITHOUT LIMITATION ALL OF BORROWER'S PROMISSORY NOTES AND/OR CREDIT AGREEMENTS EVIDENCING BORROWER'S LOAN OBLIGATIONS IN FAVOR OF LENDER, TOGETHER WITH ALL RENEWALS OF, EXTENSIONS OF, MODIFICATIONS OF, REFINANCINGS OF, CONSOLIDATIONS OF AND SUBSTITUTIONS FOR PROMISSORY NOTES OR CREDIT AGREEMENTS.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Loan.

**Security Agreement.** The words "Security Agreement" mean and include without limitation any agreements, promises, covenants, arrangements, understandings or other agreements, whether created by law, contract, or otherwise, evidencing, governing, representing, or creating a Security Interest.

**Security Interest.** The words "Security Interest" mean, without limitation, any and all types of collateral security, present and future, whether in the form of a lien, charge, encumbrance, mortgage, deed of trust, security deed, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever whether created by law, contract, or otherwise.

BORROWER ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS BUSINESS LOAN AGREEMENT AND BORROWER AGREES TO ITS TERMS. THIS BUSINESS LOAN AGREEMENT IS DATED APRIL 17, 2025.

BORROWER:

ADELAIDE POINTE MULTI-USE, LLC

By:______________________________
RYAN M LEESTMA, Manager of ADELAIDE POINTE MULTI-USE, LLC

LENDER:

WEST SHORE BANK

By:______________________________
Robert M Fisher II, Vice President

LaserPro, Ver. 20.1.0.034 Copr. Finastra USA Corporation 1997, 2025. All Rights Reserved. - MI F:\HARLAND\CFI\LPL\C40.FC TR-32802 PR-53

# Exhibit 3

**STATE OF MICHIGAN**
**IN THE BUSINESS COURT FOR COUNTY OF KENT**

INDEPENDENT BANK, a Michigan banking corporation,

Plaintiff,

v.

ADELAIDE POINTE BOATERS SERVICES, LLC, a Michigan limited liability company, ADELAIDE POINTE QOZB LLC, a Michigan limited liability company, ADELAIDE POINTE BUILDING 1, LLC, a Michigan limited liability company, LEESTMA MANAGEMENT, LLC, a Florida limited liability company, WATERLAND BATTLE CREEK PROPERTIES, LLC, a Michigan limited liability company, RYAN LEESTMA, an individual, and the RYAN M. LEESTMA DOMESTIC ASSET PROTECTION TRUST DATED NOVEMBER 30, 2018, EDWIN J VANDERPLOEG, JR., as Trustee of the Ryan M. Leestma Domestic Asset Protection Trust u/a/d November 30, 2018, jointly and severally,

Defendants.

Case No. 25-20760-CBB
Hon. Curt A. Benson

**ALL DEFENDANTS' OBJECTIONS AND RESPONSE TO RECEIVER'S MOTION TO EXPAND RECEIVERSHIP ESTATE, CONFIRM RECEIVER AUTHORITY OVER ENTIRE PROJECT SITE, AND AUTHORIZE RECEIVER TO REMEDIATE PLANNED UNIT DEVELOPMENT VIOLATIONS AND REGULATORY DEFAULTS**

| | |
|---|---|
| BODMAN PLC<br>Darren J. Burmania (P68240)<br>J. Grant Semonin (P86855)<br>*Attorneys for Plaintiff*<br>99 Monroe Ave. NW, Suite 300<br>Grand Rapids, Michigan 49503<br>Phone: (616) 205-4330<br>dburmania@bodmanlaw.com<br>gsemonin@bodmanlaw.com | TAFT STETTINIUS & HOLLISTER LLP<br>R. Christopher Cataldo (P39353)<br>*Attorneys for Defendants*<br>27777 Franklin Rd., Ste. 2500<br>Southfield, MI 48034<br>(248) 351-3000<br>ccataldo@taftlaw.com |
| RHOADES McKEE PC<br>David E. Bevins (P48955)<br>*Attorneys for Intervenor*<br>*Lake Michigan Credit Union*<br>55 Campau N.W., Ste. 300<br>Grand Rapids, MI 49503<br>(616) 235-3500<br>debevins@rhoadesmckee.com | STEVENSON & BULLOCK, PLC<br>John W. Polderman (P65720)<br>*Court-Appointed Receiver*<br>26100 American Drive, Ste. 500<br>Southfield, MI 48034<br>(248) 354-7906<br>jpolderman@sbplclaw.com |

| | |
|---|---|
| Laura R. LaMore (P79943)<br>Assistant Attorney General<br>*Attorney for State Intervenor*<br>Michigan Department of Attorney General<br>Environment, Natural Resources<br>and Agriculture Division<br>P.O. Box 30755<br>Lansing, MI 48909<br>(517) 335-7664<br>LaMoreL1@michigan.gov | Peter D. Cronk (P60172)<br>Matthew Boettcher (P40929)<br>Plunkett Cooney<br>*Attorneys for Intervenor 4Front Credit Union*<br>101 N. Washington Square, Ste. 1200<br>Lansing, MI 48933<br>(517) 324-5611<br>pcronk@plunkettcooney.com<br>mboettcher@plunkettcooney.com |
| Elisabeth M. Von Eitzen (P70183)<br>Emily R. Rucker (P79228)<br>Warner Norcross + Judd LLP<br>Attorneys for non-party West Shore Bank<br>180 E. Water St., Ste. 7000<br>Kalamazoo, MI 49007<br>(269) 276-8118<br>evoneitzen@wnj.com<br>erucker@wnj.com | Nicholas J. Spigiel (P73526)<br>Kreis, Enderle, Hudgins & Borso, PC<br>Attorneys for non-party ChoiceOne Bank<br>PO Box 4010<br>Kalamazoo, MI 49003<br>(269) 324-3000<br>nspigiel@kehb.com |


All Defendants, through undersigned counsel, hereby object to the Receiver's Motion to Expand Receivership Estate (the "Motion"), and in response state as follows:

**I. Concurrence With Objections of Choice One Bank and West Shore Bank.**

First, Defendants concur with and incorporate by reference all of the objections to the Motion to expand receivership filed by ChoiceOne Bank and West Shore Bank. Defendants repeat those objections herein only as necessary.

**II. The Motion Is Not Authorized Under the Receivership Statute.**

Second, the relief sought in the Motion is inconsistent with this Court's January 30, 2026 Order and would be an unconstitutional taking of the property of non-parties Adelaide Pointe Multi-Use, LLC, Harbor West QOZB, LLC, and Adelaide Pointe Wet Marina, LLC, none of which have been joined as parties to this case nor have any of them been served with process. Independent Bank ("IB") filed this case on or about September 22, 2025 to enforce its claimed

mortgage rights and security interests in those portions of the Adelaide Pointe development where IB held a mortgage/security interest. IB has always known that it holds no mortgage, security interest, assignment of rents or other legal right of any kind to the entire Adelaide Pointe Development, which includes the "Multi-Use" building (owned by non-party Adelaide Pointe Multi-Use, LLC), and the dry and wet marina properties (owned respectively by non-parties Harbor West QOZB, LLC and Adelaide Pointe Wet Marina, LLC). The Multi-Use, and wet and dry marina properties shall be referred to herein as the Non-Receivership Properties.

Consistent with MCL 554.1016, the Court's receivership order entered on January 30, 2026 provided in relevant part that a receiver was appointed over:

> "all real property of the Receivership Defendants subject to mortgages with Independent Bank . . . (b) all personal property of the Receivership Defendants subject to Security Agreements with Independent Bank . . ."

Importantly, Adelaide Pointe Multi-Use, LLC, Harbor West QOZB, LLC and Adelaide Pointe Wet Marina, LLC are ***NOT*** "Receivership Defendants" and in fact, are not parties to this case, nor have they been served with process. The fact that their member is Ryan Leestma, as alleged in paragraph 5 of the Motion, does not automatically allow the Receiver to pierce the corporate veil and disregard the corporate form, and treat these separate legal entities as if they were indistinguishable from their owner---the Receiver has made no showing that the separate corporate existence of these entities should be disregarded. Moreover, IB has no mortgage or security interest in any of the assets or real property of Adelaide Pointe Multi-Use, LLC, Harbor West QOZB, LLC and Adelaide Pointe Wet Marina, LLC, none of which are borrowers of IB.

The Motion cites no legal authority that would allow this Court to grant the unprecedented and extraordinary relief sought—the expansion of the receivership over property held by non-parties where there is no showing that i) the non-receivership property is currently the subject of

this litigation; ii) the expansion of the receivership is necessary to protect the non-receivership properties; iii) the owner of the non-receivership property has been served with process and joined to this case as a party. Indeed, under the Receiver's theory, he could take control over any property in the state regardless of ownership simply by arguing that doing so would make his administration of Receivership Property more convenient or efficient, all without having to join those affected owners to the lawsuit. There is no law supporting this extraordinary proposition.

Nothing in the Receivership Statute authorizes such an incredible and unprecedented expansion of power. The Motion cites to MCL 554.1016 and MCL 554.1023 as authority, but neither statute authorizes the relief sought.

MCL 554.1016(1)(a) says that the Court may appoint a receiver:

> Before judgment, to protect a party that demonstrates an apparent right, title or interest in property ***<u>that is the subject of the action</u>***, under the following circumstances: i) the property or its revenue-producing potential is being subjected to or is in danger of waste, loss, dissipation or impairment; ii) the property or its revenue producing potential has been or is about to be subject to a voidable transaction.

> MCL 554.1016(2) says that the Court may appoint a receiver "in connection with the foreclosure or other enforcement of a security agreement . . . "

The Non-Receivership Property is ***<u>not</u>*** the subject of this action, and there is no showing that any person with a right, title or interest in the Non-Receivership Property believes that the Non-Receivership Property is in any danger of waste, loss, dissipation or impairment, or about to the subject of a voidable transfer. That is, the wet and dry marina properties, and the Multi-Use Building, are not currently the subject of this case, and there is no showing that these properties are in danger of waste, loss, dissipation or impairment, or subject to foreclosure or enforcement of security interest by Plaintiff. The fact that the expansion of the receivership over these non-receivership assets would allegedly make administration more efficient as to the receivership

properties, as claimed in the Motion, even if true, does not give the Court the authority over these other assets that are not the subject of this case and owned by non-parties.

MCL 554.1023 does not govern or even address the power of a Court to appoint a receiver, but instead sets forth the duties of the owner after a receiver is appointed. There is nothing in this statute that even remotely suggests that the power of the Receiver can be expanded over non-receivership assets. Nothing. Indeed, from the context of MCL 554.1023, it is also clear that the owner's duty to cooperate with the Receiver is limited to receivership property. Again, the Receiver has cited no legal authority that would allow the Court to expand the receivership over the property of non-parties.

3. **The Relief Sought by EGLE is Improper.**

On March 27, 2026, EGLE filed a response to the Motion which asks that the Court grant it a variety of relief, including: 1) modifying the Proposed Order to ensure EGLE's continued access to allegedly ensure regulatory oversight of both Adelaide Pointe QOZB, LLC and Ryan Leestma; 2) clarifying that the Proposed Order does not transfer the Permit to a new permittee; and 3) ruling that EGLE's Agreement is not subject to adoption or rejection by the Receiver as an executory contract.

This request for relief is procedurally improper. To the extent that EGLE seeks affirmative relief, in particular a ruling from this Court as to whether the EGLE Agreement is an executory contract that is not subject to adoption or rejection by the Receiver, the proper procedure would be for EGLE to file a motion for summary disposition so that the issue can be property briefed by the parties who have an interest in the subject matter on that issue—including the Receiver, rather than raise it in the context of a response brief where the parties have little or no ability to properly respond to the legal arguments made.

This is particularly true as EGLE has not provided the Court with an accurate rendition of the facts regarding compliance with the Consent Agreement, as Adelaide Pointe QOZB, LLC and Ryan Leestma dispute the assertions made by EGLE, as they have provided a fully compliant revised proposal to EGLE for the restoration of the wetlands, fully supported by expert analysis, all of which have been arbitrarily rejected by EGLE notwithstanding EGLE's total lack of its own expert support. The EGLE response similarly acknowledges that the letter of credit default was created by the Court's Receivership Order of January 30, 2026 which prevented EGLE from drawing on the letter of credit. Similarly, Defendants think that it is an easy showing to make that EGLE remains subject to a variety of obligations under the Agreement, but again, that is an issue for another day and is not an issue that this Court needs to, or should, address as part of this Motion.

Defendants respectfully submit that the Motion should be denied.

Dated: March 30, 2026

Respectfully Submitted,

/s/ R. Christopher Cataldo
TAFT STETTINIUS & HOLLISTER LLP
R. Christopher Cataldo (P39353)
*Attorneys for Defendants*
27777 Franklin Rd., Ste. 2500
Southfield, MI 48034
(248) 351-3000
ccataldo@taftlaw.com

# Exhibit 4

Received & Sealed for Record
MARK F. FAIRCHILD REGISTER OF DEEDS
Muskegon County Michigan
07/13/2023 12:16:07 PM Liber: 4334 Page: 25

MARK F. FAIRCHILD
REGISTER OF DEEDS
Muskegon County Michigan
5799616 D02

Liber: 4334 Page: 25
Page: 1 of 5
07/13/2023 12:16:07 PM

# QUIT CLAIM DEED

KNOW ALL PERSONS BY THESE PRESENTS: That Adelaide Pointe QOZB LLC, a Michigan limited liability company

whose address is 1204 W Western Avenue, Muskegon, MI 49441

Quit Claim(s) to Adelaide Pointe Multi-Use, LLC, a Michigan limited liability company

whose address is 1204 W Western Avenue, Muskegon, MI 49441

the following described premises situated in the City of Muskegon, County of Muskegon, State of Michigan:

SEE ATTACHED EXHIBIT "A"

Subject to the Mortgage executed by Adelaide Pointe QOZB LLC, a Michigan limited liability company to Independent Bank dated March 29, 2022 and recorded March 29, 2022 in Liber 4294, Page 32 and Assignment of Rents executed by Adelaide Pointe QOZB LLC, a Michigan limited liability company to Independent Bank dated March 29, 2022 and recorded March 29, 2022 in Liber 4294, Page 33.

This instrument is exempt from taxation for the County Real Estate Transfer Tax pursuant to MCL.207.505.a

This instrument is exempt from taxation for the State Real Estate Transfer Tax pursuant to MCL.207.526.a.

Dated this July 12, 2023

(Quit Claim Deed (page 2) dated: July 12, 2023
between Adelaide Pointe QOZB LLC, a Michigan limited liability company, Grantor(s) and Adelaide Pointe Multi-Use, LLC, a Michigan limited liability company, Grantee(s).)

Adelaide Pointe QOZB LLC, a Michigan limited liability company

By: Ryan M. Leestma
It's Manager

STATE OF Michigan

COUNTY OF Muskegon

On July 12, 2023, before me appeared Ryan M. Leestma to who is the Manager of Adelaide Pointe QOZB LLC, a Michigan limited liability company.

SHARLENE SHINELDECKER
Notary Public - State of Michigan
County of Muskegon
My Commission Expires Nov 9, 2027
Acting in the County of Muskegon

Print Name: ________________
Notary Public __________ County, Michigan
Acting in __________ County
My term expires __________

File No. 372885LKS

Drafted by:

Ryan M. Leestma
1204 W Western Avenue
Muskegon, MI 49441

Return to:

Grantee

EXHIBIT "A"

Property situated in the City of Muskegon, County of Muskegon, and State of Michigan described as:

(Multi-Purpose Parcel):

All that part of Block 578 of the Revised Plat of 1903 of the City of Muskegon, Section 25, Town 10 North, Range 17 West, City of Muskegon, Muskegon County, Michigan, described as: **COMMENCING** at the Southeast corner of Block 577; thence North 87°52'58" West 260.09 feet along the North right-of-way line of Western Avenue; thence North 01°56'07" East 659.31 feet along the East line of said Block 578 and its Southerly extension thereof; thence North 32°59'53" West 729.95 feet; thence North 43°59'53" West 34.86 feet; thence South 46°00'07" West 63.51 feet to the **PLACE OF BEGINNING**; thence South 16°52'20" West 101.79 feet; thence North 73°07'40" West 161.76 feet; thence North 31°22'33" West 39.54 feet; thence North 58°43'34" East 19.69 feet; thence Northeasterly 37.29 feet on a 64.00 foot radius curve to the left, the chord of which bears North 38°50'20" East 36.77 feet; thence North 04°26'14" East 26.75 feet; thence South 73°19'17" East 170.13 feet to the place of beginning.

Together with and subject to an easement for ingress-egress and public utilities located in that part of Blocks 577, 578 & 579 of the Revised Plat of 1903 of the City of Muskegon, Section 25, Town 10 North, Range 17 West, City of Muskegon, Muskegon County, Michigan, said easement being described as: Beginning on the North right-of-way line of Western Avenue at a point being North 87 degrees 52 minutes 58 seconds West 824.34 feet from the Southeast corner of Lot 4 of said Block 577; thence North 02 degrees 08 minutes 44 seconds East 263.07 feet; thence North 34 degrees 14 minutes 29 seconds East 74.27 feet; thence North 23 degrees 44 minutes 59 seconds East 71.13 feet; thence North 02 degrees 08 minutes 44 seconds East 164.98 feet; thence Northerly 75.89 feet on a 358.00 foot radius curve to the left, the chord of which bears North 03 degrees 55 minutes 38 seconds West 75.75 feet; thence Northeasterly 53.16 feet on a 30.00 foot radius curve to the right, the chord of which bears North 40 degrees 45 minutes 35 seconds East 46.47 feet; thence South 88 degrees 28 minutes 50 seconds East 70.66 feet; thence Northeasterly 137.17 feet on a 141.00 foot radius curve to the left, the chord of which bears North 63 degrees 39 minutes 00 seconds East 131.82 feet; thence Easterly 43.20 feet on a 165.00 foot radius non-tangential curve to the left, the chord of which bears South 81 degrees 06 minutes 34 seconds East 43.07 feet; thence South 88 degrees 36 minutes 35 seconds East 77.91 feet; thence Southeasterly 164.07 feet on a 105.00 foot radius curve to the right, the chord of which bears

South 43 degrees 50 minutes 39 seconds East 147.88 feet; thence South 00 degrees 55 minutes 16 seconds West 231.33 feet; thence South 88 degrees 08 minutes 38 seconds East 57.67 feet; thence North 01 degrees 56 minutes 07 seconds East 248.95 feet; thence North 88 degrees 06 minutes 24 seconds West 8.34 feet; thence North 32 degrees 59 minutes 53 seconds West 152.26 feet; thence Northwesterly 11.02 feet on a 180.00 foot radius curve to the left, the chord of which bears North 60 degrees 10 minutes 49 seconds West 11.02 feet; thence Northwesterly 23.47 feet on a 44.00 foot radius curve to the right, the chord of which bears North 46 degrees 39 minutes 17 seconds West 23.19 feet; thence North 31 degrees 22 minutes 33 seconds West 32.33 feet; thence South 58 degrees 41 minutes 48 seconds West 30.10 feet; thence Southwesterly 24.54 feet on a 43.00 foot radius curve to the right, the chord of which bears South 75 degrees 02 minutes 37 seconds West 24.20 feet; thence North 88 degrees 36 minutes 35 seconds West 28.07 feet; thence Northwesterly 112.92 feet on a 113.00 foot radius curve to the right, the chord of which bears North 60 degrees 00 minutes 12 seconds West 108.28 feet; thence North 31 degrees 22 minutes 33 seconds West 304.82 feet; thence Northwesterly 25.59 feet on a 100.00 foot radius curve to the left, the chord of which bears North 38 degrees 42 minutes 28 seconds West 25.52 feet; thence North 73 degrees 07 minutes 40 seconds West 86.39 feet; thence Southwesterly 63.79 feet on a 52.00 foot radius curve to the left, the chord of which bears South 35 degrees 56 minutes 19 seconds West 59.86 feet; thence South 58 degrees 37 minutes 27 seconds West 514.47 feet; thence South 10 degrees 46 minutes 30 seconds West 86.44 feet; thence South 31 degrees 22 minutes 33 seconds East 25.92 feet; thence North 58 degrees 37 minutes 27 seconds East 598.50 feet; thence South 31 degrees 22 minutes 33 seconds East 297.13 feet; thence South 58 degrees 37 minutes 27 seconds West 79.88 feet; thence North 88 degrees 28 minutes 50 seconds West 95.92 feet; thence South 40 degrees 42 minutes 37 seconds West 73.46 feet to Point A, so-called; thence Southerly 123.08 feet on a 292.00 foot radius curve to the right, the chord of which bears South 09 degrees 55 minutes 48 seconds East 122.17 feet; thence South 02 degrees 08 minutes 44 seconds West 161.50 feet; thence Southwesterly 72.07 feet on a 117.00 foot radius curve to the right, the chord of which bears South 19 degrees 47 minutes 30 seconds West 70.93 feet; thence Southerly 143.52 feet on a 233.00 foot radius curve to the left, the chord of which bears South 19 degrees 47 minutes 30 seconds West 141.26 feet; thence South 02 degrees 08 minutes 44 seconds West 194.05 feet to the North right-of-way line of Western Avenue; thence Easterly 23.28 feet along said North right-of-way line on a 430.58 foot radius curve to the right, the chord of which bears South 89 degrees 25 minutes 54 seconds East 23.27 feet; thence South 87 degrees 52 minutes 58 seconds East 41.40 feet along the North right-of-way line of Western Avenue to the place of beginning.

ALSO Together with and subject to an easement for ingress-egress and public utilities described as: Beginning at above mentioned Point A, so-called; thence South 89 degrees 12 minutes 02 seconds West 32.68 feet; thence South 58 degrees 37 minutes 27 seconds West 287.81 feet; thence Northwesterly 102.90 feet on a 91.00 foot radius non-tangential curve to the right, the chord of which bears North 63 degrees 46 minutes 09 seconds West 97.50 feet; thence North 31 degrees 22 minutes 33 seconds West 168.67 feet; thence North 58 degrees 37 minutes 27

seconds East 87.08 feet; thence South 31 degrees 22 minutes 33 seconds East 185.00 feet; thence North 58 degrees 37 minutes 27 seconds East 285.00 feet; thence North 31 degrees 22 minutes 33 seconds West 185.00 feet; thence North 58 degrees 37 minutes 27 seconds East 66.00 feet; thence South 31 degrees 22 minutes 33 seconds East 245.03 feet; thence South 40 degrees 42 minutes 37 seconds West 73.46 feet to Point A, so called and the place of ending.

Together with easement for pedestrian ingress and egress as reflected in the deed between Adelaide Pointe QOZB, LLC, a Michigan limited liability company and City of Muskegon, a Municipal corporation recorded in Liber 4333, Page 980, Muskegon County Records

Tax ID:
61-24-025-100-0001-00 POLP