**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

In re:

| | |
|---|---|
| Leestma Management, LLC | Case No. 8:26-bk-02696-CED [Lead Case] |
| Adelaide Pointe QOZB, LLC | Case No. 8:26-bk-02698-CED |
| Adelaide Pointe Boaters Services, LLC | Case No. 8:26-bk-02699-CED |
| Adelaide Pointe Building 1, LLC | Case No. 8:26-bk-02700-CED |
| Waterland Battle Creek, LLC | Case No. 8:26-bk-02701-CED |
| | Chapter 11 |
| Debtors. | *Jointly Administered Cases* |

_______________________________________/

**DEBTORS' MOTION FOR ENTRY OF A FINAL ORDER (I) AUTHORIZING CERTAIN DEBTORS TO OBTAIN POST-PETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105(a), 363, 364(c)(1),364(c)(2), AND 364(d); (II) GRANTING SENIOR PRIMING LIENS AND SUPER-PRIORITY ADMINISTRATIVE EXPENSE STATUS TO THE DIP LENDER; (III) APPROVING THE DIP COMMITMENT**

Debtors Adelaide Pointe QOZB, LLC ("QOZB"), Adelaide Pointe Boaters Services, LLC ("Boaters Services"), Adelaide Pointe Building 1, LLC ("Building 1"), as debtors and debtors-in-possession (all collectively, the "Debtors" or "Borrowers") are the borrowing debtors, and are each Debtors in the jointly administrated Chapter 11 cases in case No. 8:26-bk-02696, where Debtor Leestma Management, LLC ("Leestma Management") is designated as the lead case by and through undersigned counsel, move pursuant to 11 U.S.C. §§ 105(a), 361, 363, 364(c)(1), 364(c)(2), 364(d), 503(b), and 507(b) of the Bankruptcy Code and Federal Rules of Bankruptcy Procedure 2002, 4001, 6003, 6004, and 9014, and Local Rules 2081-1, 4001-2, and 9075-1 for entry of (i) a Final Order, attached as ***Exhibit A*** (the "Final Order"): (i) approving, on a final basis, the Debtor-in-Possession Commitment Letter dated October 7, (the "Commitment"), a true and correct copy of which is attached as ***Exhibit B*** to the Final Order, with 364 Capital, LLC (the "DIP Lender"), under which it commits to providing up to $13,780,000 in senior (priming) secured debtor-in-possession financing (the "DIP Financing"); (ii) authorizing the Debtors to draw down

on the DIP Financing to use in accordance with the budget attached to the Commitment as ***Exhibit C*** ("DIP Budget"); (iii) granting DIP Lender protections, on a final basis, under 11 U.S.C. §§ 364(c) (superpriority administrative expense claim), 364(d)(1) (priming lien for the DIP Financing advanced by DIP Lender), and 364(e) (good faith finding pertaining to the documentary negotiations and the full amount of the DIP Financing advanced by DIP Lender); (iv) approving the Carve-Out and its funding (defined in the Interim and Final DIP Financing Orders and Budgets); (v) finding that Catcon, Inc. d/b/a Catalyst Construction ("Catalyst"); Soils and Structures, Inc. ("Soil and Structures"); and Edgewater Resources, LLC ("Edgewater") are critical vendors and allow payment to their respective liens; and (vi) granting related relief.

In support of this Motion, the Debtors respectfully state as follows:

## I. PRELIMINARY STATEMENT

1. The Debtors seek entry of a Final Order authorizing the DIP Financing, on the terms set forth in the Commitment to be used as provided in the DIP Budget. The DIP Loan will fund expenditures in the categories identified item by item in the DIP Budget, which includes (i) professional and administrative expenses, the compensation of the Chief Restructuring Officer, John Polderman ("CRO") at $180,000, (ii) critical-vendor and EGLE site-assessment work to be completed by Edgewater Resources and Soils and Structures, (iii) appraisal services, (iv) tax and accounting services (Brickley DeLong), (v) accrued unpaid real property taxes to Muskegon County, as well as a reserve for 2026 real property taxes, (vi) United States Trustee fees, as well as the accruing legal fees and administrative claims (subject to allowance) of counsel for the Debtors as well as all the attorneys' fees and costs incurred (or to be incurred) by counsel for the DIP Lender and (vii) the payment of the mortgage lien in favor of Catalyst who is a junior priority secured lienholder in the Building 1 condominiums. The facility also includes a $5,000,000 draw

line for the construction of hard costs to complete the build-out of the unfinished units of Building 1 (the "Condos") and the campus improvements, including but not limited to the condominium pool, the lobby and hallway build-out, landscaping, and the engineered balcony remediation (estimated by the Debtors and the CRO to be $25,000). Other items financed through the DIP Loan include construction management, estimated closing costs, a contingency reserve, approximately $689,000 of the DIP Lender's origination fees, and a $2,893,800 interest reserve for the DIP Loan, as well as an interest reserve in the amount of $1,500,000 for Independent Bank Corporation ("IBCP"). While the Debtors anticipate that of the total $13,780,000 DIP Loan the facility will only reach a maximum draw of $8,000,000 dollars during the condo construction and sell-out term the Debtors, in their business judgment, believe it is prudent to provide additional liquidity to account for market changes, delays and any potential variance in construction costs. The DIP Loan is an all-purpose project facility that funds the administration of these Chapter 11 Cases, completes the project and campus, resolves the life safety issues with respect to the condominium residential balconies, resolves the EGLE environmental claim, and significantly enhances collateral value, sales and marketability of the residential units that remain in Debtors' inventory, and provides a pathway for future financing opportunities that are critical to the Debtors' reorganization. In addition, the DIP Loan provides adequate protection for IBCP and preserves the interests of all stakeholders including but not limited to the citizens of the City of Muskegon and the State of Michigan.

2. The Debtors require the DIP Loan because (a) their operations are seasonal, (b) secured creditor IBCP closed the Debtors' promised $500,000 credit line, and (c) IBCP swept $600,000 of operating cash without notice, thereby leaving the Debtor with no ability to seek alternative financing because of the disruption and optical distress of its assets. The imposition of

a subsequent receivership by IBCP further deteriorated liquidity, operations, sales and marketing activities. The DIP Loan is both reasonable and necessary to create valuable equity necessary for the reorganization.

3. The Debtors have negotiated the proposed terms of the DIP Loan in good faith with the DIP Lender following arm's-length negotiations and a process in which the Debtors solicited interest from multiple finance and alternative financing sources. 364 Capital, LLC, is a Delaware limited liability company and specialty post-petition financing source acting through affiliate 364 Manager, LLC, and Managing Member, Renzo Renzi. The Debtors and 364 Capital, LLC have no prior relationship. The proposed terms are fair, reasonable, and within the market range for comparable or business priming-lien DIP facilities. **The DIP Loan is a priming transaction under Section 364(d) of the Bankruptcy Code**. The DIP Lender will receive senior first-priority liens on the specified pre-petition collateral (real property and personal property), and any collateral acquired hereafter, that currently secures the Debtors' obligations to IBCP — namely the warehouses, condos, boater services building and unimproved land (collectively, the "DIP Collateral"). The Debtors submit and will prove that the DIP Loan (i) protects and preserves the value of the assets of the estate, (ii) creates additional equity value through the completion of the condominiums and common areas, (iii) provides necessary funding to resolve outstanding issues related to EGLE and the City of Muskegon so that the Debtors can obtain traditional funding, (iv) protects, preserves and enhances value to all stakeholders, (v) provides adequate protection for all creditors including IBCP, and (vi) maximizes the return to all creditors of the Debtors' estates by preventing a forced liquidation of its assets.

4. Importantly, the DIP Loan also provides funds that are necessary to address the needs, requirements and concerns of the condo homeowners association (the "HOA"). By

completing the condos and providing for the important amenities such as the pool, common areas, fitness center, lobbies and hallways, the Condo homeowner investments will be both preserved and enhanced in value, and the Debtors will have significantly improved the sales and marketability of their remaining condo inventory units. The currently unfinished Condos, lobby and hallway, pool and balcony remediation is appraised "As-Is" for $16,100,000, with a "Liquidation Value" of $13,685,000. Upon completion of the condominiums and attendant amenities, that will be funded through the proposed DIP financing, the gross sellout value (the appraised value if all units sold to one purchaser at one time) of the remaining condominiums is appraised for $25,600,000. Simply stated, every dollar funded through DIP financing (specifically related to the completion of the condominiums and attendant amenities) will result in more than one dollar of value created. The interest reserve, from which adequate protection payments will be made, is solely for the benefit of IBCP and provides the Debtors the means to perform under Interim Settlement Agreement (as defined below) until such time as the Debtors are able to carry the costs of the IBCP claims through the sale of condominium units and cash flow from stabilized on-going operations.

5. The relief requested herein is consistent with the provisions of the Interim Settlement, effective as of June 24, 2026, arising from the Settlement Conference conducted by the Honorable Jacob A. Brown, and recently approved by this Court pursuant to Rule 9019 (the "Interim Settlement" and the "9019 Order") (Doc No. 231). Specifically, the Condos shall be completed, the reasonable needs of Eastern Great Lakes Environment ("EGLE") will be funded, the City of Muskegon ("City") shall be funded, and the shared expenses of all secured creditors will be minimized.

6. IBCP's interest will be adequately protected in the proposed transaction by a substantial equity cushion. The elements of adequate protection are summarized in the table below and discussed in detail in Part VII (Adequate Protection) of this Motion. The table provides the Court with a comparison of the amount of the existing IBCP debt and the enhanced value of the DIP Collateral upon completion as provided under the Interim Settlement:[1]

| IBCP Collateral | IBCP Debt Amount | Collateral Value Available to IBCP After DIP Loan Enhancements, Completion and Stabilization |
|---|---|---|
| Adelaide Pointe Building 1 (55-unit condo project) | $15,500,000 | $25,600,000 |
| Adelaide Pointe QOZB (≈225,000 SF warehouse + 250,000 SF expansion) | $7,900,000 | $15,100,000 |
| Adelaide Pointe Boaters Services | $1,500,000 | $2,500,000 |
| Hall Street, 2nd lien (USDA) — NOT primed | $3,350,000 | $5,000,000 (second position) |
| Waterland Commerce — NOT primed | $750,000 | $1,900,000 |
| Improved Land | — | $5,600,000 |
| **TOTAL** | **$27,900,000** | **$55,700,000** |

7. The relief requested is supported by the sound business judgment of the Debtors, is consistent with the standards for similar Section 364(d) priming facilities, provides for adequate protection not only by way of the IBCP interest reserve but also by way of the more than 24% equity cushion that will exist after the DIP Loan is fully deployed, and is necessary to preserve the value of the Debtors' estates for the benefit of all creditors, including each of the Debtors' pre-petition secured creditors. The enhancement in value and increased equity cushion provides IBCP with sufficient adequate protection.

[1] Even without the comparison, common sense demonstrates that completed Condos with amenities will increase the value of the DIP Collateral and of the Condos and related amenities.

## II. JURISDICTION, VENUE, AND STATUTORY PREDICATES

8. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(D) and (M). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

9. The statutory predicates for the relief requested herein are Sections 105(a), 361, 363, 364(c)(1), 364(c)(2), 364(d), 364(e), 503(b), and 507(b) of the Bankruptcy Code, Federal Rules of Bankruptcy Procedure 2002, 4001, 6003, 6004, and 9014, and Local Rules 2081-1, 4001-2, and 9075-1.

## III. THE DIP LOAN — MATERIAL TERMS

10. Pursuant to Local Rule 4001-2 and Federal Rule of Bankruptcy Procedure 4001(c)(1)(B), the Debtors summarize the material terms of the proposed DIP Loan.[2] It is anticipated that the DIP Loan funds will be available to the Debtors within two weeks after approval of this Court. The summary is qualified by the Commitment and will be evidenced by definitive Loan Documents to be executed consistent with the Commitment:

| | |
|---|---|
| **Borrowers** | Adelaide Pointe QOZB, LLC, Adelaide Pointe Boaters Services, LLC, and Adelaide Pointe Building 1, LLC, jointly and severally, as debtors-in-possession (the "Borrowers"). |
| **DIP Lender** | 364 Capital, LLC, a Delaware limited liability company, and/or its participants or assigns. |
| **Facility Amount** | A secured super-priority debtor-in-possession term loan of up to $13,780,000 (the "Maximum Loan Amount"). |
| **Funding / Advances** | Funding occurs only upon entry of the Final Order and satisfaction of the conditions in the Commitment; there is no interim draw. The initial advance at Closing is net of the Holdbacks (Commitment Fee, Servicing Fee, Interest Reserve, and Deferred Fee) (all as defined in the Commitment). Subsequent Advances are subject to the conditions precedent set forth in the |

[2] The summary is provided for convenience, and to the extent of any inconsistency between the summary provided in this Motion and the terms of the Commitment (and any Loan Documents consistent with and pursuant thereto), the terms of the Commitment (and any Loan Documents) shall control.

| | |
|---|---|
| | Commitment, including budget compliance, third-party inspector approval where applicable, lien waivers for post-petition work, and title confirmation. |
| **Use of Proceeds** | The Budget attached to the Commitment as its Exhibit B, summarized in Part V below. The Budget may be modified only as approved by the DIP Lender on or before the date of the hearing on this Motion. Unused or under-budget line-item proceeds may, with the DIP Lender's consent, be reallocated to expenses as may be approved by the Court, including items authorized to fund the Court's cash collateral orders or other orders of the Court. |
| **Interest Rate** | 14.00% per annum (the "Contract Rate"); interest-only payments monthly in arrears, computed on a 30-day month / 360-day year, and paid first from the Interest Reserve Account. The DIP Lender earns a minimum of 360 days of interest on the Maximum Loan Amount from Closing. Upon an event of default, interest accrues at the lower of the Contract Rate plus 6.00% or the maximum lawful rate (the "Default Rate"). |
| **Maturity** | Twenty-four (24) months from Closing (the "Maturity Date"). |
| **Fees** | (i) Commitment Fee of 4% of the Maximum Loan Amount (as defined in the Commitment), (ii) Loan Servicing Fee of 1% of the Maximum Loan Amount (as defined in the Commitment), (iii) Deferred Fee of $100,000; (iv) default-period servicing fee of $2,500 per month until cure; (v) 35 basis points (0.35%) per month of the principal amount of the DIP Loan which has not been advanced commencing at the Closing of the DIP Loan, (vi) an Exit Fee of 2.5% as a condition precedent to the payoff of the DIP Loan, and (vii) reimbursement of the DIP Lender's reasonable expenses, including counsel fees capped at $800 per hour, which Lender Expenses may be capitalized to principal. A $50,000 Application Fee is to be paid to the DIP Lender by a third-party remitter from non-estate funds; it is neither an obligation of the Debtors nor an asset of the estates. |
| **Break Up Fee** | If, after entry of the Final Order, the Borrowers elect not to close, the Court authorizes and the Borrowers consummate alternative financing, or the Borrowers fail to satisfy material Conditions, the DIP Lender earns a break up fee of 4.00% of the Maximum Loan Amount (as defined in the Commitment), allowed as an administrative expense; if the Borrowers obtain financing from a competing lender, the competing lender pays the break up fee in cash at its closing. No break up fee applies if the DIP Lender elects not to close. |
| **Priority** | Super-priority administrative expense status pursuant to sections 364(c)(1), 503(b), and 507(b), with priority over all other administrative expense claims, subject only to fees payable to the Bankruptcy Court, the United States Trustee (the "Carve Out") and allowed administrative claims of Debtors' Counsel. The Final Order will provide that the DIP Lender's liens and claims are not subject to surcharge under section 506(c) or otherwise. |
| **Security** | Senior first-priority priming mortgage liens and security interests pursuant to sections 364(d) and 364(c)(2) on the Collateral: the real property located at 1204 West Western Avenue, 901 Adelaide Circle, and 400 Adelaide |

| | |
|---|---|
| | Circle, Muskegon, Michigan 49441, together with vacant land on the Adelaide Pointe campus and all improvements now or hereafter located thereon, and the Borrowers' personal property (including furniture, fixtures, and equipment, permits and licenses, accounts receivable, leasehold rights, third-party contracts, and plans and specifications), senior to all pre-petition and post-petition liens and interests (senior to tax liens other than ad valorem taxes for 2025 and subsequent years). The Collateral EXCLUDES the estates' claims and causes of action under sections 502(d), 506, 510, 542, 544, 545, 547, 548, 549, 550, 551, 552, and 553 of the Bankruptcy Code, fraudulent-transfer and preference claims under applicable law, and all other pending or future causes of action and their proceeds (other than proceeds from real property). |
| **Guaranty** | None. The DIP Loan is made without any personal guaranty from Ryan M. Leestma or any other principal, member, manager, or affiliate of the Debtors, and without recourse to any non-Debtor party. The facility is underwritten to the Collateral and the Budget, preserving the personal borrowing capacity of the Debtors' principal for the benefit of the reorganization or for any exit funding. |
| **Carve Out** | Fees payable to the Bankruptcy Court and the Office of the United States Trustee and allowed administrative claims of Debtors' Counsel. |
| **Good Faith / § 364(e)** | The Final Order will include a finding that the DIP Loan is extended in good faith, entitling the DIP Lender to the protections of section 364(e), and will be effective immediately without stay. |
| **Conditions** | Include, but are not limited to: filing of this Motion with the Commitment attached; entry of the Final Order in form and substance acceptable to the DIP Lender, in its sole and absolute discretion, incorporating the Commitment in its entirety as an exhibit to the Final Order; issuance of a lender's title insurance commitment based on the Final Order without lien exceptions; property insurance naming the DIP Lender; termination of any stop-work orders, extension of the stay of actions against the Debtors' principal;, an ALTA survey or update; notice to all Parties in Interest; no material adverse change; and satisfactory completion of the DIP Lender's due diligence. |
| **Covenants** | Include: use of proceeds in substantial compliance with the Budget (line-item overages permitted where offset by line-item savings or remaining contingency, in the DIP Lender's reasonable discretion); monthly receipts-and-disbursements and proceeds reporting by the 15th of each month; delivery of appraisals within three business days of receipt; the Borrowers' agreement to oppose dismissal or conversion of the Chapter 11 Cases and any competing lien or super-priority financing absent the DIP Lender's consent; delivery to the DIP Lender of drafts of motions and plans relating to the Collateral prior to filing; and compliance with plan-filing deadlines. |
| **Events of Default; Remedies** | Events of default, including confirmation of a plan that does not treat the DIP Lender's claims as provided in the Commitment (or as the DIP Lender otherwise agrees), conversion to Chapter 7, appointment of a Chapter 11 trustee or examiner with expanded powers without consent, dismissal, entry |

| | |
|---|---|
| | of stay relief in favor of any party as to the Collateral, transfer of Collateral, competing liens or priorities, or foreclosure actions. Upon default, the DIP Lender provides Written Notice to the Borrowers, their counsel, the U.S. Trustee, secured creditors, and any committee; parties have ten business days to cure or controvert; thereafter the DIP Lender may seek emergency stay relief on 48 hours' notice, with the contest limited to the existence of the default. |
| **Commitment Expiration** | The Commitment expires October 7, 2026 at 5:00 p.m. EST if not fully executed. |
| **Section 506(c)** | The Final Order will provide that the DIP Lender's collateral position is not subject to surcharge under section 506(c) or otherwise. No section 506(c) waiver is granted as to any pre-petition secured creditor. |
| **Section 552(b) Waiver** | None requested. |
| **Roll-Up / Cross-Collateralization** | None. No pre-petition debt is repaid or rolled up with DIP proceeds, and no pre-petition claim is cross-collateralized with post-petition collateral. At the election of the DIP Lender, and with Court approval |
| **Stipulations as to Pre-Petition Liens** | None requested under this Motion. All challenge rights of the Debtors and any committee are expressly preserved. |
| **Governing Law** | To the extent not to supersede by applicable Bankruptcy law applicable to DIP financing trustees such as 11 U.S.C. § 364 in governing case law. |

11. The Debtors are filing this Motion together with the Commitment and Budget. As required by the Commitment, a copy of the Commitment will be attached to and incorporated into the Final Order. Definitive Loan Documents will be consistent with the Commitment.

## IV. USE OF PROCEEDS — THE DIP BUDGET

12. The proceeds of the DIP Loan shall be used solely in accordance with the DIP Budget attached to the Commitment. The DIP Budget allocates the full $13,780,000 Maximum Loan Amount as follows:

| DIP Budget Line Item | Payee | Amount |
|---|---|---|
| **Professional Fees** | | |
| Chief Restructuring Officer | John Polderman | $180,000 |
| Critical Vendor Payment | Edgewater Resources, LLC | $150,000 |
| EGLE Violation & Site Assessment | Edgewater Resources, LLC | $75,000 |

| | | |
|---|---|---|
| Critical Vendor Payment | Soils and Structures, Inc. | $25,000 |
| Third Party Inspector | TBD | $60,000 |
| Legal, Edgewater Resources | Orlebeke Mackraz / Patterson Law | $50,000 |
| Claims Agent | Verita Global | $9,600 |
| Appraisal Services | JLL Valuation & Advisory Services | $29,750 |
| Tax & Accounting Services | Brickley DeLong | $150,000 |
| U.S. Trustee Fees | U.S. Trustee | $35,000 |
| Debtor Legal | Jennis Law | $250,000 |
| Legal, 364 Capital, LLC | Pack Law | $100,000 |
| **Total Professional Fees** | | **$1,614,350** |
| **Hard Costs (Repairs, Maintenance & Completion)** | | |
| Build-Out of 34 Condos | One Touch Construction | $4,250,000 |
| Condo Pool | Tindall Pools | $500,000 |
| Lobby and Hallways Build-Out | One Touch Construction | $100,000 |
| Landscaping – Condos and Land | Barry's | $125,000 |
| Balcony Remediation | FJ Peterson | $25,000 |
| **Total Hard Costs** | | **$5,000,000** |
| **Other** | | |
| Past Due Real Property Taxes | City of Muskegon | $250,000 |
| 2026 Real Property Tax Reserve | City of Muskegon | $300,000 |
| Interest Payments Reserve | IBCP | $1,500,000 |
| Staging & FF&E | TBD | $544,000 |
| Reimbursement, Application Fee | Harbor West, LLC | $50,000 |
| Deferred Fee | 364 Capital, LLC | $100,000 |
| Application Fee | Summit | $50,000 |
| Estimated Closing Costs | Multiple TBD | $138,850 |
| Construction Management | Ryan M. Leestma | $150,000 |
| Contingency | As Needed | $500,000 |
| **Total Other** | | **$3,582,850** |

| | | |
|---|---|---|
| **Holdbacks / Reserves** | | |
| Commitment Fee | 364 Capital, LLC | $551,200 |
| Loan Servicing Fee | 364 Capital, LLC | $137,800 |
| DIP Interest Reserve (est. 30 months) | 364 Capital, LLC | $2,893,800 |
| **Total Holdbacks / Reserves** | | **$3,582,800** |
| **MAXIMUM LOAN AMOUNT** | | **$13,780,000** |

## V. EFFORTS TO OBTAIN AND UNAVAILABILITY OF UNSECURED CREDIT

13. Section 364(b) of the Bankruptcy Code authorizes the Debtors to obtain unsecured credit other than in the ordinary course only after notice and a hearing. Section 364(c) authorizes the Debtors to obtain credit secured by liens or with super-priority administrative expense status if the Debtors are unable to obtain unsecured credit allowable under Section 503(b)(1) as an administrative expense, and Section 364(d) authorizes priming liens where such credit is otherwise unavailable and existing lienholders are adequately protected.

14. The Debtors and their financial advisors have engaged in good-faith efforts to obtain post-petition financing on terms more favorable to the estates than those reflected in the Commitment. Those efforts have included direct outreach to:

(1) the Debtors' existing secured lenders, each of which has been afforded the opportunity to provide post-petition financing on a senior or pari passu basis — including IBCP.

(2) institutional debtor-in-possession lenders identified by the Debtors including specialty lenders active in middle-market real-estate;

(3) regional banks and credit unions with existing or prior lending relationships with the Debtors or with Mr. Leestma; and

(4) private credit funds, family offices, and high-net-worth investors known to the Debtors and to the Debtors' advisors.

15. Based on confidential judicial settlement discussions, the Debtors have also evaluated the liquidation of personal and real property of Ryan Leestma and his wife, Dr. Emily Leestma, including their Condominium located in Bradenton Beach, Florida and a recreational vehicle ("RV") as an alternate source of financing to finish the condominiums. An informal liquidation analysis of the RV shows a value of $500,000 and the Condominium value of $2,500,000. The real and personal properties may already be encumbered by an interest in favor of IBPC for the amounts of $400,000 and $2,800,000, respectively. This would leave minimal equity if the RV was sold and the existing lien was paid off. The same analysis applies to the Florida condominium which is currently encumbered by liens and mortgages in connection with the financing of the Adelaide Pointe project.[3] 16. No lender has offered to provide unsecured post-petition credit on terms allowable under Section 503(b)(1). The terms reflected in the Commitment represent the most favorable terms available to the Debtors from a lender willing to fund a DIP loan of this size in this case. The Debtors' efforts to obtain post-petition financing satisfy the requirement under Sections 364(c) and 364(d) of the Bankruptcy Code that the Debtors can demonstrate the unavailability of credit on less burdensome terms. Section 364(d) does not impose a duty to seek credit from every possible lender to conclude that other credit is unavailable. In re Snowshoe, 789 F.2d 1085 at 1088 (4th Cir. 1986) (trustee contacted other financial institutions in the immediate area and was unsuccessful). The Debtors' financing options are further constrained by a circumstance of IBCP's own making: the institution of the Receivership, the cash sweep, their refusal to pay equipment and vehicle obligations personally guaranteed by Mr. Leestma, and to compensate Mr. Leestma himself, has impaired the personal credit of the Debtors' principal and

[3] The Debtors raise these points as the liquidation of Mr. Leestma's and Dr. Leestma's personal assets has been raised as a point of "contention" in the parties' and Judge Brown's considerable efforts to resolve the disputes in this case and reach a financing result that would benefit all the stakeholders, including IBCP.

thereby foreclosed the conventional sponsor-guaranteed financing channels that would otherwise be available to an enterprise such as the Project. A DIP facility underwritten to the collateral, without a personal guaranty, is accordingly not merely the best available structure, it is the only structure reasonably available. The nature of the proceedings can control the reasonableness of the number of lenders the Debtor is required to approach to satisfy the 364(d)(1)(a) requirement. In re Sky Valley, Inc., 100 B.R. 107 (Bankr. N.D. Ga. 1988) (Debtor had little to no unencumbered property and went to two pools of creditors which were unsuccessful). Circumstances involving unusually difficult financing alters the reasonableness consideration regarding Debtor's attempts to obtain alternate financing. In re Clouter Creek Reserve LLC, 669 B.R. 764 (Bankr. D.S.C. 2025). Thus, it preserves borrowing capacity for the benefit of the reorganization.

## VI. ADEQUATE PROTECTION OF PRE-PETITION SECURED CREDITORS

17. As described above in Part I, the DIP Loan is a priming transaction under Section 364(d) of the Bankruptcy Code. The DIP Lender will receive senior, first-priority priming liens on the DIP Collateral with respect to the property owned by the Debtors. For the avoidance of doubt, Collateral for the DIP Loan shall not include the Hall Street property, nor the Waterland Commerce property, which shall not be primed. Those two properties are excluded from the DIP Collateral in their entirety, consistent with the treatment of those secured lenders' collateral under the Interim Settlement. The substantial adequate protection that exists with respect to IBCP, whose collateral is being primed, is as follows:

18. **Equity Cushion**. The Debtors' opinion and updated appraisals reflect that the primed collateral will be valued at approximately $55.7 million on an as-completed/stabilized basis against approximately $27.9 million of existing debt owed to IBCP, plus $13,780,000 of new DIP financing under the DIP Loan. Case law is uniform on an equity cushion of 20% or more

constituting adequate protection while 12% to 20% can constitute adequate protection. See In re Packard Square LLC, 574 B.R. 107 (Bankr. E.D. Mich. 2017); In re James River Assocs., 148 B.R. 790 (E.D. Va. 1992); In re Big Dog II, LLC, 602 B.R. 64 (Bankr. N.D. Fla 2019). The Debtors will offer sufficient evidence to establish that there is equity cushion of more than 24% and will adequately protect the existing debt where subordinated to the priority debt that will be secured by the first position primary lien. This is an extraordinary level of protection that no other secured creditor possesses.

19. **Replacement Liens**. The Final Order will grant IBCP replacement liens that the Court would require as adequate protection to the extent of any post-petition diminution in the value of IBCP's interest in the DIP Collateral. IBCP has always had a substantial equity cushion; its collateral position at the time it plotted the liquidation of the project via a Receivership[4] was well in excess of $20 million dollars on top of Mr. Leestma's personal guarantee.

## VII. LEGAL AUTHORITY

### A. Section 364 Provides Express Authority for the DIP Loan

20. Section 364 of the Bankruptcy Code creates multiple post-petition financing options for a debtor-in-possession. Section 364(b) authorizes unsecured non-ordinary-course credit; Section 364(c)(1) authorizes super-priority administrative expense status; Sections 364(c)(2) and (c)(3) authorize secured credit on unencumbered property and junior liens on

[4] Per USDA provided FOIA documents IBCP signed a condo completion forbearance agreement on August 22, 2025. On September 12, 2025 IBCP calculated their full and total cross-defaulted legal balances. On September 19, 2025 IBCP e-mailed the USDA that they were "in the process of appointing a receiver" despite the fact that there was no existing default. On September 22, 2025, Keith Lightbody demanded that Mr. Leestma consent to a Receivership. On September 23, IBCP initiated litigation against the Debtors. On November 13, 2025 IBCP was informed by the USDA that they were ***not*** in compliance with the pre-requisite servicing and approval requirements of the Rural Business and Industry Guarantee program. On November 19, 2025 IBCP requested that the USDA "confirm adequate notice, no intent to intervene and satisfaction with the Bank's conduct" while conceding that they had not complied with USDA requirements. The USDA declined.

encumbered property; and Section 364(d) authorizes priming liens senior to existing liens. The Debtors seek relief under Sections 364(c)(1) and 364(c)(2), together with priming relief under Section 364(d)(1) with respect to the DIP Collateral, as described in Parts IV and VII above.

21. Courts routinely approve post-petition financing under Section 364 where (i) the debtor has demonstrated that credit is unavailable on less burdensome terms; (ii) the proposed terms reflect the exercise of sound business judgment; and (iii) the terms are fair, reasonable, and adequate under the circumstances.

**B. The Debtors Have Exercised Sound Business Judgment**

22. The Debtors believe that the CRO, particularly given his newly created fiduciary duties to the Debtors as well as their respective stakeholders that now supersede his prior duties as Receiver only for IBCP, will conclude that the proposed DIP financing is in the best interests of all stakeholders. The business judgment rule governs the Court's review of a debtor-in-possession's decision to obtain post-petition financing. The relevant inquiry is whether the transaction, viewed as a whole, advances the rehabilitation of the estate.

**C. The Terms Are Fair, Reasonable, and Adequate**

23. The proposed terms of the DIP Loan are fair, reasonable, and adequate under the circumstances. The DIP Loan is particularly rightsized to fund the specific needs identified line-by-line in the DIP Budget, plus a modest contingency. The pricing reflects market terms for DIP facilities to already overly leveraged small- and middle-market debtors in similar real-estate cases of comparable size and complexity. The covenants and reporting requirements are customary. The DIP Lender requires no personal guaranty from the Debtors' principal or any non-Debtor affiliate that the Debtors submit is an uncommon and borrower-favorable feature in the priming DIP market that preserves the borrowing capacity for the benefit of the reorganization and potential exit

funding. While the Commitment requires that the Final Order provides that the DIP Lender's position is not subject to surcharge under Section 506(c), such provision is a customary and appropriate protection for a post-petition lender extending new money on a priming basis. The relief requested falls squarely within the terms of DIP transactions approved by Courts in this district with similar secured creditors. The Debtors do not seek financing in excess of what is needed to (a) complete the Condos (b) satisfy obligations under the Interim Settlement (c) fund administrative expenses in this case and (d) stabilize the Project and campus[5].

**D. IBCP Is Adequately Protected Under § 364(d)(1)(B)**

24. While the DIP Loan seeks a lien senior to IBCP's pre-petition liens on the DIP Collateral, the terms of the DIP Loan would also prime the junior lien of Catalyst. As Catalyst's continued services and goodwill will be necessary to complete the construction and remediation, the Debtors and DIP Lender have deemed it prudent to satisfy Catalyst's lien from funds estimated in the DIP Budget. The satisfaction of this junior lien will further increase the equity cushion that IBCP has in the Condos and increases the adequate protection of IBCP's interest in the collateral as part of this DIP financing solution. The payment Under Section 364(d)(1)(B) of the Bankruptcy Code, the Court may authorize the priming where, as here, the pre-petition secured creditors are adequately protected. The adequate protection of IBCP specifically rests on significant independent and overlapping grounds, as discussed above, primarily the equity cushion.

## VIII. AUTHORIZATION OF CRITICAL VENDORS

25. The DIP Loan contemplates three vendors as critical vendors: Catalyst, Soil and Structures, and Edgewater. Courts can authorize payment of pre-petition amounts to critical

[5] The remedy of priming IBCP, the most secure creditor on campus and the catalyst of the creditor crisis, is equitable under the circumstances. Per USDA FOIA documentation, IBCP plotted and pursued control and liquidation of the Project and Enterprise in bad faith and without notice, default and the regulatorily required notices and approvals of the USDA.

venders under Sections 105 and 363 of the Bankruptcy code if it is show that the payments are necessary to the reorganization process, sound business justification exists in that critical vendor will not continue to do business with the debtor if not afforded a critical vendor status, and the disfavored creditors will be in a similar position as they would have been if the vendor was not deemed a critical vendor. See In re lonosphere Clubs, Inc., 98 B.R. 174, 175-177 (Bankr. S.D.N.Y. 1989). Judge Williamson reasoned in Tropical Sportswear that vendors not paid for prior services will refuse to provide further services, certain products are critical or the debtors would be unable to continue business, and when disfavored creditors are “better off” by paying the vendors as it would enable a successful reorganization in justifying the grant of critical vendor status. In re Tropical Sportswear Int'l Corp., 320 B.R. 15 (Bankr. M.D. Fla. 2005).

26. Catalyst’s Proof of Claim concerning Building 1 reflects $684,360.40 (Claim No. 3) and the DIP Loan provides for a critical vendor payment of their lien in Building 1 for $500,000. Upon such payment, Debtors are seeking a release and termination of Catalyst’s lien pertaining to Building 1. The proposed resolution will eliminate their encumbrance on the Debtor’s assets and provide a substantial benefit to the estate and facilitating the Debtor’s reorganization. Catalyst is the construction managing firm previously employed by Debtors concerning Building 1 construction. Catalyst is familiar with the project, and with the project’s complexity and history, they are in the best position to continue the construction budgeted in the DIP Loan. The scope of their future work with Debtors are

27. Soils and Structure filed a proof of claim as related to Leestma Management in the amount of $21,314.00 (Claim No. 5). The DIP Loan provides for a payment of $25,000 to their claim for the benefit of the Borrowers. Soils and Structures are an engineering and consulting firm that is necessary to assess the requirements imposed by EGLE which will enable the Debtors to

comply with the Interim Settlement. Soils and Structures provide engineering expertise that is necessary for a successful reorganization. Resolving the issues with EGLE is imperative for the Debtors and the Creditors in which retaining future consulting services from Soils and Structures necessitates a critical vendor status.

28. The DIP Loan lists a critical vendor payment of $150,000 to Edgewater and provides $75,000 to Edgewater for EGLE violation and site assessment. Edgewater specializes in wetland and marina engineering which is the environment of the Project's location. Much of EGLE's concerns lie in the wetland, shoreline, and erosion protection. Edgewater's specialized engineering services are required for Debtors to satisfy the erosion and shoreline issues that EGLE has raised. Without receiving payment, Edgewater's services are out of reach for the Debtors and will cost the estate more capital in finding a new vendor with the familiarity and experience in wetland and coastline erosion engineering services.

## IX. LOCAL RULE 4001-2 DISCLOSURES
## (previously set forth in table format on page 18, above)

29. In compliance with Local Rule 4001-2(a)(1), the Debtors endeavor to identify the following provisions of the Commitment (to the point of redundancy) and the proposed Final Order:

(a) **Cross-Collateralization**. None. No pre-petition claim is secured by post-petition collateral.

(b) **Roll-Up.** None. No DIP proceeds repay pre-petition principal. The DIP Budget includes a $1,500,000 reserve to fund IBCP's interest, as well as a $2,893,800 interest and unused line fee reserve to fund the DIP Loan.

(c) **Waiver of Section 506(c) Surcharge**. As to the DIP Lender only: any proposed Final Order shall provide that the DIP Lender's liens, claims, and collateral are not subject

to surcharge under Section 506(c) or otherwise. No Section 506(c) protection is extended to any pre-petition secured creditor.

(d) **Waiver of Section 552(b) Exception.** None requested that the Court may find appropriate if additional and equal protection is necessary.

(e) **Stipulations as to Pre-Petition Liens or Claims.** None requested. All challenge rights of the Debtors existing under the Interim Settlement or reserved are preserved.

(f) **Liens on Avoidance Actions or Their Proceeds.** None. The Collateral expressly excludes the estates' claims and causes of action under Sections 502(d), 506, 510, 542, 544, 545, 547, 548, 549, 550, 551, 552, and 553, fraudulent-transfer and preference claims, and all other pending or future causes of action and their proceeds.

(g) **Carve-Out.** Limited to fees payable to the Bankruptcy Court and the Office of the United States Trustee and allowed administrative claims of Debtors' counsel.[6]

(h) **Validation of Pre-Petition Debt.** None requested.

(i) **Priming Liens Under § 364(d).** The DIP Lender will receive senior first-priority priming liens on all of the real personal property of the Debtors, generally located at 1204 West Western Avenue, 901 Adelaide Circle, and 400 Adelaide Circle, Muskegon, Michigan, together with vacant land on the Adelaide Pointe Project campus and all improvements thereon (the Adelaide Pointe winter boat storage warehouse, boater services, and Building 1 Condos), all currently securing the obligations of Independent Bank Corp. (previously defined as the DIP Collateral).

(j) **Deemed Consent to Lien Validity**. None.

---

[6] The Debtors believe that no official committee of unsecured creditors will be appointed in these cases.

## X. NOTICE

30. Notice of this Motion has been provided via CM/ECF to (i) the Office of the United States Trustee for the Middle District of Florida; (ii) counsel to each of the Debtors' known pre-petition secured creditors, including Independent Bank Corp., Lake Michigan Credit Union, 4Front Credit Union, ChoiceOne Bank, and Westshore Bank; (iii) all scheduled creditors of the Borrowers; (iv) EGLE; (v) the City of Muskegon; (vi) the scheduled and listed holders of the largest unsecured claims against the Debtors on a consolidated basis; (vii) the Internal Revenue Service; and (viii) any party that has filed a notice of appearance and request for service of papers that does not receive service via CM/ECF[7] in these cases. The Debtors submit that no other or further notice is necessary or required given the level of participation of represented parties in these cases and the absence of unsecured creditors or an official creditors' committee.

## XI. REQUEST FOR PRELIMINARY CONSIDERATION

31. Pursuant to Rule of Bankruptcy Procedure 4001(c)(2) and Local Rule 9013-1(e), the Debtors request that this Motion be set for an expedited hearing and pretrial conference at the earliest date consistent with Rule 4001(c)(2). The Commitment requires this Motion to be filed with the Commitment attached and no funds will be available to the Borrowers under the DIP Loan until entry of the Final Order and Closing. Each week of additional delay extends the period during which the thirty-four (34) unsold condominium units remain unfinished and unmarketable, and the estate professionals remain unfunded. Further, each week of delay consumes the summer and fall Michigan construction season during which the completion work can be performed most efficiently.

---

[7] The Debtors will file a supplemental Certificate of Service to the extent that there is any interest party entitled to notice with service that is not included on the most recent matrix, if any.

32. At the final hearing, the Debtors will request entry of the Final Order authorizing the full $13,780,000 DIP Loan, the priming liens, and the super-priority administrative expense status described herein, in each case consistent with the Commitment and the DIP Budget.

## XII. CONCLUSION AND PRAYER FOR RELIEF

WHEREFORE, the Debtors respectfully request that this Court enter a Final Order (i) authorizing the Borrowers to obtain the DIP Loan on the terms of the Commitment and to execute the Commitment and definitive Loan Documents; (ii) granting the DIP Lender the senior, first-priority priming liens under Sections 364(d)(1) and 364(c)(2), the super-priority administrative expense status under Sections 364(c)(1), 503(b), and 507(b), subject to the referenced Carve Outs, and the other protections described herein; (iii) finding that IBCP is adequately protected with respect to the DIP Collateral within the confines of Section 364(d)(1)(B); (iv) finding that the DIP Loan is extended in good faith within the meaning of Section 364(e); (v) approving the Commitment and the DIP Budget; (vi) scheduling a preliminary hearing and any final hearing on shortened or expedited notice; (vii) finding that Catalyst, Soil and Structures, and Edgewater are critical vendors and allowing payment toward their respective liens; (viii) establishing an efficient, fair and expedited discovery process in connection with any objection of IBCP;[8] and (ix) granting such other and further relief as is just and proper.

*[Remainder of Page Intentionally Left Blank]*

---

[8] The Debtors requested that in the event IBCP objects to the relief requested, that IBCP be required to produce any "appraisals" of the Condos in IBCP's possession to minimize any disputes and resolve any objections efficiently.

Dated this 7th day of October 2026.

Respectfully Submitted,

/s/ Sebastian T. Pankiewicz
Sebastian T. Pankiewicz
Florida Bar No. 1054094
David S. Jennis
Florida Bar No. 775940
**JENNIS MORSE**
606 East Madison Street
Tampa, Florida 33602
Telephone: (813) 229-2800
Email: djennis@jennislaw.com
spankiewicz@jennislaw.com
ecf@jennislaw.com

*Counsel for the Debtors and Debtors-in-Possession*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 7th day of October 2026, a true and correct copy of the foregoing was filed using the Court's CM/ECF electronic filing system, which will serve a copy on all registered users, and was served by U.S. Mail and/or electronic mail on those parties on the Master Service List who are not registered CM/ECF participants, including all parties affected by this Motion.

/s/ Sebastian T. Pankiewicz
Sebastian T. Pankiewicz

# EXHIBIT A

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

In re:

| | |
|---|---|
| Leestma Management, LLC | Case No. 8:26-bk-02696-CED [Lead Case] |
| Adelaide Pointe QOZB, LLC | Case No. 8:26-bk-02698-CED |
| Adelaide Pointe Boaters Services, LLC | Case No. 8:26-bk-02699-CED |
| Adelaide Pointe Building 1, LLC | Case No. 8:26-bk-02700-CED |
| Waterland Battle Creek, LLC | Case No. 8:26-bk-02701-CED |
| | Chapter 11 |
| Debtors. | *Jointly Administered Cases* |

_________________________________/

**FINAL ORDER GRANTING THE DEBTORS' MOTION (1) AUTHORIZING CERTAIN DEBTORS TO OBTAIN CREDIT SECURED BY A SENIOR PRIMING SECURITY INTEREST PURSUANT TO DIP FINANCING WITH 364 CAPITAL, LLC, (2) APPROVING THE DIP COMMITMENT AND LOAN DOCUMENTS, (3) SUPER-PRIORITY ADMINISTRATIVE EXPENSE STATUS WITH A GOOD FAITH DETERMINATION AND WAIVER OF STAY**

THIS CASE came before the Court on [_________________] at [_____] on the *Debtors' Motion for Entry of a Final Order (I) Authorizing Certain Debtors to Obtain Post-Petition Financing Pursuant to 11 U.S.C. § 105(a), 363, 364(c)(1), 364(c)(2), and 364(d); (II) Granting Senior Priming Liens and Super-Priority Administrative Expense Status to the DIP Lender; (III) Approving the DIP Commitment and Authorizing Execution of the Loan Documents; (IV) Scheduling a Final Hearing on Expedited Notice; and (V) Granting Related Relief* (Doc. No.

___) (the "DIP Motion"), filed by the above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), Judge Caryl Delano, United States Bankruptcy Judge, presiding.

Appearances were as noted on the record at the hearing. The Court, having considered the DIP Motion, the financing commitment issued by 364 Capital, LLC dated October 7, 2026, as revised (the "Commitment"), attached hereto as ***Exhibit B***; the line-item DIP Budget attached to the Commitment as its ***Exhibit B*** and filed concurrently herewith as ***Exhibit C***; the Declaration of Ryan M. Leestma (Doc. No. [___]); [the objections filed at Doc. Nos. [___] and [___] (collectively, the "Objections") and the replies thereto;] having heard the oral arguments of counsel at the hearing; upon review of the pleadings and record in these jointly administered cases; and the Court having stated findings of fact and conclusions of law on the record at such hearing:

**A. Jurisdiction.** This Court hereby finds that it has jurisdiction over these proceedings pursuant to 28 U.S.C. §§ 157 and 1334, and this is a "core" proceeding within the meaning of 28 U.S.C. § 157(b)(2)(D) and (M). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. This Court shall retain jurisdiction to enforce the terms of this Order.

**B. Notice.** This Court hereby finds that notice of the DIP Motion is adequate and sufficient and complies with 11 U.S.C. § 364, Rules 2002, 4001(c), 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure, and Local Rules 2081-1, 4001-2, and 9075-1 of this Court. No further notice is necessary or required.

**C. Unavailability of Other Credit.** The Borrowers (as defined below) are unable to obtain unsecured credit allowable as an administrative expense under 11 U.S.C. § 503(b)(1), or credit under 11 U.S.C. § 364(a), (b), or (c) alone, on terms more favorable than those set forth in the Commitment. The Debtors solicited interest from over one hundred post-petition

financing sources and afforded each of their existing secured lenders, including Independent Bank Corporation ("IBCP"), which declined, the opportunity to provide post-petition financing on a senior or pari passu basis.

D. **Adequate Protection; Priming.** The DIP Facility primes only the pre-petition liens of IBCP on the DIP Collateral. The Court finds that IBCP is adequately protected within the meaning of 11 U.S.C. §§ 361 and 364(d)(1)(B) by (i) the equity cushion in the DIP Collateral, which on an as-completed and stabilized basis is valued at approximately $55,700,000 against approximately $27,900,000 of IBCP debt; (ii) the enhancement in collateral value resulting from the completion of the Building 1 condominium units and campus improvements funded by the DIP Facility; and (iii) the replacement liens granted in Paragraph 18 of this Order.

E. **Business Judgment.** The Borrowers' decision to enter into the Commitment on the terms approved herein is a sound exercise of business judgment, was negotiated at arm's length and in good faith, and is in the best interests of the Debtors, their estates, and their creditors.

F. **No Affiliation.** 364 Capital, LLC is a Delaware limited liability company and specialty post-petition financing source acting through its affiliate 364 Manager LLC and its Managing Member, Renzo Renzi. The DIP Lender has no prior or affiliated relationship with any Debtor, any insider of any Debtor, or any pre-petition secured creditor, is not a "person in control" of any Debtor, and is not an "insider" within the meaning of 11 U.S.C. § 101(31).

G. **Good Faith.** This Court expressly finds that the DIP Lender is extending credit and making loans in good faith and, therefore, the DIP Lender shall be entitled to the full protections of 11 U.S.C. § 364(e), and this Order shall be made effective immediately without any stay of the effect of this Order, including any stay afforded by Rule 6004(h) of the Federal Rules of

Bankruptcy Procedure, so as to permit immediate funding within the provisions and protections of 11 U.S.C. § 364(e).

H. **Critical Vendors.** This Court finds justification that Debtors are authorized, pursuant to 11 U.S.C. §§ 105(a) and 363, to treat Catcon, Inc.; Soils and Structures, Inc.; and Edgewater Resources, LLC as critical vendors and to pay their respective prepetition claims under the terms of the DIP Loan and subject to the terms of this Order.

Accordingly, it is **ORDERED:**

1. The DIP Motion is **GRANTED** on a final basis as set forth in this Order. Any objections (including the Objections) to entry of this final Order that have not been withdrawn, waived, resolved, or settled, and all reservations of rights included therein, are hereby **DENIED** and overruled.

2. The Commitment dated October 7, 2026 between the Borrowers and 364 Capital, LLC (the "DIP Lender"), attached hereto as ***Exhibit B***, is APPROVED on a final basis, subject to the modifications set forth in this Order. In the event of any conflict between the provisions of this Order, on the one hand, and the provisions of the Commitment and other documents ultimately comprising the Loan Documents (as defined in the Commitment), on the other hand, that are not explicitly provided for in this Order, the terms of the Loan Documents, entered consistent with this Order, shall control.

3. The Borrowers are authorized to enter into the Commitment, to the extent not already so entered, on a final basis, and any and all other documents contemplated thereby, including the Loan Documents, to effectuate the transactions contemplated by the Commitment, with the following modifications:

a) The DIP Budget, attached as ***Exhibit C***, is filed concurrently herewith as ***Exhibit B*** (subject to such variances as are permitted in this Order and the Commitment); and

b) [RESERVED for modifications imposed by the Court or negotiated with objecting parties.]

4. Pursuant to the terms and conditions of the Commitment, which is approved by this Court as a legally permissible loan under the circumstances, Adelaide Pointe QOZB, LLC, Adelaide Pointe Boaters Services, LLC, and Adelaide Pointe Building 1, LLC (collectively, the "Borrowers[9]"), jointly and severally, are authorized to borrow from the DIP Lender up to the total funded amount of $13,780,000.00, including the DIP Lender's fees, costs, and accrued interest (the "DIP Facility"), as follows:

a) The Borrowers are authorized, without further action or order of this Court, to draw the initial advance at Closing, net of the Holdbacks (the Commitment Fee, Servicing Fee, Interest Reserve, and Deferred Fee, each as defined in the Commitment).

b) The Borrowers are authorized, without further action or order of this Court, to draw subsequent Advances subject to the conditions precedent set forth in the Commitment, including DIP Budget compliance, third-party inspector approval where applicable, lien waivers for post-petition work, and title confirmation.

c) No Debtor other than the Borrowers is liable, directly or contingently, for the DIP Obligations. Neither Leestma Management, LLC, Waterland Battle Creek, LLC, Hall Street, LLC, Waterland Commerce, LLC, nor Adelaide Pointe, LLC is a borrower or guarantor under the Commitment, and no property of those Debtors is DIP Collateral.

[9] The Borrowers under the DIP Facility are only Adelaide Pointe QOZB, LLC, Adelaide Pointe Boaters Services, LLC, and Adelaide Pointe Building 1, LLC. The remaining Debtors are neither borrowers nor guarantors, and none of their property constitutes DIP Collateral.

d) The DIP Facility is made without any personal guaranty from Ryan M. Leestma or any other principal, member, manager, or affiliate of the Debtors, and without recourse to any non-Debtor party.

5. **Interest and Maturity.** The DIP Facility shall bear interest at 14.00% per annum (the "Contract Rate"), payable interest-only monthly in arrears, computed on a 30-day month/360-day year, and paid first from the Interest Reserve Account. The DIP Lender shall earn a minimum of 360 days of interest on the Maximum Loan Amount from Closing. Upon an event of default, interest shall accrue at the lower of the Contract Rate plus 6.00% or the maximum lawful rate (the "Default Rate"). The DIP Facility matures twenty-four (24) months from Closing.

6. **Payment of Fees and Expenses.** The Borrowers are authorized and directed to pay, in accordance with this Order and the Commitment, the principal, interest, fees, payments, expenses, and other amounts described in the Commitment as such amounts become earned, due, and payable and without need to obtain further Court approval, including the Commitment Fee, the Loan Servicing Fee, the Deferred Fee, the Exit Fee, the Unused Line Fee, a default-period servicing fee of $2,500 per month until cure, and reimbursement of the DIP Lender's reasonable and documented expenses, including the fees of the DIP Lender's counsel at rates not to exceed $800 per hour, which Lender Expenses may be capitalized to principal. For the avoidance of doubt, the $50,000 Application Fee was paid to the DIP Lender by a third-party remitter from non-estate funds and is neither an obligation of the Debtors nor an asset of the estates.

7. **Break-Up Fee.** If, after entry of this Order, the Borrowers elect not to close, the Court authorizes and the Borrowers consummate alternative financing, or the Borrowers fail to satisfy material Conditions, the DIP Lender shall earn a break-up fee equal to 4.00% of the Maximum Loan Amount, allowed as an administrative expense. If the Borrowers obtain financing from a

competing lender, the competing lender shall pay the break-up fee in cash at its closing. No break-up fee shall be earned if the DIP Lender elects not to close.

8. The Borrowers are authorized to perform all of their obligations under the Commitment and the Loan Documents (as defined in the Commitment).

9. **Funding**. Funding shall occur only upon entry of this Order and satisfaction of the Conditions set forth in the Commitment; there is no interim draw. The funding of the DIP Facility shall remain subject to the execution of the Loan Documents, provided that the Borrowers are authorized to immediately draw upon, and the DIP Lender may in its sole discretion immediately fund, the DIP Facility consistent with the terms of the Commitment, the DIP Budget, and this Order.

10. **Use of Advances.** The Borrowers shall use advances of credit under the DIP Facility in accordance with the DIP Budget, only for the purposes specifically set forth in this Order, the Commitment, and the DIP Budget, and in compliance with the terms and conditions of this Order, the Commitment, and the Loan Documents. Line-item overages are permitted where offset by line-item savings or remaining contingency, in the DIP Lender's reasonable discretion. Unused or under-budget line-item proceeds may, with the DIP Lender's consent, be reallocated to expenses approved by the Court. Any provisional amounts included in the DIP Budget for professional fees shall be earmarked and advanced for that purpose, subject to allowance under 11 U.S.C. §§ 328, 330, and 331. Notwithstanding the foregoing, any payments to "insiders," as that term is defined in the Bankruptcy Code, including the Construction Management line item payable to Ryan M. Leestma, are authorized to be paid only after and to the extent allowed or further authorized by separate order of this Court. Likewise, to the extent the DIP Budget includes amounts for the payment of creditor claims or expenses arising pre-petition, such

amounts are authorized to be paid only after and to the extent allowed or further authorized in response to appropriate separate request.

11. **Senior Priority DIP Liens.** With respect to the DIP Facility, pursuant to 11 U.S.C. §§ 364(c)(2) and 364(d)(1), the Borrowers are authorized to obtain the credit and incur the debt contemplated by the Commitment secured by senior, first-priority priming mortgage liens and security interests (the "Senior Priority DIP Liens") on the DIP Collateral.

12. **DIP Collateral.** "DIP Collateral" means the real property (including, but not limited to, the residential condominiums and common areas, warehouses, boater services facility, and excess land) located at 1204 West Western Avenue, 901 Adelaide Circle, and 400 Adelaide Circle, Muskegon, Michigan 49441, together with vacant land on the Adelaide Pointe campus and all improvements now or hereafter located thereon, and the Borrowers' personal property (including furniture, fixtures and equipment, permits and licenses, accounts receivable, leasehold rights, third-party contracts, and plans and specifications), now existing or hereafter acquired, being more fully described in an Exhibit hereto, and excluding the Excluded Collateral.

13. **Property Not Primed.** For the avoidance of doubt, the Senior Priority DIP Liens shall not attach to, and this Order does not prime, (a) the first-position lien of Lake Michigan Credit Union with respect to the Hall Street property only, (b) any lien on the Waterland Commerce property, or (c) any collateral of non-debtor entities. Those properties are excluded from the DIP Collateral in their entirety, consistent with the treatment of those secured lenders' collateral under the Interim Settlement approved by this Court pursuant to Rule 9019 (Doc. No. 231).

14. **Excluded Collateral.** Notwithstanding the foregoing, the DIP Collateral shall not include:

    a) the estates' claims and causes of action under Sections 502(d), 506, 510, 542, 544, 545, 547, 548, 549, 550, 551, 552, and 553 of the Bankruptcy Code, fraudulent-

transfer and preference claims under applicable law, and all other pending or future claims and causes of action and their proceeds (other than proceeds from real property); and

15. **Priority and Perfection.** Subject and subordinate to the Carve Out (as defined below), effective and perfected upon the date of entry of this Order, and without the necessity of the execution, recordation, or filing by the Borrowers or the DIP Lender of any mortgages, security agreements, control agreements, pledge agreements, financing statements, or similar documents or instruments, the Senior Priority DIP Liens in favor of the DIP Lender shall be senior to any and all other pre-petition or post-petition liens or interests in the DIP Collateral, including, without limitation, judgment liens, mechanics' liens, liens imposed by applicable covenants, declarations and restrictions, and mortgages and security interests encumbering the DIP Collateral, pursuant to 11 U.S.C. §§ 364(c)(2) and 364(d). The Senior Priority DIP Liens in the DIP Collateral shall also be senior to all other interests of any party, including, without limitation, tax liens (except ad valorem taxes for 2025 and subsequent years). The Senior Priority DIP Liens may be subject to deed restrictions, equitable servitudes, or other rights in the DIP Collateral as may be acceptable to the DIP Lender in its sole and absolute discretion.

16. **Superpriority DIP Expense.** Subject and subordinate only to the Carve Out, the DIP Lender shall be allowed a superpriority administrative expense equal to the amount of the DIP Facility actually funded pursuant to 11 U.S.C. §§ 364(c)(1), 503(b), and 507(b), with priority over all other administrative expense claims (the "Superpriority DIP Expense"). The Superpriority DIP Expense shall have priority over any and all other obligations, liabilities, and indebtedness of the Borrowers (other than the Carve Out) of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code, including, to the extent allowed under the Bankruptcy Code, any and all

administrative expense claims and unsecured claims against the Borrowers or their estates, at any time existing or arising, of any kind or nature whatsoever, including, without limitation, any of the kinds specified in or ordered pursuant to Sections 105, 328, 330, 331, 364, 503(a), 503(b), 507(a) (other than 507(a)(1)), 507(b), 546(c), 726 (to the extent permitted by law), 1113, and 1114 of the Bankruptcy Code. No lien or interest avoided and preserved for the benefit of the estates pursuant to Section 551 of the Bankruptcy Code shall be pari passu with or senior to the Superpriority DIP Expense. The Superpriority DIP Expense shall not attach to, and shall not be payable from, the Excluded Collateral or the proceeds thereof.

17. **Carve Out.** Notwithstanding their relative priorities, the Superpriority DIP Expense granted to the DIP Lender pursuant to this Order shall be subject and subordinate to a carve-out (the "Carve Out") up to the amounts provided for in the DIP Budget for the payment of (i) fees payable to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930, together with any interest payable under 31 U.S.C. § 3717, and (ii) allowed administrative claims of counsel for the Debtors, with the proviso that the DIP Lender's first lien position with respect to the Carve Out shall not be subject to surcharge, either pursuant to 11 U.S.C. § 506(c) or otherwise. No Section 506(c) protection is extended to any pre-petition secured creditor. The DIP Lender shall not be required, without its consent and in its sole and absolute discretion, to accept any property other than United States currency in satisfaction of: (a) its liens and security interests which encumber the DIP Collateral as security for payment of the DIP Facility and (b) the Superpriority DIP Expense, notwithstanding 11 U.S.C. § 1129(a)(7) or (b)(2)(A). The Senior Priority DIP Liens shall not be primed, surcharged, altered or impaired, marshaled, or otherwise adversely affected in any way, whether requested by a creditor of the Borrowers or any other party, without the DIP Lender's consent. No claim or expense, excluding

those that are the subject of the Carve Out, shall have priority over, or be pari passu with, the DIP Lender's rights in the DIP Collateral.

18. **Adequate Protection**. As adequate protection for any post-petition diminution in the value of its interest in the DIP Collateral resulting from the Senior Priority DIP Liens, IBCP is hereby granted replacement liens on the DIP Collateral, junior only to the Senior Priority DIP Liens and the Carve Out, to the same extent, validity, and priority as its valid, perfected, and unavoidable pre-petition liens. Such replacement liens shall not attach to the Excluded Collateral. Nothing in this Paragraph shall be construed as a determination of the validity, priority, extent, or amount of any pre-petition lien or claim of IBCP.

19. **No Roll-Up; No Cross-Collateralization; No Stipulations.** No pre-petition debt is repaid or rolled up with proceeds of the DIP Facility, and no pre-petition claim is cross-collateralized with post-petition collateral. No waiver of Section 552(b) of the Bankruptcy Code is granted. This Order contains no stipulation, admission, acknowledgment, or determination as to the validity, priority, extent, perfection, enforceability, allowance, or amount of any pre-petition claim or lien of any pre-petition secured creditor, including IBCP, and no deemed consent to lien validity. All challenge rights, claims, defenses, objections, and causes of action of the Debtors, their estates, and any statutory committee are expressly preserved in full, and no challenge period, deadline, release, waiver, or covenant not to sue is imposed by this Order. Provided, however, that at the election of the DIP Lender and upon further order of this Court, a portion of the IBCP debt may be paid from the proceeds of the sale of condominium units.

20. **Conditions.** The DIP Lender's obligation to fund shall be expressly conditioned upon the satisfaction of and compliance with all Conditions as set forth in the Commitment.

21. **Disbursements.** All disbursements of DIP Facility proceeds shall be made by the DIP Lender (through its agent) to the Borrowers, following entry of this Order, and in conformity with the provisions of the Commitment, including the DIP Budget. For the avoidance of doubt, all disbursements of DIP Facility proceeds to third parties will be made by the Borrowers or otherwise reported to the Office of the United States Trustee.

22. **Covenants and Reporting.** The Borrowers shall (a) use proceeds in substantial compliance with the DIP Budget, (b) deliver monthly receipts-and-disbursements and proceeds reporting by the fifteenth (15th) day of each month, (c) deliver appraisals to the DIP Lender within three (3) business days of receipt, (d) deliver to the DIP Lender drafts of motions and plans relating to the DIP Collateral prior to filing, and (e) comply with the plan-filing deadlines set forth in the Commitment. The Borrowers shall oppose dismissal or conversion of these Chapter 11 Cases and any competing lien or super-priority financing absent the DIP Lender's consent, [provided that nothing herein shall require any Debtor, or any officer, director, or manager thereof, to take or refrain from taking any action inconsistent with its fiduciary duties].

23. **Notices to Parties in Interest.** Copies of all notices and reporting sent by the Borrowers to the DIP Lender and by the DIP Lender to the Borrowers, as required by or in connection with the financing authorized through this Order, shall be contemporaneously transmitted by email by the Borrowers to: (a) the Office of the United States Trustee, Timberlake Annex, Suite 1200, 501 East Polk Street, Tampa, Florida 33602, Attn: [ ]; (b) counsel to IBCP, [NAME / FIRM / ADDRESS / EMAIL]; (c) counsel to Lake Michigan Credit Union, [NAME / FIRM / ADDRESS / EMAIL]; (d) counsel to 4Front Credit Union, [NAME / FIRM / ADDRESS / EMAIL]; (e) counsel to ChoiceOne Bank, [NAME / FIRM / ADDRESS / EMAIL]; (f) counsel to Westshore

Bank, [NAME / FIRM / ADDRESS / EMAIL]; and (g) [counsel to any statutory committee appointed in these cases].

24. **Events of Default; Remedies.** Upon the occurrence and continuation of an Event of Default under the Commitment or the Loan Documents, the DIP Lender shall provide written notice to the Borrowers, counsel for the Debtors, the Office of the United States Trustee, each pre-petition secured creditor, and any statutory committee. Such parties shall have ten (10) business days from the date of such notice to cure or controvert the asserted default. Thereafter, the DIP Lender may seek emergency relief from the automatic stay on forty-eight (48) hours' notice, and the contest at any such hearing shall be limited to the existence of the asserted Event of Default.

25. **Binding Effect**. The terms of this Order shall be binding upon and inure to the benefit of the DIP Lender, the Borrowers, the Debtors, and their respective successors and assigns. This Order shall similarly bind any trustee hereafter appointed or elected for the estate of any Borrower, whether in these Chapter 11 Cases or in the event of a conversion of these Chapter 11 Cases to cases under Chapter 7 of the Bankruptcy Code. Such binding effect is an integral part of this Order.

26. **Incorporation**. The terms of the Commitment shall be incorporated into this Order in its entirety, subject to the exceptions of the changes herein and the DIP Budget.

27. **Section 364(e).** The extension of credit and financial accommodations under the Commitment and the Loan Documents was negotiated and made in good faith. Any reversal or modification on appeal of this Order's authorization under 11 U.S.C. § 364, including without limitation subsections 364(c), (d), and (e), to obtain credit, incur debt, and grant a senior lien in favor of the DIP Lender shall not affect the validity of the debt incurred, the Senior Priority DIP Liens granted, or the superpriority administrative expense status allowed in favor of the DIP Lender, whether or not the DIP Lender knows of the pendency of the appeal, unless such authorization

and the incurring of such debt, or the granting of the lien, are stayed pending appeal prior to funding of such extensions of credit.

28. This Order is binding and effective on a final basis despite any conversion of these bankruptcy cases to cases under any other chapter of title 11 of the United States Code.

29. The terms and conditions of this Order shall be effective and immediately enforceable on a final basis upon its entry by the Clerk of the Court notwithstanding any potential application of Federal Rules of Bankruptcy Procedure 4001(a)(3), 6004(h), or any other provision thereof.

30. This Order shall be conclusive evidence of the priority, perfection, and validity of all of the DIP Lender's liens granted pursuant to this Order in favor of the DIP Lender without the necessity of filing, serving, or recording any financing statements, mortgages, deeds of trust, or other agreements, documents, or instruments which may be otherwise required under federal or state law.

31. This Court retains jurisdiction to interpret and enforce this Order and to hear and determine all matters arising from or relating to the DIP Facility, the Commitment, the Loan Documents, and this Order.

32. Counsel for the Debtors shall serve a copy of this Order on all creditors of the Debtors as set forth on the Court's mailing matrix within three (3) days of entry, and thereafter file a certificate of service.

Prepared by David S. Jennis

*Attorney David S. Jennis is directed to serve a copy of this order on interested parties who do not receive service by CM/ECF and to file a proof of service within three (3) days of entry of the order.*

# EXHIBIT B

# 364 CAPITAL, LLC

**NAPLES** I ASPEN I DALLAS I MIAMI

October 7, 2026

**DEBTOR:**

Adelaide Pointe QOZB, LLC
c/o Mr. Ryan M. Leestma
1204 W. Western Avenue
Muskegon, MI 49441

**DEBTOR'S COUNSEL:**

Jennis Morse
c/o Mr. David Jennis, Esq.
606 East Madison Street
Tampa, FL 33602

**In re: FINANCING COMMITMENT FOR A CHAPTER 11 DEBTOR-IN-POSSESSION LOAN IN THE MAXIMUM LOAN AMOUNT OF THIRTEEN MILLION SEVEN HUNDRED EIGHTY THOUSAND DOLLARS ($13,780,000) ("DIP LOAN").**

Mr. Leestma:

In reference to the above-captioned matter, the undersigned is pleased to provide this non-assignable commitment ("**Commitment**") for a Chapter 11 debtor-in-possession term loan to the Borrower, debtor and debtor-in-possession in the United States Bankruptcy Court for the Middle District of Florida, Tampa Division ("**Bankruptcy Court**"), administratively consolidated under case number 8:26-bk-02696-CED ("**Bankruptcy Case**").

**LENDER:** **364 CAPITAL, LLC**, a Delaware limited liability company, and/or its participants or assigns ("**Lender**").

**BORROWERS:** (i) **Adelaide Pointe QOZB, LLC**, a Michigan limited liability company, (ii) **Adelaide Pointe Boaters Services, LLC**, a Michigan limited liability company, and (iii) **Adelaide Pointe Building 1, LLC**, a Michigan limited liability company (together, the "**Debtor**" or "**Borrower**").

**LOAN/LOAN AMOUNT:** The Borrower shall make an application for a secured super-priority debtor-in-possession term loan facility in the amount of **THIRTEEN**

**MILLION SEVEN HUNDRED EIGHTY THOUSAND DOLLARS ($13,780,000)** (hereafter, the "**DIP Loan**") to be made upon entry of the Final Order [as herein defined] of the Bankruptcy Court authorizing the DIP Loan.

For the avoidance of doubt, Lender shall not be required to advance more than the aggregate amount of the DIP Loan ("**Maximum Loan Amount**").

**BUDGET/USE OF PROCEEDS:** Proceeds from the DIP Loan shall be used by Borrower in accordance with the budget and in substantially the same form as that which is attached hereto as **Exhibit "A"** ("**Budget**"), which Budget may be modified as approved by Lender on, or before, the date of the hearing for the approval of the DIP Loan.

At Closing, Lender shall not advance to Borrower any line-items in the Budget which are capitalized for the benefit of Borrower and due to Lender including, but not limited to, the Commitment Fee, the Servicing Fee, the Interest Reserve, and the Deferred Fee (together, "**Holdbacks**").

**FINAL ORDER:** With respect to the DIP Loan, the order of the Bankruptcy Court satisfying the requirements of this Commitment and granting Lender the liens and other rights described herein has been entered, and (a) which order has not been appealed, modified, stayed, vacated, amended, or reversed, or (b) which order is not subject to a stay and the Parties, in each of their sole and absolute discretion, elect to proceed with such financing ("**Final Order**").

Lender, in its sole and absolute discretion, shall approve the form and substance of the Final Order.

**LOAN ADVANCES:** A. Upon the entry of the Final Order of the Bankruptcy Court, and upon the satisfaction, in Lender's sole and absolute discretion, of all requirements and Conditions [as herein defined] of this Commitment and the Loan Documents, Lender will make an advance, net of the Holdbacks, to the Debtor and/or Title Company at Closing.

B. The DIP Loan will be made through a series of disbursements (each, an "**Advance**") pursuant and subject to the following items, which must be satisfied, in Lender's sole and absolute discretion, as conditions precedent to Lender's obligation to disburse any portion of the Loan:

(a) Borrower is in full compliance with all of the covenants, agreements, obligations and undertakings required to be

performed by Borrower under this Commitment and under the other Loan Documents, unless compliance thereof shall have been waived in writing by Lender;

(b) no event of default, as defined herein or in any other Loan Documents, and no event or condition which with the notice or the passage of time or both as prescribed herein, or in such other Loan Documents, would constitute any such event of default, has occurred and has not been cured to Lender's satisfaction;

(c) the Real Property and/or improvements thereon shall not have suffered any:

(i) significant damage by fire or other casualty in excess of TWO HUNDRED FIFTY THOUSAND DOLLARS ($250,000);

(ii) condemnation, adverse zoning, and/or usage change;

(d) no action against the Borrower, Property and/or Improvements shall have been commenced or threatened, and no law, regulation, ordinance, moratorium, or injunctive proceeding shall have been commenced or threatened by any governmental authority if the result of such law, regulation, ordinance, moratorium, injunctive proceeding, restriction or like matter would have the effect in Lender's judgment, of materially and adversely affecting the expected benefits to be gained by Borrower in connection with the Collateral or by Lender in connection with its assisting Borrower in financing the subject transaction described in this Commitment for any reason, whether because of Borrower's being prohibited or delayed in completing the Improvements or otherwise;

(e) all statements contained in Borrower's application for advance are true and complete in all material respects, and all other certificates, statements and data furnished to Lender by, or on behalf of, Borrower or in connection with the transactions contemplated by this Agreement or any of the other Loan Documents are true and complete in all material respects, and there are no facts or events known to Borrower which, if disclosed to Lender, would make such statements, certificates or data untrue in any material respect;

(f) all documentation shall, at all times, be in form and content reasonably acceptable to Lender;

(g) Lender has received the approval of the application for advance by a third-party inspector and/or the architect ("**Inspecting Party**") (to be designated by Lender), together with any other such certifications as may be required by Lender from the Inspecting Party hereof and, if any part of an Advance is not included in the Budget, the approval of Lender shall be required;

(h) no Advance for a line item, which exceeds the sums for such line item on the Budget, shall be made provided, however, the actual expenses for a line item may exceed the line item on the Budget so long as another line item expense came in under the line item on the Budget by at least the amounts of the overage and/or there remains a contingency amount in the approved Budget sufficient to satisfy the excess amount, as determined in the Lender's reasonable discretion;

(i) Borrower will procure and deliver to Lender releases or waivers of mechanic's liens, and invoices, or paid receipts if requesting reimbursements, of all parties who have furnished materials or services or performed labor of any kind in connection with the construction of any of post-petition Improvements.

(j) evidence of title continuation or of an endorsement to the title insurance policy theretofore delivered, indicating that since the last preceding advance, or the date of issuance of the title insurance policy, as the case may be, there has been no material adverse change in the state of title and no exceptions not theretofore approved by Lender, which endorsement shall have the effect of increasing the coverage of the policy by an amount equal to the advance then being made if the policy does not by its terms provide for such an increase.

(k) copies (certified by Inspecting Party to be true and correct) of all checks issued by Borrower since the immediately preceding advance, in connection with the Collateral or construction of any improvements or any other use of proceeds from the Loan, as the case may be, together with any and all other evidence of payments requested by Lender.

C. Subject to the economic and non-economic terms under this Commitment, Lender, in its sole and absolute discretion, may make advances on the Loan to pay Lender Expenses (as herein defined) incurred in connection with the Loan, which Lender Expenses shall automatically

become part of the principal amount of the Loan as of the date(s) that each such advance was made, which advances may collectively result in a sum in excess of the Maximum Loan Amount.

D. The following expenses shall collectively be referred to herein as, "**Lender Expenses**" and shall include, but not be limited to:

(i) all of Lender's reasonable costs and out-of-pocket expenses (including, but not limited to, travel and lodging expenses) related to, and in connection with, the DIP Loan or the Bankruptcy Case;

(ii) the reasonable fees (calculated on a time-spent basis, based upon the standard hourly rates of Lender's counsel generally charged to clients of that firm for similar matters) not to exceed $800.00 per hour, and out-of-pocket expenses (including, but not limited to, travel and lodging expenses) of Lender's counsel related to, and in connection with, the DIP Loan or the Bankruptcy Case (post-closing attorneys' fees incurred by Lender's counsel shall be submitted to the Bankruptcy Court on a periodic basis for approval).

(iii) in the event of default, out-of-pocket expenses for the administration of the DIP Loan and monitoring of the Collateral;

(iv) travel expenses required to facilitate the transaction(s), and service the same, described under this Commitment and/or the Loan Documents, monitor the Bankruptcy Case and/or the Collateral, and protect any of Lender's rights under this Commitment and/or the Final Order;

E. Borrower hereby acknowledges that the DIP Loan shall be without cost to Lender.

**TERM:** The maturity date of the DIP Loan shall be TWENTY-FOUR (24) months from the Closing of the DIP Loan ("**Maturity Date**").

**INTEREST/ INTEREST RESERVE:** A. The interest rate shall be FOURTEEN PERCENT (14.00%) ("**Contract Rate**").

B. Interest only payments on the unpaid principal balance shall be due monthly, in arrears [i.e. due on first day of each month for the prior month's interest].

C. To the extent of a balance therein, monthly payments of interest shall be made from the interest reserve account ("**Interest Reserve Account**").

D. Monthly payments will be computed on a 30-day month and a 360-day year unless such computation results in the effective interest rate of the DIP Loan exceeding the maximum rate of interest allowable under applicable state and federal law. It is hereby understood and agreed upon by and between the Borrower and Lender that the Lender does not intend, under any circumstances, to charge, collect, assess or receive interest, at an effective rate, in excess of the maximum rate allowable under applicable state and federal law. If the effective interest rate does exceed the maximum rate allowable by applicable state or federal law, the Borrower and Lender intend to and hereby agree to reduce the effective interest rate to the maximum rate allowable by state or federal law. Any and all interest amounts collected by the Lender in excess of the maximum rate allowable under state and federal law shall be applied to reduce the principal balance of the DIP Loan.

E. Upon occurrence of an event of default, interest shall accrue to the Lender at the lower of (i) the sum of the Contract Rate, plus an additional SIX PERCENT (6.00%), or (ii) the maximum effective interest rate allowable under state or federal law ("**Default Rate**"). Without limiting the generality of the foregoing, payments made more than five (5) business days past their due date shall be deemed to be in default and shall be assessed at the Default Rate. If the Default Rate's effective interest rate exceeds the maximum rate allowable by applicable state or federal law, the Borrower and Lender intend to and hereby agree to reduce the Default Rate's effective interest rate to the maximum rate allowable by state or federal law. Any and all interest amounts collected by the Lender in excess of the maximum rate allowable under state and federal law shall be applied to reduce the principal balance of the DIP Loan.

F. Borrower agrees that Lender shall earn no less than THREE HUNDRED SIXTY (360) days of interest from the Closing of the DIP Loan, computed at the Contract Rate on the Maximum Loan Amount.

G. Borrower has the absolute obligation to pay interest and other amounts due in connection with the DIP Loan as such interest and/or other amounts become due and payable, despite the balance remaining, or lack thereof, in the Interest Reserve Account. For purposes of clarity, interest shall be paid first from the Interest Reserve Account.

**UNUSED LINE FEE:** Upon entry of the Final Order of the Bankruptcy Court authorizing the DIP Loan, Lender shall be entitled to a monthly unused line fee ("**Line Fee**") calculated on the basis of THIRTY-FIVE (35) basis points (0.35%) per month of the principal amount of the Loan which has not been advanced, commencing at the Closing of the DIP Loan. The Line Fee shall be payable monthly from the Interest Reserve, together with each monthly interest payment, and calculated as set forth above. As each monthly installment of the Line Fee is due and when each Advance of the DIP Loan is made, Lender shall be deemed hereunder to have funded such amount to Borrower who shall be deemed to have paid said amount to Lender. With each such payment and funding of the Line Fee, the principal balance of the DIP Loan shall be increased by such amount.

**LOAN SERVICING FEE:** At the time of the Closing [as herein defined] of the DIP Loan, from the proceeds of such funding, Borrower shall pay to Lender a loan servicing fee of ONE PERCENT (1.00%) of the Maximum Loan Amount ("**Servicing Fee**").

In the event of default, an additional sum of TWO THOUSAND FIVE HUNDRED DOLLARS ($2,500.00) per month shall be paid to Lender until such time that the default has been cured.

**COLLATERAL/ OTHER RIGHTS**: A. The DIP Loan shall be secured by a first priority mortgage (or deed of trust or similar security instrument) lien on all of the real and personal property which Borrower owns and all other property interests, real, personal, or intangible of Borrower, now existing or hereafter acquired, including, without limitation, contract rights and property interests acquired post-Closing [as herein defined].

The Collateral shall be that certain mixed-use, lakefront oriented development known as Adeldale Pointe which includes, but is not limited to, (i) THIRTY FOUR (34) to-be-completed residential condominium units (31, 1,484 square foot 2bd/2ba units; 3, 1,726 square foot 3bd/2ba units), (ii) TWO (2) industrial warehouse storage properties referred to as the west and east buildings and containing 134,809 and 78,202 square feet, respectively, (iii) THREE (3) non-contiguous parcels containing 16.67 acres of gross land area with 10.98 usable acres of usable land area approved for condominiums, hotel, or commercial uses, (iv) a modern 4,516 square foot marine services facility constructed in 2024, with contemporary finishes and specialized waterfront boat fueling and marine-grade fuel pump infrastructure and dock access, convenience store, retail space, shower and restroom amenities and outdoor swimming pool with waterfront

views, and (v) a 50 space parking garage, parking lot, fitness room, swimming pool, all owned by one or more of the debtors, generally located at 400 Adelaide Circle, Muskegon, MI 49441 ("**Real Property**").

In addition, the Collateral shall include all furniture, fixtures, and equipment, as well as all permits and licenses, accounts receivable, leasehold rights, third-party contracts, plans and specifications for the Real Property, and any other asset of the Borrower not in the form of real property (collectively, the "**Personal Property**").

The Real Property and Personal Property are more particularly described and additionally expanded under **Exhibit "B"** and **"B-1"** attached hereto except for actions or causes of action arising under sections 502(d), 506, 510, 542, 544, 545, 547, 548, 549, 550, 551, 552 or 553 of the Bankruptcy Code, or any fraudulent or voidable conveyance, or preference laws under applicable state or other law, and the proceeds thereof, and any other causes of action currently pending, or to be filed, by the Debtor or any successor and the proceeds thereof except for the proceeds of the foregoing that is in the form of real property ("**Collateral**").

The priming mortgage liens (or deed of trust or similar security instrument) and security interests in favor of Lender shall be senior to any and all other prepetition or postpetition liens or interests, including, without limitation, judgment liens, mechanics' liens, liens imposed by applicable covenants, declarations and restrictions, mortgages and security interests encumbering said Collateral pursuant to 11 U.S.C. §§ 364(d) and 364(c)(2). Lender's liens and security interests in the Collateral shall also be senior to all other interests of any party, including, without limitation, tax liens (except ad valorem taxes for 2025 and subsequent years). Lender's liens and security interests may be subject to deed restrictions, equitable servitudes or other rights in such Collateral as may be acceptable to Lender, its counsel, and the Title Company [as herein defined], in their sole and absolute discretion.

B. In addition to the foregoing, as a condition precedent to Lender's obligation to make the DIP Loan, and as a material inducement to the Lender, the Lender shall also receive a superpriority administrative expense in the Bankruptcy Case pursuant to 11 U.S.C. §§ 364(c)(1), 503(b) and 507(b), with priority over all other administrative expense claims in the Bankruptcy Case except fees payable to the Clerk of the Bankruptcy Court or the Office of the United States Trustee ("**Carve Out**"), with the proviso that the Lender's first lien position with respect to the Carve Out shall not be subject to surcharge, either pursuant to 11 U.S.C. § 506(c) or

otherwise. The Lender shall not be required, without its consent and at its sole and absolute discretion, to accept property other than cash in satisfaction of (a) its liens and security interests which encumber the Collateral as security for payment of the DIP Loan, and (b) the super-priority administrative expense claim, notwithstanding 11 U.S.C. § 1129 (a)(7) or (b)(2)(A). The Borrower hereby agrees not to support or seek to modify, subordinate, reduce, impair, alter, surcharge, extinguish or otherwise change either the priming lien or superpriority administrative expense claims of the Lender pursuant to any provisions of Title 11 or other applicable law, except that Lender acknowledges and agrees that should the a proposed plan of reorganization ("**Plan**") be confirmed and go effective, the Lender's administrative claim will be paid pursuant to that Plan, provided that the Plan is agreeable to the Lender, does not otherwise impair its Liens, and the payments conform to the Budget. None of the Lender's rights as set forth herein may be modified except with the express written consent of the Lender.

C. Lender's mortgage liens (or deed of trust or similar security instrument) and security interests shall not be primed, surcharged, altered or impaired, marshaled or otherwise adversely affected in any way, whether requested by a creditor of the Borrower or any other party. No claim or expense, including those that are the subject of the Carve Out, shall have priority over, or be *pari pasu* with, Lender's rights in the Collateral. Except as provided in the immediately preceding paragraphs A and B, including, without limitation, the Carve Out, no administrative expense, and no claim allowed and payable under 11 U.S.C. §§ 330, 331, 503(b) 506(c), 507 or 726, shall have priority over, or be *pari pasu* with, the Lender with respect to any asset of the Borrower which constitutes either the Collateral pursuant to 11 U.S.C. §364(d) or with respect to the claims of the Lender pursuant to 11 U.S.C. §364(c)(1).

D. The Final Order of the DIP Loan authorizing the first priority liens and super-priority administrative expense claims in favor of the Lender and incorporating the terms and requirements of this Commitment, shall also contain both a finding by the Bankruptcy Court that the extension of credit and making of the loan(s) by Lender hereunder to Borrower is being made in good faith and, therefore, Lender shall be entitled to the full protections of 11 U.S.C. §364(e) and shall be made effective immediately without any stay of the effect of such order and/or Final Order so as to permit, in Lender's sole and absolute discretion, immediate funding within the provisions and protections of 11 U.S.C. §364(e).

E. In the event of a conflict between the Final Order authorizing the DIP Loan and granting the interests in favor of the Lender as herein set forth and any order issued by the Bankruptcy Court, including any order confirming any plan of liquidation or reorganization, the terms of the Final Order authorizing the DIP Loan shall control.

**COVENANTS**: In addition to all standard covenants required by the Lender in debtor-in-possession and post-petition loans made under like circumstances, including all standard commercially appropriate terms in the Lender's absolute discretion, the Lender will require that:

A. Borrower shall: (a) own the Collateral, (b) disburse funds for the payment of expenses only as set forth in substantial compliance with the Budget, or as otherwise agreed to by Lender, (c) comply with all provisions of the Final Order, this Commitment and the Loan Documents, (d) present to the Lender such additional instruments as may be required for endorsements to the Title Insurance Policy as Lender may require insuring that each advance of the DIP Loan, retain the lien priority described therein, (e) notify Lender in writing of any material adverse change in the Collateral, the financial condition of the Borrower or the financial viability or performance of the Borrower's property, or of economic conditions which may materially adversely affect the value or performance of the Borrower's property, and (f) comply with all statutory deadlines for filing a Chapter 11 Plan of Reorganization [as herein defined] and the solicitation of acceptances of the Plan [as herein defined], unless otherwise extended by an order of the Bankruptcy Court.

B. Borrower shall supply to Lender: (a) on or before the 15th day of each month for the preceding calendar month during the term of the DIP Loan, a receipts and disbursements statement relating to the operation of the Collateral including the use of Loan proceeds; (b) on or before the 15th day of each month during the term of the DIP Loan, a schedule reflecting both all available proceeds not yet disbursed, if any, and all outstanding costs; (c) within THREE (3) business days after Borrower receives a copy of the same, copies of any and all appraisals of any of the Collateral; and (d) all information reasonably necessary and/or requested for Lender to monitor its DIP Loan to Borrower.

C. So long as any portion of the DIP Loan remains outstanding, the Borrower shall not seek or permit (absent Lender's consent), and shall actively object to the request for entry of, (a) an order dismissing or converting the Bankruptcy Case or (b) any order which authorizes under any section of the Bankruptcy Code the granting of any lien or security

interest in any Collateral in favor of any party other than Lender or the obtaining of any credit or the incurring of any indebtedness that is entitled to super-priority administrative status equal to or superior to that granted to Lender.

D. Borrower shall: (a) own the Collateral, (b) disburse funds for the payment of expenses only as set forth in substantial compliance with the Budget, (c) comply with all provisions of the Final Order, this Commitment and the Loan Documents, (d) present to the Lender such additional instruments as may be required for endorsements to the Title Insurance Policy as Lender may require insuring that each advance of the DIP Loan retain the lien priority described therein, (e) notify Lender in writing of any material adverse change in the Collateral, the financial condition of the Borrower or the financial viability or performance of the Borrower's.

E. Borrower shall notify Lender of any and all parties including, but not limited to, the general contractor, sub-contractor, and/or materialmen providing on-going services to the Debtor, or changes thereto.

F. Lender shall not be required to accept property other than cash in satisfaction of its DIP Loan.

G. During each Advance of the Loan, Borrower shall demonstrate through the Third-Party Inspector, Architect, and Contractor that there remains enough money in the budget to complete the construction improvements and that the work has been completed in a workmanlike manner.

H. Debtor shall provide Lender with any and all drafts of motions, requests or plans that relate to the Real Property, Personal Property, Collateral, or any financing contemplated by this Commitment prior to being filed in the Bankruptcy Case with the Bankruptcy Court.

I. Lender shall earn 100% of the net proceeds of sale of any of the Collateral until such time that the DIP Loan is repaid in-full, however the net proceeds of sale shall not be less than 92% of the gross purchase price for any of the Collateral. Specifically, the net proceeds of sale of any of the residential units shall not be less than $650,000 per residential unit.

**DEFAULT/ REMEDIES:**

A. The Loan Documents shall contain events of default and remedies customarily required by Lender in its absolute discretion in transactions

such as those which are contemplated under this Commitment and that are consistent with industry standards.

B. In addition to other rights and remedies available under the Loan Documents or applicable law, upon occurrence of an event of default:

i) Lender, if it seeks to exercise its rights and remedies under the Loan Documents with respect to the default, shall provide written notice ("**Written Notice**") to the Borrower, the Borrower's counsel of record in the Bankruptcy Case, the United States Trustee, and all persons entitled to notice, including, without limitation, all entities scheduled by the Borrower as secured creditors of the Borrower in the Bankruptcy Case, and counsel (if any) for the official committee of unsecured creditors, and shall file an affidavit with the Bankruptcy Court specifying the default. The Written Notice may be any written document providing notice of default, including but not limited to the affidavit filed with the Bankruptcy Court.

ii) Any party entitled to the Written Notice shall have TEN (10) business days from the receipt of the Written Notice in which to cure the default or file a controverting affidavit with respect to the default.

iii) If the default is not cured within the prescribed TEN (10) business day period, Lender may file an emergency motion for relief from the automatic stay, and Lender may request that the Bankruptcy Court set an expedited hearing on 48 hours' notice to determine whether Lender shall be granted relief from the automatic stay to foreclose on its liens or take any other action available to Lender under the Loan Documents and applicable law. At the hearing the Borrower may only contest the Lender's declaration of the default and may not assert any other or additional defenses.

C. The entire outstanding principal balance with respect to the DIP Loan, plus all accrued and unpaid interest (including interest at the Default Rate, from the date of the actual default notwithstanding the date the Written Notice is provided to the Borrower), fees and costs, through the date of payment, shall, in addition to default by Borrower under the Loan Documents as described above, automatically become due and payable upon (i) the failure to cure any default as is set forth above, (ii) the confirmation of any plan of reorganization in the Bankruptcy Case unless the plan proposes to treat Lender's claims in the same manner as provided in this Commitment and the Loan Documents, or such other treatment as the Lender, in its sole and absolute discretion, may agree in writing, (iii) conversion of the Bankruptcy Case to a case under Chapter 7 if, at or prior

to the Closing [as herein defined] of the DIP Loan, the Bankruptcy Case is a Chapter 11 case, (iv) appointment of a Chapter 11 trustee or examiner with expanded powers unless the Lender consents to such an appointment, (v) dismissal of the Bankruptcy Case, (vi) entry of an order granting relief from stay to any party with regard to any interest in the Collateral or any other property of the estate of Borrower, (vii) entry of an order approving the transfer of any of the Collateral, or the actual transfer of any of the Collateral either voluntarily or by operation of law, to a party other than Lender, (viii) any order which authorizes under any section of the Bankruptcy Code the granting of any lien or security interest in any Collateral in favor of any party other than Lender or the obtaining of any credit or the incurring of any indebtedness that is entitled to priority status equal to or superior to that granted to Lender, (ix) the institution of any foreclosure action with respect to any interest in the Real Property of the estate of Borrower.

D. Any failure of Lender to enforce its rights is not a waiver of such rights, and any action Lender may seek as a remedy to enforce its rights shall remain in full force and effect as of the date of the original date of such default.

**CONDITIONS:** Lender's obligations to close the DIP Loan shall be expressly subject to the following conditions precedent ("**Conditions**"):

A. On or before **October 9, 2026,** the Borrower shall have filed with the Bankruptcy Court a motion, in form and substance acceptable to Lender in its discretion, requesting (i) approval of the DIP Loan as described herein and (ii) authority to grant the Lender the lien priorities described herein with respect to the Collateral ("**Motion**"). A copy of this Commitment shall be attached to the Motion as filed and served on all parties in interest required to be so served. The Motion shall have been served on all creditors of the Borrower, all parties with whom the Borrower has an executory contract with respect to the Improvements or any of the other Collateral, all taxing authorities having or asserting authority over the Borrower, all entities having an executory contract with the Borrower, all entities who have filed a "notice to owner" or asserted potential lien rights with reference to the Collateral or any component of the Collateral.

B. The Bankruptcy Court shall have entered the Final Order authorizing the DIP Loan under the terms set forth in this Commitment, which Final Order authorizing the DIP Loan shall have a copy of this Commitment attached thereto and incorporated in its entirety by reference, and shall be in form and substance acceptable to Lender in its

sole discretion, and which Final Order authorizing the DIP Loan shall not have been appealed, modified, stayed, vacated, amended or reversed as further described above.

C. With regard to the Real Property, (i) issuance of a commitment for a lender's title insurance policy ("**Title Commitment**"), issued from a title company acceptable to Lender ("**Title Company**"), in form and substance satisfactory to Lender in its sole and absolute discretion, insuring the Lender's interest in the Real Property is consistent with the terms of this Commitment, without any exception, *inter alia*, for prepetition and post-petition liens or other security interests, claims of mechanic's liens or unpaid "notices to owner" and all conditions contained within the Title Commitment shall have been satisfied to the satisfaction of the Title Company; (ii) delivery to Lender of a property insurance binder approved by Lender showing that the improvements are insured, at Borrower's expense, in an amount not less than the greater of (a) their respective fair market value or (b) their respective replacement cost, and showing Lender as additional insured and loss payee; and (iii) all stop work orders issued by any governmental entity having or asserting jurisdiction with respect to the Improvements shall have been terminated and the Borrower has demonstrated to the satisfaction of the Lender, in its sole and absolute discretion, that there exists no legal or practical impediment to the immediate recommencement of construction to complete the Improvements in accordance with the plans and specifications thereof.

D. Borrower shall have (i) obtained such orders of the Bankruptcy Court approving the DIP Loan and attendant requirements of this Commitment, in form and content consistent, in Lender's sole and absolute discretion, with the terms of this Commitment, (ii) the Borrower shall have executed a definitive loan agreement, notes, deeds of trust or mortgages, security agreements, and other documentation and customary certificates, consistent with the terms set forth herein and otherwise in form satisfactory to Lender and its counsel; unless any such conditions are waived in Lender's sole and absolute discretion, (iii) Final Order authorizing the DIP Loan shall not have been appealed, modified, stayed, vacated, amended or reversed, and shall be in form and substance acceptable to Lender, in its sole and absolute discretion, and shall be made effective immediately without any stay of the effect of such Final Order authorizing the DIP Loan, in Lender's sole and absolute discretion, immediate funding within the provisions and protections of 11 U.S.C. §364 and (iv) in all other respects the status of the Bankruptcy Case is satisfactory to Lender, its counsel and the Title Company in their respective sole and absolute discretion(s).

In addition, Borrower shall have provided Lender evidence satisfactory to Lender and the Title Company that all agreements and documents relating to the DIP Loan have been executed by the Borrower and the party executing such documents has the authority to bind the Borrower. In the event that any portion of the DIP Loan is intended to be used to provide labor, services or materials to the Collateral, the Loan Documents shall provide for such additional protections to the Lender as the Lender may, in its sole and absolute discretion, require pertaining to, inter alia, disbursements of proceeds and conditions precedent to such disbursements. Additionally, Borrower shall provide such other legal opinions as may be required to ensure that the DIP Loan complies with all applicable state and federal legal requirements. All of the foregoing loan agreements, notes, deeds of trust or mortgages, escrow agreements, security agreements, other documentation and customary certificates, and this Commitment, shall be referred to herein, collectively, as the "**Loan Documents**". Each of the Loan Documents shall be in form and substance satisfactory to the Lender and Lender's counsel, in their sole and absolute discretion.

E. The Borrower shall have complied with all of the terms of the Loan Documents and there shall exist no event of default or set of circumstances which given the expiration of time, or the giving of notice would give rise to an event of default under the Loan Documents.

F. The Borrower, at its sole cost and expense, shall provide a survey or "update" of the existing survey of the Collateral, certified in accordance with ALTA standards to Lender and the Title Company prepared by a surveyor licensed by the state in which the Real Property is located, showing such real estate to be free of material encroachments, overlaps and other survey defects, all in accordance with Lender's and Title Company's survey requirements. Alternatively, Lender may elect to accept the most recent survey available together with an affidavit confirming that there have been no physical modifications to the Collateral since the date of the most recent survey.

G. All parties claiming prepetition or post-petition liens or other interests in the Collateral, including, without limitation, all creditors of the Borrower, all parties with whom the Borrower has an executory contract with respect to the Collateral or the Project and all entities who have filed a Notice to Owner with reference to the Collateral (all such entities being collectively referred to as the "**Parties in Interest**") shall have received notice of the Motion and the hearing thereon, and (a) all such Parties in Interest shall have consented to, or shall not have objected to, the DIP

Loan or (b) any objections of Parties in Interest shall have been specifically overruled in their entirety in the Final Order of the Bankruptcy Court authorizing the DIP Loan.

H. This Commitment is subject to and conditioned upon the accuracy of all information, representations, exhibits and other materials submitted with or in support of the DIP Loan request(s) and there must be no adverse change in the condition, business or prospects of the Collateral or the Borrower prior to the disbursements of funds or during the term of the DIP Loan.

I. After conducting its due diligence including a physical inspection of the Collateral, Lender, in its sole discretion, may choose not to enter into the DIP Loan and terminate this Commitment, for any reason whatsoever.

J. Borrower shall have demonstrated and/or Lender, in its sole discretion, shall have determined that there are no environmental, land use, zoning or other governmental or regulatory issues that will adversely impact the Collateral in its current "as is, where is" condition, the operations of Borrower or its ability to repay the DIP Loan. Borrower shall have provided the Lender with any and all reports on such issues in its possession. Said reports shall be in form and substance satisfactory to Lender in its sole discretion.

K. The Maximum Loan Amount shall not exceed FIFTY PERCENT (50.00%) of the "As Complete" value of the Collateral as reasonably determined by Lender.

L. Borrower shall demonstrate the capability based upon its business plan, in the sole and absolute discretion of the Lender, of repaying the DIP Loan on the Maturity Date.

M. Lender, at its discretion, may waive any one or more of the above-described conditions, but no such waiver shall be effective against Lender unless in writing and signed by an authorized representative of Lender.

N. The cost of all of the foregoing shall be borne by Borrower and, to the extent provided, paid for from the proceeds of the DIP Loan.

**FEES & COSTS:** A. At the time of the funding of the DIP Loan, from the proceeds of such funding, Borrower shall pay to Lender a commitment fee calculated as FOUR PERCENT (4.00%) of the Maximum Loan Amount ("**Commitment Fee**"), due and fully earned at Closing [as herein defined] of the DIP Loan.

B. In addition, at the time of the funding of the DIP Loan, from the proceeds of such funding, Borrower shall pay (a) all Lender Expenses, (b) all recording costs (including mortgage, stamp or intangible taxes) for filing the recordable Loan Documents, and (c) the cost of the Lender's title insurance policy ("**Title Policy**"), and the cost of the survey of the Real Property.

C. At the time of the payoff of the DIP Loan, Borrower shall pay to Lender an exit fee of TWO AND ONE-HALF PERCENT (2.50%) of the Maximum Loan Amount, due as a condition precedent to the payoff of the DIP Loan ("**Exit Fee**").

D. Borrower agrees that the DIP Loan shall be without cost to Lender. Borrower assumes liability for and will pay all costs and expenses required to satisfy the conditions hereof and the making of the DIP Loan as provided hereunder (including the costs of the Title Policy and the survey). Such costs and expenses shall be paid as provided hereunder, or upon demand if the DIP Loan does not close or if this Commitment is terminated.

E. All costs required to document and perfect Lender's rights, through to the Closing of the DIP Loan shall be collectively referred to as the "**Closing Costs**".

**ACCEPTANCE OF COMMITMENT:**

Upon Borrower's acceptance and execution of this Commitment, and from funds other than that of the Borrower ("**Remitter**"), Remitter shall cause to be paid to Lender from Remitter's personal funds a loan application fee in the amount of FIFTY THOUSAND DOLLARS ($50,000) ("**Application Fee**"). The Application Fee shall be earned upon receipt and shall be paid for the benefit of Debtor but shall be neither an obligation of the Debtor to repay nor an asset in which the Debtor has an interest, and subsequent repudiation of this Commitment by the Borrower or the failure of the Bankruptcy Court to approve the DIP Loan shall entitle neither the Debtor nor the Remitter to a refund of the Application Fee.

In addition, at the of the Closing of the DIP Loan, Borrower shall pay to Lender a deferred fee of ONE HUNDRED THOUSAND DOLLARS ($100,000), due and fully earned at the Closing of the DIP Loan ("**Deferred Fee**").

If this Commitment is not terminated by Lender, and upon entry of the Final Order approving the DIP Loan, subject to the terms of this Commitment, a stand-by commitment loan fee in the amount of FOUR

PERCENT (4.00%) of the Maximum Loan Amount ("Stand-by Fee") shall be earned by the Lender as follows:

The Stand-by Fee shall be deemed earned by the Lender if, after entry of the Final Order approving the DIP Loan any of the following events occur: (i) the Borrower elects to not enter into the DIP Loan under this Commitment for any reason whatsoever, (ii) the Bankruptcy Court authorizes the Borrower to obtain financing from an existing creditor or other third party lender in lieu of Lender and the financing is provided by such existing creditor or other third party lender, or (iii) the Borrower fails to satisfy any of the material Conditions contained in this Commitment (each of the foregoing being defined as a "**Triggering Event**"). Upon the occurrence of a Triggering Event, the Lender shall have an allowed administrative expense claim in the Bankruptcy Case for the amount of the Stand-by-Fee, and the Lender and the Borrower shall be relieved of any further obligation under this Commitment; provided, however, that in the event the Borrower obtains financing from another lender, creditor or third party, the Stand-by-Fee shall be paid in full, in cash, at the closing of such loan(s). If the DIP Loan is not made by Lender as a result of Lender's election to not enter into the DIP Loan then the Stand-by Fee shall not be recorded as an administrative expense claim in the Bankruptcy Case and the Lender shall receive no other compensation for its services, and the Lender shall then have no further obligation to the Borrower under this Commitment. In the event that, after the filing of this Commitment with the Bankruptcy Court, the Debtor proceeds to obtain alternative financing from a competing lender, the competing lender shall pay to Lender the Stand-by Fee.

This letter will become a Commitment once signed by all parties. This offer by Lender will expire, **October 7, 2026 @ 5:00 PM EST,** time is of the essence. Lender shall have no obligation with respect to the DIP Loan unless and until this Commitment letter is fully executed and received by Lender, and if the Commitment is not terminated under subparagraph A. of the section hereof entitled CONDITIONS.

**CLOSING**: The closing on the DIP Loan shall take place as soon as practical after satisfaction of the Conditions contained herein, in Lender's sole and absolute discretion including, without limitation, entry of the Final Order approving the DIP Loan ("**Closing**"). Each successive disbursement on the DIP Loan shall take place upon satisfaction of the conditions contained herein.

The DIP Loan will be originated by a licensed Florida and Michigan Mortgage Broker(s) at the Lender's sole and absolute discretion.

**ASSIGNMENT:** Lender may assign any or all of its obligations and rights hereunder to one or more assignees or participants and may collaterally assign the DIP Loan (or any portion thereto) and/or the Loan Documents to Lender's lender under any existing or future loan arrangement. Lender intends to bring participants into this transaction either as assignees or indirectly as lenders to Lender. Borrower consents to Lender's sale or assignment of all or a portion of the DIP Loan and Borrower agrees to execute any and all agreements and other documents reasonably requested by Lender and Lender's lenders to formalize such assignments of, or participations in, the DIP Loan.

**USURY:** This Commitment is subject to the express condition that at no time shall the Borrower be obligated or required to pay interest at a rate which could subject Lender or its assignees to either civil or criminal liability as a result of being in excess of the maximum rate which the Borrower is permitted by law to contract or agree to pay. If by the terms of this Commitment, and/or any of the Loan Documents evidencing the DIP Loan, the Borrower is at any time required or obligated to pay interest at a rate in excess of such maximum rate, the rate of interest hereunder and/or under the note shall be deemed to be immediately reduced to such maximum rate and interest payable shall be computed at such maximum rate and the portion of all prior interest payments in excess of such maximum rate shall be applied and shall be deemed to have been payments in reduction of principal balance of the DIP Loan. If Lender deems it a hardship to close the DIP Loan under usury statutes, all fees paid to Lender shall be refunded and this Commitment shall be null and void.

It is also hereby understood and agreed upon by and between the Borrower and Lender that the Lender does not intend, under any circumstances, to charge, collect, assess or receive interest, at an effective rate, in excess of the maximum rate allowable under applicable state and federal law. If the effective interest rate does exceed the maximum rate allowable by applicable state or federal law, the Borrower and Lender intend to and hereby agree to reduce the effective interest rate to the maximum rate allowable by applicable state or federal law.

It is further understood and agreed upon by and between the Borrower and Lender that the Lender does not intend, under any circumstances, to charge, collect, assess or receive interest, at the Default Rate's effective rate, in excess of the maximum rate allowable under applicable state and

federal law. If the Default Rate's effective interest rate exceeds the maximum rate allowable by applicable state or federal law, the Borrower and Lender intend to and hereby agree to reduce the Default Rate's effective interest rate to the maximum rate allowable by applicable state or federal law.

**CONFIDENTIALITY:** This Commitment is confidential. Until such time as the Commitment has been fully executed by each of the Borrower and the Lender, and the Application Fee has been paid in full by the Remitter, the Borrower shall not disclose the terms or existence of this Commitment to any third party other than its officers, directors, professionals and advisors. In the event that the terms or existence of this Commitment is disclosed to the Bankruptcy Court and/or any third party other than Borrower's officers, directors, professionals and advisors prior to Lender's receipt of the Application Fee from the Remitter, such premature disclosure shall render this Commitment null and void and of no further force or effect. This provision shall survive the termination of this Commitment.

**SURVIVAL OF COMMITMENT:** A copy of this Commitment shall be attached to, and incorporated into, each and every order entered by the Bankruptcy Court with regard to the DIP Loan. To the extent not inconsistent with the other Loan Documents, this Commitment and all of the terms and conditions contained herein shall survive the closing of the DIP Loan and shall remain binding on the Borrower and Lender as part of the Loan Documents, provided, however, that if there should exist any disagreement between the terms of this Commitment and the terms of any of the other Loan Documents, the terms of the Loan Documents shall control.

**EXECUTION AND RELIANCE ON COUNSEL:** This Commitment may be executed in counterparts which, taken together, shall constitute one original. This Commitment is for the benefit of the Borrower only and may not be assigned except upon the prior written consent of Lender, which consent may be withheld for any reason or for no reason. No party other than the Borrower, or an assignee acceptable to Lender may rely upon the terms and conditions of this Commitment. This Commitment is executed by an individual strictly in his capacity as a representative of the Lender. By acceptance of this Commitment, Borrower agrees that no representative, member, partner, shareholder, employee or agent of the Lender shall be personally liable for the payment of any claim or performance of any obligations hereunder. This Commitment will be governed by and construed in accordance with the

laws of the State of Florida and of the United States, without regard to the principles of conflicts of laws thereof. **The Borrower had the benefit of advice of counsel in connection with the execution of this Commitment and the transaction(s) contemplated hereby. This document has been negotiated at arm's length and in good faith between the Lender and the Borrower.**

**NON-WAIVER:** No failure or delay on the part of Lender to exercise any rights under the Loan Documents shall operate as a waiver thereof, nor shall any single or partial exercise by Lender of any right under the Loan Documents preclude any further exercise thereof, or the exercise of any other right. Each and every right or remedy granted under the Loan Documents or under any document delivered thereunder or in connection therewith or allowed to Lender in law or equity shall be deemed cumulative and may be exercised from time to time.

**OTHER:** The Final Order authorizing the DIP Loan shall expressly provide that the Bankruptcy Court shall retain the fullest jurisdiction over both the Borrower and the DIP Loan until such time as the DIP Loan is irrevocably repaid to the Lender, in full, in cash. The Plan shall not modify, alter or impair the liens and claims of the Lender. The Order shall also contain such waivers as Lender shall require entitling the Lender to immediately foreclose and otherwise enforce rights against the Borrower and the Collateral should the Borrower, either voluntarily or involuntarily, be subject of a subsequent case or proceeding under title 11 of the United States Code, or otherwise default under the DIP Loan or Loan Documents.

As referenced in this Commitment, funding of the DIP Loan is dependent upon, among other things, satisfactory negotiation of the Loan Documents between Borrower and Lender. The foregoing letter simply sets forth general terms and conditions upon which the Lender would be willing to make the DIP Loan described herein. **This Commitment is not, in and of itself, a document that guarantees funding by the Lender to the Borrower in the amounts set forth herein. Only final Loan Documents and satisfaction of the conditions set forth above will obligate the Lender to fund any portion of the DIP Loan.** Any material deterioration of the financial condition of the Borrower or the condition of the Collateral between the execution of this Commitment and the Closing of the DIP Loan will relieve the Lender of any obligation on the part of the Lender to fund the DIP Loan.

If you find this Commitment to your satisfaction, please execute a copy of this document in the space provided herein below and return the same to the undersigned. Please have the manager of the Borrower execute this Commitment to the Lender, upon the terms and conditions contained in this Commitment.

We appreciate this opportunity to respond to your financing requirements. If you have questions regarding this letter, please call Mr. Renzo Renzi at (239) 580-7151.

Very truly yours,

**364 CAPITAL, LLC,**
a Delaware limited liability company

By: **364 MANAGER, LLC**,
a Delaware limited liability company

By: Signed by: RENZO RENZI JR F0F22B18321947F...
Renzo Renzi, Managing Member

**BORROWERS:**

**ADELAIDE POINTE QOZB, LLC**,
a Michigan limited liability company

By: DocuSigned by: Ryan Leestma 2B6C3FEC2E034A8...

Name: Ryan Leestma

Its: Owner

**ADELAIDE POINTE BOATERS SERVICES, LLC**,
a Michigan limited liability company

By: DocuSigned by: Ryan Leestma 2B6C3FEC2E034A8...

Name: Ryan Leestma

Its: Owner

**ADELAIDE POINTE BUILDING 1, LLC**,
a Michigan limited liability company

By: DocuSigned by: Ryan Leestma 2B6C3FEC2E034A8...

Name: Ryan Leestma

Its: Owner

# EXHIBIT A
## DIP LOAN BUDGET

| Professional Fees | Payee | $ Amounts |
|---|---|---|
| Chief Restructuring Officer | John Polderman | $180,000 |
| Critical Vendor Payment | Edgewater Resources | 150,000 |
| Critical Vendor Payment | Catalyst | 500,000 |
| Third Party Inspector | TBD | 60,000 |
| EGLE Violation & Site Assessment | Edgewater Resources | 75,000 |
| Legal, Edgewater Resources | Orlebeke Mackraz LLP / Patterson Law Firm | 50,000 |
| Critical Vendor Payment | Soils and Structures | 25,000 |
| Claims Agent | Verita Global | 9,600 |
| Appraisal Services | JLL Valuation & Advisory Services, LLC | 29,750 |
| Tax & Accounting Services | Brockley Delong | 150,000 |
| U.S. Trustee Fees | U.S. Trustee | 35,000 |
| Legal, Debtor | Jennis Law | 250,000 |
| Legal, 364 Capital, LLC | Pack Law | 100,000 |
| **Total Professional Fees** | | **$1,614,350** |

| Hard Costs | Payee | $ Amounts |
|---|---|---|
| Completion Condos | One Touch Construction | $4,250,000 |
| Condo Pool | Tindall Pools | 500,000 |
| Lobby & Hallways Build-Out | One Touch Construction | 100,000 |
| Landscaping - Condos & Land | Barry's | 125,000 |
| Balcony Remediation | FJ Peterson | 25,000 |
| **Total Hard Costs (Repairs & Maintenance)** | | **$5,000,000** |

| Other | Payee | $ Amounts |
|---|---|---|
| Past Due Ad-Valorem Assessments | Treasurer | $250,000 |
| 2026 Ad-Valorem Taxes | Treasurer | 300,000 |
| Adequate Protection / Interest Payments | Independent Bank | 1,500,000 |
| Staging / FF&E | TBD | 544,000 |
| Reimbursement Application Fee | 364 Capital, LLC | 50,000 |
| Deferred Fee | 364 Capital, LLC | 100,000 |
| Application Fee | Summit | 50,000 |
| Estimated Closing Costs | Multiple TBD | 138,850 |
| Construction Management | Ryan Leestma | 150,000 |
| Contingency | As Needed | 500,000 |
| **Total Other** | | **$3,582,850** |

| DIP Loan | Payee | $ Amounts |
|---|---|---|
| Commitment Fee | 364 Capital, LLC | $551,200 |
| Loan Servicing Fee | 364 Capital, LLC | 137,800 |
| Interest Reserve (est. 2-year) | 364 Capital, LLC | 2,893,800 |
| **Total DIP Loan** | | **$3,582,800** |
| **Maximum Loan Amount** | | **$13,780,000** |

# EXHIBIT B
## COLLATERAL

Collateral: The Collateral for the DIP Loan shall include the following:

(a) The real property more particularly described on Exhibit B-1 attached hereto, together with all of the owner's right, title, interest, and privileges in all (i) streets, ways, alleys, easements, rights-of-way, licenses, rights of ingress and egress, vehicle parking rights and public places, existing or proposed, abutting, adjacent, used in connection with or pertaining to the Property or the improvements thereon; (ii) strips or gores of real property between and/or abutting or adjacent properties; and (iii) all water and water rights;

(b) Any and all improvements of any kind or nature situated, placed, or constructed on the Real Property;

(c) All fixtures, materials, supplies, equipment, systems, and apparatus, now or hereafter attached to, installed in, or used in connection with (temporarily or permanently) any of the Real Property or its improvements, including motors, engines, boilers, furnaces, pipes, cleaning, call and sprinkler systems, fire extinguishing apparatus and equipment, water tanks, swimming pools, heating, ventilating, refrigeration, plumbing, laundry, lighting, generating, cleaning, waste disposal, transportation (of people or things, including but not limited to, stairways, elevators, escalators, and conveyors), incinerating, air conditioning and air cooling equipment and systems, gas and electric machinery, appurtenances and equipment, disposals, dishwashers, refrigerators and ranges, recreational equipment and facilities of all kinds, and lighting, traffic control, waste disposal, raw and potable water, gas, electrical, storm and sanitary sewer, telephone and cable television facilities, and all other utilities whether or not situated in easements;

(d) Any and all leases, master leases, subleases, licenses, concessions, and other agreements (whether written or oral, or now or hereafter in effect) which grant to third parties a possessory interest in and to, or the right to use or occupy, all or any part of the Real Property, including all security and other deposits;

(e) All, machinery, goods, general intangibles, money, insurance proceeds, accounts, trademarks, trade names, copyrights, chattel paper, instruments, investment property, letter of credit rights, inventory, deposit accounts or other funds or evidences of cash, credit or indebtedness deposited by or on behalf of owner with any governmental agencies, boards, corporations, providers of utility services, public or private, including reimbursable tap fees, utility deposits, commitment fees and development costs, any awards, remunerations, reimbursements, settlements,

or compensation heretofore made or hereafter to be made by any governmental authority pertaining to any of the Collateral, and all other personal property of any kind or character which is now or hereafter situated in, on, or about the Real Property or used in or necessary to the complete and proper planning, development, construction, financing, use, occupancy, or operation thereof;

(f) Any and all contracts, subcontracts, and agreements, written or oral, in any way relating to the construction of the improvements on the Real Property or the supplying of material (specially fabricated or otherwise), labor, supplies, or other services therefor, contracts, licenses, permits, and rights relating to living unit equivalents or other entitlements for water, wastewater, and other utility services whether executed, granted, or issued by a private person or entity or a governmental or quasi-governmental agency, which are directly or indirectly related to, or connected with, the development, ownership, maintenance or operation of the Real Property, whether such contracts, licenses, and permits are now or at any time thereafter existing; and

(g) Any and all other rights of the owner (i) to develop and/or operate the Real Property as a commercial and/or residential project, as the case may be; (ii) in any financing arrangements relating to the financing of or the purchase of all or any portion of the Real Property by future purchasers; and (iii) in all other contracts which in any way relate to the use, enjoyment, occupancy, operation, maintenance, repair, management or ownership of the Real Property.

(h) ANY AND ALL ASSETS OF THE DEBTOR NOW EXISTING OR HEREAFTER ACQUIRED EXCEPT FOR THE DEBTOR'S AND THE ESTATE'S CLAIMS AND CAUSES OF ACTION ARISING UNDER SECTIONS 502(d), 506, 510, 542, 544, 545, 547, 548, 549, 550, 551, 552 OR 553 OF THE BANKRUPTCY CODE, OR ANY FRAUDULENT OR VOIDABLE CONVEYANCE, OR PREFERENCE LAWS UNDER APPLICABLE STATE OR OTHER LAW, AND THE PROCEEDS THEREOF AND ANY OTHER CAUSES OF ACTION CURRENTLY PENDING OR TO BE FILED BY THE DEBTOR OR ANY SUCCESSOR AND THE PROCEEDS THEREOF EXCEPT FOR THE PROCEEDS OF THE FOREGOING THAT IS IN THE FORM OF REAL PROPERTY.

# EXHIBIT B-1
# LEGAL DESCRIPTION OF REAL PROPERTY

Property situated in the City of Muskegon, County of Muskegon, and State of Michigan described as:

That part of Block 579 of the Revised Plat of 1903 of the City of Muskegon, Section 25, Town 10 North, Range 17 West, City of Muskegon, Muskegon County, Michigan, described as:

COMMENCING at the Southeast corner of Lot 4 of Block 577; thence North 87°52'58" West, 865.74 feet along the North right-of-way line of Western Avenue; thence Westerly 158.32 feet along said North right-of-way line on a 430.58 foot radius curve to the left, the chord of which bears South 81°35'02" West, 157.43 feet; thence North 31°10'08" West, 733.41 feet; thence North 58°49'52" East, 18.35 feet to the PLACE OF BEGINNING; thence Northwesterly 62.93 feet on a 99.00 foot radius curve to the right, the chord of which bears North 25° 05'28" West, 61.87 feet; thence Northwesterly 49.92 feet on a 194.00 foot radius curve to the left, the chord of which bears North 14°15'11" West, 49.78 feet; thence North 10°46'30" East, 210.84 feet; thence North 58°29'54" East, 114.58 feet; thence South 31°30'06" East, 147.26 feet; thence South 58°37'27" West, 77.48 feet; thence South 10°46'30" West, 86.44 feet; thence South 31°22'33" East, 123.02 feet; thence South 58°37'27" West, 66.43 feet; thence North 79°13'30" West, 102.40 feet to the place of beginning.

Together with an easement for ingress-egress and public utilities located in that part of Blocks 577, 578 & 579 of the Revised Plat of 1903 of the City of Muskegon, Section 25, Town 10 North, Range 17 West, City of Muskegon, Muskegon County, Michigan, said easement being described as:

Beginning on the North right-of-way line of Western Avenue at a point being North 87 degrees 52 minutes 58 seconds West, 824.34 feet from the Southeast corner of Lot 4 of said Block 577; thence North 02 degrees 08 minutes 44 seconds East, 263.07 feet; thence North 34 degrees 14 minutes 29 seconds East, 74.27 feet; thence North 23 degrees 44 minutes 59 seconds East, 71.13 feet; thence North 02 degrees 08 minutes 44 seconds East, 164.98 feet; thence Northerly 75.89 feet on a 358.00 foot radius curve to the left, the chord of which bears North 03 degrees 55 minutes 38 seconds West, 75.75 feet; thence Northeasterly 53.16 feet on a 30.00 foot radius curve to the right, the chord of which bears North 40 degrees 45 minutes 35 seconds East, 46.47 feet; thence South 88 degrees 28 minutes 50 seconds East, 70.66 feet; thence Northeasterly 137.17 feet on a 141.00 foot radius curve to the left, the chord of which bears North 63 degrees 39 minutes 00 seconds East, 131.82 feet; thence Easterly 43.20 feet on a 165.00 foot radius non-tangential curve to the left, the chord of which bears South 81 degrees 06 minutes 34 seconds East, 43.07 feet; thence South 88 degrees 36 minutes 35 seconds East, 77.91 feet; thence Southeasterly 164.07 feet on a 105.00 foot radius curve to the right, the chord of which bears South 43 degrees 50 minutes 39 seconds East, 147.88 feet; thence South 00 degrees 55 minutes 16 seconds West, 231.33 feet; thence South 88 degrees 08 minutes 38 seconds East, 57.67 feet; thence North 01 degrees 56 minutes 07 seconds East, 248.95 feet; thence North 88 degrees 06 minutes 24 seconds West, 8.34 feet; thence North 32 degrees 59 minutes 53 seconds West, 152.26 feet; thence Northwesterly 11.02 feet on a 180.00 foot radius curve to the left, the chord of which bears North 60 degrees 10 minutes 49 seconds West, 11.02 feet; thence Northwesterly 23.47 feet on a 44.00 foot radius curve to the right, the chord of which bears North 46 degrees 39 minutes 17 seconds West, 23.19 feet; thence North 31 degrees 22 minutes 33 seconds West, 32.33 feet; thence South 58 degrees 41 minutes 48 seconds West, 30.10 feet; thence Southwesterly 24.54 feet on a 43.00 foot radius curve to the right, the chord of which bears South 75 degrees 02 minutes 37 seconds West, 24.20 feet; thence North 88 degrees 36 minutes 35 seconds West, 28.07 feet; thence Northwesterly 112.92 feet on a 113.00 foot radius curve to the right, the chord of which bears North 60 degrees 00 minutes 12 seconds West, 108.28 feet; thence North 31 degrees 22 minutes 33 seconds West, 304.82 feet; thence Northwesterly 25.59 feet on a 100.00 foot radius curve to the left, the chord of which bears North 38 degrees 42 minutes 28 seconds West, 25.52 feet; thence North 73 degrees 07 minutes 40 seconds West, 86.39 feet; thence Southwesterly 63.79 feet on a 52.00 foot radius curve to the left, the chord of which bears South 35 degrees 56 minutes 19 seconds West, 59.86 feet; thence South 58 degrees 37 minutes 27 seconds West, 514.47 feet; thence South 10 degrees 46 minutes 30 seconds West, 86.44 feet; thence South 31 degrees 22 minutes 33 seconds East, 25.92 feet; thence North 58 degrees 37 minutes 27 seconds East, 598.50 feet; thence South 31 degrees 22 minutes 33 seconds East, 297.13 feet; thence South 58 degrees 37 minutes 27 seconds West, 79.88 feet; thence North 88 degrees 28 minutes 50 seconds West, 95.92 feet; thence South 40 degrees 42 minutes 37 seconds West, 73.46 feet to Point A, so-called; thence Southerly 123.08 feet on a 292.00 foot radius curve to the right, the chord of which bears South 09 degrees 55 minutes 48 seconds East, 122.17 feet; thence South 02 degrees 08 minutes 44 seconds West, 161.50 feet; thence Southwesterly 72.07 feet on a 117.00 foot radius curve to the right, the chord of which bears South 19 degrees 47 minutes 30 seconds West, 70.93 feet; thence Southerly 143.52 feet on a 233.00 foot radius curve to the left, the chord of which bears South 19 degrees 47 minutes 30 seconds West, 141.26 feet; thence South 02 degrees 08 minutes 44 seconds West, 194.05 feet to the North right-of-way line of Western Avenue; thence Easterly 23.28 feet along said North right-of-way line on a 430.58 foot radius curve to the right, the chord of which bears South 89 degrees 25 minutes 54 seconds East, 23.27 feet; thence South 87 degrees 52 minutes 58 seconds East, 41.40 feet along the North right-of-way line of Western Avenue to the place of beginning.

ALSO Together with an easement for ingress-egress and public utilities described as:
Beginning at above mentioned Point A, so-called; thence South 89 degrees 12 minutes 02 seconds West, 32.68 feet; thence South 58 degrees 37 minutes 27 seconds West, 287.81 feet; thence Northwesterly 102.90 feet on a 91.00 foot radius non-tangential curve to the right, the chord of which bears North 63 degrees 46 minutes 09 seconds West, 97.50 feet; thence North 31 degrees 22 minutes 33 seconds West, 168.67 feet; thence North 58 degrees 37 minutes 27 seconds East, 87.08 feet; thence South 31 degrees 22 minutes 33 seconds East, 185.00 feet; thence North 58 degrees 37 minutes 27 seconds East, 285.00 feet; thence North 31 degrees 22 minutes 33 seconds West, 185.00 feet; thence North 58 degrees 37 minutes 27 seconds East, 66.00 feet; thence South 31 degrees 22 minutes 33 seconds East, 245.03 feet; thence South 40 degrees 42 minutes 37 seconds West, 73.46 feet to Point A, so called and the place of ending.