UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

In re: Chapter 11

| | |
|---|---|
| Leestma Management, LLC | Case No. 8:26-bk-02696-CED [Lead Case] |
| Adelaide Pointe QOZB, LLC | Case No. 8:26-bk-02698-CED |
| Adelaide Pointe Boaters Services, LLC | Case No. 8:26-bk-02699-CED |
| Adelaide Pointe Building 1, LLC | Case No. 8:26-bk-02700-CED |
| Waterland Battle Creek, LLC | Case No. 8:26-bk-02701-CED |

Debtors. ________________________________/

Chapter 11
*Jointly Administered Cases*

**INTERIM REPORT OF THE CHIEF RESTRUCTURING OFFICER**

John Polderman, in his capacity as Chief Restructuring Officer ("CRO"), submits the following Interim Report to advise the Court, creditors and interested parties of the current status of case from the viewpoint of the CRO.

Pursuant to the *Approval Order Granting Debtors' Motion to Approve Mediated Interim Settlement Agreement Term Sheet* ("Order") [Dkt. # 231], the CRO was charged with, among other things:

(1) Developing a Chapter 11 plan (the "**Plan**") that is (i) acceptable to the Participating Secured Lenders[1] or (ii) that (x) begins debt service payments at the contract rate to the Participating Secured Lenders on January 1, 2027, on all loans to the Debtors by the Participating Secured Lenders and (y) satisfies in full all claims of the Participating Secured Lenders within two (2) years of the confirmation date of the Plan.

(2) Seeking estimates for all work required to…comply with City and EGLE current obligations and requirements by August 15, 2026.

In compliance with the Order, the CRO has engaged in extensive fact finding, administration of the estate and negotiations with numerous parties and their counsel as well as the above referenced

[1] Capitalized terms not defined herein have the meaning ascribed to them in the Order.

Debtors (collectively the "Debtor"), Debtor's counsel and Frank Peterson as described in more detail below.

At this stage of the case, the CRO has concluded for purposes of this Interim Report, that a feasible chapter 11 plan cannot be proposed. Specifically, and as described in more detail below, the requirements of the Michigan Department of Environment, Great Lakes, and Energy ("EGLE"), together with the absence of sufficient committed funding, presently prevent the Debtor from establishing a workable and financially supported path to reorganization. This Interim Report addresses the Debtors' current circumstances as of October, 2026. The Interim Report does not conclude that reorganization can never be achieved. It concludes that based upon the facts and circumstances of this case and on the information presently available, the CRO cannot recommend presenting a plan premised on unresolved regulatory requirements and sufficient funding that has not been secured. The basis for this Interim Report is below.

## I. <u>EGLE Requirements</u>

1. The Administrative Consent Agreement ACO-05963, between EGLE Water Resources Division, Ryan Leestma, and Adelaide Pointe QOZB LLC is attached hereto as **<u>Exhibit A</u>** (the "Agreement").

2. The prepetition Agreement was signed by Ryan Leestma individually and for the LLC on April 24, 2025 and supplies a specific compliance framework to remedy permit violations which exist at the Adelaide Pointe project. Illustrative drawings and maps are attached as exhibits to the Agreement.

3. It should be noted that the majority of the work contemplated under the Agreement would take place on real property owned by Adelaide Pointe Wet Marina, LLC, a non-debtor entity. In other words, the Debtors are required to expend money which would inure to the benefit

of a non-debtor entity, and arguably to the Adelaide Pointe project as a whole.

4. Paragraph 1 of the Agreement prescribes restoration of the central peninsula, western peninsula, and southern marina shoreline. Paragraph 1(i) separately requires a permit modification request to EGLE and USACE reconciling site changes. Current surveys, approved plans, sediment results, and material quantities are needed to price and implement that work.

5. Paragraphs 3 through 11 require an updated soil erosion and sedimentation control plan, installation and maintenance of controls, temporary stabilization until permanent stabilization is achieved, continuous certified construction storm water operator coverage, and uninterrupted NOC and SESC permit coverage during restoration.

6. The Agreement also establishes a phased construction obligation: the first 1.1 acres of wetland restoration must begin by November 1, 2026 and the remaining 1.1 acres by November 1, 2027 (paragraphs 1(e) and 13). As of October 12, 2026, the first deadline is imminent unless modified in writing. Earlier sampling and plan submission dates, the April 30, 2026 installment, and the August 30, 2026 mitigation purchase milestone have passed. The budget must also cover at least five years of monitoring and potential corrective work.

## II. The Costs to Implement the Agreement and Funding Shortfall

7. The Agreement also specifies a $500,000 settlement subject to $300,000 in conditional reductions, including $200,000 payable in two installments regardless of those reductions. These amounts are separate from construction costs.

8. These obligations create immediate and continuing demands on liquidity.

9. Based on estimates provided to the CRO, along with allocations made by a sophisticated purchaser, it is estimated that compliance with the Agreement will cost between $1.5 million to $4 million dollars.

10. The Debtor does not presently have sufficient available funding to satisfy the EGLE requirements as required by the Agreement in order to fund a proposed reorganization.

11. A further impediment to a proposed chapter 11 plan that is feasible, is the fact that the Debtor opposes the post- petition implementation of the Agreement and believes that it is not feasible or possible to implement the Agreement without destruction of the marina. Debtor's arguments are summarized in **Exhibit B**. As a result, the CRO and The Debtor have reached an impasse.

## III. Efforts to Resolve the Impasse

12. The CRO has spent numerous hours speaking with consultants, EGLE, Ryan Leestma, Frank Peterson and secured lenders. The end result of those discussions is that Mr. Leestma is vehemently opposed to the implementation of the Agreement and believes it will result in the erosion of the peninsulas surrounding the marina, and EGLE believes the Agreement must be complied with and represents numerous concessions already granted to the Debtors and/or Mr. Leestma.

13. There simply is no middle ground of partial compliance with the Agreement.

## IV. Effect on A Plan of Reorganization

14. The regulatory and financial obstacles are interrelated. A credible Plan must account for the cost, timing, and operational effect of the EGLE requirements, while the Debtor must have funding sufficient to carry out that approach. Addressing only one obstacle will not resolve the present impasse. A Plan dependent on uncommitted funding or an assumed regulatory accommodation would rest on contingencies that have not been resolved.

15. Furthermore, a Plan which does not comply with state law is incapable of being confirmed, therefore submitting a Plan that does not provide for implementation of the Agreement

is not a meaningful exit or rehabilitation strategy. Any going-concern plan premised on the Adelaide Pointe project must account for compliance with the Agreement or identify a written EGLE-approved modification, extension, assignment, release, or other lawful regulatory path. A debtor in possession must manage and operate estate property according to valid state law in the same manner as the owner or possessor would be bound to do outside bankruptcy, and confirmation also requires a record showing that the plan is feasible rather than likely to be followed by liquidation or further financial reorganization (1129(11); and 28 U.S.C. 959(a)(b).

16. The Debtor has obtained several term sheets from third party lenders, one of which is pending approval before this Court. However, as the CRO understands the financing terms, the proposed lending facility does not provide for funding of the Agreement. Specifically, although the pending DIP facility appears to include funding for EGLE site-assessment work, the CRO understands that it does not presently provide committed funding sufficient to implement the Agreement's restoration, settlement-payment, monitoring, and corrective-action obligations

17. The Agreement also appears to be subject to Section 362(b)(4) which expressly excepts from the automatic stay, proceedings by a governmental unit to enforce its "police and regulatory power," including enforcement of a judgment other than a money judgment. 11 U.S.C. § 362(b)(4). Environmental enforcements are generally recognized as a police and regulatory power.

18. The CRO does not take a position at this time as to whether the Agreement is considered an executory contract subject to assumption or rejection. The Court may need to decide whether the agreement is considered an executory contract subject to assumption or rejection pursuant to 11 U.S.C. § 365 of the bankruptcy code.

19. On the present record, the CRO does not have a reliable basis to support

projections showing that the Debtors can perform plan obligations, maintain necessary operations, and satisfy or lawfully modify the EGLE requirements. The absence of a committed funding source for the work, monitoring, settlement obligations, and any related operating impacts as required by the Agreement, prevents me from concluding that a going-concern plan would satisfy the feasibility requirement of 11 U.S.C. § 1129(a)(11). That provision addresses whether confirmation is likely to be followed by liquidation or further financial reorganization, except where such a course is proposed in the plan.

20. The ultimate determination of confirmation requirements remains with the Court.

21. The impasse is substantive. Merely extending the time to propose a plan would not itself supply the missing funding or resolve the EGLE requirement. Any further period devoted to pursuing reorganization should be supported by concrete milestones, an identified source of interim funding, and a budget demonstrating that the estate can sustain that effort.

## V. Recommended Next Steps

22. I recommend that the Court convene a status conference at the earliest practicable time to address the impasse, the Debtor's remaining liquidity, and the appropriate course for this case. The conference should address whether there is a realistic opportunity to obtain both an implementable resolution of the EGLE requirements and sufficient committed funding within the Debtor's available cash runway.

23. If a further effort to reorganize is warranted, I recommend immediate verification of the first restoration milestone; confirmation of existing approvals, permit coverage and protective measures; a contractor-priced remaining work scope and integrated cash forecast; and written funding commitments covering both near-term construction and continuing monitoring obligations.

24. If those conditions cannot be satisfied within a supportable timeframe, the Debtor and parties in interest should evaluate an asset sale, a liquidating Chapter 11 plan, conversion, or dismissal as appropriate.

25. It should also be noted that even under any sale or liquidation, under paragraph 36 of the Agreement, the obligated parties retain uncompleted work obligations and necessary property interests after a transfer, unless EGLE approves assignment and release. Unless the Court rules otherwise, any transfer requires written EGLE approval and a commensurate permit transfer; paragraph 28(k) makes the settlement nontransferable and payable before agreement transfer, subject to earned reductions.

26. This report makes no determination that a sale or change in case posture eliminates environmental obligations.

27. This report is a status report, not a motion seeking conversion, dismissal, approval of a sale, or other dispositive relief. Any such relief should be presented by an authorized party through the applicable notice and hearing procedures. No extension of a deadline or alteration of an existing Order is assumed by this report.

## **Conclusion**

28. The Debtor and CRO are presently at an impasse in presenting a viable plan of reorganization because the EGLE requirements lack a sufficiently funded solution. Additionally, the Debtor is adamantly opposed to implementing the Agreement, believing it to be destructive to the marina. Unless an implementable regulatory pathway and adequate funding are secured, the CRO cannot support proceeding with a going concern Plan on the current record.

29. I submit this report so that the Court and parties in interest may address the circumstances promptly and determine the next steps before available resources are exhausted.

Respectfully submitted,

**Stevenson & Bullock, PLC**

/s/ *John W. Polderman*
John W. Polderman (P65720)
Chief Restructuring Officer

Dated: October 13, 2026