**STATE OF MICHIGAN**
**DEPARTMENT OF ENVIRONMENT, GREAT LAKES, AND ENERGY**
**WATER RESOURCES DIVISION**

In the matter of:

ACO-05963
Date Entered: 2025-04-30 08:58:44
WRD40361

Ryan Leestma
1599 West Wind Court
Muskegon, Michigan 49445

and

Adelaide Pointe QOZB LLC
1204 W. Western Ave, Suite A
Muskegon, Michigan 49441

## ADMINISTRATIVE CONSENT AGREEMENT

This Administrative Consent Agreement (Agreement) is entered into by and between the Department of Environment, Great Lakes, and Energy (EGLE), Water Resources Division (WRD), Ryan Leestma, and Adelaide Pointe QOZB LLC (Adelaide Pointe) (collectively the "Parties"), and shall become effective on the date this Agreement is signed by the WRD, Ryan Leestma, and Adelaide Pointe (Effective Date). All times for performance of activities under this Agreement shall be calculated from the Effective Date of the Agreement.

## RECITALS

The WRD issued permit No. WRP036459 on April 11, 2023, and subsequent modification on January 10, 2024 for permit No. WRP036459 v1.1 (collectively the "Permit") and National Pollutant Discharge Elimination System Notice of Coverage (NOC) permit No. MIR117861 on January 24, 2024, expiring January 19, 2025, for the purpose of constructing a mixed use new development that includes public access, commercial, and residential buildings with associated infrastructure including driveways, roads, utility lines, parking areas, sidewalks, boardwalks, a seawall, rock riprap, and a new 202 slip marina that includes a pile supported pier structure with steel sheet pile that will act as a breakwater, wave attenuators, floating docks, fixed access piers, finger docks, gangways, platforms, a fishing dock, a service pier with fuel and a sanitary pump out facility. According to the Permit, the granted authorization is contingent upon the completion of on-site wetland restoration.

Exhibit A

The WRD issued Violation Notice (VN) and Enforcement Notices (ENs), to Ryan Leestma and Adelaide Pointe by correspondence dated September 9, 2023, March 19, 2024, June 17, 2024, and October 30, 2024, pursuant to Part 31, Water Resources Protection, Part 91, Soil Erosion and Sedimentation Control (SESC), Part 301, Inland Lakes and Streams, and Part 303 Wetlands Protection, of the Natural Resources and Environmental Protection Act, 1994 PA 451, as amended, MCLs 324.3101, 324.9101, 324.30101, and 324.30301 *et seq*.; the Part 4, Water Quality Standards, administrative rules promulgated pursuant to Part 31, Mich Admin Code, R 323.1041 *et seq.* (Part 4 Rules); the Part 21, Wastewater Discharge Permits, administrative rules promulgated pursuant to Part 31, Mich Admin Code, R 323.2101 *et seq.* (Part 21 Rules); and the administrative rules promulgated pursuant to Part 301 and Part 303, Mich Admin Code, R 281.811 and R 281.921 *et seq.* The WRD alleged in the VN and ENs that Ryan Leestma and Adelaide Pointe failed to properly maintain sedimentation barriers, discharged sediment into Muskegon Lake, violated the conditions of the Permit and NOC), conducted unauthorized activities within a conservation easement, and caused unnatural turbidity and coloration to a surface water of the state on the property composed of parcel Nos. 61-24-025-100-0001-30, 61-24-025-100-0001-50, 61-24-205-580-0001-00, and 61-24-025-100-0001-30 (hereinafter referred to as the "Property") (collectively referred to as the "Alleged Unauthorized Activities").

The WRD alleges that approximately 2.2 acres of wetlands and adjacent bottomlands were impacted by the Alleged Unauthorized Activities.

The WRD requested in the VN and ENs that all Alleged Unauthorized Activities on the Property cease and desist, and that Ryan Leestma and Adelaide Pointe take immediate action to address ongoing discharges and non-compliance.

Ryan Leestma and Adelaide Pointe owned or had control of the Property and performed, or had their agent perform, the Alleged Unauthorized Activities in violation of the Permit and/or without the required permit authorization under Parts, 31, 91, 301, and 303, the Part 4 Rules, and the Part 21 Rules.

Ryan Leestma, Adelaide Pointe, and the WRD acknowledge that prior to undertaking the Alleged Unauthorized Activities, a lake (Muskegon Lake) regulated by the State of Michigan under Part 301 and wetlands regulated by the State of Michigan under Part 303 existed on the Property.

Ryan Leestma, Adelaide Pointe, and the WRD desire to resolve this dispute without the necessity of additional administrative and/or judicial proceedings.

This Agreement identifies actions required to be taken by Ryan Leestma, Adelaide Pointe, and the WRD; and it imposes certain conditions upon performance of these actions. Successful completion of the terms of this Agreement will, in the opinion of the WRD, meet the statutory provisions of Parts 31, 91, 301, and 303, the Part 4 Rules, and the Part 21 Rules, and, thereby, resolve the allegations set forth in the VN and ENs.

**NOW, THEREFORE**, in consideration of the mutual covenants contained herein, the Parties agree as follows:

**COMPLIANCE AND IMPLEMENTATION SCHEDULE**

**SITE RESTORATION REQUIREMENTS**

1. By July 15, 2025, Ryan Leestma and Adelaide Pointe shall submit to EGLE and the Muskegon County Conservation District plans (Restoration Plan) to restore approximately 2.2 acres of wetlands on the Property (Restoration Area) as shown on Exhibit A of this Agreement At a minimum, the Restoration Plan shall be reviewed and approved, prior to submittal, by a licensed engineer with applicable demonstrated experience in natural shoreline restoration, hired by Ryan Leestma and/or Adelaide Pointe, and shall include the following:

    a. For the Central Peninsula:

        i. All rock is to be removed from the tip of the central peninsula and the tip of the peninsula shall be graded such that the slope of the peninsula edges is a minimum of a 10Horizontal (H):1Vertical (V) or a grade that re-establishes the elevations of lake bottom that are equivalent to those in the Permit. The wetland Restoration Area must be equivalent to the 2.2 acres of wetland restoration required by this Agreement and shall include the 1.577 acres of wetlands within the Muskegon County Conservation District's ("MCCD") easement as close to the location of the original easement (as identified in Exhibit B, Figure 1 of this

Agreement)Modifications to the easement location need to be agreed upon by WRD and MCCD in writing. Ryan Leestma and/or Adelaide Pointe shall incur the costs for resurveying and recording any new easement or amended easement requirements as they result from the modification of the MCCD's easement. This Restoration Plan shall not include additional impacts to the lake bottom beyond the footprint authorized by the Permit to preserve unpermitted fill along the central peninsula. Planting plans for this area shall comply with the Permit and the approved Restoration Plan. Substituted species may be considered but will have to be approved by EGLE.

ii. Wetland shall be established on the entire tip and sides of the central peninsula per the approved Restoration Plan. Nature-based shoreline protection designs will be used to facilitate wetland establishment along the lakeward shoreline. Fieldstone may be proposed to be relocated from other locations on the Property to be incorporated into the lakeward shoreline protection design, provided that such stone is sized consistent with Hudson's equation. The design and placement of these rocks is subject to EGLE's approval in the Restoration Plan. Final grade is to be achieved after exposed contaminated soils, if any, have been capped with clean organic topsoil. This area of wetland establishment shall encompass approximately 0.31-acre in the areas shown in Exhibit B, Figure 2 of this Agreement. Planting plans for this area shall be developed in accordance with the conditions of the Permit. Substituted species may be considered but will have to be approved by EGLE.

iii. The slope along the interior of the central peninsula shall be graded to a final restored grade of not more than 10H:1V to facilitate wetland establishment on the point and along the entire interior length of the central peninsula. This final grade is to be achieved after exposed contaminated soils, if any, have been capped with clean organic topsoil. The area of wetland establishment along the interior length of the central peninsula shall encompass approximately 0.38-acre as shown in Exhibit B, Figure 3

of this Agreement. Wetland establishment shall occur on the interior of the marina in addition to the end of the point. Additional clean fill may be necessary in areas where water depth is too deep to achieve grade to allow for wetland plant establishment. The plans shall identify the areas requiring additional fill and volume of fill required to achieve the required slope.

iv. The wetland areas shall be planted with an approved native seed mix and wetland plant plugs with species and quantities in compliance with the Permit.

v. Nature-based bioengineering practices such as soil lifts with native vegetation shall be installed on the bank of the central peninsula as shown in red on Exhibit B, Figure 2 of this Agreement.

vi. Woody structures shall be integrated into the design on the eastern bank and within the emergent marsh established around the end of the point.

b. For the Western Peninsula:

i. Existing riprap shall be removed and nature-based bioengineering practices with native vegetation shall be installed on the lakeward (western) bank. Fieldstone may be proposed to be relocated from other locations on the Property to be incorporated into the lakeward shoreline protection design, provided that such stone is sized consistent with Hudson's equation. The design and placement of these rocks is subject to EGLE's approval in the Restoration Plan. Woody structures shall also be integrated into the design on the bank as shown in red on Exhibit B, Figure 4 of this Agreement. Planting plans for this area shall be developed in accordance with the conditions of the Permit. Substituted species may be considered but will have to be approved by EGLE.

ii. The slope along the interior bank of the western peninsula shall be graded to a final restored grade of not more than 10H:1V to facilitate wetland establishment.

iii. In areas where water depth is currently too deep to achieve the required grade to allow for wetland plant establishment, the Restoration Plan may propose clean organic fill in those areas to achieve wetland establishment closer to the docks, as shown in Exhibit B, Figure 5 of this Agreement.

iv. The area of wetland establishment along the interior length of the western peninsula shall encompass approximately 0.38-acre in the location identified in Exhibit B, Figure 5 of this Agreement.

c. For the Southern Shoreline of Marina Interior:

i. The slope along the southern shoreline of the marina interior shall be graded to a final restored grade not more than 10H:1V to facilitate wetland establishment. This final grade is to be achieved after exposed contaminated soils have been capped with clean organic topsoil (Exhibit B, Figure 6 of this Agreement). The area of wetland establishment along the southern shoreline of the marina interior shall encompass approximately 1.39 acres and is shown in Exhibit B, Figure 6 of this Agreement.

ii. In areas where water depth is too deep to achieve grade to allow for wetland plant establishment, the Restoration Plan may propose clean organic fill material in those areas to achieve wetland establishment closer to the docks as shown in Exhibit B, Figure 6.

iii. Lower-energy bioengineered shoreline protection shall be used at toe of new slope. This will exclude extensive placement of rocks or rip rap. The design and placement of these rocks or rip rap are subject to EGLE's approval in the Restoration Plan.

d. All engineering specifications for construction and structure modification shall be included and provided on new engineering plans showing as-built structures.

e. The Restoration Plan shall include construction and planting sequence with proposed construction and planting dates. At least one-half of wetland construction and planting (1.1 acres) shall be completed no later than

November 1, 2026. The remaining half of wetland construction and planting (1.1 acres) shall be completed no later than November 1, 2027. Construction sequences must take into consideration fish spawning seasons, winter hibernacula and prioritize construction for the least impact to species.

f. Wave impact features shall not exceed the 25-year storm or four percent annual exceedance probability.

g. Any proposed rock features shall be called out in the Restoration Plan, including their locations and labels with rock type and size to be used in that location.

h. The Restoration Plan shall include a vegetation plug planting plan, which will include the number of proposed plugs, a list of genus and species which meets the wetland performance standards in Exhibit C of this Agreement in conjunction with the wetland seed mixes, and gridded planting locations within the Restoration Area and comply with the species and quantities within the Permit. The planting plans shall be developed in accordance with the conditions of the Permit. Substituted species may be considered but will have to be approved by EGLE. Vegetation shall be comprised only of plant species that are considered native to Michigan according to the Floristic Quality Assessment for the State of Michigan.

i. The dock configurations in place within the marina as of May 18, 2024, may remain in place. Adelaide Pointe shall submit a Permit modification request to EGLE and the United States Army Corps of Engineers (USACE) detailing the site plan changes since the last Permit version was issued, reconciling all of the changes including the boat ramp, the fueling dock within the Marina, and the change from sheet pile to rip rap in Fill Area 3 along the eastern basin. EGLE granted permission for the wave attenuator to be installed per the Permit prior to issuance of a Permit modification; however, the unpermitted changes to the marina configuration remain subject to Ryan Leestma and/or Adelaide Pointe completing this Permit modification requirement. As part of the Permit modification, all dock within the east basin as described as "East Basin Work" on page 2 of the Permit shall no longer be permitted to be installed and such work shall not be conducted.

The unpermitted fueling dock within the marina may remain in place but no additional impacts are authorized without a valid permit or Permit modification.

2. Within 30 days after receipt of the Restoration Plan identified in Paragraph 1 of this Agreement, the WRD shall provide to Ryan Leestma and Adelaide Pointe written approval and/or required modifications to the proposed plans and construction schedule.

3. By July 1, 2025, Ryan Leestma and Adelaide Pointe shall submit to EGLE, an updated SESC plan to reflect the Restoration Plan detailed in Paragraph 1 of this Agreement. The updated SESC plan, which shall be reviewed by EGLE, and approved by the County Enforcing Agency (CEA), shall include at a minimum: A schedule for implementing SESC control measures; SESC control measures and locations; monitoring frequency; turbidity curtain installation and maintenance plans for during peninsula contouring; temporary stabilization matting which is snake and animal safe and does not contain plastic netting; and a contingency plan in the event of failed stabilization during the establishment of vegetation. The stabilization materials must comply with the Permit.

4. Within ten days of approval by the CEA, Ryan Leestma and Adelaide Pointe shall submit to EGLE, the approved updated SESC plan that reflects the Restoration Plan detailed in Paragraph 1 of this Agreement. If subsequent modifications to the SESC plan are approved by the CEA, Ryan Leestma and Adelaide Pointe shall submit the amended plan to EGLE within ten days of such approval.

5. Neither Ryan Leestma nor Adelaide Pointe shall initiate any restoration and/or construction activities within the designated wetland areas as identified on sheets 32 and 34 of the Permit nor in any areas below the ordinary highwater mark of Muskegon Lake until the WRD has provided final approval or approval with modification of the Restoration Plan in accordance with Paragraph 2 of this Agreement. Nothing herein prevents Ryan Leestma and Adelaide Pointe from continuing any otherwise lawful development projects

6. By June 1, 2025, Ryan Leestma and Adelaide Pointe shall submit to EGLE plans to sample material from the central peninsula identified in Exhibit A of this Agreement. Such plans shall be prepared by a qualified environmental consultant. Ryan Leestma and Adelaide Pointe shall propose a minimum of six project depth sediment core samples

within the shoreline immediately adjacent to the unpermitted dredge location, reflective of material excavated by the unpermitted dredging, and a minimum of two surficial sediment samples from within the bottom of the unpermitted dredge area, reflective of the sediment surface exposed by the unpermitted dredging. Sediment samples shall be analyzed for the required substances provided in Exhibit E of this Agreement, EGLE procedure WRD-048, Sediment Testing for Dredge Projects, as well as perfluoroalkyl substances (PFAS). PFAS samples shall be analyzed for all analytes specified by the PFAS Recommended Minimum Laboratory Analyte List for sediment, dated June 2024. Ryan Leestma and Adelaide Pointe shall not initiate sampling activities until the WRD has provided final approval or modification of the Sampling Plan.

7. Within 15 days of receipt of the sampling analysis Ryan Leestma and Adelaide Pointe shall provide the results to EGLE for review.

8. Within 15 days of the receipt of the sample analysis, EGLE shall provide comments to Ryan Leestma and Adelaide Pointe if there are water quality sampling concerns.

9. Ryan Leestma and Adelaide Pointe shall maintain a certified construction storm water operator (CSWO) to perform certified construction storm water inspections throughout the duration of the Permit with no lapse in coverage.

10. Ryan Leestma and Adelaide Pointe shall not have a lapse in permit coverage for either the NOC or SESC permit for the duration of Restoration Plan detailed in Paragraph 1 of this Agreement. Ryan Leestma and Adelaide Pointe shall maintain inspection records of the CSWO for the period of time specified within the NOC. Ryan Leestma and Adelaide Pointe shall install and maintain SESC measures required by the SESC plan as needed to provide temporary stabilization to the Property until permanent stabilization is achieved. Ryan Leestma and Adelaide Pointe will notify EGLE to inspect the Property prior to requesting termination of the NOC.

11. Ryan Leestma and Adelaide Pointe shall verbally report to EGLE instances of noncompliance with its NOC, and any subsequent permit issued to Ryan Leestma and/or Adelaide Pointe by EGLE that occur at the Property, including but not limited to, unauthorized discharges of sediment laden storm water to waters of the state, to the WRD

no later than 24 hours after the noncompliance is identified. All verbal reports of noncompliance required by this paragraph shall be made to the WRD, Grand Rapids District Office-Water Quality Unit supervisor at 616-350-3395. No later than five days after the noncompliance is identified, Ryan Leestma and Adelaide Pointe shall submit a written report to EGLE providing a description of the noncompliance event and the corrective actions taken to remedy the noncompliance. Ryan Leestma and Adelaide Pointe may request a modification of the reporting requirements of this paragraph to eliminate the 24-hour verbal reporting of noncompliance events by providing to EGLE certification of six months of compliance with this paragraph.

12. Ryan Leestma and Adelaide Point shall provide written notification to the WRD within 48 hours of commencing work in accordance with the approved Restoration Plan.

13. Ryan Leestma and Adelaide Pointe will complete the first 1.1 acres of restoration by November 1, 2026, and the second 1.1 acres of restoration by November 1, 2027, for a total of 2.2 acres of restoration by November 1, 2027. Within 15 days after completion of the restoration activities, Ryan Leestma and Adelaide Pointe shall provide to the WRD written notification of completion of the restoration activities.

**REPORTING AND MONITORING REQUIREMENTS**

14. Ryan Leestma and Adelaide Pointe shall be responsible for monitoring the Restoration Areas for a period of five years following completion of grading, planting, and restoration of hydrology in compliance with this Agreement and this Permit. An experienced consultant shall conduct the monitoring. A complete assessment of the wetland and nature-based shoreline protection development shall be made annually. Monitoring reports shall cover the period of January 1 through December 31 and be submitted to EGLE prior to January 31 of the following year. Utilizing recognized and established scientific procedures, the monitoring report shall be prepared in accordance with the requirements found in Exhibit F of this Agreement.

15. Should the Restoration Areas (wetlands, nature based shoreline protection) fail to become established as designed after three complete growing seasons, or should they fail to demonstrate satisfactory progress towards a self-sustaining system as designed in

accordance with Exhibit C (Wetland Performance Standards) and Exhibit D (Nature-Based Shoreline Protection Standards) of this Agreement, Ryan Leestma and Adelaide Pointe shall:

a. Assess the problems and identify the probable causes;

b. Develop reasonable and necessary corrective measures as a revision to the original plan that may include, but are not limited to, regrading soils to improve hydrology, reseeding, structure adjustments, and/or replanting of wetland plants;

c. Submit a copy of the proposed corrective measures to EGLE for review; and

d. Upon EGLE approval, immediately implement the corrective measures.

**APPROVAL OF SUBMITTALS**

16. For any work plan, proposal, or other document, excluding applications for permits or licenses, that are required by this Agreement to be submitted to EGLE by Ryan Leestma and Adelaide Pointe, the following process and terms of approval shall apply.

17. All work plans, proposals, and other documents required to be submitted by this Agreement shall include all of the information required by the applicable statute and/or rule, and all of the information required by the applicable paragraph(s) of this Agreement.

18. EGLE shall reasonably review and respond to submissions by Ryan Leestma and/or Adelaide Pointe, however EGLE provides no assurances that restoration actions or corrective actions will be restricted to certain timeframes of the year.

19. In the event EGLE disapproves a work plan, proposal, or other document, it will notify Ryan Leestma and Adelaide Pointe, in writing, specifying the reasons for such disapproval. Ryan Leestma and Adelaide Pointe shall submit, within 30 days of receipt of such disapproval, a revised work plan, proposal, or other document which adequately addresses the reasons for EGLE's disapproval. If the revised work plan, proposal, or other document is still not acceptable to EGLE, EGLE will notify Ryan Leestma and Adelaide Pointe of this disapproval.

20. In the event EGLE approves with specific modifications a work plan, proposal, or other document, it will notify Ryan Leestma and Adelaide Pointe, in writing, specifying the modifications required to be made to such work plan, proposal, or other document prior to its implementation and the specific reasons for such modifications. EGLE may require Ryan Leestma and Adelaide Pointe to submit, prior to implementation and within 30 days of receipt of such approval with specific modifications, a revised work plan, proposal, or other document which adequately addresses such requested modifications. If the revised work plan, proposal, or other document is still not acceptable to EGLE, EGLE will notify Ryan Leestma and Adelaide Pointe of this disapproval.

21. Upon EGLE approval, or approval with modifications, of a work plan, proposal, or other document, such work plan, proposal, or other document shall be incorporated by reference into this Agreement and shall be enforceable in accordance with the provisions of this Agreement.

22. Failure by Ryan Leestma and Adelaide Pointe to submit an approvable work plan, proposal, or other document, within the applicable time periods specified above, constitutes a violation of this Agreement and shall subject Ryan Leestma and Adelaide Pointe to the enforcement provisions of this Agreement including the stipulated penalty provisions specified in Paragraph 30 of this Agreement.

23. Any delays caused by Ryan Leestma and Adelaide Pointe's failure to submit an approvable work plan, proposal, or other document when due shall in no way affect or alter Ryan Leestma and Adelaide Pointe's responsibility to comply with any other deadline(s) specified in this Agreement.

24. No informal advice, guidance, suggestions, or verbal comments by EGLE regarding reports, work plans, plans, specifications, schedules or any other writing submitted by Ryan Leestma and Adelaide Pointe will be construed as relieving Ryan Leestma and Adelaide Pointe of its obligation to obtain written approval, if and when required by this Agreement.

25. All notices, applications, reports, and any other submittals required to be provided to the WRD pursuant to this Agreement shall be submitted by Ryan Leestma and/or Adelaide

Pointe through its MiEnviro Portal account whenever possible. All other submittals shall be addressed, unless otherwise indicated, to:

Jeff Fischer, Enforcement Specialist
EGLE – WRD Resources Enforcement Unit
Grand Rapids District Office
State Office Building, 5th Floor
350 Ottawa Avenue NE, Unit 10
Grand Rapids, Michigan 49503-2316

or by email to:

Fischerj1@Michigan.gov

**GENERAL PROVISIONS**

26. **PROPERTY ACCESS**: The WRD shall have access to the Property to inspect and determine compliance with this Agreement. The WRD shall provide a minimum of 24-hour advance notice via phone, email, or letter to Ryan Leestma and Adelaide Pointe prior to inspection of the Property.

27. **EXTENSIONS:** EGLE may grant Ryan Leestma and Adelaide Pointe a reasonable extension of the specified deadlines set forth in this Agreement. Any extension shall be preceded by a written request to the EGLE contact identified in Paragraph 25 of this Agreement, no later than ten business days prior to the pertinent deadline, and shall include:

a. Identification of the specific deadline(s) of this Agreement that will not be met.

b. A detailed description of the circumstances that will prevent Ryan Leestma and Adelaide Pointe from meeting the deadline(s).

c. A description of the measures Ryan Leestma and Adelaide Pointe has taken and/or intends to take to meet the required deadline.

d. The length of the extension requested and the specific date on which the obligation will be met.

The Resources Enforcement Unit Litigation Specialist or a designee, in consultation with the Resources Enforcement Unit supervisor, shall respond in writing to such requests. No change or modification to this Agreement shall be valid unless in writing from EGLE, and if applicable, signed by the Parties.

28. **SETTLEMENT PENALTY PAYMENT**:

a. Ryan Leestma and Adelaide Pointe agree to pay an administrative settlement amount of $500,000 to the general fund of the State of Michigan, subject to partial waivers as set forth below.

b. Notwithstanding any other provision in this Paragraph 28, Ryan Leestma and Adelaide Pointe shall pay $200,000 of the administrative settlement amount in two equal installments pursuant to the following schedule:

| Payment Number | Due Date | Amount |
|---|---|---|
| 1 | April 30, 2026 | $100,000 |
| 2 | April 30, 2027 | $100,000 |

c. If Ryan Leestma and/or Adelaide Pointe complete the required mitigation bank purchases pursuant to Section 41 of the Permit by August 30, 2026, then the administrative settlement amount specified in Paragraph 28(a) of this Agreement shall be reduced by $25,000.

d. If Ryan Leestma and/or Adelaide Pointe fail to complete the required mitigation bank purchases pursuant to Section 41 of the Permit by August 30, 2026, then Ryan Leestma and/or Adelaide Pointe shall pay $25,000 of the administrative settlement amount specified in Paragraph 28(a) of this Agreement within 30 days after receipt of the WRD's written demand.

e. If Ryan Leestma and/or Adelaide Pointe complete the first 1.1 acres of restoration activities in accordance with Paragraph 1 of this Agreement and the Restoration Plan by November 1, 2026, to EGLE's satisfaction, then the penalty shall be reduced by $100,000.

f. If Ryan Leestma and/or Adelaide Pointe fail to complete the first 1.1 acres of restoration activities in accordance with Paragraph 1 of this Agreement and the Restoration Plan by November 1, 2026, to EGLE's satisfaction, then Ryan Leestma and/or Adelaide Pointe shall pay $100,000 of the administrative settlement amount specified in Paragraph 28(a) of this Agreement within 30 days after receipt of the WRD's written demand.

g. If Ryan Leestma and/or Adelaide Pointe complete the second 1.1 acres of restoration activities, in accordance with Paragraph 1 of this Agreement and the Restoration Plan, by November 1, 2027, to EGLE's satisfaction, then the administrative settlement amount specified in Paragraph 28(a) of this Agreement shall be reduced by $75,000.

h. If Ryan Leestma and/or Adelaide Pointe fail to complete the second 1.1 acres of restoration activities, in accordance with Paragraph 1 of this Agreement and the Restoration Plan, by November 1, 2027, to EGLE's satisfaction, Ryan Leestma and/or Adelaide Pointe shall pay $75,000 of the administrative settlement amount specified in Paragraph 28(a) of this Agreement within 30 days after receipt of the WRD's written demand.

i. If Ryan Leestma and/or Adelaide Pointe complete all required five years of wetland monitoring and provide timely submission of annual monitoring reports pursuant to Paragraph 14 of this Agreement and specification Y (43–47) of the Permit conditions, to EGLE's satisfaction, by December 31 of each year, 2028, 2029, 2030, 2031, and 2032 to EGLE's satisfaction, then the administrative settlement amount specified in Paragraph 28(a) of this Agreement shall be reduced by $100,000.

j. If Ryan Leestma and/or Adelaide Pointe fail complete the required five years of wetland monitoring and provide timely submission of annual monitoring reports pursuant to Paragraph 14 of this Agreement and specification Y (43–47) of the Permit conditions, to EGLE's satisfaction, by December 31 of each year, 2028, 2029, 2030, 2031, and 2032 to EGLE's satisfaction, Ryan Leestma and/or

Adelaide Pointe shall pay $100,000 of the administrative settlement amount specified Paragraph 28(a) of this Agreement within 30 days after receipt of the WRD's written demand for the first missed submission under this requirement. Any deficiencies identified by EGLE in the wetland monitoring report shall be subject to a 15-day right to cure following written notice.

k. The administrative settlement amount set forth in Paragraph 28(a) of this Agreement is nontransferable and must be paid in full, subject to any reductions received under Paragraphs 28(c) through 28(j) of this Agreement prior to any transfer of this Agreement.

l. Payment of any administrative settlement amount required by this Agreement shall be made by certified check payable to the State of Michigan. To ensure proper credit, the payment made pursuant to this Agreement must include Payment Identification No. WRD40361. This payment shall be sent to the Michigan Department of Transportation, Accounting Services Division, Cashier's Office for EGLE, P.O. Box 30657, Lansing, Michigan 489098157, or hand delivered to the Michigan Department of Transportation, Accounting Services Division, Cashier's Office for EGLE, 425 West Ottawa Street, Lansing, Michigan 48933.

29. **STIPULATED PENALTIES**: Upon receipt of a notice of any violation governed by this provision, Ryan Leestma and/or Adelaide Pointe shall have a 15 day right to cure the violation before stipulated penalties shall begin to accrue. For each failure to comply with a specific deadline contained in this Agreement, Ryan Leestma and Adelaide Pointe shall pay a stipulated penalty of $5,000. For each failure to comply with the provisions of Paragraphs 1 through 25 and 33 of this Agreement Ryan Leestma and Adelaide Pointe shall pay stipulated penalties of $500 per day.

30. **STIPULATED PENALTY PAYMENT**: To ensure timely payments of any stipulated penalties provided in Paragraph 28 of this Agreement, Ryan Leestma and Adelaide Pointe shall pay an interest penalty to the State of Michigan for failure to make a timely payment. This interest penalty shall be based upon a rate of 12 percent per year compounded annually, using the full increment of amount due as principal, and calculated from the due

date for the payment until the delinquent payment is finally paid in full. All payments associated with this paragraph shall be paid in the form of a cashier's check payable to the State of Michigan and sent to the Michigan Department of Transportation, Accounting Services Division, Cashier's Office for EGLE, P.O. Box 30657, Lansing, Michigan 48909-8157, or hand delivered to the Michigan Department of Transportation, Accounting Services Division, Cashier's Office for EGLE, 425 West Ottawa Street, Lansing, Michigan 48933.

31. **PENALTY PAYMENT DISPUTE**: Ryan Leestma and Adelaide Pointe agree not to contest the legal basis for the administrative settlement amount assessed pursuant to Paragraph 28 of this Agreement. Ryan Leestma and Adelaide Pointe also agree not to contest the legal basis for any stipulated penalties assessed pursuant to Paragraph 28 of this Agreement but reserve the right to dispute in a court of competent jurisdiction the factual basis upon which a demand by the WRD of stipulated penalties is made.

32. **RESOLUTION OF WRD VN AND ENs**: As part of the successful completion of the terms of this Agreement, the WRD shall deem resolved the violations alleged in the September 9, 2023, March 19, 2024, June 17, 2024, and October 30, 2024, VN and ENs.

33. **OTHER PERMIT REQUIREMENTS**: With respect to the Property, Ryan Leestma and Adelaide Pointe shall not conduct any activity within wetlands or Muskegon Lake except as provided by this Agreement, or as authorized by separate permit issued by the WRD. This Agreement does not obviate the need to acquire additional state, local, or federal permits as may be required by law. This Agreement also does not obviate the need to comply with the conditions of the Permit except as directly specified within this Agreement.

34. **FORCE MAJEURE**: Ryan Leestma and Adelaide Pointe shall perform the requirements of this Agreement within the time limits established herein, unless performance is prevented or delayed by events that constitute a "force majeure" event. For the purpose of this Agreement, force majeure means an occurrence or nonoccurrence arising from causes not foreseeable, beyond the control of, and without the fault of, Ryan Leestma and Adelaide Pointe, such as an Act of God, untimely review of permit applications or submissions by the WRD, USACE, or other applicable authority, and acts or omissions of

third parties that could not have been avoided or overcome by Ryan Leestma and Adelaide Pointe's due diligence, and that delay the performance of an obligation under this Agreement. Force majeure does not include, among other things, unanticipated or increased costs, failure to secure funding, change in financial circumstances, or failure to obtain a permit or license as a result of Ryan Leestma and Adelaide Pointe's actions or omissions.

35. **FORCE MAJEURE NOTICE**: Ryan Leestma and Adelaide Pointe shall notify the WRD by telephone within 48 hours after discovering any event that causes delay in their compliance with any provision of this Agreement. Verbal notice shall be followed by written notice within ten calendar days and shall describe in detail the anticipated length of delay, the precise cause of the delay, the measures taken by Ryan Leestma and Adelaide Pointe to prevent or minimize the delay, and the timetable by which those measures shall be implemented. Failure of Ryan Leestma and Adelaide Pointe to comply with the notice requirements above shall render the force majeure exemption void and of no effect as to the particular incident involved.

36. **ASSIGNMENT OF RIGHTS**: This Agreement shall be binding on the Parties, their officers, servants, and employees. In the event that Ryan Leestma and Adelaide Pointe sell or transfer any interest in the Property, Ryan Leestma and Adelaide Pointe shall retain the obligation to perform any uncompleted work required by this Agreement and shall retain a sufficient interest in the Property necessary for Ryan Leestma and Adelaide Pointe to complete the work required by this Agreement. The requirements under this Agreement shall not be assigned or transferred without the written approval of EGLE. This approval will not be granted without a commensurate transfer of the Permit. Ryan Leestma and Adelaide Pointe may request that EGLE approve the assignment and transfer of the requirements of this Agreement and request that EGLE release Ryan Leestma and/or Adelaide Pointe from the requirements of this Agreement. It is within the sole discretion of EGLE to approve or deny the release of Ryan Leestma and/or Adelaide Pointe from the requirements of this Agreement. Prior to any release, EGLE may require Ryan Leestma and/or Adelaide Pointe comply with any specific requirement of this Agreement subject to the timelines specified herein and may require the Transferee or Assignee to enter into this Agreement as a Party. The settlement penalty payment under Paragraph 28 of this

Agreement is nontransferable and will be required to be paid in full, subject to the completion terms, prior to transfer of this Agreement.

37. **AGREEMENT AMENDMENTS**: This Agreement may be amended or revoked at any time by an Agreement Amendment executed by all Parties to this Agreement. No change or modification to the Agreement shall be valid unless in writing and signed by all Parties to this Agreement.

38. **DISPUTE RESOLUTION**: The Parties to this Agreement agree to diligently and in good faith pursue informal negotiations to resolve any disputes arising out of this Agreement prior to resorting to judicial enforcement. Such negotiations shall proceed in a timely manner.

39. **DENIAL OF LIABILITY**: Nothing contained in this Agreement shall be construed as an admission of liability or wrongdoing by Ryan Leestma or by Adelaide Pointe. The WRD, Ryan Leestma, and Adelaide Pointe agree that the signing of this Agreement is for settlement purposes only. While not admitting liability, by entering into this Agreement, Ryan Leestma and Adelaide Pointe waive their rights to challenge or contest EGLE's determination as to the extent of lake and wetland impacts and the extent of required wetland restoration.

40. **AGREEMENT PROVISIONS**: The invalidity or unenforceability of any particular portion of this Agreement shall not affect the other provisions hereof, and this Agreement shall be construed in all respects as if invalid or unenforceable provisions were omitted.

41. **GOVERNING LAW**: This Agreement shall be executed and delivered in the State of Michigan and shall be governed by and construed and enforced in accordance with the laws of the State of Michigan.

42. **TERMINATION OF AGREEMENT**: This Agreement shall remain in full force for a period of at least five complete growing seasons following completion of the restoration activities as described in the Restoration Plans as approved or modified by the WRD pursuant to Paragraphs 1 through 13 of this Agreement. This Agreement may remain in full force for an unspecified time period contingent upon successful completion of all requirements of

this Agreement. This Agreement shall terminate only upon written notice of termination issued by the director of the WRD. Prior to issuance of a written notice of termination, Ryan Leestma and Adelaide Pointe shall submit a request to the address in Paragraph 24 of this Agreement consisting of a written certification that Ryan Leestma and Adelaide Pointe have fully complied with all requirements of this Agreement and has made all payments, including stipulated penalties, required by this Agreement.

43. **ENTIRE AGREEMENT**: This Agreement constitutes the entire Agreement among the Parties hereto and contains all of the Agreements among said Parties with respect to the subject matter hereof.

**SIGNATORIES**

The undersigned CERTIFY that they are fully authorized by the party they represent, to enter into this Agreement and to LEGALLY BIND that party to this Agreement.

**DEPARTMENT OF ENVIRONMENT, GREAT LAKES, AND ENERGY**

E-SIGNED by Jerrod Sanders
on 2025-04-30 08:58:44 EDT

Jerrod Sanders, Director
Water Resources Division

2025-04-30 08:58:44

Date

**RYAN LEESTMA**

E-SIGNED by Ryan Leestma
on 2025-04-24 10:51:57 EDT

By: Ryan Leestma

2025-04-24 10:51:57

Date

**ADELAIDE POINTE QOZB LLC**

E-SIGNED by Ryan Leestma
on 2025-04-24 10:51:59 EDT

By: Ryan Leestma

2025-04-24 10:51:57

Date

**APPROVED AS TO FORM:**

E-SIGNED by Laura LaMore
on 2025-04-24 11:30:49 EDT

By: Laura R. LaMore, Assistant Attorney General
Environment, Natural Resources, and Agriculture Division
Michigan Department of Attorney General

2025-04-24 11:30:49

Date

**EXHIBIT A**

**SITE PLAN OVERVIEW**


Exhibit A
Area F
Area D
Area E
Area C
Boat Ramp
Break wall Area
Area B
Sat May 18 2024
Vertical
Area F
Central Peninsula
Area E
Area D
Area C
Boat Ramp
Break Wall Area
Area B
Fri Apr 14 2023
nearmap
Imagery © 2024 Nearmap, HERE

**EXHIBIT B**

**WETLAND RESTORATION PLAN LOCATION REFERENCE IMAGES**




Exhibit B - Figure 1




Exhibit B - Figure 2

Exhibit B-Figure 3






Exhibit B - Figure 4




Exhibit B - Figure 5




Exhibit B - Figure 6

# EXHIBIT C

## WETLAND PERFORMANCE STANDARDS

The following performance standards will be used to evaluate the Restoration Area:

a. Construction has been completed in accordance with the approved Restoration Plan, the Permit, and specifications of this Agreement. The wetland shall demonstrate the functions and values which were approved within the Restoration Plan.

b. The wetland is characterized by the presence of water at a frequency and duration sufficient to support a predominance of wetland vegetation. At least one primary indicator of hydrology as defined by the USACE 1987 Wetland Delineation Manual and Regional Supplements will be present across the Restoration Area by the end of the monitoring period.

c. The Restoration Area meets the grade which was approved in the Restoration Plan and planting substrate is present using clean material with similar organic content as what was dredged.

d. The Restoration Area shall be free of oil, grease, debris, plastic netting, construction materials, trash, and all other contaminants.

e. The mean percent cover of native wetland species in the herbaceous layer by the end of the first year of the monitoring period and shall not be less than 60 percent.

f. The total percent cover of wetland species in each plot shall be averaged for plots taken in the same wetland type to obtain a mean percent cover value for each wetland type. For the purposes of this standard, total percent cover is the percent cover of the ground surface covered by vegetation, bare soil, and open water, when viewed from above. Total percent cover cannot exceed 100 percent. Plots within identified extensive open water and submergent areas, bare soil areas, and areas without a predominance of wetland vegetation shall not be included in this average. Wetland species refers to species listed as facultative and wetter (FAC, FACW, and OBL) on the USACE's National Wetland Plant List for Michigan.

g. The wetland supports a predominance of wetland vegetation (as defined in the USACE's Wetland Delineation Manual and Regional Supplements) in each vegetative layer, represented by a minimum number of native wetland species, at the end of the monitoring period. The minimum number of native wetland species per wetland type shall not be less than 15 species within the emergent wetland. The total number of native wetland plant species shall be determined by a sum of all species identified in sample plots of the same wetland type.

h. The mean percent cover of invasive species including, but not limited to, *Phragmites australis* (Common Reed), *Lythrum salicaria* (Purple Loosestrife), *Phalaris arundinacea* (Reed Canary Grass), *Typha angustifolia* (Narrow-Leaved Cat-tail), *Typha Glauca* (Hybrid Cat-tail), *Rhamnus frangula* (Glossy Buckthorn), and *Alliara petiolata* (Garlic Mustard) shall in combination be limited to no more than ten percent within each wetland type. Invasive species shall not dominate the vegetation in any extensive area of the Restoration Area.

   If the mean percent cover of invasive species is more than ten percent within any wetland type or if there are extensive areas of the Restoration Area in which an invasive species is one of the dominant plant species, Ryan Leestma and Adelaide Pointe QOZB LLC shall submit an evaluation of the problem to the WRD. If Ryan Leestma and Adelaide Pointe QOZB LLC is unable to reduce the cover of invasive species to meet the above performance standard, Ryan Leestma and Adelaide Pointe QOZB LLC must submit an assessment of the problem, a control plan, and the projected percent cover that can be achieved for review by the WRD. Based on this information, the WRD may approve an alternative invasive species standard. Any alternative invasive species standard must be approved in writing by the WRD.

If the Restoration Area does not satisfactorily meet these standards by the end of the monitoring period, or is not satisfactorily progressing during the monitoring period, Ryan Leestma and Adelaide Pointe QOZB LLC will be required to take corrective actions, which may or may not occur during the growing season to accommodate fish spawning or other applicable species requirements.

## EXHIBIT D

## NATURE-BASED SHORELINE PROTECTION PERFORMANCE STANDARDS

The following performance standards will be used to evaluate the nature-based shorelines:

1. Revetment structure

    a. Site shall be graded and minimum of a six-inch topsoil cap added to create a final grade of 10:1.

    b. Filter fabric shall not be used. A mix of pea gravel and drain stone should serve as the base filter layer underneath the revetment and allow for the free growth and proliferation of plants.

    c. Keystones (or toe stones) used shall be fieldstone not exceeding 24-inch in diameter and should be buried so that a third to half are set within the lake bottom. Keystones shall be placed in a manner that creates a slope that establishes the base of the revetment.

    d. Rounded fieldstone shall be used to create the living revetment. Rounded fieldstone used in the revetment shall range in size from 5 inches to 17 inches. Twenty-five percent of the fieldstone should be five to six inches, 50 percent of the fieldstone should be 10 to 11 inches, and the remaining 25 percent of the fieldstone should be 16 to 17 inches. Sizing was determined using Hudson's Equation with a three-foot design wave height with a 10:1 slope.

    e. The revetment can be top-dressed with the pea gravel/drain stone mix.

2. For fieldstone used in soil lift designs and in other areas, sizing should be determined using Hudson's Equation with appropriate design wave height, slope and constants.

3. Vegetation, in the form of seed, plantings, or other potentially viable material such as live stakes shall be used along the length of the installation. Vegetation shall be comprised only of plant species that are considered native to Michigan according to the Floristic Quality Assessment for the State of Michigan. Live stakes shall be used throughout the

entire revetment and placed approximately three feet apart. The planting of plugs directly above the entire length of the revetment shall occur and be planted 12 inches on center.

a. The mean percent cover of plant species above the revetment at the end of the monitoring period shall be 80 percent.

b. The mean percent cover of shrubs throughout the living revetment shall be 50 percent.

4. Coir logs, erosion control blankets, and encapsulated soil lift materials must be constructed of and anchored with materials that are 100 percent biodegradable, be securely affixed to bottomland, and not impair navigation.

5. Woody structure.

a. A minimum of 15 woody structure clusters shall be placed. Three to five trees shall be used in each cluster.

b. All shoreline woody structure clusters shall consist of whole hardwood trees. Trees must be freshly cut within three months of installation.

c. Acceptable whole trees shall have all of their fine structure left intact (i.e., not trimmed down to major branches for installation), be a minimum of 20 feet long, and a minimum of 12 inches in diameter.

d. All trees shall be attached securely together and attached securely to the shoreline/bottomland. Keying-in trees to the shoreline is also acceptable.

e. Trees shall not impede navigation, riparian rights, or infringe on the use of the water by the public

EGLE will determine if the performance standards have been met. If the nature-based shoreline installations do not satisfactorily meet these standards by the end of the monitoring period, or are not satisfactorily progressing during the monitoring period, Ryan Leestma and/or Adelaide Pointe QOZB LLC will be required to take corrective actions.

# EXHIBIT E

## EGLE PROCEDURE WRD-048: SEDIMENT TESTING FOR DREDGING PROJECTS

| DEQ | WATER RESOURCES DIVISION POLICY AND PROCEDURE | | DEPARTMENT OF ENVIRONMENTAL QUALITY |
|---|---|---|---|
| Original Effective Date: April 13, 2018<br><br>Revised Date:<br><br>Reformatted Date: | Subject: Sediment Testing for Dredging Projects<br><br>Program Name: Water Resources Program | | Category:<br>☐ Internal/Administrative<br>☐ External/Non-Interpretive<br>☒ External/Interpretive |
| | Number: WRD-048 | Page: 1 of 9 | Type:<br>☐ Policy<br>☐ Procedure<br>☒ Policy and Procedure |

*A Department of Environmental Quality (DEQ) Policy and Procedure cannot establish regulatory requirements for parties outside of the DEQ. This document provides direction to DEQ staff regarding the implementation of rules and laws administered by the DEQ. It is merely explanatory; does not affect the rights of or procedures and practices available to the public, and does not have the force and effect of law. DEQ staff shall follow the directions contained in this document.*

**ISSUE:**

Identify when sediment testing is required and how results will be used when processing applications for permits under authority of Part 301, Inland Lakes and Streams; Part 303, Wetlands Protection; and Part 325, Great Lakes Submerged Lands, of the Natural Resources and Environmental Protection Act, 1994 PA 451, as amended (NREPA). Sediment testing results are used as one avenue to determine whether a proposed project will result in an unacceptable negative impact on aquatic resources, related either to the mobilization of contaminants to a new location or by exposing wildlife (including fish and other aquatic life) to contaminants previously buried. The specific permit decision criteria are stated differently in each part of the NREPA but each part requires an assessment of the project's impact on the aquatic resource and related organisms. In addition, state permits under these parts may also provide authorization under Section 404 of the federal Clean Water Act, which requires that the project must not violate water quality standards. Michigan's water quality standards require the protection of designated uses including, but not limited to, aquatic life, wildlife, and public health.

This policy applies to projects that can mobilize or expose contaminated sediments including, but not limited to, sediment removals using dredges, draglines, excavators, etc., and other projects that may not directly remove sediment from the aquatic system but may result in sediment being mobilized to other areas of the aquatic system.

**AUTHORITY:**

Part 31, Water Resources Protection, of the NREPA
Part 301, Inland Lakes and Streams, of the NREPA
Part 303, Wetlands Protection, of the NREPA
Part 325, Great Lakes Submerged Lands, of the NREPA

**STAKEHOLDER INVOLVEMENT:**

This policy was placed on public notice for 30 days beginning June 26, 2017. Notification was made in the DEQ Calendar; on the DEQ dredging Web site; and to specific stakeholder groups known to have an interest in this policy, including Michigan Manufacturers Association, dredging

contractors, resource consultants, environmental groups, Michigan Townships Association, Michigan Association of Counties, Michigan Association of County Drain Commissioners, Department of Natural Resources (Fisheries, Wildlife, and Parks and Recreation Divisions), and Michigan Boating Industries Association. Comments received were used to finalize this document.

**DEFINITIONS:**

Area of known or suspected contamination: An area identified in MiWaters or other databases as containing contaminated or polluted sediment, or a facility, as defined in Part 201 (may show up as Act 307 in MiWaters), Environmental Remediation, of the NREPA, or a National Priorities List Superfund site, or any site that has known or suspected contamination as determined by DEQ staff or the applicant. This may include project sites within Great Lakes Areas of Concern, where designated uses are currently impaired by a pollutant, in areas where a historical dredge area is being expanded vertically and/or horizontally into areas of suspected contamination, new sites in areas of historically known or suspected contamination, sites in proximity and downstream of chemical storage/handling facilities, agricultural or industrial operations, or other sites where contaminants are suspected to be present in the water body's sediments within the project dredge area due to past or current land use practice, at DEQ staff's discretion. In addition, project areas greater than 2,000 cubic yards are assumed to be in sites of suspected contamination because large projects pose a greater risk of negative aquatic impacts should undetected contaminants be present.

Dioxins and Furans Test Area: The Tittabawassee River downstream of the city of Midland, the Saginaw River downstream of the Tittabawassee River, and the portion of Saginaw Bay that lies between the mouth of the Saginaw River and a line drawn between the tip of Fish Point (Tuscola County) and the tip of the unnamed point east of the lakeward end of East Pinconning Road (Bay County) (Figure 1).

MiWaters: The permit tracking and information system used by the Water Resources Division (WRD) staff to electronically record permit file information, such as locations, that are cross-referenced against spatial information stored in multiple databases.

**PROCEDURE:**

1. Projects involving dredging may require sediment testing, and permit applications submitted for these projects under Parts 301, 303, and 325 will not be considered administratively complete until the WRD determines that either:

   a. Testing is not required.

   b. The required testing results have been received.

2. WRD district staff reviews the proposed dredging project to determine if sediment testing is required. Sediment testing is required for dredging proposed in areas of known or suspected contamination and in the Dioxins and Furans Test Area.

3. Sediment testing may be waived if one of the following conditions is met:

   a. The applicant provides approved previous test data from the site, or from a site immediately adjacent to (i.e., within 100 feet) and representative of the proposed dredge area, including project depth. The test data must include results for all default parameters identified in step 5.b., below; polychlorinated biphenyl (PCB) if the project site is in a water body identified in step 5.b., below, as requiring PCB testing; and for dioxins and furans if the proposed dredging site is in the Dioxins and Furans Test Area. The test data must have been collected and analyzed within the last ten years.

   b. The total dredge volume is 2,000 cubic yards or less and the applicant has agreed to permit conditions in an applicable general permit or minor project category that isolate the area to be dredged and prevent downstream movement of sediment, or the project area is not within an area of known or suspected contamination or in the Dioxins and Furans Test Area.

   c. The total dredge volume is greater than 2,000 cubic yards but due to the specific details of the project site and implementation methods, WRD district staff determines that there is minimal risk of impacts to the aquatic resources at or downstream of the project site should contaminants be present. Note that this waiver is expected to occur only rarely. An example of when this waiver may be appropriate is dredging of a small regulated pond that is entirely on one property and has no outlet or has an outlet and the applicant proposes to use silt screens or other technology to prevent downstream movement of sediment.

4. If testing is not required (and the permit application meets all other administrative completeness criteria), WRD district staff marks the application file in MiWaters as administratively complete and continues processing the application file outside of this policy and procedure. If testing is required and results have not been provided by the applicant, the file remains incomplete and WRD district staff continues processing per this policy and procedure, continuing to step 5.

5. WRD district staff sends a Sediment Testing for Dredging Projects letter to the applicant, which contains the following guidance:

   a. Applicant may opt to conduct sieve grain analysis test for sand content, or move to step 5.b., below, if the sediment is believed to be less than 90 percent sand. For all sieve grain analysis testing for dredging projects of less than 10,000 cubic yards, the applicant shall collect sample sediment cores to project depth from 6 discrete locations within the proposed dredge area. If more than 10,000 cubic yards of dredging is

proposed, at least 1 additional sample shall be obtained and analyzed for each 10,000 cubic yards of additional material proposed for dredging. Typically, each core sample will be composited and a subset will be analyzed using United States Standard Sieve Number 200 (Number 200 Sieve). WRD district staff may mandate specific sampling criteria, locations, and/or depth intervals based on their site-specific knowledge. Applicant reports the results for each of the six (or more) discrete sample locations as a mass percentage of retained sediments. If the average mass percentage retained on the Number 200 Sieve is 90 percent sand or greater, no additional sediment testing is required unless the project is located in the Dioxins and Furans Test Area; in which case, dioxins and furans must also be analyzed. The sieve grain analysis test is a pass/fail test. If the average mass percentage of sand is less than 90 percent, then the material must be analyzed according to step 5.b., below, for at least 6 discrete sampling locations.

b. If the result of the mass percentage retained on the Number 200 Sieve is less than 90 percent sand, on average, or the applicant opted not to conduct sieve grain analysis, contaminant testing is required. For all analytical testing of dredging projects of less than 10,000 cubic yards, applicant shall sample sediments from 6 discrete locations within the proposed dredge area. If more than 10,000 cubic yards of dredging is proposed, at least 1 additional sample shall be obtained and analyzed for each 10,000 cubic yards of additional material proposed for dredging. Typically, each sample will consist of a subset of a composited core taken to full project depth. WRD district staff may mandate specific sampling criteria, locations, and/or depth intervals based on their site-specific knowledge.

The default analytical parameters include nine heavy metals (arsenic, cadmium, chromium, copper, lead, mercury, nickel, selenium, and zinc), polycyclic aromatic hydrocarbons (PAH) listed in Table 1, and biochemical oxygen demand (BOD). Additionally, phosphorus will be required if the proposed dredge spoil disposal location is in a surface water of the state as defined in the Part 4 Rules, Water Quality Standards, promulgated under Part 31, Water Resources Protection, of the NREPA. Default analytical parameters also include PCBs if the project is on one of the following bodies of water: Detroit River, Rouge River, Raisin River, Kalamazoo River, Saginaw River, Saginaw Bay, or Manistique Harbor; or canals that connect to any of the listed bodies of water or canals in the St. Clair Shores area between 11 Mile and 10 Mile Roads.

Additions or deletions to the default testing parameters can be made on a project-specific basis if district staff or the applicant has additional information related to the project. WRD district staff shall coordinate with other WRD and DEQ staff as needed to determine appropriate testing criteria if WRD district staff believes it should be different than the default parameters.

For projects in the Dioxins and Furans Test Area, dioxins and furans must also be analyzed.

c. Sediment testing must be conducted according to a United States Environmental Protection Agency-approved laboratory method and reported results must specify the reporting limits.

6. The applicant forwards the sediment analysis results to WRD district staff for review.

7. If the test data is for grain size analysis as detailed in step 5.a., above, WRD district staff performs an arithmetic mean on the grain size results of all samples to determine if the project dredge materials consist of 90 percent sand or greater by grain size.

8. If the sediment to be dredged is 90 percent sand or greater and the project is not located in a Dioxin and Furans Test Area, sediment contaminant testing is not required. Placement of dredged materials is subject to review under Parts 31, 301, 303, and 325 of the NREPA as part of a Joint Permit Application review conducted by WRD district staff.

9. If the sediment to be dredged is less than 90 percent sand or dioxins and furans testing is required, WRD district staff reviews sediment test results:

   a. If any sample test result exceeds any screening guidelines in Table 2, results shall be sent to the Lakes Erie, Huron, and Superior Unit (LEHSU) supervisor, Surface Water Assessment Section, WRD, for review pursuant to Part 31. If sediment results show PCB and/or mercury concentrations greater than 1 part per million or metals, PAH, or dioxin/furan concentrations greater than the screening guidelines in Table 2, additional sediment testing may be required to evaluate the newly exposed sediment quality or potential downstream impacts. Any additional sediment testing data will be used to evaluate potential impacts to surface water designated uses, as defined in the Part 4 Rules. The LEHSU staff will advise WRD district staff, generally within two weeks, as to the next steps based on the test results.

   b. If any BOD sample result is 250 milligrams per liter or greater, results shall be sent to the Groundwater Permits Unit (GPU) supervisor, Permits Section, WRD. The GPU supervisor will instruct WRD district staff as to the next steps based on the test results.

10. WRD staff considers the proposed placement of dredged material subject to Parts 31, 301, 303, and 325 of the NREPA, if applicable.

11. If the proposed dredge project is permittable, WRD district staff drafts the permit, including any conditions related to protection of designated uses and the disposal of dredged material, forwards the permit and information related to dredged material disposal requirements under Part 115, Solid Waste Management, of the NREPA, to the applicant, and updates MiWaters.

**ATTACHMENTS:**

Table 1. Required PAH Testing
Table 2. Aquatic Life and Wildlife Screening Guidelines
Figure 1. Dioxins and Furans Test Area

DIVISION DIRECTOR APPROVAL:

Teresa Seidel, Director
Water Resources Division

DEPUTY DIRECTOR APPROVAL:

Michael McClellan, Environment Deputy Director

Table 1. Required PAH Testing

| |
|---|
| Acenaphthene |
| Acenaphthylene |
| Anthracene |
| Benzo(a)anthracene |
| Benzo(b)fluoranthene |
| Benzo(k)fluoranthene |
| Benzo(g,h,i)perylene |
| Benzo(a)pyrene |
| Chrysene |
| Dibenzo(a,h)anthracene |
| Fluoranthene |
| Fluorene |
| Indeno(1,2,3-cd)pyrene |
| 2-Methylnaphthalene |
| Naphthalene |
| Phenanthrene |
| Pyrene |

Table 2. Aquatic Life and Wildlife Screening Guidelines

| CHEMICAL | CONCENTRATION |
|---|---|
| Metals (mg/kg) | |
| Arsenic* | 33.00 |
| Cadmium* | 4.98 |
| Chromium | 111.00 |
| Copper* | 149.00 |
| Lead* | 128.00 |
| Mercury* | 1.06 |
| Nickel* | 48.60 |
| Selenium** | 1.90 |
| Zinc* | 459.00 |
| | |
| PAH (ug/kg) | |
| Anthracene* | 845 |
| Benz(a)anthracene* | 1,050 |
| Benzo(a)pyrene* | 1,450 |
| Chrysene* | 1,290 |
| Fluorene* | 536 |
| Fluranthene* | 2,230 |
| Naphthalene* | 561 |
| Phenanthrene* | 1,170 |
| Pyrene* | 1,520 |
| Total PAH* | 22,800 |
| | |
| Total PCB (mg/kg) | 0.676 |
| | |
| Dioxin/furans as 2,3,7,8 TCDD TEQ (ug/kg)*** | 0.00012 |

References:

*Probable Effect Concentrations (PEC) from MacDonald et al., 2000. Development and Evaluation of Consensus-Based Sediment Quality Guidelines for Freshwater Ecosystems. Arch. Environ. Contam. Toxicol. 39. 20-31.

**Thompson, P.A., J. Kurias, and S. Mihok. 2005. Derivation and Use of Sediment Quality Guidelines for Ecological Risk Assessment of Metals and Radionuclides Released to the Environment from Uranium Mining and Milling Activities in Canada. Environmental Monitoring and Assessment 110:71-85.

***United States Environmental Protection Agency, Region 5, RCRA Ecological Screening Levels. August 22, 2003. Toxic Equivalency should be calculated using the 2005 World Health Organization Toxic Equivalency Factor in Table 1 of Van den Berg et al., Toxicological Sciences 93(2), 223-241 (2006). The 2005 World Health Organization Reevaluation of Human and Mammalian Toxic Equivalency Factors for Dioxin and Dioxin-Like Compounds.

| WATER RESOURCES DIVISION<br>POLICY AND PROCEDURE | |
|---|---|
| Subject: Sediment Testing for Dredging Projects | Number: WRD-048 |
| | Page 9 of 9 |




Figure 1. Dioxins and Furans Test Area

## EXHIBIT F

## WETLAND AND SHORELINE RESTORATION REPORT REQUIREMENTS

Ryan Leestma and Adelaide Pointe QOZB LLC shall monitor the Restoration Area for a minimum of five years. A monitoring report that compiles and summarizes all data collected during the monitoring period shall be submitted annually by Ryan Leestma and Adelaide Pointe QOZB LLC. Monitoring reports shall cover the period of January 1 through December 31 and be submitted to EGLE prior to January 31 of the following year. Ryan Leestma and Adelaide Pointe QOZB LLC shall conduct the following activities and provide the information collected in the monitoring reports.

a. Photograph vegetation in plots located along transects shown in Exhibit A once between July 15 and August 31. Photo locations shall be located on the sample transect at evenly spaced intervals or by another approach approved by the WRD. The minimum number of photo points for each transect shall be no fewer than three. Each point location shall show a photo directed north, east, south, and west taken from the photo point location on the monitoring transect. If additional or alternative sample locations are needed to sufficiently evaluate the wetland restoration area, they must be approved in advance in writing by the WRD.

   The herbaceous layer (all nonwoody plants and woody plants less than 3.2 feet in height) shall be sampled as a 3.28-foot by 3.28-foot (1 square meter) sample plot. The data recorded for each herbaceous layer sample plot shall include a list of all living plant species; and an estimate of percent cover in five percent intervals for each species recorded, bare soil areas, and open water relative to the total area of the plot.

   Provide plot data and a list of all plant species identified in the plots and otherwise observed during monitoring. Data for each plant species must include common name, scientific name, wetland indicator status from the most recent USACE National Wetland Plant List for Michigan, physiognomic classification, and whether the species is considered native according to the Michigan Floristic Quality Assessment (Michigan Department of Natural Resources, 2001). Nomenclature shall follow Michigan Flora, https://michiganflora.net/.

The location of sample transects and plots shall be identified in the monitoring report on a plan view showing the location of wetland types. Sample transects shall be permanently staked at a frequency sufficient to locate the transect in the field.

b. Document any sightings or evidence of wading birds, songbirds, waterfowl, amphibians, reptiles, and other animal use (lodges, nests, tracks, scat, etc.) within the wetland noted during monitoring. Note the number, type, date, and hour of the sightings and evidence.

c. Inspect the site during all monitoring visits and inspections for oil, grease, manmade debris, and all other contaminants and report the findings. Rate (e.g., poor, fair, good, or excellent) and describe the water clarity in the mitigation wetland.

d. Inspect the site during all monitoring visits and inspections for the integrity of erosion control materials (coir logs, erosion control blankets, soil lift materials, fieldstone, etc.) and woody structure. Document the locations and status (e.g. intact/pinned down, torn up, not growing vegetation, eroding) of the bioengineering materials along all areas of the shoreline. Document observed reasons for failures and any approved corrective actions implemented to address the root cause. Provide photographs to document. In areas where fieldstone is installed ensure there are minimal gaps between rocks, restack when necessary (such as in the spring after ice-off) and document actions with photographs. The top surface of the revetment should be even and rocks should be “knit” together. In areas where woody structures are installed ensure they are attached securely to the shoreline/bottomland.

e. Provide annual photographic documentation of the development of the restoration wetland during vegetation sampling from permanent photo stations located within the restoration wetland. At a minimum, photo stations shall be located at both ends of each transect. Photos must be labeled with the location, date photographed, and direction.

f. Provide a written summary of data from previous monitoring periods and a discussion of changes or trends based on all monitoring results. This summary shall include a calculation of the acres of the wetland type established, a plan view drawing depicting

each ecological type, and identification of all performance standards and whether each standard has been met.

g. Provide a written summary of all the problem areas that have been identified and potential corrective measures to address them.

A qualified individual able to identify vegetation to genus and species must conduct the wetland monitoring. Assessment of the erosion control material integrity shall be conducted by a licensed engineer with applicable demonstrated experience in natural shoreline restoration. The WRD reserves the right to reject reports with substandard monitoring data.

The WRD will determine if the performance standards have been met. If the performance standards have not been met, the WRD may require subsequent annual monitoring until final approval.