**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

In re:

| | |
|---|---|
| LEESTMA MANAGEMENT, LLC | Case No.: 8:26-bk-02696-CED [Lead Case] |
| ADELAIDE POINTE QOZB, LLC | Case No.: 8:26-bk-02698-CED |
| ADELAIDE POINTE BOATERS SERVICES, LLC | Case No.: 8:26-bk-02699-CED |
| ADELAIDE POINTE BUILDING 1, LLC | Case No.: 8:26-bk-02700-CED |
| WATERLAND BATTLE CREEK, LLC | Case No.: 8:26-bk-02701-CED |

Debtors. *Jointly Administered*
__________________________________/

## INDEPENDENT BANK'S MOTION TO DISMISS CHAPTER 11 CASES

Independent Bank, a Michigan banking corporation ("**Independent Bank**"), the primary secured creditor in each of the Chapter 11 cases filed by the Debtors, Adelaide Pointe Building 1, LLC ("**Building 1**"), Adelaide Pointe QOZB, LLC ("**QOZB**"), Leestma Management, LLC ("**LMC**"), Adelaide Pointe Boater Services, LLC ("**Boaters Services**"), and Waterland Battle Creek, LLC ("**Battle Creek**"), files this motion to dismiss these cases under 11 U.S.C. §1112(b)(4)(A) and Federal Rules of Bankruptcy Procedure 1017(f) and 9014, for cause, namely the substantial or continuing loss to or diminution of the estates and the absence of a reasonable likelihood of rehabilitations (the "**Motion**"). In support, Independent Bank states:

## PRELIMINARY STATEMENT

These cases should be dismissed because the Debtors are losing value every month and have no realistic path to reorganize. Since the petition date of April 1, 2026 (the "**Petition Date**"), the Debtors have (a) reported net operating losses and are dependent on protective

advances by Independent Bank and other secured creditors to continue operations, (b) incurred unpaid post-petition administrative expenses, (c) failed to generate sufficient revenue to cover their post-petition obligations, and (d) failed to file income tax returns. Meanwhile, the Debtors have not proposed a plan, have not identified a source of new capital, have no committed financing, have no credible business model that would allow them to fund a plan without priming the existing secured liens, and have no ability to provide adequate protection of those existing secured liens, if primed. Continued administration serves only to accrue administrative expenses and erode the recoveries of the creditors the Chapter 11 process is meant to protect.

The cases were commenced by Debtors' principal for the purpose of regaining control of the Debtors by replacing a state court appointed Receiver, who was acting solely to maximize value in the best interest of the Debtors and their creditors. To prevent the bankruptcy process from being used improperly to put the self-interest of the principal ahead of the Debtors' creditors, the Receiver should be permitted to continue with his administration of the Debtors' assets in Michigan state court. Accordingly, these Cases should be dismissed under §1112(b).

## JURISDICTION AND VENUE

1. This Court has jurisdiction over this matter under 28 U.S.C. §§157 and 1334. Venue is proper under 28 U.S.C. §1409. This Motion is a core proceeding under 28 U.S.C. §157(b)(2)(A) and (O).

2. The statutory predicate for the relief requested is 11 U.S.C. § 1112(b), and the procedural predicates are Federal Rules of Bankruptcy Procedure 1017(f), 2002(a)(4), and 9014 and Local Rule 9013-1. Independent Bank is a creditor holding claims in the aggregate

approximate amount of $30,000,000 and is therefore a "party in interest" entitled to request dismissal under 11 U.S.C. §§ 1109(b) and 1112(b)(1).

## FACTUAL AND PROCEDURAL BACKGROUND

### A. Events Leading to the Chapter 11 Filings.

3. After Debtors defaulted on their obligations to Independent Bank, the parties entered into a Forbearance Agreement on August 25, 2025 ("**Forbearance Agreement**"), under which Independent Bank agreed to forbear from collection against Debtors provided that Debtors did not further default. During that time, Debtors defaulted on their obligations to Independent Bank by failing to timely pay property taxes on Independent Bank's collateral. Independent Bank also discovered that the Debtors were unable to pay their debts to credit card holders and contractors, and that Debtors were in immediate jeopardy of failing to fund payroll.

4. Following Debtors' default under the Forbearance Agreement, on September 23, 2025, Independent Bank filed suit against Debtors for breach of the promissory notes and seeking appointment of a receiver over Debtors' assets.

5. On January 9, 2026, Michigan State Circuit Court Judge Curt Benson ordered the appointment of a receiver over Debtors' assets. On January 30, 2026, a stipulated Order Appointing Receiver was entered by Judge Benson that appointed John Polderman ("**Receiver**") as the court-appointed receiver over the Debtors' assets.

6. Following his appointment, the Receiver quickly realized that income, expenses, and operations were being commingled/shared between and among receivership and non-receivership entities. Additionally, the Receiver recognized that critical agreements were in place with governmental entities that required compliance and cooperation of both

receivership and non-receivership entities. On February 23, 2026, the Receiver filed a motion in State Court to expand the receivership over certain non-receivership entities to stabilize control of the Adelaide Pointe development. Independent Bank and 4Front Credit Union supported the Receiver's Motion. The Receiver's motion was set for hearing on April 2, 2026.

**B. The Chapter 11 Filings**.

7. On April 1, 2026, voluntary petitions for each of the Debtors were filed, all of which were subject to the State Court Receivership.

8. Debtors' principal who authorized the filings is Ryan M. Leestma.

9. Following the bankruptcy filings, the Debtors sought the turnover of their assets while Independent Bank and the Receiver sought to have turnover excused; and significant litigation on those matters ensued.

**C. Independent Bank's Claims.**

10. Debtors' primary secured creditor identified on their schedules is Independent Bank.

11. Independent Bank timely filed a proof of claim against Building 1 on June 9, 2026, relating to Loan 6155 (the "**Condo Loan**") made to Building 1 asserting a secured proof of claim against Building 1 in the amount of $15,512,905.79, exclusive of attorney's fees and costs, expenses, and any other charges the Bank is entitled to recover (the "**Building 1 Claim**"). The Building 1 Claim was supported by exhibits that summarized the Bank's claim amount and collateral and copies of the loan documents supporting the Building 1 Claim.

12. Independent Bank timely filed proofs of claim against Boaters Services on June 9, 2026, relating to Loan 1914 and Loan 2021 (the "**Boaters Services Parcel Loans**") made to Boaters Services asserting a secured proof of claim against Boaters Services in the amount

of $549,701.77 and $530,369.98, respectively, exclusive of attorney's fees and costs, expenses, and any other charges the Bank is entitled to recover (the "**Boaters Services Claim**").[1] The Boaters Services Claim was supported by exhibits that summarized the Bank's claim amount and collateral and copies of the loan documents supporting the Boaters Services Claim.

13. Independent Bank timely filed a proof of claim against QOZB relating to Loan 2049 (the "**Two Buildings and Vacant Land Loan**") made to QOZB asserting a secured proof of claim against QOZB in the amount of $4,176,522.46, exclusive of attorney's fees and costs, expenses, and any other charges Independent Bank is entitled to recover (the "**Two Buildings and Vacant Land Claim**"). The Two Buildings and Vacant Land Claim was supported by exhibits that summarized Independent Bank's claim amount and collateral and copies of the loan documents supporting the Two Buildings and Vacant Land Claim.

14. Independent Bank timely filed a proof of claim against QOZB relating to Loan 2230 (the "**Two Buildings Loan Loan**") made to QOZB asserting a secured proof of claim against QOZB in the amount of $4,339,546.43[2], exclusive of attorney's fees and costs, expenses, and any other charges Independent Bank is entitled to recover (the "**Two Buildings Claim**"). The Two Buildings Claim was supported by exhibits that summarized Independent Bank's claim amount and collateral and copies of the loan documents supporting the Two Buildings Claim.

15. Independent Bank timely filed a proof of claim against QOZB relating to Loan 2530 (the "**$1.5 Million Loan**") made to QOZB asserting a secured proof of claim against

[1] The Boaters Services Parcel Loan was jointly made with QOZB and a separate proof of claim for the Boaters Services Parcel Loan was made against QOZB.
[2] Due to a calculation error, the filed proof of claim for the Two Buildings Loan stated that the Claim amount was $4,347,223.80. The correct amount is stated in this Motion.

QOZB in the amount of $529,799.56, exclusive of attorney's fees and costs, expenses, and any other charges Independent Bank is entitled to recover (the "**$1.5 Million Claim**"). The $1.5 Million Claim was supported by exhibits that summarized Independent Bank's claim amount and collateral and copies of the loan documents supporting the $1.5 Million Claim.

16. Independent Bank timely filed a proof of claim against QOZB relating to Loan 9689 (the "**Letter of Credit Loan**") made to QOZB asserting a secured proof of claim against QOZB in the amount of $133,000.00, exclusive of attorney's fees and costs, expenses, and any other charges Independent Bank is entitled to recover (the "**Letter of Credit Claim**"). The Letter of Credit Claim was supported by exhibits that summarized Independent Bank's claim amount and collateral and copies of the loan documents supporting the Letter of Credit Claim.

17. Independent Bank timely filed a proof of claim against LMF relating to Loan 1718 (the "**$700,000 Loan**") made to LMF asserting a secured proof of claim against LMF in the amount of $621,237.85, exclusive of attorney's fees and costs, expenses, and any other charges Independent Bank is entitled to recover (the "**$700,000 Claim**"). The $700,000 Claim was supported by exhibits that summarized Independent Bank's claim amount and collateral and copies of the loan documents supporting the $700,000 Claim.[3]

18. Independent Bank timely filed a proof of claim against LMF relating to Loan 1228 (the "**$3,350,000 Loan**") made to LMF asserting a secured proof of claim against LMF in the amount of $3,664,534.57, exclusive of attorney's fees and costs, expenses, and any other charges Independent Bank is entitled to recover (the "**$3,350,000 Claim**"). The $3,350,000

[3] The $700,000 Loan was jointly made with Battle Creek and a separate proof of claim for the $700,000 Loan was made against Battle Creek.

Claim was supported by exhibits that summarized Independent Bank's claim amount and collateral and copies of the loan documents supporting the $3,350,000 Claim.[4]

19. Each of the proofs of claim filed by Independent Bank in these cases also affirms that the real properties securing the loans and the default by the specific borrower are more particularly described in the Verified First Amended Complaint in *Independent Bank v. Adelaide Pointe Boaters Services, LLC, et al* filed in the Circuit Court for Kent County, Michigan, Case No.25-020760-CBB.

20. Independent Bank, and (i) Building 1, Boaters Services, QOZB, LMF and Battle Creek and (ii) Ryan Leestma, and Ryan M. Leestma Domestic Asset Protection Trust dated November 30, 2018, Edwin J. Vanderploeg, Jr., as Trustee of the Ryan M. Leestma Domestic Asset Protection Trust u/a/d November 30, 2018 (collectively, the "**Guarantors**"), executed agreements regarding cross collateralization and cross default including agreements that all of the security documents and combined mortgaged properties of the Debtors shall secure each and every one of the combined obligations of the Debtors to Independent Bank.

21. Specifically, on April 4, 2025, Independent Bank, the Debtors and Guarantors executed an Agreement Regarding Cross Collateralization and Cross Default in favor of Independent Bank and on May 15, 2025, Independent Bank, the Debtors and Guarantors executed an Amended and Restated Agreement Regarding Cross Collateralization and Cross Default (the "**Cross-Collateral Agreement**").

22. The Cross-Collateral Agreement clearly details that all obligations of the Debtors are secured by all collateral granted by each of the Debtors. The Cross-Collateral

[4] The $3,350,000 Loan was jointly made with Battle Creek and a separate proof of claim for the $3,350,0000 Loan was made against Battle Creek.

Agreement states, "The Borrowers hereby agree that all of the Security Documents and the Combined Mortgaged Property shall secure each and every one of the Combined Obligations."

23. In the Forbearance Agreement, each of the Debtors affirmed that they had executed the Cross-Collateral Agreement pursuant to which they acknowledged that all loans to all the Borrowers were cross-collateralized and cross-defaulted.

24. In the Forbearance Agreement each of the Debtors represented and warranted that it is aware of, and possesses, no claims or causes of action against Independent Bank and they jointly and severally released Independent Bank from any liability, claim, right or cause of action arising from or in any way related to facts in existence as of August 22, 2025.

25. As of the Petition Date, the Debtors collectively owed Independent Bank $30,057,617.41 consisting of principal in the amount of $27,854,453.66, interest in the amount of $2,048,331.96, and other charges payable to Independent Bank of $154,831.79, exclusive of attorney's fees and costs, expenses, and any other charges Independent Bank is entitled to recover. This secured debt accrues interest at roughly $300,000 per month, and the attorney's fees, costs, and expenses are substantial because of the Debtors' non-stop efforts to litigate all matters.

**D. Judicial Settlement Conference and Appointment of a CRO.**

26. On June 10-11, 2026, the Debtors, Independent Bank, Choice One Bank, 4Front Credit Union, the City of Muskegon, Michigan ("**City**"), and the Michigan Department of Environment, Great Lakes, and Energy ("**EGLE**"), among others, met for a two-day judicial settlement conference with the Honorable Chief Bankruptcy Judge Jacob Brown (the "**Judicial Settlement Conference**").

27. The goal of the Judicial Settlement Conference was to reach an interim agreement to permit the Debtors to work to resolve significant ongoing issues that included a lack of financing, compliance with Debtors' agreement with the City, compliance with Debtors' Consent Agreement with EGLE, and remediation of the condominium building associated with Debtors' marina project.

28. The Judicial Settlement Conference resulted in the parties executing an Interim Settlement Agreement ("**ISA**") that resulted in the entry of an *Approval Order Granting Debtors' Motion to Approve Mediated Interim Settlement Agreement Term Sheet* ("**Approval Order**") (Doc. 231) on July 20, 2026.

29. The ISA and Approval Order provided for the appointment of the Receiver as the Chief Restructuring Officer ("**CRO**") of the Debtors during the Interim Period. The CRO manages and operates the Debtors.

30. The ISA provided that the Debtors would work to resolve the significant issues referenced above regarding financing, the City, EGLE, and the condo building.

31. On October 13, 2026, the CRO filed a *Notice of Filing CRO's Interim Report* attaching a copy of the *Interim Report of the Chief Restructuring Officer* (Doc. 322) (the "**CRO Report**"). The CRO Report states, among other things, that the CRO has concluded for purposes of the CRO Report that a feasible chapter 11 plan cannot be proposed. The CRO describes that the Administrative Consent Agreement ACO-05963, between EGLE, Ryan Leestma and QOZB made on April 24, 2025 (the "**Agreement**") is causing unresolved regulatory requirements to remedy permit violations which exist at the Adelaide Pointe project.

32. The CRO Report follows a *Final Judicial Settlement Conference Report* filed on September 9, 2026, by the Honorable Jacob A. Brown, the judicial settlement officer appointed by the Court in these cases (Doc. 279) (the "**Judge Brown Report**.") The Judge Brown Report stated, "Unfortunately, at this time, it appears that further efforts in the context of this judicial settlement will not yield benefits towards a consensual plan of reorganization, and the undersigned is declaring an impasse as of the date hereof and terminating the ongoing judicial settlement process." *See* Judge Brown Report, ¶3.

33. Indeed, in the more than three (3) months since the ISA was reached the Debtors have failed to make demonstrable progress with the City and have made no progress with EGLE. Debtors have also failed to present any financing proposal to Independent Bank that does not result in a deterioration of Independent Bank's collateral position.

34. The Debtors' failure to resolve these issues, which are critical to the operation and survival of the Adelaide Pointe development, effectively makes any effort to reorganize the Debtors an impossibility.

**E. The Debtors' Post-Petition Financial Performance.**

35. Debtors' dire financial situation is evidenced by the *Debtors' Amended Motion for Entry of A Final Order (I) Authorizing Certain Debtors to Obtain Post-Petition Financing Pursuant to 11 U.S.C, §§* 105(a*), 364(c)(1), 364(c)(2), and 364(d); (II) Granting Senior Priming Liens and* Super-*Priority Administrative Expense Status to the DIP Lender; (III) Approving the DIP Commitment* **(the "Borrowing Motion")** (DOC. 327) filed on October 21, 2026.[5] In the Borrowing Motion, Debtors set forth more than $1.6 million in professional fees that needed to be paid, including legal fees, fees for tax and accounting services, UST fees, CRO fees, and fees vendors to

[5] The Borrowing Motion was filed without the approval of the CRO and therefore was not approved.

provide environmental and engineering services, among others. Debtors also revealed unpaid past due taxes to the City of Muskegon of more than $250,000 (though the CRO has estimated unpaid past due taxes exceed $500,000).

36. Indeed, at a hearing before this Court on November 18, 2026, Debtors' counsel withdrew from representation of the Debtors citing irreconcilable differences. Debtors' representative, Mr. Leestma, explained that the withdrawal of Debtors' counsel was prompted by Debtors' inability to pay legal fees. Mr. Leestma stated that there was simply no funding available.

37. In addition to their operating losses, the Debtors have failed to pay post-petition taxes on the Condo Building, fallen behind on post-petition debt service by over $2,000,000, accrued undetermined professional fees, and failed to maintain reserves necessary to fund insurance renewals requiring Independent Bank to expect a protective advance of another approximately $200,000 in December 2026.

38. Despite making no debt service or adequate protection payments to Independent Bank post-petition, Debtors have been unable to fund basic operations or capital expenditures. As a result, Independent Bank has funded approximately $200,000 in protective advances to pay items like Debtors' payroll, utilities, and roof repairs. Independent Bank has also advanced another $360,000 to pay the Debtors' post-petition administrative expenses such as the CRO and his counsel.

39. The financial performance of the Adelaide Pointe Debtors (Building 1, Boaters Services, and QOZB) are bad when aggregated, but even worse when evaluated as individual entities/business units. Building 1 has no revenues, only expenses. Despite Debtors' earlier proposals of funding a Plan by selling Building 1 condo units, exactly 1 unit has sold in the

past 15 months (0 since the petition date). Since the petition date, Building 1 has had $0 of revenues. The Building 1 Note with more than $14 million of principal indebtedness that accrues interest at approximately $150,000 per month.[6] Building 1 cannot pay its taxes or its property insurance. Independent Bank will, for the second year in a row, be forced to fund insurance premiums for Building 1 in mid-December 2026.

40. Boaters Services has minimal revenues and substantial expenses as its purpose is solely as an amenity of convenience for boaters, not a revenue generator. Most of revenues generated are from fuel sales and those sales have obvious costs, including the purchase of the fuel, insurance, staffing, and utilities. The Boaters Services notes, with nearly $1 million of principal indebtedness, have debt service payments of approximately $16,000 per month. The net operating cash flow of Boaters Services is simply not sufficient to pay operating expenses and debt service.

41. QOZB is the owner of warehouses, a small office building, and vacant land. The primary revenue generator for QOZB is the storage of boats, vehicles, and other items. Despite Debtors' projections of more than $800,000 of revenues for storage in 2026, the actual revenues from storage appear to be approximately $640,000. The QOZB notes, with nearly $8.5 million of principal indebtedness, require debt service payments of approximately $80,000 per month. Despite significant revenues from storage and office space, the revenues of QOZB are insufficient to pay debt service alone. That doesn't even account for significant maintenance costs, payroll, utilities, insurance, and taxes.[7]

---

[6] The Building 1 Note matured in July 2025 (9 months before the Debtors filed for bankruptcy) and all unpaid principal and interest was due upon maturity.

[7] The QOZB warehouse roofs need substantial repairs at significant cost. The CRO has attempted to maintain the roofs with the limited funds available, but further deferred maintenance will only increase the eventual repair costs that Debtors cannot fund.

42. LMC owns an office building in Grand Rapids, Michigan (the "**Hall Street Building**"), that is unaffiliated with the Adelaide Pointe project. While the Hall Street Building generates significant revenues, its revenues service debt of over $12 million to Lake Michigan Credit Union and Independent Bank which requires monthly debt service payments of over $100,000 per month. With significant administrative costs, utilities, maintenance and taxes, the Hall Street Building is roughly a break-even proposition despite high occupancy rates. Additionally, the Hall Street Property is a stand-alone commercial property with no operational affiliation with the Adelaide Pointe Debtors.

43. Battle Creek owns a leasehold interest in an office building in Battle Creek, Michigan (the "**Commerce Building**"). Since the petition date, the Commerce Building has generated $163,914.27 in revenues with $198,031.83 in expenses for a net income loss of $30,289.89. In addition, the Commerce Building has more than $80,000 in unpaid property taxes ($33,002.94 post-petition) and significant deferred maintenance involving a boiler system. Like the Hall Street Building, the Commerce Building has no operational affiliation with the Adelaide Pointe Debtors.

**F. The Debtors' Lack of a Viable Path to Reorganization.**

44. The Debtors have not identified a feasible means of reorganizing. As of the date of this Motion, the Debtors have not filed a plan or disclosure statement. As agreed in the ISA and confirmed by an *Order Granting Motion to Extend Exclusivity Period For Filing a Chapter 11 Plan and Disclosure Statement* (Doc. 288) the Debtors' exclusive period to file a plan under 11 U.S.C. § 1121(b) was extended until December 31, 2026.

45. The Debtors have not obtained, or even identified, any source of financing or capital contribution to fund a plan that is not predicated on the granting of senior priming

liens and super-priority administrative expense status. The Debtors' principal has declined or is unable to contribute new capital. The Debtors' secured creditors have not consented to any restructuring of their debt. As described by the CRO Report there is an absence of a feasible plan.

46. Although the failure to timely pay taxes owed after the date of the order for relief or to file tax returns due after the date of the order for relief constitutes express cause for conversion or dismissal of Chapter 11 case under Section 1112(b)(4)(l) of the Bankruptcy Code, the Debtors have not yet filed their 2025 tax returns.

## LEGAL STANDARD

47. Section 1112(b)(1) of the Bankruptcy Code provides that, "on request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause" unless the court determines that the appointment of a trustee or examiner under § 1104(a) is in the best interests of creditors and the estate. 11 U.S.C. § 1112(b)(1). *See also* Local Rule 9013-1(a) (permitting a motion to dismiss or convert as alternative forms of relief under the same Code provision).

48. Section 1112(b)(4) provides a non-exhaustive list of circumstances constituting "cause."[8] Indeed, a "bankruptcy court has broad discretion to dismiss a Chapter 11 case under 11 U.S.C. § 1112(b)."[9]

49. "Cause" is not limited to the enumerated examples, but expressly includes "substantial or continuing loss to or diminution of the estate and the absence of a reasonable

---

[8] *In re Creekside Sr. Apartments, L.P.*, 489 B.R. 51, 60 (B.A.P. 6th Cir. 2013).
[9] *AMC Mortg. Co. v. Tennessee Dep't of Rev. (In re AMC Mortg. Co.)*, 213 F.3d 917, 920 (6th Cir. 2000).

likelihood of rehabilitation." 11 U.S.C. § 1112(b)(4)(A). Once cause is shown, dismissal or conversion is mandatory unless the court identifies "unusual circumstances" establishing that dismissal or conversion is not in the best interests of creditors and the estate, *and* the debtor or another party in interest establishes both (A) a reasonable likelihood that a plan will be confirmed within the time frames in §§ 1121(e) and 1129(e) (or within a reasonable period of time if those sections do not apply), and (B) that the grounds for relief include an act or omission, other than under § 1112(b)(4)(A), that has a reasonable justification and will be cured within a reasonable time. 11 U.S.C. § 1112(b)(2).

50. Cause under § 1112(b)(4)(A) has two elements: (i) a substantial or continuing loss to or diminution of the estate, and (ii) the absence of a reasonable likelihood of rehabilitation. Courts examine the first element by looking at whether the estate's value is declining, typically through negative cash flow, accruing unpaid expenses, or a decrease in the value of estate assets after the petition date. "Rehabilitation" is not the same as the mere possibility of a plan; it means to "put back in good condition; re-establish on a firm, sound basis." *Loop Corp. v. U.S. Trustee*, 379 F.3d 511, 515–16 (8th Cir. 2004). The inquiry is whether the debtor has a reasonable prospect of returning to a viable, going-concern footing within a reasonable time, not whether it can show a bare possibility of a successful reorganization.

51. Under the first part of this test, courts have found cause to dismiss when the debtor has suffered or continues to experience negative cash flow and an inability to pay current expenses as they come due.[10] Such loss need not be continuing, but merely substantial based on the specific financial circumstances of the debtor.[11]

---

[10] *In re 412 Boardwalk, Inc.*, 520 B.R. 126, 135 (Bankr. M.D. Fla. 2014).
[11] *Creekside Sr. Apartments, L.P.*, 489 B.R. at 61 ("The loss may be substantial or continuing. It need not be both in order to constitute cause under 11 U.S.C. 1112(b)(4)(A).").

52. As to the second part of this test, "[c]ourts have held that rehabilitation is synonymous with reorganization and the determination is not whether a debtor can confirm a plan, but whether the debtor has sufficient business prospects."[12] Upon a showing that both parts of this test are satisfied, dismissal is warranted under section 1112(b)(4)(A).

## ARGUMENT

### A. The Estates Have Suffered, and Continue to Suffer, Substantial Loss and Diminution.

53. The Debtors' own monthly operating reports establish a substantial and continuing loss. The losses are not isolated or seasonal. In fact, the 3 Debtors whose operations are tied to Adelaide Pointe, Building 1, QOZB and Boaters Services, have just completed their season. They have continued in each reporting period / increased over time, and the Debtors have offered no credible projection that they will stop.

54. The losses are compounded by accruing administrative expenses, including approximately $250,000 in unpaid professional fees; unpaid post-petition taxes of at least $250,000; unpaid U.S. Trustee quarterly fees under 28 U.S.C. § 1930(a)(6); and a decline in the value of estate property as maintenance and repairs are unable to be adequately funded. Because these obligations are entitled to priority under 11 U.S.C. §§ 503(b) and 507(a)(2), every additional month of delay shrinks the pool available to general unsecured creditors and increases the risk that the estate will be administratively insolvent. This is the kind of "substantial or continuing loss to or diminution of the estate" that § 1112(b)(4)(A) addresses.

[12] *In re Andover Covered Bridge, LLC*, 553 B.R. 162, 174-75 (B.A.P. 1st Cir. 2016); *In re Basil Street Partners, LLC*, 477 B.R. 856, 864 (Bankr. M.D. Fla. 2012).

## B. There Is No Reasonable Likelihood of Rehabilitation.

55. The second element is met because the Debtors cannot show a reasonable likelihood that they will be restored to a firm financial footing. Four features of these cases make that clear.

56. *First*, the Debtors' business does not generate positive cash flow. A debtor that cannot cover its post-petition operating costs, even while the automatic stay suspends collection of its pre-petition debts and in the absence of adequate protection or debt service payments to Debtors' largest creditor, has no basis to assume it can service those debts under a plan.

57. *Second*, the Debtors have no identified source of capital. The Debtors have not obtained exit financing, debtor-in-possession financing, or a commitment of new value from any party that is not predicated on the granting of senior priming liens and super-priority administrative expense status that would materially erode Independent Bank's collateral position. A reorganization that depends on funding that does not exist is speculation, not rehabilitation.

58. *Third*, the Debtors cannot satisfy the confirmation requirements of 11 U.S.C. § 1129. Because the Debtors' secured creditor will not accept the plan, the Debtors would have to satisfy the cramdown standards of § 1129(b)(2)(A), and they have not shown how. The Debtors have not shown that a plan is feasible under § 1129(a)(11) or that they can pay administrative claims in full on the effective date under § 1129(a)(9). Indeed, the Debtors counsel have withdrawn due to Debtors' inability to pay legal fees.

59. *Fourth*, time is not on the Debtors' side. These cases have been pending for 8 months. Delay without progress toward confirmation is itself evidence that rehabilitation is not reasonably likely.

60. Taken together, these facts show that the Debtors' losses are continuing and that they have no reasonable prospect of reversing them. Independent Bank has therefore established cause under § 1112(b)(4)(A).

### C. No "Unusual Circumstances" Under § 1112(b)(2) Preclude Dismissal.

61. Section 1112(b)(2) does not save the cases. First, subparagraph (B) of the exception requires the grounds for relief to include an act or omission of the debtor "other than under paragraph (4)(A)" that has a reasonable justification and will be cured within a reasonable time. 11 U.S.C. § 1112(b)(2)(B). Where, as here, cause rests on the absence of a reasonable likelihood of rehabilitation, there is no such act or omission to excuse or cure.

62. Second, even apart from that limitation, the Debtors cannot carry their burden under subparagraph (A) to show a reasonable likelihood that a plan will be confirmed within the time frames of §§ 1121(e) and 1129(e) or within a reasonable time, for the reasons stated above.

63. Third, nothing in the record establishes "unusual circumstances" showing that dismissal is not in the best interests of creditors and the estate.

### D. Dismissal Is in the Best Interests of Creditors and the Estate.

64. Where cause exists, the Court must choose between dismissal and conversion based on the best interests of creditors and the estate. 11 U.S.C. § 1112(b)(1). Dismissal is appropriate here because all of the Debtors' assets are encumbered by liens, so a Chapter 7 trustee would have nothing to administer for the benefit of unsecured creditors because the

Debtors have no unencumbered assets and no avoidance actions of material value and creditors can enforce their state-law rights more efficiently and at lower cost outside of bankruptcy than through a trustee's liquidation. Dismissal would also end the accrual of administrative expenses and allow creditors to pursue their non-bankruptcy remedies.

65. The interests of Debtors and their creditors are best served by permitting the Receiver to continue his administration of the Receivership Assets in Michigan state court. These Cases serve only as an expensive interruption to the Receiver's sale process, with no identifiable benefit to any party.

## RESERVATION OF RIGHTS

66. Independent Bank reserves the right to supplement this Motion, to rely on additional grounds for cause under § 1112(b)(4) or otherwise, to introduce evidence and call witnesses at the hearing, and to seek any other relief available under the Bankruptcy Code, including relief from the automatic stay under 11 U.S.C. § 362(d) and the appointment of a trustee under 11 U.S.C. § 1104(a). Any such request would be made by separate motion, consistent with Local Rule 9013-1(a).

## CONCLUSION

WHEREFORE, Independent Bank respectfully requests that the Court (i) schedule this Motion for hearing and, after notice and a hearing, enter an order finding that cause exists under 11 U.S.C. § 1112(b)(4)(A); (ii) dismiss the Debtors' Chapter 11 cases; (iii) retain jurisdiction to determine any pending applications for allowance of administrative expenses and professional compensation and to enforce the order of dismissal; and (iv) grant such other and further relief as the Court deems just and proper.

Respectfully submitted,

Dated: November 19, 2026

*/s/Jeffrey W. Warren*
BUSH ROSS P.A.
Jeffrey W. Warren
Florida Bar No.150024
1801 North Highland Avenue
Tampa, Florida 33602-2656
Phone: (813) 224-9255
Email: jwarren@bushross.com
Counsel for Independent Bank

*/s/Darren J. Burmania*
BODMAN PLC
Darren J. Burmania (P68240)
99 Monroe Ave NW, Suite 300
Grand Rapids, MI 49503
Phone: (616) 205-3313
Email: dburmania@bodmanlaw.com
Counsel for Independent Bank

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 19, 2026, I electronically filed a true and correct copy of the foregoing Motion To Dismiss Chapter 11 Cases with the Clerk of the United States Bankruptcy Court for the Middle District of Florida by using the CM/ECF system, and I furnished a copy of the foregoing document(s) to the following parties in the manner of service indicated below:

**Via the CM/ECF system which will send a Notice of Electronic Filing to:**

- **Charles W Azano** chip.azano@gtlaw.com
- **Marc Bakst** mbakst@bodmanlaw.com
- **Jessica Clemente** jessica.clemente@hwhlaw.com, phil.khezri@hwhlaw.com
- **Kathleen DiSanto** kdisanto@bushross.com, bnkecf@bushross.com;bankruptcy.eservice@bushross.com;kdisanto@ecf.courtdrive.com
- **Moe Freedman** freedmanm1@michigan.gov
- **Alberto F Gomez** al@jpfirm.com, al@jpfirm.com;andrenaw@jpfirm.com;katherineb@jpfirm.com

- **Angela N Grewal** angela.grewal@arlaw.com, jessica.bowers@arlaw.com;vicki.owens@arlaw.com;ari.martinez@arlaw.com; philip.navarro@arlaw.com
- **John B Hutton** huttonj@gtlaw.com, MIALitDock@gtlaw.com;miaecfbky@gtlaw.com;Melissa.DeLaTorre@gtlaw.com
- **David S Jennis** djennis@jennislaw.com, ecf@jennislaw.com;aschaefer@jennislaw.com
- **Sherri L Johnson** sjohnson@johnsonlegalfl.com, g24582@notify.cincompass.com
- **Stephen S. LaPlante** laplante@millercanfield.com
- **Rhys P Leonard** rleonard@trenam.com, mmosbach@trenam.com;rleonard@ecf.courtdrive.com;mmosbach@ecf.courtdrive.com;mwoods@trenam.com;mwoods@ecf.courtdrive.com;jpayne@trenam.com
- **David A Lerner** dlerner@plunkettcooney.com, nwinagar@plunkettcooney.com
- **Stephanie C Lieb** slieb@trenam.com, mmosbach@trenam.com;mwoods@trenam.com;slieb@ecf.courtdrive.com;mmosbach@ecf.courtdrive.com;mwoods@ecf.courtdrive.com;jpayne@trenam.com
- **Catrina Humphrey Markwalter** cmarkwalter@clarkhill.com, rahuja@clarkhill.com
- **Megen E. Miller** millerm59@michigan.gov
- **Sebastian Thor Pankiewicz** spankiewicz@jennislaw.com
- **John W Polderman** jpolderman@sbplclaw.com, jlassen@sbplclaw.com
- **Jon Polenberg** jpolenberg@beckerlawyers.com, ydaneshfar@beckerlawyers.com;tfritz@beckerlawyers.com;CourtMail@beckerlawyers.com;daperez@beckerlawyers.com
- **Dana Lee Robbins-Boehner** drobbins@burr.com, mguerra@burr.com;kkearney@burr.com
- **Marc N. Swanson** swansonm@millercanfield.com
- **James Timko** jtimko@deanmead.com, mgodek@deanmead.com
- **United States Trustee - TPA** USTPRegion21.TP.ECF@USDOJ.GOV
- **Jeffrey W. Warren** jwarren@bushross.com, bankruptcy.eservice@bushross.com;jwarren@ecf.courtdrive.com
- **Nathan A Wheatley** nathan.a.wheatley@usdoj.gov
- **Edmund S Whitson** ewhitson@beckerlawyers.com, tfritz@beckerlawyers.com;nportuondo@beckerlawyers.com;courtmail@beckerlawyers.com
- **Darrien Worth** worth@millercanfield.com

- **John R Yant** ryant@carltonfields.com, epritchett@carltonfields.com
- All parties who receive electronic service via the CM/ECF system

**Via U.S. Mail, Postage Prepaid to:**

Leestma Management, LLC, c/o Ryan M. Leestma, Member, 1900 Gulf Drive North, Unit 7, Bradenton Beach, FL 34217

Adelaide Pointe QOZB, LLC, Ryan M. Leestma, Manager, 1204 W. Western Avenue, Muskegon, MI 49441

Adelaide Pointe Boaters Services, LLC, Ryan M. Leestma, Manager, 400 Adelaide Circle, Muskegon, MI 49441

Adelaide Pointe Building 1, LLC, Ryan M. Leestma, Manager, 901 Adelaide Circle, Muskegon, MI 49441

Waterland Battle Creek, LLC, Ryan M. Leestma, Manager, 77 East Michigan Avenue, Battle Creek, MI 49017

Ally Bank c/o AIS Portfolio Services, LLC
4515 N Santa Fe Ave. Dept. APS
Oklahoma City, OK 73118

**Via Email and U.S. Mail, Postage Prepaid to:**

Ryan Leestma, 1599 Westwind Court, Muskegon, MI 49445
Ryan Leestma, 1900 Gulf Dr. N, Unit 7, Bradenton Beach, FL 34217
(RML@leestmamanagement.com)

Emily Leestma, 1599 Westwind Court, Muskegon, MI 49445
Emily Leestma, 1900 Gulf Dr. N, Unit 7, Bradenton Beach, FL 34217
(esl@leestmamanagement.com)

R. Christopher Cataldo, Esq. 27777 Franklin Road, Suite 2500, Southfield, MI 48034
(ccatlado@taftlaw.com)

*/s/ Jeffrey W. Warren*
Jeffrey W. Warren